UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **NORWEGIAN CRUISE LINE HOLDINGS LTD.**, a Bermuda Company; **NCL (BAHAMAS) LTD.**, d/b/a NORWEGIAN CRUISE LINE, a Bermuda Company; **SEVEN SEAS CRUISES S. DE R.L.**, d/b/a REGENT SEVEN SEAS CRUISES, a Panama Limited Liability Company; **OCEANIA CRUISES S. DE R.L.**, d/b/a OCEANIA CRUISES, a Panama Limited Liability Company; <br><br> Plaintiffs, <br><br> v. <br><br> **SCOTT A. RIVKEES, M.D.**, State Surgeon General and Head of the Florida Department of Health, in his official capacity; <br><br> Defendant. | Case No. <br><br> COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF <br><br> JURY TRIAL REQUESTED |

## INTRODUCTION

1. Plaintiffs Norwegian Cruise Line Holdings Ltd.; NCL (Bahamas) Ltd., d/b/a Norwegian Cruise Line; Seven Seas Cruises S. De R.L., d/b/a Regent Seven Seas Cruises; and Oceania Cruises S. De R.L., d/b/a Oceania Cruises (together, "NCLH") are filing this complaint and respectfully seeking appropriate declaratory and injunctive relief on behalf of themselves and their relevant operators and agents against the Defendant Surgeon General, the responsible state official. NCLH is doing so as a last resort after the State of Florida has indicated that it is otherwise preventing NCLH from safely and soundly resuming passenger cruise operations from Miami, Florida, starting August 15, 2021, in the way that this cruise line has determined will be best for all concerned—with the benefit of documentation confirming that all of its passengers and crew have been fully vaccinated against COVID-19.

2. Since March 2020, concerns about COVID-19 have led to a debilitating, total shutdown for the cruise industry generally and for NCLH specifically. That shutdown has inflicted incalculable, irrecoverable losses not only upon NCLH but upon all those whose interests ride with it—including NCLH's many crew and passengers as well as a surrounding ecosystem (contractors, vendors, manufacturers, wholesalers, hotels, restaurants, airlines, travel agents, *etc.*).

3. Now, after months of Herculean efforts, NCLH is at last set to resume sailing August 15, 2021, in a way that will be safe, sound, and consistent with governing law, particularly the Conditional Sailing Order administered by the Centers for Disease Control and Prevention ("CDC") of the U.S. Department of Health and Human Services. Yet one anomalous, misguided intrusion threatens to spoil NCLH's careful planning and force it to cancel or hobble upcoming cruises, thereby imperiling and impairing passengers' experiences and inflicting irreparable harm of vast dimensions.

4. While NCLH would require documentation confirming that its passengers have been vaccinated (per the consensus of experts, the desires of passengers, and NCLH's commitments to CDC), the State of Florida has recently enacted a law—Florida Statute § 381.00316—that expressly *prohibits* NCLH from requiring such documentation as a matter of Florida law. The upshot places NCLH in an impossible dilemma as it prepares to set sail from Florida: NCLH will find itself either on the wrong side of health and safety and the operative federal legal framework, or else on the wrong side of Florida law.

5. Because neither prospect is acceptable, NCLH must respectfully turn to this Court seeking essential relief. Only with the benefit of prompt judicial relief suspending Florida's prohibition can NCLH's passenger cruises proceed as currently planned starting August 15. For the reasons set forth in accompanying submissions, this Court has overwhelming justification to grant preliminary and permanent injunctions suspending Florida's prohibition as applied to NCLH.

6. As set forth herein, Florida's categorical prohibition against requiring documentation of vaccinations from customers, as applied to NCLH, violates federal law in multiple, independent respects: Florida's prohibition (1) conflicts with federal statutes and regulations and is therefore preempted under 42 U.S.C. § 264 and CDC's regulations thereunder; (2) blocks communications between a business and its customers, in violation of the First Amendment to the U.S. Constitution (as applicable to the State of Florida under the Fourteenth Amendment); (3) profoundly disrupts the proper flow of interstate and international commerce without advancing any substantial state interest, in violation of the Dormant Commerce Clause; and (4) inexplicably precludes this business from protecting the health and safety of its employees and customers against the extraordinary backdrop of a deadly pandemic, in violation of substantive due process as protected by the Fourteenth Amendment.

7. NCLH is duty-bound to protect the health and safety of its personnel and passengers, as NCLH can and will by requiring proof of vaccinations, yet NCLH cannot afford to expose itself to prosecution by Florida and crushing penalties of up to $5,000 per passenger, as it would by requiring vaccine documentation in the present posture.

8. Absent the requested relief, therefore, NCLH will not be able to sail as it has assured its passengers (who overwhelmingly support vaccination and documentation of same) it is otherwise poised to do. The result would be a devastating, unrecoverable loss for everyone—not only for NCLH's business but also for tens of thousands of passengers, employees, and stakeholders who all benefit from NCLH resuming safe operations as planned.

9. Whereas Florida should be glad to see NCLH resuming safe operations and generating valuable economic returns, no one will suffer from passengers simply confirming that they have been vaccinated, as agreed, while this case proceeds expeditiously to final judgment. The case for this Court to grant preliminary and then permanent injunctive relief to NCLH is therefore extremely compelling.

10. The fight that should occupy us at present is the fight against COVID-19—and we should all be working together to win that fight. NCLH's respectful submission here is that Florida cannot lawfully or sensibly tie NCLH's hands in this pivotal fight, at this sensitive time.

## THE PARTIES

11. Plaintiff Norwegian Cruise Line Holdings Ltd. is a global cruise company incorporated in Bermuda and has its principal executive office located at 7665 Corporate Center Drive, Miami, Florida 33126.

12. Plaintiff NCL (Bahamas) Ltd., d/b/a Norwegian Cruise Line is a cruise company and a wholly owned subsidiary of Norwegian Cruise Line Holdings Ltd. that is incorporated in Bermuda and has its principal executive office located at 7665 Corporate Center Drive, Miami, Florida 33126.

13. Plaintiff Oceania Cruises S. De R.L., d/b/a Oceania Cruises is a cruise company and a wholly owned subsidiary of Norwegian Cruise Line Holdings Ltd. that is incorporated in Panama and has its principal executive office located at 7665 Corporate Center Drive, Miami, Florida 33126.

14. Plaintiff Seven Seas Cruises S. De R.L., d/b/a Regent Seven Seas Cruises is a cruise company and a wholly owned subsidiary of Norwegian Cruise Line Holdings Ltd. that is incorporated in Panama and has its principal executive office located at 7665 Corporate Center Drive, Miami, Florida 33126.

15. Defendant Scott A. Rivkees, M.D., is the State Surgeon General. He is sued in his official capacity. As Surgeon General, Defendant is the head of the Florida Department of Health, *see* Fla. Stat. § 20.43(2)(a), which is responsible for enforcing the relevant provisions of Florida Statute § 381.00316, *see* Fla. Stat. § 381.00316(4).

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this suit under 28 U.S.C. §§ 1331 and 1343. This Court has authority to issue declaratory and other relief in accordance with 28 U.S.C. §§ 2201(a) and 2202.

17. Venue is proper under 28 U.S.C. § 1391(b)(2).

## FACTS

**A. The COVID-19 Pandemic And Its Impact On The Cruise Industry**

18. COVID-19, a communicable disease caused by a novel coronavirus, continues to pose serious risks for the cruise industry.

19. From the early days of the pandemic, close-contact environments and challenges with decontamination and social distancing led to significant and deadly outbreaks on cruise ships such as the Diamond Princess and Grand Princess in January and February of 2020, showcasing the speed and extent of transmission onboard.

20. In response to these and other outbreaks, members of the cruise industry's leading trade group, Cruise Lines International Association, voluntarily suspended passenger operations on March 13, 2020.

21. NCLH was among the cruise line companies that voluntarily suspended operations on March 13, 2020.

**B. CDC's Response To The Spread Of COVID-19 On Cruise Line Ships**

22. The next day, CDC issued a "No Sail Order and Suspension of Further Embarkation" ("No Sail Order"), the first of a series of CDC regulations restricting the cruise industry's operations.

23. The No Sail Order required all passenger disembarkation to be undertaken in coordination with relevant agencies, and it prevented any embarkation or operations except as specifically permitted through consultation with CDC. The No Sail Order was extended three times through October 31, 2020.

24. CDC then issued a "Framework for Conditional Sailing and Initial Phase COVID-19 Testing Requirements for Protection of Crew" ("Conditional Sailing Order") on October 30, 2020, as a framework for re-opening.

25. The Conditional Sailing Order, which incorporated by reference and superseded the No Sail Order and its three extensions, set out four phases for returning to cruise ship passenger operations in U.S. waters.

26. Phase one obligates a cruise ship operator to build a laboratory aboard each vessel for testing crew.

27. In phase two, a cruise ship operator must undertake for each cruise ship a simulated voyage designed to evaluate the cruise ship operator's on-board COVID-19 mitigation measures.

28. Before beginning a cruise ship's first simulated voyage, however, the cruise ship operator must obtain and CDC must approve a medical care agreement and a housing agreement with health care providers and the port authority in each port-of-call to ensure adequate logistics and care if COVID-19 appears aboard a ship in transit.

29. Phase three requires a Conditional Sailing Certificate from CDC before a cruise ship operator undertakes a restricted passenger voyage.

30. During this third phase, a cruise ship operator must apply for a Conditional Sailing Certificate at least 60 calendar days prior to the date on which the cruise ship operator proposes to commence restricted passenger operations.

31. Under the threat of a criminal penalty imposed by 18 U.S.C. § 1001, the application must include the cruise ship operator's attestation to, among other things, the operator's compliance with CDC's (mandatory) technical instructions and orders.

32. Following CDC review, even if CDC awards the operator a Conditional Sailing Certificate, CDC may limit the terms or conditions of a Conditional Sailing Certificate or revoke the Certificate altogether.

33. A cruise ship operator can appeal the denial of a Certificate or can attempt to modify the conditions of a Certificate by submitting the proposed modification to CDC.

34. Phase four permits operators with a Conditional Sailing Certificate to have restricted passenger voyages—but subject to several salient strictures, including a seven-day limitation on each voyage.

35. The Conditional Sailing Order describes other requirements beyond the four-phased approach. In particular, the Conditional Sailing Order explains that the phases will be further determined by both public health considerations and a cruise ship operator's success in employing the mitigation measures specified in the Conditional Sailing Order—including shoreside laboratory screening of crew, on-board testing capabilities for symptomatic travelers, sustained compliance with the No Sail Order's response plans, and the frequent monitoring and reporting of conditions onboard.

36. Finally, the Conditional Sailing Order indicated that CDC would issue additional orders and technical instructions clarifying its requirements.

### C. Evolution Of The Conditional Sailing Order

37. Although the Conditional Sailing Order presented a path forward, several uncertain and concerned cruise companies and public officials raised complaints because CDC issued virtually no implementing instructions for beginning the simulated voyages and no cruise company was authorized to begin a phase two simulated voyage.

38. CDC issued new guidance on April 2, 2021, but cruise executives, state officials, and others criticized the guidance as impractical, complaining that the guidance imposes requirements that are unduly burdensome and largely unworkable.

39. Concerned about losing another summer sailing season, some cruise companies even threatened to leave the United States if the cruise industry could not gain clarity and alignment as to what would be required to restart cruising from the United States.

40. Concerned that the April 2, 2021 (mandatory) guidance and CDC's delay would ensure that the cruise industry would not re-open in time for the summer season, the State of Florida sued six days later and moved for a preliminary injunction.

41. On April 28, 2021, CDC issued a "Dear Colleague Letter" expressing a commitment to the phased resumption of passenger operations around mid-summer and addressing scientific developments since CDC issued the Conditional Sailing Order, including the availability of COVID-19 vaccines.

42. In particular, the April 28 letter explained that, in an upcoming update, CDC would permit operators to avoid conducting a simulated voyage under Phase 2 by instead attesting that 98% of crew and 95% of passengers would be verified as fully vaccinated prior to sailing.

43. On May 14, 2021, CDC issued "Technical Instructions for Simulated Voyages by Cruise Ship Operators under CDC's Framework for Conditional Sailing Order" ("Technical Instructions"), which (among other things) provided the update regarding highly vaccinated voyages mentioned in the April 28 letter, altering the requirements slightly to 95% of crew and 95% of passengers.

44. On May 26, 2021, CDC issued the "COVID-19 Operations Manual for Simulated and Restricted Voyages under the Framework for Conditional Sailing Order" ("Operations Manual" or "Manual").

45. The Operations Manual, among other things, added discretionary considerations for operators of ships with vaccinated passengers. For example, embarking passengers with signs or symptoms of COVID-19 are to be denied boarding if not fully vaccinated without documentation of recovery but may board at the operator's discretion if fully vaccinated, among other things. Similarly,

embarking passengers who have a known close contact exposure in the past 14 days are to be denied boarding if not fully vaccinated without documentation of recovery but may board at the operator's discretion if fully vaccinated and asymptomatic. Nor are cruise ship operators required to collect SARS-CoV-2 viral testing for fully vaccinated passengers.

46. Additionally, the Manual permits cruise ship operators, at their discretion, to advise passengers and crew that—if they are fully vaccinated—they may gather or conduct activities outdoors, including engaging in extended meal service or beverage consumption, without wearing a mask; to designate areas as only accessible to fully vaccinated passengers and crew where masks and physical distancing are not required; and to advise passengers and crew that they do not have to wear a mask or maintain physical distance in any areas for ships with at least 95% of crew and 95% of passengers fully vaccinated.

47. The Manual also specifies that numerous requirements for physical distancing and food services become recommendations for ships with at least 95% of crew and 95% of passengers fully vaccinated.

### D. Florida's Lawsuit Against CDC

48. As noted above, Florida filed suit in the United States District Court for the Middle District of Florida on April 8, 2021, challenging CDC's restrictions on the cruise industry,

49. In its complaint, Florida alleged that the Conditional Sailing Order exceeds CDC's statutory and regulatory authority (Count I), that CDC acted arbitrarily and capriciously in issuing the Order (Count II), that CDC unreasonably delayed agency action (Count III), that CDC failed to conduct proper notice and comment rulemaking and improperly relied on the "good cause" exception to the notice requirement under 5 U.S.C. § 553(b)(B) in issuing the Order (Count IV), and that 42 U.S.C. § 264 effects an unconstitutional delegation of legislative authority (Count V).

50. On April 22, 2021, Florida moved for a preliminary injunction.

51. On June 18, 2021, the court granted Florida's motion for a preliminary injunction, ordering that CDC was preliminarily enjoined "from enforcing against a cruise ship arriving in, within, or departing from a port in Florida the conditional sailing order and the later measures (technical guidelines, manuals, and the like)."

52. Notably, the court additionally ordered that this preliminary injunction "is STAYED until 12:01 a.m. EDT on JULY 18, 2021, at which time the conditional sailing order and the measures promulgated under the conditional sailing order will persist as only a non-binding 'consideration,' 'recommendation' or 'guideline.'"

53. Additionally, the court provided that the "CDC may propose not later than JULY 2, 2021, a narrower injunction both permitting cruise ships to sail timely and remaining within CDC's authority as interpreted in [its] order." CDC did not propose a narrower injunction by that date.

54. On Tuesday, July 6, 2021, CDC responded by noticing an appeal to the Eleventh Circuit and seeking a stay in the district court of the preliminary injunction pending the appeal. *See* Notice of Appeal, Dkt. 95, *Florida v. Becerra*, No. 8:21-cv-839-SDM-AAS (M.D. Fla. July 6, 2021); Defendants' Time-Sensitive Motion for a Stay Pending Appeal, Dkt. 96, *Florida v. Becerra*, No. 8:21-cv-839-SDM-AAS (M.D. Fla. July 6, 2021).

55. The district court denied the stay motion on July 7, 2021. *See* Order, Dkt. 98, *Florida v. Becerra*, No. 8-21-cv-839-SDM-AAS (M.D. Fla. July 7, 2021).

56. That same day, CDC filed a motion in the Eleventh Circuit to stay the preliminary injunction pending appeal. *See* Defendants' Time-Sensitive Motion for a Stay Pending Appeal and Administrative Stay, *Florida v. Becerra*, No. 21-12243 (11th Cir. July 7, 2021).

57. CDC states in its stay request to the Eleventh Circuit that "Florida has actively impeded the cruise industry's ability to conduct safe operations by prohibiting cruise ship operators from requiring documentation that passengers are vaccinated—with violators subject to a fine of up to $5,000 per violation." *Id.* at 14.

### E.  Florida's Ban On Vaccination Certification

58. Shortly before Florida filed its suit against CDC, the Governor of Florida issued an Executive Order on April 2, 2021, prohibiting businesses in Florida from "requiring patrons or customers to provide any documentation certifying COVID-19 vaccination or post-transmission recovery to gain access to, entry upon, or service from the business." Fl. Exec. Order No. 21-81 (Apr. 2, 2021). Until that order expired, all Florida businesses that failed to comply were not "eligible for grants or contracts funded through state revenue." *Id.*

59. The Florida House and Senate then passed a bill on April 29, 2021, which the Governor signed into law on May 3, 2021, providing that "[a] business entity, as defined in s. 768.38 to include any business operating in this state, may not require patrons or customers to provide any documentation certifying COVID-19 vaccination or post-infection recovery to gain access to, entry upon, or service from the business operations in this state." An Act Relating to Emergency Management, SB 2006 § 18 (2021), *codified at* Fla. Stat. § 381.00316(1) ("Florida's Ban" or the "Ban"). This Ban took effect on July 1, 2021.

8

60. Violations of Florida's Ban can result in a "fine not to exceed $5,000 per violation." Fla. Stat. § 381.00316(4).

### F. NCLH And Its Response To The Pandemic

61. Florida's Ban poses significant burdens for NCLH, an internationally focused cruise line with a 28-ship fleet headquartered in Miami, Florida.

62. NCLH recently developed a new terminal for its operations at PortMiami in Miami, Florida, which is capable of accommodating substantial interstate and international traffic.

63. Within as little as thirty minutes of departing from PortMiami, NCLH's ships reach international waters and sail to interstate and foreign ports.

64. Many such ports require proof of vaccination to enter, proof of vaccination to enter without a mandatory quarantine, or proof of vaccination to enter without testing.

65. At the onset of the COVID-19 pandemic, NCLH executed several proactive and decisive measures to minimize the effects of COVID-19 on its business and keep its passengers and crew safe.

66. To begin, NCLH voluntarily shut down its operations shortly after the WHO declared COVID-19 as a pandemic.

67. Since then, NCLH has navigated complex regulatory, compliance, and public health challenges at considerable expense to set the stage for an eventual return to sailing.

68. NCLH partnered with Royal Caribbean Group to create the Healthy Sail Panel, a panel of world-renowned public health experts, to advise the cruise industry on safety and health protocols that reduce COVID-19-related risks.

69. In light of recommendations from the Healthy Sail Panel and other leading industry and public health advice, NCLH has concluded that the right way to ensure the health and safety of passengers and crew is to require full vaccination of all passengers and crew alike on cruises.

70. Surveys of likely NCLH cruise passengers indicate that the vast majority of likely passengers want to sail with others who have been completely vaccinated and can prove it.

71. Cultivating passenger confidence and trust in the health and safety of cruise voyages has become more vital than ever in the midst of the COVID-19 pandemic.

72. Moreover, requiring vaccination for passengers and crew is consistent with the vaccination protocols required by foreign ports where NCLH is scheduled to visit.

73. NCLH has scheduled several upcoming voyages to foreign ports that require proof of vaccination to enter without testing, including Belize, Bahamas, British Virgin Islands, and Honduras.

74. As such, NCLH has planned cruises requiring proof that 100% of passengers and crew have been vaccinated against COVID-19.

75. As part of its application for a Conditional Sailing Certificate for the Norwegian Gem, NCLH attested to CDC, under penalty of perjury, that its cruise ships will sail only upon confirmation that at least 95% of passengers have been fully vaccinated prior to sailing.

76. CDC approved NCLH's application for a Conditional Sailing Certificate for the Norwegian Gem on July 9, 2021.

77. All passengers of the Norwegian Gem have been informed of this vaccination plan when they purchased tickets, and NCLH's operations and preparations have been based on it.

78. The potential spread of the severe and highly contagious Delta variant is another factor driving NCLH's decision to require 100% vaccination on its voyages.

79. The additional requirements that unvaccinated passengers would have to satisfy in order to sail would mean that their cruising experience would be restricted, less safe, and ultimately below the standards set by NCLH. Moreover, trying to enforce such restrictions onboard any given NCLH ship would more broadly compromise the safety, flexibility, and enjoyment of all passengers, vaccinated and unvaccinated alike.

### G. The Effect of Florida's Ban On NCLH

80. Florida's Ban on vaccine verification poses imminent, substantial, irreparable harms to NCLH's business.

81. No other port or jurisdiction visited by NCLH imposes any such Ban on vaccine documentation. Only Florida is bidding to constrain NCLH in this critical respect, yet the resulting threat imperils all of NCLH's employees, passengers, and operations around the world.

82. NCLH cannot verify its passengers' COVID-19 vaccination status unless it can require passengers to show documentation certifying that they are fully vaccinated. There is no adequate substitute for documentary proof when it comes to confirming vaccination status and thereby maximizing onboard safety.

83. Risk of exposure to COVID-19 will invariably tick up if NCLH is denied the ability to verify through documentation that all passengers have been fully vaccinated.

84. The inability to verify vaccination status will hobble NCLH's ability to attract, assure and protect passengers.

85. Demand for NCLH cruises has been returning in recent months, but NCLH still faces challenges in maintaining confidence in safety among its customers, especially because those customers tend to be older in age.

86. A recent survey of more than 5,000 readers of Cruise Critic found that 80% of respondents preferred to sail on a ship with a vaccine requirement, and the industry is dealing with significant uncertainty as the summer sailing season proceeds.

87. Moreover, NCLH's crew will suffer an increased risk of exposure to COVID-19 if they cannot verify through documentation that passengers are fully vaccinated.

88. The health and safety of the local populations at NCLH's destinations around the world would be jeopardized if NCLH cannot sail with fully vaccinated ships.

89. These are critical constituencies, and NCLH depends heavily on its relationships with these local populations

90. Ultimately, the only way for NCLH to require vaccine documentation and thereby maximize everyone's safety, comfort, and confidence would be by eschewing operations in Florida.

91. As a result, NCLH's operations will be impaired and it will lose substantial revenue and goodwill if subjected to the Ban. To date, NCLH's halt in operations due to the pandemic has already cost the company in excess of $6 billion.

92. NCLH employs the approximately 100 people who work on a turn-around day at its PortMiami terminal.

93. If Florida's Ban forces NCLH to discontinue operations in Florida, NCLH will be unable to benefit from its investments in its Florida operations while the terminal's employees will be at risk of losing their employment.

94. Before the enactment of Fla. Stat. § 381.00316, NCLH had expected tens of thousands of passengers to participate in voyages embarking from Florida beginning August 15, 2021 through early 2022.

95. If the Florida Ban is enforced against NCLH, however, these voyages will be placed at risk of cancellation, disruption, and possible COVID-19 outbreak, resulting in a substantial loss of revenue, losses of wages for NCLH's crew, harm to NCLH's brand, goodwill, and reputation with past and potential passengers, as well as substantial, adverse impacts on interstate and foreign commerce. Worst of all, human life and safety would be placed at undue risk.

96. Additionally, enforcement of the Ban would preclude NCLH from completing its communications with passengers, as currently planned and consensually agreed, through the exchange of paperwork that stands to save lives.

### H. The Effect of Florida's Ban Throughout the State

97. Disruptions to the cruise industry cause serious harm with far-reaching ripple effects, particularly throughout Florida and its economy.

98. Cruise operations fuel large chunks of Florida's economy.

99. Without cruises, Florida has lost tens of millions of tax dollars and been forced to expend around $20 million in state unemployment benefits.

100. Focusing solely on NCLH, employees and businesses in Florida have lost approximately $2 billion in outlays from NCLH due to the halt of NCLH's operations in 2020.

101. Beyond harms to Florida as a whole, obstacles to safe cruise voyages harm cruise lines and their passengers.

102. About 60% of all cruise embarkations in the United States are from Florida.

103. In 2019 alone, around 13.6 million passengers and crew came ashore from cruises in Florida.

104. While cruises have been unable to sail, the cruise industry has been ravaged, with companies reporting billions of dollars in losses, causing some of them to downsize their fleets and sell ships for scrap.

105. Moreover, the harms from losing cruises flow well beyond the State and the cruise industry to hundreds of thousands of private individuals and businesses.

106. The cruise industry supports nearly 159,000 total jobs paying $8.1 billion in income within the State.

107. These jobs supported by the cruise industry run the gamut far beyond crew and across all those employed by other businesses that the cruise industry directly or indirectly supports: among these businesses whose vital interests hang in the balance are recreation and amusement establishments; wholesalers of products used in cruises such as fuel and soap; manufacturers of communications and navigation equipment; manufacturers of machinery necessary to cruise ships such as boilers and laundry machines; manufacturers of fabricated metal products such as locks and security equipment; business services such as interior design and computer-services consultants; business services that support ports such as ship pilotage and baggage handling; and the entire hospitality and transportation industries

(travel agencies, airlines, hotels, restaurants, buses, and taxis).  In short, large chunks of Florida's economy rise or fall with the cruise industry.

108.   The cruise industry has a ubiquitous footprint in the State and an enormous financial effect, reaching into most sectors of Florida's economy.

109.   The harms from suspending or diminishing cruises also extend to local governments and ports.

110.   Cruise passengers and crew spend money in Florida's local economies where many Florida businesses depend on them.

111.   Florida's ports have lost over $297 million in revenue due to the cruise industry shutdown up to February 2021 and project total losses of $398 million in revenue through July 2021.

112.   Any harm to the cruise industry constitutes harm to Florida and its citizenry.  And the same relationship holds between NCLH and Florida.

## CLAIMS FOR RELIEF

### Count I (Preemption)

### Florida Statute § 381.00316 As Applied To NCLH Is Preempted By Federal Law

113.   NCLH incorporates by reference the allegations of the preceding paragraphs.

114.   CDC's Conditional Sailing Order was promulgated pursuant to CDC's authority under 42 U.S.C. § 264.

115.   That statute provides that, "Nothing in this section or section 266 of this title, or the regulations promulgated under such sections, may be construed as superseding any provision under State law (including regulations and including provisions established by political subdivisions of States), except to the extent that such a provision conflicts with an exercise of Federal authority under this section or section 266 of this title."  42 U.S.C. § 264(e).

116.   CDC's Conditional Sailing Order authorizes the agency to issue additional orders and "technical instructions" under the Order and provides that the Order itself as well as "instructions" issued by "HHS/CDC personnel permitting ships to make port or disembark persons under stipulated conditions" are entitled to preemptive effect.  85 Fed. Reg. 70153-01, 70158 (Nov. 4, 2020).

117.   The Conditional Sailing Order and CDC's Technical Instructions provide that a cruise ship cannot resume operations in U.S. waters until (among other things) it either completes a simulated voyage or attests to CDC that 95% of crew and 95% of passengers will be verified as fully vaccinated prior to sailing.

118. CDC's Operations Manual also provides additional discretionary options for NCLH to deal with vaccinated passengers. For example, the Operations Manual provides that NCLH can, at its discretion, allow vaccinated passengers to board even if they have signs or symptoms of COVID-19 and that NCLH can, at its discretion, advise passengers and crew that they do not have to wear masks or maintain physical distance in any areas so long as at least 95% of crew and 95% of passengers are fully vaccinated.

119. Obtaining vaccine documentation is the only adequate and reliable way of verifying a person's vaccination status.

120. To comply with CDC's requirements, NCLH has attested to CDC, under penalty of perjury, that at least 95% of passengers and 95% of its crew on its upcoming cruises out of Miami "will be confirmed as fully vaccinated prior to sailing."

121. When NCLH submitted this attestation, NCLH planned—and it continues to plan—to "confirm[]" the vaccination status of its passengers and crew by obtaining vaccine documentation from them.

122. Florida's Ban, which is codified in Florida Statute § 381.00316, prohibits NCLH from requiring its customers to provide documentation certifying COVID-19 vaccination to gain access to, entry upon, or service from NCLH's cruise ships in Florida.

123. Florida's Ban, by prohibiting NCLH from obtaining vaccination documentation from its passengers, makes it impossible or inordinately difficult for NCLH to satisfy the option created by CDC of resuming sailing in U.S. waters if NCLH can verify that 95% of its crew and 95% of its passengers are fully vaccinated prior to sailing.

124. Florida's Ban, by prohibiting NCLH from obtaining vaccination documentation from its passengers, also makes it impossible or inordinately difficult for NCLH to utilize the options specifically reserved for vaccinated passengers, as set forth in CDC's Operations Manual.

125. Florida's Ban as applied to NCLH thus conflicts with, and is preempted by, CDC's Conditional Sailing Order, CDC's Technical Instructions, CDC's Operations Manual, and the federal purposes they serve.

126. For these and other reasons, Florida's Ban is preempted by federal law.

## Count II (First Amendment)

**Florida Statute § 381.00316 As Applied To NCLH Violates The First Amendment**

127. NCLH incorporates by reference the allegations of the preceding paragraphs.

128. The First Amendment of the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech[.]"  U.S. Const. amend. I.

129. The First Amendment applies to Florida under the Fourteenth Amendment to the U.S. Constitution.

130. Florida's Ban, which is codified in Florida Statute § 381.00316, prohibits NCLH from requiring its customers to provide documentation certifying COVID-19 vaccination to gain access to, entry upon, or service from NCLH's cruise ships in Florida.

131. By restricting the transmission of information, Florida's Ban infringes the freedom of speech protected by the First Amendment.

132. Moreover, Florida's Ban restricts the transmission of information based on its content, as it expressly prohibits transmission only of documentation "certifying COVID-19 vaccination or post-infection recovery."  Fla. Stat. § 381.00316(1).

133. Florida's Ban is also speaker-based and listener-based, as it prohibits only a "business entity" from requiring "patrons or customers" to provide vaccine documentation.  *Id.*  Florida's Ban does not restrict non-business entities from requiring vaccine documentation, nor does it restrict business entities from requiring vaccine documentation from employees or other individuals that are not patrons or customers.

134. Under the First Amendment, laws that restrict the transmission of health-related information based on the content of the information or the identity of the speaker are subject to strict scrutiny or some other form of heightened scrutiny.

135. Florida lacks a sufficiently important interest in banning NCLH from requiring passengers to provide vaccine documentation.  The risk of transmission of COVID-19 among the unvaccinated in the close quarters of cruise ships coupled with the effectiveness of COVID-19 vaccines in preventing the spread of COVID-19 and in reducing the deaths caused by COVID-19 makes transmission of information about COVID-19 vaccines a matter of life and death.  Precisely for that reason, CDC has embraced vaccination—and verification of vaccine status—as essential for cruise ships to operate safely.  NCLH has followed those recommendations and prepared to resume sailing by verifying—through documentation—that 100% of its crew and passengers are fully vaccinated.  Florida has no valid interest in banning NCLH from requiring that willing, desirous passengers provide it with potentially life-saving information about their vaccination status.

136. Moreover, as applied to NCLH, Florida's Ban neither substantially advances a sufficiently important governmental interest, nor is adequately tailored to any such interest.  To the

extent Florida has concerns about customers who cannot or will not obtain vaccinations or supply vaccination documentation, Florida has far less restrictive ways of addressing those concerns than banning vaccine documentation across the board. Among other things, Florida could require special exceptions for such customers upon an adequate showing, or it could adopt measures targeted at those industries in which adequate opportunities are found lacking.

137. For these and other reasons, Florida's Ban violates the First Amendment.

## Count III (Dormant Commerce Clause)

**Florida Statute § 381.00316 As Applied To NCLH Violates The Dormant Commerce Clause**

138. NCLH incorporates by reference the allegations of the preceding paragraphs.

139. Under the Commerce Clause of the U.S. Constitution, "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. 1, § 8, cl. 3.

140. "Although the clause speaks literally only to the powers of Congress, it is well settled" that the Commerce Clause "has a 'dormant' aspect as well, namely, one that serves as 'a substantive restriction on permissible state regulation of interstate commerce.'" *Bainbridge v. Turner*, 311 F.3d 1104, 1108 (11th Cir. 2002) (quoting *Dennis v. Higgins*, 498 U.S. 439, 447 (1991)).

141. Among other things, the Dormant Commerce Clause "works to keep states from 'ventur[ing] excessively into the regulation of . . . [interstate] commerce . . . [and] trespass[ing] upon national interests.'" *Id.* (alterations in original) (quoting *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 669 (1981)).

142. Florida's Ban, which is codified in Florida Statute § 381.00316, prohibits NCLH from requiring its customers to provide documentation certifying COVID-19 vaccination to gain access to, entry upon, or service from NCLH's cruise ships in Florida.

143. By prohibiting NCLH from verifying the vaccination status of cruise line passengers, Florida's Ban threatens to disrupt and even shut down the interstate and foreign cruise operations of NCLH.

144. Past and prospective cruise line passengers—many of whom are at high-risk of complications from COVID-19—have indicated concern over safety on voyages. One recent study found that 80% of passengers prefer to sail on a cruise ship with a vaccination requirement.

145. Additionally, NCLH's crew and employees face an increased risk of exposure to COVID-19 if they cannot verify that passengers are fully vaccinated.

146. Due to this increased risk, the normal, healthy flow of NCLH vessels between Florida and other States and Nations would be profoundly disrupted. Because Florida is a major hub for cruise voyages both nationally and internationally, its Ban would preclude NCLH from maintaining the protocols and operations that NCLH otherwise would for the sake of protecting the health and safety of its passengers and crew around the world, along with all the populations they come into contact with at various ports. Indeed, the only way NCLH could maintain its protocols and operations as currently planned is by abandoning Florida altogether.

147. In sum, Florida's Ban will have the practical effect of shutting down or impairing NCLH's cruise line operations into and out of Florida, which is a major interstate and international port, thereby excessively burdening the free flow of people and services between the States.

148. At the same time, the local benefits of Florida's Ban are negligible or nonexistent.

149. The risk of transmission of COVID-19 among the unvaccinated in the close quarters of cruise ships coupled with the effectiveness of COVID-19 vaccines in preventing the spread of COVID-19 and in reducing the deaths caused by COVID-19 makes transmission of information about COVID-19 vaccines a matter of life and death. Precisely for that reason, CDC has embraced vaccination—and verification of vaccine status—as essential for cruise ships to operate safely. NCLH has followed those recommendations and prepared to resume sailing by verifying—through documentation—that 100% of its crew and passengers are fully vaccinated. Florida derives no benefit by banning NCLH from requiring passengers to provide it with potentially life-saving information about their vaccination statuses.

150. To the extent Florida asserts an interest in ensuring that individuals who cannot or will not obtain vaccinations or supply vaccination documentation are not prevented from accessing businesses in the State, that interest is not furthered by the Ban as applied to NCLH. No one ostensibly gains from Florida's Ban, which operates to restrict and impair the cruise options and experiences available to all passengers.

151. For these and other reasons, Florida's Ban violates the Dormant Commerce Clause.

## COUNT IV (Due Process)

**Florida Statute § 381.00316 As Applied To NCLH Violates Due Process**

152. NCLH incorporates by reference the allegations of the preceding paragraphs.

153. The Fourteenth Amendment to the U.S. Constitution provides that no State may "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV.

154. The Fourteenth Amendment protects the rights of corporations no less than persons. *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1305 (11th Cir. 2006).

155. Florida's Ban, which is codified in Florida Statute § 381.00316, prohibits NCLH from requiring its customers to provide documentation certifying COVID-19 vaccination to gain access to, entry upon, or service from NCLH's cruise ships in Florida.

156. Florida's Ban violates the fundamental due process rights of NCLH, its crew, and its passengers to make well-informed medical decisions affecting oneself and to exercise autonomy over one's body. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

157. In the context of a deadly pandemic, Florida's Ban also prevents NCLH and its employees from supporting themselves via their chosen occupation, which likewise implicates a fundamental due process right. *See Cnty. of Butler v. Wolf*, 486 F. Supp. 3d 883, 920 (W.D. Pa. 2020).

158. As applied to NCLH, Florida's Ban cannot satisfy rational-basis review, let alone the strict scrutiny applicable to laws that infringe fundamental rights protected by the Due Process Clause.

159. Florida lacks a legitimate state interest, let alone a compelling state interest, in banning NCLH from requiring passengers to provide vaccine documentation. The risk of transmission of COVID-19 among the unvaccinated in the close quarters of cruise ships coupled with the effectiveness of COVID-19 vaccines in preventing the spread of COVID-19 and in reducing the deaths caused by COVID-19 makes transmission of information about COVID-19 vaccines a matter of life and death. Precisely for that reason, CDC has embraced vaccination—and verification of vaccine status—as essential for cruise ships to operate safely. NCLH has followed those recommendations and prepared to resume sailing by verifying—through documentation—that 100% of its crew and passengers are fully vaccinated. Florida has no valid interest in banning NCLH from requiring passengers to provide it with potentially life-saving information about their vaccination status.

160. Moreover, as applied to NCLH, Florida's Ban neither substantially advances a sufficiently important governmental interest nor is adequately tailored to such an interest. To the extent Florida has concerns about customers who cannot or will not obtain vaccinations or supply vaccination documentation, Florida has far less restrictive ways of addressing those concerns than banning vaccine documentation across the board. Among other things, Florida could require special exceptions for such customers upon an adequate showing, or it could adopt measures targeted at those industries in which adequate opportunities are found lacking.

161. For these and other reasons, Florida's Ban violates the Due Process Clause of the Fourteenth Amendment.

## DEMAND FOR JURY TRIAL

162. NCLH hereby respectfully requests trial by jury on any and all issues so triable.

## PRAYER FOR RELIEF

163. Wherefore, NCLH respectfully seeks the following relief:

    a. Preliminary and permanent injunctive relief preventing Defendant from enforcing Florida Statute § 381.00316 against NCLH, including any subsidiaries, operators or agents;

    b. A declaration that Florida Statute § 381.00316 is unlawful as applied to NCLH;

    c. An order awarding NCLH its costs and attorney's fees; and

    d. Any and all other such relief as the Court may deem appropriate.

DATED: July 13, 2021

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN LLP

By   */s/ John O'Sullivan*
John F. O'Sullivan (Fla. Bar No. 143154)
Olga M. Vieira (Fla. Bar No. 29783)
2601 South Bayshore Drive
15th Floor
Miami, FL 33133
olgavieira@quinnemanuel.com
johnosullivan@quinnemanuel.com
(305) 439-5008

Derek L. Shaffer*
Jonathan G. Cooper*
1300 I Street NW, 9th Floor
Washington, DC 20005
(202) 538-8000
derekshaffer@quinnemanuel.com
jonathancooper@quinnemanuel.com

*Applications for admission *pro hac vice* to be filed

*Attorneys for Plaintiffs Norwegian Cruise Line Holdings Ltd., NCL (Bahamas) Ltd., Seven Seas Cruises S. de R.L., and Oceania Cruises S. de R.L.*