# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **NORWEGIAN CRUISE LINE HOLDINGS LTD.,** a Bermuda Company; **NCL (BAHAMAS) LTD.,** d/b/a NORWEGIAN CRUISE LINE**,** a Bermuda Company; **SEVEN SEAS CRUISES S. DE R.L.,** d/b/a REGENT SEVEN SEAS CRUISES, a Panama Limited Liability Company; **OCEANIA CRUISES S. DE R.L.,** d/b/a OCEANIA CRUISES, a Panama Limited Liability Company; | |
| Plaintiffs, | Case No. 1:21-cv-22492-KMW |
| v. | |
| **SCOTT A. RIVKEES, M.D.,** State Surgeon General and Head of the Florida Department of Health, in his official capacity; | |
| Defendant. | |

## PLAINTIFFS' EXPEDITED MOTION FOR A PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

Table of Authorities................................................................................................................ iii

Introduction ...........................................................................................................................1

Background.............................................................................................................................2

Legal Standard .......................................................................................................................8

Argument................................................................................................................................8

I.      NCLH Is Likely To Prevail On The Merits .................................................................8

        A.      Florida's Ban Is Preempted By Federal Law. .........................................................9

              1.      Florida's Ban Conflicts With The Conditional Sailing Order's Technical Instructions..........................................................................................10

              2.      Florida's Ban Conflicts With The Conditional Sailing Order's Operations Manual. ...............................................................................12

        B.      Florida's Ban Violates The First Amendment. ....................................................12

              1.      As Applied To NCLH, Florida's Ban Is An Unconstitutional, Content-Based Restriction On Noncommercial Speech. ......................................12

              2.      Even If The Ban Were A Restriction On Commercial Speech, It Is Constitutionally Infirm As Applied To NCLH.........................................14

        C.      Florida's Ban Violates The Dormant Commerce Clause. ....................................15

II.     Absent An Injunction, NCLH Will Suffer Irreparable Harm............................................17

III.    The Balance Of Equities And Public Interest Weigh Heavily In Favor Of Enjoining Florida's Ban ..................................................................................................................19

Conclusion............................................................................................................................20

Request For Hearing .............................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*ABC Charters, Inc. v. Bronson*,
    591 F. Supp. 2d 1272 (S.D. Fla. 2008) .........................................................................18

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) .....................................................................................20

*Alsop v. DeSantis*,
    2020 WL 4927592 (M.D. Fla. Aug. 21, 2020) .............................................................20

*American Booksellers Foundation v. Dean*,
    342 F.3d 96 (2d Cir. 2003) ....................................................................................16, 17

*American Insurance Association v. Garamendi*,
    539 U.S. 396 (2003) .................................................................................................9, 11

*Bainbridge v. Turner*,
    311 F.3d 110 (11th Cir. 2002)................................................................................15, 16

*Bolger v. Young Drug Products Corp.*,
    463 U.S. 60 (1983) .......................................................................................................14

*Brown v. Entertainment Merchants Association*,
    564 U.S. 786 (2011)......................................................................................................14

*Brown-Forman Distillers Corporation v. New York State Liquor Authority*,
    476 U.S. 573 (1986) ...............................................................................................16, 17

*California v. ARC America Corporation*,
    490 U.S. 93 (1989) .........................................................................................................9

*Charles H. Wesley Education Foundation, Inc. v. Cox*,
    324 F. Supp. 2d 1358 (N.D. Ga. 2004) ........................................................................19

*Dennis v. Higgins*,
    498 U.S. 439 (1991) .....................................................................................................15

*Ferrellgas Partners, L.P. v. Barrow*,
    143 F. App'x 180 (11th Cir. 2005)...............................................................................18

*Fidelity Federal Savings & Loan Association. v. de La Cuesta*,
    458 U.S. 141 (1982) ...........................................................................................9, 11, 12

*Florida Transportation Services, Inc. v. Miami-Dade County*,
    703 F.3d 1230 (11th Cir. 2012) ...................................................................................17

*Friedenberg v. School Board of Palm Beach County*,
    911 F.3d 1084 (11th Cir. 2018) ............................................................................8

*Galvin v. New York Racing Association, Inc.*,
    70 F. Supp. 2d 163 (E.D.N.Y. 1998) ...................................................................18

*Gayle v. Meade*,
    2020 WL 3041326 (S.D. Fla. June 6, 2020) ................................................18, 19

*Geier v. American Honda Motor Company, Inc.*,
    529 U.S. 861 (2000) ......................................................................................9, 11

*Gonzalez v. Governor of Georgia*,
    978 F.3d 1266 (11th Cir. 2020) .........................................................................19

*Healy v. Beer Institute, Inc.*,
    491 U.S. 324 (1989) ...........................................................................................16

*Japan Line, Ltd. v. Los Angeles County*,
    441 U.S. 434 (1979) ...........................................................................................15

*JB Weld Co. v. Gorilla Glue Co.*,
    978 F.3d 778 (11th Cir. 2020) ...........................................................................10

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) ................................................................................18

*Kassel v. Consolidated Freightways Corporation of Delaware*,
    450 U.S. 662 (1981) ...........................................................................................15

*Lebamoff Enterprises Inc. v. Whitmer*,
    956 F.3d 863 (6th Cir. 2020) .............................................................................16

*Legato Vapors, LLC v. Cook*,
    847 F.3d 825 (7th Cir. 2017) .............................................................................16

*Martin v. Medtronic, Inc.*,
    254 F.3d 573 (5th Cir. 2001) .............................................................................11

*McCall v. California*,
    136 U.S. 104 (1890) ...........................................................................................15

*Mitchell v. Cuomo*,
    748 F.2d 804 (2d Cir. 1984) ..............................................................................18

*Nantahala Power & Light Co. v. Thornburg*,
    476 U.S. 953 (1986) ...........................................................................................11

*Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation*,
    715 F.3d 1268 (11th Cir. 2013) ..........................................................................18

*Oneok, Inc. v. Learjet, Inc.*,
    575 U.S. 373 (2015) ........................................................................... 9, 11, 12

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) .......................................................... 12, 13, 14

*Phelps–Roper v. Nixon*,
    545 F.3d 685 (8th Cir. 2008) ...........................................................................19

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ........................................................................................12

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ..................................................................................13, 14

*Sam Francis Foundation v. Christies, Inc.*,
    784 F.3d 1320 (9th Cir. 2015) .........................................................................16

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000)........................................................................18

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011)............................................................................ 13, 14, 15

*Strawser v. Strange*,
    44 F. Supp. 3d 1206 (S.D. Ala. 2015)..............................................................19

*Swain v. Junior*,
    961 F.3d 1276 (11th Cir. 2020) .......................................................................19

*Sylvan Learning Inc. v. Learning Solutions, Inc.*,
    795 F. Supp. 2d 1284 (S.D. Ala. 2011)............................................................18

*Tim Hortons USA, Inc. v. Tims Milner LLC*,
    2019 WL 2515006 (S.D. Fla. June 17, 2019) ..................................................18

*Tobinick v. Novella*,
    848 F.3d 935 (11th Cir. 2017) .........................................................................14

*Trailer Marine Transport Corp. v. Rivera Vazquez*,
    977 F.2d 1 (1st Cir. 1992) ...............................................................................16

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994) ........................................................................................13

*United States v. Alvarez*,
    567 U.S. 709 (2012) ........................................................................14

*United States v. Playboy Entertainment Group*,
    529 U.S. 803 (2000) ........................................................................14

*University of Texas v. Camenisch*,
    451 U.S. 390 (1981) ........................................................................10

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S 748 (1976) ........................................................................13

*Walgreen Co. v. Rullan*,
    405 F.3d 50 (1st Cir. 2005) .............................................................16

*Wollschlaeger v. Governor of Florida*,
    848 F.3d 1293 (11th Cir. 2017) ............................................ 12, 13, 14, 15

*Young v. Coloma-Agaran*,
    2001 WL 1677259 (D. Haw. Dec. 27, 2001) .................................17

### U.S. Constitution and Federal Statutes

U.S. Const. art. I...................................................................................15

U.S. Const. art. VI.................................................................................9

42 U.S.C. § 264.....................................................................................9

### State Statutes

Florida Statute § 381.00316............................................................ 1, 5, 10, 13

### Regulations

85 Fed. Reg. 16628-03 (Mar. 24, 2020)................................................2

85 Fed. Reg. 62732-01 (Oct. 5, 2020)..................................................2

85 Fed. Reg. 70153-01 (Nov. 4, 2020)...............................................3, 16

Plaintiffs Norwegian Cruise Line Holdings Ltd., NCL (Bahamas) Ltd., Seven Seas Cruises S. de R.L., and Oceania Cruises S. de R.L. (together, "NCLH") hereby respectfully move for a preliminary injunction under Federal Rule of Civil Procedure 65(a) for the reasons set forth below.

## INTRODUCTION

Since March 2020, concerns about COVID-19 have led to a debilitating, total shutdown of the cruise industry generally and NCLH specifically.   That shutdown has inflicted incalculable, irrecoverable losses not only upon NCLH but upon all those whose interests ride with it— including NCLH's many employees and passengers as well as a surrounding ecosystem (vendors, manufacturers, wholesalers, hotels, restaurants, airlines, travel agents, *etc*.).   Now, after months of Herculean efforts, NCLH is at last set to resume sailing August 15, 2021 from Miami, Florida, in a way that will be safe, sound, and consistent with governing law, particularly the Conditional Sailing Order issued by the Centers for Disease Control and Prevention ("CDC").   Yet one anomalous, misguided intrusion threatens to spoil NCLH's careful planning and force it to cancel or hobble upcoming cruises, thereby imperiling and impairing passengers' experiences and inflicting irreparable harm of vast dimensions.

While NCLH would require documentation confirming that its passengers have been vaccinated (per experts' consensus, passengers' desires, and NCLH's commitments to CDC), the State of Florida has enacted a law—Florida Statute § 381.00316—that expressly ***prohibits*** NCLH from requiring such documentation.   The upshot places NCLH in an impossible dilemma as it prepares to set sail from Florida:   NCLH will find itself either on the wrong side of health and safety and the operative federal legal framework, or else on the wrong side of Florida law. Because neither is acceptable, NCLH must respectfully turn to this Court seeking essential, preliminary relief.   Only with the benefit of an injunction suspending § 381.00316 as applied to NCLH can NCLH's passenger cruises from Florida proceed as planned starting August 15.

For the reasons set forth herein and in supporting declarations, this Court has overwhelming justification to grant a preliminary injunction suspending § 381.00316 as applied to NCLH.   NCLH's instant challenge is likely to succeed on multiple, independent grounds under federal law:   Florida's prohibition conflicts with federal statutes and regulations and is therefore preempted; it interferes with communications between a business and its customers, in violation of the First Amendment (as applicable to States under the Fourteenth Amendment); it profoundly disrupts the proper flow of interstate and international commerce without advancing any

1

substantial state interest, in violation of the Dormant Commerce Clause; and it precludes this business from protecting the health and safety if its employees and customers against the extraordinary backdrop of a deadly pandemic, in violation of substantive due process as protected by the Fourteenth Amendment.

Moreover, absent relief, the specter of irreparable harm is obvious and imminent. As attested by Frank Del Rio, NCLH's CEO, NCLH is duty-bound to protect the health and safety of its personnel and passengers, as it can and will by requiring proof of vaccinations, yet it cannot afford to expose itself to prosecution by Florida and crushing penalties of up to $5,000 per passenger, as it would by requiring vaccine documentation in the present posture. Absent a preliminary injunction, therefore, NCLH will not be able to sail as it has assured its passengers (who overwhelmingly support vaccination and documentation of same) it is poised to do. The result would be a devastating, unrecoverable loss for everyone—not only for NCLH's business but also for tens of thousands of passengers, employees, and stakeholders who all benefit from NCLH resuming safe operations as planned. In contrast, nothing appreciable weighs on the other side of the equitable scales. Whereas Florida should be glad to see NCLH resuming safe operations and generating valuable economic returns, no one will suffer from passengers simply confirming that they have been vaccinated, as agreed, while this case proceeds expeditiously to final judgment.

## BACKGROUND

From the onset of the COVID-19 pandemic, outbreaks aboard cruise ships were fueled by compressed environments and challenges maintaining decontamination and social distancing. The experiences of ships like the Diamond Princess and Grand Princess at the start of 2020 vividly demonstrated the potential speed and sweep of transmission onboard cruises. 85 Fed. Reg. 16628-03, 16629–30 (Mar. 24, 2020). In response, NCLH and other members of the leading trade group, Cruise Lines International Association, voluntarily suspended passenger operations on March 13, 2020. 85 Fed. Reg. at 16631; Decl. of Frank J. Del Rio ("Del Rio Decl.") ¶ 7.

The next day, CDC issued a "No Sail Order and Suspension of Further Embarkation" ("No Sail Order"), the first of a series of cruise restrictions from CDC. 85 Fed. Reg. at 16631. The No Sail Order required all passenger disembarkation to be undertaken in coordination with relevant agencies, and it prevented any embarkation or operations unless permitted by CDC. *Id.* The No Sail Order was then extended three times before expiring on October 31, 2020. 85 Fed. Reg. 62732-01 (Oct. 5, 2020).

Next came a "Framework for Conditional Sailing and Initial Phase COVID-19 Testing Requirements for Protection of Crew" ("Conditional Sailing Order"), which issued on October 30, 2020 to specify a framework for re-opening.  85 Fed. Reg. 70153-01 (Nov. 4, 2020).  The Conditional Sailing Order set out four phases for returning to passenger operations in U.S. waters. *Id.*  Phase one obligates cruise operators to build a laboratory aboard each vessel for testing crew. Order, *Florida v. Becerra*, No. 8:21-cv-839-SDM-AAS, at 5 (M.D. Fla. June 18, 2021) ("PI Order").  Phase two has operators undertaking simulated voyages to evaluate each ship's measures for mitigating COVID-19 on board.  *Id.*  Even in advance of a simulated voyage, however, the operator must obtain and CDC must approve a "medical care agreement" and a "housing agreement" with healthcare providers and port authorities lining up an appropriate response to any COVID-19 incident.  *Id.* at 5–6.

Phase three requires a "Conditional Sailing Certificate" from CDC before undertaking a restricted passenger voyage.  *Id.* at 6.  The operator must apply for a Conditional Sailing Certificate "at least 60 calendar days prior to the date on which the cruise ship operator proposes to commence restricted passenger operations."  *Id.*  In applying, the operator must attest—under threat of criminal penalties pursuant to 18 U.S.C. § 1001—to full compliance with CDC's technical instructions and orders.  *Id.*

Phase four permits operators with a Conditional Sailing Certificate to undertake "restricted passenger voyages" subject to key strictures, including a seven-day limitation on each voyage. *Id.*  The Conditional Sailing Order adds other requirements atop the four phases, and explains that the phases "will be further determined" by both "public health considerations" and an operator's success in employing specified mitigation measures.  *Id.* at 7.

Even after the Conditional Sailing Order outlined a path forward, the absence of concrete implementing instructions left the cruise industry in limbo.  New CDC guidance on April 2, 2021, prompted complaints that it would be "unduly burdensome" and "largely unworkable."  *Id.* at 8. Desperate to salvage the summer sailing season, some cruise companies even threatened to leave the U.S. absent "clarity and alignment on what it will take to restart cruising."  *Id.*  And the State of Florida sued CDC and sought a preliminary injunction in a purported effort to clear the way for cruise lines to resume passenger operations swiftly and safely.  *Id.* at 9.

On April 28, 2021, CDC issued a "Dear Colleague Letter" "commit[ting] to the phased resumption of passenger operations around mid-summer" and addressing "scientific

developments" including the advent of COVID-19 vaccines.   *Id.*   CDC previewed that operators could obviate simulated voyages by attesting that a certain percentage of crew and passengers have been verified as fully vaccinated prior to sailing.   *See* Decl. of Olga Vieira ("Vieira Decl.") Ex. 1 at 4.   On May 14, 2021, CDC then followed through and opened the door for operators to sail, provided they could verify the incidence of vaccinations at the specified rate of 95 percent, per CDC's "Technical Instructions for Simulated Voyages by Cruise Ship Operators under CDC's Framework for Conditional Sailing Order" ("Technical Instructions").   Vieira Decl. Ex. 2 at 9.

On May 26, 2021, CDC issued its operative "COVID-19 Operations Manual for Simulated and Restricted Voyages under the Framework for Conditional Sailing Order" ("Operations Manual" or "Manual").   Vieira Decl. Ex. 3.   The Operations Manual instructs operators to take systematic account of whether passengers have been fully vaccinated.   For instance, operators are to deny boarding to "[p]assengers with signs or symptoms of COVID-19" "if not fully vaccinated without documentation of recovery" but may permit such passengers to "board at [the] operator's discretion if fully vaccinated."   *Id.* at 6.   Similarly, embarking "[p]assengers who have a known close contact exposure in the past 14 days" are to be "den[ied] boarding if not fully vaccinated without documentation of recovery" but may "board at [the] operator's discretion if fully vaccinated and asymptomatic."   *Id.*   Nor need operators collect SARS-CoV-2 viral testing for "fully vaccinated passengers."   *Id.* at 5.   And operators may "advise passengers and crew that— if they are fully vaccinated—they may gather or conduct activities outdoors, including engaging in extended meal service or beverage consumption, without wearing a mask"; they may "designate areas as only accessible to fully vaccinated passengers and crew where masks and physical distancing are not required"; and they may "advise passengers and crew that they do not have to wear a mask or maintain physical distance in any areas" for "ships with at least 95% of crew and 95% of passengers fully vaccinated."   *Id.* at 8.   Numerous "requirements" for physical distancing and food services become "recommendations" for "ships with at least 95% of crew and 95% of passengers fully vaccinated."   *Id.* at 9.

To challenge the Conditional Sailing Order and its *de facto* freeze on cruise operations, Florida sued CDC on April 8, 2021 in the U.S. District Court for the Middle District of Florida. Florida complained, *e.g.*, that CDC had exceeded its statutory and regulatory authority, acted arbitrarily and capriciously, denied requisite opportunity for notice and comment absent "good cause" for deviating, and exercised an unconstitutional delegation of legislative authority.   PI

Order at 1–2.   After Florida sought a preliminary injunction, the court found that Florida was likely to prevail and preliminarily enjoined CDC "from enforcing against a cruise ship arriving in, within, or departing from a port in Florida the conditional sailing order and the later measures (technical guidelines, manuals, and the like)."   *Id.* at 123.   At the same time, the court stayed its preliminary injunction until July 18, "at which time the conditional sailing order and the measures promulgated under the conditional sailing order will persist as only a non-binding 'consideration,' 'recommendation' or 'guideline,'" unless it approved a narrower proposal from CDC (which was not forthcoming).   *Id.*   On July 6, 2021, CDC noticed an appeal to the Eleventh Circuit and unsuccessfully moved the district court for a stay pending appeal.   Order, Dkt. 98, *Florida v. Becerra*, No. 8-21-cv-8329-SDM-AAS (M.D. Fla. July 7, 2021).   The next day, CDC sought a stay pending appeal from the Eleventh Circuit, Defendants' Time-Sensitive Motion for a Stay Pending Appeal, *Florida v. Becerra*, No. 21-12243 (11th Cir. July 7, 2021) ("CDC Stay Mot."), which ordered Florida to respond by yesterday, July 12, as Florida did last night.

Shortly before Florida filed suit, the Governor of Florida issued an Executive Order on April 2, 2021 prohibiting businesses in Florida from "requiring patrons or customers to provide any documentation certifying COVID-19 vaccination or post-transmission recovery to gain access to, entry upon, or service from the business."   Fl. Exec. Order No. 21-81 (Apr. 2, 2021).   Until that order expired, businesses that failed to comply were not "eligible for grants or contracts funded through state revenue."   *Id.*   Thereafter, the same prohibition took the form of permanent legislation.   Specifically, Florida's House and Senate passed a bill that the Governor signed into law on May 3, 2021, flatly prohibiting all businesses in Florida from "requir[ing] patrons or customers to provide any documentation certifying COVID-19 vaccination or post-infection recovery to gain access to, entry upon, or service from the business operations in [Florida]."   Fla. Stat. § 381.00316(1) (2021) (hereinafter the "Ban").   Violations of this prohibition can trigger fines of up to "$5,000 per violation."   *Id.*

While NCLH has an international focus, it is headquartered in Miami, and its 28-ship fleet is based there.   Del Rio Decl. ¶¶ 4, 7–8.   NCLH recently developed a new terminal at PortMiami, which is capable of accommodating substantial interstate and international traffic. *Id.* ¶ 4.   Within some 30 minutes of departing from PortMiami, NCLH's ships reach international waters and then sail to interstate and foreign ports, many of which require proof of vaccination before passengers can enter without onerous strings.   *Id.* ¶¶ 4, 16–18.

From the onset of the COVID-19 pandemic, NCLH has done everything within its power to withstand COVID-19 and to protect its passengers and crew. *Id.* ¶ 6.   To begin, NCLH voluntarily suspended operations shortly after the WHO declared a pandemic. *Id.* ¶ 7.   Since then, it has navigated complex regulatory, compliance, and public-health challenges to set up its imminent return to sailing. *Id.* ¶¶ 7–13, 16–21.   NCLH partnered with Royal Caribbean Group to create the Healthy Sail Panel, a panel of world-renowned public-health experts who advise the cruise industry regarding the protocols that will best reduce COVID-19-related risks. *Id.* ¶ 12.

In light of the recommendations from the Healthy Sail Panel and other leading authorities, NCLH has concluded that the right way to ensure everyone's health and safety is by requiring full vaccination on cruises. *Id.* ¶ 13.   Customer surveys indicate that the vast majority of likely passengers want to sail with others who have been completely vaccinated and can prove it. *Id.* ¶ 14; Decl. of Dr. Jukka Laitamaki ("Laitamaki Decl.") ¶¶ 9–10.   Today, it is more essential than ever for NCLH to maintain the confidence and trust of its passengers that their cruises will not only be enjoyable and carefree, but healthy and safe.   Laitamaki Decl. ¶¶ 9, 12–16.

So that all concerned can set sail safely and smoothly, NCLH's planned cruises require proof that 100% of passengers and crew have been vaccinated against COVID-19.   Del Rio Decl. ¶ 13.   That is how NCLH plans to comply with CDC's Conditional Sail Order and Manual, as reflected in NCLH's certifications and applications for a Conditional Sailing Certificate, which CDC approved on July 9, 2021. *See id.* ¶ 20; Vieira Decl. Ex. 4 at 1.   Requiring vaccination documentation is all the more imperative given the vaccination protocols required by relevant foreign ports.   Del Rio Decl. ¶¶ 16–18.   To name just a few such foreign ports that NCLH is slated to visit on upcoming voyages, Belize, Bahamas, British Virgin Islands, and Honduras all require proof of vaccination before passengers can enter without testing. *Id.* ¶ 18.

Simply stated, NCLH cannot sail as planned unless and until Florida's Ban gives way.   If NCLH cannot require vaccine documentation, then it cannot verify whether its passengers have in fact been fully vaccinated against COVID-19.   Decl. of Dr. Stephen Ostroff ("Ostroff Decl.") ¶¶ 18–20.   There is no adequate substitute for documentary proof when it comes to maximizing onboard safety.   Risks of exposure to COVID-19 will invariably tick up if NCLH is denied the ability to verify that passengers have been fully vaccinated—and nothing short of documentation enables reliable verification. *See id.* ¶ 20.

Nor can NCLH complete its communications with passengers, as consensually agreed, without completing the exchange of paperwork that stands to save lives.  *Id.* ¶¶ 18–20.   Inability to verify vaccination status would also undercut NCLH's ability to attract, assure, and please passengers.   Demand for cruises has returned, but cruise lines still face critical challenges in rebuilding confidence, particularly among an older passenger base.   A recent survey of more than 5,000 readers of Cruise Critic found that 80% of respondents preferred to sail on ships that require vaccination, just as NCLH would.   Del Rio Decl. ¶ 14; Laitamaki Decl. ¶¶ 9–10, 15–16.

If Florida's Ban stands, then the only way NCLH can require vaccine documentation and maximize safety, comfort, and confidence would be by eschewing operations in Florida.   That would be a tragedy for all concerned.   Florida itself has successfully argued in federal court that disruptions to the cruise industry cause far-reaching, adverse ripple effects and deprive Florida of "an essential part of [its] economy."   Fla.'s Am. Mot. for Prelim. Inj., Dkt. 25, *Florida v. Becerra*, No. 8:21-cv-839-SDM-AAS, at 2 (M.D. Fla. Apr. 8, 2021) ("Fla. Brief").   With cruises suspended, Florida has "lost tens of millions of tax dollars" and been forced "to expend around $20 million in state unemployment benefits."   *Id.* at 22.

Florida is a major hub for cruise voyages both nationally and internationally, and it has been vital for the cruise industry, just as the cruise industry has been vital for it.   *See* Del Rio Decl. ¶¶ 33, 35.   About 60% of all U.S. cruise embarkations come from Florida.   Fla. Brief at 2–3.   In 2019 alone, around 13.6 million cruise passengers and crew came ashore in Florida.   *Id.* at 3.   That all came to a sudden halt when COVID-19 hit.   As Florida has noted, while cruises were unable to sail, "[t]he cruise industry has been 'ravaged,' with 'companies reporting billions of dollars in losses, causing some of them to downsize their fleets and sell ships for scrap.'"   *Id.*

To the extent that Florida loses cruises, damages ripple still further, as "many Florida businesses" depend on cruise passengers and crew to "spend money in Florida's local economies." *Id.* at 3.   Florida's ports lost over $297 million in revenue due to the cruise industry shutdown through February and project total losses of $398 million in revenue through July.   *See id.* Ex. 26 at 2–3.   The cruise industry supports "nearly 159,000 total jobs paying $8.1 billion in income" within the State.   *Id.* at 2.   These include jobs associated with hospitality, transportation, recreation, and amusement establishments; wholesalers of products such as fuel, soap and beverages, which outfit ships; baggage handling; manufacturers of equipment for communications, navigation, and on-board machinery like boilers and laundry machines; security providers; and

interior-design and computer consultants.   *Id.* Ex. 1 at 46.   In sum, large chunks of Florida's economy hang in the balance, as Judge Merryday emphasized in finding that the cruise industry has a "ubiquitous footprint" in Florida and an "enormous financial effect, which reaches into most sectors of Florida's economy."   PI Order at 114.

The same dynamics that hold for the cruise industry generally hold for NCLH specifically. Today, NCLH employs well over 100 people who work on a turn-around day at its PortMiami terminal.   Del Rio Decl. ¶¶ 4, 35.   Before Florida enacted § 381.00316, NCLH's subsidiaries had 15 ships planning to embark from Florida this coming fall and winter seasons with appropriate safeguards.   *Id.* ¶ 31.   So long as Florida's statute remains operative, however, these voyages will be placed at risk of cancellation, disruption, and possible outbreak.   If Florida's Ban forces NCLH to slash or compromise its operations in Florida, then NCLH will lose the benefit of its enormous investment, the terminal's employees stand to lose their employment, passengers and crew will stay home, and the resulting lack of spending will cascade through sector after sector of Florida's economy.   The result would be incalculable, unrecoverable losses—of revenue, goodwill, and reputation for the business, of compensation and opportunities for employees, of the free flow of interstate and foreign commerce, and potentially even of human life and safety.   *Id.* ¶¶ 25–35; *see also* Laitamaki Decl. ¶¶ 8, 12–17.

## LEGAL STANDARD

"A preliminary injunction may be entered when a plaintiff establishes four elements:   '(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest.'"   *Friedenberg v. Sch. Bd. of Palm Beach Cnty.*, 911 F.3d 1084, 1090 (11th Cir. 2018).   All four elements are amply satisfied here.

## ARGUMENT

## I.   NCLH IS LIKELY TO PREVAIL ON THE MERITS

NCLH is likely to prevail because Florida's Ban, e.g., (1) is preempted by federal law, (2) violates the First and Fourteenth Amendments, and (3) violates the Dormant Commerce Clause, any one of which suffices to establish NCLH's likelihood of success.[1]

---

[1]     In addition, Florida's Ban (4) violates the substantive due process component of the Fourteenth Amendment, as alleged in NCLH's parallel complaint.   Compl. ¶¶ 152–61.   Page constraints preclude NCLH from elaborating on this count at present, and it should be unnecessary

A.    **Florida's Ban Is Preempted By Federal Law.**

Under the Supremacy Clause, "the laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."   U.S. Const. art. VI.   Accordingly, Congress may "pre-empt, *i.e.*, invalidate, a state law through federal legislation," *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015), and "[f]ederal regulations have no less pre-emptive effect than federal statutes."   *Fidelity Fed. Sav. & Loan Ass'n. v. de La Cuesta*, 458 U.S. 141, 151 (1982).   Beyond using "express language in a statute," federal law may "implicitly pre-empt a state law, rule, or other state action," via "conflict pre-emption," which occurs "where 'compliance with both state and federal law is impossible,' or where 'the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"   *Oneok*, 575 U.S. at 377–78 (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989)); *accord, e.g., Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421–25 (2003).   Conflict pre-emption applies "where state law limited the availability of an option that the federal agency considered essential to ensure its ultimate objectives."   *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 882 (2000).

In this case, Florida's Ban is preempted regardless of whether that preemption is characterized as express or implied.   Congress and CDC have expressed an intent to preempt state laws to the extent they conflict with regulations promulgated under 42 U.S.C. § 264, including the Conditional Sailing Order and the Technical Instructions thereunder.   By eliminating NCLH's ability to verify its passengers' vaccination status, Florida's Ban would eliminate NCLH's essential option for complying with the Conditional Sailing Order.   It follows that the Ban conflicts with and is preempted by federal law, at least as applied to NCLH.

Both Congress and CDC have stated their intent to preempt state laws that conflict with CDC's authority under 42 U.S.C. § 264.   Pursuant to § 264(a), the HHS Secretary (through CDC) is "authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases."   Section 264(e) then makes explicit that the statute and regulations carry preemptive effect specifically "to the extent that [any] such [state] . . . provision conflicts with an exercise of Federal authority under this section or section 266 of this title."   42 U.S.C. § 264(e).   In turn, CDC expressly invoked its preemptive

---

to pile it atop the points made herein in order to establish likelihood of success.   Even so, NCLH stands ready to elaborate on this count through additional briefing if doing so will assist the Court.

authority under 42 U.S.C. § 264 when it issued the Conditional Sailing Order and specified how conflict preemption now operates:

> In accordance with 42 U.S.C. 264(e), this Order shall supersede any provision under State law (including regulations and provisions established by political subdivisions of States), that *conflict with* an exercise of Federal authority, including instructions by U.S. Coast Guard or HHS/CDC personnel permitting ships to make port or disembark persons under stipulated conditions, under this Order.

85 Fed. Reg. at 70158 (emphasis added).

The basis for conflict preemption is straightforward.   As CDC submitted to the Eleventh Circuit last week:   "Florida has actively impeded the cruise industry's ability to conduct safe operations by prohibiting cruise ship operators from requiring documentation that passengers are vaccinated—with violators subject to a fine of up to $5,000 per violation."   CDC Stay Mot. at 14. In particular, Florida's Ban forecloses the compliance options afforded by (1) the Conditional Sailing Order's Technical Instructions, and (2) the Conditional Sailing Order's Operating Manual. Notably, the Middle District of Florida's preliminary injunction should not be taken as negating this preemptive effect:   its *preliminary* assessment of *likelihood* of success is not precedent in any sense, and it by no means takes Congress's statute or CDC's regulations off the books as this Court now assesses the state of the law for itself.   *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *JB Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778, 794 (11th Cir. 2020).   Nor does Judge Merryday's preliminary injunction take effect by its terms until July 18, before which date the Eleventh Circuit should be positioned to rule on CDC's pending stay request.

> **1.     *Florida's Ban Conflicts With The Conditional Sailing Order's Technical Instructions.***

CDC's Technical Instructions pursuant to the Conditional Sailing Order provide that, "[i]n lieu of conducting a simulated voyage, cruise ship operator responsible officials, at their discretion, may," among other things, "submit to CDC a clear and specific vaccination plan and timeline to limit cruise ship sailings to 95 percent of passengers ***who have been verified by the cruise ship operator as fully vaccinated*** prior to sailing."   *See* Vieira Decl. Ex. 2 at 9 (emphasis added). But Florida's Ban prohibits NCLH from "requir[ing] patrons or customers to provide ***any documentation certifying COVID-19 vaccination***" in order to embark on a cruise.   Fla. Stat. § 381.00316(1) (emphasis added).   And vaccine documentation is the only reliable way to "verify" a passenger's vaccination status.   *See* Ostroff Decl. ¶¶ 17–18.

Nor can this conflict be dispelled by positing in the abstract that NCLH might try to thread the needle between federal and Florida law by somehow "verif[ying]" passengers' vaccination without requiring documentation of same.   Such theorizing does not deny that Florida is imposing a practical "obstacle to the accomplishment and execution of the full purposes and objectives" of the federal scheme.   *Oneok*, 575 U.S. at 377.   As the Supreme Court explained in *de la Cuesta*, a State cannot restrict regulated entities from exercising the options afforded to them by federal law:   "Although compliance with both § 545.8–3(f) [the federal regulation] and the *Wellenkamp* rule [handed down by California courts] may not be 'a physical impossibility,' *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. at 142–143, the California courts have forbidden a federal savings and loan to enforce a due-on-sale clause solely 'at its option' and have deprived the lender of the 'flexibility' given it by the Board."   458 U.S. at 155; *see also Geier*, 529 U.S. at 881–82 (2000) (citing *de la Cuesta* and other decisions as "finding conflict and pre-emption where state law limited the availability of an option that the federal agency considered essential to ensure its ultimate objectives"); *Garamendi*, 539 U.S. at 420–25 (finding conflict preemption where state law posed "an obstacle to the success" of the federal government's chosen approach to handling an issue with international implications).   The conflict here comes to a sharp point considering that NCLH has certified—under penalty of perjury—in applying to CDC for a Conditional Sailing Certificate that the requisite percentage of passengers "will be confirmed as fully vaccinated." Del Rio Decl. Ex. 2 at 1.   And CDC issued a Conditional Sailing Certificate to NCLH in reliance on that certification.   Vieira Decl. Ex. 4 at 1.   Of course, ***documentation*** of vaccination is the most natural, appropriate ***confirmation*** of same.   And Florida cannot lawfully get in the way of NCLH following through on its commitments to CDC in this fashion.   *Cf. Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 973 (1986) (approval by FERC of federal rate preempts contrary determination by state agency); *Martin v. Medtronic, Inc.*, 254 F.3d 573, 583–84 (5th Cir. 2001) (FDA approval preempts contrary arguments under state law).

In sum, the basis for preemption is clear.   Florida's Ban prohibits NCLH from requiring the documentation that would fittingly "verify" and "confirm" its passengers' vaccinations so as to ensure federal compliance.   "Although compliance with both [CDC instructions] and [Florida's law] may not be a physical impossibility," Florida has "forbidden" the practical means to certify vaccination and "depriv[ed]" cruise lines of "flexibility" afforded by CDC, *de la Cuesta*,

458 U.S. at 155, while also "actively imped[ing]" CDC's core federal objective of ensuring safe cruises, CDC Stay Mot. at 14.

### 2. *Florida's Ban Conflicts With The Conditional Sailing Order's Operations Manual.*

Florida's Ban is also preempted by CDC's May 26 Operations Manual, which affords special dispensation to cruise operators who serve vaccinated passengers. *See* Vieira Decl. Ex. 3 at 5. Numerous provisions in the Manual give NCLH discretion to permit certain activities if and only if its passengers are "fully vaccinated." Because NCLH's discretion depends on NCLH ascertaining its passengers' vaccination statuses, NCLH's ability to exercise its discretion hinges on its ability to require vaccine documentation. Accordingly, Florida's law is blocking NCLH from pursuing and obtaining certain federal benefits and it is denying NCLH flexibility afforded by federal law. Florida's law is also preventing NCLH from reliably ascertaining whether it qualifies for the Operations Manual's safe harbor from physical-distancing requirements and related obligations, which are likewise contingent on passengers' vaccination status. *See* Vieira Decl. Ex. 3 at 9. In these respects, too, the Ban "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law. *Oneok*, 575 U.S. at 377.

### B. <u>Florida's Ban Violates The First Amendment.</u>

"In the fields of medicine and public health . . . information can save lives." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1313 (11th Cir. 2017) (en banc) (citation and internal quotation marks omitted). Remarkably, Florida's Ban shuts off the communication of vital, potentially life-saving information between businesses and their customers. This poses a serious First Amendment problem, even as Florida lacks any serious case for withstanding First Amendment scrutiny. Especially considering the politicized nature of vaccination information, the Ban should be struck down as a content-based, speaker-based prohibition on noncommercial speech concerning a subject disfavored by the State—and one that does not come anywhere close to withstanding strict scrutiny. Alternatively, even if the Ban is treated as a restraint on commercial speech, it is incapable of satisfying the intermediate scrutiny that then applies.

### 1. *As Applied To NCLH, Florida's Ban Is An Unconstitutional, Content-Based Restriction On Noncommercial Speech.*

Because Florida's Ban prohibits speech based on its content, it is "'presumptively invalid.'" *Otto v. City of Boca Raton*, 981 F.3d 854, 862 (11th Cir. 2020) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622,

641–62 (1994).   "A content-based law is one that 'applies to particular speech because of the topic discussed or the idea or message expressed.'"   *Otto*, 981 F.3d at 862 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).   Here, one and only one type of medical documentation runs afoul of Florida's Ban:   "[D]ocumentation certifying COVID-19 vaccination."   Fla. Stat. 381.00316(1).   Now why would Florida specially disfavor communication **only** of <u>vaccination</u> information, **only** for <u>COVID-19</u>?   Anyone paying attention to Florida politics and statements by the Governor knows the answer.   Embracing COVID-19 vaccinations and other protective measures (such as masks) puts one opposite Florida's leaders and the positions they have staked out in a raging political and culture war.   Whatever else Florida can do to advance its polemic, however, it cannot go so far as preventing like-minded businesses and customers from communicating as they see fit to protect themselves.   Indeed, both the Supreme Court and Eleventh Circuit have struck down such state bans on health-related communications on a particular topic as impermissibly content-based.   *See, e.g.*, *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 564 (2011) ("The statute thus disfavors marketing, that is, speech with a particular content."); *Wollschlaeger*, 848 F.3d at 1307 ("The record-keeping and inquiry provisions expressly limit the ability of certain speakers—doctors or medical professionals—to write and speak about a certain topic—the ownership of firearms—and thereby restrict their ability to communicate and/or convey a message.").

Moreover, the Ban is speaker-based.   A law is speaker-based if it "imposes a burden based on the . . . identity of the speaker."   *Sorrell*, 564 U.S. at 567.   Here, the Ban identifies one group of disfavored speakers—"business entit[ies]"—and disqualifies them from requiring certain information about a certain topic.   Fla. Stat. § 381.00316(1); *see also Otto*, 981 F.3d at 863 (restrictions on speech-based therapy were "speaker-focused"); *Wollschlaeger*, 848 F.3d at 1313 (prohibition against doctors inquiring about patients' firearm ownership was "speaker-focused"). This is another reason why strict scrutiny applies.   *See Otto*, 981 F.3d at 867–68.[2]

---

[2]   Any attempt by Florida to characterize the Ban as an economic regulation should be unavailing.   *See, e.g., Sorrell*, 564 U.S. at 566–70 (strictly scrutinizing law restricting treatment of pharmacy records as content-based, notwithstanding Vermont's attempts to couch the regulation as economic regulation of conduct, and holding that "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used or disseminated"); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S 748, 756 (1976) (recognizing First Amendment to receive

Once applied, strict scrutiny is fatal to the Ban. *See id.* "Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *see United States v. Alvarez*, 567 U.S. 709, 725 (2012) (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792 (2011)). "Cases where this standard is met are few and far between." *Otto*, 981 F.3d at 868 n.6; *see also Sorrell*, 564 U.S. at 571 ("In the ordinary case it is all but dispositive to conclude that a law is content based."). Florida lacks any compelling interest in prohibiting the unvarnished exchange of public-health information between consenting parties who are trying to "save lives." *Wollschlaeger*, 848 F.3d at 1313. Even setting that defect aside, Florida has not even tried to explore less-restrictive alternatives for advancing any putative interest, such as requiring special accommodations for passengers who may have special justifications for foregoing vaccinations or for withholding documentation. In *Wollschlaeger*, "nothing in the record suggest[ed] that patients who are bothered or offended by such questions are psychologically unable to choose another medical provider." *Id.* at 1315. Just so here: Nothing suggests that customers who are averse to getting vaccinated or to documenting the same cannot find businesses that cater to their preferred approach. Categorically prohibiting all exchanges of a particular stripe, without first identifying any "real problem," let alone one commensurate with the supposed solution, is antithetical to the narrow, restrained approach the Constitution demands within this sensitive realm. *See, e.g.*, *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 827 (2000).

2. ***Even If The Ban Were A Restriction On Commercial Speech, It Is Constitutionally Infirm As Applied To NCLH.***

Even if the Court were to treat the Ban as limited to commercial speech, the Ban still cannot survive the "heightened scrutiny" applicable to content-based restrictions on commercial speech.

---

information from a willing speaker). Nor can Florida properly defend its Ban as mere regulation of "commercial speech," the "core notion" of which is confined "to speech that proposes a commercial transaction." *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (quoting *Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). Even venturing well outside that core, sharing of vaccine documentation is wholly removed from any advertising or marketplace concerns: any rationale for this Ban is ***not*** about the fundamental business exchange but about what should be the ordained view of public health and safety assuming business terms are otherwise unobjectionable and desired. *See Tobinick*, 848 F.3d at 951–52 (doctor's articles were not commercial speech despite referencing doctor's services and generating revenue because "the articles themselves . . . never propose a commercial transaction"); *Otto*, 981 F. 3d at 865 (scrutinizing state prohibition as non-commercial because "what is being regulated is not, say, an advertisement for therapy, but the therapy itself").

The Supreme Court outlined the "heightened scrutiny" standard in *Sorrell*, which requires "that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest," insomuch as there "must be a fit between the legislature's ends and the means chosen to accomplish those ends."   564 U.S. at 572 (citations and internal quotation marks omitted); *see also Wollschlaeger*, 848 F.3d at 1311–12 (applying heightened scrutiny to content-based restriction on commercial speech).   Florida lacks any "substantial governmental interest" in restricting the free flow of basic information confirming vaccination status for an especially menacing disease.   For much the same reasons that Florida does not come close to satisfying strict scrutiny, it also fails the heightened scrutiny applicable to content-based regulation of commercial speech, which is increasingly disfavored by the Supreme Court.   The Ban is not "proportional to the resulting burdens placed on speech" and evinces no "fit between the legislature's ends and the means chosen to accomplish those ends."   *Sorrell*, 564 U.S. at 572; *see also Wollschlaeger*, 848 F.3d at 1314–16 (holding that Florida's ban on doctors' questioning patients regarding firearm ownership did not survive heightened scrutiny because the ban was not narrowly tailored to further Florida's asserted interests).

## C.    Florida's Ban Violates The Dormant Commerce Clause.

Under the Commerce Clause, "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States."   U.S. Const. art. I, § 8, cl. 3.   "Although the clause speaks literally only to the powers of Congress, it is well settled" that the Commerce Clause "has a 'dormant' aspect as well, namely, one that serves as 'a substantive restriction on permissible state regulation of interstate commerce.'"   *Bainbridge v. Turner*, 311 F.3d 1104, 1108 (11th Cir. 2002) (quoting *Dennis v. Higgins*, 498 U.S. 439, 447 (1991)).   Among other things, the Dormant Commerce Clause "works to keep states from 'ventur[ing] excessively into the regulation of . . . [interstate] commerce . . . [and] trespass[ing] upon national interests'"   *Id.* (alterations in original) (quoting *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 669 (1981)).   The scope of "interstate commerce" has long been viewed broadly.   *See, e.g.*, *McCall v. California*, 136 U.S. 104, 109 (1890).   And because "there is evidence that the Founders intended the scope of the foreign commerce power to be . . . greater" than the interstate commerce power, "[t]he need for federal uniformity is no less paramount in ascertaining the negative implications of Congress' power to 'regulate Commerce with foreign Nations' under the Commerce Clause."   *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 448–49 (1979).

"To determine whether a statutory scheme violates the dormant Commerce Clause," courts "employ two tiers of analysis." *Bainbridge*, 311 F.3d at 1108. "If the scheme 'directly regulates or discriminates against interstate commerce, or . . . favor[s] in-state economic interests over out-of-state interests," courts "have generally struck down the statute without further inquiry.'" *Id.* (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)). "When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly," courts will "examine[] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.* at 1109 (quoting *Brown-Forman*, 476 U.S. at 579). Excessive burdens on specific industries or industry sectors are subject to invalidation. *See, e.g.*, *Walgreen Co. v. Rullan*, 405 F.3d 50, 52 (1st Cir. 2005) (certificate-of-need law regulating all pharmacies was unconstitutional as applied to retail pharmacies); *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 2 (1st Cir. 1992) (motor-vehicle fee was unconstitutional as applied to trailers transporting goods).

When state statutes in practice regulate wholly out-of-state conduct, they violate the Dormant Commerce Clause. *Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 872 (6th Cir. 2020) (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)); *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 827 (7th Cir. 2017); *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1324 (9th Cir. 2015); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003). Such a statute "exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy*, 491 U.S. at 336.

Although Florida's Ban does not discriminate by favoring in-state businesses over out-of-state ones, it poses a serious affront to the Dormant Commerce Clause. And that affront is specially flagrant as applied to the cruise industry. Cruise ships carry passengers from across the U.S. into ports of other nations and other States; they flow from Florida into rich and varied channels of interstate and international commerce. Del Rio Decl. ¶ 21. After disembarking from Florida, NCLH's vessels reach international waters and sail to interstate and foreign ports, many of which require proof of vaccination to enter without testing. *Id.* ¶ 17. For instance, some NCLH vessels are scheduled to travel to U.S. territories, such as Puerto Rico and the U.S. Virgin Islands, *see* Del Rio Decl. ¶ 23, where they would be subject to the Conditional Sailing Order, *see* 85 Fed. Reg. at 70158, and beyond the scope of Judge Merryday's injunction, *see* PI Order at 123. Yet Florida would disrupt all of that on the slender basis that a business like NCLH

operates in Florida and therefore must follow Florida's anomalous dictates.   Such overreach has profound negative repercussions for cruise lines' relationships and operations across other States and other Nations.   As already explained, Florida is pulling the rug out from under NCLH's existing plans and arrangements nationwide and internationally.   Indeed, by "'project[ing] its legislation' into other States" and specifying what NCLH can require from passengers anywhere in the country, Florida is regulating commerce outside of its own borders and thus violating the Dormant Commerce Clause.   *Am. Booksellers Found.*, 342 F.3d at 104 (quoting *Brown-Forman*, 476 U.S. at 584).

In sum, Florida's Ban has the effect of blocking or hampering the operation of cruise lines in and out of Florida, which is a major interstate and international port.   That excessively burdens the free flow of commerce between States and between Nations.   *See Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1235 (11th Cir. 2012) ("The Port of Miami is one of the busiest ports in the nation, fully engaged in interstate commerce, predominantly foreign commerce."); *see also Young v. Coloma-Agaran*, 2001 WL 1677259, at *11, *15 (D. Haw. Dec. 27, 2001).

To withstand the balancing appropriate in these circumstances, Florida must marshal strong justification commensurate with the drastic burden it is imposing beyond its borders.   Here, however, Florida ostensibly is hard pressed to summon ***any*** creditable justification.   This is a case where any putative local benefits will prove to be negligible, if they exist at all.   Florida has no legitimate interest in restricting the exchange of potentially life-saving, health-related information. And Florida certainly has no justification for forcing business like NCLH either to shut down altogether or else betray all of their passengers who want simply to sail safely and smoothly.   *See Fla. Transp. Servs.,* 703 F.3d at 1260–62 (rejecting a county's assertion of local benefits because "the Port Director's permitting practices do not rationally contribute to these purported local benefits").   Once this Court balances the relevant considerations based on the available evidence, NCLH is likely to prevail under the Dormant Commerce Clause.

## II.   ABSENT AN INJUNCTION, NCLH WILL SUFFER IRREPARABLE HARM

The irreparable harm faced by NCLH is glaring and profound.   To begin, violation of NCLH's First Amendment rights constitutes irreparable harm by definition.   Moreover, NCLH's economic harm is irreparable because recovery of NCLH's monetary damages may be blocked by the State's sovereign immunity.   Further still, scuttling of NCLH's plans and commitments to its passengers threatens to damage its reputation and customer goodwill in ways that are classically

irreparable.    Last, forcing NCLH to sail without being able to verify passengers' vaccination status poses undue risk to human health and safety, loss of which is likewise irreparable.

*First Amendment.*    Florida's Ban poses irreparable harm by infringing upon NCLH's First Amendment rights.    "The 'alleged violation of a constitutional right . . . triggers a finding of irreparable harm.'"    *Gayle v. Meade*, 2020 WL 3041326, at *20 (S.D. Fla. June 6, 2020) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)).    To the extent NCLH makes a substantial showing that protected communications with passengers are being chilled, "no further showing of irreparable injury is necessary."    *Id.* at *20 (quoting *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984)); *see also Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000).

*Sovereign Immunity.*    Second, NCLH's looming monetary damages are irreparable, given the State's sovereign immunity.    *See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).    "In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."    *Id.* (citing cases); *see also ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1310 (S.D. Fla. 2008).

*Serious Harm to Business & Loss of Goodwill.*    Third, the damage NCLH faces defies quantification.    After months of Herculean effort, planning and expense, NCLH has at last positioned itself to resume business in a way that is safe and sound—and it has staked its reputation and its relationships with customers on setting sail August 15 with everyone's vaccine documentation in hand.    Del Rio Decl. ¶¶ 27–28; Laitamaki Decl. ¶¶ 11–13, 16–17.    If, instead, NCLH is forced to cancel its plans or drop the protocols to which it has committed, then it will disappoint all those are now counting on it, at which point no court can restore their faith. Laitamaki Decl. ¶¶ 8, 12–13, 16–17.    Such "loss of control of reputation, loss of trade, and loss of goodwill" constitutes classic irreparable harm.    *Sylvan Learning Inc. v. Learning Sols., Inc.*, 795 F. Supp. 2d 1284, 1299 (S.D. Ala. 2011) (quoting *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190–91 (11th Cir. 2005)); *see also Tim Hortons USA, Inc. v. Tims Milner LLC*, 2019 WL 2515006, at *5–6 (S.D. Fla. June 17, 2019).    Even short of "the complete and imminent destruction of the business," a "serious injury that cannot be quantified" also belongs under the heading of irreparable harm.    *ABC Charters*, 591 F. Supp. 2d at 1309.    "[I]rreparable harm may result from the loss of a central, key component of the business . . . ."    *Id.* (citing *Galvin v. N.Y. Racing Ass'n, Inc.*, 70 F. Supp. 2d 163, 170 (E.D.N.Y. 1998), *aff'd*, 166 F.3d 1200 (2d Cir. 1998)).

18

*Risk Of COVID-19.*   Although Florida may urge NCLH to sail while abandoning vaccination documentation, no one should want that; the resulting risk of outbreak would threaten irreparable harm of an invidious kind, even as an especially dangerous variant gains ground globally.   Florida would prevent NCLH from minimizing COVID-19 exposure.   Del Rio Decl. ¶¶ 19–35.   Such exposure can result in serious illness and death that courts thereafter can never repair.   *See Gayle*, 2020 WL 3041326, at *20.   Moreover, any renewed outbreak may spell a return to the shutdown that, as Florida has elsewhere noted, "ravaged" the industry and inflicted "billions of dollars in losses," never to be recouped.   Fla. Brief at 3; Laitamaki Decl. at ¶¶ 9, 16.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF ENJOINING FLORIDA'S BAN

Numerous, weighty interests uniformly align with NCLH's as it seeks relief enabling its ships to sail safely.   Assessment of the public interest and balance of equities "merge when, as here, the [g]overnment is the opposing party."   *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020) (quoting *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020)).   These factors here favor an injunction with singular, striking force.   Indeed, no one should want to see NCLH disabled from resuming operations on terms that CDC has blessed and that all stakeholders— employees, passengers, public-health authorities, foreign ports—are encouraging and embracing.

Of course, "it is always in the public interest to protect constitutional rights."   *Strawser v. Strange*, 44 F. Supp. 3d 1206, 1210 (S.D. Ala. 2015) (quoting *Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008)); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1369 (N.D. Ga. 2004), *aff'd*, 408 F.3d 1349 (11th Cir. 2005).   For the same reasons NCLH is likely to prevail on the merits, the public interest is on its side.

Even setting aside the merits, however, the equities favoring NCLH are overwhelming and unanswerable.   Florida itself has stressed how any harm to cruise lines like NCLH in turn ripples to hundreds of thousands of individuals who depend on cruise lines for income.   Unless enjoined, the Ban threatens tens of thousands of cruise passengers, tens of thousands of Florida workers and businesses who depend on cruise voyages for income, local economies, Florida's ports, and even foreign populaces.   According to the State, the cruise industry supports "nearly 159,000 total jobs paying $8.1 billion in income" within Florida.   Fla. Brief at 2.   Also according to the State, it is "against the public interest to force a person out of a job."   *Id.* at 25.   For the same reasons that Florida was correct (and was successful) in making these points, it would be wrong to enforce its Ban at the expense of NCLH as NCLH pursues the right path forward.

Although Judge Merryday may have erred in his merits analysis, there should be no faulting his assessment of why it is beneficial for NCLH and other cruise lines to be resuming operations on terms that are safe and well considered.   The cruise industry has a "ubiquitous footprint" in the State and an "enormous financial effect, which reaches into most sectors of Florida's economy."   PI Order at 114–15.   During the shutdown, Florida's ports lost over $297 million in revenue through February 2021 and project losses of $398 million in revenue through July.   Fla. Brief, Ex. 26 at 2–3.   Without cruises, Florida has "lost tens of millions of tax dollars" and been forced "to expend around $20 million in state unemployment benefits."   Fla. Brief at 22.   To quote Florida once more, "[t]he effect on the health of the local economy is a proper consideration in the public interest analysis."   *Id.* at 24–25 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011)).   We agree.   If Florida is nevertheless intent on disabling or imperiling vital contributions to its economy, this Court should rescue the public interest and countless third parties by enjoining it.

It also bears noting that Florida's Ban reduces incentives for vaccination, thereby undermining one of the best tools to combat COVID-19.   *See* Ostroff Decl. ¶¶ 10–14.   As dangerous as COVID-19 can be, widely-available COVID-19 vaccines have proven safe and effective in limiting its spread.   *Id.* ¶¶ 9–15.   Tellingly, Florida itself touted the availability of vaccines as its first reason for impugning CDC's Order.   Fla. Brief at 5.   And when balancing Florida's COVID regulations against the rights of rental owners, the Middle District of Florida found that "the threatened harms to the public" due to COVID "outweigh decisively the injury—if any—to the plaintiffs" who challenged the health measures.   *Alsop v. DeSantis*, 2020 WL 4927592, at *4–5 (M.D. Fla. Aug. 21, 2020) (collecting cases).   The same holds here.   If there is any exigency, it is the exigency posed by COVID-19—not the concerted use of best practices to keep COVID-19 away from cruise ships.   The public interest clearly lies in fighting the COVID-19 pandemic with maximum cooperation, attention, and resources.   Granting the requested relief will powerfully serve that interest by clearing the way for NCLH to sail as NCLH should—armed with proper protections and free of intrusive impediments by Florida.

## CONCLUSION

For the foregoing reasons, NCLH respectfully requests that the Court set an expedited schedule and grant a preliminary injunction by August 6, 2021 prohibiting Florida from enforcing its Ban on requests for vaccine documentation pending resolution of the merits.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), NCLH respectfully requests that the Court schedule a hearing and permit oral argument to resolve the factual and legal issues involved in this as-applied constitutional challenge to Florida's Ban.    NCLH estimates that two hours should be sufficient.

DATED:    July 13, 2021                      Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN LLP

By    */s/ John F. O'Sullivan*
      John F. O'Sullivan
      Olga Vieira
      2601 South Bayshore Drive
      15th Floor
      Miami, FL 33133
      olgavieira@quinnemanuel.com
      johnosullivan@quinnemanuel.com

      Derek L. Shaffer*
      Jonathan G. Cooper*
      1300 I Street NW, 9th Floor
      Washington, DC 20005
      (202) 538-8000
      derekshaffer@quinnemanuel.com
      jonathancooper@quinnemanuel.com

      *Applications for admission *pro hac vice* to be filed

      *Attorneys for Plaintiffs Norwegian Cruise Line Holdings Ltd., NCL (Bahamas) Ltd., Seven Seas Cruises S. de R.L., and Oceania Cruises S. de R.L.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of July 2021, the foregoing document was electronically filed with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on the party identified below, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

**VIA EMAIL & U.S. MAIL**

Dr. Scott Rivkees, in his official capacity as State Surgeon
General, Florida Department of Health
4052 Bald Cypress Way
Tallahassee, FL 32399
health@flhealth.gov
Telephone:    (850) 245-4444

*Defendant*

By: */s/ John F. O'Sullivan*
John F. O'Sullivan
Fla. Bar No.    143154
johnosullivan@quinnemanuel.com