# EXHIBIT D

1

```
 1                    UNITED STATES DISTRICT COURT

 2                     MIDDLE DISTRICT OF FLORIDA

 3                            TAMPA DIVISION

 4   STATE OF FLORIDA,               )
                                     )  Case No. 8:21-cv-00839-SDM-AAS
 5                  Plaintiff,       )
                                     )
 6        vs.                        )  Tampa, Florida
                                     )  Wednesday, May 12, 2021
 7   XAVIER BECERRA, Secretary       )  9:03 a.m. - 3:11 p.m.
     of Health and Human             )
 8   Services, in his official       )
     capacity; HEALTH AND HUMAN      )  HEARING RE PLAINTIFF'S MOTION
 9   SERVICES; ROCHELLE              )  FOR PRELIMINARY INJUNCTION
     WALENSKY, Director of the       )
10   Centers for Disease            )
     Control and Prevention, in      )
11   her official capacity;          )
     CENTERS FOR DISEASE             )
12   CONTROL AND PREVENTION;         )
     THE UNITED STATES OF            )
13   AMERICA,                        )
                                     )
14                  Defendants.      )
     _____)
15

16                     TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STEVEN D. MERRYDAY
17                    UNITED STATES DISTRICT JUDGE

18   APPEARANCES:

19   (Appearances continued on Page 2)

20   COURT REPORTER:

21        Shayna Montgomery, CSR, RMR, CRR
          United States District Court
22        801 North Florida Avenue, Room 15A
          Tampa, Florida 33602
23        (813) 301-5024 or shayna_montgomery@flmd.uscourts.gov

24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.
```

1    <u>APPEARANCES CONTINUED</u>:

2    For the Plaintiff:

3        OFFICE OF THE FLORIDA ATTORNEY GENERAL
         BY:  JAMES HAMILTON PERCIVAL, II, ESQ.
4        -and-
         BY:  ANITA J. PATEL, ESQ.
5        -and-
         BY:  JASON H. HILBORN, ESQ.
6        -and-
         BY:  JOHN GUARD, ESQ.
7        PL-01, The Capitol
         Tallahassee, Florida 32399
8        (850) 414-3300

9

10   For the Defendants:

11       DEPARTMENT OF JUSTICE - CIVIL
         BY:  AMY POWELL, ESQ.
12       150 Fayetteville Street, Suite 2100
         Raleigh, North Carolina 27601
13       (919) 856-4013

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                         --oOo--

 3            THE COURT:  We are together in case 21-civil-839,

 4    State of Florida vs. Becerra and others.

 5            Who speaks this morning for the State of Florida?

 6            MR. HILBORN:  I do, Your Honor.  Jason Hilborn.

 7            THE COURT:  Mr. Hilborn?

 8            MR. HILBORN:  Yes, sir.

 9            THE COURT:  Good morning.

10            And who else is at counsel table, Mr. Hilborn, that

11    you would like to be recognized?

12            MR. HILBORN:  My colleagues, Jimmy Percival,

13    John Guard and Anita Patel.

14            THE COURT:  All right.  Good morning to each of you.

15            And who speaks for Becerra and the defendants, for the

16    United States for short?

17            MS. POWELL:  Amy Powell for the United States.

18            THE COURT:  Good morning, Ms. Powell.

19            Now, we have spoken briefly a few moments ago in

20    chambers just to say hello.  And as we were doing that, you

21    indicated that you had a stipulation with respect to certain

22    documentary exhibits for the hearing today.  Will one -- would

23    one or the other of you like to offer that stipulation or

24    introduce evidence or otherwise implement that stipulation?

25            MR. PERCIVAL:  I'll handle that, Your Honor.
```

1 Mr. Percival for Florida.  So we have agreed that all of the

2 exhibits on our exhibit list can be considered by the Court

3 given the relaxed evidentiary standard at the preliminary

4 injunction stage.  So I think I'll just go ahead and move our

5 exhibits and their exhibits into evidence, Your Honor.

6         THE COURT:  The ones on the exhibit list?

7         MR. PERCIVAL:  Yes, Your Honor.

8         THE COURT:  That's on the docket?

9         MS. POWELL:  That's correct, Your Honor.

10         MR. PERCIVAL:  Yes.  Yes, sir.

11         MS. POWELL:  Without waiving any objections --

12         (Court reporter admonition.)

13         MR. PERCIVAL:  I can represent that.  So we have

14 agreed -- sorry, loud voice.  I'll step back, Your Honor.

15         THE COURT:  You just speak the same volume and at the

16 same -- we can adjust.  All right.

17         MR. PERCIVAL:  Yes, Your Honor.

18         THE COURT:  Go ahead.

19         MR. PERCIVAL:  We have agreed that each of us retains

20 the right to raise relevance arguments and weight arguments,

21 but other than that, that the Court can consider the exhibits

22 that we've offered.

23         THE COURT:  Understood.  All right.  Then the exhibits

24 listed on the exhibit lists of plaintiff and the defendants are

25 received for the purposes of this hearing.

1    MR. PERCIVAL:  Thank you, Your Honor.

2    THE COURT:  All right.

3    (The exhibits on plaintiff's and defendants' exhibit

4    lists were admitted into evidence for this hearing.)

5    THE COURT:  Then since the movant here is State of

6    Florida, I'll recognize Mr. Hilborn to advance his motion for

7    preliminary injunction.  Good morning.

8    MR. HILBORN:  Good morning, Your Honor.  Thank you

9    again.

10   The CDC claims the power to unilaterally shut down the

11   multibillion dollar cruise industry for over a year, just like

12   they claim the power to prohibit evictions nationwide.  Only

13   days ago, the District of DC joined a number of other courts,

14   including the Sixth Circuit, in holding that the CDC's power is

15   a narrow sliver of what it claims.  We are here today asking

16   the Court to reach the same conclusion.  Now, as the Court is

17   no doubt aware, the CDC finally updated their website with what

18   they claim are the necessary instructions to create a path to

19   sailing.  They did so on the day that their brief was due,

20   which is, of course, no coincidence.

21   So I want to spend my time walking through all the

22   issues before the Court, but I generally want to make two main

23   points.  First, I want to explain why the conditional sailing

24   order was invalid when, in turn, this is the issue before the

25   Court.  Everything that the CDC has done since then is

6

```
1   completely derivative of that order, and the CDC appears to
2   agree that this is the central question.  They also ask the
3   Court to evaluate the order as of the time that it was issued.
4           THE COURT:  Was the original -- was the original no
5   sail order lawful?  What was it, March of '20?
6           MR. HILBORN:  It was March of 2020.  And I don't think
7   it was, Your Honor, but we --
8           THE COURT:  Just succinctly what would be your reason
9   for that?
10          MR. HILBORN:  So similar to the conditional sailing
11  order, that original no sail order relies on the same statute
12  and the same regulations and, even in large part, the same
13  facts as the conditional sailing order.  And so we think that
14  most of our analysis today would apply to that.
15          And so second today, I want to explain why, even if --
16          THE COURT:  So then all of the orders were unlawful?
17  The original and the -- was it three extensions of the --
18          MR. HILBORN:  Three extensions --
19          THE COURT:  -- no sail order?
20          MR. HILBORN:  Yes, there was an original no sail order
21  in March, and then three more extensions and then the
22  conditional sailing order in October.
23          THE COURT:  And they've all been unlawful?
24          MR. HILBORN:  I think so, yes, Your Honor.
25          THE COURT:  For the same reasons?
```

```
 1           MR. HILBORN:  Yes.  If anything --
 2           THE COURT:  Well, let me anticipate counsel's
 3   argument.  Then -- and she -- and the argument appears, why
 4   then has the United States -- has the State of Florida waited
 5   so long to assert whatever rights it might have to challenge
 6   those orders?
 7           MR. HILBORN:  So today we're challenging the
 8   conditional sailing order, and I don't think that we should be
 9   faulted for taking the CDC at its word, that they were opening
10   up the cruise industry in October 2020.  And so I don't think
11   that that is unreasonable delay at all, which is what they have
12   to show.
13           Now, second --
14           THE COURT:  So you want the measurement of delay, if
15   any, to be from October until the present, until April 20 --
16   whatever it was when you -- when you filed.
17           MR. HILBORN:  Yes, Your Honor, because that's the
18   order that we're challenging here today.
19           THE COURT:  Then why did you wait the time from
20   October until April?
21           MR. HILBORN:  Again, because the CDC said that they
22   were opening up the cruise industry in October.  And so I think
23   if we had sued in --
24           THE COURT:  Well, it was clear by November the 1st
25   maybe -- if they said they were going to open it in October, it
```

1  would have been clear on November 1st that they weren't

2  according to the State of Florida.

3      MR. HILBORN:  So I think if we had sued in November,

4  the Federal Government would have said that we're simply

5  speculating that they're actually keeping the industry shut

6  down, whereas now we know that that's absolutely what, at

7  least, was the affect of the conditional sailing order in

8  October.  And so again, I don't think we should be faulted for

9  waiting the time that we did because once we knew that it had

10  been shut down and was being shut down, we filed this lawsuit.

11      THE COURT:  So there was some point between the day

12  the suit was filed and October 20th that you were sort of on

13  notice -- to borrow the phrase -- the State of Florida was sort

14  of on notice of what it -- what it characterizes as a

15  determination by the CDC not to permit sailing.

16      MR. HILBORN:  Yes, at some point between the

17  conditional sailing order and the time we filed suit.  And I

18  don't --

19      THE COURT:  Was there some particular event that

20  occurred between October and April that fixed the position --

21  the understanding of the State of Florida that the CDC was not

22  going to, in its view, reopen the industry?

23      MR. HILBORN:  So by March 2020, when the industry was

24  not actually opened yet, there's publicly available press

25  releases where we exhorted the CDC to open the industry or we

1   were going to sue.  Then on April 2nd, the CDC released more

2   technical instructions to their website and we filed suit

3   within a week after that.  I believe we sued on April 8th.

4            THE COURT:  So when you saw the -- the -- if I

5   understand correctly, if I ask you the question directly what

6   was it that triggered the decision to sue now, it would have

7   been that those -- those additional technical -- what do they

8   call it -- technical guidance?

9            MR. HILBORN:  The CDC calls them "technical

10  instructions," and I think that was certainly a factor.  I

11  don't know if I can represent that that was the only factor.

12  Again, as time went on and the cruise industry was not opening

13  and as the summer season started approaching and as the cruise

14  ships started threatening to move abroad if the CDC didn't act,

15  that's when we brought our suit.

16           THE COURT:  I suppose similar to that 30 days to

17  remove after it becomes clear on the record one should

18  reasonably determine from the record that the amount of

19  controversy is in excess of the jurisdictional limit.

20  Sometimes that can be a little hazy as to when exactly that is.

21           MR. HILBORN:  Right.  I don't have the exact moment in

22  time, Your Honor.

23           THE COURT:  All right.  Excuse me.  Go ahead.

24           MR. HILBORN:  So -- so firstly, I want to explain why

25  the order was invalid when it was entered.  And then second, I

1    still want to explain why, even if this Court views the Dear

2    Colleague letter and the technical instructions as altering the

3    analysis, that we're still entitled to an injunction today.  So

4    I plan to start with the statute and then move through the

5    regulations and discuss our other APA arguments, and then get

6    to irreparable harm and standing.

7            Now, before I get into the statute, I want to make

8    three threshold points.  One, it's important to keep in mind

9    the conditional sailing order relies on the same statute, same

10   regulations and same facts the CDC used to shut down the cruise

11   industry and those four no sail orders that Your Honor

12   mentioned.  Fundamentally, the power they claim here is all but

13   absolute.

14           Second, although the conditional sailing order on its

15   face, as we've already discussed, does not actually purport to

16   do the same thing as the no sail orders, the fact is it's had

17   the affect of continuing the shutdown of those orders what has

18   now been six months and will be at least another two more

19   months, according to the defendants' best estimates.  That

20   means --

21           THE COURT:  Or what?

22           MR. HILBORN:  The CDC has said that they have now

23   provided a path to sailing, and so I think their best estimate

24   is that that would be by midsummer.  So we have at least a

25   couple more months to go.

1    THE COURT:  That's an estimate of how long it would

2    take to secure the port agreements and --

3    MR. HILBORN:  To --

4    THE COURT:  -- get the certificates applied for and

5    agreed to and to get to Phase 4?

6    MR. HILBORN:  Correct.  That's what they say, yes.

7    THE COURT:  Do you disagree with that practical and

8    real availability of that schedule?

9    MR. HILBORN:  So I think whether there's an actual

10    path to sailing within two months, that we should be granted

11    relief either way.

12    Now, as far as --

13    THE COURT:  Well, if I may insist upon an answer to my

14    question.

15    MR. HILBORN:  Sure.

16    THE COURT:  Do you have a basis to think that that

17    schedule -- let's call it July 1 for shorthand.  I'm not saying

18    it's July 1 --

19    MR. HILBORN:  Sure.  Sure.

20    THE COURT:  -- but let's just call it that for

21    shorthand.  That July 1 date is not either legally or

22    reasonably or practically available?

23    MR. HILBORN:  I question whether it's available simply

24    because the order itself and the technical instructions on the

25    website, almost every other paragraph says that they're subject

12

1   to change at any time.  And even in the declaration that

2   they've submitted, they say that they intend to amend the --

3           THE COURT:  Now you're talking about the website of --

4   addition of May the 5th?

5           MR. HILBORN:  The addition on May the 5th and even the

6   additions before that, Your Honor.  And so I can't tell you as

7   a factual matter that they absolutely cannot comply with that

8   before July 1st, but I certainly question whether they can

9   because of its constantly changing nature.

10          And then third, I do want to --

11          THE COURT:  There are a number -- I'm sorry, but there

12  are a number of instances in there -- in that technical

13  guidance that require application and approval --

14          MR. HILBORN:  Correct.

15          THE COURT:  -- and the availability of that.  So it

16  would affect the schedule and that would be under the control

17  of the CDC?

18          MR. HILBORN:  Right, that's correct.  And my

19  understanding is that they essentially reserve all rights to

20  accept or reject any of the conditional sailing certificates,

21  and that's after the test sails and all of that.

22          THE COURT:  So this isn't -- at least according to

23  your understanding, this is not a circumstance in which the

24  industry can't control the schedule by simply hurrying up and

25  accomplishing a list of specified things and heading out?

13

MR. HILBORN:  That's correct, Your Honor.  My
understanding is that -- and that's actually one of the
problems here -- is there isn't actually a clear set of
guidelines for them to follow where it says, If you do this you
will absolutely be able to sail.  It's still -- you still have
to go through the CDC.  They still reserve the right to approve
your certificate.  And again, all of this is subject to change
for health reasons at any time.

THE COURT:  Is there a temporal limit on the time --
there's no temporal limit on industry's requirement to satisfy
these technical instructions as I understand it.

MR. HILBORN:  I think that's correct.

THE COURT:  Is there any limitation on the time within
which the CDC must either approve or disapprove the things that
they must approve or disapprove?

MR. HILBORN:  So in the conditional sailing order --
and I'm forgetting the exact amount of time.  I think it's
either 30 or 60 days that they say it will take to go through
the certificate process.  Now, in their -- it's either their
Dear Colleague letter or the technical instructions that they
added on May 5th -- I think it's a Dear Colleague letter --
they say that, Well, we'll actually just do that in five days.
And again, that's what they say.  I don't know if -- how that's
actually playing out.

THE COURT:  Is it playing out?  Is someone doing it?

14

MR. HILBORN:  So not to my knowledge.  I know that the CDC, in their declaration, they -- and even their brief -- they say that only 80 percent of cruise ships have actually made it through Phase 1.  So again, that's Phase 1.  That's not even -- you're not even at the Phase 2 test sailing or the -- they've now broken up Phase 2 into at least two parts.  Phase 2A are these local agreements.  Phase 2B are these test sailing.  So that's not even to that.  And it's not even to applying for the certificate, and then that's not even to actually sailing with some restrictions they say.

So -- and we've touched on it -- and I just want to explain how the order actually works in practice.  So the order is signed by the CDC director, and as we've just talked about, it purports to provide a four-part framework to return to sailing.  And it states that as part of that framework, it's going to be providing these instructions, right?  And we now know that those instructions are unsigned updates on the CDC's website and, as I've said, they are subject to change at any time.  And they carry both civil and criminal penalties under the order.

And I want to pause there because it's very important.  So the CDC has enacted an order without noticing comment that says follow our substantial changing Internet guidance or go to jail.  That is not just unlawful and not just procedurally flawed under the APA, it violates the most basic principals of

15

1   our constitutional republic.

2          Now let's jump into the statute, which is Section 264.

3          THE COURT:  Under what circumstances would someone be

4   penalized?

5          MR. HILBORN:  So the order lists a lot of statutes and

6   regulations under which it's enforceable.  I think the easiest

7   to sort out are in Regulation 70 and 71, and if you excuse me,

8   Your Honor, I'm just going to grab a quick drink of water.

9          THE COURT:  Sure.

10         MR. HILBORN:  So if you look to -- I'm going to pull

11  it up right now -- 42CFR71.2 -- and we'll talk all about these

12  regulations more in depth later, but that regulation states

13  that "Persons in violation of this part are subject to a fine

14  of $100,000 or one year in jail or both."

15         And the other --

16         THE COURT:  They'd have to be a sailing violation of

17  the regulations?

18         MR. HILBORN:  I think this -- the way I read the

19  order -- and I can tell you the exact page number.

20         (Pause in proceedings.)

21         MR. HILBORN:  So on page 19 of the order, it says that

22  the order is enforceable through the provisions of 18 U.S.C.

23  3559, 3557, some other statutes, and then these two regulations

24  that I just read to you, 42CFR70.18 and 71.2.

25         So my understanding of the order is that they don't --

```
 1              THE COURT:  Have a sense of the mercy for the court
 2    reporter.  When you're rattling off numbers, if you would just
 3    slow down a bit.
 4              MR. HILBORN:  Yes, sir.
 5              THE COURT:  She'll be much more pleasant during lunch
 6    hour if you --
 7              MR. HILBORN:  Yes, sir, I apologize.
 8              So the two main regulations that I'm talking about
 9    here are 42CFR70.18 and 71.2.
10              THE COURT:  Excellent.
11              MR. HILBORN:  And to Your Honor's question about do
12    they have to be sailing to violate that, the way I read the
13    order is that that is -- that is how they're enforcing the
14    entire order.  So if you had violated the order, then you're
15    now subject to those possible penalties.
16              THE COURT:  Now, if you sail with passengers and
17    you're not in compliance with the --
18              MR. HILBORN:  Certainly if you do that.  I think
19    there's -- there's other ways to violate the order.  You know,
20    at one point the order says that you can't even apply for a
21    certificate to sail until you certify that you've complied with
22    all the previous requirements.  And so I'm not sure if that
23    would also count as a violation of the order, but absolutely if
24    you're sailing without going through the framework.
25              THE COURT:  Okay.
```

```
 1              MR. HILBORN:  Now for the statute.  And again, that's
 2    Section 264.
 3              THE COURT:  I have it in front of me.
 4              MR. HILBORN:  Perfect.  And that's what the order
 5    relies on for its authority.  Now, there's two competing
 6    interpretations out there right now in the federal courts of
 7    Section 264(a).  Argues in the majority, and that includes the
 8    Sixth Circuit, and just last week the Federal District Court
 9    for the District of Columbia.  Two district courts, though,
10    have agreed with the defendants here.  So I want to divide my
11    discussion on the statute into two parts because A, our reading
12    is the better reading and the majority view; and B, perhaps
13    more importantly, the CDC loses even on their own reading.
14              So I'll start with the text to get situated.  And I
15    know Your Honor has it in front of you, so I'll try to just
16    provide an objective paraphrase.
17              Section 264 --
18              THE COURT:  In your memorandum, you said that -- in
19    your motion for preliminary injunction, you said that the
20    statute says that the CDC can only -- you use the word
21    "only" -- do the things that are listed in the statute.  But
22    the statute doesn't say "only," does it?
23              MR. HILBORN:  That's correct, Your Honor.  And I don't
24    have that portion of our brief in front of me, but we certainly
25    would -- we are not saying that this --
```

```
1              THE COURT:  I have it in front of me.

2              MR. HILBORN:  Perfect.

3              THE COURT:  Would you like me to read it to you?

4              MR. HILBORN:  No, I, of course, trust you.

5         But we are not saying that the list there is

6    exhaustive.  And so --

7              THE COURT:  No.  Well, I took you to mean and the

8    things implied fairly by the term "other measures" understood

9    in the normal manner of statutory understanding.

10             MR. HILBORN:  Sure.

11             THE COURT:  But only those things.

12             MR. HILBORN:  Only things like those, yes.  And I do

13   think that is our position.

14             THE COURT:  Well, that is an interpretation, but it

15   doesn't -- I mean, the CDC did the same thing.  When they wrote

16   the rule, they stuck the word "including" in there in the rule,

17   which is not also in the statute.  So the State of Florida

18   oozes the word "only" into its interpretation and the CDC oozes

19   the term "including" into its regulation each sort of targeted

20   addiction.  All right.  But go ahead.

21             MR. HILBORN:  So I don't think we need to read the

22   statute then.

23             THE COURT:  Well, I mean, there's still a lot of

24   ambiguity in there or a lot of argument available, but I didn't

25   mean to preempt any statutory argument.
```

```
1            MR. HILBORN:  Sure.  I think the basic debate between

2   the two readings that are floating out there right now is

3   whether the first sentence stands totally on its own in

4   isolation or whether it's narrow and informed by the second

5   sentence.  And now we think it's the latter and that it is,

6   indeed, narrowed and informed by the second sentence, and

7   there's a few reasons for that.

8            So first, just sticking purely to the text, we think

9   that the phrases "for purposes of carrying out" and "such

10  regulations" -- referring to the such regulations in the first

11  sentence -- and "provide for" show that the sentence two is

12  describing the types of things the sentence one may authorize.

13  And I think that becomes especially clear when you apply canons

14  of construction and when you look to the fact that we know that

15  statutes have to be read in their overall context and as a

16  whole and in a way that a avoids surplusage.

17           So if the first sentence were as broad as the

18  defendants say, it would give the CDC power to make any

19  regulations that they deem necessary, and importantly, the

20  power to enforce those regulations is already found in the

21  first sentence where it says "make and enforce."  So if the

22  second sentence were a separate grant of authority as the

23  defendants say, rather than being connected to the first

24  sentence, the second sentence would be surplusage.  The powers

25  granted under the second sentence would already exist in the
```

20

1    first sentence.  And the same is true of the subsections in

2    Section 264, as well as the next statutory Sections 265 and

3    266, which both purport to provide the CDC with the power to

4    make certain regulations.

5              But again, if the first sentence already gave them

6    that power, then those provisions would be superfluous.

7    There'd be no need for them because the Secretary would already

8    have nearly limitless power.

9              Now looking more specifically at the second

10   sentence -- and Your Honor referenced this already -- we

11   explain in our brief that canons like ejusdem generis and

12   noscitur a sociis call for reading other measures in light of

13   the more specific enumerated measures before it, in and around

14   it.  And so we think that these other measures in the second

15   sentence should be related to things like inspection, light

16   fumigation and light disinfection.

17             And again, I think our reading becomes more clear when

18   you talk about the major questions doctrine.  Now, the

19   defendants misconstrue the major questions doctrine in their

20   brief at Footnote 22, so I want to be clear about what it

21   provides.  It does not say, as the defendants suggest, that

22   Congress never allows agencies to answer major questions.

23   Instead, it provides that "Congress speaks clearly if it wishes

24   to assign to an agency decisions of vast economic and political

25   significance."  And given the economic harm the CDC has caused

21

1   with this authority that they claim, we think the doctrine

2   applies.  And certainly the CDC cannot identify a clear

3   statement from Congress giving it the authority that it claims,

4   and the fact that courts have disagreed on this also shows that

5   there is no clear statement.

6       And as I mentioned, there are courts out there that

7   have agreed with us.  So we talk a lot about the Tiger Lily

8   case in our brief, which was by the Sixth Circuit, examining

9   the exact same statute that the CDC claims gives them the power

10  here and the Sixth Circuit reason that the CDC's broad

11  construction of 264(a) is incorrect.  And as I said, so did the

12  Federal District Court for the District of Columbia just last

13  week and another eviction moratorium case decided on summary

14  judgment.  Now, both of those opinions track our arguments here

15  and they explain why the first sentence of Section 264 does not

16  give the CDC the broad power that it claims.

17      THE COURT:  You would agree that a rent moratorium

18  is -- or an eviction moratorium, excuse me, is more distant by

19  far from the core function at the CDC than the management of

20  COVID-19 on cruise vessels.  I'm sure you'd agree with that.

21      MR. HILBORN:  I'd agree that an eviction moratorium

22  involving landlord/tenant relations is farther than things like

23  inspecting and managing disease on a cruise ship, yes.

24      Now, again though, this is about what 264 -- what CDC

25  claims is their power under 264, which is just like the

22

eviction moratorium case as far as their argument goes.  And I
think a telling example of how far they think their power goes
here under the same statute is that in the DDC case, which is
the Alabama Realtors.  It's at 1:20- --

           THE COURT:  I've got it.

           MR. HILBORN:  Okay, perfect.

           So in the argument the Court actually pressed the CDC
to identify limits on their power, and they couldn't do so
meaningfully.  The CDC admitted that they think they have the
power under Section 264(a) to forcibly vaccinate the rest of
the country.  Now, the State of Florida is absolutely in favor
of vaccinations, but that's a radical power for a federal
agency to claim.

           Now moving to applying our interpretation of the
statute to the conditional sailing order, I think it goes
without saying that the statute does not allow the CDC to shut
down the industry.  That's exactly what they did, and the
cruise industry remains shut down for what is now pushing 15
months from the first no sail order.  And according, again, to
the CDC's best estimates, that will push things out over a year
and a half of the cruise industry being shut down.

           And we think that the fact that it has had the affect
of extending the lockdown orders for at least nine more months
is sufficient alone to find ultra vires.  But even still,
assuming that the website updates changed anything, the order

23

1   imposes many additional requirements that we think Section 264

2   does not provide the CDC with the authority to require.  So

3   just to stay high level, we can start with these Phase 2 test

4   sailings that have been mentioned already.

5           THE COURT:  Before we go on from the statute, you

6   know, the -- well, bear with me just a second, but let's look

7   at the second sentence.  I'd be interested to see what your

8   construction is.  Let's assume that it wasn't written out

9   margin to margin like this, that it was framed up with numbers

10  and romanettes and things like that, okay?  Let's take a look

11  at it.

12          "For the purpose of carrying out" and et cetera.  So

13  it's clearly an introductory clause down to the word "such,"

14  right?  So you would put a colon there and hit the single --

15  hit the return and come back and put a one by "inspection,"

16  right?  And then you'd put a two by "fumigation," right?

17          MR. HILBORN:  Sure.

18          THE COURT:  You would put a three by "disinfection," a

19  four by "sanitation," five by "pest extermination."  And then

20  would you put a six in front of "destruction"?

21          MR. HILBORN:  Would I?

22          THE COURT:  Well, would whomever the pertinent person

23  is.  I guess it's me for the moment.  Should I put a six by

24  "destruction"?

25          MR. HILBORN:  I think Your Honor could do that.

```
 1              THE COURT:  But would it be right?

 2              MR. HILBORN:  Huh?

 3              THE COURT:  Would it be correct?

 4              MR. HILBORN:  I don't --

 5              THE COURT:  Let's phrase it a little differently then.

 6    Would I then go back to the wider margin with "of animals and

 7    articles"?  So does it say, in other words, "Inspection of

 8    animals and articles, fumigation of animals and articles found

 9    to be so infect" -- does it?

10              MR. HILBORN:  So --

11              THE COURT:  Or does it say "Inspection, fumigation,

12    disinfection and then destruction of animals and articles found

13    to be so infected"?  Or does the "found to be so infected" --

14    in other words, does that "of animals or articles found to be

15    so infected," does that distribute across the rest of the

16    sentence or is it isolated after "destruction"?

17              MR. HILBORN:  Right.  So I see where Your Honor is

18    going.  So the Northern District of Ohio and I believe also the

19    DDC case interpreted this to be a list of inspected --

20    inspection, fumigation and disinfection as applying to animals

21    or articles, which I believe that's how I understand Your

22    Honor's question to be.

23              THE COURT:  Uh-huh.

24              MR. HILBORN:  Now --

25              THE COURT:  So it would be read in that case as if
```

UNITED STATES DISTRICT COURT - TAMPA DIVISION

 1   there were an "and" between extermination and destruction.

 2   That's reading it as if there's an "and" there, right?

 3         MR. HILBORN:  I think so, Your Honor.  But -- so as

 4   the Northern District of Ohio pointed out, though --

 5         THE COURT:  Well, let's just talk about what we think

 6   it says.  If you have an argument to advance, go ahead.  I'm

 7   sorry, I didn't mean to interrupt you.

 8         MR. HILBORN:  The argument I would advance is it

 9   follows the Skyworks case in the Northern District of Ohio

10   decision where the Court there said whether this statute is

11   getting at the inspection and the fumigation and the

12   disinfection is restricted to applying to animals or articles.

13         THE COURT:  Uh-huh.

14         MR. HILBORN:  Either it's that, or either way it's

15   referring to inspection and fumigation which is commonly

16   understood as also applying to limited certain articles.

17         THE COURT:  Uh-huh.

18         MR. HILBORN:  And so the Court in Skyworks found that

19   either way it didn't really have an affect on the Court's

20   interpretation of other measures, and I think that would be our

21   position here.

22         THE COURT:  All right.  Thank you.

23         MR. HILBORN:  And so I think I left off at examples in

24   the order even if the website updates actually did anything,

25   and I mentioned Phase 2 test sailing.

1        So these test sails are to last for two to seven days

2   with volunteer passengers, and they essentially amount to the

3   CDC requiring the cruises to run experiments for the CDC on the

4   cruise industry's own dime.  And I don't see anywhere in

5   Section 264 that allows for something like that.  Section 264

6   allows the CDC to inspect ships and see if anything needs

7   disinfection on them, but forcing the cruise industry to

8   conduct experimental sailings at their own expense is nothing

9   like forcing the industry to allow the CDC to inspect their

10  ships.

11       Now, to my second point -- and I actually think this

12  might be more important because in some ways Your Honor doesn't

13  actually have to wade into the debate over the interpretation

14  of the statute because the CDC still loses on their own.  Let

15  me explain why that's the case.

16       So the first sentence, again just isolating it which

17  is what the CDC does, it authorizes two things.  It authorizes

18  making regulations and enforcing regulations.  But according to

19  the defendants, the conditional sailing order is not a

20  regulation or a rule, it's just an order.  That's not making

21  regulations, and the detailed order isn't enforcement either,

22  it's adding requirements, not enforcing them.

23       Now, the second sentence does say "providing for."  So

24  I suppose the defendants could say well, "providing for" would

25  allow us to pass an order.  But if that's true, then the

27

1    defendants are already under second sentence.  Again, they

2    can't travel under the first sentence here because they don't

3    claim to be making a regulation, and however broadly you want

4    to read the first sentence, it only authorizes making

5    regulations.

6              THE COURT:  And enforcing them.

7              MR. HILBORN:  Yes.  Yes, Your Honor, and enforcing

8    them.  And our position is that the order is not an enforcement

9    action because it's laying out all sorts of requirements that

10   must be followed.

11             Now, that concludes most of my presentation on the

12   statute, and I'm ready to move to the regulations unless Your

13   Honor has more questions.

14             THE COURT:  No, go ahead.

15             MR. HILBORN:  Now, if Section 264 does not provide the

16   statutory authority for the order, then the regulations cannot

17   somehow augment that authority.  So I'll just address them

18   briefly.

19             The CDC relies on three primary regulations.  The

20   first two are Regulations 71.31(b) and 71.32(b).  Those address

21   what the CDC can do to arriving ships from foreign ports.  And

22   we give examples in our brief, but Part 71, more broadly

23   including those two specific regulations, centers on allowing

24   the CDC to inspect arriving ships and through noninvasive

25   measures determine if anyone is sick.  That makes sense because

1   the point of Part 71 -- and this is in its scope at 71.1 -- is

2   to prevent the introduction of diseases from foreign countries

3   into the United States.  Nowhere in those two regulations, or

4   all of Part 71 more broadly, is there any inkling of the

5   ability to shut down the industry or requires something like

6   test sails.

7           Now, the other regulation, 70.2, is flawed from the

8   start as a threshold matter that regulation addresses

9   interstate quarantine.  My understanding is that other laws

10  like the Jones Act prevent cruise ships from traveling directly

11  from one state to another state.  So I'm not actually sure how

12  70.2, again under interstate quarantine, applies to the cruise

13  industry at all.  But more important, 70.2 prevents the CDC

14  from exercising any authority that 70.2 grants it until the CDC

15  determines that the measures taken by the state, including its

16  political subdivisions -- the regulations explicitly mention

17  that -- are insufficient.

18          Now, the order does pay lip service to that

19  requirement, but it reasons that because cruise ships travel

20  interstate, state measures are not sufficient.  Now, that does

21  not follow, but even if that were enough to satisfy 70.2, the

22  CDC could always satisfy that precondition and the CDC

23  completely ignored --

24          THE COURT:  Say that again.

25          MR. HILBORN:  So if the CDC's argument that because

```
 1   cruise ships travel interstate is enough to satisfy the
 2   precondition of 70.2, then that would almost always be the
 3   case.  Because it's worth remembering that these regulations --
 4   so the CDC gets at cruise ships because the regulations --
 5            THE COURT:  Yeah.
 6            MR. HILBORN:  -- cruise ships are in the regulations
 7   for carrier.  Carrier includes cars, trains, planes and other
 8   forms of transportation.  So we think if all it takes is that
 9   one of these forms of transportation travels interstate for
10   them to exercise their authority under 70.2 --
11            THE COURT:  But to preempt the State -- to preempt the
12   State regulation.
13            MR. HILBORN:  I don't --
14            THE COURT:  Well, "preempt" -- "preempt" is a loaded
15   word.
16            MR. HILBORN:  Right.
17            THE COURT:  To -- it's the equivalent of an
18   insufficiency of the State regulation.
19            MR. HILBORN:  Right.  And to then intervene --
20            THE COURT:  Right.
21            MR. HILBORN:  -- I think is --
22            THE COURT:  You argue -- excuse me.  The State of
23   Florida argues at page 12 that the CDC never considered the
24   adequacy of Florida's measures.  And --
25            MR. HILBORN:  Correct.
```

30

1    THE COURT:  -- the CDC argues that 26 and 36 of their

2    memorandum, according to my reading, that Florida never

3    explained what those supposed measures are -- I'm quoting

4    them -- much less how they are sufficient to prevent contagion.

5    So could you briefly tell me -- would you identify those for

6    the CDC what measures you're talking about?

7    MR. HILBORN:  Sure.  And those measures are actually

8    right in front of the CDC when they entered the order.  So the

9    CDC submitted exhibits here, it's Defendants' Exhibit A that

10    shows a comment that they received from Port Canaveral in

11    September 2020.  And that comment devotes the entire paragraph

12    to the safety measures being Port Canaveral, which is a

13    political subdivision of the state and which is explicitly

14    mentioned in Regulation 70.2.  And the order doesn't mention

15    any of that, Your Honor.  And as far as the CDC trying to put

16    the burden on us to, I guess, show what we've done, 70.2 puts

17    the burden on them to make that determination.  So that would

18    be my response to those arguments.

19    THE COURT:  And their dismissal of the state

20    regulation was a global one.

21    MR. HILBORN:  Correct.

22    THE COURT:  Was it the same event that dismissed

23    Florida's state regulation is the same one that just missed

24    Alaska's state regulation?

25    MR. HILBORN:  That's correct, Your Honor.  And I think

31

```
 1    if you --
 2              THE COURT:  It's a global dismissal of the entire
 3    regulation.  It's inadequate based on the fact that the
 4    transportation is international?
 5              MR. HILBORN:  Right.  And I think if you look at it --
 6              THE COURT:  Does that apply to all the other vessels
 7    that are coming in and out of the Port of Tampa every day that
 8    have crews on them from foreign countries, and is the state --
 9    is the Port of Tampa incapable of regulating them as well?
10              MR. HILBORN:  I'm sorry.  Can you ask that one more
11    time?
12              THE COURT:  Well, passenger vessels, cruise vessels
13    are not the only vessels that come in and out of the Port of
14    Tampa, in fact, not even most of them.  It's a very busy bulk
15    port.  I think it may be the eighth busiest one in the world.
16    And all of those vessels must -- there's been a late-breaking
17    development, they're all piloted and crewed by human beings
18    from places like Adelaide, Australia and North Africa and
19    phosphate and mines and things like that.
20              So I was wondering, is CDC regulating them, or do you
21    know?
22              MR. HILBORN:  I don't know if they're regulating the
23    cargo ships.  Now, I think under their theory of their case
24    here, they absolutely could.  All they would have to do is pass
25    a quick little order again.  So -- and I think they could do
```

 1   the same thing with cars and with trains and even the airline

 2   industry under their theory of this case.  But again, that's

 3   just the 70.2 precondition.

 4           And so even putting that aside, 70.2 contains similar

 5   language as 264.  Now, Your Honor pointed out earlier that

 6   there's the word "including" there.  I don't know if that's

 7   enough to knock out ejusdem generis.  But even assuming it is,

 8   you would still have noscitur a sociis.  And again, the

 9   regulation cannot be providing for more power than Section 264

10   does, so I think it should be interpreted similarly.

11           THE COURT:  And I didn't say that it did.  I just said

12   they were sort of oozing in that correction, the same way you

13   were sort of oozing it back in the other direction by using

14   "only."

15           MR. HILBORN:  Sure.

16           THE COURT:  That's fairly accurate.

17           MR. HILBORN:  So that's all I have for --

18           THE COURT:  It may not be successful, but it'll be

19   fair.

20           MR. HILBORN:  That's all I have for statutory and

21   regulatory analysis, and I'll go ahead and move to arbitrary

22   and capricious.

23           (Court reporter clarification.)

24           MR. HILBORN:  Arbitrary and capricious, our claims

25   under that.

```
 1                THE COURT:  All right, sir.

 2                MR. HILBORN:  So I think I can cover these.

 3                THE COURT:  Okay.  Let me just make it clear.  I'm

 4      sorry.  The regulations -- when you said that the CDC never

 5      considered the adequacy of Florida's measures, just real

 6      quickly, what measures were you talking about that you -- that

 7      they had not considered?

 8                MR. HILBORN:  I think the perfect example is in

 9      Exhibit A of what they submitted to Your Honor and more

10      specifically at page 20.  And that's a comment from Port

11      Canaveral one month before the conditional sailing order was --

12      was issued.  And it --

13                THE COURT:  Were there others?

14                MR. HILBORN:  I -- I don't know.

15                THE COURT:  Were there other submissions from the

16      industry or -- that -- that was from the port and not from an

17      operator at the port, as I understand it.

18                MR. HILBORN:  That's correct, Your Honor.  And the

19      defendant submitted selected comments.  There were multiple

20      comments received according to the order.  I -- I haven't gone

21      through them.

22                THE COURT:  And if they were considered, you've not

23      seen any evidence of that consideration?

24                MR. HILBORN:  I don't think there's anything in the

25      order that considers something like what Port Canaveral
```

34

|      |                                                              |
| ---- | ------------------------------------------------------------ |
| 1    | submitted and the safety measures they were taking as of     |
| 2    | September 2020.                                              |
| 3    | THE COURT:  Let me ask you this:  What you ask for in        |
| 4    | your motion and in your complaint is -- well, you asked for two |
| 5    | or three variations of the same thing, but it's basically to |
| 6    | enjoin the CDC from enforcing the conditional sailing order, |
| 7    | right?                                                        |
| 8    | MR. HILBORN:  Correct.                                       |
| 9    | THE COURT:  There are some variations to that, but          |
| 10   | what then would govern the safety of passengers in the cruise |
| 11   | industry in the state of Florida?                            |
| 12   | MR. HILBORN:  So the order itself refers to the             |
| 13   | Healthy Sail Panel, and that's something that the industry has |
| 14   | put together themselves to implement their own safety        |
| 15   | regulations.  So I think that would be the primary governing |
| 16   | document.  Now, of course, there's still Part 70 and Part 71 |
| 17   | that have other regulations in place, but certainly, the order |
| 18   | and its forepart framework would not apply to the cruise     |
| 19   | industry.                                                    |
| 20   | THE COURT:  So it would be governed by the industry's       |
| 21   | panel --                                                     |
| 22   | MR. HILBORN:  Definitely that and then --                   |
| 23   | THE COURT:  -- protocols.                                    |
| 24   | MR. HILBORN:  And whatever regulations and measures         |
| 25   | already are in existence, which I -- I don't know, and I     |

```
 1   apologize.

 2           THE COURT:  So it would be a matter of choice with the

 3   industry.  Does the industry somehow enforce -- does it have an

 4   enforcement mechanism against itself, or is it voluntary?

 5           MR. HILBORN:  Voluntary for -- for the passengers or

 6   voluntary for the cruise industry to --

 7           THE COURT:  Well, whatever the safety regulations

 8   are --

 9           MR. HILBORN:  Sure.

10           THE COURT:  -- to which you refer.

11           MR. HILBORN:  Sure, yes.  I believe that they're

12   voluntary --

13           THE COURT:  When I talked about the adequacy of

14   Florida's -- that you talk about -- this is a quote from your

15   paper -- "consider the adequacy of Florida's measures."  I

16   wanted to know what you meant by "Florida's measures."  Because

17   then the CDC goes on and responds directly to that argument and

18   says Florida never explains what those supposed measures are,

19   much less how they are sufficient to prevent contagion.

20           So you've made a fair comment; they've made a fair

21   response.  So basically asking you to resolve this for me.

22   What measures are you -- you talked about Florida's measures,

23   and I take from your answer a second ago that Florida doesn't

24   have measures.  It's the industry that has measures.  And then

25   my question would be how are they sufficient to echoing the
```

36

 1   CDC's comment?  How are they sufficient to prevent contagion?

 2            MR. HILBORN:  Right.  So the question before the Court

 3   is the CDC's actions at the time they issued the order and the

 4   decision to issue the order.  And so at the time that --

 5            THE COURT:  Right now, the issue is preliminary

 6   injunction.

 7            MR. HILBORN:  Sure.

 8            THE COURT:  And that has to do with harm.

 9            MR. HILBORN:  Sure.

10            THE COURT:  So back to the question, which is what

11   measures did Florida -- what are Florida's measures?  And two,

12   how are they sufficient to prevent contagion?

13            MR. HILBORN:  And this is for the 70.2 precondition,

14   correct?

15            THE COURT:  I don't know what the measures are, and

16   the CDC claims that they don't because Florida, according to

17   them, has never specified them.

18            MR. HILBORN:  Right.  And I think it's on the burden

19   of the CDC to determine that our measures are insufficient and

20   so they need to at least discuss that.  And at the time they

21   made the order, they knew measures that Port Canaveral was

22   taking, as an example, to combat COVID-19.

23            THE COURT:  So your response is that Florida's

24   measures are Canaveral's measures.  If I asked you the same

25   question about Tampa, Port of Tampa, do they have measures that

```
 1    they were taking that were --
 2            MR. HILBORN:  So some --
 3            THE COURT:  I'm trying to get a handle on this little
 4    argument that I've identified here --
 5            MR. HILBORN:  Sure.
 6            THE COURT:  -- in the -- between the two memorandums.
 7    So --
 8            MR. HILBORN:  So 70.2 specifically includes the
 9    political subdivision.  So that does include the ports.  I
10    don't know of the measures that Tampa was taking as of October
11    2020.
12            THE COURT:  But they've been found insufficient by --
13            MR. HILBORN:  The CDC found them insufficient, yes.
14    With --
15            THE COURT:  And you don't have any evidence that the
16    CDC considered them specifically or made any determination
17    about whatever provisions Port of Tampa might make -- might
18    have been making.
19            MR. HILBORN:  No, I don't.  All I have is the order
20    and the reasons given in the order.
21            THE COURT:  Okay.
22            MR. HILBORN:  Now, for arbitrary and capricious, and I
23    think this kind of ties in, the CDC argues that the Court must
24    evaluate the order at the time it was issued, so October 2020.
25    Now, we go through the reasons that the orders are arbitrary
```

38

and capricious in our brief, so I just want to touch quickly on
a few.

The first is that the CDC concluded that the benefits
of opening the cruise industry outweigh keeping it locked down,
but then they proceeded -- we know now that they proceeded to
keep it locked down.  And that's not at all rationally
connected to the CDC's conclusion.

Second, the CDC failed to explain its differential
treatment of the cruise industry.  Many other industries
involve settings like cruises, airlines, casinos, hotels,
restaurants --

(Court reporter admonition.)

MR. HILBORN:  Many other industries involve settings
like cruises, airlines, casinos, hotels, restaurants.  But
unlike cruises, those industries have not been locked down by
the CDC.  And even if the CDC had a good reason for doing that,
they needed to explain that in the order.  And the Supreme
Court has explained that it's not the role of courts to
speculate on the reasons that support the agency's decision.
That's the Encino case we cite in our brief, among others.  The
agency has to actually give an explanation for that and be
judged on that at the time they took the action.

And third, the CDC grounded its order on the state of
affairs at the beginning of the pandemic, and we didn't
understand the virus and we didn't have vaccines.  But the CDC

Case 8:21-cv-01693-KKM-AAS   Document 167-4   Filed 05/13/21   Page 3 of 5   PageID 2407
Case 8:21-cv-01693-SDM-AAS   Document 47   Entered on FLSD Docket 09/05/2012   Page 40 of 162

39

```
 1    knew that vaccines would be available only a few months into

 2    the order.  Yet the order doesn't even mention that, and the

 3    order was due to last for at least a year.

 4          Now, unless the Court has questions about that, I'll

 5    move to notice and comment.

 6          (Court reporter clarification.)

 7          MR. HILBORN:  Notice and comment.  And I'll grab a

 8    quick water, sorry.

 9          So I think notice and comment would go a long way to

10    reign in the CDC's actions here.  First, the order is

11    absolutely a legislative rule.

12          THE COURT:  I would like to just ask one or two quick

13    questions.  Under this notion of arbitrary and capricious, you

14    point out that -- or claim that the CDC didn't consider the

15    ongoing operation of foreign cruise lines.  Isn't that one of

16    the -- I think you state that -- I think that's stated in both

17    the complaint and the motion for preliminary injunction.

18          MR. HILBORN:  Yes.

19          THE COURT:  How long have those cruise lines been

20    operating?

21          MR. HILBORN:  I believe since at least July 2020.

22          THE COURT:  Is there a reservoir of data in existence

23    about their history?

24          MR. HILBORN:  So I think we can look to paragraph 80

25    of the -- of the declaration that the CDC submitted, and I'll
```

1    go ahead and turn that now -- to that now.

2            So again, this is the Treffiletti declaration.  Now,

3    you see that --

4            THE COURT:  I suppose the question -- if the premise

5    is right that you consider this as of October, then the

6    question would be not what's in the Treffiletti declaration

7    because there's a whole lot in there.

8            MR. HILBORN:  Correct, Your Honor.

9            So we -- we don't think that anything added by the

10   technical instructions should save the arbitrary and capricious

11   analysis because Your Honor should consider the order at the

12   time that it was entered.  Now, if Your Honor is inclined to

13   consider the technical instructions, then that's when our

14   argument comes in of considering what's going on now.  Because

15   I think -- I think that's their reasoning that the technical

16   instructions can be considered now and it added a whole bunch

17   of requirements.

18           And so --

19           THE COURT:  In other words, they want the benefit of

20   now, but they don't want the responsibility for now.

21           MR. HILBORN:  Correct, Your Honor.

22           THE COURT:  So that's good if you can work that.

23           MR. HILBORN:  So that's where our looking at foreign

24   countries comes in.

25           THE COURT:  All right.  But my question was -- had to

UNITED STATES DISTRICT COURT - TAMPA DIVISION

1  do with the foreign cruise lines.  And was there data available

2  in October, for example, about that?

3          MR. HILBORN:  So --

4          THE COURT:  Because I understand your -- your tack is

5  on conditional sailing order as of October.

6          MR. HILBORN:  Correct.

7          THE COURT:  It's pretty reasonable to say that the

8  President of the United States had assured everybody, at least

9  not everyone believed him, but said there was going to be

10  within weeks a vaccine and that you sort of raised that

11  specter.  And then you say, well, there's also the fact that

12  the foreign cruise lines or sailing.  Was there a reservoir of

13  data available to the CDC in October 2020 that would have

14  verified the safety of the protocols that were then in effect

15  if -- I assume there were some, maybe not -- in the -- in the

16  foreign cruise line industry?  I think I seem to remember that

17  you specified the ones in Europe and maybe the ones in Northern

18  Europe.  Maybe I just made that up.

19          MR. HILBORN:  So the -- the data I have is what the

20  CDC submitted for data from July 2020 to February 2021, which

21  we can talk about.  Now, again, though, when we -- when we're

22  arguing that the CDC needs to be looking to the -- to the

23  cruise lines now and the success of the cruise lines now to

24  open up the industry, Your Honor pointed out kind of the

25  inconsistencies of the premise.  And my point is that if Your

42

Honor is inclined to consider the technical instructions,
that's when I would push that argument. Because if the
technical instructions are relevant and do inform the analysis
and the CDC gets to constantly change things as things change
on the ground, well, something changing on the ground right now
that the CDC should then be looking at is the success of
foreign cruises abroad.

THE COURT: I guess my question was should they have
looked at that in October 2020?

MR. HILBORN: I think that yes, they should have
looked at it in October 2020. And that --

THE COURT: And did they?

MR. HILBORN: I don't think that the conditional
sailing order mentions it. Now, the no sail orders do mention
it, and they mention it in a negative light as a reason -- they
say that, well, Europe and others have shut down cruises. So
we're -- it's either that they have shut down cruises or it's
not going well. I can't remember. And so they shut it down in
the no sail order. I don't think they bring that back up in
the conditional sailing order, but I could be recalling it
incorrectly.

THE COURT: All right, sir.

MR. HILBORN: So now for notice and comment, and as I
said, I think that would go a long way to reign in the CDC's
actions here. The order is absolutely a legislative rule that

43

should have gone through and needs to go through notice and

comment.

Now, the Eleventh Circuit has said that a legislative

rule creates new law, new rights and new duties.  That's the

Warshauer case at 577 F.3d 1330.  The order purports to create

new binding duties with the force of law that carry again

criminal and civil penalties for failing to follow it.  And the

order has also been utilized to lock down the cruise industry.

So we think it's absolutely a legislative rule.

Now, the defendants do say that they had good cause

not to go through notice and comment because of the emergency

of the pandemic.  So let's think about that for a second.  By

the time of the conditional sailing order in October, the CDC

had already shut down the industry for six months.  The

conditional sailing order the CDC says was about returning to

sailing, not locking down the cruise industry.  So the CDC

wants you to believe that there was an emergency from the

pandemic because there were ships at sea full of infection and

they were coming ashore.  But again, the -- when the

conditional sailing order was signed, the cruise industry had

been shut down for six months.

Now, to invoke good cause based on an emergency, the

rule needs to be doing something to remedy the emergency.  The

Mack Trucks case that we cite in our brief discusses that, and

they give an example of mining safety regulations where the

44

```
 1    agency had to hurry up these regulations to save a disaster
 2    from happening.  That's an emergency-based good cause.  Now,
 3    what was the emergency justifying good cause to abandon notice
 4    and comment for the conditional sailing order?  Was it that the
 5    cruise ships were not sailing and that they needed to return to
 6    sailing?  The only way that the CDC believed that there was an
 7    emergency is if they believed the conditional sailing order was
 8    extending the lockdown to keep the ships locked down.  And we
 9    now know that's exactly what it did.
10            Now, if the pandemic really poses such a problem for
11    the CDC that they could not have gone through notice and
12    comment, then, at a minimum, they should have done what the
13    Federal Government has done for decades and issued an
14    interim-final rule.  And that's where the agency makes a rule
15    effective without comment, but it solicits comment at the time
16    of publication and then it adjusts the final rule based on
17    those comments.  That's the compromise here to the extent there
18    even needs to be one.
19            But again, as we also explained in our brief -- and
20    the CDC doesn't respond to this -- good cause, even if it
21    exists, is a temporary necessity.  Eventually, you need to take
22    the rule through notice and comment.  And I think that notice
23    and comment would at least potentially solve the problem of
24    criminal liability for failing to comply with constantly
25    changing Internet guidance.
```

1        (Court reporter clarification.)

2        MR. HILBORN:  I said that I think that notice and

3   comment would at least potentially solve the problem of

4   criminal liability for failing to comply with constantly

5   changing Internet guidance.

6        Now to briefly touch on our constitutional claims

7   before getting into standing and irreparable harm.  Of course

8   we first think that avoiding the constitutional issues

9   altogether is another reason to adopt argue of the statute.

10  But if the Court disagrees with that, then it must address the

11  constitutional issues.  Now, for nondelegation, there is no

12  intelligible principal under the CDC's construction of the

13  statute.  They can do anything so long as it is in the name of

14  preventing the spread of disease.

15       And again, I've mentioned these regulations and the

16  definition of "carrier."  And I think that's an example where,

17  because ships are under the definition of carrier and so too

18  are cars, trains and planes, holding in the CDC's favor here

19  means that they can do the exact same thing to cars, trains and

20  airlines.  But again, the CDC's reading of Section 264(a) is

21  even broader, and I mentioned that in two weeks ago, that they

22  think that -- I mentioned that two weeks ago in DDC, that they

23  think that that means that they have the power to mandate

24  universal vaccination.  And again, we're in favor of that, but

25  whether you should get vaccinated is a different question than

1    whether an agency can force you to do so under 264(a).

2            Now, again, standing, which I'm sure Your Honor wants

3    to talk about.  So we assert three financial injuries: paying

4    millions in unemployment benefits, losing millions in lost tax

5    dollars and losing millions on port revenue.  Now, I'll walk

6    through each of those in a second, but first, I just want to

7    point out that in the Eleventh Circuit economic injury gives

8    state standing.  That's the Alabama v. Army Corps case that we

9    cite in our brief where the Eleventh Circuit readily concluded

10   that Florida had standing to sue over allegedly illegal agency

11   action that might adversely impact Florida's economy.

12   Defendants, again, do not address that case in their brief.

13   And I think that I could really stop there, but like I said,

14   I'll go through each one.

15           First is unemployment.  And again, the defendants only

16   address unemployment in a footnote under the irreparable harm

17   section.  And I don't think I'm actually giving up any ground

18   to actually say that that -- our unemployment theory, I think,

19   is the most obvious theory that we have.  Because a pocketbook

20   injury is the quintessential injury-in-fact, and whatever

21   "special solicitude" means under the Massachusetts v. EPA case,

22   it can't mean that we somehow have less standing than a private

23   litigant otherwise would to seek redress for financial harm.

24   And in the Chiles case that we cited in our brief that's by the

25   Eleventh Circuit, the Court concluded that a county's having to

```
 1    expend additional money on police personnel to control prison
 2    riots was the epitome of an injury-in-fact.
 3            And there's also support in other federal appellate
 4    courts like the DC Circuit.  One example is the Air Housing v.
 5    EPA case, which is 906 F.3d 1049.  And the DC Circuit said that
 6    states have pocketbook standing to sue based on expenses they
 7    had previously made and may incur again based on the EPA's
 8    failing to properly regulate chemical accidents.  So that's our
 9    unemployment standing.
10            Now for tax dollars, the defendants focus a lot on
11    that.  There's at least two Supreme Court cases that support
12    that.  It's the Gladstone Realtors case, which is 441 U.S. 91,
13    and Wyoming v. Oklahoma, which is 502 U.S. 437.  Now, the
14    defendants cite out-of-circuit cases involving tax dollars
15    standing over generalized grievances of harm to the economy as
16    a whole, which then decrease the overall tax base and then
17    decrease tax dollars to the state.  That is not what we're
18    bringing here.  We point to the loss of tax dollars specific to
19    the CDC shutting down the cruise industry, and that's enough.
20            Now for the ports, our position is that, as the
21    Florida Attorney General's Office, unlike other state agencies,
22    we have standing to sue to assert any harm to the state of
23    Florida, including its political subdivisions.  And we think
24    that's particularly true for the ports because they are purely
25    creatures of the Florida legislature.
```

48

And as for redressability, the CDC acknowledges that more people in ships will be sailing if Your Honor grants an injunction than if you don't.  And you can look to their brief at page 11, at page 44, and then I think the best evidence of that is paragraph 77 of their declaration.  And we only need to show that Your Honor's entering an injunction will mitigate our alleged injuries.  We don't actually need to show that we would be fully redressed.  Again, that's the Massachusetts v. EPA case.  So long as one cruise line sails again or one cruise employee gets rehired, we satisfy redressability.  And as far as depending on third parties, the Supreme Court recently explained in the commerce case, which we cite in our brief, that you can rely on third parties if they are likely to react in predictable ways.  We know that cruise lines and passengers want to cruise again.

Now for irreparable harm, the CDC argues that our harm is not substantial enough.  I don't think that's actually true, but I know that that's not the correct legal test.  In the Eleventh Circuit, in the older Beck case, not to mention the Second, Third, Sixth, Ninth, and Tenth Circuits, they all hold that the lack of the availability of money damages because of sovereign immunity provides for irreparable harm based on financial injury.  And I'll point out that our irreparable harm is not just based on the financial injuries, but it also flows from the cruise ships permanently leaving Florida if they are

49

 1   not allowed to sail soon.

 2          And finally, for balance of the equities, it is always

 3   in the public interest to make the federal government follow

 4   the law.  The order puts hundreds of thousands of Floridians

 5   out of work, and livelihoods are being destroyed.  If the

 6   Federal Government is going to do that, they better make sure

 7   they have the authority and follow proper procedures and turn

 8   square corners.  And further, the record shows, as we

 9   discussed, the cruises have been successful abroad, the

10   Americans are actually flying overseas to go on them, and that

11   the chances of catching COVID on these cruises has been lower

12   than on land.

13          Now, the CDC's declaration at paragraph 80 laments

14   that foreign cruises have resulted in what they call

15   "outbreaks" of five people or one person.  But that just shows

16   that the protocols that the cruise industry has adopted and are

17   using is working because that's containing COVID.  If one

18   person on a cruise ship is all that got COVID, COVID was

19   contained on that cruise ship and it cannot be that the

20   denominator here is zero COVID.  Even the CDC's Dear Colleague

21   letter admits that cruising will never be a zero-risk activity,

22   nor will any of the number of other activities that the CDC is

23   not currently prohibiting.

24          The question --

25          THE COURT:  It never has been.

1            MR. HILBORN:  What was that?

2            THE COURT:  I would have asked, do you know a safe

3    activity, one with zero risk?

4            MR. HILBORN:  No.  Certainly not driving to the

5    courthouse today.

6            THE COURT:  Yeah.  Coming here today, yeah, everybody

7    was at risk.

8            MR. HILBORN:  Right, and --

9            THE COURT:  I think I've been hit in my car twice

10   coming back and forth to the courthouse.

11           MR. HILBORN:  So along those lines, the question is

12   whether responsible cruising presents a disproportionate risk.

13   We submit that it doesn't, and I think I'll pause there and see

14   if the Court has any more questions.  Otherwise, I'll save my

15   remaining points for rebuttal.

16           THE COURT:  Otherwise you'll what?

17           MR. HILBORN:  I'll save my remaining points for

18   rebuttal.

19           THE COURT:  I do have some other questions.  I

20   promised you I wouldn't ask as many as I already have, but at

21   least at the present.

22           Do you know what part of the port revenue is

23   attributable to the cruise -- cruise industry?  I mean, for

24   instance, I don't think there's a lot of cargo in and out at

25   Canaveral, and -- just nuclear submarines and passenger vessels

1    at Canaveral, I think, and fishermen.

2              MR. HILBORN:  I don't know the full breakdown.  But

3    again, for standing we only need to show that we would suffer

4    one dollar of harm.  And if you excuse me, Your Honor, can I

5    actually confer with my co-counsel real quick?

6              THE COURT:  You can always get information if it

7    helps.

8              MR. HILBORN:  Sorry, Your Honor.

9              THE COURT:  This is not an audition, this is an

10   argument.  So if somebody can help, sure, you can -- what do

11   they call it on that game show?  You can, what, dial a friend

12   or whatever it is?

13             MR. HILBORN:  Phone a friend, yes.

14             THE COURT:  Call him.  Poor Ms. Powell has no friends

15   there, so maybe that's --

16             MR. HILBORN:  So --

17             THE COURT:  -- not equitable.

18             MR. HILBORN:  So just quickly, Your Honor, after --

19   after conferring with co-counsel, I actually can represent that

20   the moment that ultimately triggered our lawsuit was the April

21   guidance.  It came out April 2nd, which I think was six days

22   before we filed our complaint, and also seeing the industry's

23   reaction to that guidance as not actually moving the ball

24   forward.

25             THE COURT:  The -- I don't know if this is a fair

52

 1    question or not, but certainly the CDC asks that -- so let me

 2    just see what your response is to it.

 3              Why didn't the industry sue then?  And we certainly

 4    could've avoided this big standing argument that way, right?

 5              MR. HILBORN:  So I --

 6              THE COURT:  Or do you know?

 7              MR. HILBORN:  Well, so point one, I don't think it's

 8    relevant because I think we have independent injuries of the

 9    cruise industry.

10              THE COURT:  I understand that.  Okay.

11              MR. HILBORN:  Point two, I don't think that it would

12    come as a surprise to anyone that there's times when regulated

13    parties are perhaps hesitant to sue the regulators specifically

14    when they're repeat players and have to continue the

15    relationship.  So that's what I'll say to that.

16              THE COURT:  All right.  Another one of the things

17    that -- I don't have the page citation for this, but it

18    certainly pervades the CDC's argument about whether the present

19    regulatory array is a pathway to sailing or a lockdown.  From

20    my perspective, the question is your injury needs to be real

21    and immediate in order to justify an injunction.

22              MR. HILBORN:  Correct.

23              THE COURT:  So if it's possible that the industry can

24    resume activity within weeks, how is it that the State claims a

25    real and immediate injury?

53

MR. HILBORN:  So I think we're being harmed as we stand here today and we will be harmed tomorrow as the cruise industry continues to be shut down.  Now, I think the CDC wants Your Honor to evaluate the order as if it just came out yesterday, and let's take that.  If it had just came out yesterday and it was only going to last for three weeks and it was invalid, I don't think that would allow them to escape injunction of it.  And I think that's essentially similar to what's occurring here.  So we're going to be harmed tomorrow, and that's the question for irreparable harm in entering an injunction.

THE COURT:  And a month from now.

MR. HILBORN:  And a month from now.  That's part of the problem.  Yes, they do say that there's a path to sailing.  They said that in October.  I don't know.

THE COURT:  At least part of your standing claim is parens patriae, and isn't it a general principle that the state of Florida cannot sue parens patriae to protect a citizen against an action by the United States of America?

MR. HILBORN:  So I don't think --

THE COURT:  They might be able to assert it against someone, but since Massachusetts vs. Mellon and things like that, it's unclear, I guess, where the balance -- well, I think it's unclear where the balance of almost any of this is -- are, but isn't that a little bit attenuated?

54

```
 1            MR. HILBORN:  So we are not asserting a parens patriae
 2    theory of standing here.  We're asserting the three distinct
 3    financial harms to us as a sovereign, let alone a quasi
 4    sovereign, and I think that's all that Your Honor --
 5            THE COURT:  So you're not making any assertion of
 6    standing parens patriae?  I thought that you had, but I might
 7    be mistaken.
 8            MR. HILBORN:  The three theories of standing we have
 9    are the three financial harms that I spoke with -- about with
10    Your Honor.  Now, I'm certainly not going to concede that we
11    could not bring a parens patriae action, because as Your Honor
12    points out, I think that's certainly unsettled.
13            THE COURT:  Well, it may not be unsettled if you
14    assert a federal constitutional violation or violation of
15    federal statute for regulation as the basis for that, but
16    anyway.
17            All right.  Okay.  So you're finished for a while?
18            MR. HILBORN:  Yes, Your Honor.
19            THE COURT:  Is that what you were saying?
20            MR. HILBORN:  Yes, Your Honor.
21            THE COURT:  All right.  Well, we've been going for
22    about an hour and 15 minutes.  It may be a good time to take a
23    recess before we recognize Ms. Powell.  Does that sound like a
24    good idea?  So we'll be in recess for about 10 or 15 minutes,
25    and then we'll come back and recognize Ms. Powell.  Maybe I
```

```
 1    should install a phone so she can phone in -- phone a friend.

 2           MS. POWELL:  I don't need friends.

 3           THE COURT:  Thank you.

 4           (Off the record at 10:15 a.m.)

 5           (On the record at 10:41 a.m.)

 6           THE COURT:  All right, Ms. Powell.  Good morning.

 7           MS. POWELL:  Good morning.

 8           Your Honor, the CDC --

 9           THE COURT:  Ms. Powell, if it suits you, there's a

10    little switch right there on that -- do you see that little

11    metal switch?  If you flick that switch, that thing will lower

12    a little bit.

13           MS. POWELL:  I did just lower it a little bit more.

14    Yeah, I'm much shorter than Mr. Hilborn.

15           THE COURT:  You know, they spent an enormous amount of

16    money buying that thing and for -- you can run it on down if

17    you want to because --

18           MS. POWELL:  I'm good.  This is fine for me, if it

19    works for you.

20           THE COURT:  I used to joke with counsel that if

21    Kareem Abdul-Jabbar ever decides to come through the Middle

22    District of Florida to practice law, that's his lectern right

23    there because it will -- you'd be amazed how high that --

24           MS. POWELL:  Cover me right up.

25           THE COURT:  It would.  It would.  But it won't go down
```

56

```
 1   far enough.  We have quite a few counsel who come in who are
 2   five-six or less, and it doesn't help them much.  I just wanted
 3   two -- what I want -- what I asked them to do was just give me
 4   two inexpensive lecterns so that counsel could stand up there
 5   at the same time.  But no.  Instead of that, the government
 6   gave me just one --
 7            MS. POWELL:  One expensive one.
 8            THE COURT:  -- expensive monster.  And I won't go into
 9   the whole story but this -- well, maybe I will.  This panel
10   over here -- see those two little door handle -- door things
11   down there?  If you open that up, there's a whiteboard behind
12   that and it pulls out maybe a foot or so on these expensive
13   springs, these kind of things.  And they anticipated that some
14   lawyer would use that for jury presentations.  Can you imagine
15   that?  Of course no lawyer has ever done so or would in a
16   million years.  It would be crazy to do that.  Half the jury
17   wouldn't even be able to read it.
18            And then the thing that failed -- if you see that
19   black strip along the top there I was telling you this morning?
20            MS. POWELL:  Uh-huh.
21            THE COURT:  That screen lowers from that.
22            MS. POWELL:  Uh-huh.
23            THE COURT:  We had a surge and two or three of them in
24   the building won't now work.  Anyway, that's that.  You'd think
25   that the General Services Administration, who's your landlord
```

1   as well as mine, after building courthouses for more than 200

2   years or however long they've been in existence would have it

3   down by now.  You'd be wrong.

4           All right, Ms. Powell.  Good morning.

5           MS. POWELL:  Good morning.

6           The CDC has imposed reasonable safety protocols as a

7   condition -- a temporary condition -- on the operation of large

8   cruise ships in the United States, acting pursuant to well

9   understood authority in this area.

10          The State of Florida's motion asks this Court to

11  vacate all of those conditions -- not just some of them, but

12  all of them -- a demand that's not only inconsistent with the

13  law, it is dangerous.  Cruise ships were the setting of

14  particularly deadly outbreaks at the outset of the pandemic,

15  and it's been found that they were uniquely problematic.

16  COVID-19 transmitted easily and quickly in crowded and confined

17  conditions on board and then traveled around the world with

18  passenger, ship and crew.

19          THE COURT:  Let me stop you, Ms. Powell.  The initial

20  no sail order in March of 2020.  The duration of that was what?

21          MS. POWELL:  I think the first one may have been a

22  month or two.  I'm not sure exactly.

23          THE COURT:  And then was I correct that there were

24  three more or four more, or were there a total of three or

25  four?

58

```
 1              MS. POWELL:  I think there was the no sail order and
 2    three extensions.
 3              THE COURT:  Three extensions, right.  That's what I
 4    have.  And they were, more or less, 90 days apiece?
 5              MS. POWELL:  More or less.  I think the last one was
 6    30 days.
 7              THE COURT:  That accounts for why it's not longer.
 8    Okay.  And the conditional sail order is a one-year order,
 9    right?
10              MS. POWELL:  Probably.  It expires in November 2021 or
11    it expires at the end of the public health emergency or when
12    the Secretary or CDC sees fit to rescind it.
13              THE COURT:  So we don't know when it ends, but it'll
14    be --
15              MS. POWELL:  It could expire earlier.
16              THE COURT:  -- no longer than November '22 -- '21.
17              MS. POWELL:  2021.  It could, of course, at that time
18    be extended in theory depending, but there would need to be new
19    factual findings.
20              THE COURT:  Would those -- would there need to be a
21    notice and comment to extend it again?
22              MS. POWELL:  If they did -- I'm not sure.  It depends
23    on what they did instead.
24              THE COURT:  I see.
25              MS. POWELL:  Of course the CDC has taken the position
```

1  that this is an order, effectively conditions on a license

2  rather than a rule, such that notice and comment is not

3  required and, in the alternative, made a good cause finding.

4  In theory, they could do that again or they could submit it to

5  notice and comment again if they give themselves sufficient

6  time and if there were sufficient time based on

7  rapidly-changing conditions.

8           THE COURT:  But the result is, at least for the

9  first -- for the duration of the no sail order, that the cruise

10  industry was halted from March until October.

11           MS. POWELL:  So most of the cruise industry had

12  actually voluntarily shut down before that.

13           THE COURT:  Did we agree on the 95-percent number?

14  Was that the number that everybody sort of is using?

15           MS. POWELL:  For those who are part of CLIA or?

16           THE COURT:  I don't know.  You said "most of it."

17  What percentage did you mean?

18           MS. POWELL:  I don't know.  I don't know a precise

19  number.  There are some small ship operators that are not

20  members of CLIA is my understanding, but I don't know how many.

21           THE COURT:  They had shut down before the no sail

22  order, right?

23           MS. POWELL:  Yes.  The industry had generally shut

24  down before the order.  The CDC continued that and as condition

25  of granting free pratique required such ships to disembark all

1   passengers and not embark more pending the duration of the

2   order.

3          THE COURT:  Did the fact that the cruise industry had

4   voluntarily shut down affect the assessment of whether there

5   was an emergency at that moment?

6          MS. POWELL:  Yes.  It's certainly taken into account

7   in the order.  They note and acknowledge that the cruise

8   industry thought it was an emergency too and necessary to shut

9   down, and they considered it necessary to impose the no sail

10  order on top of that, in light of the fact that there were

11  other operators and that they thought the pause in operations

12  needed to continue for some time.

13         THE COURT:  So your understanding is that people who

14  are in the industry but not in the industry group were

15  operating.

16         MS. POWELL:  I don't know actually.  They were not

17  obligated to not operate in the same way that the cruise

18  industry itself had said that it would not operate.  There's no

19  data in the order itself as to who was in operation where.

20         THE COURT:  So when the October '20 order was entered,

21  the industry had been halted since March?

22         MS. POWELL:  Yes.

23         THE COURT:  And presumably no one was going to be able

24  to comply immediately, so there was implicit in the October '20

25  order, at best, some period of additional time that the

61

```
 1    industry was going to be shut or closed.

 2              MS. POWELL:  That's correct.  And Phase 1 required a

 3    couple of things.  One is it required mass testing of crew

 4    members on board and gave them at least 30 days to do that.

 5    And it contemplated the procurement and installation of on

 6    board testing capacity so that future passengers and crew could

 7    be tested as necessary on board without waiting for shoreside

 8    laboratories.  And that was all going to take some time.

 9              THE COURT:  Right.

10              MS. POWELL:  It did, in fact, as the Treffiletti

11    declaration explains, take somewhat longer than expected

12    because the equipment wasn't available.

13              THE COURT:  And in terms of the resumption of sailing,

14    it was necessary to have these Phase 2 specifications,

15    guidelines, technical guidance or whatever you want to call it,

16    that had to be promulgated, right?

17              MS. POWELL:  Correct.

18              THE COURT:  So in October of 2020, fair to say that

19    everyone understood that the industry was probably going to be

20    shut down under the CDC's mandate for at least a year total

21    from March -- at least into March 2021?

22              MS. POWELL:  Oh, I think that is a fair assessment,

23    yes.

24              THE COURT:  I wonder if in trying to get a grasp on

25    some of the issues in this case -- I think everybody has talked
```

```
 1    about -- and certainly the CDC did -- about instances
 2    historically of -- I don't know that you used the term of
 3    "peculiar federal interest," but there was certainly a
 4    historical federal interest in comings and goings at ports and
 5    some of the old Supreme Court cases addressed quarantine.  One
 6    of the more amusing ones is the quarantine of the green teas --
 7    the -- you know, the low-quality teas.  And that was a Supreme
 8    Court case about whether the CDC could quarantine tea.  And
 9    there appears to be some precedent for at least the detention
10    of a vessel long enough to conduct inspections and some of the
11    things that are listed in the statute, fumigation and the like.
12            Do you know of an instance in United States history
13    where a vessel has been detained under this sort of authority,
14    quarantined as it were, for, say, more than three months?
15            MS. POWELL:  So I don't know about specific time
16    frames.  I do know that CDC has previously, even before this
17    pandemic, issued no sail orders to ships under its vessel
18    sanitation program and other things where they found that a
19    particular ship was a problem.
20            THE COURT:  Right.
21            MS. POWELL:  Now --
22            THE COURT:  They have done that ship per ship.
23            MS. POWELL:  Yes.
24            THE COURT:  Do you know of any instance in United
25    States history where they've done it for an industry?
```

63

```
 1              MS. POWELL:  So it might depend on what you call an
 2    industry.
 3              THE COURT:  All right.
 4              MS. POWELL:  There are certainly Public Health Service
 5    Act regulations and things that ban things nationwide.  The
 6    ones that have been litigated are things which are, I realize,
 7    not terribly analogous here, but things like the sale of baby
 8    turtles is prohibited.  There's also a ban on the sale of some
 9    sort of prairie dog, but things like that where they've issued
10    nationwide bans pursuant to the Public Health Service Act.
11              THE COURT:  But you don't know of the quarantining of
12    a vessel, single vessel for, say, a year or more?
13              MS. POWELL:  I don't know any time duration.  So no, I
14    don't have an example I could give you.
15              THE COURT:  Well, I couldn't find one.
16              MS. POWELL:  Yeah.
17              THE COURT:  I scrambled back, and I don't see one --
18    the baby turtle thing wasn't because of any baby turtle disease
19    that was going to affect human beings, right?
20              MS. POWELL:  It was actually.
21              THE COURT:  Was it?
22              MS. POWELL:  Yeah.
23              THE COURT:  What was it?
24              MS. POWELL:  I think the baby turtles were carriers of
25    salmonella and children like to put them in their mouths or
```

```
 1   something like that, and that led to outbreaks in the past.
 2          THE COURT:  They probably don't like to put them in
 3   their mouth a second time.
 4          MS. POWELL:  Yeah, wouldn't think so.
 5          THE COURT:  But not -- so your response is you think
 6   that there have been effective national quarantines on
 7   contagion -- on the basis of contagion, historically?
 8          MS. POWELL:  So I wouldn't call those quarantines,
 9   right.
10          THE COURT:  Right.
11          MS. POWELL:  That's a use of the Public Health Service
12   Act.  They aren't quarantines.
13          THE COURT:  They're bannings --
14          MS. POWELL:  Yes.
15          THE COURT:  -- or prohibitions or something.
16          MS. POWELL:  Yes, they -- and the Vessel Sanitation
17   Program that's described in the Treffiletti declaration imposes
18   specific requirements on certain kinds of ships to do certain
19   sorts of sanitation measures to prevent the sorts of
20   gastroenteritis problems that were a problem aboard cruise
21   ships specifically.
22          THE COURT:  But in those situations, some ships would
23   comply and presumably go away after an inspection unaffected
24   and other vessels, if noncompliant, would be detained.  Those
25   specific items satisfied, and if they were, then they would be
```

65

1   released --

2          MS. POWELL:  That's true.  The condition --

3          THE COURT:  -- or permitted into port as the case

4   might be.

5          MS. POWELL:  That's right.  The conditions are imposed

6   on a nationwide basis is my understanding.  But they are

7   complied with on a ship-by-ship basis.  And I want to resist

8   the --

9          THE COURT:  And that didn't happen here, right?  I

10  mean, this is -- this is -- this would apply presumably to a

11  ship with no instances of -- of COVID on the ship and ones

12  without.

13         MS. POWELL:  It is a -- so I want to resist a little

14  bit the idea that the CSO requires a shutdown, which is

15  language that plaintiff has used that I don't think is

16  accurate.  The no sail order and the industry suspension

17  effectively required a temporary shutdown.

18         THE COURT:  We agreed that it effectively created a

19  shutdown at least through March of 2021.  The question is the

20  duration of the shutdown that it created.

21         MS. POWELL:  Well, the question is what the CSO did,

22  which I agree --

23         THE COURT:  I asked you if the industry was not shut

24  down, if the effect of the CSO was not to shut down the

25  industry for a total at a minimum of March '20 to March '21,

1   and you agreed.

2          MS. POWELL:  Well, the effect of the CSO was to make

3   sure it could not -- that ships could not start back up until

4   conditions were in place, which would take, at a minimum, a few

5   more months.

6          THE COURT:  Right.

7          MS. POWELL:  Now we are now in a place --

8          THE COURT:  So are we splitting the difference between

9   what is a set of conditions that cannot be satisfied for six

10  months and a shutdown for six months?  Is that the difference

11  that we're focused on?

12         MS. POWELL:  Yes.

13         THE COURT:  And how much of a difference is that?

14         MS. POWELL:  A fairly significant one.

15         THE COURT:  And identify the significance -- material

16  significance of that distinction.

17         MS. POWELL:  Well, for example, I think plaintiff

18  concedes that a lot of the conditions are perfectly lawful and

19  within the CDC's authority.  Conditions within the CSO and the

20  now promulgated --

21         THE COURT:  I'm sorry.  The difference -- the question

22  was what is the difference in material terms between issuing a

23  set of -- between issuing an order that says you can't sail for

24  six months and issuing a set of conditions that restricts

25  sailings that -- which conditions cannot be satisfied under any

1    circumstances for six months?

2          MS. POWELL:  Well, I think as a factual difference,

3    you are correct, right.  It'll take them a while to meet it.

4    There is, however, a legal difference.  It is the difference

5    between saying you cannot drive or you can drive after you pass

6    a driving course and a test and get your driver's license.  And

7    that is what is being required here.

8          THE COURT:  Not if you have a contract to drive for

9    money in 30 days and you can't get a driver's license test for

10   six months -- or for two months, you're done.

11         MS. POWELL:  The analogy gets a bit strained, I

12   realize.  But it is a set of conditions that takes a certain

13   amount of time to meet, and they can meet them now.

14         THE COURT:  They can meet them now, but they couldn't

15   meet them, we've agreed, until March at best.

16         MS. POWELL:  Probably, yes.

17         THE COURT:  Okay.  All right.  We don't know of an

18   instance in United States history where an industry has been

19   closed because of -- of a quarantine of this nature.

20         MS. POWELL:  Unless you count something like baby

21   turtles as an industry.

22         THE COURT:  Unless we count the turtles, and I

23   would --

24         MS. POWELL:  I would add that --

25         THE COURT:  I don't think that would be an industry.

68

 1   I don't -- that's certainly the distribution of a product, but

 2   I don't think we'd be shutting down an industry.  It would

 3   be -- maybe if you said the sale of -- retail sale of pets,

 4   that might come closer to an industry or something like that.

 5            MS. POWELL:  I would say this is somewhere in between,

 6   right.  Remember there are currently 59 ships that are subject

 7   to the CSO because they intend to operate in U.S. waters.  So

 8   yes, it is an industry, but it is a clearly identified set of

 9   ships.  There may be more in the future as more enter U.S.

10   waters or intend to operate, but it is currently 59 ships that

11   are subject to the order.

12            THE COURT:  You mean today?

13            MS. POWELL:  Yes, as of yesterday when I asked.

14            THE COURT:  Were there 59 in March of 2020?

15            MS. POWELL:  There were more then.  I don't recall the

16   number.

17            THE COURT:  All right.  So the rest of them have gone

18   away.  Okay.

19            MS. POWELL:  They tend to circulate in and out of U.S.

20   waters on a seasonal basis, so...

21            THE COURT:  So we don't know actually what the

22   operating U.S. cruise industry -- you're not saying that the

23   operating U.S. cruise industry over a year comprises 59

24   vessels, right?

25            MS. POWELL:  No.  I'm saying that the number of

1 vessels that have said they intend to operate in U.S. waters

2 this year is 59.

3          THE COURT:  Okay.

4          MS. POWELL:  And it's not under any circumstances

5 thousands of vessels, like...

6          THE COURT:  No.

7          MS. POWELL:  We are talking a clearly identifiable set

8 of vessels.

9          THE COURT:  Correct.

10          MS. POWELL:  I'm happy to be directed where the Court

11 likes if you want me to jump into the statutory interpretation.

12 I was going to touch on standing and harm first.

13          THE COURT:  As you like.

14          MS. POWELL:  Okay.  With standing, plaintiffs have to

15 establish standing for the specific form of relief sought.

16 Here, they have not and cannot seek redress for their lost tax

17 revenues and other injuries of last year.  None of those past

18 injuries are fairly traceable to defendants, nor redressable by

19 this Court in any event.  But the Supreme Court says to seek

20 relief looking forward, you have to look at injury going

21 forward.  And, in fact, plaintiffs have to show a certainly

22 impending future injury.

23          Here -- so we have to look at where we are now.  The

24 cruise industry, which has not joined this lawsuit, has

25 advocated for lifting the CSO, but that is because they say

1   they want to restart operations around July.  The CDC -- in

2   fact, they don't want to restart operations.  They want to

3   begin a phased resumption of operations around July.  The CDC

4   has said that with the currently issued guidance, i.e.

5   everything that came out last week, the industry can resume

6   phased operations beginning around July.

7         Now, that's a prediction.  There are uncertainties

8   built in, but what plaintiffs have to prove here is a certainly

9   impending future difference.  They haven't put in anything that

10  would predict the difference for the state of Florida's

11  finances between operating with the CSO and without the CSO.

12  They have pointed generally to harm to their citizens and

13  economy.  I understand them to now be abjuring the parens

14  patriae argument.  That leaves them with -- they said tax

15  revenues, unemployment and port fees.  Everything they put in

16  goes to past injuries on those fronts.  With respect to tax

17  revenues, the Supreme Court has actually recognized, including

18  in one of the cases they cite, that a state cannot establish

19  standing based on indirect effects on general tax revenues.

20        THE COURT:  No, that's -- that's precisely what they

21  said, but that's indirect effects on general revenues.  And

22  they're not really doing that according to counsel in the first

23  presentation.  His position was that they were establishing a

24  direct effect to a specified very narrow revenue that the

25  Supreme Court didn't say never based it on any revenue.  It's

1    just sort of a revenue to the general fund of the State.

2             MS. POWELL:  Right.

3             THE COURT:  They're talking about the ports which

4    operate, of course, with a distinctive revenue extreme.

5             MS. POWELL:  Sure.  They've asserted three different

6    injuries.  One was this affect on their general tax revenues,

7    and that is all that declaration -- I forget which one it was

8    now -- reflects, which is general tax revenues effects on their

9    income tax and sales tax collected that are affected indirectly

10   because the cruise ship industry was not operating last year.

11            Those are past revenues, but they're also not

12   connected to a specific tax on cruise industries.  So the

13   exception to the general rule that tax revenues aren't

14   sufficient was explained in Wyoming v. Oklahoma where there was

15   a specific challenged action which targeted a specific tax

16   collection of another state.  This coal extraction tax for

17   taking the coal out of state, and it targeted that tax because

18   it didn't want the other state's citizens paying that tax

19   instead of their own.

20            So they have no similar link here to a direct cruise

21   ship industry specific tax.  I think that injury falls away.

22   Their unemployment benefits, now, the only thing they've put

23   in, of course, is about their past losses, not a prediction of

24   future losses nor anything that attributes those losses to the

25   conditional sailing order.  The individuals who are currently

72

1    or were in 2020 on unemployment are no more likely in the

2    result of an injunction to seek employment with the cruise

3    industry as opposed to elsewhere.  So it's not an injury this

4    Court can necessarily redress.  And we know that the cruise

5    industry hires primarily abroad, so it's not particularly

6    likely that it would be redressed given that the industry

7    primarily hires foreign workers.

8           And the third was the port fees.

9           THE COURT:  Did they limit -- did Florida limit its

10   claim about unemployment to crew members?

11          MS. POWELL:  It was unclear to me.  I think it was

12   broader than crew members, and some of those are certainly --

13   there are, obviously, some employees who are hired in the

14   United States.  But whether as a result of an injunction here

15   those people would be hired specifically by the cruise industry

16   and get off unemployment is at best speculative.

17          The port fees is a little harder to know how to

18   respond to.  All they have is a declaration indicating total

19   port revenues from last year without tying those specifically

20   to the cruise industry, even much less what would be collected

21   if the injunction were lifted.

22          And I don't think that the case they specifically

23   refer to, the Army Corps of Engineer case is particularly

24   helpful to them.  Ultimately, the court -- the Eleventh Circuit

25   does, in fact, mention the economy, but it is based upon the

73

```
 1    State's sovereign rights in an economic and other interest in

 2    water.  It is litigation about the federal management of water

 3    reservoir and that it recognizes the State's sort of unique

 4    rights in its own land, although it does mention the downstream

 5    economic effects as well.  I think it's pretty clear under the

 6    sort of environmental injury type cases the State's control

 7    over its land, air and water tends to give rise to standing,

 8    and nothing similar here with respect to cruise ships.

 9           THE COURT:  So -- I mean, there are -- there are, for

10    instance, fuel that's put on those cruise ships, right?

11           MS. POWELL:  Uh-huh.

12           THE COURT:  And that's taxed by the state of Florida

13    in addition to the United States?

14           MS. POWELL:  I presume so.

15           THE COURT:  And there are -- there are motel rooms,

16    the occupancy of which is taxed by the state of Florida very

17    heavily, I might say.  That's a good source of revenue for the

18    state of Florida, which accounts for one of the reasons why you

19    referenced to an income tax.  I know it was inadvertent, but we

20    don't have one.  And there are, of course, the portage fees.

21    But, you know, there are people operating the tugs.  There are

22    people operating food services for the vessels.  They take on a

23    lot of food, they take on a lot of fuel, they take on water.

24    They stay in motel rooms, baggage has to get handled,

25    passengers have to be delivered.
```

74

1          A lot of people fly into Tampa International Airport

2     and then transport from the airport to the -- to the port,

3     which is right here.  My window overlooks it, as a matter of

4     fact.  So I see and hear the comings and goings of the vessels

5     when they're coming and going.

6          But is that -- is that fair game for the state of

7     Florida to say that all those people are unemployed to the

8     extent that they were -- if you're handling baggage on a

9     passenger ship, or handling -- driving people back and forth to

10    the passenger ships, you probably are unemployed.  Or if you're

11    not -- if you're a pilot for a tug and there's no vessel to

12    position, you're unemployed.  But they didn't detail that in

13    any event, that's for sure.

14         MS. POWELL:  True, they did not.  And I think they

15    have to, to fall within that exception to the tax issue.  Some

16    of those -- I mean, I don't want to overstate any case, right?

17    I am not arguing that this has zero effect on the economy of

18    the state of Florida, you know.

19         THE COURT:  Right.  That wouldn't be --

20         MS. POWELL:  No.

21         THE COURT:  -- a viable position.

22         MS. POWELL:  That's not where we are.  We're arguing

23    that they haven't showed a specific pecuniary or territorial

24    interest in the outcome of -- especially of this particular

25    injunction, that they have to show that it wouldn't --

```
 1              THE COURT:  They haven't quantified the loss --

 2              MS. POWELL:  Correct.

 3              THE COURT:  -- that they're asking me to weigh.  But

 4   didn't they say $82 million?

 5              MS. POWELL:  I think that was, like, total tax

 6   revenues from 2020 when the cruise industry was voluntarily

 7   shut down and tourism was at another -- there were lots of

 8   problems other than the no sail orders, which are no longer

 9   even in effect.  Like, to bring this injunction, they have to

10   tie an injury specifically to the CSO, which is hard to do when

11   the cruise industry has said that all they want to do is open

12   operations in July, and the CDC has said they think they can

13   open operations in July.

14              To transition hopefully smoothly, the same analysis

15   goes to irreparable harm as well.  In Swain vs. Junior, the

16   Eleventh Circuit's analysis is particularly helpful.  The

17   Eleventh Circuit found that the district court had erred in

18   issuing a mandatory injunction without -- which changed the

19   status quo without making specific findings about what would

20   have happened with and without the injunction, but it had to

21   consider specifically the other measures that were -- that

22   would take place absent an injunction and whether or not those

23   would ameliorate the harm.  Plaintiff hasn't even attempted to

24   do that here and tie any injury to the CSO.

25              Counsel argued about all these uncertainties, and they
```

1   weren't sure whether the cruise industry could open.  We don't

2   think that's sufficient to establish standing because it's not

3   a "certainly impending" future injury, and certainly not

4   sufficient to establish the irreparable harm necessary for the

5   extraordinary remedy of a preliminary injunction.  Thus --

6           THE COURT:  Your use of the term "status quo" -- I

7   know there was a little bit of a discussion about this in the

8   motion and in your response.  You are treating the status

9   quo -- you're treating the term "status quo" to mean the

10   circumstance with the CSO in order -- in effect.

11           MS. POWELL:  Correct.

12           THE COURT:  Often, that phrase is "status quo ante."

13   Somebody begins to do something, a litigant comes to court and

14   wants them to stop doing this and restore the status quo ante.

15   And there's certainly plenty of precedent for stopping the

16   status quo ante, so I'm not sure -- maybe this is another

17   semantic problem there, but it's also a real distinction.  Very

18   often, litigants, when they ask for an injunctive relief, want

19   me to enjoin something that's being done and restore the status

20   quo ante.  I take that to be what the State's doing, which

21   seems to be entirely within the purview of the power of

22   injunction.

23           MS. POWELL:  I mean, we're not arguing --

24           THE COURT:  It would be a mandatory injunction if I

25   ordered you to build a new port.

```
 1              MS. POWELL:  I think the Eleventh Circuit --

 2              THE COURT:  It would be a status quo ante if I ordered

 3    you to stop building the one that you're building.  You know, I

 4    know you're not.  So anyway, not to quibble about that, but I

 5    did -- the reason that that argument didn't appeal to me

 6    particularly was because it is not a mandatory injunction.  It

 7    is a typical negative injunction, which is to stop enforcing --

 8    that they seek, which is to stop enforcing this order.

 9              MS. POWELL:  I'm not sure we agree, but I understand

10    the point.

11              THE COURT:  It requires you to defer, to not act

12    rather than to act, and it restores the status quo ante if they

13    get it.

14              MS. POWELL:  So the status quo ante of February 2020,

15    in which cruise operations are not subject to any COVID-19

16    controls?

17              THE COURT:  That was the question that I was trying to

18    ask counsel in the first thing, which is, what is it that he

19    wants, what is it that he exactly is asking me to do, and

20    what -- what regime will be in place if he were to be rewarded

21    that relief?  So, yes, that's exactly what I asked him, and

22    that's what I came around to ask you the same thing in a little

23    bit different way.  But that's what I understood him to be

24    asking me to do, is to restore the status quo ante, although I

25    don't think they said it that way.
```

1            MS. POWELL:  No, the Government certainly wouldn't

2       characterize it that way, but I take your point.

3            So we think that even if plaintiff had shown some

4       diminution in tax revenue that they have not established here

5       because they haven't shown it, it's a diminution that could be

6       redressed by an injunction.  It's not the sort of irreparable

7       injury -- significant irreparable injury that warrants the

8       still extraordinary remedy of the preliminary injunction.

9            THE COURT:  And your primary argument that they can't

10      show redressability is that they can't -- there's no guarantee,

11      and they therefore cannot assure that people will actually --

12      if -- assume however long it would take the industry to begin

13      sailing, they can't guarantee who -- not who, how many

14      passengers would be on those vessels, how many of the vessels

15      there would be, and therefore what revenue would be involved.

16           MS. POWELL:  I want to acknowledge there's a lot of

17      uncertainty sort of involved in that, what the landscape looks

18      like if the CSO is enjoined.  It is true that there would be no

19      prohibition at that point on resuming operations, but the

20      cruise industry has said they want to resume in July.  There

21      aren't any pending plans to resume before that.  That is part

22      of their advocacy for lifting the CSO, is that they want to

23      resume in July.  So there's no reason to think they would

24      necessarily start sooner.  If they did, if they skipped some of

25      the safety steps that we think are absolutely necessary, that

 1  would pose a significant danger to the public health.  CDC has

 2  made findings about outbreaks in the past.  Sooner or later,

 3  someone will skip a safety step.  The question is whether there

 4  are sufficient response plans in place to deal with it and

 5  contain it so that it does not become a significant outbreak.

 6          And --

 7          THE COURT:  When you say that the cruise industry

 8  wants to resume in July, I think everyone would agree that they

 9  do want to resume in July.  The question is, would they also

10  want to resume in June?  Are you saying that you have some

11  information suggesting that the cruise industry does not want

12  to or think it's capable of resuming operations before July in

13  a safe manner?

14          MS. POWELL:  I think that is consistent with what the

15  cruise industry itself has said.  The statement from the cruise

16  industry that we put into the record says they want the CSO

17  lifted now so that they can resume operations in July.

18          THE COURT:  Oh, I see.  You meant -- you meant resume

19  operations in July without the CSO.

20          MS. POWELL:  Yes.

21          THE COURT:  I see.

22          MS. POWELL:  But that is the fastest they have said

23  that they think they can do so safely.

24          THE COURT:  And that statement is in the record?

25          MS. POWELL:  Yes, it is.  It is in -- I got my exhibit

1    list.

2         THE COURT:  Even without a citation, if you can just

3    give me a descriptor of where it is, I can probably find it.

4         MS. POWELL:  Sure.  It appears most directly in

5    Defendants' Exhibit 8, which is a statement from the cruise

6    industry.

7         THE COURT:  I see.

8         MS. POWELL:  It is strongly implied in Exhibit B to

9    the Treffiletti declaration, which is the CDC's Dear Colleague

10   letter that says "consistent with our understanding of what you

11   want" -- I'm paraphrasing, but -- "we hope that operations can

12   begin around midsummer."  And the Treffiletti declaration

13   itself says something similar to that effect.

14        Counsel argued that sovereign immunity means that any

15   injury will do just one ship.  I don't think that's consistent

16   with the case law.  It is true that the United States has

17   sovereign immunity and they cannot recover damages against the

18   United States or its agencies.  It is not true that one dollar

19   of injury will suffice for the extraordinary remedy of

20   preliminary injunction, and the Eleventh Circuit hasn't held

21   otherwise.  It has to be a significant injury, and they haven't

22   even attempted to quantify the forward-looking injury here.

23        And I'm happy to move onto the merits if you don't

24   have questions about that.

25        THE COURT:  About standing?

81

```
 1              MS. POWELL:  Or harm.

 2              THE COURT:  Or harm.  Go ahead.  I may have some

 3    questions later.

 4              MS. POWELL:  Sure.

 5              THE COURT:  I promised both of you I wouldn't

 6    interrupt too many times during your direct.  I think I'm

 7    subject to contempt by Mr. Hilborn on the first presentation,

 8    so...

 9              MS. POWELL:  I don't really like listening to myself

10    talk.  I'd rather answer the Court's questions.

11              THE COURT:  I see.

12              MS. POWELL:  On the CDC's statutory authority, we

13    begin, of course, with the text of the statute, which I know

14    you have in front of you and was read earlier.  I think this

15    flexible language vests a great deal of discretion in the

16    Secretary to determine what is necessary to prevent the

17    introduction, transmission or spread of the disease, focusing

18    on transmission across state and international borders.

19              THE COURT:  I understand you were asked elsewhere

20    exactly how far that authority goes.  Is there some bound to

21    it -- identifiable bound to how -- to your authority?

22              MS. POWELL:  Yes.  At a bare minimum, the CDC needs to

23    be making a finding that there is a risk of the interstate or

24    international transmission of the disease at issue.  So that's

25    one very important bound, and they have to find that the
```

82

1    measures are necessary to control it.

2           THE COURT:  Then I'll rephrase it.  Is there any bound

3    on what measures the CDC can implement?

4           MS. POWELL:  I'm not sure what you -- I thought I just

5    answered that question, so maybe I didn't understand it.

6           THE COURT:  No.  You asked -- you answered the

7    question, is there any bound on when they can resort to

8    measures.  That's the question that you answered, which is not

9    the question I intended to ask because I knew that answer.  The

10   question that I intended to ask that I understand you were

11   asked elsewhere, quite understandably, was, what is the bound

12   on the remedial measures that the CDC has at its control?

13           For instance, we found out here it can issue a no

14   sailing order that closes an industry, or I'm sure counsel

15   would remind me, claims that it can under its statutory grant.

16   Are there any bounds on CDC's authority?  Could it shut down

17   the airline industry?

18           MS. POWELL:  So the answer is the bound in the statute

19   is clearly that it be necessary.  That -- and I think that

20   bounds of necessary is going to be pretty expansive during a

21   public health emergency.  It's going to depend on the specific

22   findings of the CDC and that circumstances.  I don't want to --

23   I don't feel like for this case in particular we need to

24   explore the outer edges of the Public Health Service Act

25   authority because what the CDC has done here is regulate the

 1    conveyances of interstate and international travel during an
 2    emergency in which those specific conveyances as a category
 3    were found to pose a risk of transmission of the disease
 4    because of the characteristics of those conveyances.
 5             This is not playing --
 6             THE COURT:  I understand you regulated it at least so
 7    far by halting it.
 8             MS. POWELL:  Correct.  There was --
 9             THE COURT:  So I'm asking is there any bound -- so you
10    could do anything that the CDC -- and I guess this is the
11    Secretary, Mr. Becerra.  I guess if he thinks it's necessary
12    and there's some kind of emergency, he can do it under this
13    statute.  So my question is, could he shut down transportation
14    in general?  That is, stop the airline industry, the train
15    industry, the bus industry, which, you know, the Greyhound
16    folks and people like that, stop the sail service, which I
17    guess that's -- everyone would regard that as extreme, right?
18    Stop the Acela service.  Is there a bound on what he can --
19    what he can do on a finding necessary?
20             MS. POWELL:  It had to -- it would have to include the
21    findings.  It's all subject to APA review at least absent some
22    unusual condition.
23             THE COURT:  Well, it --
24             MS. POWELL:  So --
25             THE COURT:  -- it wasn't subject to it here.  It's

84

1   just done.

2          MS. POWELL:  I mean, it's subject to APA review by a

3   court, Your Honor.

4          THE COURT:  Well, that's --

5          MS. POWELL:  The question is whether the -- the

6   Secretary in those instances, if they shut down all travel,

7   have acted arbitrarily.  And maybe that would be arbitrary.  It

8   sounds awfully arbitrary to just -- to shut down all car

9   travel.

10         THE COURT:  Well, in this --

11         MS. POWELL:  And if it's interstate car travel --

12         THE COURT:  -- in this circumstance --

13         MS. POWELL:  Yeah.

14         THE COURT:  -- could he have shut down the airline

15   industry because of the -- because we didn't know -- as you

16   said, we didn't know what the contagion level was and other

17   factors and all these kind of things in this situation.  Could

18   he have just shut down the airline industry?

19         MS. POWELL:  If he had made a finding that the

20   airlines were specifically contributing to the spread of the

21   interstate and international spread of the disease and that

22   this was necessary.  And then there would be questions about

23   whether that was arbitrary under the circumstances, whether his

24   findings were sufficient.  So I think that yes, the statutory

25   authority would encompass that.  That doesn't mean it's

85

```
 1    justified, but when we're talking about the --

 2            THE COURT:  When you say the statutory authority,

 3    then, your -- your position is that he could -- he could impose

 4    any remedy that he found to be necessary subject to judicial

 5    review of arbitrary capricious.

 6            MS. POWELL:  Yes.

 7            THE COURT:  Close the border?

 8            MS. POWELL:  We did that subject to different

 9    authority.

10            THE COURT:  Well, indeed.  So the president can close

11    the border under -- let's say suppose the president hadn't done

12    it or had come out and said, I won't do it.  It's not

13    necessary.  In fact, very prominent people said the president

14    shouldn't have done it.  So then can the director of CDC come

15    out the next day and say, well, I'm going to do it -- and I

16    almost said trump the president -- supersedes -- supersedes the

17    president's authority?

18            MS. POWELL:  Well, they can't supersede the

19    president's authority if the president -- if the president can

20    overrule them, but they can issue orders about the border and,

21    in fact, have, some of which have, in fact, been challenged or

22    are now in court.  That's separate authority for doing that --

23            THE COURT:  Which border?

24            MS. POWELL:  Huh?

25            THE COURT:  Which border?
```

```
 1              MS. POWELL:  So the -- so the section -- I'm going to
 2    mess this up.
 3              THE COURT:  You're talking about ports of entry?
 4              MS. POWELL:  Yes.
 5              THE COURT:  Okay.
 6              MS. POWELL:  They have imposed significant
 7    restrictions on ports of entry in their operation.  And, in
 8    fact, the president's order actually closed the northern and
 9    southern borders for a time.  So that is, in fact, authority
10    they've exercised.  But primarily, there's a separate section
11    of the statute that deals with that though, and I think we
12    would argue it is supplemented by this section of the statute
13    as well, but the sort of conveyances of international commerce
14    we're talking about.
15              THE COURT:  You said a moment ago that the
16    president -- the president could overrule the secretary of HHS
17    on this.  Did I understand you to say that?
18              MS. POWELL:  I don't know if that's correct, actually.
19    I'm sorry I misspoke.
20              THE COURT:  Yeah, I don't -- I didn't spot that
21    anywhere that he could.  I think the question that I asked is
22    yes, he could if the President of the United States said, No, I
23    refuse to do what President Trump did, I refuse to stop airline
24    flights back and forth from -- where was it -- Europe and China
25    and maybe some other places and the CDC director could come out
```

1  or HSS secretary could come out the next day and say, Well, I'm

2  going to do it under this authority.

3       MS. POWELL:  That just might have some compelling

4  arbitrary capricious arguments in that case.

5       THE COURT:  And they would be -- they would be subject

6  to litigation.

7       MS. POWELL:  Yes.

8       THE COURT:  So they could file a suit.

9       MS. POWELL:  Yes.

10       THE COURT:  And that suit would -- okay.

11       MS. POWELL:  But again, all of that goes to sort of

12  the outer limits of what the CDC can do.  What the CSO does --

13       THE COURT:  Well, I'm trying to get to the point of

14  what the outer limit is, and you just say it's just what they

15  find necessary.

16       MS. POWELL:  Yes, I think that's correct.  There

17  are --

18       THE COURT:  Which means it's not identifiable.

19       MS. POWELL:  Well, it means that it's flexible based

20  on discretion intentionally conferred upon the Secretary with

21  these specific kinds of findings, right?  It is intended to be

22  flexible language.  Congress knows how to legislate broadly and

23  how to do so narrowly.  They legislated broadly here.

24       I think some of the wind goes out of plaintiff's sails

25  there.  Again, that was not intended, I apologize.

1    THE COURT:  It happens.

2    MS. POWELL:  Completely inappropriate.

3    When plaintiff concedes that the regulations

4    themselves are within the authority and only disputes that the

5    CSO itself is.  We think the CSO is within the regulations.

6    They provide that upon finding that a carrier may be infected

7    or contaminated, the CDC can require a list of public health

8    measures and the CDC can require as a condition of free

9    pratique the ability to begin operations in U.S. ports, can

10   impose reasonable safety protocols of various kinds.

11   That's exactly what the CSO does.  Now, plaintiff

12   argues that those take too long or effectively shut down, but

13   all of that goes to whether or not they're reasonable under the

14   circumstances, whether they are too time-consuming or too

15   onerous.  They don't go to whether or not they fall within the

16   regulations in the statute.

17   Frankly, if there were any gaps in the CDC's

18   regulatory authority here with respect to arriving carriers, we

19   think it's amply filled in by Part 70.2 which permits the CDC

20   to act in the event of inadequate local control.  Plaintiffs

21   are quite correct, of course, that the CDC didn't find that

22   some port was acting negligently or that there was a specific

23   inappropriate action by a local authority.  They didn't think

24   that was necessary under the circumstances because they make

25   the common-sense conclusion that cruise ships have motors and

89

1    rudders and are primarily international vessels and mostly

2    foreign-flagged and they move from jurisdiction to

3    jurisdiction, and it is impossible for any local port to

4    inspect and enforce outside their jurisdiction.

5             THE COURT:  That was the basis on which the CDC found

6    the state standards insufficient, is that right?

7             MS. POWELL:  Yes, and that local control was

8    inadequate during the course of this pandemic for where that

9    specific reason, that --

10            THE COURT:  You've -- so the CDC found that -- so

11   almost sort of as an abstract matter as a generalization as --

12   I think I've described it as a global determination earlier,

13   that local control was inadequate to deal with international

14   travel.

15            MS. POWELL:  During the course of the pandemic based

16   on specific findings about cruise ships which have been known

17   to be the source of international transmission of the disease.

18            THE COURT:  As have airlines, right?

19            MS. POWELL:  Probably.  I don't know if they've done

20   anything like on the scale for any specific flight, obviously

21   doesn't carry thousands of people most likely, much less

22   require the sort of enormous response efforts that were

23   necessary to disembark cruise ships and provide for quarantine

24   and isolation facilities for thousands of people on one ship.

25            THE COURT:  Well, let me make sure that I understand.

1   Did you find that -- I'm sorry about this new thing, I know you

2   weren't involved in this any more than I was --

3           MS. POWELL:  That's all right.

4           THE COURT:  -- and Mr. Hilborn.

5           Did the CDC examine what, if any, controls were in

6   place and determine them inadequate?

7           MS. POWELL:  No.  In the sense of making specific

8   findings about them, certainly not.  There are things that CDC

9   was aware of as a result of the public comment period and

10   things like that at the time of the CSO.

11           I want to --

12           THE COURT:  Is there -- is there some regulation or

13   requirement for health that the CDC is requiring now or will

14   require as the resumption of sailing occurs that could not be

15   imposed by the State?

16           MS. POWELL:  Yes.

17           THE COURT:  And that -- I include the port.

18           MS. POWELL:  Yes.

19           THE COURT:  And what is that?

20           MS. POWELL:  States can't impose any measure outside

21   their jurisdictions.  So they can't inspect a ship that is

22   currently in Mexico or Galveston before it enters U.S. waters.

23           THE COURT:  They can't -- say that again.

24           MS. POWELL:  They can't, for example, inspect a ship

25   or issue citations for a ship that's outside their

```
 1   jurisdiction.

 2           THE COURT:  Correct.  But the -- the State or its

 3   subdivisions could enact inspection and entry requirements for

 4   any port, right?

 5           MS. POWELL:  It could.  And if all -- every state

 6   court --

 7           THE COURT:  So my question was, was there anything

 8   that the CDC can impose or condition on -- create as a

 9   condition of entry into a port or disembarkation from a

10   court -- is that the right word -- from a vessel that the

11   State, in its political subdivisions, could not impose?

12           MS. POWELL:  So if the question is whether every

13   jurisdiction and port in the country could get together and

14   impose the CDC protocols for their port and whether that would

15   work just as well, quite possibly, but the inter-jurisdictional

16   enforcement would be complicated at best.  I would note that

17   the comments that Florida pointed to in their presentation

18   actually sort of undermined that.

19           THE COURT:  Are there any restrictions on traveling

20   from one American port to another American port?

21           MS. POWELL:  Currently, not that I'm aware of.  The --

22           THE COURT:  But you didn't look and say, Well, does

23   Port Canaveral have adequate --

24           MS. POWELL:  Well, they don't, and they told us they

25   don't.  So for example --
```

```
1           THE COURT:  Well, excuse me for invoking privilege.
2     But you didn't look -- as I understand it from what first
3     counsel said, you didn't look at to determine whether Port
4     Canaveral was adequate -- had adequate controls or whether Port
5     Tampa did or whether the port in Fort Lauderdale did or Miami
6     or whatever's there and the port in Galveston and assess each
7     one of theirs and determine whether there were some ports that
8     should be allowed to sail and some not.  You made a global
9     determination that it was not possible for the state to
10    regulate and dismissed them out of hand as a whole, if I
11    understand what the CDC did based on what counsel has said.
12          MS. POWELL:  I don't know that we would phrase it that
13    way, but it is --
14          THE COURT:  I'm sure you wouldn't.
15          MS. POWELL:  It is accurate that they did not make
16    port-specific findings.  We don't think that's required given
17    the nature of cruise ships and international and interstate
18    travel, nor do the ports agree with that.  The comments
19    submitted by plaintiffs in one -- or sorry, the comments
20    pointed to by plaintiff that we submitted are comments from
21    their ports saying the CDC needs to impose protocols.  The CDC
22    needs to make sure that these cruise ship operators are working
23    with us on emergency response planning which is exactly what
24    the CSO does.  They say we need CDC's help.
25          So it's not accurate that CDC wasn't aware and didn't
```

93

think of these things.  CDC is, obviously, well aware that
local ports in general don't have broad-spectrum regulations on
cruise ships, which is why they knew it was necessary as a
broad matter.  The fact they didn't make specific findings
about Tampa or Canaveral or Galveston is not helpful to
plaintiff, especially when their own ports are saying we need
CDC authority in this area.

          To be more specific --

          THE COURT:  Well, the statute does seem to have
some -- 264 does seem to have some reference to specific
instances, doesn't it?

          MS. POWELL:  Where?

          THE COURT:  Where?

          MS. POWELL:  Sorry, yeah.

          THE COURT:  Well, where is the generalization,
probably would be the way I would phrase it.

          MS. POWELL:  Well, 264(a) says "The Secretary can make
and enforce regulations such as in his judgment are necessary
to prevent the transmission of the disease."

          And plaintiff goes to the second --

          THE COURT:  And then where it says for the purposes of
carrying this out, it can do a number of things.  And each one
of them says -- each one of the things on that list says "of
animals or articles found to be so infected or contaminated."
And that's -- I mean, that's sort of an individualization or a

94

1 specification requirement, isn't it?

2          MS. POWELL:  Sort of.  I am reasonably certain that

3 that "found to be so infected or contaminated" phrase applies

4 only to destruction.  I realize the DDC court found otherwise,

5 but bear with me for a moment.  If it applied to everything in

6 the preceding list, it would also apply to inspection, which

7 means you can only inspect things after you'd found them to

8 be -- the "so infected or contaminated," which doesn't make any

9 sense.  It's also consistent with the legislative history --

10          THE COURT:  Assuming inspection means to determine

11 whether it's infected and not to determine where it -- where,

12 say, in a building or in a warehouse or in the port.

13          MS. POWELL:  Correct.  And that is how --

14          THE COURT:  Or a vessel.

15          MS. POWELL:  Correct.  And that is how we would

16 normally use it, inspection to see if there's an infection.

17          THE COURT:  Or to find out where the infection is,

18 already -- already knowing that there's one.

19          MS. POWELL:  Right.  So I don't think the DDC court's

20 analysis that that phrase applies to everything before makes

21 any sense.

22          THE COURT:  It's a little bit awkward, isn't it,

23 because you've got that "and" down there, that "and other

24 measures," and there's no -- if there was an "and" between

25 extermination and destruction, that would be really clear,

```
 1   wouldn't it?

 2          MS. POWELL:  Yeah.  And it's just not --

 3          THE COURT:  I couldn't tell.  Did you say "yeah"?

 4          MS. POWELL:  Yes.

 5          THE COURT:  Okay.

 6          MS. POWELL:  Sorry.

 7          I would add that I think that's supported by the House

 8   report on this bill from 1944.  There's not a lot in there, but

 9   one thing that is in there is that it is intended to clarify

10   that the Secretary has the authority to destroy private

11   property, not just do the other things.  So I think that is at

12   least somewhat helpful to our reading.  And I think the

13   sentence on its face appears to be illustrative examples, not a

14   limiting sentence in any way, and that conclusion is buttressed

15   by the sections that follow.  Those sections are about

16   quarantine of individuals, and they explicitly modify (a) --

17   they modify Subsection (a).  They say, you know, for

18   regulations issued under this section.  But quarantine, of

19   course, is not one of the things listed in 264(a), even though

20   the following sections go on to impose limits on them.

21          So I think the idea that this sentence is not limiting

22   is reasonably clear from the sentence itself, but also from the

23   sections that follow.

24          THE COURT:  Well, there's one thing that struck me

25   about it.  I had never read it until this case came up.  I'd
```

```
 1    never seen it.  I didn't know what it said.  First thing that

 2    struck me about it when I read it was it seems like given the

 3    expansiveness of the first sentence, that the second sentence

 4    seemed almost trivial.  That examples there seemed almost

 5    trivial given the reading that it's being given now by the CDC.

 6    I mean, there's a real stark difference between closing down

 7    the airlines, closing down the cruise ship industry, closing

 8    the border contrary to the president and fumigating a place

 9    found to be infected or killing a pig.  There's a pretty wide

10    gap in there.  And it's sort of odd to understand why such a --

11    an expansive grant of authority in the first sentence would be

12    so minutely conditioned.

13             MS. POWELL:  I can think of two reasons.

14             THE COURT:  All right.

15             MS. POWELL:  One is what I said before -- that they

16    wanted to clarify that you could destroy property, and I don't

17    think that's limited to --

18             THE COURT:  And that would be -- that would have some

19    significance --

20             MS. POWELL:  Yeah.

21             THE COURT:  -- because it might -- it would clearly be

22    incompensable --

23             MS. POWELL:  Yeah.  Yes.

24             THE COURT:  -- if that authority's right here to do

25    that and there's -- you won't be troubled with lawsuits.
```

```
 1              MS. POWELL:  Right.

 2              THE COURT:  So it's easy to understand why they would

 3    say that about destruction of animals and articles.

 4              MS. POWELL:  The others --

 5              THE COURT:  By the way, do you think a cruise ship --

 6    I'm not saying you've said this, but I'm just -- in fact, I

 7    don't think you have -- but is a cruise ship an article?

 8              MS. POWELL:  Yes.

 9              THE COURT:  You think a cruise ship is an article?

10              MS. POWELL:  I do.

11              THE COURT:  I mean, one of the judges had talked about

12    that, didn't he, in one of these cases?

13              MS. POWELL:  Eviction -- they didn't think an eviction

14    was an article, which is, obviously, a very different

15    conclusion.  My -- my follow-up point on this is even if I'm

16    wrong and our --

17              THE COURT:  About the article -- the definition of

18    "articles"?

19              MS. POWELL:  No, I think I'm right about that.  But

20    even if I'm wrong that the sentence is not -- the second

21    sentence isn't a limit, if the sentence is a limit, the sorts

22    of things it describes -- inspection and hygiene measures and

23    destruction of property -- are, in fact, what the CSO requires.

24    It takes them time to do what the CSO requires, but it requires

25    testing and sanitation and hygiene and basically a practice
```

```
 1    run -- a fire drill to test the safety protocols.  That's in
 2    line with the things listed in that article, and it applies to
 3    a site or article that is specifically found to be infected
 4    here, I mean this category of cruise ships.
 5            So I mean, plaintiffs cite and we tussle over,
 6    obviously, the significance of those eviction order cases, but
 7    this Court's obviously not tasked with deciding the validity of
 8    the eviction order which is much farther afield, as you know,
 9    than the regulation of cruise ships is, nor does this Court
10    need to decide whether a whole sail shutdown falls within it.
11    That might've been the case if they sued last year when the no
12    sail orders were in effect, but they haven't.
13            What's in effect here is a set of preconditions that
14    will take some time to implement, a set of preconditions on
15    operation that the cruise ships fully expect they can meet and
16    that the CDC expects them to meet.  Those safety conditions are
17    akin to the other things that are listed in the statute.  And
18    the question of whether or not it's reasonable to shut down an
19    industry, all of -- and things like that sort of goes to the
20    reasonability.  Plaintiffs count to -- not to whether we could
21    do it if it were warranted under the circumstances.
22            I'm happy to move on to the arbitrary and capricious
23    claims, but do you have further questions about the statute or
24    regulations?
25            THE COURT:  I do.  The concept of an article -- I'm
```

```
 1    not sure how important it is here to this case, but since we're

 2    all here together and on the topic, it's a word that has --

 3    it's used in several contexts, but this is I think in the same

 4    context as an article of clothing.

 5            MS. POWELL:  It's a thing.  It's not an animal or a

 6    person.  I would call it an article.

 7            THE COURT:  An object.

 8            MS. POWELL:  Just like we could call a car an article.

 9            THE COURT:  What would a car be an article of?

10            MS. POWELL:  Is that a thing?  An article of

11    something?

12            THE COURT:  We would say an article of clothing.

13            MS. POWELL:  But we don't call a desk an article of --

14            THE COURT:  Furniture.

15            MS. POWELL:  Furniture?  Is it an article of

16    furniture?

17            THE COURT:  I think it's a lot closer to that than --

18            MS. POWELL:  I've never heard the term "article of

19    furniture."

20            THE COURT:  -- that a -- that a aircraft carrier is --

21    what is that an article -- is that an article?

22            MS. POWELL:  Article of vessel, if one had to use that

23    terminology.  But I think there's lots of things we would not

24    say "article of" about.

25            THE COURT:  Well, I do too.  That's a pretty
```

```
 1    bizarre --
 2            MS. POWELL:  Yeah.
 3            THE COURT:  -- way to express tangible objects, isn't
 4    it?
 5            MS. POWELL:  Right, but so is --
 6            THE COURT:  In fact, it almost seems -- you know what
 7    it sounds like to me?  Some trivial object or some -- but --
 8    but in any event, an infected object.
 9            MS. POWELL:  Article?  Well, I think "article"
10    encompasses objects.
11            THE COURT:  Any object.
12            MS. POWELL:  I don't have any legislative history or
13    other things to support that, but I think the ordinary usage
14    would encompass objects whether or not you could describe those
15    as an article of something, but...
16            THE COURT:  That was a poor choice of words, not by
17    far the only poor choice Congress has ever made but --
18            MS. POWELL:  Sure.
19            THE COURT:  -- or even the worst one by far.
20            MS. POWELL:  Sure.
21            THE COURT:  But it is -- it is -- you know, I don't
22    want to get in trouble with anyone and I love animals, but
23    destruction of an animal who's infected with contagious disease
24    is to be expected and the destruction of some article that's
25    been exposed to something that can be -- result in contagion
```

1   from a surface, I suppose, is to be expected.  But this isn't

2   even a question of a cruise ship.  I mean, this gives -- first

3   of all, you give -- the CDC's quite predictably given the

4   statute a broad breadth and it's given a conditioning clause of

5   broad breadth and now it's giving all the individual words

6   including expanding "article" -- the word "article" to mean a

7   cruise ship.

8           MS. POWELL:  I think Congress intentionally legislated

9   broadly here and gave the CDC the authority to do things as

10  long as it had findings sufficient to support them.  And to

11  reemphasize, even if that second sentence is intending to be

12  limiting, I think the other measures covers this because the

13  other measures that are imposed by the CSO, as contrasted with

14  the no sail orders of last year, the other measures are a lot

15  like what's listed here.  It's inspection and hygiene measures.

16  There's more to it of course.  The sort of emergency response

17  planning and that sorts of thing but it is in fact a lot like

18  the list of items of actions that are listed here.

19          Moving on to the arbitrary and capricious claim --

20          THE COURT:  So if we were having the delegation

21  argument -- or nondelegation argument, depending which side

22  you're on -- your defense of the -- against the nondelegation

23  attack would be that the statute is limited by the term and

24  only by the term "necessary."

25          MS. POWELL:  And also by there have to be findings

```
 1    about interstate or international transmission of a -- of a
 2    communicable disease.
 3              THE COURT:  Necessary to prevent.
 4              MS. POWELL:  Yes.
 5              THE COURT:  So anything, anything necessary to prevent
 6    that.
 7              MS. POWELL:  Yes.
 8              THE COURT:  So can you see why Article III judges are
 9    a little uncomfortable with that because -- and why some of
10    them have said, Well, in order to avoid facing the next issue
11    that that presents, I'm going to find that there is a nearer
12    and more approximate bound than that?
13              MS. POWELL:  You know, it is part of the reason we
14    make the argument that we fall within the narrower
15    interpretation as well or to -- like to see limits.  I would
16    posit, though, that the sorts of intelligible principles
17    here about --
18              THE COURT:  Only because the constitution invested the
19    legislative power in Congress.
20              MS. POWELL:  Yes.  But Congress has repeatedly done
21    delegations like this one which have been upheld by the courts.
22    I really don't think that the Public Health Service Act is
23    going to be the first act struck down by the Supreme Court in
24    30 some years when it contains principles and findings that the
25    CDC -- that the Secretary has to make in order to utilize it.
```

```
 1   Those are meaningful.  "Necessary" isn't just anything, it
 2   means they have to find that it's necessary.
 3            THE COURT:  Well, several courts have gone out of
 4   their way to avoid putting that question to the court.
 5            MS. POWELL:  Yes.  And others have found that we were
 6   correct in our interpretation.  I thought the Chambless opinion
 7   was particularly persuasive in analyzing this question, and it
 8   goes through the other nondelegation cases and the types of --
 9   types of delegations that have been upheld.  They use very
10   similar language.
11            On the arbitrary and capricious claim --
12            THE COURT:  They used language in the grant clause.
13   They use very similar language in the grant clause.  Those
14   grant clauses were not followed by one of these peculiar -- for
15   the purpose of carrying out and enforcing clauses.  I don't
16   believe any of those circumstances had a -- I mean, for
17   shorthand, just say "carrying out" clause.  They didn't have a
18   similar carrying out clause, did they?
19            MS. POWELL:  At least one of them has something along
20   the lines of making enforced regulations, that it is about
21   promulgating regulations that meet the certain standards.
22            THE COURT:  Well, that's in the first sentence.  You
23   clearly have the authority to make enforced regulations.  And
24   the question is how to conduct the enforcement.  And the other
25   ones didn't have a follow-up sentence that says "for the
```

1    purpose of carrying out and enforcing."  And "enforcing"

2    appears in the first sentence and the second and, more or less,

3    "measures" does too.

4           MS. POWELL:  I don't know that that makes it

5    significantly different from the other cases, but I'm afraid I

6    did not print out the other statutory language and bring it

7    with me.

8           THE COURT:  Yeah.  Well, I didn't either, so...

9           MS. POWELL:  Yeah.

10          THE COURT:  There has to be limits on how much you can

11   bring.

12          MS. POWELL:  I am comfortable -- I understand there

13   have to be limits.  I feel like the specificity of the language

14   here about interstate and international transmission and the

15   necessary language are meaningful limits.  They're certainly

16   intelligible principles.

17          THE COURT:  They are on the field for regulation.

18   They are -- and I don't understand the State to be arguing that

19   they're not on the field of regulation.  But on the -- on the

20   carrying out and enforcing part, the question is what remedial

21   measures are authorized by the statute.

22          MS. POWELL:  That's interesting.  Well, you know,

23   the -- to the extent that --

24          THE COURT:  Of course part of your argument is that

25   this was not rulemaking.

1          MS. POWELL:  Right.  So that is part of our argument.

2     If the Court was not convinced that this fell within --

3          THE COURT:  That this is a regulation but not a rule?

4          MS. POWELL:  No.  We think -- we think it is an order

5     rather than a rule.  If we're wrong about that, the CDC made

6     the alternative finding that there's good cause.  So if the

7     Court thinks it needs to be a regulation, it is that as well in

8     the -- it is stated as that as well.  And the question would be

9     the adequacy of the good cause finding, right?  If it needs to

10    be -- if it would be legitimate as a regulation rather than as

11    an enforcement order, the question then becomes is the good

12    cause finding sufficient.  Because the CDC did do that in the

13    alternative, right?  As long as it's not wholly outside CDC's

14    authority in any way, the question would be whether it is

15    within the good cause exception.

16         THE COURT:  Yeah.  That's one of the questions that

17    appears, yes.

18         MS. POWELL:  Arbitrary and capricious claim, I'd like

19    to begin, of course, with the general principal that deference

20    is due to public health authorities during a crisis.  And

21    notably absent from any filing of the plaintiff is any opinion

22    from a public health authority anywhere, including their own,

23    that lifting the CSO would be a good idea or even that it would

24    be not that bad an idea.  There's nothing in the record that

25    would indicate some disagreement from public health authorities

1     on this front.

2          Plaintiffs point to several things that CDC supposedly

3     failed to consider.  I think given the deference due and the

4     lack of disagreement among the experts who are relevant here,

5     that deference is due to the CDC on these.  The first was

6     vaccines.  At the time of the CSO, there were not vaccines

7     available.  So of course there are not detailed findings about

8     them and how effective they are and whether they warrant the

9     CSO.  Rather, the CDC has incorporated them as it has moved

10    forward.

11         And it has, in fact, incorporated them to the extent

12    plaintiff -- I don't think that plaintiff is challenging the

13    technical instructions or guidance.  They have said they are

14    not doing that, only the CSO.  And since the information wasn't

15    available at the time of the CSO, I don't see how CDC can be

16    faulted for it.

17         To the extent --

18         THE COURT:  Well, I think part of it is there was good

19    reason on October 20th to think that the vaccine was imminent.

20    And the rule is, at least on its face, in effect for a year.

21    And not -- not a month after the effective date of the order,

22    the vaccine was underway.

23         MS. POWELL:  Sure, but not widely available until much

24    more recently, and even now it doesn't justify the lifting of

25    the CSO.  If CDC finds at some point that it justifies lifting

1    the CSO, they will.  The Treffiletti declaration has an

2    explanation for why it doesn't now justify lifting the CSO.  It

3    is something the CDC has thought about, and they've continually

4    engaged with state and local authorities and with the cruise

5    industry on the specific question and how the availability of

6    vaccines will affect operations going forward.

7            So for example, one of the things they have done is

8    created an exception to the simulated sailing requirement.

9    They don't have to do a full simulated voyage as long as they

10   can maintain a highly vaccinated set of crew and passengers

11   with a highly effective vaccine.  Thus far, of course, they

12   have not -- cruise ships have not submitted any plans for how

13   to do that in light of the various difficulties posed with

14   vaccinating crew and passengers.

15           Now that the vaccine is widely available in the United

16   States, it is available to passengers from the United States,

17   in any case.  But it's complicated by things like Florida's

18   law, which purports to prohibit checking -- sorry, purports to

19   prohibit requiring proof of vaccination from customers.

20           THE COURT:  Was that a law or an executive order?

21           MS. POWELL:  It was an executive order.  I believe it

22   was then signed into law by the legislature, is my

23   understanding.

24           THE COURT:  Have you read that law?

25           MS. POWELL:  I read the executive order.  I've not

```
 1    seen what was passed.

 2            THE COURT:  I meant to ask the State's counsel about

 3    that.

 4            MS. POWELL:  Oh.  I know the cruise industry --

 5            THE COURT:  What is the relationship between that

 6    statute and that order?  That order -- and my -- my

 7    recollection is I didn't -- ambiguous.  I did not reread that

 8    before today, but doesn't that prohibit a private business from

 9    requiring vaccination as a condition to do business or travel?

10            MS. POWELL:  That is my understanding.

11            THE COURT:  So what is the relationship between that

12    and a member of the cruise industry saying "We are not

13    requiring this as a condition of your traveling, the CDC is

14    requiring this as a condition of our sailing with you on

15    board"?  And do we know that the statute or the executive order

16    would purport to supercede -- well, do we know what the

17    interplay is between those two things?

18            MS. POWELL:  I can tell you from CDC's perspective

19    that at this time, CDC does not believe it has taken action to

20    preempt the Florida law in question.  It doesn't mean it could

21    not.

22            THE COURT:  No, but I think my question was, can the

23    cruise ship operator say to the State, "We are not the source

24    of this requirement," and therefore run afoul of the state

25    statute?  This is a requirement of the CDC, and certainly the
```

```
1   legislation in the state of Florida cannot prevent the CDC from
2   promulgating a regulation that says 95 percent vaccination is
3   required.
4             MS. POWELL:  That is a good question.  It might be
5   better directed to the State of Florida as to whether their law
6   would prohibit that.  We have not claimed to preempt the state
7   law.  Like we have not said --
8             THE COURT:  Well, what was the --
9             MS. POWELL:  -- "you have to require this
10  information."
11            THE COURT:  You suggested that Governor DeSantis's
12  order would interfere with -- in a footnote in your memorandum,
13  I think you suggested that you'd made a determination that
14  Governor DeSantis's order would interfere with resumption of
15  sailing.
16            MS. POWELL:  I think we said it would complicate
17  matters, but yes.
18            THE COURT:  Complicate matters -- interfere, much like
19  the differences -- distinction we were talking about before.
20  But I also wonder what the basis for that was.
21            MS. POWELL:  Because the order, on its face, prohibits
22  them from asking customers, i.e. passengers, whether or not
23  they've been vaccinated and requiring them to show proof.
24            THE COURT:  And my question to you was, isn't their
25  response to that likely to be "We're not, the CDC is.  Here's
```

```
 1   their -- here's their guidance"?

 2           MS. POWELL:  The problem is the CDC is not requiring

 3   it at this point.  The CDC has offered this up as an option for

 4   cruise ships and has not purported to preempt state law on the

 5   question.

 6           THE COURT:  That's --

 7           MS. POWELL:  That could change.  And my understanding

 8   is the cruise industry is in negotiation with the governor's

 9   office.  I don't know what is transpiring.

10           THE COURT:  I'm sure they are.  In light of what --

11           MS. POWELL:  Yeah, I don't have any idea what is

12   transpiring other than what I read in the newspapers on the

13   question, which is that cruise ships are threatening to up

14   anchor.

15           THE COURT:  I'm in the same spot you are.

16           MS. POWELL:  Yeah.  But all that to say, even aside

17   from Florida law, there's a question of how to get vaccinations

18   for crew members who are largely foreign nationals.  And they

19   may have access to vaccination in their own country, or the

20   cruise ships will have to procure it, but they're not yet

21   commercially available.  So I know some cruise lines may be

22   attempting to negotiate with states, but that is a work in

23   progress.

24           In other words, there's not currently a way to ensure

25   that vaccinations are sufficient to ensure a safe voyage.  It's
```

```
 1   something the CDC continues to look at and will continually

 2   reevaluate.

 3          THE COURT:  Has the CDC looked at the availability of

 4   a vaccination, for example, in Tampa?

 5          MS. POWELL:  In a specific location, no.

 6          THE COURT:  Well, because when you say it's not

 7   commercially available, I don't know what you mean by

 8   "commercially available."  You mean available for a price,

 9   but --

10          MS. POWELL:  It's not available to --

11          THE COURT:  In the state of Florida, vaccinations are

12   available almost everywhere you look.  And you can get one in

13   about 60 seconds, literally, just right down the street here.

14   Walk in, get your vaccination, and you're done.

15          MS. POWELL:  I don't know that those are available to

16   foreign nationals, for example, operating on the --

17          THE COURT:  I don't know that either.

18          MS. POWELL:  -- cruise ships offshore, which is why

19   cruise ships are in negotiations trying to procure vaccines.

20   That's my understanding.

21          I am, admittedly, not an expert in the ins and outs of

22   what is made available to who in Florida, but it is my

23   understanding that --

24          THE COURT:  Nor am I.

25          MS. POWELL:  -- that one cannot --
```

Case 8:21-cv-02429-SDM-AAS   Document 64   Entered on FLSD Docket 07/15/2021   Page 113 of
162
Case 1:21-cv-02429-KMM-AAS   Document 44   Filed 05/13/21   Page 112 of 161   PageID 1480

112

1          THE COURT:  But I didn't promulgate a regulation,

2    so...

3          MS. POWELL:  Well, it is my understanding that the

4    cruise lines cannot, say, go buy a bunch of vaccines for their

5    current foreign crew members who are all on board ship, much

6    less the ones that they still want to bring on ship who are

7    abroad.

8          Plaintiffs --

9          THE COURT:  Yes.  But Governor DeSantis can't win.  He

10   gets blasted for making these things available at Publix, and

11   then he gets blasted for not making them available.

12         MS. POWELL:  Yes.

13         THE COURT:  He can't win.

14         All right.  Go ahead.

15         MS. POWELL:  Yes, I fully acknowledge that the way to

16   handle these public health initiatives and vaccinations is, at

17   best, complicated.

18         THE COURT:  Yeah.

19         MS. POWELL:  And that's one of the reasons we can't

20   just assume that vaccines solve everything right now and that

21   it is safe to resume cruising as normal when we don't know how

22   many people are vaccinated, when we don't know if it's possible

23   to vaccinate crew.

24         Plaintiff argues that the CDC failed to consider the

25   assertive foreign cruise operations.  It's not entirely

```
 1    accurate.  As plaintiff's counsel acknowledged, some of the
 2    early information about foreign cruises is discussed in the
 3    extensions of the no sail order, which is incorporated by
 4    reference into the CSO.  Also, that information is, in fact, in
 5    the public record to some extent.  And there's additional
 6    information in the Treffiletti declaration --
 7               THE COURT:  Do we understand what the success of the
 8    foreign cruise lines is in cruising while controlling
 9    transmission?
10               MS. POWELL:  We do not have a full picture.  We know
11    there have been some outbreaks.  The European cruises largely
12    are not collecting the data that would be necessary to fully
13    evaluate those cruise operations and their impact.  They're
14    not, for example, doing disembarkation testing of passengers to
15    see who may have caught it on board, nor contract tracing after
16    that.  And that's the sort of data that the CDC wants to see,
17    certainly before cruise operations are wide open.
18               Second, we -- the other -- other cruise operations may
19    be collecting such data.  For example, we're led to believe
20    that operations in Singapore are highly effective.  They are,
21    of course, a country where there is very little community
22    spread of COVID-19 at all, and they're not letting foreign
23    nationals on those cruises for the most part.  They're very
24    contained.  They're subject to strict orders, which look a lot
25    like the CSO, in fact, only more restrictive.  Other countries,
```

```
 1    of course, are continuing to ban cruise operations.  Canada
 2    through 2022, which is going to prevent Alaska from having a
 3    regular cruise season.  Australia has said they'll do a
 4    framework for reopening but have not announced it yet.
 5            In other words, it's not as though the United States
 6    is lagging behind the rest of the world on reopening.  Everyone
 7    thinks it's safe.  Lots of people think it's not at all safe,
 8    including our neighbor to the north.  And those who have
 9    reopened have had mixed results and/or are not collecting
10    enough data.
11            THE COURT:  And I talked to this -- to counsel earlier
12    about this topic, but everybody has used this word "safe."  I
13    think both of you used it in your -- in your memorandums.
14    What -- what does that mean, "safe"?
15            MS. POWELL:  It doesn't mean there's zero risk.  It
16    doesn't --
17            THE COURT:  Excuse me?
18            MS. POWELL:  It does not mean there is zero risk.  We
19    realize at this point that COVID-19 is circulating and it will
20    appear aboard cruise ships.
21            THE COURT:  Well, so will -- we've always had
22    contagion on board --
23            MS. POWELL:  Sure.
24            THE COURT:  -- all means of mass transit, haven't we?
25            MS. POWELL:  Sure.  And the contagion of COVID-19 that
```

1  was on board cruise ships beginning in January 2020 was

2  catastrophic.  The number of deaths associated with it, the

3  extent to which it spread it around the globe, the enormous

4  response of government response efforts to --

5            THE COURT:  I understand that, but it does have

6  something to do with what level of risk is acceptable --

7            MS. POWELL:  Yes.

8            THE COURT:  -- and because there's always a level of

9  risk of contagion, you know, when you go out of the house or

10 even if you stay in the house.  So the question is -- and I

11 don't mean to trivialize it, but the question is, what do you

12 mean -- what did you mean in your memorandum when you used the

13 word "safe"?

14           MS. POWELL:  So what the CDC means and what they've

15 described is that if there is COVID-19 aboard ship, they want

16 to be able to contain it and safely respond without creating a

17 massive transmission on board and without creating a huge drag

18 on state, local and federal resources.  That is the goal.  It's

19 not that it will never appear on board.  It's that it can be

20 managed on board and they can prevent a significant outbreak.

21           Now, the operations manual sets a certain standard at

22 which a cruise has to be shut down when so many people are

23 infected.  I don't remember exactly what it is, but the goal,

24 in general terms, is to ensure that any -- any transmission can

25 be contained on board and not create a significant drag on

1    resources.

2            THE COURT:  All right.  Before we go on to another

3    subject -- I guess we already did because you've talked about

4    the foreign cruise lines, but I notice that neither the State

5    nor the CDC mentioned therapeutics in their papers.  I mean,

6    not only do we have vaccines, but we have a much, much greater

7    advanced set of therapeutics available.  Does that play into

8    this at all, in other words, if you have -- if you have a case

9    that becomes much more treatable?

10           MS. POWELL:  I mean, in the abstract it certainly does

11   in that I think if we still had a completely untreatable

12   disease we might not be considering reopening at all.  So it

13   plays into it in that sense.  There's nothing in the record

14   right now about that specifically, but it's not as though it's

15   not taken into account.  I think if we had a untreatable

16   disease with no vaccine or therapeutic we would be in a very

17   different situation.

18           THE COURT:  Right.  We do have a disease that has a

19   very low mortality rate.

20           MS. POWELL:  Certainly lower than it was.  It's more

21   transmissible and far less fatal than we initially thought.

22           THE COURT:  Correct.

23           MS. POWELL:  Which does not mean there are not still

24   significant number of cases and hospitalizations and serious

25   illness.

 1          THE COURT:  Those -- the serious illnesses and the

 2    deaths were clustered, weren't they, in certain identifiable

 3    groups?

 4          MS. POWELL:  I'm not sure.  I mean, yes, certain

 5    groups are more at risk than others.

 6          THE COURT:  People my age and older.

 7          MS. POWELL:  Yes, yes.  The older demographic is at

 8    risk.  It's something they found to be an issue on cruise

 9    ships, which typically have an older demographic in the

10    passenger population, that that might be why so many people

11    became ill and died aboard the Diamond Princess.

12          Plaintiff argues, at least in their papers now that I

13    heard it today --

14          THE COURT:  Well, one of the things they argue about

15    is that the CDC has dealt with this as kind of an

16    all-or-nothing proposition and hasn't look looked at

17    intermediate resolutions.

18          MS. POWELL:  That is exactly where I was going, Your

19    Honor --

20          THE COURT:  Good.

21          MS. POWELL:  -- because it's not true.  It is perhaps

22    an --

23          THE COURT:  As soon as you make this, we're going to

24    take the lunch hour.

25          MS. POWELL:  Excellent.

1          THE COURT:  Okay.  Because you've been standing there

2     an hour and a half, which is about as long as you should have

3     to stand.

4          MS. POWELL:  It is perhaps an accusation that could've

5     been levelled at the no sail orders of last year -- that it was

6     an all-or-nothing approach.  That is not what we have now.  We

7     have a path to reopening just subject to certain safety

8     preconditions that cruise lines, we believe, are able to meet

9     and will meet relatively soon.

10          So to the extent that was an issue, it is no longer an

11     issue.  And the CDC specifically considered in the CSO on the

12     face of it -- not talking about post-talk rationalizations --

13     but in the CSO considered the recommendations of the cruise

14     industry and the measures they had adopted and, in many cases,

15     agreed with them and adopted those specific measures as

16     guidance and requirements.  But the CDC made specific findings

17     that continued public health oversight was necessary, that some

18     additional things were required on top of the measures that the

19     cruise industry was adopting on its own, as well as the

20     oversight to make sure that they were implemented correctly and

21     consistently.

22          I think history will certainly show that, sooner or

23     later, when there are safety precautions required, someone will

24     not implement them as they're supposed to.  Having federal

25     public health oversight can mitigate the impact of that and

1   prevent it from happening.

2           Plaintiff argues that it's -- we have still failed to

3   explain why the cruise industry is different than other

4   industries.  It appears both in the CSO -- on the face of the

5   CSO, the explanation there as well as the more detail in the

6   Treffiletti declaration, but it really is different.  The

7   confining people in close confined spaces for long periods of

8   time is, in fact, the problem.  They found it was enormously

9   difficult to implement isolation and quarantine measures on

10  board so that even during the period of the no sail order when

11  the only people on board were crew members and the limited

12  number of crew members, many cruise ships had difficulty

13  controlling COVID-19 aboard.  In those unusual situations where

14  there were no passenger operations, they still had some spread

15  on board and had trouble implementing the social distancing and

16  safety measures that are necessary.

17          So when we saw at the beginning of the pandemic these

18  astonishingly high transmission rates on board the --

19  reproductive rate of the virus at the time I think was around 3

20  or 4 they thought from the early data in Wuhan, whereas on the

21  Diamond Princess it was more like 14.8.  This sort of

22  astonishingly higher rate is due to the unique conditions

23  aboard a cruise ship.  In order to reduce that now -- it would

24  be reduced now -- now it's simply because of vaccines and other

25  things.  We know more about the virus now.  It is still going

 1   to be higher than it is in other settings in light of the

 2   conditions on board the cruise ships.

 3            And that is my presentation on the arbitrary and

 4   capricious claim.

 5            THE COURT:  Well, then that's a good place to stop for

 6   lunch.

 7            MS. POWELL:  Okay.

 8            THE COURT:  And we'll take up right there when we

 9   return.

10            So thank you all for your patience this morning and I

11   appreciate your argument and I look forward to seeing you at

12   how about 1:30?  It's an hour and 15 minutes for lunch.  Is

13   that enough for everybody?  Or at least two of you?  Maybe the

14   rest, but okay.  I'll see you then.  Thank you.

15            (Off the record at 12:11 p.m.)

16            (On the record at 2:04 p.m.)

17            THE COURT:  I hope everyone had a relaxing and

18   pleasant lunch hour.

19            Ms. Powell, I believe we were going to come back to

20   you --

21            MS. POWELL:  Yes.

22            THE COURT:  -- at this point.

23            MS. POWELL:  Yes.  I don't have too much more.

24            THE COURT:  Okay.

25            MS. POWELL:  I'm, of course, happy to answer the

1   Court's questions whenever.

2           THE COURT:  Okay.  Well, I have one just left over

3   from this morning that my lawyers wanted me to get out of the

4   way, and I think rightly so.  And this is not a challenge of

5   any kind.  I just want to make sure I understand exactly what

6   you're saying -- what the CDC is saying.  I also tell my clerks

7   and others not to use too many pronouns, and here I am doing

8   that.

9           If I understand correctly, CDC's position is that the

10  conditional sailing order, as its name suggests, is an order

11  only and it is an order that conditions a license and it is not

12  a rule or regulation, and therefore the rulemaking regimen was

13  inapplicable and there was no need for a formal notice and

14  comment period, no reason for a determination of good cause and

15  the like, is that correct?

16          MS. POWELL:  Except for the word "only," that is all

17  correct.

18          THE COURT:  Where was the "only"?

19          MS. POWELL:  Way back in the beginning, when we

20  said -- I believe you said it is "only" an order and not a

21  rule.  We said we believe it is an order and not a rule, but if

22  we're wrong and it is a rule, there is good cause to forgo

23  notice and comment.

24          THE COURT:  Right.  So maybe I should have said your

25  preferred or --

```
 1              MS. POWELL:  Yes.

 2              THE COURT:  -- primary view of this --

 3              MS. POWELL:  Correct.

 4              THE COURT:  -- and identify the license to which you

 5    refer when you say a condition on a license.  What -- identify

 6    that license.

 7              MS. POWELL:  The regulations authorize CDC to place

 8    conditions on controlled free pratique, which is itself, by its

 9    nature, a license.  It's defined in the regulations -- sorry, I

10    don't have the definition in front of me, but it is essentially

11    permission to enter a U.S. port and begin operations.

12              THE COURT:  Enter only?

13              MS. POWELL:  I think that's correct.

14              THE COURT:  "Pratique" is by -- by definition, entry.

15              MS. POWELL:  I think that's correct.

16              THE COURT:  So does that govern a vessel, for

17    instance, more to Port Canaveral?

18              MS. POWELL:  It's continued free pratique can be

19    conditioned -- can have conditions on it, yes.  Those

20    conditions can be changed.

21              THE COURT:  All right.

22              MS. POWELL:  I think that's correct.

23              THE COURT:  Was --

24              MS. POWELL:  I would --

25              THE COURT:  Okay.  Given CDC's preferred theory, do I
```

UNITED STATES DISTRICT COURT - TAMPA DIVISION

```
1    understand you to say that the request for public information,
2    I think is what you called it, was voluntary or -- I don't want
3    to say "gratuitous" because that sounds like some kind of
4    pejorative, but it was done, not -- it wasn't required?
5            MS. POWELL:  I think that's correct.  It was
6    intentionally done in order to capture many of the benefits
7    that --
8            THE COURT:  Yes.
9            MS. POWELL:  -- notice and comment can require.  The
10   CDC wanted to have a formal, or relatively formal, means to
11   solicit input from the public and the industry and local and
12   public health authorities.
13           THE COURT:  But I don't know of any reason that would
14   have been mandatory to do that.  And what is the source -- you
15   say their regulations authorize the issuance of an order
16   conditioning license.
17           MS. POWELL:  Yes.  The CDC --
18           THE COURT:  And are those regulations promulgated
19   under 264(a) also?
20           MS. POWELL:  Yes.
21           THE COURT:  As other measures?
22           MS. POWELL:  Yes.
23           THE COURT:  Okay.  All right.
24           MS. POWELL:  Yes.  Part 71 has measures that authorize
25   CDC to impose conditions on controlled free pratique and to
```

1  take other measures with respect to carriers that pose -- I

2  forget the exact language, but something to the affect of "may

3  be contaminated with a communicable disease."

4          (Court reporter admonition.)

5          THE COURT:  Yeah, you --

6          MS. POWELL:  I apologize.  I will slow down.

7          THE COURT:  I couldn't understand that either.  I

8  don't mean to be a --

9          MS. POWELL:  No, it's fine.

10          THE COURT:  -- but if I could just ask you to say that

11  again.  You were talking about the difference, I think, between

12  70 and 71 of the regulations.

13          MS. POWELL:  71 authorize -- so it's -- 71.32(b)

14  authorizes the CDC, upon a finding that a carrier is or may be

15  contaminated, they can require various public health measures,

16  including other measures, with respect to that vessel.  7 -- I

17  don't have the number written down here.  A different part of

18  71 says that CDC can issue controlled free pratique stipulating

19  what measures must be carried out before they can enter a U.S.

20  port and begin operations.

21          THE COURT:  Which is the definition of "controlled

22  free pratique."

23          MS. POWELL:  Yes.

24          THE COURT:  Okay.  But that's on an arriving carrier?

25          MS. POWELL:  Yes.

```
 1              THE COURT:  But you sort of mean that, as a practical
 2   matter, that means all carriers?
 3              MS. POWELL:  Well, in this situation where we have --
 4   well, certainly within Florida, entirely foreign-flagged
 5   carriers were in -- either in U.S. ports or about to arrive in
 6   U.S. ports at the time the no sail order was issued and have
 7   been -- either left U.S. waters or remained where they were
 8   since then -- or in the same situation they were since then.
 9   So yes, we are treating them as arriving carriers for that
10   situation.
11              THE COURT:  All right.
12              MS. POWELL:  I would add that I don't -- based on the
13   arguments plaintiffs have made and the sorts of health measures
14   that plaintiff agrees would be lawful, it seems accurate to say
15   that there would not be any dispute that the CDC could issue
16   such an order with respect to a single vessel; that the CDC, if
17   it found --
18              THE COURT:  Okay.  You caught me off guard there.
19   What -- just hold on a second.
20              (Pause in proceedings.)
21              THE COURT:  Yes.  Okay.  I have you.
22              MS. POWELL:  That the CDC, if they found a vessel was
23   contaminated, could issue an order saying, you know, disembark
24   all your passengers, stop, and you cannot restart until you've
25   met this list of preconditions including good emergency
```

1    planning, good sanitary measures, testing your new sanitary

2    measures.  That seems, to me, like something CDC could

3    obviously do, even under plaintiff's theory of the statute and

4    regulations.

5            THE COURT:  Does that apply as well if you found that

6    out about some vessel entering the port as well as exiting the

7    port for an international destination?

8            MS. POWELL:  Perhaps.

9            THE COURT:  Okay.

10           MS. POWELL:  So ships have left U.S. ports during the

11   period of the no sail order, and we did not say that the no

12   sail order stopped that from happening.  So I don't know that

13   they would necessarily be prohibited from doing that.  I don't

14   want to speak too broadly here, but the point I was getting to

15   was that I think it's really clear that the CDC could do this

16   for one vessel upon findings.  The question is whether CDC can

17   do this for a category, a readily identifiable category of

18   vessels who know who they are and who it applies to without it

19   becoming a rule that's subject to notice and comment

20   rulemaking.

21           I think at least under these unusual circumstances

22   where there was catastrophic outbreaks on board cruise ships at

23   the beginning of a pandemic that we did not know how to handle

24   at the time and emergency measures were being implemented, now

25   we're at the CSO stage and we are acting with respect to the

1  same category on a temporary basis to impose safety measures

2  that are the best ones available on current scientific

3  evidence.  I think it's also justified.

4         But that sort of gets us to the not-a-rule argument.

5  If it is a rule, we do think the good cause finding is solid

6  here.  The statute says that the agency can find that notice

7  and comment rulemaking is impractical and necessary or contrary

8  to the public interest.  CDC specifically found in the

9  alternative to its not-a-rule interpretation that it was --

10  would be justified to skip notice and comment rulemaking here.

11         THE COURT:  For -- for the conditional sail order?

12         MS. POWELL:  Yes.

13         THE COURT:  And -- and that, after nine months,

14  certainly that raises the eyebrow --

15         MS. POWELL:  Understood.

16         THE COURT:  -- as to why -- so we come here today so

17  many months into this, more than a year, and looking at some

18  more months, and we've never had a notice and comment and we've

19  never had a rulemaking, and is that reasonable?  Why was it

20  unreasonable for the October 20th procedure not to have invoked

21  the full formalities before continuing a general shutdown such

22  as this?  Or maybe, but why was it arbitrary -- why was it not

23  arbitrary and capricious to do that?

24         MS. POWELL:  So the good cause is based on their

25  finding as of October 2020, right?  And as of October 2020,

128

```
1    they found that it would be unsafe to allow cruise ships to

2    resume operations without --

3              THE COURT:  Well, they found that as of October 2020

4    without any notice and comment.

5              MS. POWELL:  Correct.

6              THE COURT:  And the question is, why couldn't you have

7    done that?

8              MS. POWELL:  So there were two options as of October

9    2020.  They finally had a framework drafted based on the best

10   scientific evidence available.  They could have proposed that

11   draft.

12             THE COURT:  Yes.

13             MS. POWELL:  But in the interim, they would have been

14   continuing the no sail order because they made a specific

15   finding that it would be --

16             THE COURT:  Actually, they can propose one and enforce

17   it pending comment, can't they, in the short term?

18             MS. POWELL:  An interim final rule?

19             THE COURT:  Yeah.

20             MS. POWELL:  They also have to have good cause to do

21   that.  They have good cause to do one, I guess --

22             THE COURT:  If they had good cause to do the more

23   extreme -- take the more extreme measure, they, by definition,

24   had good cause to take a less extreme measure.

25             MS. POWELL:  Yes.
```

UNITED STATES DISTRICT COURT - TAMPA DIVISION

1     THE COURT:  Well, then why didn't they?  Because

2  they're obligated to do the least restrictive thing, aren't

3  they?

4     MS. POWELL:  I don't know that that's accurate,

5  actually.  I don't know that the case law says if you can do an

6  interim final rule with interim comment, that you have to do

7  it.  It does say if you can -- if you have the --

8     THE COURT:  It does say you have to use the least

9  restrictive measure.  The statutes and rules say that, don't

10  they?

11     MS. POWELL:  I don't think that includes the mandatory

12  use of an interim final rule.  Sorry, I'm not recalling

13  specific cases on the subject.  But what the CDC did instead,

14  of course, is solicit public comment before -- while they were

15  drafting the rule so that they had the benefit of that.  And

16  that goes into the good cause finding, not just the prejudicial

17  error argument that we've made.  It goes into the good cause

18  finding that they had solicited public comment rather

19  specifically on the reopening of cruise lines and how to do it.

20     It's also justified because while they specifically

21  found that immediate resumption of operations would be unsafe,

22  anything they imposed was going to be somewhat temporary and

23  transient.  And the public and the states and the local health

24  authorities would have the opportunity to participate in the

25  next phases of that, and, in fact, they have.  Not only did

 1    they submit public comments to the request for information
 2    that's cited, they've also participated extensively in the
 3    development of the technical instructions.
 4         The extensive interaction with the industry and the
 5    public over the CSO, including the collection and consideration
 6    of comments and data from them, I think, forms an important
 7    part of the good cause analysis; that it doesn't make sense to
 8    wait another 30 days to even begin implementing a framework if
 9    they're involved in the development of it.
10         It seems that, at least to some extent, plaintiff
11    wouldn't necessarily disagree with all of that -- that if CDC
12    had gone through a rulemaking that plaintiff says is required
13    for sort of full notice and comment before putting it into
14    effect, there would have been a no sail order in effect in the
15    interim.  We found good cause to depart from that.  We have --
16    then we have good cause to proceed in a different manner,
17    especially since here it specifically solicits and incorporates
18    the input of the states and local health authorities and the
19    public.
20         When it comes to prejudicial error, courts don't
21    require the plaintiff to show that any particular comment would
22    have changed the result.  That is accurate, but there does have
23    to be some showing that there was some inability of them to
24    provide input or influence the outcome in the way they would
25    like.  The only thing plaintiff has pointed to here is that

1   it's not going as fast as they would like, and that seems to be

2   the sort of comment that CDC has specifically considered during

3   this process and continues to consider in the development of

4   the guidance and technical instructions.

5          To wrap up briefly, the remedy demanded here really is

6   extraordinary in the way that preliminary injunctions are

7   extraordinary.  Whether or not you consider it a mandatory

8   injunction, it's wholesale vacatur of the order in a way that

9   countermands the uncontradicted public health advice -- public

10  health conclusions in the record.  There is uncertainty about

11  what happens going forward, and I want to acknowledge that.

12         But in balancing the relative interests of the United

13  States and the public versus the financial interests of the

14  state of Florida, you have to compare what happens if the CSO

15  remains in place versus what happens if it's lifted.  With the

16  former, if it remains in place, we expect, based on our current

17  understanding of where the cruise lines are and where the

18  agency is, that they will begin opening -- they will begin a

19  phased resumption of operations by midsummer and that they will

20  do so with specific safety protocols in place based on the best

21  available current scientific evidence inspected and enforced by

22  federal authorities with the consent of local authorities.

23         That doesn't guarantee there will be zero outbreaks,

24  but we have every reason to think it will allow outbreaks to be

25  managed and contained.  Absent a CSO on the other hand --

1   cruise lines have said they would like to reopen by midsummer,

2   i.e. around the same timeframe.  But absent a CSO, they would

3   be doing so against public health's advice with the CDC's

4   explicit travel notice in place saying people should not do it.

5   And it's unclear what the cruise lines would do, what state and

6   local health authorities would do in other places if they

7   weren't, you know, empowered by the agreements language in the

8   CSO whether cruising would really be able to resume everywhere.

9        So it's unclear whether they would restart.  If they

10   did, they might restart slower.  If some did restart, and they

11   may, they may do so without proper safety protocols in place.

12   And that, of course, is where the real danger arises from our

13   perspective.  If they restart operations somewhere without

14   proper safety protocols in place and an outbreak occurs, it can

15   be immensely costly.  Even a single cruise ship with a single

16   outbreak can dump enormous costs on some local health

17   authorities, as well as the CDC to manage it.

18        History shows us that some of them will, in fact,

19   eventually skip over some safety measures.  The risk of

20   additional outbreak in that situation is significant.

21        Other things that go to the balancing of the harms, I

22   think, Your Honor.  The plaintiff, while they demand the

23   wholesale vacatur of the CSO, they actually admit elsewhere

24   that certain aspects of it seem to be within the CDC's

25   authority, i.e. requirements for sanitation and hygiene and

133

1    masking and social distancing -- those sorts of requirements

2    are part of the CSO.  They're built into it by the CDC's

3    guidance and technical instructions, and I think they're

4    plainly within the agency's authority.  And those too would be

5    undone by the vacatur that the plaintiffs have asked for here.

6              And finally, if the Court is weighing against these

7    serious public health risks, it's worth noting that, even if

8    the Government loses on summary judgment, it's not clear that

9    vacatur would be the appropriate remedy then.  The Eleventh

10   Circuit has recognized -- and I think it's called Black Warrior

11   Riverkeeper -- that vacatur is not always the appropriate

12   remedy for APA violations, especially arbitrary and capricious

13   violations or certain procedural violations that don't

14   necessarily create such deficiencies in the rule that it needs

15   to be vacated immediately.  And those situations, often the

16   most appropriate remedy for the error, is to remand to the

17   agency.  But plaintiffs haven't asked for what because what

18   they really want is for cruising to reopen immediately.  That

19   is not going to happen regardless, and I think that -- and I

20   just ask the Court to consider seriously and weigh heavily the

21   uncontradicted public health advice here.

22             THE COURT:  And what are the instructions that

23   accompany the remand?

24             MS. POWELL:  Well, it would depend on what error the

25   Court finds.  I don't think the -- you know, the lesson of the

134

Supreme Court is the Court can't order a particular outcomes

when it does a remand like that, but it can set time frames and

explain what the error was and don't redo that error.  So if

the Court thought notice and comment rule making was necessary,

it could remand for the agency to begin notice and comment

without vacating the rule in the interim.

THE COURT:  You know -- and I take it that's the end

of your --

MS. POWELL:  Yes.

THE COURT:  -- presentation.  You know, one of the

things that's troublesome here, just in general from the

standpoint of my looking at what the CDC has done, is as one of

my clients used to say, my feet are planted firmly in shifting

sand.  This was within business negotiations.  There aren't any

time limits.  Everything is subject to change.  Everything is

subject to delay.  I don't think I did ask you all yet if the

six-month delay between -- after October 20th and before April

whatever it was, 20th, was unreasonable on its face.  But

there's been delay.

There are places you can point for that delay, but I

don't know that they explicitly have said this -- maybe they

did, but I have to feel that the industry, which is not a

party, and certainly the State of Florida in terms of its

interests wonder just exactly when and if during 2021 there's

any real prospect of cruise resumption, the -- I think wasn't

 1   the -- I think the State of Florida cited this with some glee

 2   on page 1 or 2 of their -- of their memorandum, that the CDC

 3   director or someone -- maybe it was the Secretary -- testified,

 4   when asked by Senator Murkowski, when will we resume, said I

 5   don't know.  Well, I don't think the state of Florida knows.  I

 6   don't think the -- then surely -- excuse me -- then, surely,

 7   the state of Florida doesn't know.  And I don't think the CDC

 8   would hide that from the Secretary if they knew knowing he was

 9   going before Congress to testify, including the Senator from

10   Alaska.

11          So -- and it's so easy to slide forward here, and

12   everyone knows this is a seasonal industry and not -- I think

13   it actually goes 365 but in very different quantities,

14   noticeable out my window.  But what is a fair -- when does this

15   become facially unreasonable?  When do these -- I mean, as you

16   say, you came out with something May 5.  I read those things.

17   I mean, that -- I got irritated just reading them.  There were

18   so many things there, it's obviously going to take a long time

19   for anybody to read them, dispatch staff to comply with them.

20   It's not quite stonewalling, but it looks like it's certainly

21   not with an eye toward expedition, let's put it that way.

22          MS. POWELL:  Your Honor, you asked a lot of questions

23   in there.

24          THE COURT:  Well, I did.

25          MS. POWELL:  Let me --

1    THE COURT:  They amount to there's not any reliable

2    end to the no sail -- to the effective and practical no sail.

3    If there is one, what is it?

4        MS. POWELL:  I think what plaintiffs have called an

5    effective no sail order, I don't think that's accurate.  But I

6    think if it were accurate, it ended last week when the guidance

7    was issued.  Plaintiff's lawsuit was premised on this

8    misconception that we were stuck in Phase 1 or 2A indefinitely.

9    That was never accurate.  I think the Treffiletti declaration

10   has some compelling explanation for what was happening in the

11   interim.  Phase 1 was where these testing requirements and the

12   procurement of on board testing and that took longer than

13   expected because the testing equipment was not available.  And

14   they wanted to get at least most of the cruise operators

15   through it.

16       And at the same time, they were briefing leadership

17   and developing the new guidance and reviewing the data from the

18   testing that was being conducted during that time to develop

19   the guidance.  So it took them a while to get out the Phase 2

20   guidance.  They got that out before the rest of the guidance

21   because it was going to take -- because that was a prerequisite

22   for the simulated voyages, i.e. the rest of Phase 2.  So they

23   wanted the cruise lines to be able to get started on that, and

24   they did.  They got started on it.

25       (Court reporter admonition.)

1          MS. POWELL:  I apologize.  And they did.  They got

2     started on it.  They also complained a lot about how slowly the

3     CDC was moving for sure, and it was during that time frame that

4     the -- I think it was Director Walensky was asked about it at

5     Congress.  And she was asked what date they would reopen, and

6     she said she did not know, which is not surprising.  We don't

7     have a date certain even now, nor at that time had they

8     finished and finalized the guidance which would provide some

9     time frame for when the reopening would occur.

10          Now we have that guidance for the remainder of the

11     phases.  They know how to apply to do a simulated voyage.  They

12     know they can skip that step if they have a plan in place for a

13     highly-vaccinated voyage.  They know how to report back data to

14     the CDC on the simulated voyage and they know how to apply for

15     a conditional sailing certificate.  And an operations manual

16     that's available now and is being updated fairly constantly

17     provides guidance on how cruise ship operations should occur

18     during the rest of the period of the conditional sailing order.

19          As of yesterday, we didn't have any applications for

20     either vaccinated voyages or simulated voyages, but I imagine

21     that is a matter of time.  Now, the original CSO plaintiffs are

22     right, the CDC asked for 30 days in which to make a decision on

23     such applications.  In the Dear Colleague letter that he

24     referenced, they said that that is a guideline and they will do

25     their best to act as quickly as possible.  They expect to

1    respond to applications in around five days.

2         That means that the fate of the cruise lines and when

3    they reopen at this point is entirely within their hands.  They

4    can move through the phases at the speed at which they can.

5    Yes, CDC will have to process applications, but there's

6    certainly no reason for this Court to presume at the

7    preliminary injunction stage, in the absence of any evidence,

8    that the CDC will drag their feet on that.  It was simply never

9    the case that the CDC was not planning on reopening.  It took

10   longer than expected to draft all the guidance and get it in

11   place so that cruise lines could move through the phases of

12   reopening.  But longer than expected is not the same thing as

13   inherently unreasonable.

14        Now, we also have arguments in the briefs that I think

15   should dispose of their own reasonable delay claim that they

16   have to identify a specific mandatory agency action that's

17   mandated by a statute or reg before a Court can mandate it,

18   and -- and we think the actions are reasonable here.  But even

19   aside from that, any such claim is moot.  I think that was the

20   heart of plaintiff's claim, even though they didn't frame it

21   that way, that what they were really upset about was that this

22   was taking too long, not that it's outside CDC's authority or

23   inherently arbitrary, just that it was taking a while.  Any

24   claim to that effect is now moot.  The guidance is out there

25   and the cruise lines can move through it.  We have predicted,

 1  and I have not yet heard objection from the cruise lines
 2  industry or seen it, that they don't think they can meet their
 3  July targeted reopening.
 4          THE COURT:  All right.  I don't promise to ask you a
 5  few more questions at the end after I talk again to opposing
 6  counsel, but thank you very much.  Have you argued several of
 7  those other cases as well?  I think I saw your name on a couple
 8  of them, didn't I?
 9          MS. POWELL:  I was not on the eviction cases.  I was
10  consultant on them.
11          THE COURT:  I see.
12          All right.  Welcome back.
13          MR. HILBORN:  Thank you, Your Honor.
14          So I just have a few quick points.
15          First, I think it's important to explain why we know
16  that cruises and passengers will be sailing more quickly with
17  an injunction than without.  Now, we just heard the defendant
18  say that they don't have a date certain, even now, when they
19  can say exactly when cruises will be sailing.
20          THE COURT:  Now, what she said was that it was in the
21  hands of the industry and therefore --
22          MR. HILBORN:  She did say that too, yes.
23          THE COURT:  If that's true, then she wouldn't know
24  because she's not the industry.  So I think what she said was
25  as of May 5th -- or maybe it was the earlier thing -- but that

 1    it's -- in other words, circumstances have changed since the

 2    suit was filed and it's now in the hands of the industry, less

 3    somewhere between 5 and 30 days for an approval.

 4          MR. HILBORN:  Right.  And so I also heard her mention

 5    the original conditional sailing order, and we think that

 6    there's only ever been one conditional sailing order and that

 7    Your Honor should evaluate the conditional sailing order at the

 8    time it was entered without the existence of any of these

 9    technical instructions that now are purporting to modify it.

10          But let me explain, though, and walk you through why I

11    think that we know that cruises and passengers will be sailing

12    more quickly if Your Honor enters an injunction.  So on page 11

13    of their brief -- and they've said it here today -- that the

14    cruise lines abdicated lifting the conditional sailing order.

15    Now, if you go to page 44 of their brief --

16          THE COURT:  I have been to page 44 of their brief.

17          MR. HILBORN:  Okay.  Perfect.  Sorry.  They say that

18    "Allowing cruise ship operators to immediately return to

19    unrestricted passenger sailing would exacerbate and amplify the

20    spread of the disease."  Now, we disagree that bad things are

21    happening, but that argument presupposes that if Your Honor

22    enters an injunction there's going to be more people sailing

23    and cruises actually happening than if Your Honor doesn't.

24          And I think that becomes even more clear in paragraph

25    77 of their declaration.  And then this is in the context of

1   talking about airline travelers flying overseas to go on

2   cruises, and they say that "Experience and common sense suggest

3   that that number who are going overseas to cruise is

4   significantly less than those passengers who would choose to

5   cruise from a port in the United States if cruise ship

6   operations were to immediately resume."

7           And we think that those arguments and those

8   submissions presupposes that if Your Honor enters an injunction

9   there's going to be more people cruising and -- more people

10  cruising and more ships cruising than otherwise.  And you

11  talked a lot about this with the defendants, and I do think

12  it's important to note that they have moved the ball here at

13  least twice already.  So in April 2020 in that no sail order

14  they say, again, "If you, as a condition of obtaining a

15  controlled free pratique, do these 14 things."  Then there's

16  the July no sail order and then the September 2020 no sail

17  order.

18          And in the September 2020 no sail order they recognize

19  that at least 11 ships had done those 14 things, but they say

20  that they need more time.  And then the conditional sailing

21  order comes out in October and again extends the lockdown.  And

22  we think that it's a reasonable inference that cruises -- who

23  again the defendants admit have asked to lift the order --

24  would sail faster and sooner without an order that is operated

25  as a lockdown for the last 14 or 15 months.

```
 1            Now I want to go back to State measures, which we
 2     talked about earlier, and I think there's really two distinct
 3     points there that I don't think I was clear enough about.  So
 4     first, to the extent State measures go to the harm of
 5     reopening, there you consider not just the State measures but
 6     also the industry measures.  And you also consider what's going
 7     on now presently.  And we're not aware of any member of the
 8     industry that does not actually want to sail safely because of
 9     course it's in their interest to do so.
10            Now, the second distinct point is if we're talking
11     just about 70.2, the regulation that has the precondition,
12     there you consider only the State measures in the political
13     subdivisions and you consider that only at the time of October
14     when the order was issued.  And we've confirmed that the
15     State -- one thing that the State is offering now -- sorry.
16     This actually goes to my first point.  I'm sorry, Your Honor.
17     We've confirmed that the State is offering free vaccines to
18     nonresidents -- so not just residents anymore, but
19     nonresidents, And we think that goes to the harm from the State
20     measures from the first section.
21            THE COURT:  Nonresidents of Florida or noncitizens?
22            MR. HILBORN:  So I realize there is a legal
23     distinction there.  I can confirm that we're offering it to
24     nonresidents and --
25            THE COURT:  Well, I'll take notice that there are --
```

```
 1    that there are --
 2            MR. HILBORN:  More than just residents.
 3            THE COURT:  -- nonresidents of Hillsborough County in
 4    the state of Florida.  We had a swarm of people and -- swarm
 5    into Florida to their -- to their rental condo or something to
 6    get a -- to get their vaccine, from New York and places.
 7            MR. HILBORN:  Oh wow.  And then on that --
 8            THE COURT:  And resident -- I know resident
 9    noncitizens who have their -- can get the vaccine, but people
10    who are transient aliens -- I don't know.  Is that what you're
11    saying, that you --
12            MR. HILBORN:  All I'm saying is that I think in your
13    discussion with the defendants' counsel it came up that whether
14    you had to be an actual resident of Florida to receive a
15    vaccine, and I --
16            THE COURT:  A citizen from another state coming here
17    getting ready to board?
18            MR. HILBORN:  That's my understanding, that you no
19    longer have to be an actual resident.
20            THE COURT:  But there wouldn't be much of that because
21    of the waiting period for the two-shot thing and the effective
22    time.  They'd have to come two weeks -- actually, they'd have
23    to come, what, four weeks early, right?  Two weeks between shot
24    one and shot two, and then two weeks from shot two until they
25    can clear.
```

1          MR. HILBORN:  Correct.  I think it depends on the

2   vaccine, correct.

3          THE COURT:  Well, in any event, would be two weeks.

4          MR. HILBORN:  Right.  Yes.  Yes.

5          Now for the equities, again they cite these outbreaks

6   in Europe of five or one person as their best evidence.  Now,

7   they do on the same paragraph --

8          THE COURT:  I'm sorry.  An outbreak of what?

9          MR. HILBORN:  Of one person or five people, and they

10  call that an outbreak over in Europe.

11         Now, in the same paragraph they do give an example of

12  whether there, I'll say, was an actual outbreak of 200 people.

13  But the CEO of that ship publicly apologized for not following

14  the protocols that were in place.  And I'll note that for these

15  same examples of five person -- five people or one person, the

16  timeline on that is up to I want to say February 2021, so still

17  not exactly in vaccine land there.

18         And Your Honor also asked about parens patriae.  So

19  parens patriae considerations are relevant to the equities.  So

20  we talked about all the Floridians that are out of work and

21  again the harm to our state, which the defendants' counsel

22  recognized that Florida is being harmed by this order.  And

23  again, there's lots of focus on all this health data and best

24  scientific data.  At some point, they need to actually point to

25  that data in the order.  And then it's also not just about --

```
 1   balancing the equities is balancing the equities.  So yes, we
 2   need to consider the public health considerations.  But again,
 3   we need to consider also that the industry is shut down, that
 4   people are out of work, and also that it's always in the
 5   federal -- in the public interest for the federal government to
 6   follow the law.
 7           And then last point on standing.  We submit many
 8   exhibits that are not just limited to our declarations.  So in
 9   our brief at page 22, we cite reports from each port that shows
10   tax revenues.  That's Exhibits 20 to 24, as well as Exhibit 27.
11   And then for the ports as well, we submit Exhibit 2 at pages 9
12   to 10.  So it's not just the declarations that we're relying on
13   here.
14           And there was a few points in defendants' presentation
15   where --
16           THE COURT:  Now that you've had time to think a bit
17   more about it -- you know, I did ask about Florida's measures
18   earlier, and I pointed out the specific phrases that were in
19   conflict in the two papers from the CDC and Florida.  Is there
20   some set of measures that has been attendered by Florida or the
21   industry to CDC or to the Court that say these are the measures
22   that we think are the ones that should be prevailing, not the
23   burdensome and too long delayed measures of the CDC?
24           MR. HILBORN:  I think I would just point Your Honor
25   again to the Healthy Sail Panel protocols that the order itself
```

```
 1    discusses.  And then as far as Florida as well, I mentioned the
 2    vaccines.
 3            THE COURT:  And those Healthy Sail protocols, was it
 4    protocols or plan?  I know it's a "P."  What is it?
 5            MR. HILBORN:  I think it's Healthy Sail plan.
 6            THE COURT:  Plan.
 7            MR. HILBORN:  That has protocols in place.
 8            THE COURT:  The industry is ready to observe those?
 9            MR. HILBORN:  I probably can't make a representation
10    like that on --
11            THE COURT:  Let me ask this.  Suppose that Director
12    Valencia said, Okay, you're right, give me those instructions
13    and we'll make an emergency order and you can sail when you
14    comply with those.
15            MR. HILBORN:  Well, I think it would --
16            THE COURT:  What would happen then?  Be ready to go in
17    a month?  Or what -- because you're not arguing it to be an
18    unregulated, are you?  Or are you?
19            MR. HILBORN:  We are arguing that the conditional
20    sailing order goes above and beyond what the CDC is allowed to
21    do, whether -- whether that's viewed as a shutdown or whether
22    that's viewed just on its face by the requirements that it
23    imposes.
24            THE COURT:  But you're asking me to set it aside.
25            MR. HILBORN:  Correct.
```

```
1              THE COURT:  If I set it aside, then what becomes the
2    governing regime?  So I was saying, well, let's assume a
3    miracle viewed from your vantage point -- vantage and say that
4    Director Valencia says, All right, we'll accept the Healthy
5    Sail plan.  You're really right.  Then how long is it going to
6    be until you can sail, or is the industry compliant with that
7    uniformly now?  Or is CDC then going to have to inspect all the
8    vessels over the next month or two and decide whether they're
9    compliant with that?
10             MR. HILBORN:  I don't know the answer to that, Your
11   Honor.  I'm sorry.
12             THE COURT:  Does that strike you as pertinent to my
13   decision?
14             MR. HILBORN:  I can see how it's pertinent -- I
15   understand Your Honor's concern about the public health concern
16   and when weighing vaccines.
17             THE COURT:  And weighing the balance of --
18             MR. HILBORN:  Absolutely.  Absolutely.  And I think
19   that makes sense.  I think --
20             THE COURT:  I'm having trouble understanding what one
21   side of that is.  I know what the CDC's solution to that is.
22             MR. HILBORN:  So I think the other side of the
23   solution is that yes, it would be the industry regulating
24   itself which they have every incentive to do.
25             THE COURT:  And that's the Healthy Sail plan, at least
```

```
 1    those who subscribe to it?

 2         MR. HILBORN:  That's my understanding, again from the

 3    description in the order.

 4         THE COURT:  And does it contemplate that the state of

 5    Florida, for example, or the port captain or the CDC or

 6    somebody will confirm compliance?

 7         MR. HILBORN:  I don't -- I don't know.

 8         THE COURT:  Do you know whether some vessels are more

 9    compliant right now than others are?

10         MR. HILBORN:  I do not know.

11         THE COURT:  All right.

12         MR. HILBORN:  Thank you for your time, Your Honor.

13         THE COURT:  Well, thank you.  Let me just take a

14    minute or two more of your time since I've got you here and may

15    not get you back again.  So just bear with me a minute, okay?

16         MR. HILBORN:  Sure.

17         THE COURT:  The CDC claims that the American Rescue

18    Plan reimburses its state for its unemployment spending.  Is

19    that so, and if so, what is the effect of that on the

20    unemployment compensation component of your standing argument?

21    It has three prongs I know, but what is it?

22         MR. HILBORN:  So that declaration that we submitted

23    already backs out any federal reimbursements.  So it's just

24    pure costs to the state.

25              (Pause in proceedings.)
```

```
 1              THE COURT:  You know, I understand your argument that
 2     part of the CDC's argument is assuming -- well, that's too
 3     complicated.  I didn't see any quantification and you didn't
 4     promise it, but I didn't see any or any attempt to project what
 5     the level of subscription to voyages would be.  I suppose it's
 6     fair to say you don't contend that they're going to -- that
 7     passengers will immediately return to pre-pandemic levels.  It
 8     will probably be a gradual one, maybe not.
 9              MR. HILBORN:  I think it's fair to say that it'll
10     probably be gradual.  But again, as long as some come back,
11     that's enough for standing redressability.
12              (Court reporter clarification.)
13              MR. HILBORN:  Redressability.
14              THE COURT:  Excuse me?  You all are whispering back
15     and forth and I can't hear.  What was said?
16              MR. HILBORN:  I said -- I repeated myself that I said
17     standing and redressability.
18              THE COURT:  Right.
19              Okay.  Four of your counts are APA counts, and one is
20     this nondelegation count which we really don't talk about too
21     much, in many respects the most fun, I believe.  In all
22     respects, it's the most fun.  But the standing requirements are
23     not identical.  Constitutional standing is one thing and APA
24     standing is another.  And I don't remember whether we've talked
25     about this zone of interest concept, but I believe CDC does
```

1   object to the notion that Florida is a litigant that is in the

2   zone of interests intended for protection or benefit by a

3   particularized federal statute or regulation.

4          And your response to that APA zone of interest

5   standing point is what?

6          MR. HILBORN:  It's that HHS already recognized that we

7   are in the zone of interest by promulgating Rule 70.2, which

8   first requires CDC to determine that our measures are

9   inadequate.  And then I would note too that the Supreme Court,

10   every chance it has gotten over the last 20 years has --

11   there's two ways to say this -- has expanded the zone of

12   interests for purposes of that test.  And we explain that in

13   our brief and it only needs to be arguably within the zone.  We

14   don't need to show that Congress had intended or had a purpose

15   to have us be in the zone and we cite those cases in our brief.

16          THE COURT:  And your standing argument for

17   constitutional standing is based on the three-prong revenue

18   argument only, is that right?  Is that what you told me, I

19   think, at the outset of your argument?

20          MR. HILBORN:  Yes, we're not bringing parens patriae.

21          THE COURT:  And you're not asserting any other form of

22   governmental standing?  In other words, you're not saying that

23   some governmental or quasi sovereignty interest in regulating

24   the ports or something like that is a -- an interest that the

25   state is entitled to litigate if it's impinged?

1          MR. HILBORN:  I'm not considering that it isn't, but

2   we aren't pushing that here.

3          THE COURT:  There were a few words in your memo that

4   suggested that to me at least.  I just wanted to make sure.

5          MR. HILBORN:  But again, I do think that those

6   interests are relevant for the equities and analysis.

7          (Court reporter clarification.)

8          MR. HILBORN:  Analysis.

9          (Pause in proceedings.)

10         THE COURT:  All right.  Thank you very much.

11         MR. HILBORN:  Thank you, Your Honor.

12         MS. POWELL:  Your Honor, I just have two quick points,

13  but if you're done I can be done as well.

14         THE COURT:  You may.

15         MS. POWELL:  Thank you.

16         The first was you had reminded me of our zone of

17  interest argument that I'd like to very briefly respond to

18  plaintiffs on.  The essential argument is that Florida is not

19  the proper plaintiff here not because they have nothing to do

20  with the regulation, but because the interests they have

21  asserted here are not interests within the zone of interest of

22  the statute or regulations.  So the relevant Supreme Court

23  cases don't ask whether the regulations in any way consider the

24  plaintiff.  It looks at the particular interests asserted by

25  those plaintiffs, so in this case Florida's tax revenues and

152

1    unemployment benefits, which I think are plainly not within the

2    zone of interest or even properly considered in developing

3    these public health regulations.

4           Second point, I thought of this for both times

5    plaintiff's counsel was speaking, and I kept forgetting to come

6    back to it.  He had pointed to -- it says local measures, these

7    comments submitted by the local ports as some proof that CDC

8    did not consider local measures that exist.  I think this book

9    answers that point and also perhaps goes to standing to some

10   extent in that the local ports in Florida virtually asked for

11   these measures in the CSO.  They may have wanted them more

12   quickly.

13          But for example, in -- let's see Exhibit A to the

14   Treffiletti declaration on PDF page 14.  The Florida Ports

15   Council says, "We recommend that the CDC, in partnership with

16   the Florida Department of Health, develop a set of guidelines

17   and protocols for the transportation and medical treatment for

18   any people on board a returning ship after a COVID-19" --

19          THE COURT:  Slow down.  Slow down a bit.  If you're

20   going to read it, read it so that the reporter can --

21          MS. POWELL:  You are correct.  Sorry.

22          -- "develop a set of guidelines and protocols for the

23   transportation and medical treatment for any people on board a

24   returning ship after a COVID-19 outbreak is identified."  Then

25   it includes details about those guidelines.  And there is

        1    another one from the Port Everglades Department that says, for

        2    example, that the port -- that "Broward County urges the CDC to

        3    act quickly to develop standard protocols and guidelines that

        4    can be used by our cruise line partners to submit and

        5    expeditiously receive approvals from the CDC to resume sailings

        6    from the U.S. ports."

        7            Now, these are the public comments from September.  So

        8    before the CSO asking that the CDC impose requirements very

        9    much like the CSO, in fact, does suggesting that they believed

       10    the local measures alone could not solve the problem.  And

       11    that's background information that the CDC had when it found

       12    that local measures were obviously inadequate to solve the

       13    problem and the local ports in Florida agree.

       14            And my last point was that contrary to my previous

       15    joke to the Court, I did, in fact, phone a friend during the

       16    break and asked them if they could send me some language from

       17    some of the nondelegation cases.  If the Court is interested,

       18    they looked some up for me, of delegations of broad authority

       19    that have been upheld by the court.

       20            THE COURT:  Just give me the case name.  I probably am

       21    familiar with it.

       22            MS. POWELL:  Got it.

       23            THE COURT:  You can assume that I've looked pretty

       24    closely at that myself.

       25            MS. POWELL:  All right.  I am happy to rest then,

```
 1   unless the Court has questions.

 2           THE COURT:  Did they mention the Justice Gorsuch's

 3   opinion in Gundy?

 4           MS. POWELL:  Yes.

 5           THE COURT:  Well, I would say that most anything said

 6   before that and particularly after Justice Kavanaugh's dissent

 7   to the circ denial and the addition of Justice Barrett, I have

 8   no idea what that court might rule because there have been a

 9   lot of indications that the agencies are continuing to bound

10   outward without bound and that there are a lot of people very,

11   very uneasy about that.

12           MS. POWELL:  Understood, Your Honor.  And I recognize

13   the CDC has put forward a broad reading here of what we believe

14   is flexible authority.  I would be remiss if I did not point

15   out there are other narrower readings that would still

16   authorize extensive regulation of international cruise ships.

17           THE COURT:  Well, I think that's probably right.

18   There might well be.  None that have been made.  Well, that

19   might not be correct.  But it is unsettling, I will say that,

20   and I think there are a lot of people unsettled about it, about

21   the extent of some of these delegations and the amount of

22   authority that it exercised.

23           MS. POWELL:  Understood.  I really just --

24           THE COURT:  In a way that is, in fact, exercised, they

25   in the United States.
```

```
 1            MS. POWELL:  Understood.  I -- I don't think --

 2            THE COURT:  I'm not criticizing the Director or the

 3      Secretary or anyone else --

 4            MS. POWELL:  Understood.

 5            THE COURT:  -- as a general matter.

 6            MS. POWELL:  I just I think that we don't have to get

 7      to really the outer edges of the CDC's authority here to get at

 8      the regulation of international cruise ships.

 9            THE COURT:  Just a couple of technical questions, I

10      guess.  Let me make sure I get this right.  71 -- 42 -- excuse

11      me, 42CFR70 -- 42CFR71.1 finds detention as the temporary

12      holding of a ship.  And "apprehension" in quotes -- I'm making

13      quotation marks with my fingers -- and "surveillance" --

14      quotation marks again -- are limited to, quotation marks,

15      "temporary duration."  How does the CDC interpret the term

16      "temporary" when 42 U.S.C. 243(c)(2) defines temporary as not

17      in excess of six months and 42 U.S.C. 319 has a -- restricts

18      temporary to 30 days?

19            MS. POWELL:  So two things.  One, I wouldn't interpret

20      anything in the CSO as detaining ships.  They are free to

21      leave.  It does prevent them from resuming passen --

22            THE COURT:  Well, it's not a detention in the sense

23      that it's permanent, but it is a temporary holding --

24            MS. POWELL:  It's --

25            THE COURT:  -- of a ship.
```

 1          MS. POWELL:  It's not because they are free to leave.

 2   It does impose conditions on passenger operations.  So they

 3   cannot begin passenger operations, but that in and of itself, I

 4   do not believe, is a detention.

 5          THE COURT:  It's not a holding.

 6          MS. POWELL:  Yes.

 7          THE COURT:  Holding or detention.

 8          MS. POWELL:  Yes.  So I would not consider that a

 9   detention.  Even if it were, I don't think this -- the

10   applicable statute and regs here themselves define that

11   detention in such a way that's limited to X number of days.

12   It's rather the time necessary to do the public health measures

13   that are required.  I forget the precise terminology, but it

14   can be detained for the time necessary to implement the public

15   health measures or something to that affect.  And that is

16   typically how we would define it in those circumstances, which

17   again, I don't think the CSO does.

18          THE COURT:  I think you and I -- I think it was you

19   and I were discussing earlier this concept of the least

20   restrictive means.

21          MS. POWELL:  Yes.

22          THE COURT:  And if I read it correctly, 82 FR 6890

23   says that "In implementing quarantine, isolation or other

24   public health measures" -- there's other measures again -- "HHS

25   CDC will seek to use the least restrictive means necessary to

```
 1   prevent the spread of communicable disease."  So that was why I

 2   asked the question about --

 3          MS. POWELL:  Got it.

 4          THE COURT:  -- why -- what was -- whether what was

 5   being done was the least restrictive means that were available.

 6          MS. POWELL:  Understood.  I -- I think they are, to be

 7   clear, based on the CDC's findings that they're necessary to

 8   prevent transmission in the circumstance.

 9          THE COURT:  Because if they're not the least

10   restrictive means, they're not necessary by definition.

11          MS. POWELL:  Right.

12          THE COURT:  Right.

13          MS. POWELL:  Right.  I think that's right.  I think a

14   lot of where we've had to really parse that language is when it

15   comes to quarantine of individuals, whether the least

16   restrictive means of apprehending and detaining people is being

17   used.  That's not at issue in this CSO.

18          THE COURT:  Yeah.  We get that in bail cases.

19          MS. POWELL:  I don't think we have had any or we've

20   had very little litigation about that, I should say, but there

21   has been some.

22          THE COURT:  The -- I'm sorry.  I have a lot of

23   acronyms running through my brain here.

24          MS. POWELL:  Happens to me.

25          THE COURT:  The one from the industry, the safety
```

Case 8:21-cv-02429-KKM-AAS   Document 4   Entered on FLSD Docket 05/15/2021   Page 159 of 162
Case 1:21-cv-22429-KMM-AAS   Document 4   Entered on FLSD Docket 05/15/2021   Page 159 of 162

158

1    plan.

2            MS. POWELL:  The Healthy Sail Panel.

3            THE COURT:  Healthy Sail plan.  Have you or have you

4    not affirmed that that has been evaluated by CDC to determine

5    whether it or some modification or enhancement of it might be a

6    least restrictive means to accomplish the goals?

7            MS. POWELL:  Yes.  It is explicitly described and

8    considered in the CSO itself.  CDC representatives were there

9    as observers and for informal discussions with the participants

10   in the Healthy Sail Panel who developed the planning documents

11   that came out of that.  The Treffiletti declaration describes

12   more detail about what they were doing there and why, and that,

13   in fact, they ultimately adopted some of the recommendations of

14   the Healthy Sail Panel and imposed additional ones.  The --

15   sort of a lot of the emergency planning sort of elements of the

16   CSO actually originally came out of the Healthy Sail plan.

17           THE COURT:  I remember the discussion of their being

18   there and I remember the mention of the plan in the CSO, which

19   is not electronic reading.

20           MS. POWELL:  No.

21           THE COURT:  But I don't remember them -- yes, they --

22   it was the root of some of the things that they did, but I

23   don't -- I don't recall them saying, but it is otherwise

24   inadequate for this reason.  Or did they say that?

25           MS. POWELL:  What they concluded in the CSO is that

 1     despite those very positive measures and developments that a

 2     continued public health oversight was needed for enforcement

 3     purposes, and there are some things in the CSO that were not in

 4     the Healthy Sail Panel recommendations, as sort of standard

 5     requirements.  But the biggest thing, of course, is just

 6     continued public health orders, yes.

 7          THE COURT:  In order to determine what those were, do

 8     I have to go back and just take the Healthy Sail plan and the

 9     CSO and compare it, or is there a place in there where they say

10     the Healthy Sail plan was inadequate for these reasons?

11          MS. POWELL:  It is not that explicit.

12          THE COURT:  I didn't think so because I was looking

13     for it and I didn't remember it.

14          MS. POWELL:  It is not that explicit.  So for example,

15     I'm not recalling the specific language, but the Healthy Sail

16     plan suggested sort of practicing disembarkation measures in

17     emergency situations.  That became the, among other things,

18     the -- it became part of the requirement for simulated voyages

19     that they practice those emergency operations, that sort of

20     thing.  But there are more requirements built in to the

21     simulated voyages than that alone, for example.  A lot of that

22     is about data collection to see how well it works at mitigating

23     the transmission of COVID-19.

24          (Pause in proceedings.)

25          THE COURT:  I think we're through.

```
 1              MS. POWELL:  Thank you, Your Honor.

 2              THE COURT:  Thank you very much.  Thank you.  Let's

 3    see.  The State of Florida's brief is due next Wednesday, I

 4    think.

 5              MR. HILBORN:  Yes, Your Honor.

 6              THE COURT:  All right.  And we have a couple of

 7    motions to intervene that are outstanding.  But other than

 8    that, we'll just await your brief, right, and then we'll --

 9    it's possible we might have to have some kind of follow up, but

10    we can do that by other means if necessary, or meet here again

11    if it's convenient, depending on the portion -- proportion of

12    that.

13              Well, thank you very much.  I appreciate your

14    patience.  I know it was a long list of questions that I had,

15    and you had a lot -- there are a lot of points and a lot of

16    arguments back and forth.  It was a very busy little case for

17    such a short time.

18              So I thank you very much.  And just to say hello, I'd

19    like to see Ms. Powell and the lawyers at the bench for the

20    State just in my office chambers.  Just come on around.

21    Mr. Fish will let you in, and we'll get a chance to say hi.

22              Okay.  Thank you very much.  We're in adjournment, and

23    I'll rule as quickly as I can.

24              (The proceedings adjourned at 3:10 p.m.)

25                          --oOo--
```

UNITED STATES DISTRICT COURT - TAMPA DIVISION

**CERTIFICATE OF REPORTER**

COUNTY OF HILLSBOROUGH     )

                                   )   SS.

STATE OF FLORIDA           )

I, Shayna Montgomery, Official Court Reporter, Registered Merit Reporter, in and for the United States District Court for the Middle District of Florida, do hereby certify that I reported, stenographically, the foregoing proceedings at the time and place hereinbefore set forth; that the same was thereafter reduced to typewritten form by means of computer-aided transcription; and I do further certify that this is a true and correct transcription of my stenographic notes.

DATED: 05/13/2021

S:/SHAYNA MONTGOMERY

SHAYNA MONTGOMERY, CSR, RMR, CRR

FEDERAL OFFICIAL COURT REPORTER