# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **NORWEGIAN CRUISE LINE HOLDINGS LTD.**, a Bermuda Company; **NCL (BAHAMAS) LTD.**, d/b/a NORWEGIAN CRUISE LINE, a Bermuda Company; **SEVEN SEAS CRUISES**, a Panama Limited Liability Company; **OCEANIA CRUISES S. DE R.L.**, d/b/a OCEANIA CRUISES, a Panama Limited Liability Company, | ) ) ) ) ) ) ) ) ) ) Case No.: 1:21-cv-22492 |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| **SCOTT A. RIVKEES, M.D.**, State Surgeon General and Head of the Florida Department of Health, in his official capacity, | ) ) ) ) |
| Defendant. | ) ) ) |

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR A PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ..................................................................................................................1

BACKGROUND ....................................................................................................................3

ARGUMENT ..........................................................................................................................6

I.     Norwegian Is Not Likely to Succeed on the Merits....................................................6

     A.  Florida's Law Is Not Preempted By Federal Law. ................................................7

          i.  The CSO, Technical Instructions, and Operations Manual Cannot Preempt Florida's Law Because They Are Enjoined.................................................7

          ii.  Even if the CDC's Order is Lawful, Neither It, the Technical Instructions, Nor the Operations Manual Has a Preemptive Effect. ...............................7

          iii.  The CDC's Order Violates the APA.........................................................10

              1.  The CSO Exceeds the CDC's Statutory Authority. ......................10

              2.  The CDC's Order Exceeds the CDC's Regulatory Authority. ......12

              3.  The Order Is Arbitrary and Capricious. .........................................13

              4.  The Order Unlawfully Dispensed with Notice and Comment.......13

              5.  Congress Did Not Ratify the Order. ..............................................14

     B.  Florida's Law Does Not Violate the First Amendment. .......................................15

     C.  Florida's Law Does Not Violate the Dormant Commerce Clause. .......................17

II.    Norwegian Will Not Suffer Irreparable Harm Absent an Injunction. .........................18

III.   The Balance of Equities and Public Interest Weigh Decidedly in Favor of Not Enjoining Florida's Law. ..........................................................................................19

CONCLUSION.....................................................................................................................20

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                      **Page**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009) .................... 6

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) ...................................................................... 18

*Ala. Ass'n of Realtors v. HHS*, No. 20-cv-3377, 2021 WL 1779282
    (D.D.C. May 5, 2021) ............................................................................................................ 11, 15

*Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2320 (2021) ................................................................ 12

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ......................... 19

*Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153 (D.C. Cir. 1981) .......................................... 14

*Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957 (D.C. Cir. 1985) ..................................................... 12

*Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019) ......................................................... 8, 13, 14

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ..................................................... 16, 17

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1986) ..................................... 8

*Brown v. Secretary, U.S. Dep't of Health & Human Servs.*, No. 20-14210,
    2021 WL 2944379 (11th Cir. July 14, 2021) ............................................................................ 11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) ......... 16, 17

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ............................................................. 11

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ............................................................................ 10

*City of Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740 (D.C. Cir. 1992) ............................... 8

*Corley v. United States*, 556 U.S. 303 (2009) .............................................................................. 11

*Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235 (11th Cir. 2015) ............................................. 15

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) ............................................................. 18, 19

*EEOC v. CBS, Inc.*, 743 F.2d 969 (2d Cir. 1984) ........................................................................ 15

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ................................................................... 15

*Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237 (3d Cir. 2008) ............................................... 8

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) .............................................. 9

*First Specialty Ins. Corp. v. 633 Partners, Ltd.*, No. 06-cv-20618,
    2009 WL 10667542 (S.D. Fla. Jan. 5, 2009) ........................................................................... 18

*Florida v. Becerra*, No. 8:21-cv-839, 2021 WL 2514138
    (M.D. Fla. June 18, 2021) ............................................. 2, 5, 7, 8, 11, 12, 13, 14, 15

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ............................................................ 9, 10

*Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997) .......................................... 15, 16

*Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989) ............................................................................ 17

*Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707 (1985) ........10

*Indus. Union Dep't v. Am. Petroleum Inst.*, 448 U.S. 607 (1980) ................................. 12

*Jones v. United States*, 529 U.S. 848 (2000) ................................................................. 12

*Katz v. United States*, 389 U.S. 347 (1967) .................................................................. 17

*Kollett v. Harris*, 619 F.2d 134 (1st Cir. 1980).............................................................. 14

*Locke v. Shore*, 634 F.3d 1185 (11th Cir. 2011) ........................................................... 15

*Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012) ............................................... 14

*Mazzeo v. Nature's Bounty, Inc.*, No. 14-cv-60580, 2014 WL 5846735 (S.D. Fla. 2014).............7

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ....................................................9, 10, 19

*Mobil Oil Corp. v. DOE*, 610 F.2d 796 (Temp. Emer. Ct. App. 1979) .........................14

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978)................................................. 15

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015)..........................................................8, 9

*P.R. Maritime Shipping Auth. v. Fed. Maritime Comm'n*, 678 F.2d 327 (D.C. Cir. 1982)............8

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ............................................................. 17

*Regeneron Pharm., Inc. v. HHS*, No. 20-cv-10488,
   2020 WL 7778037 (S.D.N.Y. Dec. 30, 2020) .................................................... 14

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................................................. 17

*Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006) ...........................................................15, 16

*Salt Lake Trib. Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081 (10th Cir. 2003) ...............19

*Scroos LLC v. Att'y Gen. of United States*, No. 20-cv-689,
   2020 WL 5534281 (M.D. Fla. Aug. 27, 2020) .................................................. 18

*Second City Music, Inc. v. City of Chicago*, 333 F.3d 846 (7th Cir. 2003) .................19

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) ................................................. 6, 18

*Skyworks, Ltd. v. CDC*, No. 20-cv-2407, 2021 WL 911720 (N.D. Ohio Mar. 10, 2021) ...........11

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001)..............................14, 15

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) ....................................................... 16

*South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) ............................................... 17

*Thomas v. New York*, 802 F.2d 1443 (D.C. Cir. 1986)................................................... 8

*Tiger Lily, LLC v. HUD*, 992 F.3d 518 (6th Cir. 2021) .........................................11, 15

*Tiger Lily, LLC v. HUD*, No. 21-5256, 2021 WL 3121373 (6th Cir. July 23, 2021) .............11, 12

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) ........................................ 15

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014)....................................................... 11

*Wabash Valley Power Ass'n v. Rural Electrification Admin.*, 903 F.2d 445 (7th Cir. 1990)..........8

*Warshauer v. Solis*, 577 F.3d 1330 (11th Cir. 2009) ................................................................7, 14

*Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955)...............................................15

*Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323 (2011) ...........................................9, 10

*Wollschlaeger v. Governor*, 848 F.3d 1293 (11th Cir. 2017)..................................................16

*Wyeth v. Levine*, 555 U.S. 555 (2009) ...................................................................................9

**Statutes**

5 U.S.C. § 551(4) ...................................................................................................8, 13, 14

5 U.S.C. § 553(b)(B)....................................................................................................14

5 U.S.C. § 706(2)(A).....................................................................................................8

5 U.S.C. § 804(2) ........................................................................................................11

42 C.F.R. § 70.2 ...........................................................................................................12

42 C.F.R. § 71.31(a).....................................................................................................13

42 C.F.R. § 71.31(b).....................................................................................................13

42 C.F.R. § 71.32(b).....................................................................................................13

42 C.F.R. § 71.41 ..........................................................................................................13

42 C.F.R. § 71.42 ..........................................................................................................13

42 C.F.R. § 264(a) ...................................................................................................10, 11

42 U.S.C. § 264(b) .......................................................................................................11

42 U.S.C. § 265 ............................................................................................................11

42 U.S.C. § 266 ............................................................................................................11

FLA. STAT. § 381.00316 ......................................................................................3, 16, 18

**Legislative Materials**

Alaska Tourism Restoration Act, Pub. L. No. 117-14, 135 Stat. 273 (May 24, 2021)............14, 15

*House Session*, FLA. HOUSE OF REP. (Apr. 28, 2021), https://bit.ly/3xSFNRq ...............................4

*Senate Session*, FLA. SENATE (Apr. 29, 2021), https://bit.ly/3xSYLaH .........................................4

**Administrative Materials**

85 Fed. Reg. 44,083 ......................................................................................................14

Framework for Conditional Sailing and Initial Phase COVID-19 Testing
    Requirements for Protection of Crew, 85 Fed. Reg. 70,153
    (Nov. 4, 2020) ..................................................................................1, 4, 7, 10, 12, 13, 14

No Sail Order and Other Measures Related to Operations,

85 Fed. Reg. 16,628 (Mar. 24, 2020)......................................................................................4

## INTRODUCTION

The State of Florida has been in the vanguard of protecting its most vulnerable citizens from COVID-19 while at the same time seeking to protect Floridians from the unprecedented intrusion into personal liberties that the pandemic has sparked. Exercising its sovereign authority through its traditional police power of safeguarding public health, safety, and the economic well-being of its citizens, the Florida Governor and Legislature have determined that businesses in the State should be prohibited from denying service to customers who decline to provide documentation certifying COVID-19 vaccination—so-called "vaccination passports"—or post-COVID-19 recovery. In issuing an executive order that preceded State legislation codifying this policy, the Governor explained that he was adamantly opposed to creating "two classes of citizens based on vaccination" status and personal health decisions, but that he continued to support businesses' ability to "institut[e] COVID-19 screening protocols in accordance with state and federal law to protect public health." Exec. Order No. 21-81 (Apr. 2, 2021), Doc. 16-1 at 3–4.

Now months after Fla. Stat. § 381.00316 was enacted on May 3, 2021, and nearly two weeks after it took effect on July 1, 2021, Plaintiffs Norwegian Cruise Line Holdings Ltd., NCL (Bahamas) Ltd., Seven Seas Cruises, and Oceania Cruises S. de R.L. (together, "Norwegian") have challenged § 381.00316 and moved for a preliminary injunction so that it may exclude unvaccinated passengers from its cruises. Although Norwegian repeatedly portrays its challenge as motivated by ensuring the safety of its customers and as necessary to protect the public health, this characterization is belied by the lesser standards promoted by health officials. The Centers for Disease Control and Prevention's ("CDC") Conditional Sailing Order[1] ("CSO" or "Order") and subsequent technical and substantive specifications upon which Norwegian bases its preemption argument—all of which currently are enjoined—allow a cruise line to sail by complying with either of two options: it may conduct a simulated voyage to test the cruise line's COVID-19 preparedness, or it may submit to the CDC an attestation that 95% of the crew is fully vaccinated and a plan to limit sailings to 95% of passengers who the cruise operator verifies are fully vaccinated.[2] That the CDC considers both of these options sufficient refutes Norwegian's

---

[1] Framework for Conditional Sailing and Initial Phase COVID-19 Testing Requirements for Protection of Crew, 85 Fed. Reg. 70,153 (Nov. 4, 2020).

[2] *See id.* at 70,159 (simulated voyage); *Technical Instructions for Simulated Voyages by Cruise Ship Operators Under CDC's Framework for Conditional Sailing Order* ("Technical Instructions"), CDC (May 14, 2021), Doc. 3-2 Ex. 2 at 17 (95% option).

argument that it cannot ensure its customers' safety and comply with Florida's law. Indeed, the Healthy Sail Panel, a group of experts co-convened by Norwegian "to define a set of protocols and procedures that would protect guests, crew, and the communities cruise ships visit from [COVID-19] and reduce the risk of transmission below the level people would experience in other normal activities," Decl. of Dr. Stephen Ostroff Ex. 2 (July 12, 2021), Doc. 3-4 at 38, and upon which Norwegian relies, *see* Compl. ¶ 69 (July 13, 2021), Doc. 1; Pls.' Expedited Mot. for a Prelim. Inj. & Incorporated Mem. of Law at 6 ("Mot.") (July 13, 2021), Doc. 3, concluded that by following protocols such as rigorous testing, physical distancing and masking, and supervising off-board excursions, the cruise industry could reopen "in the safest ways possible" and "protect passengers and crew against the risk of transmission," Doc. 3-4 at 98–99, even in the absence of an available vaccine. Similarly, on May 11, 2021, the Cruise Lines International Association ("CLIA")—of which Norwegian is a member and its CEO is on the Global Executive Committee—recommended a framework to the CDC that it stated would allow the operation of cruises in a manner that would "significantly reduce risk to a level that would compare favorably to other venues" while merely encouraging customer vaccination. Decl. of Nicholas A. Varone Exs. 13–15 (July 27, 2021) ("Varone Decl.").

And other cruise lines have chosen to undertake the simulated voyage option, including Disney Cruise Lines, Royal Caribbean, and Carnival. *Id.* Exs. 1–3, 16. Norwegian's case, therefore, is not about public health but rather about a business decision it has made in an apparent attempt to reduce costs and distinguish the company from its competitors, including by promising its passengers that it would be sailing with fully vaccinated ships (not even suggested by any CDC guidance), Decl. of Frank J. Del Rio ¶ 28 (July 12, 2021), Doc. 3-1, despite committing to Miami-Dade County that it would comply with Florida law, Varone Decl. Ex. 17. Norwegian's profitability does not override Florida's sovereign decision to protect its citizens' personal liberties, health, and privacy through § 381.00316.

Norwegian's arguments in support of its motion for a preliminary injunction are unavailing. First, the CSO and subsequent technical and substantive specifications do not preempt § 381.00316. Because the CDC currently is enjoined from "enforcing against a cruise ship arriving in, within, or departing from a port in Florida the conditional sailing order and the later measures (technical guidelines, manuals, and the like)," *Florida v. Becerra*, No. 8:21-cv-839, 2021 WL 2514138, at *51 (M.D. Fla. June 18, 2021); the CSO and measures implementing it cannot preempt

§ 381.00316. Even if the CDC were not enjoined, and even if the CSO were lawful—which it is not—the subsequent technical and substantive specifications issued under the CSO are not the type of guidance that is accorded preemptive effect. In any event, Norwegian will be able to comply with both the CSO and Florida's law, and Florida's law does not present an obstacle to the accomplishment of the CDC's objectives. Second, Florida's law does not violate Norwegian's First Amendment rights. The law is an economic regulation and does not prohibit the free flow of information between Norwegian and its customers, including about their vaccination status. Third, Florida's law does not violate the dormant Commerce Clause. The law applies only to Norwegian's business operations in Florida, so it does not reach beyond Florida's borders to regulate conduct in other jurisdictions, and it does not excessively burden the free flow of commerce between states and nations.

Furthermore, Norwegian cannot demonstrate that it will be irreparably harmed absent an injunction. It is unable to make a substantial showing that its First Amendment rights are being infringed, and any monetary damages, harm to business, or loss of goodwill are attributable to Norwegian's voluntary business decisions. Finally, the balance of equities and the public interest weigh heavily in favor of upholding Florida's law. The State of Florida has enacted into law a public policy that businesses cannot require customers to furnish documentation evidencing COVID-19 vaccination. Enjoining the law would infringe on this sovereign determination, whereas leaving the law in place would still allow Norwegian to sail safely and in a manner consistent with the CSO should that Order ever again be enforceable.

This Court should deny Norwegian's motion for a preliminary injunction.

## BACKGROUND

On April 2, 2021, Governor DeSantis issued an Executive Order prohibiting businesses in Florida from "requiring patrons or customers to provide any documentation certifying COVID-19 vaccination or post-transmission recovery to gain access to, entry upon, or service from the business" or else be ineligible for grants or contracts funded through state revenue. Doc. 16-1 at 3. The Florida Legislature then enacted a bill stating that "A business entity, as defined in s. 768.38 to include any business operating in this state, may not require patrons or customers to provide any documentation certifying COVID-19 vaccination or post-infection recovery to gain access to, entry upon, or service from the business operations in this state." FLA. STAT. § 381.00316.

Section 381.00316 reflects a sovereign policy judgment that companies should not

condition service upon documentation of a customer's vaccination status. Norwegian's lawsuit represents a novel effort to discriminate among customers, including families with children, based on otherwise private health information. Indeed, during debate on the bill, legislators repeatedly justified the prohibition based on protecting individual liberties, protecting privacy, and preventing discrimination.[3] The Governor signed the bill on May 3, 2021, and it took effect on July 1, 2021.

While the State of Florida has sought to ensure the right of its citizens to participate in the economy, the CDC has engaged in heavy-handed regulation of the cruise industry. On March 14, 2020, the CDC issued a "No Sail Order"[4] that essentially shut down the industry. On October 30, 2020, the CDC issued the CSO, which specified a framework for reopening. The CSO requires the completion of four phases before a vessel again qualifies to sail: (1) establishment of laboratory testing of crew onboard cruise ships in U.S. waters; (2) simulated voyages designed to test a cruise ship operator's ability to mitigate COVID-19; (3) a certification process; and (4) a return to passenger voyages in a manner that mitigates the risk of COVID-19. CSO, 85 Fed. Reg. at 70,157. Following cruise industry complaints that the CSO lacked sufficient implementing instructions, the CDC issued a series of guidance documents, letters, and technical instructions. On April 28, 2021, the CDC issued a "Dear Colleague Letter" that, among other things, allowed a cruise ship to avoid the requirement of a simulated voyage if a cruise ship operator's crew is 98% fully vaccinated and the cruise line "submit[s] to CDC a clear and specific vaccination plan and timeline to limit cruise ship sailings to 95 percent of passengers who have been verified by the cruise ship operator as fully vaccinated prior to sailing."[5] On May 14, 2021, the CDC issued Technical Instructions that further refined the option in lieu of a simulated voyage by lowering the percentage requirement for crew to be fully vaccinated to 95%. Doc. 3-2 Ex. 2 at 17. Finally, on May 26,

---

[3] *See House Session*, at 2:26:25–2:27:00, FLA. HOUSE OF REP. (Apr. 28, 2021), https://bit.ly/3xSFNRq (statement of Rep. Beltran) (explaining that the bill would prevent businesses from discriminating "based upon arbitrary classifications"); *id.* at 2:28:10–2:31:03 (statement of Rep. Leek) (arguing that the bill strikes the appropriate balance between protecting one's safety and one's personal liberty and that it protects "the rights of a material portion of our minority population who remains vaccine hesitant"); *Senate Session*, at 6:18:20–6:19:18, FLA. SENATE (Apr. 29, 2021), https://bit.ly/3xSYLaH (statement of Sen. Burgess) (explaining that the bill would prevent a situation "where you have to provide a piece of documentation . . . in order to go to the grocery store").

[4] No Sail Order and Other Measures Related to Operations, 85 Fed. Reg. 16,628 (Mar. 24, 2020).

[5] *Dear Cruise Industry Colleagues Letter* at 4, CDC (Apr. 28, 2021), Doc. 3-2 Ex. 1.

2021, the CDC issued the "Operations Manual," which added discretionary options for ships with vaccinated passengers, such as allowing fully vaccinated passengers not to wear masks during outdoor activities.[6] At no point has the CDC ever required cruise ship operators to require their customers to be vaccinated before sailing, much less obtain documentation of vaccination. Accordingly, the CDC has disclaimed any intent to preempt Florida's vaccination law.[7]

In response to the CSO and its burdens on the cruise industry, Florida sued the CDC on April 8, 2021, in the U.S. District Court for the Middle District of Florida. *Florida*, 2021 WL 2514138. Florida argued that the CDC exceeded its statutory and regulatory authority, acted arbitrarily and capriciously, denied the required opportunity for notice and comment without good cause, and exercised an unconstitutional delegation of legislative authority. *Id.* at *1. Florida moved for a preliminary injunction, which the court granted, concluding that Florida was likely to prevail on the merits of its claims. *Id.* at *51. A divided panel of the Eleventh Circuit initially stayed the injunction pending appeal on July 17, 2021, Order, *Florida v. Sec'y Dep't of Health & Human Servs.*, No. 21-12243 (11th Cir. July 17, 2021), but on July 23, 2021, the panel *sua sponte* vacated its July 17 Order and denied the CDC's motion for a stay pending appeal. Order*, Florida v. Sec'y Dep't of Health & Human Servs.*, No. 21-12243 (11th Cir. July 23, 2021). Consequently, the CDC currently is enjoined "from enforcing against a cruise ship arriving in, within, or departing from a port in Florida the conditional sailing order and the later measures (technical guidelines, manuals, and the like)." *Florida*, 2021 WL 2514138, at *51.

Meanwhile, on May 28, 2021, Norwegian and Miami-Dade County executed a Memorandum of Agreement ("MOA") pursuant to the CSO. The MOA was sent to Defendant by Miami-Dade County for Defendant's execution. Decl. of Mark S. Lander Ex. 1 (July 27, 2021). Rather than executing the MOA, Defendant sent Norwegian a letter on June 1, 2021, stating that the CSO likely is unlawful, but explaining that regardless "the letter satisfies the requirement that your company receive approval from the Department." *Id.* Ex. 2.

Norwegian subsequently submitted a modified MOA with Miami-Dade County to the CDC

---

[6] *COVID-19 Operations Manual for Simulated and Restricted Voyages Under the Framework for Conditional Sailing Order*, CDC (May 26, 2021), Doc. 3-2 Ex. 3.

[7] Varone Decl. Ex. 9 at 108:18–20 ("I can tell you from CDC's perspective that at this time, CDC does not believe it has taken action to preempt the Florida law in question."); 109:6–7 ("We have not claimed to preempt the state law."); 110:3–5 ("The CDC has offered [the 95% vaccination option] as an option for cruise ships and has not purported to preempt state law on the question.").

not including the State Department of Health when applying for a Conditional Sailing Certificate under the CSO. *See* Varone Decl. ¶ 18. Dated June 2, 2021, the MOA stated that "nothing in this MOA or any approved exhibits or annexes hereto shall be construed to require persons to provide any documentation certifying COVID-19 vaccination or post-infection recovery to gain access to, entry upon, or service from any [Norwegian] vessel or business operation in this state" and required Norwegian to "comply with all applicable laws," including those "pertaining to SARS-CoV-2/COVID-19." *Id.* Ex. 17 at 6, 10. Norwegian's vaccination strategy was in an exhibit, and it stated that Norwegian "shall require . . . embarking passengers . . . to be fully vaccinated prior to participating in simulated or restricted voyages *except where prohibited by applicable law*." *Id.* Ex. 17, at Ex. 3 ¶ II(a)(i) (emphasis added). On June 10, 2021, Norwegian referenced this strategy when attesting to the CDC that it had a plan to limit sailings to 95% verified vaccinated passengers. *See* Doc. 3-1 Ex. 2; Varone Decl. ¶ 18.

Thus, while Norwegian made public statements as early as May acknowledging the tension between § 381.00316 and Norwegian's plan to require 100% of its customers to be vaccinated, Varone Decl. Exs. 4–5, Norwegian's submission to the CDC indicated that it *would not* require vaccine documentation from Florida customers. Norwegian nevertheless continued to advertise fully vaccinated cruises and then set its own preferred sailing date of August 15, 2021. Other cruise lines, such as Disney Cruise Lines, Royal Caribbean, and Carnival, have opted to perform simulated sailings, *id.* Exs. 1, 6–7, and appear poised to sail from Florida in compliance with CDC requirements without mandating documentation of vaccination status, *see id.*

## ARGUMENT

A party seeking entry of a preliminary injunction must establish that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). "A preliminary injunction is an extraordinary and drastic remedy," *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (internal quotation marks omitted), that is "the exception rather than the rule," *Siegel*, 234 F.3d at 1176 (internal quotation marks omitted).

### I.    Norwegian Is Not Likely to Succeed on the Merits.

Norwegian is not likely to prevail because § 381.00316 (1) is not preempted by federal

law, (2) does not violate Norwegian's First Amendment rights, and (3) does not violate the dormant Commerce Clause. Norwegian's substantive due process claim is not before the Court because it is only mentioned in a footnote devoid of argument or citation to authority. *See* Mot. at 8 n.1; *Mazzeo v. Nature's Bounty, Inc.*, No. 14-cv-60580, 2014 WL 5846735, at *2 n.1 (S.D. Fla. 2014).

### A.  Florida's Law Is Not Preempted By Federal Law.

#### i.  The CSO, Technical Instructions, and Operations Manual Cannot Preempt Florida's Law Because They Are Enjoined.

The Middle District has preliminarily enjoined the CDC from enforcing the CSO, Technical Instructions, and Operations Manual against cruise ships arriving in, within, or departing from a port in Florida, finding that "Florida is highly likely to prevail on the merits of its claim that CDC's [CSO] and the implementing orders exceed the authority delegated to CDC under Section 264(a)." *Florida*, 2021 WL 2514138, at *51. That injunction is now in effect, as the Eleventh Circuit denied the CDC's motion for a stay pending appeal. *See* Order, *Florida*, No. 21-12243-D (11th Cir. July 23, 2021). Consequently, the CSO cannot preempt Florida's law because the CDC is enjoined from enforcing it in the State. And because, as explained below, the Middle District rightly found Florida likely to succeed, the injunction likely will become permanent.

#### ii.  Even if the CDC's Order is Lawful, Neither It, the Technical Instructions, Nor the Operations Manual Has a Preemptive Effect.

Even assuming that the CDC's CSO is lawful—which, as explained below, it is not— neither the Technical Instructions nor the Operations Manual preempt Florida law.

*First*, the CDC did not have the authority under its own CSO to substitute the 95% vaccination option in place of a simulated voyage in the Dear Colleague Letter and Technical Instructions. The CSO states that the CDC "may issue additional requirements through technical instructions or orders relating to a cruise ship operator's processes and procedures *for conducting and evaluating a simulated voyage* prior to applying for a COVID-19 Conditional Sailing Certificate." CSO, 85 Fed. Reg. at 70,160 (emphasis added). A vaccination option that displaces the simulated voyage option is not a process or procedure for conducting or evaluating a simulated voyage. The CDC was thus not acting pursuant to its own CSO when it authorized that option, and it is therefore unlawful.

*Second*, to the extent the Technical Instructions or Operations Manual "create[ ] new law, rights, or duties," *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009)—as Norwegian insists that they do for cruise lines that verify 95% customer vaccination—they are substantive rules that

required notice-and-comment rulemaking. *See* 5 U.S.C. § 551(4); *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019). If Norwegian is correct and the vaccination provisions do create new rights and duties for cruise lines wishing to sail, then they would constitute unlawful agency action that would have to be set aside as invalid under the APA on account of the agency's failure to engage in notice and comment rulemaking.

*Third*, even if they were somehow validly issued under the APA, the lack of both notice and comment and of publication in the Federal Register would still mean that the Technical Instructions and the Operations Manual would lack the force of federal law and could not preempt state law. *See, e.g.*, *Thomas v. New York*, 802 F.2d 1443 (D.C. Cir. 1986) (Scalia, J.) (holding that a letter from the Administrator of the EPA did not have the force of law because it was not issued after notice and comment and was not published in the Federal Register); *Wabash Valley Power Ass'n v. Rural Electrification Admin.*, 903 F.2d 445, 453–54 (7th Cir. 1990) (agency letter had no preemptive effect where "[t]here was no notice, no opportunity for comment, no statement of basis, no administrative record, [and] no publication in the Federal Register); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538 (D.C. Cir. 1986) (Scalia, J.) (rule not published in the Federal Register is not a regulation); *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 245 (3d Cir. 2008).

*Fourth*, the CDC's setting of the percentage threshold of vaccinated crew and passengers necessary to bypass a simulated voyage and relax other requirements—and even the provision of that option at all—was arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A). In the April 28, 2021 Dear Colleague Letter, the CDC set the thresholds at 98% of crew and 95% of passengers vaccinated. Doc. 3-2 at 7. But in the May 14, 2021 Technical Instructions, the threshold for crew had changed to 95%. *Id.* at 17. In neither document did the CDC explain how it determined those thresholds, why it was allowing this specific option in lieu of conducting a simulated voyage, nor "why the vaccination rate is so much higher than the rate it deem[ed] sufficient [at that time] to obtain so-called 'herd immunity.'" *Florida*, 2021 WL 2514138, at *46 n.49. Nor in the Operations Manual did the CDC explain how it determined to relax certain on-board requirements for ships meeting the vaccine thresholds. *See City of Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740, 743 (D.C. Cir. 1992); *P.R. Maritime Shipping Auth. v. Fed. Maritime Comm'n*, 678 F.2d 327, 336 (D.C. Cir. 1982).

*Fifth*, "[c]onflict pre-emption exists where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of

the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (internal quotation marks omitted).[8] Norwegian fundamentally errs by attempting to analyze the preemptive effect of the vaccination option in isolation, rather than as part of the broader scheme established by the CSO. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485–86 (1996). That Order establishes mandatory requirements for cruise lines to fulfill before being certified to sail, and conspicuously absent is any requirement to ensure customers are vaccinated. The Technical Instructions and the Operations Manual were issued to implement and clarify the CSO, *see* Doc. 3-2 at 9, 19, and they simply relax some requirements for cruise lines that verify a certain percentage of customers and crew are vaccinated. There is no indication in these documents that the CDC's full purposes can be met only if this option remains a live one for cruise lines, or that it is even important to the CDC that cruise lines have this option. Indeed, it appears to have been the result of lobbying by the cruise lines, as the Dear Colleague Letter announcing it in its initial form is bereft of any substantive reasoning but notes that the relevant agencies had "engaged in twice-weekly meetings with representatives from various cruise lines," including Norwegian, "regarding the importance of vaccines," and that "as part of these discussions, CDC reviewed" an industry position statement on vaccines and cruising. Doc. 3-2 at 4.

Norwegian's reliance on *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), is misplaced. *Geier* was a unique case in which the existence of an array of options for motor vehicle manufacturers to satisfy passive restraint requirements was itself an important agency objective. Requiring manufacturers select only one of these options therefore was an obstacle to the agency's purposes. *Id.* at 878, 881; *see also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 156 (1982) (finding conflict preemption where state law limited the availability of an option that the federal agency considered *essential* to ensure its ultimate objectives). *Geier*'s reasoning does not extend to a situation such as this when such a purpose is absent. *See Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 332–35 (2011). "[T]he mere fact that an agency regulation allows [regulated entities] a choice between options is insufficient to justify implied pre-emption; courts should only find pre-emption where evidence exists that an agency has a regulatory objective . . . whose achievement depends on [regulated entities] having a choice between options." *Id.* at 337–

---

[8] Several Justices have questioned the continued validity of "obstacle" preemption, *see, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 583 (2009) (Thomas, J., concurring), and we reserve the right to contest its validity before the Supreme Court.

38 (Sotomayor, J., concurring). There is no such evidence here.

*Sixth*, even if preserving the ability of cruise lines to take advantage of the exception to the baseline CSO rules provided by the vaccine option were an important agency objective—and there is no evidence that it is—Norwegian's preemption argument would still fail. That is because the evidence does not establish that Florida's law forecloses Norwegian's exercise of the 95% vaccination option. Florida's law only bans *requiring* vaccine documentation; it does not otherwise bar cruise lines from seeking through non-coercive means (such as recommending vaccination or through marketing efforts) to achieve 95% customer vaccination. *See* Doc. 3-2 at 17. Indeed, in the vaccine plan it submitted to the CDC Norwegian itself stated that it would not require vaccination for embarking passengers "where prohibited by applicable law." *See* Varone Decl. Ex. 17, at Ex. 3 II(a)(i).

*Seventh*, the CDC itself disclaimed that the vaccination option preempts Florida's law, *id.* Ex. 9 at 108:18–20, 109:6–7, 110:3–5, a fact the Court should weigh in its analysis.[9]

### iii.   The CDC's Order Violates the APA.

Norwegian's preemption arguments suffer from the additional fundamental problem that the CSO *itself* is invalid, meaning the regulatory actions the CDC has taken to *implement* that order—and that Norwegian relies on for its preemption arguments—likewise are invalid. While the Court need not reach this issue if it determines that Norwegian's preemption arguments fail for the reasons already given, it cannot rule in favor of Norwegian without addressing it.

### 1.   The CSO Exceeds the CDC's Statutory Authority.

The CDC bases its CSO mainly on 42 U.S.C. § 264 and its implementing regulations. CSO, 85 Fed. Reg. at 70,158. Because neither that statute nor the regulations give the CDC the power it claims, its actions violate the APA. *See City of Arlington v. FCC*, 569 U.S. 290, 298 (2013).

The CSO is not authorized by 42 U.S.C. § 264(a). The first sentence of Section 264(a) authorizes the CDC to "make and enforce such regulations" as "necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). The second sentence provides examples of the measures that the statute authorizes, clarifying that the statute authorizes measures like "inspection, fumigation, [and] disinfection." *Id.* This second sentence

---

[9] *See Williamson*, 562 U.S. at 335; *Geier*, 529 U.S. at 883; *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 721–22 (1985); *cf. Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495–96 (1996).

reflects that the CDC's authority is limited to measures that resemble or remain akin to the ones expressly listed in the statute. *See Brown v. Secretary, U.S. Dep't of Health & Human Servs.*, No. 20-14210, 2021 WL 2944379, at *2 (11th Cir. July 14, 2021); *Tiger Lily, LLC v. HUD*, No. 21-5256, 2021 WL 3121373, *2–3 (6th Cir. July 23, 2021) ("*Tiger Lily II*"); *Tiger Lily, LLC v. HUD*, 992 F.3d 518, 522–24 (6th Cir. 2021); *Florida*, 2021 WL 2514138, at *19–21; *Ala. Ass'n of Realtors v. HHS*, No. 20-cv-3377, 2021 WL 1779282, at *5 (D.D.C. May 5, 2021); *Skyworks, Ltd. v. CDC*, No. 20-cv-2407, 2021 WL 911720, at *9–10 (N.D. Ohio Mar. 10, 2021). Thus, the "second sentence . . . lists illustrative examples of the types of actions the CDC may take" and against whom or what the CDC may take those actions. *Skyworks*, 2021 WL 911720, at *9. And those examples limit the scope of the CDC's authority. *Id.*

The scope of the "other measures," 42 U.S.C. § 264(a), identified by the second sentence is "controlled and defined by reference to the enumerated categories . . . before it," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001), because "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," *id.* at 114–15. These "other measures" thus are limited to measures like "inspection, fumigation, disinfection, sanitation, [and] pest extermination," applied to "animals or articles" that are "so infected" that they are "sources of dangerous infections to human beings." § 264(a). CDC is thus authorized to take only "other measures" that are "similar in nature" to inspecting and disinfecting animals and articles. This reading is reinforced by at least five additional considerations.

*First*, the unbridled power claimed by the CDC would require clear authorization from Congress, and the agency has identified none. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *Tiger Lily II*, 2021 WL 3121373, at *3. The CDC acknowledges that if the CSO is a rule—which it is—it is a major rule under the Congressional Review Act, CSO, 85 Fed. Reg. at 70,158, because it is likely to affect the economy by more than $100 million, 5 U.S.C. § 804(2).

*Second*, reading the statute otherwise (to give the agency power to do anything it deems "necessary" for disease prevention) renders the second sentence (which refers to narrower, specified powers) superfluous. *See Corley v. United States*, 556 U.S. 303, 314 (2009); *Tiger Lily II*, 2021 WL 3121373, at *3. The many other statutes that grant the agency specific powers likewise would be surplusage. *See, e.g.*, 42 U.S.C. §§ 264(b), 265, 266.

*Third*, such a reading would raise serious federalism and non-delegation concerns and

11

should therefore be rejected. *See Indus. Union Dep't v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality op.); *Tiger Lily II*, 2021 WL 3121373, at *4–5. The only limits that the CDC identified in the *Florida v. Becerra* litigation were the requirement to determine something is "necessary" and the prospect of APA review. Varone Decl. Ex. 9 at 83:9–85:5, 86:15–87:15. Courts must avoid interpretations that raise significant "constitutional questions." *Jones v. United States*, 529 U.S. 848, 857 (2000).

*Fourth*, the federal government's traditional authority to combat disease historically included measures like "inspection, sanitation, and isolation" that were "distinctly limited in time, scope, and subject matter." *See Florida*, 2021 WL 2514138, at *15. Defendant's interpretation of the statute aligns with that tradition.

*Finally*, in *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2320 (2021), four justices voted to vacate a stay premised on the same interpretation of § 264(a) that the CDC has asserted justifies the CSO. A fifth Justice, Justice Kavanaugh, "agree[d]" that "the [CDC] exceeded its existing statutory authority by issuing a nationwide eviction moratorium," but found it unnecessary to vacate the stay because the measure was set to expire "in only a few weeks." *Id.* at 2320–21. Here, timing cuts the other way because the CSO will not expire until at least November 2021.

Under this proper interpretation of § 264(a), the CDC exceeded its statutory authority by issuing the CSO, and thus, the Order and its subsequent elaborations do not preempt Florida's law.

### 2. The CDC's Order Exceeds the CDC's Regulatory Authority.

Beyond § 264, the Order relies on 42 C.F.R. §§ 70.2, 71.31(b), and 71.32(b). CSO, 85 Fed. Reg. at 70,158. But if the CDC lacks the statutory authority under § 264 for the Order—which it does—regulations implementing § 264 cannot grant the CDC more authority. *See, e.g.*, *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 965 (D.C. Cir. 1985). Further, these regulations fail to move the needle, and § 70.2 provides an independent basis to find the CSO unlawful.

Section 70.2 allows the CDC to exercise its § 264 authority only if it first "determines that the measures taken by" a state "are insufficient to prevent the spread" of a communicable disease "from such State . . . to any other State." 42 C.F.R. § 70.2. The CDC, however, simply claimed § 70.2 is per se satisfied because "[c]ruise ships by their very nature travel interstate and internationally." CSO, 85 Fed. Reg. at 70,157. That argument is insufficient. The CDC's regulations required it to consider the adequacy of State measures and it did not do so.

Nor do any of the other regulations the CDC cites authorize the CSO. The CSO is not a

"controlled free pratique" under 42 C.F.R. § 71.31(b). The CDC's free pratique power authorizes it only to condition the admission of specific ships that may "arriv[e] at a U.S. port" on completion of "measures outlined in this part"—meaning Part 71. *See* § 71.31(a), (b). It does not authorize the CDC to micromanage an entire cruising industry. As the Middle District recognized, Part 71 authorizes only the types of measures that § 264(a) itself authorizes, like disinfecting cargo, § 71.42, or "disinfestation" of vermin, § 71.41. *Florida*, 2021 WL 2514138, at *25.

Section 71.32(b) similarly allows the CDC to "require detention, disinfection, disinfestation, fumigation, or other related measures" when the CDC "has reason to believe that any arriving carrier or article or thing on board the carrier is or may be infected or contaminated with a communicable disease." As with § 71.31(b), the "detention" must be limited to the time needed to disinfect the ship and complete "other related measures."

### 3.   The Order Is Arbitrary and Capricious.

The CSO also is arbitrary and capricious. *First*, as explained above, under 42 C.F.R. § 70.2, before trying actions like the ones here, the CDC must first determine that the measures taken by States and their "political subdivisions" (like ports) are insufficient. Even if the CDC *could have* made the determination there, it did not engage in the type of reasoned decisionmaking required by the APA. The CSO made only a blanket determination that every State and political subdivision lacked sufficient measures to prevent the spread of COVID-19, but "says absolutely nothing evaluative about any 'measure taken by health authorities of any State.'" *Florida*, 2021 WL 2514138, at *42. This determination thus "falls far short of conducting a reasoned finding that the measures 'taken by health authorities of any State' are insufficient to prevent contagion." *Id.*

*Second*, the Order imposes vague, shifting guidance carrying criminal penalties. *See* CSO, 85 Fed. Reg. at 70,158. And the CDC may "enforce any of the provisions of th[e] framework through additional orders . . . and issue additional technical instructions as needed." *Id.*; *see also id.* at 70,159, 70,162. By "[i]mposing on the cruise industry exhaustive, indeterminate, inconsistent, and unclear requirements (each of which threatens substantial penalty), the conditional sailing order likely is by definition capricious." *Florida*, 2021 WL 2514138, at *41.

### 4.   The Order Unlawfully Dispensed with Notice and Comment.

The CSO is invalid for the additional reason that the CDC unlawfully dispensed with notice-and-comment rulemaking. Substantive rules need to go through notice and comment. *See Azar*, 139 S. Ct. at 1812. The CDC's Order qualifies as a substantive rule—it is an "agency

statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). The CDC cannot "avoid notice and comment simply by mislabeling [its] substantive pronouncements." *Azar*, 139 S. Ct. at 1812. The Order "creates new law, rights, or duties," *Warshauer*, 577 F.3d at 1337.

The CDC, however, failed to conduct proper notice and comment rulemaking. It instead invoked the "good cause" exception to the notice requirement, *see* 5 U.S.C. § 553(b)(B), and the months-old "emergency" of COVID-19, arguing that it would be "impracticable" and "contrary to the public's health, and by extension the public's interest," to go through proper rulemaking procedures, CSO, 85 Fed. Reg. at 70,158. "[A] mere recital of good cause," though, "does not create good cause." *Mobil Oil Corp. v. DOE*, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979). Further, the good-cause exception "is to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).

Good cause based on the impracticalities of notice and comment does not exist when the agency has sufficient time to provide notice and comment. *See Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir. 1980); *Regeneron Pharm., Inc. v. HHS*, No. 20-cv-10488, 2020 WL 7778037, at *11–12 (S.D.N.Y. Dec. 30, 2020). The CDC's call for and collection of comments in July of 2020, 85 Fed. Reg. 44,083, before finally issuing the CSO at the end of October (although without directly responding to or attempting to address in any meaningful way the responses it had collected, *see* 85 Fed. Reg. at 70,156) undermines any argument for good cause because it demonstrates that the "CDC had ample time to effect notice and comment." *Florida*, 2021 WL 2514138, at *45.

Moreover, the good cause exception to notice and comment is supposed to be temporary—meaning the agency should conduct notice and comment after promulgating the rule, which the CDC has not done in the many months since issuing the CSO. *See Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981).

Finally, the change contemplated by the CSO—going from *no sailing* to *sailing under specified circumstances*—belies any exigent public health reason for foregoing notice and comment. *Florida*, 2021 WL 2514138, at *45. It also heightened the need for public comment given the many competing considerations and tradeoffs implicated. *Id.*

### 5. Congress Did Not Ratify the Order.

Congress did not ratify the CSO through the Alaska Tourism Restoration Act ("ATRA"). *See* Pub. L. No. 117-14, 135 Stat. 273 (May 24, 2021). Showing ratification is a "difficult task,"

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001); *see also Ala. Ass'n of Realtors*, 2021 WL 1779282, at *9, because when Congress wants to ratify agency conduct, it does so clearly, *see Tiger Lily*, 992 F.3d at 524; *EEOC v. CBS, Inc.*, 743 F.2d 969, 974 (2d Cir. 1984).

ATRA says nothing about the CSO. Instead, as a condition for a Jones Act exception in the Pacific Northwest, ATRA requires Alaskan ships to obtain a COVID-19 Conditional Sailing Certificate. *See* ATRA § 2(a)(1). "Identifying the class of ships to which a statute grants a benefit is far different from—and much less than—expressly ratifying an agency's authority to issue a certificate, the holders of which constitute the affected category or class." *Florida*, 2021 WL 2514138, at *27.

### B. Florida's Law Does Not Violate the First Amendment.

Norwegian's First Amendment claim is unlikely to succeed because Florida's law is an economic regulation subject to rational basis review, which it easily satisfies.

Where a law regulates conduct, not speech, it is "subject only to rational-basis review as a mine-run economic regulation." *Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1241 (11th Cir. 2015). Legislatures are given wide latitude to "balance the advantages and disadvantages" when choosing whether and how to regulate commercial behavior. *Id.* at 1242. Indeed, the Supreme Court has applied a lenient standard to ordinary commercial or regulatory legislation, recognizing the need to defer significantly to legislative judgment. *See, e.g.*, *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 475–76 (1997). In such cases, "[i]t is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955); *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938). Courts applying rational-basis review have no license to second-guess "the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

Moreover, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 63 (2006); *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011). A legislature, for example, can prohibit racial discrimination in hiring without violating the First Amendment, even though such a prohibition would require an

15

employer to take down a sign reading "White Applicants Only." *FAIR*, 547 U.S. at 63.

There are several reasons why this Court should review Florida's law "under the standard appropriate for the review of economic regulation," not "under a heightened standard appropriate for the review of First Amendment issues." *Glickman*, 521 U.S. at 469. For one, Florida's statute neither forbids nor requires anyone to say anything, to engage in any form of speech, or to endorse any particular point of view, whether ideological or related to the sale of a product. *Cf. id.* at 469–70. The law simply prohibits businesses from *conditioning service* on customers providing "documentation certifying COVID-19 vaccination." FLA. STAT. § 381.00316. Norwegian can still *request* COVID-19 vaccination documentation from its customers, its customers can *voluntarily* provide that documentation, and both parties are free to discuss the topic. What Norwegian may not do is forbid access to its cruises to customers who fail to provide that documentation. Florida's law thus "regulates conduct, not speech." *FAIR*, 547 U.S. at 60. It affects what businesses cannot *do*—condition service on vaccination documentation—"not what they may or may not *say*." *Id.*

Moreover, Florida's law does not prevent the free flow of information or "prevent[ ] like-minded businesses and customers from communicating as they see fit to protect themselves." Mot. at 13. Again, Norwegian can *discuss* COVID-19 vaccination status with its customers to whatever extent it wishes and *request* documentation of vaccination status. Norwegian simply cannot *require* its customers to provide vaccination documentation. This fact distinguishes Florida's law from the cases Norwegian cites because they concerned prohibitions attaching to expressive activity. Norwegian describes *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011), and *Wollschlaeger v. Governor*, 848 F.3d 1293 (11th Cir. 2017) (en banc), as cases about "state *bans* on health-related communications," Mot. at 13 (emphasis added), thereby differentiating them from Florida's law, which does not prohibit a business from asking for a customer's vaccination documentation. Indeed, *Wollschlaeger* cuts sharply against Plaintiffs because there the Eleventh Circuit held that Florida law prohibiting doctors from discriminating against patients who owned firearms *did not* implicate the First Amendment. *See Wollschlaeger*, 848 F.3d at 1317.

But even if this Court determines that Florida's law does implicate the First Amendment, it is a regulation on commercial speech subject only to intermediate scrutiny. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). The "core notion" of commercial speech is "speech which does no more than propose a commercial

transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (internal quotation marks omitted). Here, Norwegian's requiring its passengers to submit COVID-19 vaccination documentation in order to sail on its cruises is core commercial speech because it is made pursuant to and in furtherance of a commercial transaction, namely, customers purchasing a cruise ticket. Even if Norwegian's "speech" falls outside this core notion, it is nevertheless commercial speech because it is made with "reference to a specific product" and Norwegian "has an economic motivation" for the speech. *Bolger*, 463 U.S. at 66. Norwegian alleges that requiring vaccination documentation would be in its business interests and would affect its "bottom-line." Doc. 3-1 ¶¶ 14, 30–31, 34. Florida's law should thus be subject only to intermediate scrutiny as a regulation on commercial speech. *See Cent. Hudson*, 447 U.S. at 566.

Florida's law passes any potential level of scrutiny, even strict, which requires the State to prove that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (internal quotation marks omitted). Florida has compelling interests in protecting the medical privacy of its citizens, *see Katz v. United States*, 389 U.S. 347, 350–51 (1967), and in avoiding discrimination through balkanization of the marketplace, *cf. Roberts v. U.S. Jaycees*, 468 U.S. 609, 625–26 (1984). Section 381.00316 is narrowly tailored to achieving those interests because it prohibits the minimum amount of speech possible (in fact, no speech at all)—conditioning service on vaccine documentation—while allowing discussion of the topic and customers' voluntary disclosure of that information.

### C.  Florida's Law Does Not Violate the Dormant Commerce Clause.

Norwegian contends that Florida's law violates the dormant Commerce Clause by regulating commerce outside of its borders and "excessively burden[ing] the free flow of commerce between States and between Nations." Mot. at 16–17. Norwegian is wrong on both points.[10]

*First*, Fla. Stat. § 381.00316 does not regulate commerce outside of Florida's borders. To conduct the extraterritoriality inquiry, a court asks "whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). Florida's law prohibits a business entity from requiring a customer to provide

---

[10] Several Justices have questioned dormant Commerce Clause doctrine, *see, e.g.*, *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2100 (2018) (Thomas, J., concurring); and we reserve the right to challenge the doctrine in the Supreme Court.

documentation certifying COVID-19 vaccination "to gain access to, entry upon, or service from the business operations *in this state*." FLA. STAT. § 381.00316 (emphasis added). The law has no application to a business's conduct elsewhere. Norwegian may require documentation of COVID-19 vaccinations for its cruises leaving from other states or nations without running afoul of Florida's law.

*Second*, Florida's law does not unduly burden interstate or international commerce because the law *does not* have the effect of blocking or hampering the operations of cruise lines in and out of Florida. As demonstrated by the plans of numerous major cruise lines, Varone Decl. Exs. 6–7, 10, and the Healthy Sail Panel's and CLIA's recommendations, Doc. 3-4 at 98–99; Varone Decl. Ex. 13, cruise ships can operate safely and practically without requiring vaccine documentation. Norwegian also can comply with the requirements of the foreign ports to which it plans to sail, some of which require "proof of vaccination before passengers can enter *without testing*." Mot. at 6, 16 (emphasis added). That Norwegian might prefer to document the vaccination status of its passengers instead of testing them does not turn Florida's lawful statute into an unconstitutional burden on interstate or international commerce in violation of the dormant Commerce Clause.

## II. Norwegian Will Not Suffer Irreparable Harm Absent an Injunction.

Any need for an injunction to avoid irreparable harm caused by a conflict between Florida law and CDC requirements does not exist because those CDC requirements are enjoined in Florida. And even apart from the injunction, Norwegian's arguments fail to establish irreparable harm.

First, although this Court presumes irreparable injury for "certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether," *Siegel*, 234 F.3d at 1178, Norwegian fails to demonstrate a substantial likelihood that Florida's law violates its First Amendment rights, so no finding of irreparable injury follows. All that is denied Norwegian is the ability to *refuse service* to customers who fail to document vaccination; Norwegian remains free to engage in whatever speech with its customers it likes.

Second, Norwegian cannot rely on alleged economic harms, damage to reputation, or loss to customer goodwill to show irreparable harm. Any such injuries are caused by Norwegian's own actions. Self-inflicted injuries cannot constitute irreparable harm. *See, e.g.*, *Scroos LLC v. Att'y Gen. of United States*, No. 20-cv-689, 2020 WL 5534281 (M.D. Fla. Aug. 27, 2020); *First Specialty Ins. Corp. v. 633 Partners, Ltd.*, No. 06-cv-20618, 2009 WL 10667542, at *10 (S.D. Fla. Jan. 5, 2009); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020); *Di Biase v. SPX*

*Corp.*, 872 F.3d 224, 235 (4th Cir. 2017); *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003); *Salt Lake Trib. Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003). Norwegian has known for months about Florida's law, but chose nevertheless to "stake[ ] its reputation and its relationships with customers on setting sail August 15 with everyone's vaccine documentation in hand." Mot. at 18. Because Norwegian at a minimum could have pursued CDC's simulated voyage option, Norwegian's dilemma is of its own making.

Finally, by sailing in compliance with Florida's law, Norwegian will not suffer irreparable harm in the form of undue risks to human health and safety. The CDC has presented cruise lines with two equivalent options to safely sail—performing a simulated voyage to demonstrate safety protocols or verifying 95% vaccination rates aboard the ship—so Norwegian cannot complain that one CDC-approved choice would lead to irreparable harm. Numerous major cruise lines have implemented measures short of demanding vaccine documentation, Varone Decl. Exs. 6–7, 10, to safely comply both with the CDC's Order and Florida's law. And the submissions of the Healthy Sail Panel and the CLIA refute the notion that vaccine documentation is required for safe cruises, as does the CLIA's insistence that cruises have been operating in Europe and Asia since summer 2020—well before vaccines were available—with "a far lower incident rate than on land." *Id.* Ex. 18.

### III.    The Balance of Equities and Public Interest Weigh Decidedly in Favor of Not Enjoining Florida's Law.

The balance of the equities and the public interest weigh against enjoining Florida's law. As a sovereign, Florida possesses the traditional police power to protect the health, safety, and welfare of its citizens. *See Medtronic*, 518 U.S. at 475. Because these interests are "primarily, and historically, . . . matter[s] of local concern, the States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Id.* (internal quotation marks omitted). This includes protection of economic well-being. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

Here, Florida has exercised this sovereign power to protect its citizens' personal liberties, privacy, and economic well-being through § 381.00316. Although "the State of Florida absolutely is in favor of vaccinations," Varone Decl. Ex. 9 at 22:11–12, the State has determined that its citizens should be free to make the decision whether to get vaccinated for themselves, and thus has enacted into law a public policy that businesses cannot require customers to furnish documentation

evidencing COVID-19 vaccination before providing service. The State also wants to keep its economy open to everyone. Businesses requiring vaccine documentation, on the other hand, could prevent the unvaccinated—or those who want to keep their vaccination status private—from accessing the marketplace. This Court should show deference to Florida's determination as a sovereign that the balance of equities and public interest are in favor of § 381.00316.

Norwegian's arguments to the contrary are unavailing. It predicts that Florida's law will pose substantial risks to cruise passengers, devastate the cruise industry, and cause significant ripple effects to Florida's economy. Mot. at 19–20. Norwegian entirely ignores that numerous other major cruise lines have devised plans to be fully operational under both the CDC's Order and Florida's law. *See* Varone Decl. Exs. 6–7, 10. Norwegian's own Healthy Sail Panel concluded that, even in the absence of a vaccine, cruise lines could reopen "in the safest ways possible" and "protect passengers and crew against the risk of transmission" by following protocols such as rigorous testing, physical distancing and masking, and supervising off-board excursions. Doc. 3-4 at 98–99. In fact, the Panel's "paramount goal and guiding principle" was to define a set of "protocols and procedures" that would "reduce the risk of transmission below the level people would experience *in other normal activities*," so presumably cruise passengers would be *safer* on a cruise ship implementing the Healthy Sail Panel's plan than in their everyday lives even without being vaccinated. *Id.* at 38. The CLIA, of which Norwegian is a member, similarly has insisted that even without requiring customer vaccination the industry could "significantly reduce risk to a level that would compare favorably to other venues." Varone Decl. Ex. 13 at 3.

These facts refute Norwegian's insinuation that Florida is risking its citizens' lives to "advance its polemic" "in a raging political and cultur[al] war." Mot. at 13. In fact, despite having one of the oldest populations in the Nation, Varone Decl. Ex. 11, Florida's COVID-19 death rate is lower than the COVID-19 death rate for the Nation as a whole, *id.* Ex. 12. It is regretful that Norwegian reduces itself to such accusations against a sovereign State that has had to make difficult choices in balancing a multitude of competing considerations in responding to the COVID-19 pandemic and that has fought hard for the right of the cruise industry—including Norwegian—to restart operations. Norwegian apparently believes requiring vaccines will be best for its bottom line, but Florida has a broader array of interests to consider.

## CONCLUSION

This Court should deny Norwegian's motion for a preliminary injunction.

Dated: July 27, 2021                          Respectfully submitted,

                                              /s/Joseph O. Masterman
Raymond Frederick Treadwell                   Joseph O. Masterman
Florida Bar No. 93834                         Florida Bar No. 1004179
EXECUTIVE OFFICE OF THE GOVERNOR              COOPER & KIRK, PLLC
Office of the General Counsel                 1523 New Hampshire Avenue, N.W.
400 South Monroe Street                       Washington, DC 20036
The Capitol                                   (202) 220-9600
Suite 209                                     (202) 220-9601 (fax)
Tallahassee, FL 32399                         jmasterman@cooperkirk.com
(850) 488-9810
ray.treadwell@eog.myflorida.com               Charles J. Cooper*
                                              Peter A. Patterson*
                                              Nicholas A. Varone*
                                              COOPER & KIRK, PLLC
                                              1523 New Hampshire Avenue, NW
                                              Washington, DC 20036
                                              (202) 220-9600
                                              (202) 220-9601 (fax)
                                              ccooper@cooperkirk.com
                                              ppatterson@cooperkirk.com
                                              nvarone@cooperkirk.com

                                              *Appearing *pro hac vice*

         *Attorneys for Defendant Scott A. Rivkees, M.D.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Memorandum of Law was

served to all counsel of record through the Court's CM/ECF system on this 27th of July, 2021.

<p style="margin-left: 40%;">
<u>/s/Joseph O. Masterman</u><br>
Joseph O. Masterman<br>
Florida Bar No. 1004179<br>
<br>
<em>Attorney for Def. Scott A. Rivkees, M.D.</em>
</p>