**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 21-22492-CIV-WILLIAMS**

NORWEGIAN CRUISE LINE
HOLDINGS, LTD., *et al.*

      Plaintiffs,

vs.

SCOTT RIVKEES, M.D.,

      Defendant.

_____/

## ORDER ON PRELIMINARY INJUNCTION

**THIS MATTER** is before the Court on Plaintiffs' Motion for Preliminary Injunction.

(DE 3.)  Defendant filed a response (DE 32) and Plaintiffs filed a reply (DE 35).  On August

6, 2021, the Parties appeared before the Court for oral argument on the Motion.  For the

reasons below, the Motion (DE 3) is **GRANTED**.

**I.      BACKGROUND**

On July 13, 2021, Plaintiffs—Norwegian Cruise Line Holdings Ltd.; NCL

(Bahamas) Ltd., d/b/a Norwegian Cruise Line; Seven Seas Cruises S. De R.L., d/b/a

Regent Seven Seas Cruises; and Oceania Cruises S. De R.L., d/b/a/ Oceania Cruises

(collectively, "***Plaintiffs***" or "***NCLH***")—initiated this action against Dr. Scott Rivkees, the

Surgeon General of Florida and the head of the Florida Department of Health

("***Defendant***").  (DE 1.)  After 15 months of suspended operations, NCLH plans to resume

passenger cruises from Florida on August 15, 2021 on the *Norwegian Gem*.  (*Id.* at ¶ 1.)

NCLH has adopted a policy requiring all passengers on its vessels to be fully vaccinated

against COVID-19 and to provide documentation confirming their vaccination status before boarding.  (*Id.* at ¶¶ 4, 35.)

Plaintiffs assert that a recently-enacted Florida law, codified at Fla. Stat. § 381.00316 ("***Section 381.00316***" or "***the Statute***"), prevents them from implementing the vaccination policy for vessels departing from Florida.  (*Id.* at ¶ 122.)  Under the Statute, Plaintiffs are prohibited from requiring passengers to provide "any documentation certifying COVID-19 vaccination or post-infection recovery" prior to boarding.  Fla. Stat. § 381.00316.  NCLH explains that if it cannot maintain its vaccination policy in Florida, it would be forced to either cancel all voyages leaving from the state or allow unvaccinated passengers to sail, and both options would cause significant financial and reputational harms.  (DE 3 at 17–19.)

NCLH brings this as-applied constitutional challenge, arguing that the Statute violates its rights under the First Amendment, the dormant Commerce Clause, and Substantive Due Process.  (DE 1.)  It also claims that the Statute is preempted by the CDC's Conditional Sailing Order ("***CSO***") and subsequent instructions.  Plaintiffs have asked the Court to enjoin the enforcement of Section 381.00316 pending resolution on the merits of their claims.  Upon a review of the record, and with the benefit of oral argument, the Court finds that Plaintiffs are entitled to a preliminary injunction.

### A.  The COVID-19 Pandemic

The COVID-19 pandemic has had a devastating global impact.  In the United States, people quarantined and avoided social gatherings for many months, public life essentially shut down, and businesses closed.  Now, nearly a year and a half into the pandemic, businesses have resumed operations.  However, as society endeavors to

"reopen," these businesses face unprecedented challenges, including the understandably difficult tasks of restoring consumer confidence and minimizing the spread of COVID-19. In addition, the nation is now threatened by new virus variants that are more transmissible than the initial strain.

Preventing the spread of COVID-19—a highly contagious infectious disease caused by the novel coronavirus (SARS-Cov-2)—has been an extraordinarily difficult and complex undertaking that is now complicated by the advent of lineage B.1.617 of SARS-CoV-2 ("**the Delta Variant**").  The principal mode by which COVID-19 spreads is through exposure to respiratory fluids carrying infectious virus, which can occur through direct inhalation; depositing fluids on exposed mucous membranes in the mouth, nose, or eye through sprays; and touching mucous membranes with contaminated hands.[1]  Since its onset, COVID-19 has infected almost 200 million people and caused over 4.2 million deaths globally.[2]  Domestically, over 35.67 million people have been infected and over 614,200 individuals have died.[3]  Those who are immunocompromised, have certain medical conditions, suffer from longstanding systemic and social inequities, or who are older are more likely to become severely ill or die from the virus.[4]  Individuals infected

---

[1] Ctrs. for Disease Control & Prevention, *Scientific Brief: SARS-COV-2 Transmission* (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html.

[2] World Health Org., *WHO Coronavirus (COVID-19) Dashboard*, https://covid19.who.int/ (last visited Aug. 5, 2021).

[3] Ctrs. for Disease Control & Prevention, *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction*, https://covid.cdc.gov/covid-data-tracker/#cases_cases per100klast7days (last visited Aug. 5, 2021).

[4] Ctrs. for Disease Control & Prevention, *People with Certain Medical Conditions* (May 13, 2021) [hereinafter "People With Certain Medical Conditions"], https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#MedicalConditionsAdults; Ctrs. for Disease Control & Prevention, *Older Adults* (July 3, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

with COVID-19 experience a range of symptoms from none at all (asymptomatic) to severe illness and death.[5] While the majority of those afflicted have been able to recover fully, even after recovery, various long-term health problems may linger.[6]

In January 2020, the first case of COVID-19 was detected in the nation.[7] Since then, the number of confirmed cases have multiplied exponentially in this country, which has now already experienced four waves of new cases.[8] This past winter was particularly harsh: on January 8, 2021, the Centers for Disease Control and Prevention ("*CDC*") reported 312,325 new cases, the highest number in a single day since the start of the pandemic.[9]

Since then, vaccines have played a vital role in slowing the spread. COVID-19 vaccines first became available in the United States in December 2020 and became widely available to the public by spring 2021.[10] As of the date of this Order, the U.S. Food

---

[5] *People With Certain Medical Conditions*, *supra* note 4.

[6] Ctrs. for Disease Control & Prevention, *COVID-19 Trends Among Persons Aged 0-24 Years—United States, March 1-December 12, 2020* (Jan. 13, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7003e1.htm. Studies have shown that children and young people may have fewer severe COVID-19 outcomes than adults. The Court notes that more recent information on the Delta Variant suggests that it impacts a younger demographic with more serious symptoms. *See generally* Kathy Katella, *5 Things to Know About the Delta Variant*, Yale Medicine (Aug. 3, 2021) [hereinafter "5 Things to Know"] ("Kids and young people are a concern as well. 'A recent study from the United Kingdom showed that children and adults under 50 were 2.5 times more likely to become infected with Delta[]'"), https://www.yalemedicine.org/news/5-things-to-know-delta-variant-covid.

[7] Derrick Bryson Taylor, *A Timeline of the Coronavirus Pandemic*, N.Y. Times (Mar. 17, 2021), https://www.nytimes.com/article/coronavirus-timeline.html.

[8] Ctrs. for Disease Control & Prevention, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory* [hereinafter "CDC COVID-19 Trends"], https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (last visited Aug. 5, 2021).

[9] *Id.*

[10] Ben Guarino, Ariana Eunjung Cha, Josh Wood & Griff Witte, *'The weapon that will end the war': First coronavirus vaccine shots given outside trials in U.S.*, Wash. Post (Dec. 14, 2020 5:50 PM), https://www.washingtonpost.com/nation/2020/12/14/first-covid-vaccines-new-york/.

and Drug Administration has authorized three COVID-19 vaccines for emergency use: Pfizer-BioNTech, Moderna, and Johnson & Johnson's Janssen.[11]   The Pfizer and Moderna vaccines are 95 percent effective against the original version of COVID-19 and 90 percent against the Delta Variant.  (DE 3-4 at ¶ 14).  They have also been shown to reduce the risk of transmission from a fully vaccinated person by 80 to 90 percent.  (*Id.* at ¶ 14.)  Likewise, Johnson & Johnson's Janssen vaccine provides strong protection against severe illness against all known variants.  (*Id.*)  With the vaccine rollout, the number of new infections per day dropped significantly.  On June 21, 2021, there were only 8,420 new reported cases.[12]

Despite those recorded improvements, the United States is currently experiencing yet another wave of infection surge.  The number of new infections per day has been on the rise since late June, with 124,928 new cases reported on August 6, 2021.[13]  One cause of this surge is the rapid spread of the Delta Variant, a highly-transmissible variant that is 50 percent more contagious than the initial strain.[14]  The Delta Variant is now the predominant strain of COVID-19 threatening public health, comprising approximately 83.2 percent of recent U.S. cases.[15]  Although the vaccination rate increased rapidly from

---

[11] U.S. Food & Drug Admin., *COVID-19 Vaccines* (Aug. 3, 2021), https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-vaccines.

[12] CDC COVID-19 Trends, *supra* note 8.

[13] *Id.*

[14] 5 Things to Know, *supra* note 6; Ctrs. for Disease Control & Prevention, *COVID Data Tracker Weekly Review* (Aug. 6, 2021) [hereinafter "CDC COVID Data Tracker"], https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html.

[15] *CDC COVID Data Tracker, supra* note 14.

January to May 2021, it has remained relatively stagnant for several months.[16] As of the date of this Order, 50.1 percent of the total U.S. population are fully vaccinated.[17] Unfortunately, "[n]ew COVID-19 cases often originate in unvaccinated individuals." *Klaassen v. Trustees of Indiana Univ.*, 2021 WL 3073926, at *4 (N.D. Ind. July 18, 2021).

Since the end of June, the number of new COVID-19 cases has increased dramatically in Florida, which now accounts for 20 percent of all new cases in the United States.  (DE 35-2 at ¶ 5.)  On August 7, 2021, the CDC reported 23,903 new daily COVID-19 cases in Florida, "the highest single-day case count in [the State] since the pandemic began last year."[18] The rate of new cases increased 780 percent in Florida from late June to late July 2021.  (DE 35-2 at ¶ 5.)  In contrast, the national rate increased 480 percent during the same period.  (*Id.*)

### B.  The Cruise Industry During the Pandemic

#### 1.  Risks of COVID-19 onboard a Cruise Ship

From its onset, the pandemic has had a ruinous economic impact on the U.S. cruise industry, which was shut down from March 2020 until recently, when cruise lines embarked on a few "simulated" and "restricted" revenue voyages pursuant to CDC guidelines.  *See infra* at 14−15.  During the early days of the pandemic, major COVID-19

---

[16] *Id.*  In response to the rapid spread of the Delta Variant, it has been reported that demand for COVID-19 vaccines has increased during the past couple of weeks.  *See* Dan Goldberg & Tucker Doherty, *Vaccine demand jumps in states pummeled by Delta variant*, Politico (Aug. 6, 2021 12:50 PM), https://www.politico.com/news/2021/08/06/vaccine-demand-states-delta-502701;  Eduardo Medina, *Demand for shots is increasing in less-vaccinated states under siege from the Delta variant*, N.Y. Times (July 31, 2021), https://www.nytimes.com/2021/07/31/world/less-vaccinated-covid-shots.html.

[17] Ctrs. for Disease Control & Prevention, *COVID-19 Vaccinations in the United States*, https://covid.cdc.gov/covid-data-tracker/#vaccinations (last visited Aug. 7, 2021).

[18] Howard Cohen & David J. Neal, *Florida COVID update: Record-breaking 23,903 new cases, more people than ever in hospital*, Miami Herald (Aug. 7, 2021 4:35 PM), https://www.miamiherald.com/news/coronavirus/article253335513.html.

outbreaks occurred on the cruise ships *Diamond Princess* and *Grand Princess*.  85 Fed. Reg. at 70155.  Among the 3,711 *Diamond Princess* passengers and crew, 712 (19.2 percent) were infected with COVID-19: 37 persons required intensive care and nine died. *Id.*  Outbreaks on two voyages of the *Grand Princess* caused 159 infections and eight deaths.  *Id.*

Even with precautions, cruising raises unique risks of COVID-19 outbreaks, concerns that are now heightened due to the Delta Variant.  Cruise ships involve the movement of a large volume of individuals in close quarters for days and weeks and present many opportunities for person-to-person contact in crowded or indoor settings, such as group and buffet dining, entertainment events, and excursions. *Id.* at 16629–16630.  Ship cabins are small, increasing the risk of transmission between cabinmates. *Id.*  Similarly, the crew typically live and eat in small congregate places.  *Id.*  In addition, once a cruise concludes, passengers may engage in air transportation or other types of common transports to return home.  *Id.*  Consequently, infected passengers who disembark and return to their communities could occasion further widespread transmission and possibly "super spreader" events.  *Id.*

### 2.  The CDC's No Sail Order and Conditional Sailing Order

In light of these risks, on March 13, 2020, NCLH and other members of the Cruise Line International Association ("**CLIA**") voluntarily suspended all cruise ship operations for thirty days.  (DE 3-1 at ¶ 7); *see also* 85 Fed. Reg. at 16631.  Concerned that cruising could "markedly increase[] the risk and impact of the COVID-19 disease outbreak within the United States," the CDC also began to regulate the cruise industry through a series of orders and technical instructions.  85 Fed. Reg. at 16630.

On March 14, 2020, the CDC issued the No Sail Order, which prohibited cruise ship operators from continuing operations unless approved by the U.S. Coast Guard in consultation with the CDC. *Id.* at 16631. The No Sail Order was extended three times before expiring on October 31, 2020. *Id.* at 62739. On November 4, 2020, the CDC issued the CSO, which established a four-step framework for a "phased resumption of cruise ship passenger operations." *Id.* at 70153. The steps include: (1) establishing "laboratory testing of crew onboard cruise ships in the U.S. waters"; (2) performing "simulated voyages designed to test a cruise ship operators' ability to mitigate COVID-19 on cruise ships"; (3) completing "a certification process"; and (4) resuming restricted passenger voyages in a manner that mitigates the spread of COVID-19. *Id.* at 70157. The CSO remains effective until November 1, 2021.[19] *Id.* at 70163. Furthermore, the CDC reserves its right to enforce the provisions of the CSO by issuing additional technical instructions as needed. *Id.* at 70153.

While the CSO outlined a path for cruises to resume, some industry representatives complained that it lacked sufficient implementing instructions and expressed their dismay at potentially losing another summer of sailing. (DE 3 at 3.) The CDC responded with a series of letters and instructions. (*Id.*) On April 28, 2021, it issued a "Dear Colleague" letter that acknowledged the CDC's commitment to the "phased resumption of passenger operations in the United States" by mid-summer and recognized the advent of "scientific developments" including COVID-19 vaccines. (DE 3-2 at 4–7.)

---

[19] The CSO may become ineffective earlier, if either of the following events occurs before November 1, 2021: (1) the "expiration of the Secretary of Health and Human Services' declaration that COVID-19 constitutes a public health emergency," or (2) "the CDC Director rescinds or modifies the order based on specific public health or other consideration." 85 Fed. Reg. at 70163.

The letter suggested that, instead of a simulated voyage, cruise lines could satisfy step two of the framework through an alternative method: (1) attesting that 98 percent of crew members are fully vaccinated; and (2) submitting to the CDC "a clear and specific vaccination plan and timeline to limit cruise ship sailings to 95 percent of passengers who have been verified by the cruise ship operator as fully vaccinated prior to sailing" ("**Attestation Method**").  (*Id.* at 7.)  On May 14, 2021, the CDC issued technical instructions ("**Instructions**") confirming that in lieu of a simulated voyage, cruise ships could satisfy step two through the Attestation Method.  (DE 3-2 at 9–17).  The Instructions also reduced the vaccination requirement for crew members from 98 percent to 95 percent.  (*Id.*)  On May 26, 2021, the CDC issued an operation manual ("**Manual**"), setting forth mandatory COVID-19 protocols for simulated and restricted passenger voyages. (*Id.* at 19–32.)  The Manual offers more lenient, alternative operational possibilities for ships with at least 95 percent vaccinated crew members and 95 percent vaccinated passengers; for these ships, the Manual's requirements on physical distancing and food services are recommendations only.  (*Id.*)

Arguing that the CSO framework would delay the reopening of the cruise industry because "no cruise company ha[d] begun phase-two test voyages," on April 8, 2021, Florida filed a lawsuit against the CDC in the Middle District of Florida, seeking to strike down the CSO and its subsequent instructions.[20]  *See Florida v. Becerra*, No. 8-21-CIV-839-SDM (M.D. Fla. April 8, 2021).  On June 18, 2021, Judge Steven D. Merryday issued

---

[20] The State of Florida challenged the CSO on several grounds including that: (1) the CSO exceeded the CDC's statutory and regulatory authority, (2) the CDC acted arbitrarily and capriciously by issuing the CSO, (3) the CDC unreasonably delayed agency action, (4) the CDC failed to conduct proper notice and comment rulemaking, and (5) the enabling statute, 42 U.S.C. § 264, constitutes an unconstitutional delegation of legislative authority.  *See Becerra*, 2021 WL 2514138, at *1-*4.

a preliminary injunction prohibiting the CDC from "enforcing against a cruise ship arriving in, within, or departing from a port in Florida the Conditional Sailing Order" and subsequent instructions.  *Becerra*, 2021 WL 2514138, at *51 (M.D. Fla. June 18, 2021).  The CSO was stayed in Florida until July 18, 2021, at which point the CSO and subsequent instructions issued by the CDC would exist only as a "non-binding consideration, recommendation, or guideline."  *Id.*  (internal quotations omitted).

On appeal to the Eleventh Circuit, the CDC sought a stay of the injunction, pending resolution of the appeal.  *See Florida v. Sec'y, Dep't of Health & Hum. Servs.*, No. 21-12243 (11th Cir. July 6, 2021).  On July 17, 2021, the Eleventh Circuit granted the CDC's request for a stay.  *See Sec'y, Dep't of Health & Hum. Servs.*, No. 21-12243 (11th Cir. July 17, 2021).  However, on July 23, 2021, the Eleventh Circuit reversed course by vacating the July 17 order and denying the request for a stay.[21]  *See Sec'y, Dep't of Health & Hum. Servs.*, No. 21-12243 (11th Cir. July 23, 2021).  Without a further stay, the CSO and subsequent CDC instructions now appear to be non-binding guidelines for vessels departing from and arriving to Florida ports.  Nevertheless, all cruise lines operating in Florida have agreed to continue following the CDC order and instructions on a voluntary basis.[22]

---

[21] In the July 17, 2021 order, the Eleventh Circuit stated that a written order explaining its decision would be issued.  *See Sec'y, Dep't of Health & Hum. Servs.*, No. 21-12243 (11th Cir. July 17, 2021).  However, in the July 23, 2021 order, the Court reversed its position but did not issue an accompanying written opinion. *See Sec'y, Dep't of Health & Hum. Servs.*, No. 21-12243 (11th Cir. July 23, 2021).

[22] Taylor Dolven, *Here's what you need to know if you are taking a Florida cruise this summer*, Miami Herald (July 28, 2021 5:32 PM), https://www.miamiherald.com/news/business/tourism-cruises/article253058338 .html.

### C.  The *Norwegian Gem*

After nearly a year and half without sailing, NCLH intends to resume sailing from Florida in about a week.  (*See* DE 3 at 7.)  NCLH, a public corporation based in Miami, Florida, recently developed a multi-million-dollar terminal at PortMiami with Miami-Dade County.[23]  (DE 3-1 at ¶ 4.)  From March 13, 2020 until very recently,[24] NCLH's entire 28-vessel fleet was docked and inactive due to the pandemic and the company had repatriated nearly 30,000 crew members to their respective countries.  (DE 3-1 at ¶¶ 7–9.)  To date, the halt in operations has cost NCLH more than $6 billion.  (*Id.* at ¶ 10.)

NCLH plans to resume sailing from Florida for the first time since the pandemic aboard the *Norwegian Gem*.  (*See* DE 3 at 7.)  On July 9, 2021, the CDC approved the *Norwegian Gem*'s application for a Conditional Sailing Certificate.  (DE 3 at 12 (citing DE 3-1 at ¶ 20).)  The vessel fulfilled the second step of the CSO framework through the Attestation Method, instead of a simulated sail.  (DE 3-1 at ¶ 20; DE 3-2 at 34.)  Starting August 15, 2021, the *Norwegian Gem* will offer several passenger voyages from Florida to the Bahamas, Honduras, Belize, Mexico, the Dominican Republic, the U.S. Virgin Islands, and the British Virgin Islands.  (DE 3-1 at ¶ 23.)  To date, over 1,200 passengers have already booked tickets for the *Norwegian Gem's* August 15 voyage.  (*Id.*)

In resuming sail, NCLH and other cruise lines face the difficult challenge of restoring consumer confidence while assuaging concerns about COVID-19 exposure and

---

[23] Taylor Dolven, *PortMiami is remaking the city's skyline for $1.5 billion, one cruise terminal at a time*, Miami Herald (Nov. 4, 2019), https://www.miamiherald.com/news/business/tourism-cruises/article236564 698.html.

[24] On July 25, 2021, the *Norwegian Jade* became the first of NCLH's ships to resume commercial services from Athens, Greece. Grace Dean, *Norwegian Cruise Line has finally restarted sailing after a 500-day suspension. All passengers on the 7-day Greek Isles cruise must be vaccinated and wear masks.*, Insider (July 27, 2021 7:43 AM), https://www.businessinsider.com/NCLH-cruise-line-restarts-sailing-pandemic-covid-greek-isles-jade-2021-7.

outbreaks.  According to a May 2021 poll, only 50 percent of respondents are confident that the cruise industry can reopen safely coming out of the pandemic.  (DE 3-3 at ¶ 9.) Another poll revealed that 80 percent of respondents would prefer to sail on a cruise with a vaccine requirement.  (DE 3-1 at 11–12.)

To address customer anxiety, NCLH has implemented a policy of requiring full vaccination of its crew and passengers until October 31, 2021.  (*Id.* at ¶ 13.)  In addition, the company is requiring all passengers to provide some documentation proving their COVID-19 vaccination status before boarding.  (*Id.* at ¶ 27.)   NCLH explains that it has adopted this policy as a measure to prevent a COVID-19 outbreak onboard, build brand trust and goodwill with customers, ensure compliance with the attestation it submitted to the CDC, and take advantage of the leniency afforded cruise ships with 95 percent vaccinated passengers and crew under the CDC's Operation Manual.  (*Id.* at ¶¶ 20, 26, 27.)

### D.  Section 381.00316

An obstacle to NCLH's full vaccination plan is Florida's recently-enacted law prohibiting businesses from requiring patrons to provide COVID-19 vaccination documentation for entry or service.  Fla. Stat. § 381.00316.  To guarantee full vaccination rate, NCLH states that it needs to verify the vaccination status of all passengers and the most reliable method for doing so is through COVID-19 vaccination documentation.  (*See* DE 3-1 at ¶ 6.)

On April 2, 2021, Florida Governor Ron DeSantis issued an executive order, prohibiting businesses in Florida from "requiring patrons or customers to provide any documentation certifying COVID-19 vaccination or post-transmission recovery to gain

access to, entry upon, or service from the business."  Fla. Exec. Order No. 21-81 (Apr. 2, 2021).  The executive order required all businesses to comply "to be eligible for grants or contracts funded through state revenue."  *Id.*  A month later, the Florida Legislature passed and Governor DeSantis signed into law a bill expanding on the executive order, stating that **all** business entities "may not require patrons or customers to provide any documentation certifying COVID-19 vaccination or post-infection recovery to gain access to, entry upon, or services from the business operations in this state," subject to the imposition of a fine not exceeding $5,000 per violation.[25]  The bill, codified at Fla. Stat. § 381.00316, authorizes the Florida Department of Health to enforce the Statute and adopt implementing rules, *id.* § 381.00316(6), but as of the date of this Order, the Department of Health has not done so.  The Statute became effective on July 1, 2021.

Notably, Section 381.00316 does not prohibit businesses from requiring employees to provide COVID-19 vaccination documentation.  For instance, the Walt Disney Company announced on July 31, 2021 that they will require all salaried and non-union U.S. employees to be fully vaccinated and provide verification of vaccination before returning to any work site, including theme parks; salaried and non-union employees in Florida are not exempt from this requirement.[26]  The Statute also does not prohibit businesses from adopting a vaccination requirement for a percentage of customers or asking for oral verification of one's vaccination status.

---

[25] *See* Press Release, Fla. Gov. Ron DeSantis, *Governor Ron DeSantis Signs Landmark Legislation to Ban Vaccine passports and Stem Government Overreach* (May 3, 2021), https://www.flgov.com/2021/05/03/governor-ron-desantis-signs-landmark-legislation-to-ban-vaccine-passports-and-stem-government-overreach/.

[26] Sarah Whitten, *Disney tells salaried and non-union employees in the U.S. they must be vaccinated by end of September*, CNBC (July 31, 2021 6:23 AM), https://www.cnbc.com/2021/07/30/disney-tells-salaried-and-non-union-employees-they-must-be-vaccinated.html; *see also infra* note 39.

### E.  Other Cruise Lines

Like NCLH, other cruise lines—Carnival Cruise Line ("**Carnival**"), Royal Caribbean International ("**Royal Caribbean**"), Royal Caribbean subsidiary Celebrity Cruises ("**Celebrity**"), and MSC Cruises ("**MSC**")—have resumed operations from Florida this summer.  To date, four cruise ships have already resumed restricted voyages from Florida with paying customers, Carnival's *Carnival Horizon* and Royal Caribbean's *Freedom of the Seas* from PortMiami and Celebrity's *Celebrity Edge* and *Celebrity Equinox* from Port Everglades in Fort Lauderdale.[27]  On June 26, 2021, the *Celebrity Edge* became the first ship to set sail from the United States on a revenue cruise "in more than a year."  (DE 34-3 at 3.)  In addition to the *Norwegian Gem*, additional ships have received their Conditional Sailing Certificate from the CDC and plan to sail from Florida soon: MSC's *MSC Meraviglia* and Carnival's *Carnival Sunrise* from PortMiami and Carnival's *Carnival Mardi Gras* and *Carnival Magic* from Port Canaveral in Brevard County.  (DE 34-13.)  Several other ships are still in the process of obtaining CDC authorization.  For instance, Royal Caribbean's *Allure of the Seas* and *Symphony of the Seas* have only recently completed simulated voyages.  (DE 34-16.)

Each of the foregoing cruise lines has adopted robust COVID-19 protocols and allowed at least some unvaccinated passengers to sail, although the policy regarding the number of unvaccinated passengers permitted to sail on each ship varies by company.  As of the date of this Order, Carnival has required vessels to sail with at least 95 percent of their passengers fully vaccinated; no more than five percent of a Carnival vessel's

---

[27] Dolven, *supra* note 22.

passengers may be unvaccinated.[28]  (DE 34-7 at 2.)  Unvaccinated customers who desire to sail on a Carnival cruise must apply for an exemption, which is "not guaranteed and [is] capacity-controlled based on the total number of vaccinated guests on board."  (*Id.* at 2.) Vaccinated passengers must "provide proof of vaccination at the terminal in advance of boarding."  (*Id.*)

Other companies, such as MSC, have not required ships to sail with a set percentage of vaccinated guests. (DE 34-10.) But cruise lines that do allow unvaccinated passengers onboard require them to comply with additional restrictions and requirements. For instance, companies have required unvaccinated guests to purchase traveler's insurance, take additional COVID-19 tests during the cruise at their own expense, and comply with restrictions regarding access to venues, events, and excursions.  *See infra* at 34–35.

## II.    LEGAL STANDARD

"A party seeking a preliminary injunction must establish the following four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that its own injury outweighs the injury to the nonmovant; and (4) that the injunction would not disserve the public interest."  *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000).  "The third and fourth factors 'merge' when, as here, the government is the opposing party." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020) (internal citation and brackets omitted).  "A preliminary injunction is an 'extraordinary and drastic remedy' and should not be granted unless 'the movant clearly

---

[28] *See also* Carnival Cruise Line, *Have Fun. Be Safe. COVID-19 Guest Protocols* [hereinafter "Carnival COVID-19 Guest Protocols"], https://www.carnival.com/legal/covid-19-legal-notices/covid-19-guest-protocols (last visited Aug. 7, 2021).

establishes the burden of persuasion as to each of the four prerequisites.'" *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (internal citations and brackets omitted).  "Although the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial."  *Id.* (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).

## III.  DISCUSSION

NCLH argues that it is entitled to a preliminary injunction because it is likely to prevail on the merits of its First Amendment, dormant Commerce Clause, and preemption claims.  Upon a careful review of the record, the Court finds that Plaintiffs are entitled to a preliminary injunction because they have shown: (1) a substantial likelihood of success on the merits of their First Amendment and dormant Commerce Clause claims; (2) that they would suffer irreparable injury absent an injunction; and (3) that the equities and public interest weigh in favor of an injunction.

### A.  NCLH has shown a substantial likelihood of success on the merits of its First Amendment and dormant Commerce Clause claims

#### 1.  NCLH's First Amendment claim

##### a.  Section 381.00316 is a content-based restriction on speech

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citing U.S. Const. amend. I).  Pursuant to this clause, a state "has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Id.* (citing *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972)).  "Content-based laws—those that target speech based on its

communicative content—are presumptively unconstitutional. . . ." *Id.* (citing *R.A.V. v. St. Paul,* 505 U.S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105 (1991)).

"Government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed." *Id.* "This commonsense meaning of the phrase 'content based' requires a court to consider whether the regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* A law is a content-based restriction of speech if it "singles out specific subject matter for differential treatment." *Barr v. Am. Ass'n of Pol. Consultants, Inc*, 140 S. Ct. 2335 (2020) (citation omitted). "One reliable way to tell if a law is restricting speech is content-based is to ask whether enforcement authorities must 'examine the content of the message that is conveyed' to know whether the law has been violated." *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 862 (11th Cir. 2020) (citing *McCullen v. Coakley*, 573 U.S. 464, 479 (2014)).

Section 381.00316 is a content-based restriction because, on its face, it draws distinctions based on the message of speech. *See Reed*, 576 U.S. at 163. In other words, it is apparent from the text of the law that speech is regulated differently because of its subject matter and content. The Statute prohibits businesses from requiring their patrons to present "documentation certifying COVID-19 vaccination or post-infection recovery" for access or services. Fla. Stat. § 381.00316(1). However, nothing in the Statute prohibits businesses from demanding documentation of a negative COVID-19 test or any other type of medical or informational documentation. In fact, because the Statute

allows businesses to institute "screening protocols"[29] to protect public health, *id.*, business entities are expressly permitted to require this type of documentation, including COVID-19 test results, other vaccine documentation, and other types of medical information.[30] Under Section 381.00316, the only documentation businesses cannot demand is COVID-19 vaccine documentation.   Accordingly, the statute is a content-based restriction because it singles out documentation regarding a particular subject matter (certification of "COVID-19 vaccination or post-infection recovery") and subjects it to restrictions (businesses may not require them for entry or services) that do not apply to documents regarding other topics.   *See Barr*, 140 S. Ct. at 2346 ("Because the law favors speech made for collecting government debt over political and other speech, the law is a content-based restriction on speech."); *Otto*, 981 F.3d at 862 ("If adorable videos of puppies are allowed and horrifying videos of puppy abuse are not, that restriction is based on content, no matter how desirable it may be."); *Wollschlaeger v. Governor, State of Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) ("The record-keeping, inquiry, and anti-harassment provisions of [the federal Firearm Owners Protection Act] are speaker-focused and content-based restrictions.   They apply only to the speech of doctors and medical professionals, and only on the topic of firearm ownership.").

Application of the analyses set forth by the Supreme Court in *Reed* and *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), demonstrates that Section 381.00316 is a content-based restriction on speech.   *Reed* involved a First Amendment challenge to a code that

---

[29] The Statute does not define the term "screening protocols" and Defendant has not defined the term or adopted any implementing rules in this regard.

[30] Under Florida state law and regulations promulgated by the Florida Department of Health, children must receive numerous vaccines for polio, rubella, chickenpox, and other diseases caused by viruses, before they may enroll in and attend public school in Florida. *See* Fla. Stat. §§ 1003.22(1), (3); Fla. Admin. Code Ann. r. 64D-3.046.

18

regulated outdoor signs adopted by the town of Gilbert, Arizona. *See Reed*, 576 U.S. at 159. The code prohibited the display of signs within the town without a permit, but exempted 23 categories including "Ideological Signs," "Political Signs," and "Temporary Directional Signs." *Id.* at 159–162. The exemptions were based on the sign's content: "Ideological Signs" communicated a message for a noncommercial purpose; "Political Signs" were signs designed to influence the outcome of an election; and "Temporary Directional Signs" directed the public to church or some other qualifying event. *Id.* Under the code, each exemption was subject to a different set of restrictions; "Temporary Directional Signs" were treated less favorably than the other two exemptions, which were subject to more lenient size and temporal restrictions. *Id.* In a majority opinion authored by Justice Clarence Thomas, the Supreme Court concluded that "[o]n its face, the Sign Code is a content-based regulation of speech" because "[t]he restrictions in the Sign Code that apply to a given sign [] depend entirely on the communicative content of the sign." *Id.* at 164–165. The Supreme Court emphasized that, by imposing more stringent restrictions to signs with directional content than those with ideological or political messages, the code was a content-based law because it "single[d] out specific subject matter for differential treatment." *Id.* at 156.

*Sorrell* presented a First Amendment challenge to a Vermont law that prohibited pharmacies from selling prescriber-identifying information—pharmacy records that revealed the prescribing practices of individual doctors—to marketers or "detailers," or allow the information to be used for marketing purposes without the prescriber's consent. *See* 564 U.S. at 557–59. However, under the law, pharmacies could sell, and allow this information to be used for, other purposes including research, compliance with health

insurance formularies, educational communications provided to patients, or law enforcement. *Id.* at 559—60. The Court concluded that, "[o]n its face, Vermont's law enacts content-and speaker-based restrictions on the sale, disclosure, and use of prescriber-identifying information." *Id.* at 563—64. Justice Anthony Kennedy, writing for the majority, emphasized that "those who wish[ed] to engage in certain 'educational communications' . . . may purchase the information," but that the statute "bars any disclosure when recipient speakers will use the information for marketing." *Id.* at 564 (internal citation omitted). Accordingly, the Court concluded that the law was content-based because it "disfavor[ed] marketing, that is, speech with a particular content." *Id.*

*Reed* and *Sorrell* make clear that a law constitutes a content-based restriction if it singles out particular speech on a subject matter for less favorable treatment. Similar to the laws in *Reed* and *Sorrell* that disfavored "Temporary Directional Signs" and marketing, Section 381.00316 singles out and disfavors documentary proof of COVID-19 vaccination, subjecting this particular content to greater restrictions than other forms of documentation. While businesses are prohibited from requiring customers to produce COVID-19 vaccination documentation, they are free to demand other categories of documents to provide services.[31] As such, Section 381.00316 constitutes a content-based restriction on speech.

### b. Section 381.00316 is a restriction on speech and not merely an economic regulation

The Supreme Court has explained that the "dissemination of information [is] speech within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570. "Facts,

---

[31] For example, businesses routinely require customers to provide personal identifying information, such as driver's licenses, social security number, financial reports, and medical information to procure services, procedures, and access to facilities.

after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Id.*; *Otto*, 981 F.3d at 866 ("if the acts of disclosing and publishing information do not constitute speech, it is hard to imagine what does fall within that category.") (quoting *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (internal quotation marks omitted). Nonetheless, in his response, Defendant fails to address whether Section 381.00316 is a content-based restriction on speech and does not challenge the notion that the exchange of COVID-19 vaccination documentation between a business and its patrons is speech protected under the First Amendment.

Defendant instead argues that Section 381.00316 is not a regulation on speech, but rather an economic regulation that does not implicate First Amendment review. (DE 32 at 15–17.) He explains that the Statute does not regulate speech because it does not prohibit any speech. The law does not forbid NCLH from requesting these documents or prohibit willing customers from providing them; the Statute allows businesses and patrons to exchange COVID-19 vaccination documents on a voluntary basis. (*Id.*) Thus, Defendant submits that the Statute only prohibits business-related conduct: the act of "conditioning service on customers providing documentation certifying COVID-19 vaccination." (*Id.* at 16.) Simply put, Defendant contends that Section 381.00316 is not governed by the First Amendment, because it only "affects what businesses cannot *do* . . . not what they may or may not say." (*Id.* (internal citation omitted).) The Court is not persuaded by this argument.

First, Defendant wrongly suggests that a law only regulates speech if it "forbids" or "prohibits" a form of speech. (*Id.*) It is well-established that a law may constitute a speech-based restriction by burdening or limiting speech on a particular topic, even if it

does not outright ban a form of speech.  *See, e.g.*, *Reed*, 576 U.S. at 169 (holding that a law that imposed various temporal, size, and location restrictions for different signs constituted a content-based restriction on speech); *Sorrell*, 564 U.S. at 564 (holding that a law that disallowed the sale and use of prescriber-identifying information for marketing *without the prescriber's consent* was a content-based restriction on speech); *Wollschlaeger*, 848 F.3d at 1303 (holding that the inquiry and record-keeping provisions of the federal Firearm Owners Protection Act, which prohibited medical professionals from asking patients about firearm ownership and recording answers to such questions *unless the professional had information to believe that the patient was suicidal or had violent tendencies*, was a content-based restriction on speech); *Otto*, 981 F.3d at 859 (holding that a city ordinance that banned conversion therapy was a content-based restriction on speech, even though it exempted "counseling that provides support and assistance to a person undergoing gender transition").  Accordingly, the fact that Section 381.00316 does not forbid the exchange of COVID-19 vaccination documentation between businesses and patrons does not mean that it is not a regulation of speech.  Like the laws at issue in *Reed*, *Sorrell*, *Otto*, and *Wollschlaeger*, Section 381.00316 regulates speech because it restricts the free flow of information by rendering the exchange permissible in some circumstances but impermissible in others.

Defendant's position that Section 381.00316 does not implicate the First Amendment because it merely regulates an economic activity is similarly unavailing.  A valid regulation on economic or professional conduct is "not unconstitutional as an abridgement of the right to free speech, *so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation*."  *Locke v. Shore*, 634

F.3d 1185, 1191 (11th Cir. 2011) (emphasis added); *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1251 (11th Cir. 2015).  Defendant does not explain how the Statute affects protected speech in merely an incidental way.  In any event, *Sorrell* cuts sharply against Defendant's position that Section 381.00316 does not trigger First Amendment scrutiny.

In *Sorrell*, the Supreme Court explained that "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct."  564 U.S. at 567.  The Court recognized that "[t]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech," *id.*, and identified several laws that regulated conduct but did not trigger First Amendment review because their effect on protected expression was merely incidental, including: "a ban on race-based hiring [that] may require employers to remove White Applicants Only signs," "an ordinance against outdoor fires [that] might forbid burning a flag," and "[an] antitrust law[] [that] prohibit[ed] 'agreements in restraint of trade . . . .'" *Id.* (citing *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 62 (2006); *R.A.V.*, 505 U.S. at 385; *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)) (internal quotations omitted).  The Supreme Court distinguished these examples and concluded that the Vermont law was a restriction on speech.  *Sorrell*, 564 U.S. at 567—68.  As summarized previously, that law made it unlawful for pharmacies to "*sell, license, or exchange*" prescriber-identifying information to marketers or "*permit the use*" of the information for marketing purposes absent the prescriber's consent.  *Id.* at 558—59 (emphasis added) (internal quotations and citations omitted).  Vermont's law also barred pharmaceutical manufacturers and marketers from "*us[ing]*" this information for marketing

purposes without the prescriber's consent.  *Id.* at 559 (emphasis added).  However, the law contained an exception that allowed this information to be sold, licensed, and used for other purposes, including health care research, compliance with health insurance formularies, and more.  *Id.* at 559—60.  While the law appeared to proscribe conduct (*i.e.*, the sale, license, and use of prescriber-identifying information), the Supreme Court concluded that it was still subject to First Amendment scrutiny because it directly targeted marketing, a form of protected speech.  *Id.* at 557, 580.  The Supreme Court explained, "[b]oth on its face and in its practical operation, Vermont's law imposes a burden based on the content of speech and the identity of the speaker."  *Id.* at 567.  It emphasized that "Vermont's law *does not simply have an effect on speech*, *but is directed at certain content* and is aimed at particular speakers."  *Id.* (emphasis added).  Because the Statute directly targeted marketing, the Court concluded that it "impose[d] more than an incidental burden on protected expression."  *Id.*

While he argues that Section 381.00316 only regulates the economic conduct of "*conditioning service* on customers providing 'documentation certifying COVID-19 vaccination documentation,'" Defendant does not address the fact that it also directly targets a form of protected speech.  (DE 34 at 16.)  Like the law in *Sorrell*, on its face, Section 381.00316 singles out and disfavors only one type of speech.  The Vermont law singled out marketing; while it prohibited the sale and use of prescriber-identifying information for marketing, it allowed the sale and use of this information for other content (*e.g.*, research).  *See Sorrell*, 564 U.S. at 558—60.  Likewise, Section 381.00316 singles out documentary proof of COVID-19 vaccination: while the Statute prohibits businesses from conditioning service based on the exchange of COVID-19 vaccination documents, it

does not prohibit businesses from predicating services based on the exchange of other medical documents or oral verification of vaccination.  Thus, *Sorrell* instructs that Section 381.00316 does not merely have an incidental effect on speech because it is specifically "directed at certain content."[32]  564 U.S. at 567; *see also Wollschlaeger v. Farmer*, 814 F. Supp. 2d 1367, 1380 (S.D. Fla. 2011) ("The law has more than an incidental effect on protected expression; rather, *the law directly targets protected expression by restricting it.*") (emphasis added); *Dana's R.R. Supply*, 807 F.3d at 1248 (explaining that a law that imposed "a *direct and substantial burden on disfavored speech*" imposed more than just an "'incidental burden' on speech.") (emphasis added).  And while the "burdened speech" may result from "an economic motive, so too does a great deal of vital expression." *Sorrell*, 564 U.S. at 567.  Accordingly, Section 381.00316 does not evade First Amendment review.

The reasoning in the case *Dana's R.R. Supply v. Attorney General* further illustrates why the Statute is not merely an economic regulation, but a restriction on speech.  807 F.3d at 1239.  In *Dana*, the Eleventh Circuit considered a First Amendment challenge to Florida's "no-surcharge law," which made it a second-degree misdemeanor for merchants to impose a "surcharge" for credit card purchases, but allowed them to offer "a discount for the purpose of inducing payment by cash." *Id.* at 1239.  At first blush, the

---

[32] Defendant cites several cases to support his position that the Statute only regulates conduct and not speech.  However, those cases are easily distinguishable because, unlike Section 381.00316, the laws in those cases did not explicitly target or disfavor a form of speech.  *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006) (scrutinizing a law that conditioned federal funding to law schools on equal access to on-campus recruiting opportunities for the military). Similarly, Defendant's reliance on *Wollschlaeger*'s discussion regarding the antidiscrimination provision of the federal Firearm Owners Protection Act is misplaced.  That statute is distinguishable because it did not "on its face, implicate the spoken or written word." 848 F.3d 1317.  Here, as previously explained, the Statute expressly regulates a form of speech.  In addition, because the Statute does not regulate professional conduct, Defendant's cases regarding the regulation of professional activity are distinguishable.

law appeared to prohibit "dual-pricing" conduct (*i.e.*, "charging different prices to different customers depending on whether payment is made in cash or by credit card").  *Id.* at 1243.  However, the court noted that the law did not actually accomplish this objective because merchants could still offer discounts for cash payments, as expressly authorized by the Statute.  *Id*. at 1243-45.  Instead, the court found that the law was a restriction on speech because it allowed merchants to engage in dual-pricing, as long as the cost difference was described as a "cash discount" and not a "credit card surcharge."  *Id.* at 1252.  The Eleventh Circuit explained, "[i]n order to violate the statute, a defendant must communicate the price difference to a customer and that communication must denote the relevant price difference as a credit-card *surcharge*," as opposed to a cash *discount*.  *Id.* at 1245.  As such, the court held that the law was a content-based restriction because it penalized the "wrong choice" of "equally plausible alternative descriptions of an objective reality."  *Id.* at 1245.

Similar to the law in *Dana's R.R. Supply*, at first blush, Section 381.00316 appears to prohibit businesses from requiring patrons to verify their vaccination status for entry or services.   However, a review of the text shows that nothing in the statute forbids businesses from doing so.  Instead, the Statute only disallows businesses from requiring customers to verify their vaccination status with "*documentation certifying COVID-19 vaccination or post-transmission recovery*," Fla. Stat. § 381.00316 (emphasis added).  Accordingly, businesses could still require customers to provide *oral verification* as to whether they have received a COVID-19 vaccination.[33]  Thus, like the law in *Dana's R.R.*

---

[33] Fla. Stat. § 381.00316 does not define the word "documentation." While the Statute incorporates definitions of other terms from elsewhere in the Florida Statutes, such as "business entity," "educational institution," and "health care provider," it does not incorporate a definition of "documentation" from

*Supply*, while there are multiple ways of communicating the same information (vaccination status), some expressions are favored (oral verification) while others are disfavored (COVID-19 vaccination documents).

Finally, the Court is mindful of the Eleventh Circuit's observations that "[t]he government cannot regulate speech by relabeling it conduct" and that "characterizing speech as conduct is a dubious constitutional enterprise.'" *Otto*, 981 F. 3d at 861 (citing *Wollschlaeger*, 848 F. 3d at 1308). The Eleventh Circuit's concerns that recharacterizing speech as conduct is "unprincipled" and "susceptible to manipulation" are warranted where, as here, the law regulating conduct also directly targets and disfavors a form of speech. *Id.* (citation omitted). By characterizing certain laws as regulation of economic conduct, laws that restrict bookstores from *selling* biographies or prohibit video rental shops from *renting* documentaries also could evade First Amendment scrutiny under the logic that they merely affect "what businesses cannot *do*" and "not what they may or may not say," despite the significant burdens they impose on protected expression. (DE 34 at 16.)

---

elsewhere. Therefore, the Court interprets "documentation" in accordance with its "plain and ordinary meaning." *Spencer v. Specialty Foundry Prods., Inc.*, 953 F.3d 735, 740 (11th Cir. 2020) (citing *Barton v. U.S. Att'y Gen.*, 904 F.3d 1294, 1298 (11th Cir. 2018)). "To determine the ordinary meaning of an undefined statutory term, '[courts in the Eleventh Circuit] often look to dictionary definitions for guidance,'" *Spencer*, 953 F.3d at 740 (quoting *In re Walter Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018)), including "'popular and legal' dictionaries." *Spencer*, 953 F.3d at 740 (quoting *Rainbow Gun Club, Inc. v. Denbury Onshore, L.L.C.*, 760 F.3d 405, 409 (5th Cir. 2014)). Black's Law Dictionary defines "documentation" as "[o]fficial documents, reports, and the like used to prove that something is true or correct . . . . [t]he act of recording information in a tangible medium . . . . [t]he preparation of documents for use or filing . . . . [and] [t]he act or process of furnishing a ship with papers." Black's Law Dictionary (11th ed. 2019). Further, during oral argument, Defendant conceded that oral verification is "not explicitly prohibited by the law" and "is not addressed explicitly by the [S]tatute . . . ." Accordingly, the Court finds that oral verification is permitted under Section 381.00316.

### c.  Section 381.00316 does not survive intermediate scrutiny under the *Central Hudson* test

Having determined that Section 381.00316 is subject to First Amendment scrutiny as a restriction on speech, the question then becomes what level of Constitutional scrutiny the Court should apply.  Because the Statute is not merely an economic regulation, rational basis review is not appropriate.  Content-based restrictions on speech generally trigger strict or heightened scrutiny.  *See*, *e.g*., *Reed*, 574 U.S. at 164 (content-based restrictions on speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."); *Otto*, 981 F. 3d at 861 ("strict scrutiny ordinarily applies to content-based restrictions on speech. . . . "); *Sorrell*, 564 U.S. at 572 ("To sustain the targeted, content-based burden § 4631(d) imposes on protected expression, the State must show that the Statute directly advances a substantial government interest and that the measure is drawn to achieve that interest.").  NCLH argues that in light of the decision in *Reed* decision, strict scrutiny is the appropriate standard to be applied.  (DE 3 at 13—14.)  Plaintiffs presents a compelling argument in this regard and the Court agrees that strict scrutiny is appropriate in light of the well-established precedent.

However, Defendant argues that to the extent the First Amendment applies, the Court should apply the *Central Hudson* test, a less rigorous form of intermediate scrutiny, because the Statute regulates commercial speech.  (DE 32 at 17.)  "Commercial speech is a narrow category of necessarily expressive communication that is related solely to the economic interests of the speaker and its audience, . . . . or that does no more than propose a commercial transaction."  *Dana's R.R. Supply*, 807 F.3d at 1246 (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 561 (1980); *Va.*

28

*Pharmacy Bds. v. Va. Citizens Consumer Council*, 425 U.S. 748, 762 (1976)) (internal quotations omitted).  COVID-19 vaccination documentation does not fit the definition of commercial speech and does not relate "solely" to an economic interest.  NCLH submitted evidence showing that it had non-economic justifications for requiring the documentation, including to prevent a COVID-19 outbreak aboard its ships and the communities where it travels.  (DE 3-1 at ¶¶ 14, 27; DE 3-4 at ¶ 16.)  In addition, unlike advertising or marketing, these documents do not propose a commercial transaction.  Consequently, the Court is skeptical that Section 381.00316 regulates only commercial speech.

Nevertheless, even if Defendant is correct, the Court does not believe that the Statute could survive the lesser *Central Hudson* standard.  *See Dana's R.R. Supply*, 807 F.3d at 1241.  Under this test, "a restriction on commercial speech is valid under the First Amendment if: (1) the speech is not misleading and does not concern unlawful activity, (2) the government has a substantial interest in restricting the speech, (3) the regulation directly advances the asserted government interest, and (4) the regulation 'is not more extensive than is necessary to serve that interest.'"  *FF Cosms. FL, Inc.*, 866 F.3d at 1298 (citing *Cent. Hudson Gas*, 447 U.S. at 566).  "[T]he burdens at the preliminary injunction stage track the burdens at trial."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 429 (2006).  "It is well established that '[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it."  *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (citation omitted).  "This burden is not satisfied by **mere speculation or conjecture**; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that **the harms it recites are real** and that its restriction will in fact alleviate them to a material degree."  *Id.*  Moreover, Defendant bears

the burden of demonstrating that the Statute is "appropriately tailored in light of the substantial interests it seeks to achieve." *FF Cosms. FL, Inc.*, 866 F.3d at 1298.

Defendant does not attempt to defend Section 381.00316 on the grounds that it regulates "misleading" speech or "unlawful activity."  Accordingly, the Court examines whether Defendant has sufficiently shown that the Statute is justified by substantial government interests, directly advances those interests, and is appropriately tailored. Because Defendant has failed to meet this burden and justify the constitutionality of this Statute, Plaintiffs are likely to prevail on their First Amendment claim.

### i. Does Florida have a substantial interest in restricting the speech?

Defendant asserts two interests that Section 381.00316 purportedly addresses: "protecting the medical privacy of its citizens" and "avoiding discrimination through balkanization of the marketplace."  (DE 32 at 17).

To demonstrate that an articulated interest is a "substantial government interest," the burden is on the governmental entity to show that these interests are based on a problem that actually exists.  *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 561 (2001) ("Our review of the record reveals that the Attorney General has provided **ample documentation** of the problem with underage use of smokeless tobacco and cigars.") (emphasis added); *FF Cosms. FL, Inc.*, 866 F.3d at 1298 ("[T]he district court correctly found that the City's asserted interests are substantial: '**substantial witness testimony**' demonstrated that 'solicitations and handbilling in Miami Beach's historic district is a problem that exists in fact.'").  Here, Defendant has presented no evidence to demonstrate that his asserted interests are in response to real problems that Florida residents are actually facing.  There is no evidentiary support to show that residents have

experienced intrusions on their medical privacy or discrimination because some businesses, including cruise lines, have required COVID-19 vaccination documentation.[34] The legislative record cited by Defendant is bereft of any facts or data underpinning the Statute's purported purpose.[35]   *See Sorrell*, 564 U.S. at 597 (noting that "Vermont compiled a **substantial legislative record** to corroborate" its articulated state interests) (emphasis added).   In light of the absence of any appropriate data, reports, or even anecdotal evidence on this issue, the Court cannot conclude that Defendant's articulated interests are based on "a problem that exists in fact," *FF Cosms. FL, Inc.*, 866 F.3d at 1298, as opposed to "mere speculation or conjecture." *Edenfield*, 507 U.S. at 770; *Wollschlaeger*, 848 F.3d at 1316 ("At an abstract level of generality, Florida does have a substantial interest in regulating professions like medicine. . . . [t]hat interest, however, is not enough here.").

Moreover, Defendant cites to no relevant authority to support his position that during a global pandemic, his articulated objectives constitute substantial state interests.[36]   Rather, courts have suggested that the unvaccinated population is not a

---

[34] To the contrary, polls show that most passengers who would sail on a cruise at this moment are in favor of a vaccination requirement, suggesting that many are comfortable exchanging COVID-19 vaccination documentation and would not find it to be an unwanted "intrusion."  (DE 3-3 at ¶ 9; DE 3-1 at 11–12.) Record evidence also shows that individuals who do not wish to exchange these documents could easily prevent this "intrusion" by cruising on ships that do not require them or waiting until NCLH's policy expires on October 31, 2021.  (DE 35-1 at 15—21.)  *See Klaassen*, 2021 WL 3073926, at *1 (explaining that Indiana University students who "do not want to be vaccinated may go elsewhere" and "have ample educational opportunities.").

[35] During legislative debate, the sponsoring legislators could not articulate the difference between COVID-19 vaccinations and the other vaccinations that students are required to obtain to attend schools in Florida. (DE 32 at 4 n. 3.)

[36] Defendant cites to *Katz v. U.S.*, 389 U.S. 347 (1967) and *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), to support his assertion that "medical privacy" and "avoiding discrimination" against the unvaccinated population are substantial state interests.  (DE 32 at 17.)  These cases provide no support for Defendant's position.  In *Katz*, the Supreme Court held that the Government's activity of electronically listening and recording a private conversation in a telephone booth constituted a search and seizure under the Fourth

---

protected class that enjoys a fundamental Constitutional right to remain unvaccinated. *See*, *e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (scrutinizing a state law that required all members of the public to be vaccinated against the smallpox under the rational basis test); *Klaassen*, 2021 WL 3073926, at *40 (declining to recognize a fundamental right "to privacy to medical information."). The thorough and well-reasoned analysis set forth in *Klaassen*, including an examination of Jacobson's continued viability, casts doubt that the referenced objectives constitute the type of substantial government interest that could justify this law. For these reasons, Defendant has failed to demonstrate that the Statute is justified by a substantial government interest.

### ii. Does the Statute advance the asserted state interest?

However, even assuming that the articulated objectives constitute substantial government interests, Defendant has also failed to show that Section 381.00316 advances these objectives in a material way. In evaluating a statute's effectiveness in advancing the state's interest, a "commercial speech regulation 'may not be sustained if it provides only ineffective or remote support for the government's purpose.'" *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (quoting *Cent. Hudson*, 447 U.S. at 564). "For that reason, the State bears the burden of showing not merely that its regulation will advance its interest, but also that it will do so 'to a material degree.'" *Id*. (quoting *Edenfield,* 507 U.S. at 771).

---

Amendment. The Supreme Court had no occasion in *Katz* to consider whether protecting the privacy of medical records, including COVID-19 vaccination documentation, constituted a substantial state interest. In *Roberts*, the Supreme Court found that a state law that protected women from **gender discrimination** in places of public accommodation served a compelling state interest. 468 U.S. at 625. Again, the Supreme Court did not consider whether protecting unvaccinated individuals—or individuals who do not want to provide documentary proof of vaccination—serves a substantial state interest.

As an initial matter, Defendant provides no evidence to show that the Statute is materially effective at either protecting the medical privacy of Florida residents or preventing discrimination against unvaccinated individuals.  Again, the record is devoid of any reports, data, affidavits, or any other appropriate evidence on this issue.  Due to the dearth of any supporting evidence demonstrating the effectiveness of the Statute, Defendant fails to satisfy his burden as to this factor.  *See*, *e.g.*, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 490 (1995) ("The Government did not offer any convincing evidence that the labeling ban has inhibited strength wars."); *Edenfield*, 507 U.S. at 771 ("The Board has not demonstrated that, as applied in the business context, the ban on CPA solicitation advances its asserted interests in any direct and material way.").

Moreover, the record appears to support the opposite conclusion: the Statute is not an effective measure for advancing either of these objectives.  First, Section 381.00316 only prevents businesses from requiring patrons to provide "documentation certifying COVID-19 vaccination or post-infection recovery," but nothing in the statute appears to prohibit businesses from imposing a vaccination requirement.  While companies cannot require customers to verify their vaccination status with "documentation," the statute does not prohibit businesses from verifying vaccination status in other ways (*e.g.*, orally).  Accordingly, under Section 381.00316, businesses could still "discriminate" against unvaccinated individuals by adopting a vaccination requirement, which they could enforce by requiring oral verification of vaccination status before entry or by deterring unvaccinated patrons from entering by putting up signs that read "vaccinated customers only" and "unvaccinated patrons are not allowed."

In addition, the Statute also does not prohibit businesses from subjecting unvaccinated customers—and those who decline to verify their vaccination status and are deemed unvaccinated—to restrictions, requirements, and expenses that do not apply to vaccinated patrons.[37]  For instance, other cruise lines operating in Florida have required unvaccinated passengers to take multiple COVID-19 tests throughout the cruise at their own expense, with each test costing more than $100.  (DE 35-1 at 15–51.) These passengers are also required to purchase costly travel insurance that covers medical travel and related costs for COVID-19.  (*Id*.)  Cruise lines have also limited unvaccinated passengers' access to events, activities, and venues.  (*Id.*)  Unvaccinated guests on Royal Caribbean's *Freedom of the Seas* do not have access to certain dining venues, the casino, art auctions, the indoor pool, or the spa and during shows, they are required to sit in the back of the theater.  (DE 35-1 at 22–29.)  Princess and Carnival have also limited the excursions available to unvaccinated guests at ports of call. (DE 35-1 at 31–51.) Thus, Section 381.00316 does not prohibit businesses from treating unvaccinated passengers differently by charging them more while offering them less.[38]  Furthermore,

---

[37]  As of the date of this Order, the Nation's three largest cruise line operators—Royal Caribbean, Carnival, and NCLH—have all implemented mandatory screening protocols for all passengers. *See* Royal Caribbean Int'l, *Getting Ready to Cruise – Florida* [hereinafter "Royal Caribbean COVID-19 Protocols"] ("All guests age 2 and older—regardless of vaccination status—will need to take a COVID-19 test (PCR or antigen) with an accredited test provider . . . no more than 3 days before arriving at the terminal for embarkation. Guests will need to show a negative test result upon arriving at the terminal."), https://www.royalcaribbean.com/the-healthy-sail-center/getting-ready-to-cruise (last visited Aug. 7, 2021); Carnival COVID-19 Guest Protocols, *supra* note 28 ("[E]ffective August 14, 2021, fully vaccinated guests must prevent negative results of a COVID-19 test (PCR or antigen) taken within three days of their embarkation . . . . Unvaccinated guests approved for a vaccine exemption must present a negative PCR COVID-19 test at check-in . . . ."); Norwegian Cruise Line, *Sail Safe* ("All guests will be required to take a COVID-19 antigen test . . . prior to boarding and receive a negative result."), https://www.ncl.com/sail-safe (last visited Aug. 7, 2021).

[38] During oral argument, counsel for Defendant stated that the term "discrimination" for purposes of Section 381.00316 is the conduct or practice of "distinguishing" between two things.  To be clear, absolutely nothing in the record suggests that the COVID-19 protocols adopted by NCLH or any other cruise lines are motivated by animus towards unvaccinated individuals.  *See Klaassen*, 2021 WL 3073926, at *39 ("This

Furthermore, the Statute does not prevent cruises from continuing to offer adult-only cruises that exclude children, who are a significant cohort of the unvaccinated population. (DE 35-1 at 11–13.)

Finally, because the Statute does not regulate employers, it does not prohibit employers from requiring COVID-19 vaccination documentation for continued employment or adopting policies that favor vaccinated over unvaccinated employees, such as disallowing unvaccinated employees to return to the worksite or assigning them different work. [39]   In sum, if combatting discrimination were the goal, merely banning the exchange of COVID-19 vaccination documentation is an ineffective way to accomplish this objective because the Statute does not directly prohibit the treating of unvaccinated persons or those who decline to verify their vaccination status by businesses and employers differently.

---

record is devoid of any evidence of bullying or discrimination.").  What is undisputed is that vaccinated individuals are significantly less likely to transmit the virus than their unvaccinated counterparts.  (DE 3-4 at ¶ 14.)  These protocols—which are based on scientific and medical data—are aimed at protecting the health of passengers and preventing the spread of the virus onboard.  *See Klaassen*, 2021 WL 3073926, at *43 (recognizing that the decision to refuse the vaccine "necessarily bears on the health of other students, faculty, and staff.").

[39] *See Jackson Health Workers Must Get Vaccinated or Face Restrictions: CEO*, NBC 6 (Aug. 5, 2021 6:22 PM) ("Jackson Health System in Miami will be requiring all workers to get vaccinated . . . ."), https://www.nbcmiami.com/news/local/jackson-health-workers-must-get-vaccinated-or-face-restrictions-ceo/2521706/; Austin Fuller & Katie Rice, *Disney requires all non-union U.S. employees to get COVID-19 vaccinations*, Orlando Sentinel (July 31, 2021 5:14 PM) ("The Walt Disney Co., Central Florida's largest employer, is requiring all of its non-union hourly and salaried employees across the U.S. to get the coronavirus vaccine. Staffers who work on-site will have 60 days . . . to complete getting vaccinated, and those who work from home will need to provide verification of vaccination before returning to work . . . . New hires will need to be fully vaccinated before starting."), https://www.orlandosentinel.com/business/os-bz-disney-employees-vaccination-20210730-6dozeysiwrfz5fikmifcxkpswe-story.html; Press Release, Delta Air Lines, Inc., *Delta to require new hires in the U.S. to be vaccinated against COVID-19* (May 14, 2021 11:00 AM), https://news.delta.com/delta-require-new-hires-us-be-vaccinated-against-covid-19; Press Release, Walmart Inc., *Walmart Announces COVID-19 Vaccination Policy for Campus Office Associates* (July 30, 2021), https://corporate.walmart.com/newsroom/2021/07/30/walmart-announces-covid-19-vaccination-policy-for-campus-office-associates.

Similarly, Section 381.00316 does not effectively protect the medical privacy of residents.  The law is far too underinclusive to meaningfully advance this goal.  The Statute does not govern employers, who are free to require COVID-19 vaccination documentation from employees, and Defendant does not explain why the exchange of these documents is less intrusive on medical privacy in the employment context.  *See Dana's R.R. Supply*, 807 F.3d at 1250 ("If customers would be harmed learning that they faced *surcharges* but not *discounts* from private merchants, creating an exception allowing the State to impose *convenience fees* betrays the frailty of any potential state interest.") (emphasis added).  And by only restricting the exchange of COVID-19 vaccination documentation, the law does not safeguard against any hypothetical violation of medical privacy caused by exchanging other medical or health-related documentation.  Businesses and employers are free to require COVID-19 test results, hospital records, other vaccination records, as well as information regarding exposure to third parties with COVID-19.  Defendant fails to explain why COVID-19 vaccination documents are more medically sensitive or need more protection than these other documents.

As previously explained, the Statute also does not prohibit businesses and employees from requiring individuals to provide their COVID-19 vaccination status orally. Finally, the Statute does not prohibit businesses from retaining, disclosing, or publishing a person's COVID-19 vaccination status. Cruise lines have subjected unvaccinated passengers to different policies that easily disclose their unvaccinated status.  (DE 35-1 at 15–51.)  For instance, Royal Caribbean provides unvaccinated patrons with a "hole punched in their SeaPass" to indicate their status to crewmembers and segregates these passengers to one deck of the main dining room.  (DE 35-1 at 24.)

For these reasons, Defendant has failed to show that Section 381.00316 will advance the articulated objectives to a "material degree."

### iii. Is the regulation more extensive than necessary?

And finally, assuming that the statute advances substantial government interests, Defendant has failed to demonstrate that the law is not more extensive than necessary to accomplish them. "To survive First Amendment scrutiny, a commercial speech prohibition must employ 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective.'" *FF Cosms. FL, Inc.*, 866 F.3d at 1299 (internal citation omitted and cleaned up).

The Supreme Court has made "clear that if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371–72 (2002). The existence of alternative laws that could "advance the Government's asserted interest in a manner less intrusive to First Amendment rights indicate[s] that the law [is] more extensive than necessary." *Id.* (internal ellipses and quotation marks omitted). "[T]here is a significant distinction between failing to employ less-restrictive means and **completely disregarding obvious less-burdensome alternatives**." *FF Cosms. FL, Inc.*, 866 F.3d at 1300 (emphasis added). "By ignoring far less restrictive and precise means, it is likely that an ordinance burdens substantially more speech than necessary." *Id.*

Once again, Defendant provides no evidentiary support for this factor and has therefore failed to show that the statute is appropriately tailored. *See Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1240 (11th Cir. 2017) (finding that the state failed to satisfy its burden on this factor where it "has introduced no evidence at all" in support); *Thompson*, 535 U.S. at 371–72 (finding that the government did not satisfy its burden because "[t]here is no hint that the Government even considered . . . any other alternatives."). There is no evidence in the record to demonstrate that Florida considered obvious, alternative policies that could advance the stated objectives without restricting speech. To prevent "discrimination," Florida could have directly regulated "discriminatory" businesses practices, as opposed to the exchange of COVID-19 vaccination documentation. *See Dana's R.R. Supply*, 807 F.3d at 1239 ("Any of the asserted interests . . . would be better served by direct and focused regulation of actual pricing behavior"). To address medical privacy concerns, the state could have prevented or placed limitations on businesses photocopying, keeping, or storing a copy of such documentation. Because he has not offered any reason why these or other possibilities would be insufficient—or that Florida even considered any alternative policies— Defendant has failed to show that the law is not more extensive than necessary.

In sum, because Defendant has failed to show that Section 381.00316 would materially advance a substantial government interest or that it is appropriately tailored, Plaintiffs are likely to prevail on the merits of their First Amendment claim.

### 2.  NCLH's Dormant Commerce Clause Claim

Plaintiffs also argue that they are likely to prevail on the merits of their dormant Commerce Clause claim.  (DE 3 at 21–23.)  While the Commerce Clause expressly grants Congress the power to regulate interstate commerce, *see* U.S. Const. art. I, § 8, cl. 3, "'[t]his affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce.'"  *Fla. Transp. Servs., Inc. v. Miami-Dade Cty.*, 703 F.3d 1230, 1243 (11th Cir. 2012) (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 326 n.1 (1989)).  The dormant Commerce Clause "prevents a [s]tate from 'jeopardizing the welfare of the Nation as a whole' by 'plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.'"  *Am. Trucking Ass'ns v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005) (quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995)).

The dormant Commerce Clause not only limits the authority of states to enact laws that affirmatively discriminate against out-of-state actors, but it also limits the authority of states to enact laws that indirectly affect—that substantially burden—interstate commerce.  Thus, courts examine laws challenged under the dormant Commerce Clause "using a two-tiered analysis." *Fla. Transp. Servs., Inc.*, 703 F.3d at 1243.

#### i.  The first tier of analysis

Under the first tier of analysis, courts determine "whether the law or regulation [at issue] 'directly regulates or discriminates against interstate commerce, or has the effect of favoring in-state economic interests.'"  *Id.*  (quoting *Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844, 846 (11th Cir. 2008) (internal quotations omitted)).  "The

central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism . . . ."  *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).  When a state statutory scheme "'directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [courts] have generally struck down the statute without further inquiry.'"  *Bainbridge v. Turner*, 311 F.3d 1104, 1108-09 (11th Cir. 2002) (quoting *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986)).  "Only if such a regulation is shown to 'advance[] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives' will it be upheld."  *Bainbridge*, 311 F.3d at 1109 (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988)).

Here, the Court finds that the first tier of analysis does not apply.[40]  Section 381.00316 does not directly regulate, or affirmatively discriminate against, interstate commerce.  Moreover, the Statute is applicable to both out-of-state and in-state business entities that operate in the State of Florida.  Therefore, the Statute does not implicate concerns about local economic protectionism raised by courts that apply the first tier of analysis.  *See Carbone*, 511 U.S. at 390.

## ii.  The second tier of analysis and the *Pike* balancing test

The dormant Commerce Clause inquiry does not end at tier one.  Rather, courts move to the second tier of analysis: if a state's facially nondiscriminatory law "advances a legitimate local interest and has only 'indirect effects on interstate commerce,' [courts]

---

[40] This finding is undisputed.  Plaintiffs concede that Fla. Stat. § 381.00316 "does not discriminate by favoring in-state businesses over out-of-state businesses" (DE 3 at 22), and accordingly, Plaintiffs did not examine discrimination under the first tier of analysis in their motion for preliminary injunction.  (*See id.* at 21-23.)  Nor did Defendant in his response. (DE 32 at 23–24.)

apply the balancing test from *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), and invalidate the law only if 'the burden on interstate commerce clearly exceeds the local benefits [to the state].'" *Fla. Transp. Servs., Inc.*, 703 F.3d at 1244 (quoting *Island Silver & Spice, Inc.*, 542 F.3d at 846) (internal quotations omitted)); *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008) ("[T]hat a state law does not amount to forbidden discrimination against interstate commerce is not the death knell of all dormant Commerce Clause challenges, for we generally leave the courtroom door open to plaintiffs invoking the rule in *Pike*, that even nondiscriminatory burdens may be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice.").

In *Pike*, the Supreme Court determined that when a state statute "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is *clearly excessive* in relation to the putative local benefits." 397 U.S. at 142 (emphasis added). "This test is more permissive, but a statute that imposes burdens on commerce that clearly outweigh the local benefits will fail." *Island Silver & Spice, Inc.*, 475 F. Supp.2d 1281, 1289 (S.D. Fla. 2007) (citing *Brown-Forman Distillers Corp.*, 476 U.S. at 579), *aff'd*, 542 F.3d 844 (2008). A state "cannot avoid th[is] second stage of the inquiry **simply by invoking [a] legitimate state interest** underlying [a statute]." *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 178 (S.D.N.Y. 1997) (emphasis added); *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350 (1977) ("[A] finding that state legislation furthers matters of legitimate local concern, even in the health and consumer protection areas, does not end the inquiry."); *Bibb v. Navajo Freight Lines*, 359

U.S. 520, 529 (1959) ("[L]ocal safety measures that are nondiscriminatory [and thus presumptively valid may nonetheless] place an unconstitutional burden on interstate commerce.").

The *Pike* balancing test is a fact-sensitive inquiry.  397 U.S. at 142 (citing *S. Pacific Co. v. Arizona*, 325 U.S. 761 (1945)) ("If a legitimate local purpose is found, then the question becomes one of degree.  And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved . . . ."); *see also 8 Erie St. JC LLC v. City of Jersey City*, 2021 WL 689147, at *5 (D.N.J. Feb. 19, 2021) (describing the *Pike* balancing test as a "fact sensitive inquiry"); *Teladoc, Inc. v. Tex. Med. Bd.*, 2015 WL 8773509, at *12 (W.D. Tex. Dec. 14, 2015) (quoting *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 546 (4th Cir. 2013)) ("This inquiry is inherently fact-intensive . . . . '[t]he *Pike* inquiry, like the discrimination test, is fact-bound.'").  In applying the *Pike* balancing test, courts consider whether states could have implemented alternatives that impose smaller, less substantial burdens on interstate commerce.  *Pike*, 397 U.S. at 142; *see also Fla. Transp. Servs., Inc.*, 703 F.3d at 1261 (determining that "reasonable and less burdensome alternatives would have served [the government's] purposes, but the actual [ordinance challenged under the dormant Commerce Clause] did not."); *Diamond Waste, Inc. v. Monroe Cty., Ga.*, 939 F.2d 941, 946 (11th Cir. 1991) ("[U]nder the particular circumstances at issue, the fact that less restrictive alternatives are available to [the government] makes the burden imposed by the [statute] clearly excessive in relation to the local benefits created.").  For example, in *Minnesota v. Clover Leaf Creamery Company*, the Supreme Court upheld the constitutionality of a state law that prohibited the sale of milk in plastic containers, because "no approach with 'a lesser impact on

interstate activities' [was] available."  449 U.S. 456, 473 (1981) (internal citations omitted) (quoting *Pike*, 397 U.S. at 142).

### iii.  Applying the *Pike* balancing test

#### 1.  Legitimate local purpose

In his brief, three-paragraph response to Plaintiffs' dormant Commerce Clause argument, Defendant fails to specifically articulate any local purpose that justifies the Statute's alleged burdens on interstate commerce pursuant to *Pike*.  (*See* DE 32 at 23–24.)  In the absence of any articulated local purpose, the Court need not move any further in the *Pike* analysis.  *See Pike*, 397 U.S. at 142 (noting that "a legitimate local purpose **[must be] found**" for courts to apply the fact-sensitive balancing test) (emphasis added). However, based on Defendant's briefing regarding the First Amendment, the Court presumes that Florida's decision to enact Section 381.00316 reflects the state's desire to safeguard its residents' rights to medical privacy and prevent "discrimination" against unvaccinated residents. (*See* DE 32 at 7 (quoting DE 16-1 at 3–4)).

Outside of conclusory characterizations of Florida's commitment to these concepts as local purposes, Defendant fails to articulate *why* they are legitimate local purposes or *how* they weigh against any burdens that the Statute imposes on interstate commerce. Defendant's mere assertion of protecting medical privacy and preventing "discriminating" against unvaccinated persons, *without more*, fails to satisfy the dictates of *Pike* and its progeny. *See Pike*, 397 U.S. at 142 (noting that "a legitimate local purpose [must be] found" for courts to apply the fact-sensitive balancing test); *Island Silver & Spice, Inc.*, 542 F.3d at 847 ("The district court properly determined that, although *'[i]n general*, preserving a small town community is a legitimate purpose . . .*, in this instance*, [the

defendant] has not demonstrated that it has any small town character to preserve.") (emphasis added); *Bainbridge*, 311 F.3d at 1114 ("This does not mean, however, that the State can prevail without *evidence*. . . .[w]e find it inadequate the State's proffered concerns of protecting minors and ensuring orderly markets.").   And as previously explained, Defendant cites to no relevant authority to support his claim that these objectives constitute legitimate state interests.  *See supra* at 32.

Furthermore, Section 381.00316 does not actually advance the objectives of protecting "medical privacy" and "discrimination" against unvaccinated individuals in any meaningful way.  *See supra* at 32–37.   Among other reasons already discussed, Florida's failure to regulate employers, COVID-19 test results, and other medical documentation— including documentary proof-of-vaccination requirements for schoolchildren—conflicts with its purported desire to protect medical privacy.[41]  *See supra* at 36–37.  The statute also does not actually protect against the "discrimination" of unvaccinated individuals.  As explained, cruise lines have adopted measures and practices that differentiate between vaccinated and unvaccinated passengers.  *See supra* at 33–36.

This Court confronted a similar quandary in *Island Silver & Spice, Inc. v. Islamorada*.  The Village of Islamorada, Florida enacted an ordinance that restricted the types and sizes of stores that could occupy certain commercial establishments, in an effort "to serve local business interests by preventing competition from national chains . . . . [and] preserv[e] a small town community."  475 F. Supp. 2d 1281, 1291-92 (S.D. Fla. 2007), *aff'd*, 542 F.3d 844 (2008). After Islamorada cited to the ordinance to prevent a

---

[41] Additionally, there is no record evidence that Plaintiffs intend to maintain or store COVID-19 vaccination documentation for any period of time. Plaintiffs stated at oral argument that they use documentary proof of vaccination for verification purposes only and do not at all maintain, store, or transmit this type of information.

developer from establishing a Walgreens Pharmacy in the village, the developer challenged the ordinance's constitutionality, arguing that it violated the dormant Commerce Clause.  *See* 475 F. Supp. 2d at 1283–89.  While the ordinance prohibited the developer from building a Walgreens, it did not restrict existing national chains in Islamorada from continuing to operate, or interfere with the construction of a CVS Pharmacy.  *Id.* at 1292.  Given this paradox, this Court found that the ordinance failed to advance the local purposes that Islamorada articulated, because it could not hold out as legitimate a local purpose that other, existing laws, regulations, and practices clearly contradicted.  *See id.*  Accordingly, Defendant has failed to articulate how the goals of medical privacy and antidiscrimination are fulfilled by the express terms of the Statute.

## 2.  Burdens on interstate commerce

Plaintiffs are likely to succeed on the merits in showing that Section 381.00316 imposes substantial burdens on interstate commerce that will directly affect their abilities to operate the *Norwegian Gem* and other vessels.  Plaintiffs contend that, because "NCLH's vessels reach international waters and sail to interstate and foreign ports, many of which require proof of vaccination to enter without testing . . . . [Section 381.00316] has the effect of blocking or hampering the operation of cruise lines in and out of Florida . . . . excessively burden[ing] the free flow of commerce between States and between Nations." (DE 3 at 22–23.)  Frank J. Del Rio, NCLH's President and CEO, stated that "[m]any foreign ports require proof of vaccination to enter, proof of vaccination to enter without a mandatory quarantine, or proof of vaccination to enter without testing . . . . [and] NCLH has scheduled several upcoming voyages to foreign ports that require proof of vaccination to enter without testing, including Belize, [the] Bahamas, [the] British Virgin Islands, and

45

Honduras." (DE 3-1 at ¶¶ 17–18.)  Sailing schedules submitted by Defendant list NCLH vessels scheduled to depart from Miami, Florida during the next few months (*see* DE 33-1 at 24–34), and "[s]tarting August 15, 2021, NCLH's cruise ship *Norwegian Gem* will offer several passenger revenue voyages from Florida to the Bahamas, Honduras, Belize, Mexico, the Dominican Republic, the U.S. Virgin Islands, and the British Virgin Islands." (DE 3-1 at ¶ 23.)  Plaintiffs state that, if they cannot require documentary proof of COVID-19 vaccination, their vessels and passengers will be forced to "re-route around Florida or else go through tortured, costly, time-consuming, damaging contortions in order to go to or from Florida relative to other ports, none of which have any such Ban and many of which require proof of vaccinations."  (DE 35 at 14.)

In response, Defendant argues that Plaintiffs "can comply with the requirements of the foreign ports to which it plans to sail," since some foreign nations allow individuals to enter without providing COVID-19 vaccination documentation, so long as they undergo testing and/or quarantine for certain periods of time.  (DE 32 at 24 (internal quotations omitted).)  Defendant asserts that, just because Plaintiffs "might prefer to document the vaccination status of its passengers instead of testing them does not turn Florida's [] statute into an unconstitutional burden on interstate or international commerce in violation of the dormant Commerce Clause."  (*Id.*)

It is undisputed that nearly every country and port that Plaintiffs intend to set sail to during the remainder of the year have varying, often complicated requirements.  (*See* DE 3-1 at ¶¶ 17–18.)  It is also clear that COVID-19 vaccination documents are the fulcrum of many of these requirements.  For instance, any person 18 years or older, who is traveling internationally to the Bahamas, must apply for a Bahamas Travel Health

Visa.[42]   To apply, the traveler must create a profile on a website operated by the Bahamian government.[43]   Bahamas requires travelers to indicate their vaccination status. Fully-vaccinated travelers are "required to upload valid proof of vaccination . . . . confirm[ing] [that] they have passed [a] two-week immunity period."[44]   On the other hand, unvaccinated travelers are required "to upload their negative COVID-19 PCR test results . . . . [which] must be taken no more than 5 days prior to the date of arrival."[45] Unvaccinated travelers must also complete a daily health survey during their trip and, unless they depart the Bahamas on or before five days after their arrival, unvaccinated travelers must take a COVID-19 test.[46]

In Belize, travelers must present documentary proof of COVID-19 vaccination, "reflecting the receipt of the dual or single dose vaccine at least two weeks prior to arrival."[47]   Adult travelers who "cannot provide proof of immunization" must do the following: (1) present documentary proof of a negative COVID-19 PCR test "taken within 96 hours of travel"; (2) present documentary proof of a negative "Rapid Antigen, Sofia, SD Biosensor, [or] ABBOTT (Panbio) test taken no more than 48 hours prior to travel"; or

---

[42] Bahamas Travel Compliance Unit, *Bahamas Travel Health Site*, https://travel.gov.bs/ (last visited Aug. 6, 2021).

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] Belize Tourism Bd., *Belize COVID-19 Update*, https://www.belizetourismboard.org/news-and-gallery/belize-covid-19-update (last visited Aug. 7, 2021).

(3) take a COVID-19 test upon arrival.[48]  Children who are at least five years old "must present a negative COVID test."[49]

The British Virgin Islands, an overseas territory of the United Kingdom, has implemented extensive COVID-19 protocols for persons entering from abroad.  As of July 12, 2021, all foreign travelers, regardless of vaccination status, must do the following to enter the British Virgin Islands: (1) present documentary evidence of a negative COVID-19 PCR test or "an approved rapid antigen test" within five days of travel to the British Virgin Islands; (2) take "an approved rapid antigen SARS COV-2 test" on the day of the traveler's arrival to the British Virgin Islands "and quarantine until a negative test result is received"; and (3) obtain "a BVI Gateway Traveller Authorisation Certificate at a cost of $50."[50]  Travelers who decline to present documentary proof of vaccination (showing that it has been at least two weeks since they received a single-dose vaccine or the second dose of a two-dose vaccine) must quarantine for at least four full days upon arrival to the British Virgin Islands.[51]

Even in U.S. territories, divergent requirements have made it difficult—if not impossible—for cruise lines to comply with Section 381.00316.  Plaintiffs have indicated that their vessels are "scheduled to travel to U.S. territories, such as Puerto Rico and the U.S. Virgin Islands . . . ."  (DE 3 at 22 (citing DE 3-1, at ¶ 23.))  The U.S. Virgin Islands recently shared its plan to "implement a new requirement that all passengers ages 12 and

---

[48] *Id.*

[49] *Id.*

[50] British Virgin Islands Tourism, *Reopening*, https://www.bvitourism.com/reopening (last visited Aug. 7, 2021).

[51] *Id.*

older traveling onboard a cruise ship must be fully vaccinated in order for the ship to be allowed entry into St. Thomas," the most-populous island in the U.S. Virgin Islands where many cruise ships dock.[52]   These plans have already affected two Royal Caribbean vessels scheduled to depart on August 8, 2021 from Florida to the U.S. Virgin Islands.[53] As of the date of this Order, Royal Caribbean now requires passengers on those vessels who are 12 and older to "provide documentation of full vaccination at the terminal [in Port Canaveral, Florida] as a condition to boarding."[54]

Amid myriad, rapidly-changing requirements regarding quarantining and testing, there is one constant that facilitates cruise line customers' access to advertised ports of call: documentary proof of vaccination will expedite passengers' entry into virtually every single country and port where Plaintiffs intend to sail.   On the other hand, without documentary proof of vaccination, protocols vary so markedly—and change so frequently, especially as the Delta Variant becomes more widespread—to make it not only impractical, but also financially, legally, and logistically onerous for cruise lines like NCLH to comply.   Defendant has not refuted evidence furnished by Plaintiffs that shows that "[t]esting is an important adjunct measure but cannot serve as a substitute for vaccination . . . . [because] tests are susceptible to false positive and false negative results, even when repeated testing is done."   (DE 3-4 at 3.)   Moreover, quarantining and advance-

---

[52] Royal Caribbean COVID-19 Protocols, *supra* note 37. On August 2, 2021, Royal Caribbean International announced that "the Government of the United States Virgin Islands ha[d] informed [them] of [these] plans" regarding vaccination. *Id.*

[53] *Id.*

[54] *Id.*; *see also* Richard Tribou, *US Virgin Islands vaccine requirement throws wrinkle into Florida cruise plans*, Orlando Sentinel (Aug. 4, 2021 11:08 AM), https://www.orlandosentinel.com/business/tourism/os-bz-virgin-islands-vaccine-requirement-florida-cruises-20210804-23tiusoawzhntemkmb4wdiodbe-story.html.

testing requirements can be impractical as applied to the cruise line industry, given that vessels typically dock, disembark at, and depart from a foreign or interstate port for another, all in one day.  For example, Plaintiff Oceania Cruises' *MS Marina*, which is scheduled to depart from Miami, Florida on December 1, 2021, is slated to land at two Belizean ports on December 5 and 6 and depart for Honduras the following day. (DE 33-1 at 25.)  Consequently, the "tortured, costly, time-consuming, damaging contortions" (DE 35 at 14) presented by ensuring that every passenger complies with an array of interstate and international laws, regulations, and protocols regarding testing and quarantining—instead of simply requiring proof of vaccination—are so burdensome that it tips the scales in the Court's application of the *Pike* balancing test.

Section 381.00316 presents an impediment to commerce analogous to an Illinois law that required trucks to use curved mudguards.  *See Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959).  In *Bibb*, the Supreme Court held that an Illinois law unconstitutionally burdened interstate commerce in part because trucks traveling through Illinois from other states could not reasonably comply with the state's law requiring curved mudguards when Arkansas required, and nearly every other state permitted, trucks to use straight mudguards.  *Id.* at 527.  The Supreme Court stated that "[a] State which insists on a design out of line with the requirements of almost all the other States may sometimes place a great burden of delay and inconvenience on those interstate motor carriers entering or crossing its territory."  *Id.* at 529–30.  And while such a design "may be so compelling that the innovating State need not be the one to give way," the Supreme Court determined that Illinois had not met that showing when balanced against "the clear burden on commerce."  *Id.* at 530; *see also Air Transp. Ass'n of Am., Inc. v. Healey*, 2021

WL 2256289, at *9 (D. Mass. June 3, 2021) ("[A] statute that causes disruptions to and/or delays in interstate travel can impose a burden under the dormant Commerce Clause . . . .").

Plaintiffs "operate extensively in interstate [and international] commerce," *Bibb*, 359 U.S. at 528, navigating vessels in and out of U.S. waterways and the ports of various states, U.S. territories, and other nations. Section 381.00316 imposes a prohibition on documentary proof of vaccination that is completely "out of line" with the laws and regulations applicable to other states, U.S. territories, and foreign nations where cruise lines operate. *Id.* at 529–30. Complying with the Statute prevents NCLH and other cruise lines from operating vessels optimally with regard to safety—as advertised—and consistent with the business acumen, expertise, and judgment of its principals. (*See* DE 3-1 at ¶¶ 15, 25, 26 (declaration of Frank Del Rio, NCLH's CEO, stating that "[u]nless it is able to verify vaccination status, NCLH's ability to attract and assure its passengers will be severely undercut . . . . [Section 381.00316] creates grave liability risks and substantial compliance obstacles for NCLH and forces NCLH into a dangerous dilemma . . . . [and only] by verifying the vaccination status of cruise passengers can we best guard against the introduction of COVID-19 aboard our ships and the potential spread thereof."); DE 3-3 at ¶ 13 (declaration of Dr. Jukka Laitamaki, Plaintiffs' brand consultant and a business strategy professor, stating that NCLH's inability to keep its promise to passengers of a fully vaccinated cruise "would threaten NCLH's brand trust, especially given that many of its passengers likely bought tickets, made plans, and incurred costs based on this promise."); DE 3-4 at ¶ 20 (declaration of Dr. Stephen Ostroff, epidemiologist, Healthy Sail Panel member, and former Acting Administrator of the U.S. Food and Drug

Administration, stating that "[n]o other approach to verifying vaccinations is as effective or reliable . . . . [and only] documentation can supply appropriate proof.")).   Further, Section 381.00316 will prevent NCLH and other cruise lines from possessing verified information necessary to effectively and efficiently process landing and disembarking at various, preferred domestic and international ports where documentary proof of vaccination is required.   This affects not only opportunities for vacation activities like sightseeing, but also responses to mechanical and medical emergencies, or even geopolitical crises.   Depriving cruise lines of corroboration of passengers' vaccination status impedes their ability to prepare and address these eventualities.

If Plaintiffs abandon their plan to require all passengers to present documentary proof of vaccination (*see* DE 3-1, at ¶¶ 13–15), and passengers must instead be subjected to an array of diverse quarantining and testing requirements, it will impede the ability of Plaintiffs to manage the business of vessels at foreign and interstate ports and lead to incalculable and unpredictable delays in travel.   And "[w]hether and how easily [Plaintiffs] could mitigate any increase in delays speaks to *how* burdensome [Section 381.00316] is rather than to whether a burden exists . . . in the first instance."   *Air Transp. Ass'n of Am., Inc.*, 2021 WL 2256289, at *9 (emphasis in original).   It is therefore likely that Plaintiffs can show on the merits a strong likelihood that Section 381.00316 places a "heavy burden" on the "interstate [and international] movement" of cruise line vessels, thereby "pass[ing] the permissible limits" of a state's police power and unconstitutionally burdening interstate commerce. *Bibb*, 359 U.S. at 530.

### 3.  Availability of less-restrictive alternatives

Although Defendant also fails to address the issue of less-restrictive alternatives in his discussion on the dormant Commerce Clause, it is likely that Plaintiffs can show at the merits stage that there are alternatives that impose lesser burdens on interstate commerce.  The cruise line industry is a unique sector whose entire business model depends on operators' abilities to traverse across various federal, state, local, and international jurisdictions in a matter of days and even hours—each with different laws, regulations, and protocols.  At the same time, scientific research shows that cruise lines are hotbeds for COVID-19 transmission.  *See* discussion at *supra* 5–6.  Therefore, the cruise line industry must navigate the unpredictable nature of the ever-developing COVID-19 pandemic while complying with regulations on quarantining, testing, and vaccination.

While the Statute creates an exemption for health care and service providers, *see* Fla. Stat. § 381.00316(5) ("This section does not apply to a health care provider . . . a service provider . . . or a provider with an active health care clinic exemption . . . .") and does not apply to employers, it does not create a similar exception for cruise lines.  In his response, Defendant fails to articulate why a less restrictive alternative would not have addressed Florida's purportedly legitimate concerns.  For example, Florida could have adopted a narrow carve out that specifically exempts cruise line operators that travel in and through international waterways from complying with the Statute.  Florida also could have carved an exemption for interstate activities and services, such as international cruises and private bus excursions.  While these examples are "not an exhaustive list of alternatives available" to Florida, they show that the state could have "avoid[ed] burdening

interstate commerce while feasibly" pursuing its purportedly legitimate objectives. *Diamond Waste, Inc.*, 939 F.2d at 945. Defendant's failure to adopt a less restrictive alternative—and failure to respond to the suggestion that less restrictive measures would suffice—undermine the survival of Section 381.00316 when applying the *Pike* balancing test.

Consequently, this is a case where "measures that are [facially] nondiscriminatory place an unconstitutional burden on interstate commerce." *Bibb*, 359 U.S. at 529. Therefore, as applied to Plaintiffs, and at this stage of the proceedings, because Defendant fails to provide a valid evidentiary, factual, or legal predicate for the local benefits that purportedly justify Section 381.00316's restrictions, Plaintiffs have shown that the Statute is likely to fail the *Pike* balancing test and is likely unconstitutional under the dormant Commerce Clause. [55]

### 3. Preemption Claim

---

[55] In a footnote to his three-paragraph response, Defendant has "reserve[d] the right to challenge the [dormant Commerce Clause] doctrine in the Supreme Court." (DE 32 at 23 n.10.) The Court acknowledges that, as with many constitutional doctrines, the reach of the dormant Commerce Clause is the subject of vigorous, judicial, and scholarly discussion. However, neither party suggests that the two-tiered analysis is not the standard to be applied by this Court to determine whether a statute violates the dormant Commerce Clause. The *Pike* balancing test also uncontrovertibly remains governing precedent in the Nation and this circuit. *See, e.g.*, *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018) (quoting *Pike*, 397 U.S. at 142) ("State laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'"); *id.* at 2099-2100 (contemplating applying "the balancing framework of *Pike*" and stating that a state's tax requirements "includes several features that appear designed to prevent discrimination against or undue burdens upon interstate commerce"); *Fla. Transp. Servs., Inc. v. Miami-Dade Cty.*, 703 F.3d 1230, 1257-62 (11th Cir. 2012) (affirming district court decision that determined a county applied an ordinance in violation of the dormant Commerce Clause); *Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844, 846 (11th Cir. 2008) (affirming district court decision that determined a Florida village's ordinance violated the dormant Commerce Clause). Moreover, while statutes challenged under the dormant Commerce Clause have survived *Pike* balancing, the fact-sensitive nature of this inquiry means that every matter and every set of facts present unique circumstances that may lead to different outcomes. *See Wayfair, Inc.*, 138 S. Ct. at 2094 (2018) (quoting *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994)) ("The Court's Commerce Clause jurisprudence has 'eschewed formalism for a sensitive, case-by-case analysis of purposes and effects.'").

Finally, Plaintiffs argue that they are likely to succeed on their Preemption claim. NCLH asserts that the Statute is preempted because by restricting its ability to verify the vaccination status of passengers, the law impedes its ability operate in accordance with the framework established by the CSO, the Instructions, and the Manual.  (DE 3 at 9–12.) Specifically, NCLH argues that the Statute impairs its ability to fulfill its obligation to the CDC pursuant to its certification for the Attestation Method and take advantage of the leniency offered to ships with 95 percent vaccinated passengers under the Manual.  (DE 3 at 9–12.)  Defendant responds by arguing, *inter alia*, that the CSO and subsequent instructions cannot preempt state law because they are unlawful.  (DE 32 at 7–15.)

Because Plaintiffs have shown a likelihood of success on the merits on their First Amendment and dormant Commerce Clause claims, the Court need not address the Preemption claim at this stage.  Nevertheless, the Court notes that Plaintiffs have raised compelling arguments as to why the Statute is conflict preempted by the CDC's guidelines.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000).  The Court will address these arguments at a later stage of the proceeding.

## B. NCLH has shown that absent a preliminary injunction, it would be irreparably injured

On several independent grounds, Plaintiffs have demonstrated that they will suffer irreparable injury absent entry of a preliminary injury.  As the Eleventh Circuit has recognized, "[a] showing of irreparable injury is 'the *sine qua non* of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Ne. Fla. Chapter of the Ass'n of DGen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). "Irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Id.* at 1176–77.  "The harm considered by the district court is necessarily confined to that

which might occur in the interval between ruling on the preliminary injunction and trial on the merits." *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983).

First, because Plaintiffs have established that they are substantially likely to succeed on the merits of their First Amendment claim, the continued enforcement of Section 381.00316 against them constitutes an irreparable injury.  The Supreme Court has explained that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)); *see also FF Cosms. FL, Inc.*, 866 F.3d at 1298 ("The district court correctly noted that an ongoing violation of the First Amendment constitutes an irreparable injury.").

NCLH has also shown that if they are required to comply with the Statute, they would suffer irreparable injury from the loss reputation, trust, and goodwill. *See Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) ("[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.") (internal citation omitted).  The undisputed record establishes that if Plaintiffs could not require passengers to provide COVID-19 vaccination documentation, the company would have no other reliable method for ensuring that all passengers have been vaccinated.  (DE 3-1 at ¶ 29.)  Consequently, NCLH would have no choice but to either cancel its itinerary for the *Norwegian Gem* (and other ships that plan to leave from or arrive to Florida) or suspend its vaccination policy.  (DE 3-1 at ¶¶ 28–31, 34; DE 3-3 at ¶¶ 12–13.)  Either option would injure NCLH's reputation, trust, and goodwill among customers who were promised a vaccination requirement before October 31, 2021, as well as the 20,000

people who have already booked tickets for voyages on ships departing from or arriving to Florida between now and January 2022.  (DE 3-1 at ¶ 28; DE 3-3 at ¶¶ 13, 16, 32.)  In his affidavit, Frank Del Rio, NCLH's CEO, stated that cancellations would disrupt passengers' travel plans, which would "caus[e] NCLH to suffer a loss of goodwill."  (DE 3-1 at ¶ 32.)  Dr. Jukka Laitamaki, Plaintiffs' brand consultant and a business strategy professor, opined that suspending the policy would tarnish NCLH's reputation because a vaccination requirement is "a powerful tool" for countering customers' fears of COVID-19.  (DE 3-3 at ¶ 16.)  She further explained that allowing unvaccinated guests onboard increases the risks of COVID-19 transmission and "NCLH's brand trust would be severely harmed and could be destroyed if there were an outbreak of COVID-19 on any of its cruise ships."  (*Id.* at ¶ 12.)  Defendant presents no evidence to refute NCLH's assertion that absent an injunction, it would suffer significant reputational damage.

Finally, Plaintiffs have shown that without an injunction, they would suffer monetary losses, which they would not be able to recover from the state because of sovereign immunity.  "In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1310 (S.D. Fla. 2008) ("In cases where the defendant is immune from a claim for damages such as claims against the state barred by Eleventh Amendment immunity, irreparable harm is presumed.").  As previously explained, the undisputed record establishes that without a preliminary injunction, NCLH would likely be forced to cancel the itinerary for the *Norwegian Gem* and other ships.  Mr. Del Rio stated that "[t]he cancellation could cost

NCLH approximately $4 million in lost revenues per seven-day cruise."  (DE 3-1 at ¶ 31.) And Defendant has not rebutted NCLH's assertion that absent an injunction, it is likely to suffer significant financial losses.  For these reasons, NCLH has demonstrated that without a preliminary injunction, it would be irreparably injured.

### C. NCLH has shown that the equities and public interest weigh in favor of an injunction

"The third and fourth factors 'merge' when, as here, the government is the opposing party."  *Gonzalez*, 978 F.3d at 1271.  Because Plaintiffs have shown that Section 381.00316 is likely an unconstitutional statute under the First Amendment and the dormant Commerce Clause, the balance of harm and the public interest weigh in their favor.  *See Odebrecht*, 715 F.3d at 1290 ("[t]he public has no interest in the enforcement of what is very likely an unconstitutional statute."); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("As noted, even a temporary infringement of First Amendment rights constitutes a serious and substantial injury, and the city has no legitimate interest in enforcing an unconstitutional ordinance. For similar reasons, the injunction plainly is not adverse to the public interest. The public has no interest in enforcing an unconstitutional ordinance.").

Moreover, as discussed, while Plaintiffs advance substantial unrebutted evidence showing that they are likely to suffer significant financial and reputational harms absent an injunction, Defendant fails to articulate or provide any evidence of harms that the state would suffer if an injunction was entered.  And while NCLH has demonstrated that public health will be jeopardized if it is required to suspend its vaccination requirement, Defendant identifies no public benefit from the continued enforcement of the Statute

against NCLH.  For these reasons, the balance of equities and the public interest[56] also weigh in favor of an injunction.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (DE 3) is **GRANTED**.  Defendant is **ENJOINED** from enforcing Section 381.00316 against Plaintiffs pending resolution of the merits of this case.

**DONE AND ORDERED** in Chambers in Miami, Florida on this <u>8th</u> day of August, 2021.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

---

[56]  As Judge Leichty noted in *Klaassen*, "in times of crisis, perhaps constitutional adherence proves the very anchor we all need against . . .  government intrusion that would otherwise scuttle the ship." 2021 WL 3073926, at *17.