1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NUMBER 21-CV-22492-KMW

Norwegian Cruise Line Holdings Ltd., et al

        **vs.**

Scott Rivkees, M.D.
**State Surgeon General and Head of the Florida
Department of Health in his official capacity**

ZOOM HEARING HELD 8-6-2021
BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE PLAINTIFF**s**:          Derek L. Shaffer, ESQ.
                                 1300 I Street, NW
                                 Washington, DC 20001-3706


FOR THE DEFENDANT:               John F. O'Sullivan, ESQ.
                                 **2601 South Bayshore Drive**
                                 Miami, FL  33133


FOR THE DEFENDANT:               Charles J. Cooper, ESQ.
                                 **1523 New Hampshire Avenue, NW**
                                 Washington, DC 20036

REPORTED BY:                     PATRICIA SANDERS, RPR
                                 United States Court Reporter
                                 400 North Miami Avenue, Suite 11-3
                                 Miami, FL  33128
                                 T: 305.523.5528
                                 patricia_sanders@flsd.uscourts.gov

| | | |
|---|---|---|
| 09:57 | 1 | THE COURT:  Good morning. I think we are all assembled |
| 09:57 | 2 | and ready to proceed. |
| 09:58 | 3 | The Court then calls Case No. 21-22492; Norwegian |
| 09:58 | 4 | Cruise Line versus Scott Rivkees. |
| 09:58 | 5 | Counsel, if you would please announce your appearances |
| 09:58 | 6 | for the record; starting first with the plaintiff. |
| 09:58 | 7 | MR. O'SULLIVAN:  Good morning, Your Honor, on behalf |
| 09:58 | 8 | of plaintiff Norwegian Cruise Line, from Quinn Emmanuel, John |
| 09:58 | 9 | O'Sullivan along with my colleague... |
| 09:58 | 10 | MR. SHAFFER:  Derek Shaffer also with Quinn Emmanuel |
| 09:58 | 11 | on behalf of plaintiffs. |
| 09:58 | 12 | THE COURT:  Good morning, Mr. O'Sullivan, and good |
| 09:58 | 13 | morning, Mr. Shaffer. |
| 09:58 | 14 | MR. SHAFFER:  Good morning, Your Honor. |
| 09:58 | 15 | THE COURT:  And on behalf of the defendant. |
| 09:58 | 16 | MR. PATTERSON:  Good morning, Your Honor, Pete |
| 09:58 | 17 | Patterson with Cooper & Kirk on behalf of the defendant. |
| 09:58 | 18 | THE COURT:  Good morning, Mr. Patterson. |
| 09:58 | 19 | All right. Before I begin our proceedings here today |
| 09:58 | 20 | let me give my standard public service announcement. |
| 09:58 | 21 | First to the lawyers; I would ask you to please speak |
| 09:58 | 22 | loudly and speak clearly.  And I won't say slowly because I am |
| 09:58 | 23 | unclear as to each of your patterns in terms of whether you are |
| 09:58 | 24 | rapid speakers or not. |
| 09:58 | 25 | |

09:58    1        Even with the benefit of the video, it is sometimes

09:59    2    more difficult for the court reporter since it is being done

09:59    3    virtually.  So if you would try to speak clearly and in a

09:59    4    modulated tone for the benefit of both the court reporter and

09:59    5    for the record.

09:59    6        Also, for the public and any observers of these

09:59    7    proceedings; I would remind you that recording, live streaming

09:59    8    or rebroadcasting of the proceedings is strictly prohibited.

09:59    9        And anyone that violates that order may be subject to

09:59   10    sanctions, which are set out in full on the docket.

09:59   11        With that said; we are here this morning to discuss

09:59   12    Norwegian's motion for preliminary injunction.

12:42   13        They have brought an as applied Constitutional

12:42   14    challenge against Dr. Rivkees, the Florida Surgeon General,

12:43   15    with regard to the provisions of Florida Statute 386.00316.

10:00   16        I have read all of the parties' submissions, all of

10:00   17    the exhibits, and I am prepared this morning to engage in a

10:00   18    discussion.

10:00   19        I am assuming each side would like fifteen or so

10:00   20    minutes to give a summation of their most salient arguments; as

10:00   21    presented in their briefing.

10:00   22        I will warn everyone that while I always do endeavor

10:00   23    to give you the full time of the argument that I have allotted,

10:00   24    sometimes if I am especially engaged or have a question about

10:01   25    something you said I might jump in.

10:01  1          So I thought I would give you all a heads-up in that

10:01  2    regard.  All right. Since it is Norwegian's motion, I am going

10:01  3    to turn to them to begin.

10:01  4          MR. SHAFFER: Thank you, Your Honor.  Again, Derek

10:01  5    Shaffer for plaintiffs.

10:01  6          With the Court's permission we would propose to use a

10:01  7    slide deck to guide our discussion today. And we will of course

12:44  8    go wherever Your Honor wishes in terms of questions because it

10:01  9    is obviously the most important part of the hearing -- as we

10:01  10   all recognize -- but to hit some of the salient points I would

10:01  11   propose to walk the Court through a few slides.

10:01  12         THE COURT:  Have you provided Mr. Patterson with the

10:01  13   slides?

10:01  14         MR. SHAFFER: We discussed with Mr. Patterson that each

10:01  15   side might be using slides -- I am happy to provide it if the

10:01  16   Court so wishes -- but we certainly have it available for the

10:01  17   Court's convenience and Mr. Patterson as well.

10:01  18         THE COURT:  Mr. Patterson.

10:02  19         MR. PATTERSON: Your Honor, I am not planning on using

10:02  20   any slides, but I have no objection to Mr. Shaffer using his

10:02  21   slides.

10:02  22         THE COURT:  All right. The Court has no issue -- other

10:02  23   than I hope you know how to do it -- because I certainly do

10:02  24   not.

10:02  25

10:02  1    MR. SHAFFER: I don't either, Your Honor, but I have

10:02  2    some great assistants that do.

10:02  3    THE COURT: All right. Then you may proceed.

10:02  4    MR. SHAFFER:  Does Your Honor have it in front of you

10:02  5    now on screen?

10:02  6    THE COURT:  I do.

10:02  7    MR. SHAFFER:  Understanding that Your Honor has read

10:02  8    all of the pleadings, I would like to go to the next slide.

10:02  9    THE COURT:  Very good.

10:03  10   MR. SHAFFER: I would propose at this stage just going

10:03  11   through Florida's law -- and claimed justification -- and then

10:03  12   talk about irreparable harm and balance of equities....

10:03  13   THE COURT:  Well, first you need to slow down.

10:03  14   MR. SHAFFER: Yes, Your Honor.

10:03  15   THE COURT:  So, as to my comment regarding whether any

10:03  16   of the lawyers participating today are rapid speakers, the

10:03  17   answer is yes, and it is you.

10:03  18   MR. SHAFFER: Your Honor, I plead guilty and throw

10:03  19   myself on the mercy of the Court and the court reporter.

10:03  20   THE COURT:  Yes.  You will need to slow down to a pace

10:03  21   so that Ms. Sanders can understand what you are saying and make

10:03  22   an accurate and complete record.

10:03  23   And also, what I observed earlier about the possible

10:03  24   sanctions for recording this proceeding, there would be no

12:47  25   worse sanction than the wrath of Ms. Sanders.

10:03   1        MR. SHAFFER: Your Honor, I cannot say I have felt the

10:03   2   wrath of Ms. Sanders before, but I have felt the wrath of other

10:04   3   court reporters in perhaps the same way.

12:49   4        However, in the Zoom hearings it is a little different

12:49   5   because they can't throw things at me the same way.  But I will

12:49   6   heed Your Honor's admonition and try to go slowly.

12:49   7        THE COURT:  Thank you. You may continue.

10:04   8        MR. SHAFFER:  So, Your Honor, I would first like to

10:04   9   begin with the law and the justification for the law.

12:51   10       And as Your Honor has seen from the briefing, Mr.

12:51   11  Patterson is an excellent lawyer, and you cannot find anyone

12:52   12  better to defend this case.

12:52   13       But the one thing Mr. Patterson cannot do today is

10:04   14  change the law, change the terms of the law or change the scope

10:04   15  of the law that Your Honor is reviewing in terms of the

10:04   16  legality.

10:04   17       And what the law says is that a business entity may

10:04   18  not require patrons or customers to provide documentation

03:24   19  certifying Covid 19 vaccination.  It is only the documentation

10:04   20  that cannot be required of them.

10:04   21       THE COURT:  And since you are starting this way with

10:04   22  the plain text, let me ask you, this law does not prohibit

10:04   23  employers from asking for documentation just businesses who

10:05   24  have patrons and customers?

10:05   25       MR. SHAFFER: Yes, Your Honor.

10:05  1          THE COURT:  That is your reading of it?

10:05  2          MR. SHAFFER: It is, Your Honor, and I have not heard

10:05  3  anything different from any other lawyer or the State.

10:05  4          THE COURT:  Okay.

10:05  5          MR. SHAFFER: It is the documentation, it is not the

10:05  6  request or underlying information, as to whether someone has

10:05  7  been vaccinated.

10:05  8          If you trip that wire and demand the documentation as

10:05  9  a business then the Department may impose a fine of up to five

10:05  10  thousand dollars.

12:53  11          And so when we are talking about cruise ships where

12:53  12  there are thousands of passengers -- obviously that is a very

12:53  13  Draconian penalty that no cruise ship in Norwegian's position

12:53  14  is able to withstand.

12:53  15          So when you look at what the law does do -- first,

12:54  16  what does it not do? It does not prohibit them from requiring

12:54  17  this very same documentation from employees or contractors.

10:05  18          It does not prohibit them from asking the customer to

10:06  19  discuss their vaccination status orally, or requesting the

01:00  20  documentation of vaccination status.

10:06  21          You can see that from the defendant in the opposition

10:06  22  brief on page sixteen.  It does not stop them from excluding

10:06  23  customers who say, candidly, they have not been vaccinated or

10:06  24  if you decline to answer the question.

10:06  25

It does not stop cruise lines or any other business if they obtain information about whether customers have been vaccinated from publically broadcasting that information to the world, posting it on the Internet, or whatever they wish to do.

It does not prevent them from requiring vaccination documentation or other medical information for any number of other...

THE COURT:  So under four it is your understanding if a cruise line is going to a place where let's say there is a malaria outbreak or TB or any other highly communicable disease this statute does not prohibit documentation of any of those conditions? I mean, it does not allow it, but it does not prohibit it?

MR. SHAFFER: That is exactly right, Your Honor.  It also does not prevent, say, schools in Florida from demanding vaccination documentation as a pre-condition of kids going to school. That can be conditioned on vaccination status; albeit for diseases other than Covid 19.

THE COURT:  Okay.

MR. SHAFFER:  And so who does this protect?  When you cut through all of the posturing who really benefits?  It is the one patron -- it is the patron coming onto the cruise ship and is answering the question, have you been vaccinated, and is lying and saying, yes, I have been vaccinated.

10:07  1      But if you dig down to the tell-tale documentation you

10:07  2  would you find out there is no such documentation, they have

10:07  3  not been vaccinated.

10:08  4      It is a very peculiar and very suspect law. And it is

10:08  5  strange as to how -- how the State justifies it. And we will

10:08  6  take a look at how the State tries to justify this very limited

10:08  7  and off-putting set of passengers.

10:08  8      Now, there are two rationales that they offer. The

01:16  9  first is anti-discrimination and the second is privacy.  And I

01:16  10  would like you to look at both of those justifications, Your

01:16  11  Honor...

01:16  12      THE COURT:  Before you do, let me ask you where is the

10:08  13  evidence in this record of what the justification is for the

10:08  14  law?  Are there any surveys or anecdotes such as Judge Leichty

10:08  15  has?

10:08  16      Are there affidavits?  What do we have to demonstrate

10:09  17  in a record like this the justification?

10:09  18      MR. SHAFFER:  To be fair, Your Honor, I think you

10:09  19  certainly have in the opposition brief what the lawyers are

10:09  20  arguing -- but it is not the same thing as the Legislature put

10:09  21  forward as a justification and the Legislative record that Your

10:09  22  Honor will need to review.

10:09  23      And I think in fairness to the Legislative record,

10:09  24  Your Honor, there are indications the same two interests that

10:09  25  the defendant is advancing before this Court were articulated

1    by the Legislature; anti-discrimination and privacy. And there

2    are citations in the opposition brief to the articulation of

3    these rationales.

4         But Your Honor is asking something else; what is the

5    hard evidence?

6         THE COURT:  So if someone passed a law that -- and I

7    am getting ahead of myself -- if someone passed a law that

8    interfered with Interstate Commerce and the justification was

9    to protect civil liberties and there was no evidence that a

10   certain issue had been considered by the Legislature, there was

11   just a characterization, then no law could ever run afoul of

12   say the Dormant Commerce Clause.

13        So I understand there has been articulation in various

14   places in Mr. Patterson's introductory paragraph, but are you

15   aware of any evidence any -- other than a characterization --

16   anything else that was relied on by the Legislature?

17        MR. SHAFFER: No, Your Honor.  This Legislative record

18   is conspicuously bereft -- there is not even a report that the

19   Legislature farmed out which can tell us this is an actual

20   problem, or whether there is a certain portion of the would-be

21   patrons or customers being denied adequate opportunity within a

22   particular industry.

23        There is nothing that was done by the Legislature to

24   substantiate the concerns and show that the contours of this

25   law are designed to address actual problems -- as opposed to

01:55 1  hypothesized or imagined problem. That I believe is insoluble

02:00 2  for Mr. Patterson.

01:55 3          But there is another problem too -- apart from the

01:56 4  absence of any Legislative record evidence that Your Honor

01:56 5  would rightly require for purposes of Dormant Commerce Clause

01:56 6  and First Amendment scrutiny -- the rationale does not make

01:56 7  sense; it is incoherent on its face.

02:02 8          And I think I can demonstrate to Your Honor today --

02:02 9  even beyond the absence of evidentiary support -- that this is

02:02 10 a conspicuously suspect and we believe invalid law for reasons

02:02 11 that just jump out from the face of the statute.

02:03 12          THE COURT:  Well, that may be.  Under what standard do

10:12 13 I redress the issue?

10:12 14          In the question that I asked I was looking at the

03:56 15 First Amendment, and the Dormant Commerce Clause which both

10:12 16 required -- Sorrell, Bainbridge, Wayfair -- they all require

10:12 17 some indicia, some evidence in the record about the operation

10:12 18 and focus of the legislation.

10:12 19          I understand you are saying it does not appear to have

02:41 20 coherence. That goes to one of the tests, whether it fulfills

02:42 21 the requisites of the statute, and is not thought to unduly

02:42 22 burden the First Amendment or commerce -- unless I am getting

02:42 23 that totally wrong

10:13 24          MR. SHAFFER: No -- Your Honor is getting it exactly

10:13 25 right.

10:13    1          I think it is fatal to the statute that there is an

02:44    2    absence of Legislative evidence; and for that reason alone we

02:44    3    are likely to succeed.

02:44    4          But our likelihood of success is even greater than

02:44    5    that because even if you were to forgive and overlook the

10:13    6    complete absence of legislative evidence here, you would also

10:13    7    see that the rationale does not make any sense and could

10:13    8    potentially flunk rational basis.

02:46    9          Your Honor does not need to reach that question

02:46   10    because heightened Constitutional scrutiny aside -- I think

02:46   11    there are tell-tale signs that this law does not make any sense

02:46   12    by its terms.

02:46   13          First, as to anti-discrimination -- obviously, Your

10:13   14    Honor, no one takes lightly claims of discrimination. Certainly

10:13   15    Norwegian does not; especially when the claims are directed at

02:46   16    us.

02:46   17          There is a suggestion, at least, that Norwegian is

02:46   18    discriminating -- and that is not who we are, and we would

10:14   19    absolutely never stand for that.

10:14   20          One of the supposed purposes of the law is to protect

10:14   21    against discrimination; so let's look at that by its terms.

10:14   22          The law, again, does not prohibit discrimination

10:14   23    against the unvaccinated -- only requiring documentation of

02:53   24    vaccination status.

02:53   25

And so the businesses can inquire about would-be cruise-goers, have you been vaccinated, and if they do not like the answer or do not get the answer they can exclude based upon vaccination status.

Whoever heard of an anti-discrimination law like that. The only beneficiaries of the law are narrowly defined. The only businesses who are prevented from discriminating -- if I may use their quote in terms of discrimination because I do not believe that it is discrimination -- discriminating against patrons or customers.

Because, Your Honor, you can still require vaccination documentation for Covid 19 -- from employees, from suppliers, from contractors.

We have all been to amusement parks where there are height restrictions in place for certain rides.  And that is not about being cruel to kids or discriminating against people who are shorter; it is about having a safe and healthy time while in the park.

THE COURT:  Am I correct, Mr. Shaffer, that one of your affiliates -- and I don't know if it is Crystal -- am I correct for many years has had adults only cruises?

MR. SHAFFER: Your Honor is correct -- and Florida has never suggested that there is anything wrong with that type of a cruise -- and that is direct exclusion of children.

03:02  1      And so who in their right mind would believe that

03:02  2  there is anything problematic about a cruise line having a

03:02  3  health restriction that may exclude children of certain ages

03:02  4  when cruise ships are perfectly free to say no children will be

03:02  5  allowed -- period and full stop.

03:02  6      So the effort by Florida is to portray this as some

03:02  7  type of a Jim Crow restriction, when it is the same sort of

03:02  8  restriction for all other sorts of things -- such as driving a

03:02  9  vehicle and the purchase of alcohol -- which is restricted to a

03:03  10  certain age.

03:03  11      THE COURT:  Well, in fairness to Mr. Patterson, I do

10:16  12  not recall that either he or Dr. Rivkees ever used that as an

10:17  13  argument -- perhaps newscasters, pundits or people that are not

10:17  14  of record.

10:17  15      MR. SHAFFER:  Yes, Your Honor.

10:17  16      THE COURT:  Nor did I anticipate they would.

10:17  17      MR. SHAFFER: Your Honor is exactly right. I apologize

10:17  18  if I suggested that those words came from Mr. Patterson or the

10:17  19  lawyers in the case.

10:17  20      I think some of the press reports have come from some

10:17  21  Florida officials -- and I could be wrong -- but I certainly

10:17  22  mean to disabuse anyone of the notion that the law that we are

10:17  23  talking about here today has anything to do with the verbal

10:17  24  efforts these people have been making to protect against

10:17  25  discrimination -- as we have all understood discrimination.

10:17   1           THE COURT:  All right. And just to be clear, other

10:17   2   than the exhibits I have been provided by the parties and the

10:18   3   Legislative history -- of which there is very little -- any

10:18   4   comment made outside of those contexts have no evidentiary

10:18   5   value and would not be a part of my analysis in any way.

10:18   6           MR. SHAFFER: Understood. To the extent there is an

10:18   7   anti-discrimination rationale anywhere articulated in the

10:18   8   Legislative record, or in defense of the law, you have to have

10:18   9   a completely new notion of what it is discrimination means in

10:18   10  order to credit that rationale.

03:06   11          Even on the face of it -- and let me step back -- we

03:06   12  are talking about luxury cruise lines who charge what many,

03:06   13  many would believe are very high prices for a ticket to get

03:06   14  aboard.   That is the same as well for luxury automobiles.

03:06   15          And so that does exclude a certain part of the

03:22   16  population based upon socio-economic status and how much they

03:22   17  are willing to pay for those things.

10:19   18          And, Your Honor, that has never, ever been understood

10:19   19  as discrimination.   That's just doing business on one's desired

10:19   20  terms.

10:19   21          So Florida, or the defendant or anyone else, who wants

10:19   22  to think that excluding some portion of the population because

10:19   23  of your business terms -- it doesn't work for them -- and so

10:19   24  that is going to be treated as discrimination, we would have to

10:19   25  fundamentally rethink the nature of business and the nature of

10:19  1    our markets and Government regulation thereof.

10:19  2         THE COURT:   Again, to be clear, the challenge here is

03:26  3    not -- it's as applied to Norwegian -- so really we are talking

10:19  4    about where the statute has been designed to redress some

10:19  5    articulated discrimination against unvaccinated persons who

10:19  6    wish to cruise.

10:20  7         MR. SHAFFER: Your Honor is exactly correct, and that

10:20  8    is what the scope -- is the scope of the preliminary injunction

03:26  9    that we seek. One that is narrowly confined to these plaintiffs

03:27 10    and their as applied challenge as you say.

03:27 11         THE COURT:   Okay.

10:20 12         MR. SHAFFER: And, Your Honor, as we look at that, I

10:20 13    would urge the Court to keep in mind the comparison here --

10:20 14    where the Florida schools right now do require vaccination

03:28 15    documentation as a pre-condition not for coming on a luxury

03:28 16    cruise ship but going into school.

10:20 17         So you have to then ask the question, Your Honor, how

10:20 18    is it that Florida can consider what we're talking about today

03:29 19    to be discrimination but not what you have every day with the

03:29 20    schools?

10:20 21         In the opposition brief the defendant says Norwegian

10:20 22    should be doing it the way other major cruise lines do it --

10:21 23    and that will solve all the problems -- but look at what other

10:21 24    cruise lines are doing.

10:21 25

10:21   1    I don't mean to name names, but right now you have

10:21   2    another cruise line that makes everyone who is unvaccinated --

10:21   3    where they have to wear a red bracelet, a scarlet red bracelet,

10:21   4    that they have to have on all the time.

03:34   5    Which restricts where they can go and restricts their

03:34   6    activities and limits what they can do. And so they are giving

10:21   7    them worse treatment with the red bracelet.

10:21   8    And it appears, Your Honor, that is not discrimination

10:21   9    that the State is concerned with.

10:21   10   THE COURT:  So your argument then is the fact that

10:21   11   these unvaccinated passengers are segregated on the ship and

10:21   12   are not allowed to use the casino and spa, certain indoor bars,

10:22   13   you are saying that would constitute the type of discrimination

10:22   14   one would assume the statute was directed to but has not been

10:22   15   enforced in that regard?

10:22   16   MR. SHAFFER: Yes, Your Honor. And I don't think anyone

10:22   17   that is sincerely and genuinely concerned about discrimination

10:22   18   in this context could say what Norwegian proposes is somehow

10:22   19   problematic but what these other major cruise lines are doing

03:42   20   in terms of what Your Honor just listed is fine with the State

10:23   21   of Florida.

10:23   22   Just one other point, Your Honor, in terms of how

03:43   23   these unvaccinated passengers are being treated -- because it

10:24   24   is not just worse treatment or being segregated as has been

10:24   25   described here -- they also have to pay more than other

03:44  1   passengers. Cruise lines require the unvaccinated passengers --

03:44  2   only those passengers -- to provide proof of valid travel

03:44  3   insurance, which is very expensive. So they are paying more for

03:45  4   worse treatment.

03:45  5          And so that is what the State of Florida is saying is

03:45  6   fine with them, but there is an issue with Norwegian saying

03:45  7   that if you are not vaccinated then ours is not the right

03:45  8   cruise experience for you.

03:46  9          Which is just another reason, Your Honor, I do not

03:46  10  believe you can credit the rationale advanced in support of

03:46  11  this law.

03:46  12         THE COURT:  All right.

03:46  13         MR. SHAFFER:  And if there is any discrimination here,

03:46  14  Your Honor -- and I do not believe there is -- that terminology

03:46  15  is coming from the State.

03:46  16         But if there is any discrimination at all it is Covid

03:46  17  that discriminates against the unvaccinated in ways that are

03:46  18  medical, and in ways that puts human health and safety and life

03:46  19  at risk.

10:24  20         And, Your Honor, the other rationale that is being

10:25  21  offered is one of privacy; supposedly Florida is out to protect

10:25  22  privacy.

10:26  23         Florida's ban does not protect medical privacy -- I'm

10:26  24  not saying medical information or vaccine information that is

04:12  25  generally protected as a category -- and even as to Covid 19

1  vaccination status.  It does not prevent businesses from

2  requiring other forms of vaccine documentation for other

3  vaccines.

4         Does not prevent them asking for the same underlying

5  information, are you vaccinated against Covid 19 or not, and

6  most remarkably does not stop any business that obtains this

7  information from broadcasting the vaccination status.

8         How might they broadcast it?  Again, for some of these

9  other cruise lines that you have seen, they welcome aboard the

10 unvaccinated passengers and give them their red scarlet wrist

11 bands.

12         And they have them wearing those wrist bands around

13 hundreds of their new friends on the cruise ship -- who they

14 will be seeing for the next week -- where everyone knows that

15 John Smith and Jane Doe are unvaccinated for everyone to see.

16         Compare that with what Norwegian is doing; where there

17 is a very discrete and private exchange that says to a would-be

18 passenger, sorry, if you don't have proof of vaccination you

19 should not come aboard.

20         That is the end of it. If there is any privacy concern

21 here it should be about what the law is forcing and not what

22 Norwegian is proposing.

23         THE COURT:  The privacy concerns -- I am not entirely

24 clear on the process. So you come to the Port of Miami and you

25 have your vaccination card.

04:50  1          Is that copied or made a part of a database?

04:50  2          It seems to me if there was a concern in that regard

10:27  3    then there could be a restriction as to how long you could

10:27  4    maintain the data -- if you could record it at all -- is that a

10:27  5    component of your boarding process?

10:28  6          MR. SHAFFER: That is an excellent question, which I

04:51  7    cannot answer right now, but I will promptly get Your Honor the

04:51  8    answer.  But I can tell Your Honor this much, there is a check

10:28  9    before the boarding of the vaccine documentation.

04:51  10         As to whether that is recorded any place in either a

04:51  11   temporary record or some data base, I do not know the answer to

04:51  12   that, but I think the important point to make today is that the

10:28  13   law does not prevent that from being made, even if it is an

10:28  14   oral exchange and you orally obtain the passenger's vaccination

04:52  15   status.

04:52  16         You can do with it what you will. And, again, the

04:52  17   other cruise lines are actually broadcasting the status of one

10:28  18   passenger versus another with the red bracelets.

10:28  19         If this law were concerned about protecting the

10:28  20   information as private it would do what Your Honor is

10:28  21   suggesting it would, speak to how records are retained and how

10:28  22   they are transmitted.

10:28  23         Not to how one specific exchange between a willing

10:28  24   passenger and a business that is doing business on these terms;

10:28  25   how they are able to announce and verify vaccine status.

10:29   1       It would be speaking to two totally different things.

10:29   2       THE COURT:  If that were a part of the legislation

04:53   3  that prohibited a business like Norwegian from maintaining on

10:29   4  record someone's Covid vaccination I don't think that would be

10:29   5  a problem.

10:29   6       Let's say, if I go on a cruise and I have an allergy

10:29   7  to shell fish, isn't that something you share because you do

10:29   8  not want me getting ill while I am dining?

10:29   9       Wouldn't that be something you would share?

10:29  10       MR. SHAFFER: We would share it with the kitchen staff,

10:29  11  yes.  So what would happen -- every time someone dines at a

04:54  12  restaurant that would be done -- but I do not believe there is

04:54  13  a permanent record of that made.

10:29  14       It is not like the kitchen keeps it on file. It is

10:29  15  between a waiter and passenger and then back to the kitchen

10:29  16  each time.

10:30  17       But there is other medical information as well. If you

10:30  18  are a pregnant woman, and if you are 24 or 25 weeks into your

10:30  19  pregnancy, then you have to produce medical documentation and

04:55  20  you have to produce authorization from your physician that you

04:55  21  are fit to sail and you will not be imperiled by sailing.

04:55  22       So that is something they would have -- at least for

04:55  23  some period of time -- a record of that. And the Florida law

04:56  24  has nothing to say about that.

10:30  25

10:30    1          THE COURT:  So this is a Sorrell issue where it --

10:30    2   while all of us here understand the person's right to maintain

10:30    3   medical privacy, you can't enact a content based restriction

04:58    4   because it is illusory, it does not really fulfill that need

10:30    5   when you can get other information; just not this?

10:31    6          MR. SHAFFER: Correct, Your Honor. And this law is even

10:31    7   more bizarre and more suspect. Because it says you can get this

10:31    8   information just not by way of the documentation.

10:31    9          It actually regulates the mode of communication, so if

05:01   10   you get the information orally you don't trip the wire of --

10:31   11   for this prohibition -- if you get it through documentation you

05:03   12   are facing a $5,000 fine.

05:03   13          And here with my client, Your Honor, that vaccination

05:03   14   documentation is checked when you book, and then thereafter

05:03   15   there is no record of that.  They know that everyone that has

05:04   16   come on the ship is vaccinated and that is the end of it.

05:04   17          So that is as private as you can get.  And as was

05:04   18   discussed, the other cruise lines are doing much more than that

05:04   19   in terms of this information...

05:05   20          THE COURT:  Slow down.

05:05   21          MR. SHAFFER:  And, Your Honor, another way that shows

10:31   22   us this law is suspect; in Florida the schools can require and

10:31   23   do require vaccine documentation, but just for diseases other

10:32   24   than Covid 19. There is no real explanation of that in the

05:08   25   Legislative record -- as to why that is so.

10:32   1    But, Your Honor, let me show you what there is in the

05:08   2 Legislative record.

10:32   3    (VIDEO RECORDING PLAYED)

10:32   4    "What is the difference between one vaccine or another

10:32   5 that is already required by law to attend a public school?"

05:11   6    "Thank you, Mr. President.  I don't think I am smart

05:11   7 enough to answer that question. I have no medical background.

05:11   8    But here we are, the vaccine before us, and we are

05:11   9 trying to best address the world we live in this unprecedented

05:11   10 situation ..."

10:32   11    (INAUDIBLE SOUND FROM VIDEO)

10:32   12    MR. SHAFFER: And, Your Honor, in fairness to the

10:32   13 Legislature, I do not believe there is anyone that is smart

05:13   14 enough to answer that question.

05:13   15    So, this does provide proof positive -- as Your Honor

05:13   16 pointed out -- this is a content based restriction that has no

05:14   17 adequate justification.

05:14   18    THE COURT:  So are you under the First Amendment

05:14   19 advocating that a strict scrutiny apply as opposed to the

05:14   20 intermediate scrutiny of Central Hudson and Dana?

10:33   21    MR. SHAFFER: Yes, Your Honor, I am. I don't think you

10:33   22 have to worry about that for purposes of finding that Norwegian

10:33   23 is likely to succeed.

05:15   24    I think we would win either way -- we would win under

05:16   25 intermediate scrutiny because there is no evidence at all in

05:16  1   this Legislative record that would be capable of satisfying

05:16  2   intermediate scrutiny.

05:16  3        And then you have a law that is facially incoherent.

05:16  4   So it is not even a close call.

10:33  5        Then with strict scrutiny, that is DOA.  Once You

10:33  6   recognize that strict scrutiny applies -- as I think the 11th

05:18  7   Circuit and the Supreme Court has indicated it does -- that is

05:18  8   really the end of the analysis.

05:18  9        Either way we would prevail on the First Amendment

05:18 10   grounds.  And that should suffice to justify issuance of a

05:18 11   preliminary injunction.

10:33 12        If I may now -- I will skip preemption and move to the

10:34 13   First Amendment.

10:34 14        THE COURT:  All right.

10:34 15        MR. SHAFFER: The information that we are talking

10:34 16   about, whether one has been vaccinated against Covid 19 or not,

10:34 17   that is medical and public health information.  That is the

10:34 18   exchange that Florida is restricting here.

10:34 19        And to explain -- to kind of do away with Florida's

10:34 20   effort to avoid what we think is the proper First Amendment

10:34 21   scrutiny, they try to characterize the law as regulating

05:20 22   conduct and not speech.

05:21 23        We have already seen, Your Honor, why that line of

10:34 24   defense does not work. This law does not prevent the underlying

10:34 25   conduct -- does not prevent differential treatment of the

05:21   1   passengers based upon whether they are vaccinated or not. It

05:22   2   permits it.

05:22   3          And, in fact, Florida is encouraging it.

10:35   4          THE COURT:  So you disagree with Mr. Patterson's

10:35   5   characterization of what is happening here as purely economic

10:35   6   conduct?

10:35   7          MR. SHAFFER: I do -- and let me explain why -- if the

10:35   8   law said this is the law that regulates all businesses and

10:35   9   regulates businesses in their advertising, and here is what we

05:24  10   have to say about businesses advertising within the economic

10:35  11   realm -- no business can reference Black Lives Matter when they

10:35  12   are advertising -- what is that law doing?

10:35  13          Yes, it is speaking to businesses and, yes, it is

10:35  14   talking about for profit advertising -- most First Amendment

05:25  15   cases on the books involve someone who is trying to speak for

10:35  16   personal benefit or for profit, and the Government trying to

10:35  17   stop that.

05:26  18          Here the speech that is being regulated, based upon

05:26  19   its content, is on a salient cultural and political issue. And

05:26  20   that law is striking at core protected speech under the First

05:27  21   Amendment.

05:27  22          Even though it is directed at businesses and their

05:27  23   advertisement -- this law is comparable. It is adopting a sui

05:27  24   generis approach to proof of Covid 19 vaccination.

05:27  25

10:36  1    And it is doing that to favor one side of a raging

10:36  2  national debate over Covid 19. It is not only content based,

10:36  3  and it is not only striking at the exchange of public health

10:36  4  information, it is doing it in a way that is viewpoint

10:36  5  discriminatory...

05:37  6    THE COURT:  You are going to have to slow down so that

05:37  7  Ms. Sanders can make an accurate record.

05:38  8    MR. SHAFFER:  Sorry, Your Honor.  And so under the

05:38  9  heightened intermediate scrutiny, you have to ask does the

05:38  10  statute directly advance a substantial governmental interest?

05:39  11    Is it narrowly drawn to achieve that?

05:39  12    Do you look for evidence that is totally absent from

05:39  13  the Legislative record?

05:40  14    You find all the incoherency that I believe is not

05:40  15  answerable.  I would quote Professor Redish on this -- and I

05:40  16  think that he is spot on.

05:41  17    It is difficult to find a Supreme Court decision

10:37  18  upholding Governmental suppression of truthful commercial

10:37  19  speech in the last 25 years.

10:37  20    I don't know what the precedent would be that has

10:37  21  upheld it. This law, unlike any other I have ever encountered

10:37  22  or found in the Federal records, it is trying to prevent

10:37  23  truthful speech.

10:37  24    And it is, again, shielding the lie about vaccination

10:37  25  status while prohibiting the documentary information that would

05:43  1   provide the tell-tale information.  It is trying to prevent,

05:43  2   Your Honor, an exchange of truthful information.  And the

05:43  3   Government cannot do that for commercial speech -- just like it

05:43  4   cannot do it for anything else.

10:38  5          THE COURT:  Right.  That is the first question of the

10:38  6   four part inquiry in intermediate scrutiny, whether or not it

10:38  7   is misleading or false.

10:38  8          MR. SHAFFER: Correct, Your Honor. I don't know of any

10:38  9   argument by the State to that effect.

10:38  10         THE COURT:  No.

05:45  11         MR. SHAFFER: And I know that Your Honor has reviewed

05:45  12   the precedent. I know that Your Honor has reviewed a number of

05:45  13   cases. And when you read them -- you know that there is a First

05:45  14   Amendment problem here.

05:46  15         So, that makes Norwegian likely to succeed -- and I

05:47  16   would submit certain to succeed -- but you do not need to

05:47  17   decide that here.  The fact that we are likely to succeed

05:47  18   suffices for your analysis.

05:47  19         And very briefly on the Dormant Commerce Clause. As

10:38  20   Your Honor has alluded to, you have a law that is very

10:39  21   profoundly interrupting the free flow of international and

05:49  22   Interstate Commerce.

05:49  23         You have customers that are less likely to book their

05:49  24   cruises. You have passengers who are subject to division and

10:39  25   disruption and displeasure while they are moving between the

05:49   1   streams of commerce. You have passengers who are spending much

10:39   2   less money now.  You have disruptive testing and restriction at

10:39   3   foreign ports.

05:51   4        Worst of all, you have heightened risk of outbreak

05:51   5   aboard that affects everyone and everything -- and that is all

10:39   6   happening because Florida is the tail that is wagging this

10:39   7   Interstate and international dog.

10:39   8        Because these ships leave from Florida they are

07:33   9   subject to special restrictions that disrupt everything else

07:33   10  that would happen in terms of the other ports that these ships

10:39   11  are meant to be visiting and all of the other places that these

07:33   12  passengers are coming from.

10:39   13       And the CDC has noted without contradiction, and we

10:40   14  agree, that cruise ships like Norwegian uniquely implicate

07:35   15  these things.

07:35   16       That is why you have Federal regulations -- without

07:35   17  even answering the question whether the Federal statute here is

07:35   18  preempted -- you know there is Federal effort to regulate, and

07:36   19  specifically to protect against diseases coming onto U.S.

07:36   20  shores.

07:36   21       So you have this Federal framework, Your Honor, and

07:36   22  you have the State of Florida interrupting these things.

10:40   23       And so then under Pike you have to balance those

10:40   24  profound burdens on Interstate and international commerce

07:37   25  against the claimed benefits.

10:40   1          Those benefits are illusory -- and, again, there is no

10:40   2   Legislative record that would begin to weigh in favor of the

10:40   3   State side of this scale.

07:47   4          That in a nutshell is the Dormant Commerce Clause

10:40   5   analysis that also makes Norwegian likely to succeed -- and

10:40   6   likely to succeed even if we did not have the First Amendment

10:41   7   problem that we identified.

10:41   8          THE COURT:  I think Mr. Patterson identifies that --

10:41   9   and I don't know that you would be heard to disagree -- but you

10:41  10   can certainly do so if you do disagree, Mr. Shaffer.

10:41  11          That the Dormant Commerce Clause is subject to much

10:41  12   discussion among jurists and legal scholars. But as best I can

10:41  13   tell from the 11th Circuit law, and even up to and including

10:41  14   Wayfair, it is still viable and appropriate jurisprudence for

10:41  15   me to examine and apply.

10:41  16          But that the argument is not that there is a direct

10:41  17   favoring of instate business to the exclusion of out-of-state

10:41  18   business, it is the impairment of the Interstate business of

10:42  19   Norwegian. Which brings me to the Pike balancing test.

10:42  20          Is that an overall correct assessment, Mr. Shaffer?

10:42  21          MR. SHAFFER: It is.

10:42  22          THE COURT:  Okay.

10:42  23          MR. SHAFFER: It seems that Mr. Patterson is reserving

10:42  24   the right to challenge -- if he gets to the Supreme Court --

10:42  25   challenge existing Dormant Commerce Clause precedent.

```
07:48    1          But in the meantime, that precedent from the United
07:48    2   States Supreme Court and the 11th Circuit -- as recently as
07:49    3   Florida Transportation where it struck down Florida law finding
10:42    4   Pike balancing -- that is the law of the land.
10:42    5          And if -- we are here to argue about likelihood of
10:42    6   success, so whatever Mr. Patterson may argue about what the
07:48    7   United States Supreme Court might do with the case if it ever
10:42    8   gets there, that is a Hail Mary pass, and is not something that
10:42    9   moves the needle on likelihood of success.
10:42   10          THE COURT:  All right. And I am giving, Mr. Patterson,
10:43   11   a heads-up because I did read that footnote after the three
10:43   12   paragraphs written on Dormant Commerce Clause.
10:43   13          Because while everyone wants to retain their right to
10:43   14   present an argument to the United States Supreme Court, I think
10:43   15   I need a record here to engage in the balancing test that the
10:43   16   11th Circuit has advised I need do.
10:43   17          Going back to your justification argument, I don't
10:43   18   know what facts I am balancing other than I believe your brand
10:43   19   expert and CEO have mentioned the damage to the brand, and if I
10:43   20   am not mistaken Mr. Del Rio discussed a $4,000,000 loss within
07:49   21   the next few weeks and a $100,000,000 loss over time.
10:44   22          MR. SHAFFER:  Yes, Your Honor. I think also on the list
10:44   23   I would put Mr. Del Rio's attestation as to -- about what the
07:58   24   restrictions and the concerns are in foreign ports.
07:58   25
```

10:44  1    Where these foreign ports want to see that passengers
10:44  2 are vaccinated in order to leave the cruise ship without any
10:44  3 restrictions, as well as the concerns about their own local
10:44  4 population that would be put at risk if Norwegian cannot sail
10:44  5 the way it is planning to do.
08:01  6    All of that sounds in terms of Dormant Commerce Clause
08:01  7 concerns. And the worst Dormant Commerce Clause violation
10:44  8 traditionally is when you have invidious discrimination that
10:44  9 favors in state businesses over out-of-state businesses.
08:01 10    We are not saying you have a record of that here. What
10:44 11 you do have that brings this outside of the mine run of Dormant
10:44 12 Commerce Clause challenges under Pike is -- what you have is
10:44 13 foreign commerce that is profoundly implicated here.
08:03 14    That puts on steroids the concerns that we are citing
08:03 15 that makes the Pike challenge more likely to succeed. You have
08:03 16 at least attempted Federal regulations -- even if you do not
10:45 17 agree that there is preemption -- and we think you should --
08:04 18 even if you did not go that far you know that the Federal
10:45 19 Government is treating this as an Interstate concern.
10:45 20    In an effort to protect against disease, and Florida
10:45 21 is getting in the way of that.  So, this is another tell-tale
08:06 22 indication -- at least as challenged by Norwegian as applied --
10:45 23 and is especially suspect.
10:45 24    Then you get to the other side of the scales -- and we
10:45 25 submit you don't find anything else.

10:45  1        I know Your Honor has been very indulgent of me and my

10:45  2  applied irreparable harm and balance of the equities ...

08:09  3        THE COURT: Slow down.

08:09  4        MR. SHAFFER:  The ban does put NCLH in an untenable

08:09  5  position. I think we have demonstrated that our options are

08:09  6  either we shut down in Florida -- and I do not think that

08:09  7  anyone wants that -- or we sail in ways that are unsafe for our

08:09  8  passengers and crew.

08:09  9        And in a way, Your Honor, which will imperil other

08:10  10  jurisdictions, foreign ports, and which is ultimately anathema

08:10  11  to public health.  And either of those things are a path to

08:10  12  irreparable harm.

10:46  13        I don't think that there is any serious dispute that

10:46  14  Norwegian will lose money from this. We will not be able to

10:46  15  recover that money from the State of Florida as they invoke

08:12  16  their sovereign immunity.  And that is irreparable harm under

08:12  17  the case law.

10:46  18        And, Your Honor, it goes on.  We will have to

08:17  19  compromise our Covid 19 protocols, things that we have said

08:17  20  that we would do -- which causes us to break a very important

08:17  21  promise to our customers -- and which hurts NCLH's brand.

10:46  22        And that, Your Honor, is something we cannot repair.

10:46  23  The same thing in terms of cruise experience. Norwegian prides

10:46  24  itself on -- and has again promised its passengers that it has

08:17  25  a brand that stands for hygiene and safety while it is still

08:17   1   providing a wonderful cruise experience. If we have to do what

08:17   2   other cruise lines are doing, that is antithetical to what

08:17   3   Norwegian stands for, and what the passengers value about

08:17   4   Norwegian.

08:18   5         So, if we have to sail that way we are getting hurt as

10:47   6   well -- along with all of our passengers -- and that too is

08:34   7   irreparable harm.

10:47   8         THE COURT:  So, what do you say to Mr. Patterson's

10:47   9   argument that the harm is self inflicted?

10:47   10        MR. SHAFFER:  Your Honor, while I have the utmost

08:52   11  respect for Mr. Patterson, I do not for that particular

08:53   12  argument.

08:53   13        Because I don't know what that means other than -- any

08:53   14  business that wants to operate, and is operating of its own

08:53   15  volition, and doing something that it wants to do, and when the

08:53   16  Government stands in the way of that -- something we believe is

08:53   17  illegal -- then that business is allowed to get a preliminary

08:53   18  injunction.

08:54   19        Again, the reason any of this is happening at all is

08:54   20  because of Covid 19 -- so blame Covid 19 if need be. We are not

10:48   21  happy about it either.

10:48   22        All we are doing, Your Honor, is trying to protect

10:48   23  ourselves and our passengers and get back to sailing as best we

10:48   24  can during this deadly global pandemic.

10:48   25

08:59  1    And we have world class experts that have advised us

08:59  2  and gotten us ready to do so.

08:59  3    So, in thinking about the balance of equities and the

08:59  4  public interests here, and in terms of what the data and the

09:00  5  numbers are here in Florida, you have had Dr. Ostroff who has

09:00  6  discussed and explained the numbers that are now coming out of

09:00  7  Florida.

09:00  8    And as these cases are rising -- it is very scary --

09:02  9  it is not just part of Florida but all of Florida that is a

09:02  10  hotspot. And so all of Florida needs to be working to combat

09:02  11  Covid 19 and not open up any gratuitous exposure to Covid 19.

09:02  12    And Norwegian is mindful of that, Your Honor. They

09:02  13  want to do everything they can to protect against Covid 19, and

09:03  14  have made those efforts.

09:03  15    The cruise industry is vulnerable -- and this is

10:49  16  undisputed -- because you have people in close proximity.  And

10:49  17  there are these variants that are making things worse, not

10:49  18  better, so you have to be especially careful.

09:08  19    And so those interests weigh heavily on the scales,

09:08  20  Your Honor.

10:49  21    The only way that Norwegian can operate these cruise

10:49  22  ships in a safe and proper manner is the way that it is asking

09:09  23  the Court to permit and which Florida is attempting to prevent.

09:10  24    You have Mr. Del Rio the CEO of Norwegian -- he sits

09:10  25  over a company that is valued at over eight billion dollars.

09:10  1          You can see in his declaration how hard he has worked

09:10  2  on these issues and how passionate he is about doing it in this

09:11  3  manner; a manner in which all of the experts have explained is

09:11  4  the only way to keep the passengers and crew safe as they begin

09:11  5  sailing on these cruise ships.

09:12  6          THE COURT:  I understand that, but make no mistake

09:12  7  about it Mr. Del Rio's decision is a business decision.

09:12  8          MR. SHAFFER:  Yes.

09:12  9          THE COURT:  And all of these persons -- Dr. Ostroff --

09:12  10  and the CDC declarations, they all demonstrate why it is that

09:12  11  Mr. Del Rio's decision is based on a deliberative and a wide

09:12  12  ranging review of his options, and what is important.

10:51  13          But the issue before this Court is the Florida Statute

10:51  14  interfering with Norwegian's First Amendment right with regard

10:51  15  to their business; and to engage in Interstate Commerce.

10:51  16          MR. SHAFFER: Absolutely, Your Honor. And while he is

09:33  17  of course a business-person, yes, he has been advised by the

09:34  18  leading experts in this field, experts who have advised him as

09:34  19  to what they believe the right course is.

09:35  20          And that is to have people who get onto these cruise

09:35  21  ships vaccinated.  Which has been validated as well by the CDC,

09:35  22  Your Honor.

09:36  23          And Dr. Rivkees to his credit has gone on record as

09:36  24  saying that vaccines are our path out of the pandemic and is

09:40  25  endorsing people getting vaccinated.

10:52   1          And who do you have from the defense side saying that

10:52   2   Norwegian is wrong and Florida is right and that Florida law

10:52   3   will best serve the public health interest?

10:53   4          You have no one -- not in the attestations and not in

10:53   5   anything anywhere -- nothing saying that. And I think that is

10:53   6   telling as you do this weighing and balancing.

09:50   7          In the event that Mr. Patterson suggests it should

09:50   8   stand in the way of Norwegian prevailing, Your Honor, and in

09:50   9   granting this preliminary injunction -- let me be clear that,

09:50  10   yes, while there are business interests at risk and while we do

09:50  11   care about them, and that we believe is irreparable harm, there

09:51  12   is something much bigger -- and we all acknowledge -- and that

09:51  13   is human life.

09:51  14          And Norwegian believes that succumbing to Florida's

09:51  15   law would put at risk human life and safety.

10:54  16          What do you have on the other side?  You have, again,

10:58  17   just circling back, Your Honor, what Norwegian proposes is what

10:58  18   is going to allow our cruise passengers to have a safe and a

10:58  19   healthy and an enjoyable cruise experience.

10:59  20          And that benefits the Florida economy -- that is going

10:59  21   to benefit the economy due to the revenue that these cruises

10:59  22   bring in.

10:59  23          And what do we have on the other side? Who does it

10:59  24   benefit?  It is the people that want to lie about their vaccine

10:59  25   status.

11:00  1  And those people that will be asked, have you been

11:00  2  vaccinated and are going to say orally, yes, so I can get on

11:00  3  the cruise ship that way, but we don't have access to the

11:00  4  documentation that gives us that proof and comfort that that

11:00  5  information is truthful.

11:00  6  Your Honor, that is not -- and I struggle to call that

11:00  7  an interest -- but what we have been talking about here today

11:02  8  falls on the side of Norwegian.

11:02  9  Thank you, Your Honor.

10:54  10  THE COURT:  Thank you, Mr. Shaffer.

10:54  11  All right. Mr. Patterson, I will turn to you for your

10:55  12  argument.  I know you have important points you would like to

10:55  13  make, and now that we have been going a while it is likely that

10:55  14  I will interrupt you more quickly than I did Mr. Shaffer --

10:55  15  though I think I asked him a question pretty early on.

10:55  16  So, if you would on behalf of your client.

10:55  17  MR. PATTERSON: Thank you, Your Honor. And I welcome

10:55  18  your questions.  I have remarks prepared, but I would like to

10:55  19  address any issues concerning Your Honor.

10:55  20  At bottom this case is about a multi billion dollar

10:55  21  corporation seeking to invalidate Florida law to deny service

10:55  22  to customers from whom it cannot extract private medical

10:55  23  documentation.

10:55  24  I am not aware of any case under any theory of the

11:06  25  United States Constitution that allows a private business the

11:06  1  right to extract private information from an individual.

11:07  2  And Norwegian is unlikely to succeed on the merits of any of

11:07  3  its claims upon preemption.

11:07  4      The regulatory documents Norwegian says preempts

11:08  5  Florida law are enjoined. So those claims are not even ripe. We

10:56  6  don't know if those documents are going to come back on line,

10:56  7  and even if that were the case, Norwegian has forfeited any

10:56  8  argument to the contrary that those documents are legitimate.

11:09  9      And we have several reasons in our response in the PI

11:09  10  motion why the CDC's CSO is invalid.

11:09  11      And in the reply brief Norwegian said we don't need to

10:56  12  belabor those points, see the CDC'S briefing in the Middle

10:56  13  District's litigation.

10:56  14      That is not sufficient to sustain an argument, and we

10:57  15  submit that argument has been forfeited.

10:57  16      THE COURT:  Let me ask you about that, Mr. Patterson.

10:57  17  I am a little confused about the status of what is happening in

10:57  18  the Middle District vis-a-vis the 11th Circuit.

10:57  19      Is it Dr. Rivkees' position that the CDC guidelines

10:57  20  are unconstitutional and that they cannot operate in any way

10:57  21  whatsoever?

10:57  22      MR. PATTERSON: There is a constitutionality argument.

10:57  23  The primary argument is that they are not valid, they exceed

10:57  24  the CDC'S statutory authority.

10:57  25

11:13  1          They are arbitrary and capricious. They did not go

11:13  2     through notice and comment and rule making as they were

10:57  3     required to do.

10:57  4          All of those arguments we made in our response brief,

10:57  5     Your Honor, to which Norwegian did not respond.

10:58  6          THE COURT:  My question goes to whether there are any

10:58  7     regulations operating to govern the health and the safety of

10:58  8     international cruises?

10:58  9          So either they are operating in an advisory capacity

10:58  10    or -- somewhat like the sentencing guidelines going from

10:58  11    mandatory to advisory -- so they still have some resonance.

11:14  12         And therefore Norwegian is being precluded from

10:58  13    addressing the options of the advisory guidelines, or there are

10:58  14    no regulations governing any of this and the Surgeon General

10:58  15    has not engaged in any implementation of this statute.

11:16  16         So I need to know what picture -- and I think the

11:16  17    cruise line needs to know what are they looking at in terms of

11:16  18    that order.

10:59  19         Are they advisory guidelines, and they should be

10:59  20    considered as such by the industry; who have all, I think, said

11:19  21    they are going to follow them?  Or do you consider them just

10:59  22    infirm and incapable of any application?

10:59  23         MR. PATTERSON: Your Honor, our understanding of the

10:59  24    status is that they are enjoined from enforcement in Florida --

11:20  25    in Florida the cruise lines can choose to follow them.

11:21  1          Outside of Florida there is no injunction against

10:59  2   them; I readily acknowledge that. The point I am making is a

10:59  3   different one.

10:59  4          In the de la Questa case that Norwegian is relying on,

10:59  5   the Supreme Court made very clear that if an agency regulation

11:22  6   is invalid it cannot preempt State law.

11:22  7          And our submission is that these are invalid as to

11:22  8   Federal law.  Under the Supremacy Clause it is only Federal law

11:22  9   that can preempt State law.

11:22  10          An agency suggestion, guidance -- or any agency's

11:23  11   action that exceeds its authority cannot preempt State law --

11:23  12   for all the reasons that we have said in the briefs.

11:23  13          My position here is that Norwegian has forfeited any

11:23  14   argument to the contrary that these things are valid.  And they

11:00  15   have not one word of legal argument -- or any citation to any

11:00  16   authority in its reply brief -- about why these CFO regulations

11:00  17   are valid and binding Federal law for purposes of preemption.

11:00  18          THE COURT:  So everybody is evened out I suppose.  You

11:00  19   are saying they did not raise and discuss preemption, and you

11:00  20   only did three paragraphs on the Dormant Commerce Clause, so

11:01  21   those two should both come off the table...

11:01  22          I am not going to treat either that way. According to

11:01  23   your analysis though, Mr. Patterson, don't we look to Geier

11:01  24   versus American Honda Motor?

11:01  25

11:01  1    Because the discussion is not that regulations have no

12:01  2  place in a preemption analysis -- there is a presumption that

11:01  3  Congress delegated the authority -- in Geier they were given an

11:01  4  option, the auto industry, of two possible methods of safety,

11:01  5  the air bag or the self seat belt.

11:01  6    MR. PATTERSON: Automatic seat belt.

11:01  7    THE COURT: Right. Whoever thought that was ever...

11:01  8  But those two were available.  And when American Honda was

11:01  9  sued because they didn't do one, they were told, no, you have

11:01  10  the benefit of preemption.

11:02  11    Isn't that more like this advisory scheme with the CDC

11:02  12  and the options presented to the cruise line; or no?

11:02  13    MR. PATTERSON: Not at all, Your Honor.

11:02  14    THE COURT:  All right.

11:02  15    MR. PATTERSON: The regulations in Geier were valid

12:04  16  regulations. They went through notice and comment rule making,

12:04  17  which is what -- as the Seventh Circuit case we have cited to

12:04  18  Your Honor has said -- they are not aware of and we are not

12:04  19  aware of any case in which an agency guidance document that is

11:02  20  not purported to be binding has been held to preempt State law.

11:02  21    And there is a heavy presumption against preemption

11:02  22  generally in Federal law. It would be quite remarkable to hold

11:02  23  that an agency -- because an agency exceeded its authority in

11:02  24  issuing an order -- and so it can't bind anyone, but it is

11:02  25  advisory, it is a recommendation, that that somehow preempts

11:03    1    State law.  But even taking Geier on its own terms, Your Honor,

12:47    2    the reason there was preemption there is because the option

12:48    3    that the State law took away there was considered essential to

11:03    4    the agency's purpose.

11:03    5          You just don't have that before you here.

11:03    6          THE COURT:  You don't think vaccination is essential

11:03    7    to the CDC'S purpose to promote health and safety?

11:03    8          And let's talk about Federal Maritime travel. I do

11:03    9    understood the distinction, perhaps, of the CDC'S direction on

11:03   10    landlord tenant matters.

11:03   11          But this is a classically Federal Maritime situation

11:03   12    where the CDC has always promulgated rules. Why wouldn't we

11:03   13    think they would have an interest in offering the 95 percent

11:04   14    vaccinated attestation to its stakeholders?

11:04   15          MR. PATTERSON: A few things on that, Your Honor.

11:04   16          THE COURT:  Yes.

11:04   17          MR. PATTERSON:  As Judge Merryday explained at length,

11:04   18    Your Honor, this is not in line with things that have been done

11:04   19    in the past -- even with respect to Maritime matters.

11:04   20          And even beyond that, you have to look at the agency's

12:48   21    intention. That is the key touchstone in a preemption analysis.

12:48   22    The CDC repeatedly told Judge Merryday, we have not intended to

11:04   23    preempt Florida law.

11:04   24          We cited those excerpts from the trial record in our

11:04   25    briefs -- and they are attached to our opposition.

11:04  1      Looking at the guidance documents. The sequence here

11:04  2  is you have the conditional sailing order that is issued in

12:50  3  October, and it has a four step process.

11:04  4      And the CDC says to cruise ships, you can sail and you

11:04  5  can sail safely if you go through this process.

11:05  6      And Florida as a state thought that process was too

11:05  7  burdensome itself, but that is the process the CDC said cruise

11:05  8  ships needed to go through.

11:05  9      Several months later in a dear colleague letter in an

11:05  10  unexplained and unreasoned one paragraph statement, the CDC

12:52  11  announces this vaccine option.

11:05  12      It does not say they are essential. It does not say

11:05  13  cruise ships have to have the vaccine option. It does not say

11:05  14  that cruise ships need to take this vaccine option; it just

11:05  15  says you have this option.

11:05  16      And so this is very much a case like Williamson where

11:05  17  there was a State law that got rid of an option that was

11:05  18  available under a Federal safely regulation.

11:05  19      And the Court said this was not a case like Geier

11:05  20  where that option was -- you had an administrative record

12:54  21  indicating that option was essential.

12:54  22      You had the agency itself -- or through the Solicitor

12:54  23  General -- telling the Court that we intended to preempt; we

12:55  24  think we have preempted the law.

12:55  25

12:55 1          Here is like Williamson. You have no indication in the

12:55 2    record that this is an essential option. You have the agency

12:55 3    telling the Middle District, we did not intend to preempt

12:56 4    Florida law.

12:56 5          So this is a situation, as Justice Sotomayor said in

12:56 6    concurring in Williamson, simply because there are two options

12:56 7    does not mean that there is preemption.

12:57 8          THE COURT:  Well I don't necessarily agree with your

12:57 9    characterization of the CDC's comment during the hearing in

12:59 10   front of Judge Merryday.

11:06 11         I still don't see how anyone can look to the CDC'S

11:06 12   operation -- whether it is advisory or mandatory -- and not

11:06 13   think that vaccination is an option that they wish to pursue to

11:07 14   maintain health and safety in communities and businesses and

11:07 15   the like.

11:07 16         But we can move on. I think I have your answer as to

11:07 17   Geier.

11:07 18         MR. PATTERSON: Your Honor, just quickly at docket 34-9

11:07 19   a 110, the CDC told the Middle District it has offered this up

11:07 20   as an option for cruise ships and has not purported to preempt

11:07 21   State law on this question.  So in our submission we believe it

11:07 22   was pretty clearly stated.

11:07 23         I am happy to move on to the First Amendment. The key

11:07 24   point here is that Florida law prohibits only conduct and not

11:07 25   speech.

11:07  1          Norwegian remains free to say what it wants about

11:07  2   vaccines, but it cannot discriminate against customers by

11:08  3   refusing service to those who refuse to provide documentation.

01:01  4          THE COURT:  So employers can refuse to allow employees

01:01  5   to come to work if they don't they give proof of vaccination,

11:08  6   we are just talking about businesses and patrons?

11:08  7          And in this case we are just talking about cruise

11:08  8   lines; is that right?

11:08  9          MR. PATTERSON: Well, in this case, yes. But the law of

11:08  10  course applies more broadly. And it is our contention that the

11:08  11  First Amendment claim is actually foreclosed by Wollschaeger.

11:08  12         And here is why, Your Honor.

11:08  13         THE COURT:  Okay.

11:08  14         MR. PATTERSON:  Wollschaeger had before it a provision

11:08  15  that said doctors cannot discriminate against patients on the

01:02  16  basis of firearm ownership information.

01:03  17         And the Court reversed the District Court's decision

01:03  18  striking that down under the First Amendment.  And they said

11:08  19  that this is a regulation of conduct and not a regulation of

11:09  20  speech.

11:09  21         It is essentially the converse of what we have here.

11:09  22  The law in Wollschaeger is you cannot discriminate against

11:09  23  patients on the basis of information they give you.  Here you

11:09  24  cannot discriminate against customers on the basis of their

11:09  25  refusal to give you information.

11:09  1        THE COURT:  So I am clear, that is your reading of

11:09  2  Wollschaeger -- you are saying Wollschaeger actually governs

11:10  3  this case in your favor?

11:10  4        MR. PATTERSON: Yes.

11:10  5        THE COURT:  Okay.

11:10  6        MR. PATTERSON: So there were five pertinent provisions

11:10  7  in Wollschaeger. One restricted doctors from asking about

01:48  8  firearm ownership information.

01:48  9        One restricted the ability to record firearm

01:48  10  ownership.  One restricted their ability to harass patients

01:48  11  about firearm ownership.

01:48  12        Another gave patients the right to refuse to answer

01:48  13  questions about firearm ownership.

01:48  14        And the final one gave -- said that doctors cannot

11:10  15  discriminate against patients for owning firearms. The Court

11:10  16  struck down the first three.

11:10  17        Those are not implicated here. Norwegian is free to

11:10  18  ask about vaccine information. They are free to record that

11:10  19  information.

11:10  20        And that would -- Your Honor suggested it would not

01:50  21  implicate the First Amendment, but under Wollschaeger it would

11:11  22  restrict what Norwegian could do.

11:11  23        THE COURT:  So they can ask for it, they can record

11:11  24  it, they can keep it, they just can't make a business decision

11:11  25  about who to admit on their ships on the basis of that?

11:11  1          With that in mind; let me ask you about the other

11:11  2  cruise lines who are not a part of this, but also I do not

11:11  3  believe have been cited by Dr. Rivkees.

11:11  4          So let's talk about Carnival; that is docket entry 34,

11:11  5  Exhibit Seven. Vaccinated cruises are available for guests.

11:11  6  You will need to provide proof of vaccination at the terminal

11:11  7  in advance of boarding.  They don't even allow it to be on

11:11  8  your phone.

11:11  9          So, does that language run afoul of the statute?

11:12  10         MR. PATTERSON: You are saying the cruise line is

11:12  11  requiring documentation of vaccination before boarding?

11:12  12         THE COURT: Yes; docket entry 34, Exhibit 7. Vaccinated

11:11  13  cruises are available for guests.  You will need to provide

11:11  14  proof of vaccination at the terminal in advance of boarding.

11:12  15         MR. PATTERSON: It is my understanding they are

11:12  16  requiring documentation before being allowed to board the ship.

11:12  17  That is my understanding of Carnival's policy -- and I believe

11:12  18  it is reflected in the document.

11:12  19         Although I cannot -- it is implicit -- so on page two

11:12  20  they have travel insurance requirement for Florida and Texas

11:13  21  based ships.

11:13  22         It is my understanding in Florida they are not --

11:13  23  unlike Norwegian -- they are not insisting upon a vaccine

01:51  24  document because it would be contrary to the law.

01:51  25

01:51   1         THE COURT:  Well wouldn't that --

11:13   2         MR. PATTERSON: My client has sad--

11:13   3         THE COURT: Well, let me stop you there because I know

11:13   4 so many people are listening in -- and probably the cruise

11:13   5 ships' lawyers.  It seems to me that might end up in some

11:13   6 FDUPTA -- as we fondly call it here in Florida -- Florida

11:13   7 Deceptive Unfair Trade Practices action.

11:13   8         Because if you are advertising you are allowing

11:13   9 vaccinated persons on your ship and you are asking for proof to

11:13   10 demonstrate that, but then you are saying in Florida, no....

11:13   11         MR. PATTERSON: And, Your Honor, I don't want the

11:13   12 misspeak.

11:13   13         THE COURT:  Okay.

11:13   14         MR. PATTERSON: Let me be clear -- a cruise ship is

11:13   15 free to say we recommend that you are vaccinated and we request

11:14   16 that you provide us with a document --

11:14   17         THE COURT:  No, no. "You will need proof in advance of

11:14   18 boarding."

11:14   19         Let me move on.  I am sure your client is aware of

11:14   20 this -- it has happened over the past couple of days -- where

11:14   21 the U.S. Virgin Islands are requiring proof of vaccination to

11:14   22 dock there.

11:14   23         And Royal Caribbean has announced that two cruise

01:54   24 ships leaving the eighth -- and this is the sixth so two days

01:54   25 from now -- it says the Government of the Virgin Islands has

11:14  1   informed us to comply with the requirement guests must provide

11:14  2   documentation of full vaccination at the terminal as a

11:14  3   condition to boarding.

11:14  4          So, is that violative of the statute?

11:15  5          MR. PATTERSON: Not, Your Honor, if the boarding is

11:15  6   occurring in the U.S. Virgin Islands.

11:15  7          THE COURT:  No, no; they are leaving from Port

11:15  8   Canaveral.

11:15  9          MR. PATTERSON: If the cruise line is saying in order

11:15  10  to get on our ship you have to show us a vaccine document then

11:15  11  that is violative of the plain text of the statute as I read

11:15  12  it.

11:15  13         I have not discussed that specific example with my

11:15  14  client so I can caveat it by that, but the plain text of the

11:15  15  statute is you cannot deny service to someone in Florida --

11:15  16  once you are outside of Florida's waters Florida law does not

11:15  17  apply, but in Florida...

11:15  18         THE COURT:  So it is a wink and a nod?  We are going

11:15  19  to ask, are you vaccinated? You say, yes.  You wink, you get

11:16  20  onboard and then you go to other ports where they demand you

11:16  21  have the vaccination proof, and you take it out.

11:16  22         And it does not matter even though that affects the

11:16  23  health and safety of other passengers and how each ship aligns

11:16  24  its services?

11:16  25

11:16  1          You heard Mr. Shaffer talk about the fact that on

11:16  2  these compliant ships everyone has to wear masks.

11:16  3          You have to sit at the back of the theater, you cannot

11:16  4  disembark, you cannot go to the sauna or indoor bar.

11:16  5          Does your client consider that conduct in any way

01:56  6  discriminatory against the unvaccinated people that the statute

01:56  7  is designed to protect?

01:57  8          MR. PATTERSON: Your Honor, those things occur after

01:57  9  that ship is outside of Florida waters where Florida law does

01:57  10 not apply.

02:00  11         THE COURT:  Let me be clear, once they clear Florida

02:01  12 waters your client has no interest in how cruise ships are

02:01  13 treating their clients?

02:01  14         Is that what you are telling me?

11:17  15         MR. PATTERSON: It is not that we have no interest, we

11:17  16 have no authority.

11:17  17         THE COURT:  Okay.

11:17  18         MR. PATTERSON: In terms of distinction, Your Honor,

11:17  19 the CLIA, of which Norwegian's CEO is on the Global Executive

11:17  20 Committee, submitted a document to the CDC I believe on

11:17  21 May 11th.

02:02  22         And they had a framework for vaccinated cruising --

02:02  23 and open to all cruising -- they said both of these things can

11:17  24 be done safely.

11:17  25

11:17   1          And I invite Your Honor to look at the list of the

11:17   2   differences for vaccinated and open to all cruising.  It is

11:17   3   much less stark than the distinction, I believe, that has been

11:18   4   portrayed here.

11:18   5          There is additional -- yes, some additional masking

02:03   6   and distancing requirements for unvaccinated customers, and

02:03   7   there is a limitation on where they can go, but this leaves it

02:04   8   up to the patients -- I'm sorry, Your Honor, not the patients,

02:04   9   the customers.

02:04  10          It leaves it up to them whether or not they choose to

02:04  11   go on this ship knowing that they will have to abide by these

11:18  12   restrictions.

11:18  13          THE COURT:  Right, they have a choice, but the

11:18  14   discrimination component -- which seems to be cabined to the

11:18  15   port -- it appears has no meaning or resonance once the ship

11:18  16   sails.

11:19  17          And here there are other options available to the

02:05  18   cruising public in Florida if they so choose -- if they don't

02:05  19   want to go on Norwegian -- not unlike Judge Easterbrook and

11:19  20   Judge Leichty's comments in Klaassen versus Indiana University.

11:19  21          Where you would like to go there next semester, but

11:19  22   you can't, so you can go elsewhere; the choice is available.

11:19  23          And by your analysis people are free to cruise with

11:19  24   other cruise lines. I am not trying to undermine Norwegian's

11:19  25   market share, but they can go elsewhere.

11:19    1    MR. PATTERSON: Well, if they are available. If this

11:19    2    law is struck down we don't know how many of those cruise ships

02:06    3    will be available.

02:07    4    And the difference between here and Indiana is there

11:20    5    is a statute in the State of Florida saying Norwegian cannot do

11:20    6    this.

11:20    7    They are saying we have a Constitutional right to

02:08    8    condition service on -- upon extracting this document from you.

02:10    9    And there is simply no case that says that or that supports

11:20    10    that.

11:20    11    Take Sorrell -- they point to Sorrell -- in that case

11:20    12    it was a restriction on what pharmacuetical marketers could do

11:20    13    with information that they had, or what pharmacies could do

11:20    14    with information that they had.

02:12    15    In order for the law to be akin to the law here, in

11:20    16    that case it would have had to have said -- or the equivalent

02:12    17    right would have been the pharmacuetical company saying we can

11:20    18    tell a doctor we are not going to let you prescribe our drugs

11:20    19    unless in exchange you give us your patients' records.

11:21    20    That is not a First Amendment issue. There is no First

11:21    21    Amendment case that Norwegian has cited that says someone has a

11:21    22    First Amendment right to extract information from someone

11:21    23    against their will.

11:21    24    THE COURT:  Well, I think in Sorrell the discussion

11:21    25    was would the statute be saved by the same dimension you are

1   discussing -- would it be saved if we said they could consent?

2   And the Supreme Court said, no, the statute itself is just not

3   viable.

4         And it is interesting that you mention Sorrell because

5   in Sorrell the Supreme Court talked about the very robust

6   Legislative history and all the information they had in order

7   to make the analysis they did.

8         So, if you could please cite to me in the record where

9   I have some demonstration of the intent here to promote the

10   anti-discrimination and medical record privacy components.

11         MR. PATTERSON: I believe at footnote three on page

12   four of our PI we have quotes from the Legislative history.

13         And also page one we have the executive order from

14   Governor DeSantis that had the same policy that was codified

15   here that speaks previously to those interests.

16         This case demonstrates the fulfillment of those

17   interests -- and what this legislation says is we think that

18   businesses should not be able to discriminate against customers

19   on the basis of vaccine documentation.

20         And we believe that customers that do not want to

21   provide that documentation as a condition to getting service

22   should be able to maintain the privacy of that documentation.

23         Here Norwegian is proving the rationale that without

24   this legislation businesses -- some number of businesses --

25   will demand this.

11:23  1        THE COURT:  Well, Norwegian is only here on behalf of

11:23  2   Norwegian -- and presumably other cruise lines -- this is an as

11:23  3   applied discussion.

11:23  4        Whether or not within the State of Florida businesses

11:23  5   such as Walmart or Disney -- I think they are requiring all of

11:23  6   their employees to vaccinate.

02:28  7        Which is an odd dichotomy, where the statute does not

02:28  8   seem to worry about discrimination and privacy concerns of the

02:28  9   State's employees who are actually here within the borders of

02:28  10  Florida, but is focused on patrons of businesses -- and in this

02:29  11  case those who are sailing away to other ports of call.

11:24  12       MR. PATTERSON: Your Honor, the employer, employee

02:29  13  relationship is a different relationship -- it is usually in a

11:24  14  First Amendment context -- where the complaint would be the

11:24  15  Legislature has gone too far.

11:24  16       Here this admittedly narrow, Your Honor, were Florida

11:24  17  is saying specifically we don't want consumers when they are

11:24  18  shopping to have to be carrying around virtually or physically

02:32  19  a vaccine document in order to access the marketplace.

02:32  20       And so this narrowly targets that interest, and it

02:32  21  protects that interest a hundred percent in that domain. The

02:32  22  fact that it does not apply in other domains -- and Florida

11:24  23  maybe could have gone broader -- usually that is a virtue and

11:25  24  not a vice when you are talking about laws that potentially

11:25  25  implicate the First Amendment.

11:25   1        THE COURT:  Again, you are saying that if I go to a

11:25   2   store and I am asked, are you vaccinated, and I tell them yes

11:25   3   or no, that conversation can be had?

11:25   4        And then what? The business can do nothing with that

11:25   5   information? They cannot say, if you are vaccinated go through

11:25   6   aisles 2 through 4, and if you are not vaccinated go through

11:25   7   aisles 7 through 6?

11:25   8        Or are you just allowing people to share their lives

11:25   9   and times and medical histories, but businesses in the midst of

11:25   10  a pandemic can do nothing to absorb that information into their

02:34   11  commercial decisions -- except of course for their employees --

11:26   12  they are not letting their employees out there if they are not

11:26   13  vaccinated?

11:26   14       MR. PATTERSON:  There are a couple different questions

02:43   15  embedded in there, Your Honor.

02:43   16       THE COURT:  Okay.

02:43   17       MR. PATTERSON:  One is this question of a verbal

02:43   18  attestation -- which, you know, I suppose is not explicitly

02:43   19  prohibited by the law.

11:26   20       THE COURT:  No, it talks about documentation.

11:26   21       MR. PATTERSON:  They have not put forward one example

11:26   22  of a business in the State of Florida that is relying on verbal

02:46   23  attestations and will refuse business if a verbal attestation

02:46   24  is not given because their position is..

02:46   25

02:47    1          THE COURT:  Well, Mr. Patterson, that is not the

02:47    2    question so let me stop you.  Because by the plain text and

11:26    3    language of the statute -- which precludes requiring of

11:26    4    documentation -- it does not address any type of oral exchange

11:26    5    of information.

11:26    6          And it did not prohibit any action, that I can see,

11:27    7    based on that information.  So it goes to the argument of the

04:23    8    coherence of the statute to achieve the intended benefits, i.e.

04:24    9    medical privacy and anti-discrimination.

11:27   10          I think that is the point here, and I think that I

11:27   11    hear you saying, yes, oral verification is not addressed by the

11:27   12    statute.

11:27   13          MR. PATTERSON:  Well, what I was hoping to say is that

11:27   14    oral verification is not addressed explicitly by the statute,

11:27   15    and there is no evidence in this record that anyone is doing

11:27   16    oral verification.  Norwegian has said in order to do an

11:27   17    effective vaccine mandate you need to require documentation.

11:27   18          That is what the schools do; they require a document.

11:27   19    That is what Norwegian wants to do -- it requires a document.

11:27   20          THE COURT:  So, let me roll back to what you just said

11:27   21    Mr. Patterson--

04:29   22          MR. PATTERSON:  And so, Your Honor, it is not that the

04:29   23    statute is designed to protect liars --

04:29   24          THE COURT:  Stop please, Mr. Patterson, if you would.

04:29   25          MR. PATTERSON:  My apologies, Your Honor.

11:28  1          THE COURT:  So because there is no evidence that

11:28  2    businesses are, in fact, asking for oral verification and then

11:28  3    doing something accordingly then there would be -- well, what

11:28  4    does that mean?

11:28  5          It's like a partial score.  If it is not a part of the

11:28  6    statute it means that activity can go on legally, undermining

11:28  7    the purpose of the statute.

04:32  8          Before the statute was enacted did the Legislature

04:32  9    consider evidence of members of the eager cruising public who

04:32  10    wanted to book cruises but could not do so because they were

04:32  11    being asked for passport vaccination?

04:33  12          Because there are statistics in the record that say

04:33  13    80 percent of those surveyed said they would like to go on a

04:33  14    totally vaccinated cruise.

04:33  15          And that is fine; that's like the adult only cruises.

04:33  16    The unvaccinated folks have their choice as well -- they are

04:33  17    not precluded from this.  So I am not following your logic on

11:29  18    the parameters of the statute.

11:29  19          But I interrupted you, Mr. Patterson, and perhaps that

11:29  20    is why I did not understand.

04:34  21          MR PATTERSON:  And I did not mean to interrupt you,

04:34  22    Your Honor, this environment is a little more difficult; so I

04:34  23    do apologize.

04:34  24          THE COURT:  You don't need to apologize.

04:34  25

11:29 1      MR. PATTERSON:  And, so Your Honor, the point I was

11:29 2  trying to make is the Legislature is entitled to address the

11:29 3  particular issue or evil that is presented to it in its -- and

11:29 4  I am not using evil in a moral sense.

11:29 5      THE COURT:  Yes.

11:29 6      MR. PATTERSON:  But the issue here, Your Honor, was

11:29 7  the vaccine documentation requirements; so that is what the

11:29 8  Legislature decided to address.

11:29 9      If there were evidence or if it were to come up that,

11:30 10  okay, now that we can't do vaccine passports we are going to do

11:30 11  a verbal attestation -- and that come to the Legislature's

11:30 12  attention -- maybe they would want to address that.

11:30 13      But the issue they have addressed here is as to the

11:30 14  vaccine passport. This statute is 100 percent tailored to that

11:30 15  interest of not allowing a system of vaccine passports.

11:30 16      And so it is the policy of the State of Florida that

11:30 17  that is not going to be allowed.

11:30 18      In terms of the rationale, Your Honor, like I said --

11:30 19  and it is in the record -- Florida Bar versus Wentworth.  It is

11:30 20  the Supreme Court at 515 U.S. 629.

11:30 21      In the opinion by Justice O'Connor..

11:30 22      (INAUDIBLE COMMENTS)

11:30 23      ... acknowledged even under strict scrutiny that a

11:30 24  Legislature can use commonsense.

11:30 25

```
11:30   1        It is commonsense to say if we are worried about

11:31   2   vaccine passports we will pass a law outlawing vaccine

11:31   3   passports.  It is a one to one correspondence.

02:24   4        THE COURT:  Let me stop you there.  So you are saying

02:24   5   that anytime the Legislature expresses concern about any topic,

02:24   6   they may pass a law, and the fact of that concern will pass

02:24   7   Constitutional scrutiny?

02:24   8        Just the fact that there is a concern about vaccine

02:24   9   passports, a concern about bees, a concern about books -- a

11:31   10  concern about people wearing shoes -- the concern itself as a

11:31   11  basis for the legislation is enough to pass the scrutiny of the

11:31   12  cases you have cited?

11:31   13       MR. PATTERSON:  Well, yes, in this context because

11:31   14  this question should vaccine passports be allowed -- this is a

02:24   15  public policy judgment that implicates several different

02:24   16  interests.

02:24   17       It is not something that would be subject to empirical

11:32   18  testing or something like that.

11:32   19       THE COURT:  So, it is just the documentation?  If I

11:32   20  were to say to you would you give me -- like Judge Leichty in

11:32   21  the Indiana University case -- an attestation, yes, I swear

11:32   22  that I got the vaccine..

11:32   23       So you are just worried about the document?  You don't

11:32   24  care about affidavits or the attestations?  That would be okay

11:32   25  under the statute?
```

11:32    1    MR. PATTERSON:  Well, an affidavit is a document.  I

11:32    2    have not discussed that with my client whether an affidavit

11:32    3    would pass or not.

11:32    4    THE COURT:  All right.  So, any kind of vaccine

11:32    5    documentation?

11:32    6    MR. PATTERSON:  Yes.

11:32    7    THE COURT:  On the flip-side, isn't not saying whether

11:33    8    you are vaccinated a form of speech itself?

11:33    9    MR. PATTERSON:  Anyone that wants to say anything is

11:33   10    free to say it.  This law is not restricting -- it is not like

11:33   11    Wollschaeger where the doctor could not ask -- even if the

11:33   12    patient wanted to tell him, the doctor could not ask and even

11:33   13    if the patient wanted it in his medical records it could not

11:33   14    happen.

11:33   15    Here Norwegian is free to ask.  They can say we would

11:33   16    like it if all of our passengers had vaccines, and we would

11:33   17    like you to show that -- by showing documentation -- if you

11:33   18    don't we will let you on the ship, but there can be some

11:33   19    additional restrictions in accordance with the public health

11:33   20    guidance.

11:33   21    THE COURT:  What public health guidance?

11:33   22    MR. PATTERSON:  Such as the different framework set

11:34   23    out by the CLIA 34-13 for vaccinated cruises.

11:34   24    THE COURT:  That is the CDC, right?

11:34   25

11:34   1          MR. PATTERSON:  That was something that the cruise

11:34   2   ship industry submitted to the CDC.

11:34   3          THE COURT:  So when you talk about consistent with

04:39   4   public health guidance all roads lead back to the CDC even in

11:34   5   an advisory capacity?

11:34   6          MR. PATTERSON:  The thing is you cannot condition

11:34   7   service on the provision of a document.  You can say if you

11:34   8   don't give me a document you can come in but you have to wear a

11:34   9   mask.  That is consistent with what the law says.

11:34   10         And another thing to keep in mind here is we are not

11:34   11  talking about a distinction between 100 percent vaccinated

11:34   12  cruises and ten percent vaccinated cruises.

11:34   13         All of the evidence that is in the record indicates

11:34   14  that these cruise ships will have a very high proportion of

11:35   15  vaccinated customers regardless of if a mandate can be in

11:35   16  place.

11:35   17         That is shown by 35-1, an article that Norwegian put

11:35   18  in that says both Celebrity and Carnival have committed to

11:35   19  sailing from Florida with at least 95 percent of passengers

11:35   20  vaccinated -- and they don't have vaccine mandates in Florida.

11:35   21         There was a document that industry representatives --

11:35   22  this is at 34-8 -- gave the CDC saying we believe the vast

11:35   23  majority of our guest bookings will be fully vaccinated before

11:35   24  sailing at 35-1 at 17.

11:35   25

11:35   1          THE COURT:  How do they know that.

11:35   2          MR. PATTERSON:  What was that?

11:35   3          THE COURT:  How do they know that?  How does a multi

04:41   4   billion dollar business forecast and plan and employ and engage

04:42   5   in the commerce that yields Florida the hundreds of millions of

11:36   6   dollars it does?

11:36   7          It appears you are suggesting that it is all going to

11:36   8   shake out in the wash so no worries.

11:36   9          MR. PATTERSON:  I am not saying that, Your Honor, what

11:36   10  I am saying is what the factual record here shows -- is that

11:36   11  the industry representatives told the CDC that based upon their

11:36   12  market research they believed the vast majority of the guests

11:36   13  booking would be fully vaccinated before sailing.

11:36   14         And also at 35-1 at 17 the news article that Norwegian

11:36   15  submitted said on the first U.S. Cruise on Celebrity that 99

11:36   16  percent of the people on board were fully vaccinated. And our

11:36   17  understanding is there was no documentation mandate.

11:36   18         Also the same article Royal Caribbean said its survey

11:36   19  showed that 90 percent of the customers who were booking were

11:36   20  already vaccinated or planned to be in time for their cruise.

04:43   21         So the evidence indicates that even if Florida's law

04:43   22  remains in place that cruise ships are not going to be a low

11:37   23  vaccinated environment.

11:37   24         I do want to address this question of self inflicted

11:37   25  harm -- and hopefully I can at least convince Mr. Shaffer this

04:44  1   is a plausible argument.  So the basis of that is that the

11:37  2   Government issued this executive order on April 2nd saying

04:45  3   basically no vaccine passports...

04:45  4          THE COURT:  The same day that the CDC issued some

04:45  5   guidance.  I thought that was very serendipitous.

11:37  6          MR. PATTERSON:  And the Florida Legislature passes and

11:37  7   the governor on May 3rd signs into law no vaccine passports.

11:37  8          THE COURT:  Right.

11:37  9          MR. PATTERSON:  It is not until June 7th -- this is at

11:37  10  docket entry 3-5 -- that Norwegian unannounced the August the

11:38  11  15th cruise that is the basis of the emergency that we have

11:38  12  allegedly before the Court today.

11:38  13          Apparently Norwegian was promising its customers we

11:38  14  are going to require 100 percent vaccine documentation despite

11:38  15  knowing that Florida law prohibited that.

11:38  16          Rather than coming to court immediately when they were

11:38  17  conceiving of these plans -- perhaps back in April sometime --

11:38  18  certainly when the executive order came out, but they wait

11:38  19  until the last moment.

11:38  20          So they wait to have this PI litigated right before

11:38  21  they are set to sail.

11:38  22          THE COURT:  Well, this seems to be the same argument

11:38  23  that was discussed in front of Judge Merryday as to Florida's

04:47  24  standing; when Florida was characterizing the conditional sail

11:39  25  order and the CDC'S conduct as a shut down.

11:39  1        The CDC said, well you know, we have said this since

11:39  2  October and you have waited all these many months.  And Judge

11:39  3  Merryday took it under advisement, and said that it went to the

11:39  4  standing issue, it just didn't eliminate standing all together.

11:39  5        I think we have a little smaller window here -- but I

11:39  6  think the argument has been raised in both Courts.

11:39  7        MR. PATTERSON:  I would say that it is different here,

11:39  8  Your Honor.  There Florida said we were waiting until the CDC

11:39  9  gave this guidance to see what it looks like.  Once they gave

11:39  10  the guidance and we were unsatisfied with it we acted within

11:39  11  weeks.

11:39  12        Here the same policy has been in place for months, and

11:39  13  despite the policy Norwegian has been promising its customers

11:40  14  that it will have a certain vaccine requirement that it knows

11:40  15  violates Florida law -- or it should know.

11:40  16        So they knowingly put themselves in this position, and

11:40  17  then waited before coming to this Court.

11:40  18        Another thing Norwegian has said is that we promised

11:40  19  this to the CDC.

11:40  20        I would point, Your Honor, to 34-17.

11:40  21        And it was represented to us that this was the

11:40  22  documentation we submitted to the CDC in order to get our

11:40  23  conditional sailing certificate.

11:40  24        And at paragraph 4.6 of the document -- this was an

11:40  25  MOU between Norwegian and Port of Miami -- it says nothing in

11:40 1   this MOU or any cruise exhibits or annexes hereto shall be

11:40 2   construed to require persons to provide any documentation

11:41 3   certifying Covid 19 vaccination or post infection recovery to

11:41 4   gain access to, entry upon or service from any CSL vessel or

11:41 5   business operation in this state or from the Port of Miami or

11:41 6   County facility or operation.

11:41 7        It goes on to say the parties shall comply with all

11:41 8   applicable laws, and then it specifies laws pertaining to

11:41 9   sars-cov-2 and Covid 19.

11:41 10       THE COURT:  I noted that.  What does that mean?  Are

11:41 11  you suggesting that an MOU deprives a party of its right to

11:41 12  address a Constitutional violation in court?

11:41 13       MR. PATTERSON:  This goes to Norwegian's claim that

11:41 14  what Florida is doing would cause it to go back on what it

11:41 15  promised to the CDC.

11:41 16       Again, if you look at the documents submitted to the

11:41 17  CDC they say we are not going to mandate vaccine documentation

11:42 18  in Florida.

11:42 19       So that is a part of the equitable analysis.  And this

04:52 20  goes back to -- where we get to the balancing of the equities,

04:52 21  which we submit it should, because we are likely to succeed on

04:53 22  the merits and that is a requirement.

11:42 23       THE COURT:  But you understand, Mr. Patterson, that

11:42 24  you are -- on the one hand you are telling me to ignore the man

11:42 25  behind the curtain, ignore the CDC.

11:42  1          And on the other hand, well, Norwegian said this to

11:42  2    the CDC, and the CDC did not tell them that they had to do a

11:43  3    vaccination mandate.

11:43  4          You understand that what this case is about is the

11:43  5    State prohibiting a business from making a business decision as

11:43  6    to how to fulfill Federal health regulations.

11:43  7          Or even setting that aside; as to how to conduct its

11:43  8    business in a way that is both profitable and safe.

11:43  9          So the MOU is not really the issue here.

11:43  10         MR. PATTERSON:  Well, it is under preemption because

11:43  11   they are saying this law is an obstacle to us fulfilling this

11:43  12   option that the CDC has given us.

11:43  13         But according to the CDC it is not.  The CDC approved

11:43  14   the conditional sailing certificate based on a representation

11:43  15   that we are not going to mandate vaccine documentation in

11:43  16   Florida. So it is relevant to that, Your Honor. It is also

11:44  17   relevant in terms of the balancing of the equities -- in the

11:44  18   sense of whether -- and to the extent it is pulling the rug out

11:44  19   from Norwegian.

11:44  20         Norwegian knew what it was getting into when it

11:44  21   promised its customers vaccinations -- specifically on this

11:44  22   ship that is set to sail on August the 15th -- where the ship

11:44  23   is set to sail from Florida.

11:44  24         That is the point I was making with respect to those

11:44  25   things.  I wanted to make a couple points on the Dormant

11:44   1    Commerce Clause.

11:44   2           THE COURT:  Yes, please.  And as I noted earlier, there

11:44   3    were only three paragraphs and a footnote saying you would like

11:44   4    to argue this before the Supreme Court.

11:45   5           I would imagine that as a very credentialed and well

11:45   6    regarded appellate attorney you understand I have to apply the

11:45   7    Pike Balancing test in the first instance to examine whether or

11:45   8    not there is a violation of the Dormant Commerce Clause.

11:45   9           MR. PATTERSON:  Absolutely, Your Honor.  We are just

11:45   10   protecting ourselves.  If we get to the United States Supreme

05:00   11   Court we don't want Mr. Shaffer saying you never said anything

11:45   12   about -- or raised that argument --  therefore, Supreme Court,

11:45   13   you should not consider it.

11:45   14          We are just flagging that and reserving our right to

11:45   15   argue the issue of should the Dormant Commerce Clause be --

05:01   16   Pike balancing in particular be thrown out.

11:45   17          THE COURT:  It is like Babe Ruth, you are pointing,

11:45   18   that is where you were hitting.

11:45   19          MR. PATTERSON:  It is -- metaphorically that way, yes.

11:45   20   And so that is the reason for that footnote.  We are not asking

11:45   21   Your Honor to disregard binding precedent.

11:45   22          THE COURT:  All right.

05:03   23          MR. PATTERSON: That is actually relevant to the First

05:03   24   Amendment too, Your Honor, because the Supreme Court on point

05:03   25   binding precedent says that intermediate scrutiny applies to

05:03  1   commercial speech regulation. While Reed some have perceived to

05:05  2   be in tension with that; that case is not a commercial speech

11:46  3   case.  It did not address commercial speech.

11:46  4           THE COURT:  Well, it addressed some commercial speech.

11:46  5   Because some of the signs -- that is the point -- some of the

11:46  6   signs were about where to go to church, some of the signs were

11:46  7   political signs, some of the signs were advertising.

11:46  8           Reed must be a very active, active community; they

11:46  9   have a lot of signs.  But it was not all about commercial

11:46  10  speech.

11:46  11          So you are advocating that I apply the Central Hudson

11:46  12  standard?

11:46  13          MR. PATTERSON:  If you get to -- yes.  And our primary

05:07  14  position, as we have said, is that it does not implicate the

11:46  15  First Amendment, its rational basis, but if you get to the

11:46  16  First Amendment it's the Central Hudson standard.

11:46  17          Because it's a purely economic transaction; like the

11:47  18  greater Philadelphia Chamber of Commerce case that Norwegian

11:47  19  cites where there was a law that said prospective employers

11:47  20  could not even ask about wage history; which is different than

11:47  21  the Florida law.

11:47  22          But it says they can't even ask about wage history.

11:47  23  And the Third Circuit there said that is economic commercial

11:47  24  speech because it's concerning this economic arrangement.

11:47  25

11:47  1  And they upheld it under intermediate scrutiny.  And

11:47  2  here we're saying this is similar; this is part and parcel of

11:47  3  an economic transaction.

11:47  4  And the only reason that Norwegian is even asking is

11:47  5  because they are selling cruise tickets and so has an economic

11:47  6  motivation with respect to a particular product.

11:47  7  To the extent you get to First Amendment scrutiny we

11:47  8  suggest it should be intermediate scrutiny.

11:47  9  THE COURT:  All right.

11:47  10  MR. PATTERSON:  Just a few points, Your Honor, on the

11:47  11  Pike balancing, Your Honor -- and these are points taken from

11:47  12  the Norwegian cases.

11:47  13  So the Island, Silver and Spice case that they cite

11:47  14  makes clear that the ultimate object is to determine whether

11:48  15  the regulation involves economic protection.

11:48  16  I just think there can be no -- I mean this is a

11:48  17  regulation about what is appropriate in the in-state market.

11:48  18  There can be no -- I don't think -- submission that

11:48  19  this is about economic protectionism.

11:48  20  The Supreme Court in this case also said that State

11:48  21  laws that violate the Dormant Commerce Clause in the realm of

11:48  22  health and safety are few in number.

11:48  23  And Justice O'Connor -- citing prior precedence in her

11:48  24  concurrence in ...

11:48  25  (INAUDIBLE FOR THE RECORD)

11:48  1      ...said that the existence of substantial in-state

11:48  2  interests harmed by a regulation is a powerful safeguard

11:48  3  against Legislative discrimination.

11:48  4      Again, as this case proves, you have substantial

11:48  5  in-state interests that are harmed allegedly by this law.

11:48  6      And Norwegian --

11:48  7      THE COURT:  But it is a balance, isn't it?  I believe

11:49  8  that Norwegian has ceded the first tier about, you know, kind

11:49  9  of rising above all others.

11:49  10      It is a balance between the local impact identified --

11:49  11  and in Islamorada I think it was the loveliness of the outdoor

11:49  12  architecture, small town feel of Islamorada, against the burden

11:49  13  being placed on Interstate Commerce.

11:49  14      Never have mud-flaps received such attention from so

11:49  15  many people.  And so the mud-flaps on the trucks had to be

11:49  16  taken off as they went from place to place.  And even allowing

11:49  17  for -- that the truckers knew what they were doing, and it

11:49  18  probably only took a few minutes, that unduly burdened

11:49  19  Interstate Commerce.

11:50  20      With our record it seems our documentation is our

11:50  21  mud-flap -- or the prohibition of the document, the ban, is the

11:50  22  mud-flap.

11:50  23      So, what I need to understand is the local interest as

11:50  24  it pertains to the Interstate burden.  There's the balancing I

11:50  25  was talking to Mr. Shaffer about, and that I think we are

1  talking about now.

2          MR. PATTERSON:  Yes.  And the interests are the

3  interests I think that we have stated -- and Wollschaeger again

4  held -- that privacy and anti-discrimination are substantial

5  Government interests.

6          THE COURT:  Based on a record that was developed by

7  the parties.  And they even talked about the anecdotes, the

8  affidavits.

9          Bainbridge, which was a first tier Dormant Commerce

10  Clause, kind of did a hybrid where it says even then there

11  needed to be evidence in the record.

12          That's what I'm trying to find -- not a conclusionary

13  this is a problem -- but a basis for what the problem is and

14  how it is being redressed.

15          MR. PATTERSON:  Well I think it is plain from the face

16  of the law the problem was the -- that businesses are going to

17  require vaccine passports.

18          And as this case demonstrates --

19          THE COURT:  That is a problem why?

20          MR. PATTERSON:  If we don't act that is going to

21  happen.

22          THE COURT:  Okay.

23          MR. PATTERSON:  As Norwegian's behavior here shows if

24  not for this law there would be a vaccine passport requirement

25  to get on a cruise ship with Norwegian.

11:51  1          That is what the Legislature was trying to accomplish.

11:51  2   There is nothing hinting of protectionism there. In the Island

11:52  3   Spice case the village council member had said the point of the

11:52  4   law is we want none of them darn chain stores to come to town.

11:52  5          That was protectionism, Your Honor.  In the Raymond

11:52  6   Motor Transport case there were exceptions that were enacted at

11:52  7   the insistence of and primarily benefited the industry.

11:52  8          In Pike itself the point was to promote Arizona

11:52  9   producers above California.

11:52  10          In Carbone there's a flow control ordinance that the

11:52  11   prize competitors -- including out of-state-firms -- from

11:52  12   having access to a local market.

11:52  13          The Yamaha Motor Corp. case the law the Court said

11:52  14   imposed heavy burdens predominately on out-of-state interests.

11:52  15          So the point is these Dormant Commerce Clause cases

11:52  16   are about primarily protection.

11:52  17          There were a few where that was not the reasoning.

11:52  18   For example, in the Bibb case it was conclusively shown that

11:53  19   that mud-flap -- posed zero advantages over the conventional

11:53  20   mud-flap.

11:53  21          THE COURT:  Well, haven't you taken that choice away

11:53  22   by saying oral discussion of vaccination is fine but written

11:53  23   vaccination, no.

11:53  24          MR. PATTERSON:  Respectfully, I don't think there is

11:53  25   any evidence before the General Assembly -- and opposing

11:53  1    counsel has not brought any here -- that there are going to be

11:53  2    verbal vaccine passports or that companies are doing that.

11:53  3            THE COURT:  Well, there is no such thing as a vaccine

11:53  4    passport.  I think there is either documentation or a verbal

11:54  5    assent that, yes, I have been vaccinated and there are medical

11:54  6    records.

11:54  7            That is a phrase that does not have any meaning in

11:54  8    this legal analysis. I don't even know if documentation other

11:54  9    than the card you get when you get the shot is viable under

11:54  10   this statute.

11:54  11           I don't know if Norwegian might even be exploring that

11:54  12   because I don't think we have a clear indication that you can't

11:54  13   give attestation.

11:54  14           MR. PATTERSON:  The statute says you cannot require

11:54  15   any documentation certifying Covid 19 vaccination.

11:54  16           THE COURT:  Okay.

11:54  17           MR. PATTERSON: And, again, as I interpret it any

11:54  18   documentation is pretty broad.

11:54  19           THE COURT:  No documents; okay.

11:54  20           MR. PATTERSON:  Again, that was what the Legislature

11:54  21   was concerned about.  As shown by this case, we are right to be

11:55  22   concerned -- you may disagree with the policy judgment behind

11:55  23   the law, but this case is not about that policy.

11:55  24           THE COURT:  And I have no business getting into policy

11:55  25   judgments, nor would I ever, but as Judge Leichty so ably

11:55  1   discussed in Klaassen, when students raise the issue of their

11:55  2   being discriminated against because they were unvaccinated, he

11:55  3   said there is absolutely nothing in this record that

11:55  4   demonstrates that they would be discriminated against or that

11:55  5   they could be or that they were bullied.

11:55  6        And one of the reasons was they have a choice to go to

11:55  7   school, not to go to school or finish out somewhere else.

11:55  8        Here the cruising public has myriad choices -- great

11:55  9   for Florida -- with the many, many cruise industry presences

11:56 10   here.

11:56 11        But there is no discrimination if there is no proof

11:56 12   that they don't have services available to them.

11:56 13        And then, again, once they get on the ship we have

11:56 14   already determined that nobody much looks to that.

11:56 15        MR. PATTERSON:  So, if I were here representing a

11:56 16   passenger saying I have a Constitutional right..

11:56 17        THE COURT:  To cruise?  You have a Constitutional

11:56 18   right to cruise?

11:56 19        MR. PATTERSON:  Yes -- if I were saying I have a

11:56 20   Constitutional right to say I have a substantive due process

11:56 21   privacy right to get on one of Norwegian's ships without having

11:56 22   to give them this document, then those sorts of analyzes would

11:56 23   potentially come into play.

11:56 24        But that is different, Your Honor.

11:56 25

11:56  1          THE COURT:  I think if you said that you have a

11:56  2    Constitutional substantive due process right to get onboard a

11:56  3    cruise then Judge Easterbrook and Judge Leichty would say, no,

11:57  4    I really don't think you do.

11:57  5          Just as I have thought -- I have not mentioned it --

11:57  6    Norwegian might have an issue with a substantive due process

11:57  7    right about how they conduct their business.

11:57  8          No such Constitutional guarantees exists.

11:57  9          MR. PATTERSON:  Right.  The point I was making is that

11:57  10   is not the argument we are making, Your Honor.  We are not

11:57  11   making the argument that Judge Easterbrook rejected.

11:57  12         We are making the argument Norwegian does not have a

11:57  13   Constitutional right to demand that document -- and that is

11:57  14   different from addressing what the passengers' Constitutional

11:57  15   rights are.

11:57  16         THE COURT:  You are targeting certain conduct, certain

11:57  17   speech and saying that Norwegian cannot conduct its business,

11:57  18   and they say it is in violation of their First Amendment right

11:57  19   to do so.

11:57  20         Businesses -- commercial speech while not ordinarily

11:58  21   subject to the same strict scrutiny strictures still have to --

11:58  22   regulations still have to survive Constitutional scrutiny.

11:58  23         It cannot be viewpoint based -- content based -- and I

11:58  24   believe the Auto Court, Judge Grant, warned against the

11:58  25   insidiousness of just characterizing conduct or speech as

11:58   1   conduct in order to avoid this Constitutional scrutiny. That is

11:58   2   a decision, along with Wollschaeger and Dana and -- I am

11:58   3   forgetting the third -- of the 11th Circuit that I must follow.

11:58   4           MR. PATTERSON:  I don't want to overstep Your Honor's

11:58   5   indulgence, but just one additional point on this.

11:58   6           THE COURT:  Sure.

11:58   7           MR. PATTERSON:  This is a classic anti-discrimination

11:58   8   law.  By calling it anti-discrimination does not mean we are

11:59   9   equating it to other forms of discrimination.  To discriminate

11:59   10  just means to distinguish between two things.

11:59   11          Florida has said you can't discriminate on this basis.

11:59   12  It is no different than saying you cannot discriminate on any

11:59   13  other basis.  It would be no different than -- if you were

03:26   14  talking a gender context or racial context or some other

03:26   15  context and saying to them, well, there are lots of other

03:26   16  cruise lines and there are lots of other cruise ships.

11:59   17          You can go on another cruise ship if you wish.  And

11:59   18  you're interfering with Norwegian's First Amendment right by

11:59   19  having a law that says you can't discriminate on those grounds.

11:59   20          It is the same thing here. We have a law that says you

11:59   21  can't discriminate because someone is not giving you something

11:59   22  you want them to give you.

11:59   23          Under Wollschaeger the 11th Circuit said that it was

11:59   24  fine to have a law that says you cannot discriminate based upon

11:59   25  something they did give you -- in that case the information

11:59    1    about them owning firearms.

11:59    2        THE COURT:  Well, let me direct you to Judge Leichty's

11:59    3    Klaassen discussion.

11:59    4        "The Constitution never provides a fundamental right

12:00    5    to collegiate education."

12:00    6        Which I personally would rank a little higher than

12:00    7    cruising; no offense Mr. Shaffer or Mr. O'Sullivan.

12:00    8        "Nor does it secure a fundamental liberty of student's

12:00    9    right to attend a public university no matter her vaccination

12:00    10    status.  Every individual has the right to choose."

12:00    11        I don't understand your argument about discrimination.

12:00    12    If it is not found in the context of children's education how

12:00    13    are you saying that Norwegian is infringing on a Constitutional

12:00    14    right of some sort?

12:00    15        MR. PATTERSON:  Your Honor, I'm not -- I am sorry if I

12:00    16    am giving that impression.

12:00    17        THE COURT:  Then that's my fault; I misunderstood.

12:00    18        MR. PATTERSON:  What I am saying is that Florida has a

12:01    19    substantial interest in protecting against this sort of

12:01    20    discrimination  and Norwegian does not have a Constitutional

12:01    21    right to operate its business in a way that countermands

12:01    22    Florida's judgment.

12:01    23        That is the argument that I am making here.  And the

12:01    24    further argument is that this is conduct -- this refusal of

12:01    25    service -- it is conduct not speech.

12:01 1    Norwegian is free to say what it wants to say. It is

12:01 2  free to record what information it wants to record if that

12:01 3  information is given to it.

12:01 4    It is free to vociferously encourage its passengers to

12:01 5  get vaccinated.  All it cannot do is say as a condition of

12:01 6  getting on our boat you have to give me something, and if you

12:01 7  won't you can't come on the boat.

12:01 8    It is our submission, Your Honor, that Norwegian does

12:01 9  not have a Constitutional right to do that.

12:01 10    I am happy to answer any other questions Your Honor

12:01 11  may have.  I feel I have taken up more time than I was allotted

12:01 12  so I apologize for that.

12:02 13    THE COURT:  You never need apologize, Mr. Patterson,

12:02 14  for vigorously representing your client as you have done so

12:02 15  ably today.

12:02 16    MR. PATTERSON:  Thank you, Your Honor.

12:02 17    THE COURT:  I will turn to, Mr. Shaffer, with this

12:02 18  caveat for rebuttal; short rebuttal.

12:02 19    MR. SHAFFER:  I will be short and slow for everyone's

12:02 20  sake.  When Your Honor was speaking with Mr. Patterson about

12:02 21  the notion -- Mr. Patterson invokes customer's choice and that

12:02 22  Florida wants to protect that.

12:02 23    With all due respect to Mr. Patterson, it is totally

12:02 24  fictive to pretend that there is a contrast between the record

12:02 25  that the Legislature had -- to say that there was a concern

about what he calls vaccine passports.  Documentation being
demanded by certain businesses to the exclusion of customers
versus this theoretical hypothesized concern that maybe the
same businesses that want to find out whether their customers
have been vaccinated, if they can't get it through
documentation they will ask for it.

Hey, I am asking you, have you been vaccinated?

It could happen to you in Whole Foods.  They say you
have to wear a mask unless you are vaccinated -- and they may
demand that from you.

That is just an anecdote, Your Honor, but it could
happen.

So if the Legislature -- who has no record whatsoever
of any vaccine passport requirement let alone any particular
customer going without options in a particular business because
they just can't find anyone to serve them -- that Legislature
if they are acting to address the one concern about demanding
this information through documentation, if they were sincerely
concerned about that, of course they would then say and neither
can you ask about it and neither can you demand an answer to
that question.

Here this Legislature did not do that.  And it is
absolutely antithetical to customer choice when we have an as
applied challenge by Norwegian.

12:04  1     The only cruise line that is today offering from

12:04  2  Florida vaccinated only voyages where all passengers onboard

11:17  3  have to be vaccinated and have to prove it.  Passengers will

12:04  4  either have that option through Norwegian or they will not have

12:04  5  it at all.

12:04  6     The notion that customer choice is on the side of the

12:04  7  State I do not think is one that could possibly be credited.

12:04  8     And the notion that there are no examples of verbal

11:19  9  attestations being demanded or verbal answers being required --

11:20  10  again, there is no more -- no more record of vaccine passports

12:04  11  at the time this law was passed.

12:04  12     That is a tell-tale sign, Your Honor, that you have a

12:04  13  Legislature that is not driven by the concerns articulated

12:04  14  here. What they want to do is score political points and favor

12:05  15  one side of a raging debate over -- about whether people should

11:22  16  be vaccinated and how should they be coming together.

12:05  17     THE COURT:  Well, I am not going to engage in any

12:05  18  characterization of why the Legislature chose one over the

12:05  19  other.  But I do have questions about, again, the stated

12:05  20  purpose and the reality.

12:05  21     And, Mr. Patterson, you will be able to chime in on

12:05  22  this if you want because I forgot to ask you.

12:05  23     The statute does not prohibit screening protocols --

12:05  24  some would argue that a vaccination is the ultimate screening

11:24  25  protocol.

11:24   1        So if you come to our courthouse there is a machine

11:24   2   that registers your temperature, which is medical information,

11:24   3   that is registered.

11:24   4        That is a screening protocol.

11:25   5        Or the question have you been exposed to anyone with

11:25   6   Covid over the past three days?

12:06   7        That is private information.  So, again, that seems to

12:06   8   me to intrude on medical privacy, but it is just the way it is

12:06   9   done.

12:06   10        MR. SHAFFER:  Your Honor, I think if Mr. Patterson

12:06   11   were to win this day and say Florida has good enough grounds in

12:06   12   terms of what they are calling anti-discrimination or privacy

12:06   13   to prevent cruise lines from requiring documentation as to this

12:06   14   vaccine status, we could go from there to where -- where the

12:06   15   Legislature is asked to consider outlawing even asking about

12:06   16   this.

12:31   17        So it would follow that you would be able to do the

12:31   18   same with Covid 19.  People that have had Covid 19 have medical

12:31   19   information about them.

12:31   20        And to require testing that uncovers that information

11:58   21   -- and just to take the State's terms -- you are discriminating

11:58   22   against those who have Covid.

11:58   23        And as Your Honor articulated, you are to some extent

11:58   24   stepping on their privacy, and you are of course doing that for

11:58   25   overwhelmingly legitimate reasons because this is a life and

11:58  1    death matter -- that matters to everyone. It is not based on

11:58  2    some protected characteristic.  It has nothing to with a

11:58  3    particular person.  We are just trying to protect public health

11:59  4    and safety.

11:59  5          We have never, I think, as a nation or the rule of law

11:59  6    credited that as protected by anti-discrimination or privacy

11:59  7    rights.

12:08  8          THE COURT:  There is no definition I have seen in the

12:08  9    statute what screening protocols are.  So what would or would

12:08  10   not be appropriate?

12:08  11         That is one.

12:08  12         And, two, am I correct there have been no implementing

12:08  13   procedures with regard to enforcement or direction or guidance

12:08  14   as to the statute?  Did I miss somewhere definitional language

12:08  15   as to what the screening protocols are?

12:58  16         MR. PATTERSON:  I do not believe so, Your Honor.  I

12:58  17   think the second sentence is more of a clarification because

12:58  18   what the statute says is -- you have the first sentence where a

12:09  19   business can't require the documentation.

12:09  20         And then it just says that this subsection does not

12:09  21   otherwise restrict businesses, and then it goes on.

12:09  22         So it is making clear that the only restriction that

12:09  23   it is putting in place is the -- where you can't demand this

12:09  24   documentation.

12:09  25

12:09  1          And maybe someone can think as a policy matter, well,

12:09  2     this other information should be prohibited on the same

12:09  3     rationale.  But, Your Honor,  it is the Legislature's job to

12:09  4     balance those policy judgements and say we're going to draw the

12:09  5     line here.

12:09  6          To the extent this implicates speech -- if we started

12:09  7     saying you can't even ask then maybe we would get into a speech

12:09  8     restriction, but here we are saying you can't deny service

12:09  9     based on that.

12:09  10         You can ask, you just cannot deny service if someone

12:09  11    does not give you the answer that you want.  So it is not a

12:10  12    First Amendment problem.

12:10  13         THE COURT:  Let me ask you about the commerce issue --

12:10  14    it seems to me that one way to address everyone's concern as to

12:10  15    this particular issue is exempting international or interstate

12:10  16    business.

12:10  17         Do you know, Mr. Patterson, was that considered?

12:10  18         MR. PATTERSON:  I don't know what was considered in

12:10  19    the halls of the Legislature.  In terms of my client, the

12:10  20    statute is what it is; we can't carve out exceptions from a

12:10  21    statute.

12:11  22         THE COURT:  There is the concept the statute -- we

12:11  23    need to ascertain whether it could have been more narrowly

12:11  24    drawn to effectuate everyone's purpose.  In Pike and other

12:11  25    cases that was a part of the analysis.

12:11   1        MR. SHAFFER:  Your Honor, the Legislature did

12:11   2   explicitly acknowledge -- and we have it in the Legislative

12:11   3   history -- where the Legislature specifically addressed how

12:11   4   problematic this prohibition as passed would be for the

12:11   5   cruises.

12:11   6        Not in the abstract -- you've got businesses that are

12:11   7   international and interstate -- for the cruise industry in

12:11   8   particular where you have these problems.

12:11   9        So, Your Honor, they raised it and they acknowledged

12:11   10  it and yet they did nothing with it. It is the opposite of

12:12   11  tailoring.  There is no reasonable explanation from the

12:12   12  Legislature as to why they failed to offer any such tailoring.

12:12   13        It was staring them in the face -- as is obvious to

12:12   14  Your Honor -- in terms of the record, including the Legislative

12:12   15  record, that there is this problem. If I may address what Mr.

01:07   16  Patterson discussed as sort of this self inflicted injury -- he

01:08   17  makes the argument as well as it can be made, but it just

01:08   18  cannot be made well.

12:12   19        It is an extraordinary thing for Norwegian to be here

12:12   20  challenging the policies and the practices of the Government

12:12   21  officials who are here at its home base in Florida.

12:12   22        And it has done that as a last resort. What Norwegian

12:12   23  was doing, and Mr. Patterson is not denying, is just trying to

01:09   24  work sensibly with the Florida officials to determine if there

12:12   25  was some way to reach an understanding.

1    Something that would allow Norwegian and others to

2  safely sail in a way that is proper and safe and consistent

3  with the Delta variant.

4    And it was only when those discussions failed -- and

5  this is the same sort of dialogue that the CDC was having with

6  Florida -- and when Florida saw it was not going to have its

7  way with the CDC that is when Florida went to court.

8    Exactly the same is true with Norwegian, Your Honor.

9  I could prove that -- the day before we filed the lawsuit was

10  the day we finally understood from the State there would be no

11  reasonable carve-out for Norwegian or any other cruise line to

12  substantively be able to do what it needed to do to sail

13  safely.

14    That is when we filed the lawsuit.  And that was of

15  course informed by what was going on with Covid.  And as we

16  continued to have these very scary numbers coming out of

17  Florida -- as these concerns are going up and up -- Norwegian

18  is trying more and more to get reasonable concessions from

19  Florida.

20    And so for Norwegian to be faulted for not having

21  filed this lawsuit earlier when it was doing so as a last

22  resort -- and even as the last resort it was doing something

23  that no other cruise line in its position has been willing to

24  do in standing up for its Constitutional rights. So, that is my

25  answer on the self inflicted injury claim.

03:19   1          And Mr. Patterson gives one other account of law --

03:19   2   because Your Honor pointed out you are focused on is there a

03:19   3   substantive disaffect between the justification of the law and

02:58   4   what the law actually does.

02:58   5          And Your Honor had a colloquy with Mr. Patterson based

02:58   6   upon the fact that you have unvaccinated passengers who were

02:58   7   undisputedly being treated differently -- and even worse --

02:58   8   based upon their vaccination status, and they are sailing from

02:58   9   Florida and Florida is fine with it.

02:58   10         And I heard one answer from Mr. Patterson -- as a

02:58   11  substantive answer -- he said that is outside of Florida's

02:58   12  waters so it is not Florida's concern.

02:59   13         Again, the utmost respect to Mr. Patterson, but I

02:59   14  don't know where he is getting that from other than his mouth.

02:59   15         What you have in terms of the undisputed reports is

02:59   16  that when passengers going aboard cruise ships -- they have

02:59   17  their bracelets and their instructions as to where they can go

02:59   18  physically, where they can eat and sit.

02:59   19         Those experiences can be happening in Florida's waters

02:59   20  and Florida is fine with it, and the law has nothing to say

02:59   21  about that.

02:59   22         And I do think that quite objectively that shows there

02:59   23  is a mismatch between the proposed justification for this law

02:59   24  that is now being offered by the defense.

02:59   25

02:59  1          Moving to my next point Your Honor..

12:15  2          THE COURT:  Well, well, I thought this was going to be

12:15  3   short and slow, which it does not appear to be either.

12:15  4          MR. SHAFFER:  I wanted to address with Your Honor --

12:15  5   because Wollschaeger is something that Mr. Patterson directed

12:15  6   you to as though that is his case.

12:15  7          In fact, what Mr. Patterson is referring to in terms

12:15  8   of the aspects of the Wollschaeger case was its treatment of

12:15  9   the anti-discrimination provision.

12:15  10          Which in Wollschaeger, Your Honor, regulated any

03:23  11   discrimination based upon the substantive information.  It was

03:23  12   not about the mode of conveyance of the information.

03:23  13          It did not say -- unlike what Florida is saying now --

12:16  14   if and only if you receive this information, the firearm

12:16  15   information in writing, you are demanding documentation of

12:16  16   that, that is prohibited, but if you want to ask about it, if

12:16  17   you want to collect the information, if you want to insist upon

12:16  18   it that is fine.

12:16  19          That is what this law is doing.  It is specifically

12:16  20   restricting only one way, the most truthful way, of conveying

12:16  21   the information.

12:16  22          So Wollschaeger was actually treating all information

12:16  23   about firearm ownership the same, not regulating a particular

03:26  24   mode of communication, which is a fundamental distinction for

03:26  25   First Amendment purposes; as Your Honor notes.

1    But there is a second thing about Wollschaeger.  It

2  specifically says -- if you look at the relevant portion -- I

3  think it is the 11th Circuit -- it is 1317.  The Court had to

4  construe the law only in non-expressive conduct.

5    So it was very basic things about whether you returned

6  the phone calls and so forth.  Not about anything that could be

7  expressive of a physician's position.

8    And that too is a fundamental distinction because what

9  Norwegian is saying when it demands vaccination documentation

10  and this -- and is so offensive to the Florida law -- the only

11  thing that offends the Florida law is saying we stand in favor

12  of vaccination for all.

13    And we are a cruise ship that prides itself on being

14  100 percent vaccinated.   That is what we equate as safety,

15  Your Honor, and that is what we are holding ourselves out as.

16    We are committed to being safe and keeping everyone

17  around us safe.  It is that commitment -- that is what Florida

18  is prohibiting.

19    That is classic viewpoint discrimination.  That is a

20  trigger for strict scrutiny.  That does mean this law should be

21  fatal on arrival, and it is different than what was at issue in

22  Wollschaeger.

23    Two other cases that I would point Your Honor to. One

24  is Dana Railroad from the 11th Circuit, and Expressions Hair

25  from the United States Supreme Court, and they go together

<sub>12:18</sub> 1  quite well. They answer Mr. Patterson's point -- which is in

<sub>12:18</sub> 2  the First Amendment context you want to be narrow -- narrow is

<sub>12:18</sub> 3  a virtue; you are better tailored.

<sub>12:18</sub> 4      The problem in those cases are what you have here.

<sub>12:18</sub> 5  The law was too narrow to credit the purported defense.  The

<sub>12:18</sub> 6  laws operated the same way. They said that you as a merchant

<sub>12:18</sub> 7  cannot say you are charging a higher price for those that pay

<sub>12:18</sub> 8  with credit cards.

<sub>12:18</sub> 9      You can include the surcharge -- you can do exactly

<sub>12:18</sub> 10  the same thing, charge the customers who pay by credit card a

<sub>03:38</sub> 11  higher price if you give them a discount for paying that way.

<sub>03:38</sub> 12      Call it a discount, that is okay, no problem; demand

<sub>12:18</sub> 13  the surcharge and that is what offends the law.

<sub>12:19</sub> 14      That is what we have here.  If you want to ask about

<sub>03:46</sub> 15  the vaccination status you can do that.  If you want to ask

<sub>03:47</sub> 16  about that verbally they are not prohibiting that; that is

<sub>03:47</sub> 17  absolutely fine.

<sub>12:19</sub> 18      But there is no denying the law today.  Mr. Patterson

<sub>12:19</sub> 19  cannot rewrite for Your Honor's benefit, and he cannot tweak

<sub>03:48</sub> 20  that law in the face of preliminary injunction.

<sub>03:48</sub> 21      The only thing that law is prohibiting is the exchange

<sub>12:19</sub> 22  of written documentation. And that means you cannot credit this

<sub>12:19</sub> 23  claim that the law is actually, you know, regulating underlying

<sub>03:29</sub> 24  treatment of the unvaccinated -- it is only how the vaccination

<sub>03:29</sub> 25  status is to be conveyed.

1  That is a classic First Amendment problem.  It is

2  conceptionally the same First Amendment problem identified in

3  both Dana Railroad and Expressions.

4  And there has been this suggestion that we forfeited

5  our preemption argument. We did not.  We were relying on the

6  excellent briefing from the CDC, Your Honor.

7  It was not a good use of our pages, and so we were not

8  going to ask for a page extension for that purpose. But the

9  arguments I think are substantively the right argument for Your

10  Honor to consider.

11  I think they establish quite well what Your Honor was

12  alluding to when you were speaking with Mr. Patterson.

13  If you don't have the CDC regulatory framework then

14  all bets are off. You have a total vacuum as far as what is

15  regulating cruise ships as they go from port to port interstate

16  and internationally.

17  And I think it is an improbable result that that whole

18  framework is invalid and due to be thrown out and that cruise

19  ships are then left to their own devices.

20  And as long as that is true, Your Honor, I think the

21  rest of the preemption analysis is straightforward in favor of

22  preemption based upon a conflict.

23  And I would point Your Honor to the CDC's last word on

24  the subject.  Mr. Patterson quotes what was submitted to CDC

25  and things that happened before the Delta variant was emerging

12:20  1   the way it is and things happening before we filed the case.

12:21  2   And explained how it is that Norwegian is relying upon vaccine

12:21  3   documentation to honor CDC ...

12:21  4        (FOR THE RECORD UNABLE TO UNDERSTAND COMMENTS BY

12:21  5   COUNSEL)

03:58  6        ...once the CDC had the benefit of the submissions and

03:58  7   looking at this as applied challenge it submitted to the 11th

03:58  8   Circuit in its reply, pages four and five specifically, that it

03:58  9   saw Florida's law as standing in the way of accomplishing

12:21  10  Federal objectives specifically when it comes to vaccination on

03:59  11  cruise ships, specifically when it comes to vaccination of

03:59  12  passengers who then if they are vaccinated and only if they are

03:59  13  vaccinated can have Federal ...

03:59  14        (FOR THE RECORD UNABLE TO UNDERSTAND COMMENTS BY

03:59  15  COUNSEL)

12:21  16        One other point as we are talking about what was

12:21  17  submitted; Florida's submission to the Middle District with the

04:02  18  simulated voyage option -- that is the only option short of the

04:02  19  95 percent vaccination threshold that we can't verify unless we

04:02  20  have the tell-tale documentation of that simulated voyage.

04:03  21        They called that a prohibition in practice that,

12:22  22  quote, sets the business up for certain failure.  The notion

12:22  23  that this option that we are being foreclosed from pursuing

04:06  24  potentially is not important to the Federal Government is

12:22  25  belied by their own submissions.

12:22  1      And what is the status today of the CDC regulations?

12:22  2  The CDC regulations are still recommendations; much like the

12:22  3  sentencing guidelines in Florida.

12:22  4      But Judge Merryday's preliminary injunction is

12:22  5  restricted to Florida, the ports in Florida.  For ships going

12:22  6  elsewhere, like the U.S. Virgin Islands and Puerto Rico and

12:22  7  operations out of Alaska, all of those are still regulated by

12:22  8  the CDC.

12:22  9      And are still subject to the same certifications and

12:22  10  still subject to the same requirements.

12:22  11      And so there is still the same disruption of what is

12:22  12  otherwise a coherent and responsible Federal scheme if Florida

03:31  13  is able to impose its sui generis prohibition; the likes of

12:22  14  which does not exist elsewhere in the United States and neither

04:21  15  does it exist anywhere in the world as far as we are aware.

12:23  16      THE COURT:  Thank you, Mr. Shaffer.

12:23  17      And, Mr. Patterson, if there was something you wished

12:23  18  to address briefly.

12:23  19      MR. PATTERSON:  I will say two things.  One; in the

12:23  20  brief that the CDC submitted to the 11th Circuit which says,

04:16  21  Florida's law prohibiting cruise operators from requiring

04:16  22  documentation that passengers are vaccinated has undermined the

04:16  23  cruise industry's ability to take advantage of the flexibility

04:16  24  that the CDC provides for vaccinated passengers on highly

04:16  25  vaccinated cruises.

04:16  1      This is consistent with what they told the Middle

04:16  2  District, that this is just an option we are giving to the

04:12  3  cruise industry, we are not attempting to preempt Florida law.

12:24  4      Your Honor, after Mr. Shaffer's very able presentation

12:24  5  I have not heard an example of a single case finding that a

12:24  6  private corporation has a Constitutional right to deny service

04:15  7  to individuals because they will not give them the information

12:24  8  they wish to obtain.

12:24  9      And so, Your Honor, we ask for all of the reasons

12:24  10  discussed here today that you deny their motion.

12:24  11      THE COURT:  All right.  Thank you both for the breadth

12:24  12  of the briefing, as well as the extremely well written and

12:24  13  thoughtful pleadings that I have reviewed and am continuing to

12:24  14  read and reread.

12:24  15      I thank you for your oral presentations today, which

12:24  16  were excellent.  I commend counsel for both Norwegian and Dr.

12:24  17  Rivkees.

04:19  18      I am going to take this all under advisement and hope

12:25  19  to be getting back to you all on this very soon.

12:25  20      Thank you.  Everyone please continue to stay safe.

21                      HEARING CONCLUDED.

22

23

24

25

```
 1                          -  -  -

 2                   C E R T I F I C A T E.

 3                          -  -  -

 4          This proceeding occurred during the COVID-19 pandemic

 5   and is therefore subject to the technological limitations of

 6   reporting remotely.

 7

 8                              /S/PATRICIA SANDERS

 9   _____              _____

10   DATE FILED              PATRICIA SANDERS, RPR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

**$100,000,000** [1] - 30:21
**$4,000,000** [1] - 30:20
**$5,000** [1] - 22:12

**/**

**/S/PATRICIA** [1] - 94:8

**1**

**100** [4] - 58:14, 61:11, 63:14, 88:14
**11-3** [1] - 1:20
**110** [1] - 44:19
**11th** [12] - 24:6, 29:13, 30:2, 30:16, 38:18, 50:21, 76:3, 76:23, 88:3, 88:24, 91:7, 92:20
**1300** [1] - 1:12
**1317** [1] - 88:3
**1523** [1] - 1:17
**15th** [2] - 63:11, 66:22
**17** [2] - 61:24, 62:14
**19** [20] - 6:19, 8:18, 13:12, 18:25, 19:5, 22:24, 24:16, 25:24, 26:2, 32:19, 33:20, 34:11, 34:13, 65:3, 65:9, 73:15, 81:18

**2**

**2** [1] - 55:6
**20001-3706** [1] - 1:13
**20036** [1] - 1:18
**21-22492** [1] - 2:3
**21-CV-22492-KMW** [1] - 1:2
**24** [1] - 21:18
**25** [2] - 21:18, 26:19
**2601** [1] - 1:15
**2nd** [1] - 63:2

**3**

**3-5** [1] - 63:10
**305.523.5528** [1] - 1:21
**33128** [1] - 1:20
**33133** [1] - 1:15
**34** [2] - 47:4, 47:12
**34-13** [1] - 60:23
**34-17** [1] - 64:20
**34-8** [1] - 61:22
**34-9** [1] - 44:18
**35-1** [3] - 61:17, 61:24,

62:14
**386.00316** [1] - 3:15
**3rd** [1] - 63:7

**4**

**4** [1] - 55:6
**4.6** [1] - 64:24
**400** [1] - 1:20

**5**

**515** [1] - 58:20

**6**

**6** [1] - 55:7
**629** [1] - 58:20

**7**

**7** [2] - 47:12, 55:7
**7th** [1] - 63:9

**8**

**8-6-2021** [1] - 1:8
**80** [1] - 57:13

**9**

**90** [1] - 62:19
**95** [3] - 42:13, 61:19, 91:19
**99** [1] - 62:15

**A**

**abide** [1] - 51:11
**ability** [3] - 46:9, 46:10, 92:23
**able** [10] - 7:14, 20:25, 32:14, 53:18, 53:22, 80:21, 81:17, 85:12, 92:13, 93:4
**ably** [2] - 73:25, 78:15
**aboard** [5] - 15:14, 19:9, 19:19, 28:5, 86:16
**absence** [4] - 11:4, 11:9, 12:2, 12:6
**absent** [1] - 26:12
**absolutely** [6] - 12:19, 35:16, 67:9, 74:3, 79:23, 89:17
**absorb** [1] - 55:10
**abstract** [1] - 84:6
**access** [4] - 37:3, 54:19, 65:4, 72:12
**accomplish** [1] - 72:1

**accomplishing** [1] - 91:9
**accordance** [1] - 60:19
**according** [2] - 40:22, 66:13
**accordingly** [1] - 57:3
**account** [1] - 86:1
**accurate** [2] - 5:22, 26:7
**achieve** [2] - 26:11, 56:8
**acknowledge** [3] - 36:12, 40:2, 84:2
**acknowledged** [2] - 58:23, 84:9
**act** [1] - 71:20
**acted** [1] - 64:10
**acting** [1] - 79:17
**action** [3] - 40:11, 48:7, 56:6
**active** [2] - 68:8
**activities** [1] - 17:6
**activity** [1] - 57:6
**actual** [2] - 10:19, 10:25
**additional** [4] - 51:5, 60:19, 76:5
**address** [15] - 10:25, 23:9, 37:19, 56:4, 58:2, 58:8, 58:12, 62:24, 65:12, 68:3, 79:17, 83:14, 84:15, 87:4, 92:18
**addressed** [5] - 56:11, 56:14, 58:13, 68:4, 84:3
**addressing** [2] - 39:13, 75:14
**adequate** [2] - 10:21, 23:17
**administrative** [1] - 43:20
**admit** [1] - 46:25
**admittedly** [1] - 54:16
**admonition** [1] - 6:6
**adopting** [1] - 25:23
**adult** [1] - 57:15
**adults** [1] - 13:21
**advance** [4] - 26:10, 47:7, 47:14, 48:17
**advanced** [1] - 18:10
**advancing** [1] - 9:25
**advantage** [1] - 92:23
**advantages** [1] - 72:19
**advertisement** [1] - 25:23
**advertising** [6] - 25:9, 25:10, 25:12, 25:14,

48:8, 68:7
**advised** [4] - 30:16, 34:1, 35:17, 35:18
**advisement** [2] - 64:3, 93:18
**advisory** [8] - 39:9, 39:11, 39:13, 39:19, 41:11, 41:25, 44:12, 61:5
**advocating** [2] - 23:19, 68:11
**affects** [2] - 28:5, 49:22
**affidavit** [2] - 60:1, 60:2
**affidavits** [3] - 9:16, 59:24, 71:8
**affiliates** [1] - 13:20
**afoul** [2] - 10:11, 47:9
**age** [1] - 14:10
**agency** [7] - 40:5, 40:10, 41:19, 41:23, 43:22, 44:2
**agency's** [3] - 40:10, 42:4, 42:20
**ages** [1] - 14:3
**agree** [3] - 28:14, 31:17, 44:8
**ahead** [1] - 10:7
**air** [1] - 41:5
**aisles** [2] - 55:6, 55:7
**akin** [1] - 52:15
**al** [1] - 1:3
**Alaska** [1] - 92:7
**albeit** [1] - 8:17
**alcohol** [1] - 14:9
**aligns** [1] - 49:23
**allegedly** [2] - 63:12, 70:5
**allergy** [1] - 21:6
**allotted** [2] - 3:23, 78:11
**allow** [5] - 8:12, 36:18, 45:4, 47:7, 85:1
**allowed** [6] - 14:5, 17:12, 33:17, 47:16, 58:17, 59:14
**allowing** [4] - 48:8, 55:8, 58:15, 70:16
**allows** [1] - 37:25
**alluded** [1] - 27:20
**alluding** [1] - 90:12
**alone** [2] - 12:2, 79:14
**Amendment** [32] - 11:6, 11:15, 11:22, 23:18, 24:9, 24:13, 24:20, 25:14, 25:21, 27:14, 29:6, 35:14, 44:23, 45:11, 45:18, 46:21, 52:20, 52:21,

52:22, 54:14, 54:25, 67:24, 68:15, 68:16, 69:7, 75:18, 76:18, 83:12, 87:25, 89:2, 90:1, 90:2
**American** [2] - 40:24, 41:8
**amusement** [1] - 13:14
**analysis** [13] - 15:5, 24:8, 27:18, 29:5, 40:23, 41:2, 42:21, 51:23, 53:7, 65:19, 73:8, 83:25, 90:21
**analyzes** [1] - 74:22
**anathema** [1] - 32:10
**anecdote** [1] - 79:11
**anecdotes** [2] - 9:14, 71:7
**annexes** [1] - 65:1
**announce** [2] - 2:5, 20:25
**announced** [1] - 48:23
**announcement** [1] - 2:20
**announces** [1] - 43:11
**answer** [18] - 5:17, 7:24, 13:3, 20:7, 20:8, 20:11, 23:7, 23:14, 44:16, 46:12, 78:10, 79:20, 83:11, 85:25, 86:10, 86:11, 89:1
**answerable** [1] - 26:15
**answering** [2] - 8:23, 28:17
**answers** [1] - 80:9
**anti** [13] - 9:9, 10:1, 12:13, 13:5, 15:7, 53:10, 56:9, 71:4, 76:7, 76:8, 81:12, 82:6, 87:9
**anti-discrimination** [13] - 9:9, 10:1, 12:13, 13:5, 15:7, 53:10, 56:9, 71:4, 76:7, 76:8, 81:12, 82:6, 87:9
**anticipate** [1] - 14:16
**antithetical** [2] - 33:2, 79:23
**anytime** [1] - 59:5
**apart** [1] - 11:3
**apologies** [1] - 56:25
**apologize** [4] - 14:17, 57:23, 57:24, 78:12, 78:13
**appear** [2] - 11:19, 87:3

**appearances** [2] - 1:11, 2:5
**appellate** [1] - 67:6
**applicable** [1] - 65:8
**application** [1] - 39:22
**applied** [8] - 3:13, 16:3, 16:10, 31:22, 32:2, 54:3, 79:24, 91:7
**applies** [3] - 24:6, 45:10, 67:25
**apply** [7] - 23:19, 29:15, 49:17, 50:10, 54:22, 67:6, 68:11
**approach** [1] - 25:24
**appropriate** [3] - 29:14, 69:17, 82:10
**approved** [1] - 66:13
**April** [2] - 63:2, 63:17
**arbitrary** [1] - 39:1
**architecture** [1] - 70:12
**argue** [5] - 30:5, 30:6, 67:4, 67:15, 80:24
**arguing** [1] - 9:20
**argument** [31] - 3:23, 14:13, 17:10, 27:9, 29:16, 30:14, 30:17, 33:9, 33:12, 37:12, 38:8, 38:14, 38:15, 38:22, 38:23, 40:14, 40:15, 56:7, 63:1, 63:22, 64:6, 67:12, 75:10, 75:11, 75:12, 77:11, 77:23, 77:24, 84:17, 90:5, 90:9
**arguments** [3] - 3:20, 39:4, 90:9
**Arizona** [1] - 72:8
**arrangement** [1] - 68:24
**arrival** [1] - 88:21
**article** [3] - 61:17, 62:14, 62:18
**articulated** [5] - 9:25, 15:7, 16:5, 80:13, 81:23
**articulation** [2] - 10:2, 10:13
**ascertain** [1] - 83:23
**aside** [2] - 12:10, 66:7
**aspects** [1] - 87:8
**assembled** [1] - 2:1
**Assembly** [1] - 72:25
**assent** [1] - 73:5
**assessment** [1] - 29:20
**assistants** [1] - 5:2
**assume** [1] - 17:14
**assuming** [1] - 3:19

**attached** [1] - 42:25
**attempted** [1] - 31:16
**attempting** [2] - 34:23, 93:3
**attend** [2] - 23:5, 77:9
**attention** [2] - 58:12, 70:14
**attestation** [7] - 30:23, 32:14, 55:18, 55:23, 58:11, 59:21, 73:13
**attestations** [4] - 36:4, 55:23, 59:24, 80:9
**attorney** [1] - 67:6
**August** [2] - 63:10, 66:22
**authority** [6] - 38:24, 40:11, 40:16, 41:3, 41:23, 50:16
**authorization** [1] - 21:20
**Auto** [1] - 75:24
**auto** [1] - 41:4
**automatic** [1] - 41:6
**automobiles** [1] - 15:14
**available** [10] - 4:16, 41:8, 43:18, 47:5, 47:13, 51:17, 51:22, 52:1, 52:3, 74:12
**Avenue** [2] - 1:17, 1:20
**avoid** [2] - 24:20, 76:1
**aware** [6] - 10:15, 37:24, 41:18, 41:19, 48:19, 92:15

## B

**Babe** [1] - 67:17
**background** [1] - 23:7
**bag** [1] - 41:5
**Bainbridge** [2] - 11:16, 71:9
**balance** [7] - 5:12, 28:23, 32:2, 34:3, 70:7, 70:10, 83:4
**Balancing** [1] - 67:7
**balancing** [10] - 29:19, 30:4, 30:15, 30:18, 36:6, 65:20, 66:17, 67:16, 69:11, 70:24
**ban** [3] - 18:23, 32:4, 70:21
**bands** [2] - 19:11, 19:12
**Bar** [1] - 58:19
**bar** [1] - 50:4
**bars** [1] - 17:12
**base** [2] - 20:11, 84:21
**based** [22] - 13:3,

15:16, 22:3, 23:16, 25:1, 25:18, 26:2, 35:11, 47:21, 56:7, 62:11, 66:14, 71:6, 75:23, 76:24, 82:1, 83:9, 86:5, 86:8, 87:11, 90:22
**basic** [1] - 88:5
**basis** [13] - 12:8, 45:16, 45:23, 45:24, 46:25, 53:19, 59:11, 63:1, 63:11, 68:15, 71:3, 76:11, 76:13
**Bayshore** [1] - 1:15
**bees** [1] - 59:9
**begin** [5] - 2:19, 4:3, 6:9, 29:2, 35:4
**behalf** [6] - 2:7, 2:11, 2:15, 2:17, 37:16, 54:1
**behavior** [1] - 71:23
**behind** [2] - 65:25, 73:22
**belabor** [1] - 38:12
**belied** [1] - 91:25
**believes** [1] - 36:14
**belt** [2] - 41:5, 41:6
**beneficiaries** [1] - 13:6
**benefit** [8] - 3:1, 3:4, 25:16, 36:21, 36:24, 41:10, 89:19, 91:6
**benefited** [1] - 72:7
**benefits** [5] - 8:21, 28:25, 29:1, 36:20, 56:8
**bereft** [1] - 10:18
**best** [4] - 23:9, 29:12, 33:23, 36:3
**bets** [1] - 90:14
**better** [3] - 6:12, 34:18, 89:3
**between** [12] - 20:23, 21:15, 23:4, 27:25, 52:4, 61:11, 64:25, 70:10, 76:10, 78:24, 86:3, 86:23
**beyond** [2] - 11:9, 42:20
**Bibb** [1] - 72:18
**bigger** [1] - 36:12
**billion** [3] - 34:25, 37:20, 62:4
**bind** [1] - 41:24
**binding** [4] - 40:17, 41:20, 67:21, 67:25
**bizarre** [1] - 22:7
**Black** [2] - 11:7, 35:15, 35:17, 36:10, 37:25, 46:24, 55:4, 55:22,
**blame** [1] - 33:20
**board** [2] - 47:16,

62:16
**boarding** [8] - 20:5, 20:9, 47:7, 47:11, 47:14, 48:18, 49:3, 49:5
**boat** [2] - 78:6, 78:7
**book** [3] - 22:14, 27:23, 57:10
**booking** [2] - 62:13, 62:19
**bookings** [1] - 61:23
**books** [2] - 25:15, 59:9
**borders** [1] - 54:9
**bottom** [1] - 37:20
**bracelet** [2] - 17:3, 17:7
**bracelets** [2] - 20:18, 86:17
**brand** [4] - 30:18, 30:19, 32:21, 32:25
**breadth** [1] - 93:11
**break** [1] - 32:20
**brief** [8] - 7:22, 9:19, 10:2, 16:21, 38:11, 39:4, 40:16, 92:20
**briefing** [5] - 3:21, 6:10, 38:12, 90:6, 93:12
**briefly** [2] - 27:19, 92:18
**briefs** [2] - 40:12, 42:25
**bring** [1] - 36:22
**brings** [2] - 29:19, 31:11
**broad** [1] - 73:18
**broadcast** [1] - 19:8
**broadcasting** [3] - 8:3, 19:7, 20:17
**broader** [1] - 54:23
**broadly** [1] - 45:10
**brought** [3] - 3:13, 73:1
**bullied** [1] - 74:5
**burden** [3] - 11:22, 70:12, 70:24
**burdened** [1] - 70:18
**burdens** [2] - 28:24, 72:14
**burdensome** [1] - 43:7
**business** [38] - 6:17, 7:9, 8:1, 15:19, 15:23, 15:25, 19:6, 20:24, 21:3, 25:11, 29:17, 29:18, 33:14, 33:17, 35:7, 35:15, 35:17, 36:10, 37:25, 46:24, 55:4, 55:22,

55:23, 62:4, 65:5, 66:5, 66:8, 73:24, 75:7, 75:17, 77:21, 79:15, 82:19, 83:16, 91:22
**business-person** [1] - 35:17
**businesses** [26] - 6:23, 13:1, 13:7, 19:1, 25:8, 25:9, 25:10, 25:13, 25:22, 31:9, 44:14, 45:6, 53:18, 53:24, 54:4, 54:10, 55:9, 57:2, 71:16, 75:20, 79:2, 79:4, 82:21, 84:6
**BY** [3] - 1:19, 91:4, 91:14

## C

**cabined** [1] - 51:14
**California** [1] - 72:9
**Canaveral** [1] - 49:8
**candidly** [1] - 7:23
**cannot** [37] - 6:1, 6:11, 6:13, 6:20, 20:7, 27:3, 27:4, 31:4, 32:22, 37:22, 38:20, 40:6, 40:11, 45:2, 45:15, 45:22, 45:24, 46:14, 47:19, 49:15, 50:3, 50:4, 52:5, 55:5, 61:6, 73:14, 75:17, 75:23, 76:12, 76:24, 78:5, 83:10, 84:18, 89:7, 89:19, 89:22
**capable** [1] - 24:1
**capacity** [3] - 1:7, 39:9, 61:5
**capricious** [1] - 39:1
**Carbone** [1] - 72:10
**card** [3] - 19:25, 73:9, 89:10
**cards** [1] - 89:8
**care** [2] - 36:11, 59:24
**careful** [1] - 34:18
**Caribbean** [2] - 48:23, 62:18
**Carnival** [2] - 47:4, 61:18
**Carnival's** [1] - 47:17
**carrying** [1] - 54:18
**carve** [2] - 83:20, 85:11
**carve-out** [1] - 85:11
**case** [42] - 1:2, 6:12, 14:19, 30:7, 32:17, 37:20, 37:24, 38:7,

40:4, 41:17, 41:19, 43:16, 43:19, 45:7, 45:9, 46:3, 52:9, 52:11, 52:16, 52:21, 53:16, 54:11, 59:21, 66:4, 68:2, 68:3, 68:18, 69:13, 69:20, 70:4, 71:18, 72:3, 72:6, 72:13, 72:18, 73:21, 73:23, 76:25, 87:6, 87:8, 91:1, 93:5
**Case** [1] - 2:3
**cases** [9] - 25:15, 27:13, 34:8, 59:12, 69:12, 72:15, 83:25, 88:23, 89:4
**casino** [1] - 17:12
**category** [1] - 18:25
**caveat** [2] - 49:14, 78:18
**CDC** [42] - 28:13, 35:10, 35:21, 38:19, 41:11, 42:12, 42:22, 43:4, 43:7, 43:10, 44:19, 50:20, 60:24, 61:2, 61:4, 61:22, 62:11, 63:4, 64:1, 64:8, 64:19, 64:22, 65:15, 65:17, 65:25, 66:2, 66:12, 66:13, 85:5, 85:7, 90:6, 90:13, 90:24, 91:3, 91:6, 92:1, 92:2, 92:8, 92:20, 92:24
**CDC's** [3] - 38:10, 44:9, 90:23
**CDC'S** [6] - 38:12, 38:24, 42:7, 42:9, 44:11, 63:25
**ceded** [1] - 70:8
**Celebrity** [2] - 61:18, 62:15
**Central** [3] - 23:20, 68:11, 68:16
**CEO** [3] - 30:19, 34:24, 50:19
**certain** [13] - 10:10, 10:20, 13:15, 14:3, 14:10, 15:15, 17:12, 27:16, 64:14, 75:16, 79:2, 91:22
**certainly** [7] - 4:16, 4:23, 9:19, 12:14, 14:21, 29:10, 63:18
**certificate** [2] - 64:23, 66:14
**certifications** [1] - 92:9

**certifying** [3] - 6:19, 65:3, 73:15
**CFO** [1] - 40:16
**chain** [1] - 72:4
**challenge** [8] - 3:14, 16:2, 16:10, 29:24, 29:25, 31:15, 79:24, 91:7
**challenged** [1] - 31:22
**challenges** [1] - 31:12
**challenging** [1] - 84:20
**Chamber** [1] - 68:18
**change** [3] - 6:14
**characteristic** [1] - 82:2
**characterization** [5] - 10:11, 10:15, 25:5, 44:9, 80:18
**characterize** [1] - 24:21
**characterizing** [2] - 63:24, 75:25
**charge** [2] - 15:12, 89:10
**charging** [1] - 89:7
**Charles** [1] - 1:17
**check** [1] - 20:8
**checked** [1] - 22:14
**children** [3] - 13:24, 14:3, 14:4
**children's** [1] - 77:12
**chime** [1] - 80:21
**choice** [8] - 51:13, 51:22, 57:16, 72:21, 74:6, 78:21, 79:23, 80:6
**choices** [1] - 74:8
**choose** [4] - 39:25, 51:10, 51:18, 77:10
**chose** [1] - 80:18
**church** [1] - 68:6
**circling** [1] - 36:17
**Circuit** [13] - 24:7, 29:13, 30:2, 30:16, 38:18, 41:17, 68:23, 76:3, 76:23, 88:3, 88:24, 91:8, 92:20
**citation** [1] - 40:15
**citations** [1] - 10:2
**cite** [2] - 53:8, 69:13
**cited** [5] - 41:17, 42:24, 47:3, 52:21, 59:12
**cites** [1] - 68:19
**citing** [2] - 31:14, 69:23
**civil** [1] - 10:9
**claim** [5] - 45:11, 65:13, 85:25, 89:23

**claimed** [2] - 5:11, 28:25
**claims** [4] - 12:14, 12:15, 38:3, 38:5
**clarification** [1] - 82:17
**class** [1] - 34:1
**classic** [3] - 76:7, 88:19, 90:1
**classically** [1] - 42:11
**Clause** [19] - 10:12, 11:5, 11:15, 27:19, 29:4, 29:11, 29:25, 30:12, 31:6, 31:7, 31:12, 40:8, 40:20, 67:1, 67:8, 67:15, 69:21, 71:10, 72:15
**clear** [12] - 15:1, 16:2, 19:24, 36:9, 40:5, 46:1, 48:14, 50:11, 69:14, 73:12, 82:22
**clearly** [3] - 2:22, 3:3, 44:22
**CLIA** [2] - 50:19, 60:23
**client** [10] - 22:13, 37:16, 48:2, 48:19, 49:14, 50:5, 50:12, 60:2, 78:14, 83:19
**clients** [1] - 50:13
**close** [2] - 24:4, 34:16
**codified** [1] - 53:14
**coherence** [2] - 11:20, 56:8
**coherent** [1] - 92:12
**colleague** [1] - 43:9
**colleague..** [1] - 2:9
**collect** [1] - 87:17
**collegiate** [1] - 77:5
**colloquy** [1] - 86:5
**combat** [1] - 34:10
**comfort** [1] - 37:4
**coming** [10] - 8:22, 16:15, 18:15, 28:12, 28:19, 34:6, 63:16, 64:17, 80:16, 85:16
**commend** [1] - 93:16
**comment** [5] - 5:15, 15:4, 39:2, 41:16, 44:9
**COMMENTS** [3] - 58:22, 91:4, 91:14
**comments** [1] - 51:20
**commerce** [6] - 11:22, 28:1, 28:24, 31:13, 62:5, 83:13
**Commerce** [24] - 10:8, 10:12, 11:5, 11:15, 27:19, 27:22, 29:4, 29:11, 29:25, 30:12, 31:6, 31:7, 31:12,

35:15, 40:20, 67:1, 67:8, 67:15, 68:18, 69:21, 70:13, 70:19, 71:9, 72:15
**commercial** [10] - 26:18, 27:3, 55:11, 68:1, 68:2, 68:3, 68:4, 68:9, 68:23, 75:20
**commitment** [1] - 88:17
**committed** [2] - 61:18, 88:16
**Committee** [1] - 50:20
**commonsense** [2] - 58:24, 59:1
**communicable** [1] - 8:10
**communication** [2] - 22:9, 87:24
**communities** [1] - 44:14
**community** [1] - 68:8
**companies** [1] - 73:2
**company** [2] - 34:25, 52:17
**comparable** [1] - 25:23
**compare** [1] - 19:16
**comparison** [1] - 16:13
**competitors** [1] - 72:11
**complaint** [1] - 54:14
**complete** [2] - 5:22, 12:6
**completely** [1] - 15:9
**compliant** [1] - 50:2
**comply** [2] - 49:1, 65:7
**component** [2] - 20:5, 51:14
**components** [1] - 53:10
**compromise** [1] - 32:19
**conceiving** [1] - 63:17
**concept** [1] - 83:22
**conceptionally** [1] - 90:2
**concern** [15] - 19:20, 20:2, 31:19, 59:5, 59:6, 59:8, 59:9, 59:10, 78:25, 79:3, 79:17, 83:14, 86:12
**concerned** [6] - 17:9, 17:17, 20:19, 73:21, 73:22, 79:19
**concerning** [2] - 37:19, 68:24
**concerns** [9] - 10:24,

19:23, 30:24, 31:3, 31:7, 31:14, 54:8, 80:13, 85:17
**concessions** [1] - 85:18
**CONCLUDED** [1] - 93:21
**conclusionary** [1] - 71:12
**conclusively** [1] - 72:18
**concurrence** [1] - 69:24
**concurring** [1] - 44:6
**condition** [7] - 8:16, 16:15, 49:3, 52:8, 53:21, 61:6, 78:5
**conditional** [4] - 43:2, 63:24, 64:23, 66:14
**conditioned** [1] - 8:17
**conditions** [1] - 8:12
**conduct** [16] - 24:22, 24:25, 25:6, 44:24, 45:19, 50:5, 63:25, 66:7, 75:7, 75:16, 75:17, 75:25, 76:1, 77:24, 77:25, 88:4
**confined** [1] - 16:9
**conflict** [1] - 90:22
**confused** [1] - 38:17
**Congress** [1] - 41:3
**consent** [1] - 53:1
**consider** [7] - 16:18, 39:21, 50:5, 57:9, 67:13, 81:15, 90:10
**considered** [5] - 10:10, 39:20, 42:3, 83:17, 83:18
**consistent** [4] - 61:3, 61:9, 85:2, 93:1
**conspicuously** [2] - 10:18, 11:10
**constitute** [1] - 17:13
**Constitution** [2] - 37:25, 77:4
**Constitutional** [19] - 3:13, 12:10, 52:7, 59:7, 65:12, 74:16, 74:17, 74:20, 75:2, 75:8, 75:13, 75:14, 75:22, 76:1, 77:13, 77:20, 78:9, 85:24, 93:6
**constitutionality** [1] - 38:22
**construe** [1] - 88:4
**construed** [1] - 65:2
**consumers** [1] - 54:17
**content** [5] - 22:3, 23:16, 25:19, 26:2,

75:23
**contention** [1] - 45:10
**context** [8] - 17:18, 54:14, 59:13, 76:14, 76:15, 77:12, 89:2
**contexts** [1] - 15:4
**continue** [2] - 6:7, 93:20
**continued** [1] - 85:16
**continuing** [1] - 93:13
**contours** [1] - 10:24
**contractors** [2] - 7:17, 13:13
**contradiction** [1] - 28:13
**contrary** [3] - 38:8, 40:14, 47:24
**contrast** [1] - 78:24
**control** [1] - 72:10
**convenience** [1] - 4:17
**conventional** [1] - 72:19
**conversation** [1] - 55:3
**converse** [1] - 45:21
**conveyance** [1] - 87:12
**conveyed** [1] - 89:25
**conveying** [1] - 87:20
**convince** [1] - 62:25
**Cooper** [2] - 1:17, 2:17
**copied** [1] - 20:1
**core** [1] - 25:20
**Corp** [1] - 72:13
**corporation** [2] - 37:21, 93:6
**correct** [8] - 13:19, 13:21, 13:22, 16:7, 22:6, 27:8, 29:20, 82:12
**correspondence** [1] - 59:3
**council** [1] - 72:3
**COUNSEL** [2] - 91:5, 91:15
**counsel** [3] - 2:5, 73:1, 93:16
**countermands** [1] - 77:21
**County** [1] - 65:6
**couple** [3] - 48:20, 55:14, 66:25
**course** [8] - 4:7, 35:17, 35:19, 45:10, 55:11, 79:19, 81:24, 85:15
**court** [7] - 3:2, 3:4, 5:19, 6:3, 63:16,

65:12, 85:7
**COURT** [127] - 1:1, 1:9, 2:1, 2:12, 2:15, 2:18, 4:12, 4:18, 4:22, 5:3, 5:6, 5:9, 5:13, 5:15, 5:20, 6:7, 6:21, 7:1, 7:4, 8:8, 8:19, 9:12, 10:6, 11:12, 13:19, 14:11, 14:16, 15:1, 16:2, 16:11, 17:10, 18:12, 19:23, 21:2, 22:1, 22:20, 23:18, 24:14, 25:4, 26:6, 27:5, 27:10, 29:8, 29:22, 30:10, 32:3, 33:8, 35:6, 35:9, 37:10, 38:16, 39:6, 40:18, 41:7, 41:14, 42:6, 42:16, 44:8, 45:4, 45:13, 46:1, 46:5, 46:23, 47:12, 48:1, 48:3, 48:13, 48:17, 49:7, 49:18, 50:11, 50:17, 51:13, 52:24, 54:1, 55:1, 55:16, 55:20, 56:1, 56:20, 56:24, 57:1, 57:24, 58:5, 59:4, 59:19, 60:4, 60:7, 60:21, 60:24, 61:3, 62:1, 62:3, 63:4, 63:8, 63:22, 65:10, 65:23, 67:2, 67:17, 67:22, 68:4, 69:9, 70:7, 71:6, 71:19, 71:22, 72:21, 73:3, 73:16, 73:19, 73:24, 74:17, 75:1, 75:16, 76:6, 77:2, 77:17, 78:13, 78:17, 80:17, 82:8, 83:13, 83:22, 87:2, 92:16, 93:11
**Court** [35] - 1:19, 2:3, 4:11, 4:16, 4:22, 5:19, 9:25, 16:13, 24:7, 26:17, 29:24, 30:2, 30:7, 30:14, 34:23, 35:13, 40:5, 43:19, 43:23, 45:17, 46:15, 53:2, 53:5, 58:20, 63:12, 64:17, 67:4, 67:11, 67:12, 67:24, 69:20, 72:13, 75:24, 88:3, 88:25
**Court's** [3] - 4:6, 4:17, 45:17
**courthouse** [1] - 81:1
**Courts** [1] - 64:6
**Covid** [25] - 6:19, 8:18,

13:12, 18:16, 18:25, 19:5, 21:4, 22:24, 24:16, 25:24, 26:2, 32:19, 33:20, 34:11, 34:13, 65:3, 65:9, 73:15, 81:6, 81:18, 81:22, 85:15
**COVID-19** [1] - 94:4
**credentialed** [1] - 67:5
**credit** [7] - 15:10, 18:10, 35:23, 89:5, 89:8, 89:10, 89:22
**credited** [2] - 80:7, 82:6
**crew** [2] - 32:8, 35:4
**Crow** [1] - 14:7
**cruel** [1] - 13:16
**cruise** [84] - 7:11, 7:13, 8:1, 8:9, 8:22, 13:2, 13:24, 14:2, 14:4, 15:12, 16:6, 16:16, 16:22, 16:24, 17:2, 17:19, 18:1, 18:8, 19:9, 19:13, 20:17, 21:6, 22:18, 28:14, 31:2, 32:23, 33:1, 33:2, 34:15, 34:21, 35:5, 35:20, 36:18, 36:19, 37:3, 39:17, 39:25, 41:12, 43:4, 43:7, 43:13, 43:14, 44:20, 45:7, 47:2, 47:10, 48:4, 48:14, 48:23, 49:9, 50:12, 51:23, 51:24, 52:2, 54:2, 57:14, 61:1, 61:14, 62:20, 62:22, 63:11, 65:1, 69:5, 71:25, 74:9, 74:17, 74:18, 75:3, 76:16, 76:17, 80:1, 81:13, 84:7, 85:11, 85:23, 86:16, 88:13, 90:15, 90:18, 91:11, 92:21, 92:23, 93:3
**Cruise** [4] - 1:3, 2:4, 2:8, 62:15
**cruise-goers** [1] - 13:2
**cruises** [13] - 13:21, 27:24, 36:21, 39:8, 47:5, 47:13, 57:10, 57:15, 60:23, 61:12, 84:5, 92:25
**cruising** [7] - 50:22, 50:23, 51:2, 51:18, 57:9, 74:8, 77:7
**Crystal** [1] - 13:20
**CSL** [1] - 65:4
**CSO** [1] - 38:10
**cultural** [1] - 25:19

**curtain** [1] - 65:25
**customer** [4] - 7:18, 79:15, 79:23, 80:6
**customer's** [1] - 78:21
**customers** [23] - 6:18, 6:24, 7:23, 8:2, 10:21, 13:10, 27:23, 32:21, 37:22, 45:2, 45:24, 51:6, 51:9, 53:18, 53:20, 61:15, 62:19, 63:13, 64:13, 66:21, 79:2, 79:4, 89:10
**cut** [1] - 8:21

**D**

**damage** [1] - 30:19
**Dana** [4] - 23:20, 76:2, 88:24, 90:3
**darn** [1] - 72:4
**data** [3] - 20:4, 20:11, 34:4
**database** [1] - 20:1
**DATE** [1] - 94:10
**days** [3] - 48:20, 48:24, 81:6
**DC** [2] - 1:13, 1:18
**de** [1] - 40:4
**deadly** [1] - 33:24
**dear** [1] - 43:9
**death** [1] - 82:1
**debate** [2] - 26:2, 80:15
**Deceptive** [1] - 48:7
**decide** [1] - 27:17
**decided** [1] - 58:8
**decision** [8] - 26:17, 35:7, 35:11, 45:17, 46:24, 66:5, 76:2
**decisions** [1] - 55:11
**deck** [1] - 4:7
**declaration** [1] - 35:1
**declarations** [1] - 35:10
**decline** [1] - 7:24
**defend** [1] - 6:12
**defendant** [6] - 2:15, 2:17, 7:21, 9:25, 15:21, 16:21
**DEFENDANT** [2] - 1:14, 1:17
**defense** [5] - 15:8, 24:24, 36:1, 86:24, 89:5
**defined** [1] - 13:6
**definition** [1] - 82:8
**definitional** [1] - 82:14
**Del** [5] - 30:20, 30:23, 34:24, 35:7, 35:11

**delegated** [1] - 41:3
**deliberative** [1] - 35:11
**Delta** [2] - 85:3, 90:25
**demand** [8] - 7:8, 49:20, 53:25, 75:13, 79:10, 79:20, 82:23, 89:12
**demanded** [2] - 79:2, 80:9
**demanding** [3] - 8:15, 79:17, 87:15
**demands** [1] - 88:9
**demonstrate** [4] - 9:16, 11:8, 35:10, 48:10
**demonstrated** [1] - 32:5
**demonstrates** [3] - 53:16, 71:18, 74:4
**demonstration** [1] - 53:9
**denied** [1] - 10:21
**deny** [6] - 37:21, 49:15, 83:8, 83:10, 93:6, 93:10
**denying** [2] - 84:23, 89:18
**Department** [2] - 1:7, 7:9
**deprives** [1] - 65:11
**Derek** [3] - 1:12, 2:10, 4:4
**DeSantis** [1] - 53:14
**described** [1] - 17:25
**designed** [4] - 10:25, 16:4, 50:7, 56:23
**desired** [1] - 15:19
**despite** [2] - 63:14, 64:13
**determine** [2] - 69:14, 84:24
**determined** [1] - 74:14
**developed** [1] - 71:6
**devices** [1] - 90:19
**dialogue** [1] - 85:5
**dichotomy** [1] - 54:7
**difference** [2] - 23:4, 52:4
**differences** [1] - 51:2
**different** [15] - 6:4, 7:3, 21:1, 40:3, 54:13, 55:14, 59:15, 60:22, 64:7, 68:20, 74:24, 75:14, 76:12, 76:13, 88:21
**differential** [1] - 24:25
**differently** [1] - 86:7
**difficult** [3] - 3:2, 26:17, 57:22

**dig** [1] - 9:1
**dimension** [1] - 52:25
**dines** [1] - 21:11
**dining** [1] - 21:8
**direct** [3] - 13:24, 29:16, 77:2
**directed** [4] - 12:15, 17:14, 25:22, 87:5
**direction** [2] - 42:9, 82:13
**directly** [1] - 26:10
**disabuse** [1] - 14:22
**disaffect** [1] - 86:3
**disagree** [4] - 25:4, 29:9, 29:10, 73:22
**discount** [2] - 89:11, 89:12
**discrete** [1] - 19:17
**discriminate** [12] - 45:2, 45:15, 45:22, 45:24, 46:15, 53:18, 76:9, 76:11, 76:12, 76:19, 76:21, 76:24
**discriminated** [2] - 74:2, 74:4
**discriminates** [1] - 18:17
**discriminating** [5] - 12:18, 13:7, 13:9, 13:16, 81:21
**discrimination** [40] - 9:9, 10:1, 12:13, 12:14, 12:21, 12:22, 13:5, 13:8, 13:9, 14:25, 15:7, 15:9, 15:19, 15:24, 16:5, 16:19, 17:8, 17:13, 17:17, 18:13, 18:16, 31:8, 51:14, 53:10, 54:8, 56:9, 70:3, 71:4, 74:11, 76:7, 76:8, 76:9, 77:11, 77:20, 81:12, 82:6, 87:9, 87:11, 88:19
**discriminatory** [1] - 50:6
**discriminatory..** [1] - 26:5
**discuss** [3] - 3:11, 7:19, 40:19
**discussed** [10] - 4:14, 22:18, 30:20, 34:6, 49:13, 60:2, 63:23, 74:1, 84:16, 93:10
**discussing** [1] - 53:1
**discussion** [8] - 3:18, 4:7, 29:12, 41:1, 52:24, 54:3, 72:22, 77:3
**discussions** [1] - 85:4

**disease** [2] - 8:10, 31:20
**diseases** [3] - 8:18, 22:23, 28:19
**disembark** [1] - 50:4
**Disney** [1] - 54:5
**displeasure** [1] - 27:25
**dispute** [1] - 32:13
**disregard** [1] - 67:21
**disrupt** [1] - 28:9
**disruption** [2] - 27:25, 92:11
**disruptive** [1] - 28:2
**distancing** [1] - 51:6
**distinction** [6] - 42:9, 50:18, 51:3, 61:11, 87:24, 88:8
**distinguish** [1] - 76:10
**DISTRICT** [3] - 1:1, 1:1, 1:19
**District** [6] - 38:18, 44:3, 44:19, 45:17, 91:17, 93:2
**District's** [1] - 38:13
**division** [1] - 27:24
**DIVISION** [1] - 1:2
**DOA** [1] - 24:5
**dock** [1] - 48:22
**docket** [5] - 3:10, 44:18, 47:4, 47:12, 63:10
**doctor** [3] - 52:18, 60:11, 60:12
**doctors** [3] - 45:15, 46:7, 46:14
**document** [19] - 41:19, 47:18, 47:24, 48:16, 49:10, 50:20, 52:8, 54:19, 56:18, 56:19, 59:23, 60:1, 61:7, 61:8, 61:21, 64:24, 70:21, 74:22, 75:13
**documentary** [1] - 26:25
**documentation** [61] - 6:18, 6:19, 6:23, 7:5, 7:8, 7:17, 7:20, 8:6, 8:11, 8:16, 9:1, 9:2, 12:23, 13:12, 16:15, 19:2, 20:9, 21:19, 22:8, 22:11, 22:14, 22:23, 37:4, 37:23, 45:3, 47:11, 47:16, 49:2, 53:19, 53:21, 53:22, 55:20, 56:4, 56:17, 58:7, 59:19, 60:5, 60:17, 62:17, 63:14, 64:22, 65:2,

65:17, 66:15, 70:20, 73:4, 73:8, 73:15, 73:18, 79:1, 79:6, 79:18, 81:13, 82:19, 82:24, 87:15, 88:9, 89:22, 91:3, 91:20, 92:22
**documents** [6] - 38:4, 38:6, 38:8, 43:1, 65:16, 73:19
**Doe** [1] - 19:15
**dog** [1] - 28:7
**dollar** [2] - 37:20, 62:4
**dollars** [3] - 7:10, 34:25, 62:6
**domain** [1] - 54:21
**domains** [1] - 54:22
**done** [8] - 3:2, 10:23, 21:12, 42:18, 50:24, 78:14, 81:9, 84:22
**Dormant** [18] - 10:12, 11:5, 11:15, 27:19, 29:4, 29:11, 29:25, 30:12, 31:6, 31:7, 31:11, 40:20, 66:25, 67:8, 67:15, 69:21, 71:9, 72:15
**down** [12] - 5:13, 5:20, 9:1, 22:20, 26:6, 30:3, 32:3, 32:6, 45:18, 46:16, 52:2, 63:25
**Dr** [8] - 3:14, 14:12, 34:5, 35:9, 35:23, 38:19, 47:3, 93:16
**Draconian** [1] - 7:13
**draw** [1] - 83:4
**drawn** [2] - 26:11, 83:24
**Drive** [1] - 1:15
**driven** [1] - 80:13
**driving** [1] - 14:8
**drugs** [1] - 52:18
**due** [6] - 36:21, 74:20, 75:2, 75:6, 78:23, 90:18
**during** [3] - 33:24, 44:9, 94:4

# E

**eager** [1] - 57:9
**early** [1] - 37:15
**Easterbrook** [3] - 51:19, 75:3, 75:11
**eat** [1] - 86:18
**economic** [10] - 15:16, 25:5, 25:10, 68:17, 68:23, 68:24, 69:3, 69:5, 69:15, 69:19

**economy** [2] - 36:20, 36:21
**education** [2] - 77:5, 77:12
**effect** [1] - 27:9
**effective** [1] - 56:17
**effectuate** [1] - 83:24
**effort** [4] - 14:6, 24:20, 28:18, 31:20
**efforts** [2] - 14:24, 34:14
**eight** [1] - 34:25
**eighth** [1] - 48:24
**either** [13] - 5:1, 14:12, 20:10, 23:24, 24:9, 32:6, 32:11, 33:21, 39:9, 40:22, 73:4, 80:4, 87:3
**eliminate** [1] - 64:4
**elsewhere** [4] - 51:22, 51:25, 92:6, 92:14
**embedded** [1] - 55:15
**emergency** [1] - 63:11
**emerging** [1] - 90:25
**Emmanuel** [2] - 2:8, 2:10
**empirical** [1] - 59:17
**employ** [1] - 62:4
**employee** [1] - 54:12
**employees** [7] - 7:17, 13:12, 45:4, 54:6, 54:9, 55:11, 55:12
**employer** [1] - 54:12
**employers** [6] - 6:23, 45:4, 68:19
**enact** [1] - 22:3
**enacted** [2] - 57:8, 72:6
**encountered** [1] - 26:21
**encourage** [1] - 78:4
**encouraging** [1] - 25:3
**end** [4] - 19:20, 22:16, 24:8, 48:5
**endeavor** [1] - 3:22
**endorsing** [1] - 35:25
**enforced** [1] - 17:15
**enforcement** [2] - 39:24, 82:13
**engage** [5] - 3:17, 30:15, 35:15, 62:4, 80:17
**engaged** [2] - 3:24, 39:15
**enjoined** [2] - 38:5, 39:24
**enjoyable** [1] - 36:19
**entirely** [1] - 19:23
**entitled** [1] - 58:2

**entity** [1] - 6:17
**entry** [4] - 47:4, 47:12, 63:10, 65:4
**environment** [2] - 57:22, 62:23
**equate** [1] - 88:14
**equating** [1] - 76:9
**equitable** [1] - 65:19
**equities** [4] - 32:2, 34:3, 65:20, 66:17
**equities...** [1] - 5:12
**equivalent** [1] - 52:16
**especially** [4] - 3:24, 12:15, 31:23, 34:18
**ESQ** [3] - 1:12, 1:14, 1:17
**essential** [5] - 42:3, 42:6, 43:12, 43:21, 44:2
**essentially** [1] - 45:21
**establish** [1] - 90:11
**et** [1] - 1:3
**evened** [1] - 40:18
**event** [1] - 36:7
**ever..** [1] - 41:7
**evidence** [18] - 9:13, 10:5, 10:9, 10:15, 11:4, 11:17, 12:2, 12:6, 23:25, 26:12, 56:15, 57:1, 57:9, 58:9, 61:13, 62:21, 71:11, 72:25
**evidentiary** [2] - 11:9, 15:4
**evil** [2] - 58:3, 58:4
**exactly** [6] - 8:14, 11:24, 14:17, 16:7, 85:8, 89:9
**examine** [2] - 29:15, 67:7
**example** [4] - 49:13, 55:21, 72:18, 93:5
**examples** [1] - 80:8
**exceed** [1] - 38:23
**exceeded** [1] - 41:23
**exceeds** [1] - 40:11
**excellent** [4] - 6:11, 20:6, 90:6, 93:16
**except** [1] - 55:11
**exceptions** [2] - 72:6, 83:20
**excerpts** [1] - 42:24
**exchange** [9] - 19:17, 20:14, 20:23, 24:18, 26:3, 27:2, 52:19, 56:4, 89:21
**exclude** [3] - 13:3, 14:3, 15:15
**excluding** [1] - 7:22, 15:22

**exclusion** [3] - 13:24, 29:17, 79:2
**executive** [2] - 53:13, 63:2, 63:18
**Executive** [1] - 50:19
**exempting** [1] - 83:15
**Exhibit** [2] - 47:5, 47:12
**exhibits** [3] - 3:17, 15:2, 65:1
**exist** [2] - 92:14, 92:15
**existence** [1] - 70:1
**existing** [1] - 29:25
**exists** [1] - 75:8
**expensive** [1] - 18:3
**experience** [4] - 18:8, 32:23, 33:1, 36:19
**experiences** [1] - 86:19
**expert** [1] - 30:19
**experts** [4] - 34:1, 35:3, 35:18
**explain** [2] - 24:19, 25:7
**explained** [4] - 34:6, 35:3, 42:17, 91:2
**explanation** [2] - 22:24, 84:11
**explicitly** [3] - 55:18, 56:14, 84:2
**exploring** [1] - 73:11
**exposed** [1] - 81:5
**exposure** [1] - 34:11
**expresses** [1] - 59:5
**Expressions** [2] - 88:24, 90:3
**expressive** [2] - 88:4, 88:7
**extension** [1] - 90:8
**extent** [5] - 15:6, 66:18, 69:7, 81:23, 83:6
**extract** [3] - 37:22, 38:1, 52:22
**extracting** [1] - 52:8
**extraordinary** [1] - 84:19
**extremely** [1] - 93:12

## F

**face** [6] - 11:7, 11:11, 15:11, 71:15, 84:13, 89:20
**facially** [1] - 24:3
**facility** [1] - 65:6
**facing** [1] - 22:12
**fact** [10] - 17:10, 25:3, 27:17, 50:1, 54:22, 57:2, 59:6, 59:8,

86:6, 87:7
**facts** [1] - 30:18
**factual** [1] - 62:10
**failed** [2] - 84:12, 85:4
**failure** [1] - 91:22
**fair** [1] - 9:18
**fairness** [3] - 9:23, 14:11, 23:12
**falls** [1] - 37:8
**false** [1] - 27:7
**far** [4] - 31:18, 54:15, 90:14, 92:15
**farmed** [1] - 10:19
**fatal** [2] - 12:1, 88:21
**fault** [1] - 77:17
**faulted** [1] - 85:20
**favor** [6] - 26:1, 29:2, 46:3, 80:14, 88:11, 90:21
**favoring** [1] - 29:17
**favors** [1] - 13:2
**FDUPTA** [1] - 48:6
**Federal** [19] - 26:22, 28:16, 28:17, 28:18, 28:21, 31:16, 31:18, 40:8, 40:17, 41:22, 42:8, 42:11, 43:18, 66:6, 91:10, 91:13, 91:24, 92:12
**felt** [2] - 6:1, 6:2
**few** [7] - 4:11, 30:21, 42:15, 69:10, 69:22, 70:18, 72:17
**fictive** [1] - 78:24
**field** [1] - 35:18
**fifteen** [1] - 3:19
**file** [1] - 21:14
**FILED** [1] - 94:10
**filed** [4] - 85:9, 85:14, 85:21, 91:1
**final** [1] - 46:14
**finally** [1] - 85:10
**fine** [11] - 7:9, 17:20, 18:6, 22:12, 57:15, 72:22, 76:24, 86:9, 86:20, 87:18, 89:17
**finish** [1] - 74:7
**firearm** [7] - 45:16, 46:8, 46:9, 46:11, 46:13, 87:14, 87:23
**firearms** [2] - 46:15, 77:1
**firms** [1] - 72:11
**first** [14] - 2:6, 2:21, 5:13, 6:8, 7:15, 9:9, 12:13, 27:5, 46:16, 62:15, 67:7, 70:8, 71:9, 82:18
**First** [32] - 11:6, 11:15, 11:22, 23:18, 24:9,

24:13, 24:20, 25:14, 25:20, 27:13, 29:6, 35:14, 44:23, 45:11, 45:18, 46:21, 52:20, 52:22, 54:14, 54:25, 67:23, 68:15, 68:16, 69:7, 75:18, 76:18, 83:12, 87:25, 89:2, 90:1, 90:2
**fish** [1] - 21:7
**fit** [1] - 21:21
**five** [3] - 7:9, 46:6, 91:8
**FL** [2] - 1:15, 1:20
**flagging** [1] - 67:14
**flap** [4] - 70:21, 70:22, 72:19, 72:20
**flaps** [2] - 70:14, 70:15
**flexibility** [1] - 92:23
**flip** [1] - 60:7
**flip-side** [1] - 60:7
**FLORIDA** [1] - 1:1
**Florida** [101] - 1:6, 3:14, 3:15, 8:15, 13:22, 14:6, 14:21, 15:21, 16:14, 16:18, 17:21, 18:5, 18:21, 21:23, 22:22, 24:18, 25:3, 28:6, 28:8, 28:22, 30:3, 31:20, 32:6, 32:15, 34:5, 34:7, 34:9, 34:10, 34:23, 35:13, 36:2, 36:20, 37:21, 38:5, 39:24, 39:25, 40:1, 42:23, 43:6, 44:4, 44:24, 47:20, 47:22, 48:6, 48:10, 49:15, 49:16, 50:9, 50:11, 51:18, 52:5, 54:4, 54:10, 54:16, 54:22, 55:22, 58:16, 58:19, 61:19, 61:20, 62:5, 63:6, 63:15, 63:24, 64:8, 64:15, 65:14, 65:18, 66:16, 66:23, 68:21, 74:9, 76:11, 77:18, 78:22, 80:2, 81:11, 84:21, 84:24, 85:6, 85:7, 85:17, 85:19, 86:9, 86:20, 87:13, 88:10, 88:11, 88:17, 92:3, 92:5, 92:12, 93:3
**Florida's** [14] - 5:11, 18:23, 24:19, 36:14, 49:16, 62:21, 63:23, 77:22, 86:11, 86:12, 86:19, 91:9, 91:17, 92:21

**Florida..** [1] - 49:17
**flow** [2] - 27:21, 72:10
**flunk** [1] - 12:8
**focus** [1] - 11:18
**focused** [2] - 54:10, 86:2
**folks** [1] - 57:16
**follow** [4] - 39:21, 39:25, 76:3, 81:17
**following** [1] - 57:17
**fondly** [1] - 48:6
**Foods** [1] - 79:8
**footnote** [4] - 30:11, 53:11, 67:3, 67:20
**FOR** [6] - 1:12, 1:14, 1:17, 69:25, 91:4, 91:14
**forcing** [1] - 19:21
**forecast** [1] - 62:4
**foreclosed** [2] - 45:11, 91:23
**foreign** [5] - 28:3, 30:24, 31:1, 31:13, 32:10
**forfeited** [4] - 38:7, 38:15, 40:13, 90:4
**forgetting** [1] - 76:3
**forgive** [1] - 12:5
**forgot** [1] - 80:22
**form** [1] - 60:8
**forms** [2] - 19:2, 76:9
**forth** [1] - 88:6
**forward** [2] - 9:21, 55:21
**four** [5] - 8:8, 27:6, 43:3, 53:12, 91:8
**framework** [5] - 28:21, 50:22, 60:22, 90:13, 90:18
**free** [12] - 14:4, 27:21, 45:1, 46:17, 46:18, 48:15, 51:23, 60:10, 60:15, 78:1, 78:2, 78:4
**friends** [1] - 19:13
**FROM** [1] - 23:11
**front** [3] - 5:4, 44:10, 63:23
**fulfill** [2] - 22:4, 66:6
**fulfilling** [1] - 66:11
**fulfillment** [1] - 53:16
**fulfills** [1] - 11:20
**full** [4] - 3:10, 3:23, 14:5, 49:2
**fully** [3] - 61:23, 62:13, 62:16
**fundamental** [4] - 77:4, 77:8, 87:24, 88:8
**fundamentally** [1] -

15:25

## G

**gain** [1] - 65:4
**Geier** [6] - 40:23, 41:3, 41:15, 42:1, 43:19, 44:17
**gender** [1] - 76:14
**General** [5] - 1:6, 3:14, 39:14, 43:23, 72:25
**generally** [2] - 18:25, 41:22
**generis** [2] - 25:24, 92:13
**genuinely** [1] - 17:17
**given** [4] - 41:3, 55:24, 66:12, 78:3
**Global** [1] - 50:19
**global** [1] - 33:24
**goers** [1] - 13:9
**govern** [1] - 39:7
**governing** [1] - 39:14
**Government** [10] - 16:1, 25:16, 27:3, 31:19, 33:16, 48:25, 63:2, 71:5, 84:20, 91:24
**governmental** [1] - 26:10
**Governmental** [1] - 26:18
**Governor** [1] - 53:14
**governor** [1] - 63:7
**governs** [1] - 46:2
**Grant** [1] - 75:24
**granting** [1] - 36:9
**gratuitous** [1] - 34:11
**great** [5] - 5:2, 74:8
**greater** [2] - 12:4, 68:18
**grounds** [3] - 24:10, 76:19, 81:11
**guarantees** [1] - 75:8
**guest** [1] - 61:23
**guests** [4] - 47:5, 47:13, 49:1, 62:12
**guidance** [10] - 40:10, 41:19, 43:1, 60:20, 60:21, 61:4, 63:5, 64:9, 64:10, 82:13
**guide** [1] - 4:7
**guidelines** [5] - 38:19, 39:10, 39:13, 39:19, 92:3
**guilty** [1] - 5:18

## H

**Hail** [1] - 30:8

**Hair** [1] - 88:24
**halls** [1] - 83:19
**Hampshire** [1] - 1:17
**hand** [2] - 65:24, 66:1
**happy** [4] - 4:15, 33:21, 44:23, 78:10
**harass** [1] - 46:10
**hard** [2] - 10:5, 35:1
**harm** [8] - 5:12, 32:2, 32:12, 32:16, 33:7, 33:9, 36:11, 62:25
**harmed** [2] - 70:2, 70:5
**Head** [1] - 1:6
**heads** [2] - 4:1, 30:11
**heads-up** [2] - 4:1, 30:11
**health** [16] - 14:3, 18:18, 24:17, 26:3, 32:11, 36:3, 39:7, 42:7, 44:14, 49:23, 60:19, 60:21, 61:4, 66:6, 69:22, 82:3
**Health** [1] - 1:7
**healthy** [2] - 13:17, 36:19
**hear** [1] - 56:11
**heard** [6] - 7:2, 13:5, 29:9, 50:1, 86:10, 93:5
**hearing** [2] - 4:9, 44:9
**HEARING** [2] - 1:8, 93:21
**hearings** [1] - 6:4
**heavily** [1] - 34:19
**heavy** [2] - 41:21, 72:14
**heed** [1] - 6:6
**height** [1] - 13:15
**heightened** [3] - 12:10, 26:9, 28:4
**held** [2] - 41:20, 71:4
**HELD** [1] - 1:8
**hereto** [1] - 65:1
**high** [2] - 15:13, 61:14
**higher** [3] - 77:6, 89:7, 89:11
**highly** [2] - 8:10, 92:24
**hinting** [1] - 72:2
**histories** [1] - 55:9
**history** [6] - 15:3, 53:6, 53:12, 68:20, 68:22, 84:3
**hit** [1] - 4:10
**hitting** [1] - 67:18
**hold** [1] - 41:22
**holding** [1] - 88:15
**Holdings** [1] - 1:3
**home** [1] - 84:21

**Honda** [2] - 40:24, 41:8
**honor** [1] - 91:3
**Honor** [144] - 2:7, 2:14, 2:16, 4:4, 4:8, 4:19, 5:1, 5:4, 5:7, 5:14, 5:18, 6:1, 6:8, 6:10, 6:15, 6:25, 7:2, 8:14, 9:18, 9:22, 9:24, 10:4, 10:17, 11:4, 11:8, 11:24, 12:9, 12:14, 13:11, 13:22, 14:15, 14:17, 15:18, 16:7, 16:12, 16:17, 17:8, 17:16, 17:20, 17:22, 18:9, 18:14, 18:20, 20:7, 20:8, 20:20, 22:6, 22:13, 22:21, 23:1, 23:12, 23:15, 23:21, 24:23, 26:8, 27:2, 27:8, 27:11, 27:12, 27:20, 28:21, 30:22, 32:1, 32:9, 32:18, 32:22, 33:10, 33:22, 34:12, 34:20, 35:16, 35:22, 36:8, 36:17, 37:6, 37:9, 37:17, 37:19, 39:5, 39:23, 41:13, 41:18, 42:1, 42:15, 42:18, 44:18, 45:12, 46:20, 48:11, 49:5, 50:8, 50:18, 51:1, 51:8, 54:12, 54:16, 55:15, 56:22, 56:25, 57:22, 58:1, 58:6, 58:18, 62:9, 64:8, 64:20, 66:16, 67:9, 67:21, 67:24, 69:10, 69:11, 72:5, 74:24, 75:10, 77:15, 78:8, 78:10, 78:16, 78:20, 79:11, 80:12, 81:10, 81:23, 82:16, 83:3, 84:1, 84:9, 84:14, 85:8, 86:2, 86:5, 87:4, 87:10, 87:25, 88:15, 88:23, 90:6, 90:10, 90:11, 90:20, 90:23, 93:4, 93:9
**Honor's** [3] - 6:6, 76:4, 89:19
**Honor.** [1] - 87:1
**Honor..** [1] - 9:11
**HONORABLE** [1] - 1:9
**hope** [2] - 4:23, 93:18
**hopefully** [1] - 62:25
**hoping** [1] - 56:13
**hotspot** [1] - 34:10

**Hudson** [3] - 23:20, 68:11, 68:16
**human** [3] - 18:18, 36:13, 36:15
**hundred** [1] - 54:21
**hundreds** [2] - 19:13, 62:5
**hurt** [1] - 33:5
**hurts** [1] - 32:21
**hybrid** [1] - 71:10
**hygiene** [1] - 32:25
**hypothesized** [2] - 11:1, 79:3

## I

**i.e** [1] - 56:8
**identified** [3] - 29:7, 70:10, 90:2
**identifies** [1] - 29:8
**ignore** [2] - 65:24, 65:25
**ill** [1] - 21:8
**illegal** [1] - 33:17
**illusory** [2] - 22:4, 29:1
**imagine** [1] - 67:5
**imagined** [1] - 11:1
**immediately** [1] - 63:16
**immunity** [1] - 32:16
**impact** [1] - 70:10
**impairment** [1] - 29:18
**imperil** [1] - 32:9
**imperiled** [1] - 21:21
**implementation** [1] - 39:15
**implementing** [1] - 82:12
**implicate** [4] - 28:14, 46:21, 54:25, 68:14
**implicated** [2] - 31:13, 46:17
**implicates** [2] - 59:15, 83:6
**implicit** [1] - 47:19
**important** [6] - 4:9, 20:12, 32:20, 35:12, 37:12, 91:24
**impose** [2] - 7:9, 92:13
**imposed** [1] - 72:14
**impression** [1] - 77:16
**improbable** [1] - 90:17
**in-state** [3] - 69:17, 70:1, 70:5
**INAUDIBLE** [3] - 23:11, 58:22, 69:25
**incapable** [1] - 39:22
**include** [1] - 89:9

**including** [3] - 29:13, 72:11, 84:14
**incoherency** [1] - 26:14
**incoherent** [2] - 11:7, 24:3
**Indiana** [3] - 51:20, 52:4, 59:21
**indicated** [1] - 24:7
**indicates** [2] - 61:13, 62:21
**indicating** [1] - 43:21
**indication** [3] - 31:22, 44:1, 73:12
**indications** [1] - 9:24
**indicia** [1] - 11:17
**individual** [2] - 38:1, 77:10
**individuals** [1] - 93:7
**indoor** [2] - 17:12, 50:4
**indulgence** [1] - 76:5
**indulgent** [1] - 32:1
**industry** [11] - 10:22, 34:15, 39:20, 41:4, 61:2, 61:21, 62:11, 72:7, 74:9, 84:7, 93:3
**industry's** [1] - 92:23
**infection** [1] - 65:3
**infirm** [1] - 39:22
**inflicted** [4] - 33:9, 62:24, 84:16, 85:25
**information** [52] - 7:6, 8:2, 8:3, 8:6, 18:24, 19:5, 19:7, 20:20, 21:17, 22:5, 22:8, 22:10, 24:15, 24:17, 26:4, 26:25, 27:1, 27:2, 37:5, 38:1, 45:16, 45:23, 45:25, 46:8, 46:18, 46:19, 52:13, 52:14, 52:22, 53:6, 55:5, 55:10, 56:5, 56:7, 76:25, 78:2, 78:3, 79:18, 81:2, 81:7, 81:19, 81:20, 83:2, 87:11, 87:12, 87:14, 87:15, 87:17, 87:21, 87:22, 93:7
**information..** [1] - 22:19
**informed** [2] - 49:1, 85:15
**infringing** [1] - 77:13
**injunction** [8] - 3:12, 16:8, 24:11, 33:18, 36:9, 40:1, 89:20, 92:4

**injury** [2] - 84:16, 85:25
**inquire** [1] - 13:1
**inquiry** [1] - 27:6
**insidiousness** [1] - 75:25
**insist** [1] - 87:17
**insistence** [1] - 72:7
**insisting** [1] - 47:23
**insoluble** [1] - 11:1
**instance** [1] - 67:7
**instate** [1] - 29:17
**instructions** [1] - 86:17
**insurance** [2] - 18:3, 47:20
**intend** [1] - 44:3
**intended** [3] - 42:22, 42:23, 56:8
**intent** [1] - 53:9
**intention** [1] - 42:21
**interest** [11] - 26:10, 36:3, 37:7, 42:13, 50:12, 50:15, 54:20, 54:21, 58:15, 70:23, 77:19
**interesting** [1] - 53:4
**interests** [13] - 9:24, 34:4, 34:19, 36:10, 53:15, 53:17, 59:16, 70:2, 70:5, 71:2, 71:3, 71:5, 72:14
**interfered** [1] - 10:8
**interfering** [2] - 35:14, 76:18
**intermediate** [8] - 23:20, 23:25, 24:2, 26:9, 27:6, 67:25, 69:1, 69:8
**international** [6] - 27:21, 28:7, 28:24, 39:8, 83:15, 84:7
**internationally** [1] - 90:16
**Internet** [1] - 8:4
**interpret** [1] - 73:17
**interrupt** [2] - 37:14, 57:21
**interrupted** [1] - 57:19
**interrupting** [2] - 27:21, 28:22
**interstate** [3] - 83:15, 84:7, 90:15
**Interstate** [10] - 10:8, 27:22, 28:7, 28:24, 29:18, 31:19, 35:15, 70:13, 70:19, 70:24
**introductory** [1] - 10:14
**intrude** [1] - 81:8

**invalid** [5] - 11:10, 38:10, 40:6, 40:7, 90:18
**invalidate** [1] - 37:21
**invidious** [1] - 31:8
**invite** [1] - 51:1
**invoke** [1] - 32:15
**invokes** [1] - 78:21
**involve** [1] - 25:15
**involves** [1] - 69:15
**irreparable** [6] - 5:12, 32:2, 32:12, 32:16, 33:7, 36:11
**is.** [1] - 55:24
**Islamorada** [2] - 70:11, 70:12
**Island** [2] - 69:13, 72:2
**Islands** [4] - 48:21, 48:25, 49:6, 92:6
**issuance** [1] - 24:10
**issue** [19] - 4:22, 10:10, 11:13, 18:6, 22:1, 25:19, 35:13, 52:20, 58:3, 58:6, 58:13, 64:4, 66:9, 67:15, 74:1, 75:6, 83:13, 83:15, 88:21
**issued** [3] - 43:2, 63:2, 63:4
**issues** [2] - 35:2, 37:19
**issuing** [1] - 41:24
**itself** [8] - 32:24, 43:7, 43:22, 53:2, 59:10, 60:8, 72:8, 88:13

**J**

**Jane** [1] - 19:15
**Jim** [1] - 14:7
**job** [1] - 83:3
**John** [3] - 1:14, 2:8, 19:15
**Judge** [16] - 9:14, 42:17, 42:22, 44:10, 51:19, 51:20, 59:20, 63:23, 64:2, 73:25, 75:3, 75:11, 75:24, 77:2, 92:4
**JUDGE** [1] - 1:9
**judgements** [1] - 83:4
**judgment** [3] - 59:15, 73:22, 77:22
**judgments** [1] - 73:25
**jump** [2] - 3:25, 11:11
**June** [1] - 63:9
**jurisdictions** [1] - 32:10
**jurisprudence** [1] - 29:14

**jurists** [1] - 29:12
**Justice** [3] - 44:5, 58:21, 69:23
**justification** [10] - 5:11, 6:9, 9:13, 9:17, 9:21, 10:8, 23:17, 30:17, 86:3, 86:23
**justifications** [1] - 9:10
**justifies** [1] - 9:5
**justify** [2] - 9:6, 24:10

**K**

**KATHLEEN** [1] - 1:9
**keep** [4] - 16:13, 35:4, 46:24, 61:10
**keeping** [1] - 88:16
**keeps** [1] - 21:14
**key** [2] - 42:21, 44:23
**kids** [2] - 8:16, 13:16
**kind** [4] - 24:19, 60:4, 70:8, 71:10
**Kirk** [1] - 2:17
**kitchen** [3] - 21:10, 21:14, 21:15
**Klaassen** [3] - 51:20, 74:1, 77:3
**knowing** [2] - 51:11, 63:15
**knowingly** [1] - 64:16
**knows** [2] - 19:14, 64:14

**L**

**land** [1] - 30:4
**landlord** [1] - 42:10
**language** [3] - 47:9, 56:3, 82:14
**last** [6] - 26:19, 63:19, 84:22, 85:21, 85:22, 90:23
**law** [116] - 5:11, 6:9, 6:14, 6:15, 6:17, 6:22, 7:15, 9:4, 9:14, 10:6, 10:7, 10:11, 10:25, 11:10, 12:11, 12:20, 12:22, 13:5, 13:6, 14:22, 15:8, 18:11, 19:21, 20:13, 20:19, 21:23, 22:6, 22:22, 23:5, 24:3, 24:21, 24:24, 25:8, 25:12, 25:20, 25:23, 26:21, 27:20, 29:13, 30:3, 30:4, 32:17, 36:2, 36:15, 37:21, 38:5, 40:6, 40:8, 40:9, 40:11, 40:17,

41:20, 41:22, 42:1, 42:3, 42:23, 43:17, 43:24, 44:4, 44:21, 44:24, 45:9, 45:22, 47:24, 49:16, 50:9, 52:2, 52:15, 55:19, 59:2, 59:6, 60:10, 61:9, 62:21, 63:7, 63:15, 64:15, 66:11, 68:19, 68:21, 70:5, 71:16, 71:24, 72:4, 72:13, 73:23, 76:8, 76:19, 76:20, 76:24, 80:11, 82:5, 86:1, 86:3, 86:4, 86:20, 86:23, 87:19, 88:4, 88:10, 88:11, 88:20, 89:5, 89:13, 89:18, 89:20, 89:21, 89:23, 91:9, 92:21, 93:3
**laws** [5] - 54:24, 65:8, 69:21, 89:6
**lawsuit** [3] - 85:9, 85:14, 85:21
**lawyer** [2] - 6:11, 7:3
**lawyers** [5] - 2:21, 5:16, 9:19, 14:19, 48:5
**lead** [1] - 61:4
**leading** [1] - 35:18
**least** [6] - 12:17, 21:22, 31:16, 31:22, 61:19, 62:25
**leave** [2] - 28:8, 31:2
**leaves** [2] - 51:7, 51:10
**leaving** [2] - 48:24, 49:7
**left** [1] - 90:19
**legal** [3] - 29:12, 40:15, 73:8
**legality** [1] - 6:16
**legally** [1] - 57:6
**legislation** [5] - 11:18, 21:2, 53:17, 53:24, 59:11
**Legislative** [17] - 9:21, 9:23, 10:17, 11:4, 12:2, 15:3, 15:8, 22:25, 23:2, 24:1, 26:13, 29:2, 53:6, 53:12, 70:3, 84:2, 84:14
**legislative** [1] - 12:6
**Legislature** [27] - 9:20, 10:1, 10:10, 10:16, 10:19, 10:23, 23:13, 54:15, 57:8, 58:2, 58:8, 58:24, 59:5, 63:6, 72:1,

73:20, 78:25, 79:13, 79:16, 79:22, 80:13, 80:18, 81:15, 83:19, 84:1, 84:3, 84:12
**Legislature's** [2] - 58:11, 83:3
**legitimate** [2] - 38:8, 81:25
**Leichty** [4] - 9:14, 59:20, 73:25, 75:3
**Leichty's** [2] - 51:20, 77:2
**length** [1] - 42:17
**less** [3] - 27:23, 28:2, 51:3
**letter** [1] - 43:9
**letting** [1] - 55:12
**liars** [1] - 56:23
**liberties** [1] - 10:9
**liberty** [1] - 77:8
**lie** [2] - 26:24, 36:24
**life** [4] - 18:18, 36:13, 36:15, 81:25
**lightly** [1] - 12:14
**likelihood** [3] - 12:4, 30:5, 30:9
**likely** [12] - 12:3, 23:23, 27:15, 27:17, 27:23, 29:5, 29:6, 31:15, 37:13, 65:21
**limitation** [1] - 51:7
**limitations** [1] - 94:5
**limited** [1] - 9:6
**limits** [1] - 17:6
**Line** [3] - 1:3, 2:4, 2:8
**line** [14] - 8:9, 14:2, 17:2, 24:23, 38:6, 39:17, 41:12, 42:18, 47:10, 49:9, 80:1, 83:5, 85:11, 85:23
**lines** [17] - 8:1, 15:12, 16:22, 16:24, 17:19, 18:1, 19:9, 20:17, 22:18, 33:2, 39:25, 45:8, 47:2, 51:24, 54:2, 76:16, 81:13
**list** [2] - 30:22, 51:1
**listed** [1] - 17:20
**listening** [1] - 48:4
**litigated** [1] - 63:20
**litigation** [1] - 38:13
**live** [2] - 3:7, 23:9
**Lives** [1] - 25:11
**lives** [1] - 55:8
**local** [4] - 31:3, 70:10, 70:23, 72:12
**logic** [1] - 57:17
**look** [13] - 7:15, 9:6, 9:10, 12:21, 16:12, 16:23, 26:12, 40:23,

42:20, 44:11, 51:1, 65:16, 88:2
**looking** [4] - 11:14, 39:17, 43:1, 91:7
**looks** [2] - 64:9, 74:14
**lose** [1] - 32:14
**loss** [2] - 30:20, 30:21
**loudly** [1] - 2:22
**loveliness** [1] - 70:11
**low** [1] - 62:22
**Ltd** [1] - 1:3
**luxury** [3] - 15:12, 15:14, 16:15
**lying** [1] - 8:24

**M**

**M.D** [1] - 1:6
**machine** [1] - 81:1
**maintain** [4] - 20:4, 22:2, 44:14, 53:22
**maintaining** [1] - 21:3
**major** [2] - 16:22, 17:19
**majority** [2] - 61:23, 62:12
**malaria** [1] - 8:10
**man** [1] - 65:24
**mandate** [6] - 56:17, 61:15, 62:17, 65:17, 66:3, 66:15
**mandates** [1] - 61:20
**mandatory** [2] - 39:11, 44:12
**manner** [3] - 34:22, 35:3
**Maritime** [3] - 42:8, 42:11, 42:19
**market** [4] - 51:25, 62:12, 69:17, 72:12
**marketers** [1] - 52:12
**marketplace** [1] - 54:19
**markets** [1] - 16:1
**Mary** [1] - 30:8
**mask** [2] - 61:9, 79:9
**masking** [1] - 51:5
**masks** [1] - 50:2
**Matter** [1] - 25:11
**matter** [4] - 49:22, 77:9, 82:1, 83:1
**matters** [3] - 42:10, 42:19, 82:1
**mean** [10] - 8:12, 14:22, 17:1, 44:7, 57:4, 57:21, 65:10, 69:16, 76:8, 88:20
**meaning** [2] - 51:15, 73:7
**means** [5] - 15:9,

33:13, 57:6, 76:10,
89:22
**meant** [1] - 28:11
**meantime** [1] - 30:1
**medical** [18] - 8:6,
18:18, 18:23, 18:24,
21:17, 21:19, 22:3,
23:7, 24:17, 37:22,
53:10, 55:9, 56:9,
60:13, 73:5, 81:2,
81:8, 81:18
**member** [1] - 72:3
**members** [1] - 57:9
**mention** [1] - 53:4
**mentioned** [2] - 30:19,
75:5
**merchant** [1] - 89:6
**mercy** [1] - 5:19
**merits** [2] - 38:2,
65:22
**Merryday** [5] - 42:17,
42:22, 44:10, 63:23,
64:3
**Merryday's** [1] - 92:4
**metaphorically** [1] -
67:19
**methods** [1] - 41:4
**mIAMI** [1] - 1:2
**Miami** [6] - 1:15, 1:20,
1:20, 19:24, 64:25,
65:5
**Middle** [6] - 38:12,
38:18, 44:3, 44:19,
91:17, 93:1
**midst** [1] - 55:9
**might** [7] - 3:25, 4:15,
19:8, 30:7, 48:5,
73:11, 75:6
**millions** [1] - 62:5
**mind** [4] - 14:1, 16:13,
47:1, 61:10
**mindful** [1] - 34:12
**mine** [1] - 31:11
**minutes** [2] - 3:20,
70:18
**misleading** [1] - 27:7
**mismatch** [1] - 86:23
**miss** [1] - 82:14
**misspeak** [1] - 48:12
**mistake** [1] - 35:6
**mistaken** [1] - 30:20
**misunderstood** [1] -
77:17
**mode** [3] - 22:9,
87:12, 87:24
**modulated** [1] - 3:4
**moment** [1] - 63:19
**money** [3] - 24:2,
32:14, 32:15
**months** [1] - 43:9,

64:2, 64:12
**moral** [1] - 58:4
**morning** [9] - 2:1, 2:7,
2:12, 2:13, 2:14,
2:16, 2:18, 3:11,
3:17
**most** [5] - 3:20, 4:9,
19:6, 25:14, 87:20
**motion** [4] - 3:12, 4:2,
38:10, 93:10
**motivation** [1] - 69:6
**Motor** [3] - 40:24,
72:6, 72:13
**MOU** [4] - 64:25, 65:1,
65:11, 66:9
**mouth** [1] - 86:14
**move** [4] - 24:12,
44:16, 44:23, 48:19
**moves** [1] - 30:9
**moving** [2] - 27:25,
87:1
**MR** [126] - 2:7, 2:10,
2:14, 2:16, 4:4, 4:14,
4:19, 5:1, 5:4, 5:7,
5:10, 5:14, 5:18, 6:1,
6:8, 6:25, 7:2, 7:5,
8:14, 8:20, 9:18,
10:17, 11:24, 13:22,
14:15, 14:17, 15:6,
16:7, 16:12, 17:16,
18:13, 20:6, 21:10,
22:6, 22:21, 23:12,
23:21, 24:15, 25:7,
26:8, 27:8, 27:11,
29:21, 29:23, 30:22,
32:4, 33:10, 35:8,
35:16, 37:17, 38:22,
39:23, 41:6, 41:13,
41:15, 42:15, 42:17,
44:18, 45:9, 45:14,
46:4, 46:6, 47:10,
47:15, 48:2, 48:11,
48:14, 49:5, 49:9,
50:8, 50:15, 50:18,
52:1, 53:11, 54:12,
55:14, 55:17, 55:21,
56:13, 56:22, 56:25,
57:21, 58:1, 58:6,
59:13, 60:1, 60:6,
60:9, 60:22, 61:1,
61:6, 62:2, 62:9,
63:6, 63:9, 64:7,
65:13, 66:10, 67:9,
67:19, 67:23, 68:13,
69:10, 71:2, 71:15,
71:20, 71:23, 72:24,
73:14, 73:17, 73:20,
74:15, 74:19, 75:9,
76:4, 76:7, 77:15,
77:18, 78:16, 78:19,

81:10, 82:16, 83:18,
84:1, 87:4, 92:19
**mud** [6] - 70:14,
70:15, 70:21, 70:22,
72:19, 72:20
**mud-flap** [4] - 70:21,
70:22, 72:19, 72:20
**mud-flaps** [2] - 70:14,
70:15
**multi** [2] - 37:20, 62:3
**must** [3] - 49:1, 68:8,
76:3
**myriad** [1] - 74:8

## N

**name** [1] - 17:1
**names** [1] - 17:1
**narrow** [4] - 54:16,
89:2, 89:5
**narrowly** [3] - 13:6,
16:9, 26:11, 54:20,
83:23
**nation** [1] - 82:5
**national** [1] - 26:2
**nature** [2] - 15:25
**NCLH** [1] - 32:4
**NCLH's** [1] - 32:21
**necessarily** [1] - 44:8
**need** [20] - 5:13, 5:20,
9:22, 12:9, 22:4,
27:16, 30:15, 30:16,
33:20, 38:11, 39:16,
43:14, 47:6, 47:13,
48:17, 56:17, 57:24,
70:23, 78:13, 83:23
**needed** [3] - 43:8,
71:11, 85:12
**needle** [1] - 30:9
**needs** [2] - 34:10,
39:17
**never** [8] - 12:19,
13:23, 15:18, 67:11,
70:14, 77:4, 78:13,
82:5
**New** [1] - 1:17
**new** [2] - 15:9, 19:13
**news** [1] - 62:14
**newscasters** [1] -
14:13
**next** [5] - 5:8, 19:14,
30:21, 51:21, 87:1
**no...** [1] - 48:10
**nobody** [1] - 74:14
**non** [1] - 88:4
**non-expressive** [1] -
88:4
**none** [1] - 72:4
**North** [1] - 1:20
**Norwegian** [88] - 1:3,

2:3, 2:8, 12:15,
12:17, 16:3, 16:21,
17:18, 18:6, 19:16,
19:22, 21:3, 23:22,
27:15, 28:14, 29:5,
29:19, 31:4, 31:22,
32:14, 32:23, 33:3,
33:4, 34:12, 34:21,
34:24, 36:2, 36:8,
36:14, 36:17, 37:8,
38:2, 38:4, 38:7,
38:11, 39:5, 39:12,
40:4, 40:13, 45:1,
46:17, 46:22, 47:23,
51:19, 52:5, 52:21,
53:23, 54:1, 54:2,
56:16, 56:19, 60:15,
61:17, 62:14, 63:10,
63:13, 64:13, 64:18,
64:25, 66:1, 66:19,
66:20, 68:18, 69:4,
69:12, 70:6, 70:8,
71:25, 73:11, 75:6,
75:12, 75:17, 77:13,
77:20, 78:1, 78:8,
79:24, 80:4, 84:19,
84:22, 85:1, 85:8,
85:11, 85:17, 85:20,
88:9, 91:2, 93:16
**Norwegian's** [10] -
3:12, 4:2, 7:13,
35:14, 50:19, 51:24,
65:13, 71:23, 74:21,
76:18
**noted** [2] - 28:13,
65:10, 67:2
**notes** [1] - 87:25
**nothing** [11] - 10:23,
21:24, 36:5, 55:4,
55:10, 64:25, 72:2,
74:3, 82:2, 84:10,
86:20
**notice** [2] - 39:2,
41:16
**notion** [6] - 14:22,
15:9, 78:21, 80:6,
80:8, 91:22
**number** [4] - 8:6,
27:12, 53:24, 69:22
**Number** [1] - 1:2
**numbers** [3] - 34:5,
34:6, 85:16
**nutshell** [1] - 29:4
**NW** [2] - 1:12, 1:17

## O

**O'Connor** [1] - 69:23
**O'Connor.** [1] - 58:21
**O'SULLIVAN** [1] - 2:7

**O'Sullivan** [3] - 1:14,
2:9, 77:7
**o'Sullivan** [1] - 2:12
**object** [1] - 69:14
**objection** [1] - 4:20
**objectively** [1] - 86:22
**objectives** [1] - 91:10
**observed** [1] - 5:23
**observers** [1] - 3:6
**obstacle** [1] - 66:11
**obtain** [3] - 8:2, 20:14,
93:8
**obtains** [1] - 19:6
**obvious** [1] - 84:13
**obviously** [3] - 4:9,
7:12, 12:13
**occur** [1] - 50:8
**occurred** [1] - 94:4
**occurring** [1] - 49:6
**October** [2] - 43:3,
64:2
**odd** [1] - 54:7
**OF** [1] - 1:1
**of-state-firms** [1] -
72:11
**off-putting** [1] - 9:7
**offends** [2] - 88:11,
89:13
**offense** [1] - 77:7
**offensive** [1] - 88:10
**offer** [2] - 9:8, 84:12
**offered** [3] - 18:21,
44:19, 86:24
**offering** [2] - 42:13,
80:1
**official** [1] - 1:7
**officials** [3] - 14:21,
84:21, 84:24
**onboard** [3] - 49:20,
75:2, 80:2
**once** [7] - 24:5, 49:16,
50:11, 51:15, 64:9,
74:13, 91:6
**one** [45] - 6:13, 8:22,
11:20, 12:14, 12:20,
13:19, 16:9, 17:14,
17:22, 18:21, 20:17,
20:23, 23:4, 24:16,
26:1, 36:4, 40:3,
40:15, 41:9, 43:10,
46:7, 46:9, 46:10,
46:14, 53:13, 55:17,
55:21, 59:3, 65:24,
74:6, 74:21, 76:5,
79:17, 80:7, 80:15,
80:18, 82:11, 83:14,
86:1, 86:10, 87:20,
88:23, 91:16, 92:19
**one's** [1] - 15:19
**open** [3] - 34:11,

50:23, 51:2
**operate** [4] - 33:14, 34:21, 38:20, 77:21
**operated** [1] - 89:6
**operating** [3] - 33:14, 39:7, 39:9
**operation** [4] - 11:17, 44:12, 65:5, 65:6
**operations** [1] - 92:7
**operators** [1] - 92:21
**opinion** [1] - 58:12
**opportunity** [1] - 10:21
**opposed** [2] - 10:25, 23:19
**opposing** [1] - 72:25
**opposite** [1] - 84:10
**opposition** [5] - 7:21, 9:19, 10:2, 16:21, 42:25
**option** [18] - 41:4, 42:2, 43:11, 43:13, 43:14, 43:15, 43:17, 43:20, 43:21, 44:2, 44:13, 44:20, 66:12, 80:4, 91:18, 91:23, 93:2
**options** [7] - 32:5, 35:12, 39:13, 41:12, 44:6, 51:17, 79:15
**oral** [8] - 20:14, 56:4, 56:11, 56:14, 56:16, 57:2, 72:22, 93:15
**orally** [4] - 7:19, 20:14, 22:10, 37:2
**order** [17] - 3:9, 15:10, 31:2, 39:18, 41:24, 43:2, 49:9, 52:15, 53:6, 53:13, 54:19, 56:16, 63:2, 63:18, 63:25, 64:22, 76:1
**ordinance** [1] - 72:10
**ordinarily** [1] - 75:20
**Ostroff** [2] - 34:5, 35:9
**other..** [1] - 8:7
**otherwise** [2] - 82:21, 92:12
**ourselves** [3] - 33:23, 67:10, 88:15
**out-of-state** [3] - 29:17, 31:9, 72:14
**outbreak** [2] - 8:10, 28:4
**outdoor** [1] - 70:11
**outlawing** [2] - 59:2, 81:15
**outside** [6] - 15:4, 31:11, 40:1, 49:16, 50:9, 86:11
**overall** [1] - 29:20

**overlook** [1] - 12:5
**overstep** [1] - 76:4
**overwhelmingly** [1] - 81:25
**own** [5] - 31:3, 33:14, 42:1, 90:19, 91:25
**ownership** [6] - 45:16, 46:8, 46:10, 46:11, 46:13, 87:23
**owning** [2] - 46:15, 77:1

**P**

**pace** [1] - 5:20
**page** [5] - 7:22, 47:19, 53:11, 53:13, 90:8
**pages** [2] - 90:7, 91:8
**pandemic** [4] - 33:24, 35:24, 55:10, 94:4
**paragraph** [2] - 10:14, 43:10, 64:24
**paragraphs** [3] - 30:12, 40:20, 67:3
**parameters** [1] - 57:18
**parcel** [1] - 69:2
**park** [1] - 13:18
**parks** [1] - 13:14
**part** [12] - 4:9, 15:5, 15:15, 20:1, 21:2, 27:6, 34:9, 47:2, 57:5, 65:19, 69:2, 83:25
**partial** [1] - 57:5
**participating** [1] - 5:16
**particular** [11] - 10:22, 33:11, 58:3, 67:16, 69:6, 79:14, 79:15, 82:3, 83:15, 84:8, 87:23
**parties** [3] - 15:2, 65:7, 71:7
**parties'** [1] - 3:16
**party** [1] - 65:11
**pass** [6] - 30:8, 59:2, 59:6, 59:11, 60:3
**passed** [4] - 10:6, 10:7, 80:11, 84:4
**passenger** [5] - 19:18, 20:18, 20:24, 21:15, 74:16
**passenger's** [1] - 20:14
**passengers** [31] - 7:12, 9:7, 17:11, 17:23, 18:1, 18:2, 19:10, 25:1, 27:24, 28:1, 28:12, 31:1, 32:8, 32:24, 33:3,

3:6, 33:23, 35:4, 36:18, 49:23, 60:16, 61:19, 78:4, 80:2, 80:3, 86:6, 86:16, 91:12, 92:22, 92:24
**passengers'** [1] - 75:14
**passes** [1] - 63:6
**passionate** [1] - 35:2
**passport** [5] - 57:11, 58:14, 71:24, 73:4, 79:14
**passports** [11] - 58:10, 58:15, 59:2, 59:3, 59:9, 59:14, 63:7, 71:17, 73:2, 79:1, 80:10
**passports..** [1] - 63:3
**past** [3] - 42:19, 48:20, 81:6
**path** [2] - 32:11, 35:24
**patient** [2] - 60:12, 60:13
**patients** [7] - 45:15, 45:23, 46:10, 46:12, 46:15, 51:8
**patients'** [1] - 52:19
**PATRICIA** [2] - 1:19, 94:10
**patricia_sanders@ flsd.uscourts.gov** [1] - 1:21
**patron** [2] - 8:22
**patrons** [6] - 6:18, 6:24, 10:21, 13:10, 45:6, 54:10
**patterns** [1] - 2:23
**patterson** [5] - 56:21, 59:13, 83:17, 87:5, 92:17
**PATTERSON** [74] - 2:16, 4:19, 37:17, 38:22, 39:23, 41:6, 41:13, 41:15, 42:15, 42:17, 44:18, 45:9, 45:14, 46:4, 46:6, 47:10, 47:15, 48:2, 48:11, 48:14, 49:5, 49:9, 50:8, 50:15, 50:18, 52:1, 53:11, 54:12, 55:14, 55:17, 55:21, 56:13, 56:22, 56:25, 57:21, 58:1, 58:6, 60:1, 60:6, 60:9, 60:22, 61:1, 61:6, 62:2, 62:9, 63:6, 63:9, 64:7, 65:13, 66:10, 66:19, 67:19, 67:23, 68:13, 69:10, 71:2, 71:15,

71:20, 71:23, 72:24, 73:14, 73:17, 73:20, 74:15, 74:19, 75:9, 76:4, 76:7, 77:15, 77:18, 78:16, 82:16, 83:18, 92:19
**Patterson** [40] - 2:17, 2:18, 4:12, 4:14, 4:17, 4:18, 6:11, 6:13, 11:2, 14:11, 14:18, 29:8, 29:23, 30:6, 30:10, 33:11, 36:7, 37:11, 38:16, 40:23, 56:1, 56:24, 57:19, 65:23, 78:13, 78:20, 78:21, 78:23, 80:21, 81:10, 84:16, 84:23, 86:1, 86:5, 86:10, 86:13, 87:7, 89:18, 90:12, 90:24
**Patterson's** [4] - 10:14, 25:4, 33:8, 89:1
**pay** [4] - 15:17, 17:25, 89:7, 89:10
**paying** [2] - 18:3, 89:11
**peculiar** [1] - 9:4
**penalty** [1] - 7:13
**people** [17] - 13:16, 14:13, 14:24, 34:16, 35:20, 35:25, 36:24, 37:1, 48:4, 50:6, 51:23, 55:8, 59:10, 62:16, 70:15, 80:15, 81:18
**perceived** [1] - 68:1
**percent** [12] - 42:13, 54:21, 57:13, 58:14, 61:11, 61:12, 61:19, 62:16, 62:19, 63:14, 88:14, 91:19
**perfectly** [1] - 14:4
**perhaps** [5] - 6:3, 14:13, 42:9, 57:19, 63:17
**period** [2] - 14:5, 21:23
**permanent** [1] - 21:13
**permission** [1] - 4:6
**permit** [1] - 34:23
**permits** [1] - 25:2
**person** [2] - 35:17, 82:3
**person's** [1] - 22:2
**personal** [1] - 25:16
**personally** [1] - 77:6
**persons** [4] - 16:5, 35:9, 48:9, 65:2
**pertaining** [1] - 65:8

**pertains** [1] - 70:24
**pertinent** [1] - 46:6
**Pete** [1] - 2:16
**pharmacies** [1] - 52:13
**pharmaceutical** [2] - 52:12, 52:17
**Philadelphia** [1] - 68:18
**phone** [2] - 47:8, 88:6
**phrase** [1] - 73:7
**physically** [2] - 54:18, 86:18
**physician** [1] - 21:20
**physician's** [1] - 88:7
**PI** [3] - 38:9, 53:12, 63:20
**picture** [1] - 39:16
**Pike** [10] - 28:23, 29:19, 30:4, 31:12, 31:15, 67:7, 67:16, 69:11, 72:8, 83:24
**place** [10] - 8:9, 13:15, 20:10, 41:2, 61:16, 62:22, 64:12, 70:16, 82:23
**placed** [1] - 70:13
**places** [2] - 10:14, 28:11
**plain** [5] - 6:22, 49:11, 49:14, 56:2, 71:15
**plaintiff** [2] - 2:6, 2:8
**PLAINTIFFS** [1] - 1:12
**plaintiffs** [3] - 2:11, 4:5, 16:9
**plan** [1] - 62:4
**planned** [1] - 62:20
**planning** [2] - 4:19, 31:5
**plans** [1] - 63:17
**plausible** [1] - 63:1
**play** [1] - 74:23
**PLAYED** [1] - 23:3
**plead** [1] - 5:18
**pleadings** [2] - 5:8, 93:13
**point** [21] - 17:22, 20:12, 40:2, 44:24, 52:11, 56:10, 58:1, 64:20, 66:24, 67:24, 68:5, 72:3, 72:8, 72:15, 75:9, 76:5, 87:1, 88:23, 89:1, 90:23, 91:16
**pointed** [2] - 23:16, 86:2
**pointing** [1] - 67:17
**points** [7] - 4:10, 37:12, 38:12, 66:25, 69:10, 69:11, 80:14

**policies** [1] - 84:20
**policy** [11] - 47:17,
53:14, 58:16, 59:15,
64:12, 64:13, 73:22,
73:23, 73:24, 83:1,
83:4
**political** [3] - 25:19,
68:7, 80:14
**population** [3] - 15:16,
15:22, 31:4
**Port** [4] - 19:24, 49:7,
64:25, 65:5
**port** [3] - 51:15, 90:15
**portion** [3] - 10:20,
15:22, 88:2
**portray** [1] - 14:6
**portrayed** [1] - 51:4
**ports** [8] - 28:3, 28:10,
30:24, 31:1, 32:10,
49:20, 54:11, 92:5
**posed** [1] - 72:19
**position** [9] - 7:13,
32:5, 38:19, 40:13,
55:24, 64:16, 68:14,
85:23, 88:7
**positive** [1] - 23:15
**possible** [2] - 5:23,
41:4
**possibly** [1] - 80:7
**post** [1] - 65:3
**posting** [1] - 8:4
**posturing** [1] - 8:21
**potentially** [4] - 12:8,
54:24, 74:23, 91:24
**powerful** [1] - 70:2
**practice** [1] - 91:21
**Practices** [1] - 48:7
**practices** [1] - 84:20
**pre** [2] - 8:16, 16:15
**pre-condition** [2] -
8:16, 16:15
**precedence** [1] -
69:23
**precedent** [6] - 26:20,
27:12, 29:25, 30:1,
67:21, 67:25
**precluded** [2] - 39:12,
57:17
**precludes** [1] - 56:3
**predominately** [1] -
72:14
**preempt** [9] - 40:6,
40:9, 40:11, 41:20,
42:23, 43:23, 44:3,
44:20, 93:3
**preempted** [2] - 28:18,
43:24
**preemption** [15] -
24:12, 31:17, 38:3,
40:17, 40:19, 41:2,

41:10, 41:21, 42:2,
42:21, 44:7, 66:10,
90:5, 90:21, 90:22
**preempts** [2] - 38:4,
41:25
**pregnancy** [1] - 21:19
**pregnant** [1] - 21:18
**preliminary** [7] - 3:12,
16:8, 24:11, 33:17,
36:9, 89:20, 92:4
**prepared** [2] - 3:17,
37:18
**prescribe** [1] - 52:18
**presences** [1] - 74:9
**present** [1] - 30:14
**presentation** [1] -
93:4
**presentations** [1] -
93:15
**presented** [3] - 3:21,
41:12, 58:3
**president** [1] - 23:6
**press** [1] - 14:20
**presumably** [1] - 54:2
**presumption** [2] -
41:2, 41:21
**pretend** [1] - 78:24
**pretty** [3] - 37:15,
44:22, 73:18
**prevail** [1] - 24:9
**prevailing** [1] - 36:8
**prevent** [11] - 8:5,
8:15, 19:1, 19:4,
20:13, 24:24, 24:25,
26:22, 27:1, 34:23,
81:13
**prevented** [1] - 13:7
**previously** [1] - 53:15
**price** [2] - 89:7, 89:11
**prices** [1] - 15:13
**prides** [2] - 32:23,
88:13
**primarily** [2] - 72:7,
72:16
**primary** [2] - 38:23,
88:13
**privacy** [18] - 9:9,
10:1, 18:21, 18:22,
18:23, 19:20, 19:23,
22:3, 53:10, 53:22,
54:8, 56:9, 71:4,
74:21, 81:8, 81:12,
81:24, 82:6
**private** [8] - 19:17,
20:20, 22:17, 37:22,
37:25, 38:1, 81:7,
93:6
**prize** [1] - 72:11
**problem** [16] - 10:20,
11:1, 11:3, 21:5,

27:14, 29:7, 71:13,
71:16, 71:19, 83:12,
84:15, 89:4, 89:12,
90:1, 90:2
**problematic** [3] - 14:2,
17:19, 84:4
**problems** [3] - 10:25,
16:23, 84:8
**procedures** [1] - 82:13
**proceed** [2] - 2:2, 5:3
**proceeding** [2] - 5:24,
94:4
**proceedings** [3] -
2:19, 3:7, 3:8
**process** [9] - 19:24,
20:5, 43:3, 43:5,
43:6, 43:7, 74:20,
75:2, 75:6
**produce** [2] - 21:19,
21:20
**producers** [1] - 72:9
**product** [1] - 69:6
**Professor** [1] - 26:15
**profit** [2] - 25:14,
25:16
**profitable** [1] - 66:8
**profound** [1] - 28:24
**profoundly** [2] -
27:21, 31:13
**prohibit** [8] - 6:22,
7:16, 7:18, 8:11,
8:13, 12:22, 56:6,
80:23
**prohibited** [6] - 3:8,
21:3, 55:19, 63:15,
83:2, 87:16
**prohibiting** [6] -
26:25, 66:5, 88:18,
89:16, 89:21, 92:21
**prohibition** [5] -
22:11, 70:21, 84:4,
91:21, 92:13
**prohibits** [1] - 44:24
**promise** [1] - 32:21
**promised** [4] - 32:24,
64:18, 65:15, 66:21
**promising** [2] - 63:13,
64:13
**promote** [3] - 42:7,
53:9, 72:8
**promptly** [1] - 20:7
**promulgated** [1] -
42:12
**proof** [13] - 18:2,
19:18, 23:15, 25:24,
37:4, 45:5, 47:6,
47:14, 48:9, 48:17,
48:21, 49:21, 74:11
**proper** [2] - 24:20,
34:22, 85:2

**proportion** [1] - 61:14
**propose** [3] - 4:6,
4:11, 5:10
**proposed** [1] - 86:23
**proposes** [2] - 17:18,
36:17
**proposing** [1] - 19:22
**prospective** [1] -
68:19
**protect** [14] - 8:20,
10:9, 12:20, 14:24,
18:21, 18:23, 28:19,
31:20, 33:22, 34:13,
50:7, 56:23, 78:22,
82:3
**protected** [4] - 18:25,
25:20, 82:2, 82:6
**protecting** [2] - 20:19,
67:10, 77:19
**protection** [2] - 69:15,
72:16
**protectionism** [3] -
69:19, 72:2, 72:5
**protects** [1] - 54:21
**protocol** [2] - 80:25,
81:4
**protocols** [4] - 32:19,
80:23, 82:9, 82:15
**prove** [2] - 80:3, 85:9
**proves** [1] - 70:4
**provide** [12] - 4:15,
6:18, 18:2, 23:15,
27:1, 45:3, 47:6,
47:13, 48:16, 49:1,
53:21, 65:2
**provided** [2] - 4:12,
15:2
**provides** [2] - 77:4,
92:24
**providing** [1] - 33:1
**proving** [1] - 53:23
**provision** [3] - 45:14,
61:7, 87:9
**provisions** [2] - 3:15,
46:6
**proximity** [1] - 34:16
**public** [17] - 2:20, 3:6,
23:5, 24:17, 26:3,
32:11, 34:4, 36:3,
51:18, 57:9, 59:15,
60:19, 60:21, 61:4,
74:8, 77:9, 82:3
**publically** [1] - 8:3
**Puerto** [1] - 92:6
**pulling** [1] - 66:18
**pundits** [1] - 14:13
**purchase** [1] - 14:9
**purely** [2] - 25:5,
68:17
**purported** [3] - 41:20,

44:20, 89:5
**purpose** [6] - 42:4,
42:7, 57:7, 80:20,
83:24, 90:8
**purposes** [5] - 11:5,
12:20, 23:22, 40:17,
87:25
**pursue** [1] - 44:13
**pursuing** [1] - 91:23
**put** [8] - 9:20, 30:23,
31:4, 32:4, 36:15,
55:21, 61:17, 64:16
**puts** [2] - 18:18, 31:14
**putting** [2] - 9:7, 82:23

**Q**

**Questa** [1] - 40:4
**questions** [6] - 4:8,
37:18, 46:13, 55:14,
78:10, 80:19
**quickly** [2] - 37:14,
44:18
**Quinn** [2] - 2:8, 2:10
**quite** [4] - 41:22,
86:22, 89:1, 90:11
**quote** [3] - 13:8,
26:15, 91:22
**quotes** [2] - 53:12,
90:24

**R**

**racial** [1] - 76:14
**raging** [2] - 26:1,
80:15
**Railroad** [2] - 88:24,
90:3
**raise** [2] - 40:19, 74:1
**raised** [3] - 64:6,
67:12, 84:9
**ranging** [1] - 35:12
**rank** [1] - 77:6
**rapid** [2] - 2:24, 5:16
**rather** [1] - 63:16
**rational** [2] - 12:8,
68:15
**rationale** [9] - 11:6,
12:7, 15:7, 15:10,
18:10, 18:20, 53:23,
58:18, 83:3
**rationales** [2] - 9:8,
10:3
**Raymond** [1] - 72:5
**reach** [2] - 12:9, 84:25
**read** [6] - 3:16, 5:7,
27:13, 30:11, 49:11,
93:14
**readily** [1] - 40:2
**reading** [2] - 7:1, 46:1

**ready** [2] - 2:2, 34:2
**real** [1] - 22:24
**reality** [1] - 80:20
**really** [6] - 8:21, 16:3, 22:4, 24:8, 66:9, 75:4
**realm** [2] - 25:11, 69:21
**reason** [6] - 12:2, 18:9, 33:19, 42:2, 67:20, 69:4
**reasonable** [3] - 84:11, 85:11, 85:18
**reasoning** [1] - 72:17
**reasons** [6] - 11:10, 38:9, 40:12, 74:6, 81:25, 93:9
**rebroadcasting** [1] - 3:8
**rebuttal** [2] - 78:18
**receive** [1] - 87:14
**received** [1] - 70:14
**recently** [1] - 30:2
**recognize** [2] - 4:10, 24:6
**recommend** [1] - 48:15
**recommendation** [1] - 41:25
**recommendations** [1] - 92:2
**RECORD** [3] - 69:25, 91:4, 91:14
**record** [51] - 2:6, 3:5, 5:22, 9:13, 9:17, 9:21, 9:23, 10:17, 11:4, 11:17, 14:14, 15:8, 20:4, 20:11, 21:4, 21:13, 21:23, 22:15, 22:25, 23:2, 24:1, 26:7, 26:13, 29:2, 30:15, 31:10, 35:23, 42:24, 43:20, 44:2, 46:9, 46:18, 46:23, 53:8, 53:10, 56:15, 57:12, 58:19, 61:13, 62:10, 70:20, 71:6, 71:11, 74:3, 78:2, 78:24, 79:13, 80:10, 84:14, 84:15
**recorded** [1] - 20:10
**recording** [2] - 3:7, 5:24
**RECORDING** [1] - 23:3
**records** [5] - 20:21, 26:22, 52:19, 60:13, 73:6
**recover** [1] - 32:15
**recovery** [1] - 65:3

**red** [5] - 17:3, 17:7, 19:10, 20:18
**Redish** [1] - 26:15
**redress** [2] - 11:13, 16:4
**redressed** [1] - 71:14
**Reed** [1] - 68:1
**reed** [1] - 68:8
**reference** [1] - 25:11
**referring** [1] - 87:7
**reflected** [1] - 47:18
**refusal** [2] - 45:25, 77:24
**refuse** [4] - 45:3, 45:4, 46:12, 55:23
**refusing** [1] - 45:3
**regard** [6] - 3:15, 4:2, 17:15, 20:2, 35:14, 82:13
**regarded** [1] - 67:6
**regarding** [1] - 5:15
**regardless** [1] - 61:15
**registered** [1] - 81:3
**registers** [1] - 81:2
**regulate** [1] - 28:18
**regulated** [3] - 25:18, 87:10, 92:7
**regulates** [3] - 22:9, 25:8, 25:9
**regulating** [4] - 24:21, 87:23, 89:23, 90:15
**regulation** [9] - 16:1, 40:5, 43:18, 45:19, 68:1, 69:15, 69:17, 70:2
**regulations** [12] - 28:16, 31:16, 39:7, 39:14, 40:16, 41:1, 41:15, 41:16, 66:6, 75:22, 92:1, 92:2
**regulatory** [2] - 38:4, 90:13
**rejected** [1] - 75:11
**relationship** [2] - 54:13
**relevant** [4] - 66:16, 66:17, 67:23, 88:2
**relied** [1] - 10:16
**relying** [4] - 40:4, 55:22, 90:5, 91:2
**remains** [2] - 45:1, 62:22
**remarkable** [1] - 41:22
**remarkably** [1] - 19:6
**remarks** [1] - 37:18
**remind** [1] - 3:7
**remotely** [1] - 94:6
**repair** [1] - 32:22
**repeatedly** [1] - 42:22
**reply** [3] - 38:11,

40:16, 91:8
**report** [1] - 10:18
**REPORTED** [1] - 1:19
**reporter** [3] - 3:2, 3:4, 5:19
**Reporter** [1] - 1:19
**reporters** [1] - 6:3
**reporting** [1] - 94:6
**reports** [2] - 14:20, 86:15
**representation** [1] - 66:14
**representatives** [2] - 61:21, 62:11
**represented** [1] - 64:21
**representing** [2] - 74:15, 78:14
**request** [2] - 7:6, 48:15
**requesting** [1] - 7:19
**require** [16] - 6:18, 11:5, 11:16, 13:11, 14:14, 18:1, 22:22, 22:23, 56:17, 56:18, 63:14, 65:2, 71:17, 73:14, 81:20, 82:19
**required** [5] - 6:20, 11:16, 23:5, 39:3, 80:9
**requirement** [6] - 47:20, 49:1, 64:14, 65:22, 71:24, 79:14
**requirements** [3] - 51:6, 58:7, 92:10
**requires** [1] - 56:19
**requiring** [11] - 7:16, 8:5, 12:23, 19:2, 47:11, 47:16, 48:21, 54:5, 56:3, 81:13, 92:21
**requisites** [1] - 11:21
**reread** [1] - 93:14
**research** [1] - 62:12
**reserving** [2] - 29:23, 67:14
**resonance** [2] - 39:11, 51:15
**resort** [3] - 84:22, 85:22
**respect** [6] - 33:11, 42:19, 66:24, 69:6, 78:23, 86:13
**respectfully** [1] - 72:24
**respond** [1] - 39:5
**response** [2] - 38:9, 39:4
**responsible** [1] - 92:12

**rest** [1] - 90:21
**restaurant** [1] - 21:12
**restrict** [2] - 46:22, 82:21
**restricted** [5] - 14:9, 46:7, 46:9, 46:10, 92:5
**restricting** [3] - 24:18, 60:10, 87:20
**restriction** [10] - 14:3, 14:7, 14:8, 20:3, 22:3, 23:16, 28:2, 52:12, 82:22, 83:8
**restrictions** [6] - 13:15, 28:9, 30:24, 31:3, 51:12, 60:19
**restricts** [2] - 17:5
**result** [1] - 90:17
**retain** [1] - 30:13
**retained** [1] - 20:21
**rethink** [1] - 15:25
**returned** [1] - 88:5
**revenue** [1] - 36:21
**reversed** [1] - 45:17
**review** [2] - 9:22, 35:12
**reviewed** [3] - 27:11, 27:12, 93:13
**reviewing** [1] - 6:15
**rewrite** [1] - 89:19
**Rico** [1] - 92:6
**rid** [1] - 43:17
**rides** [1] - 13:15
**right.** [1] - 74:16
**rightly** [1] - 11:5
**rights** [3] - 75:15, 82:7, 85:24
**Rio** [2] - 30:20, 34:24
**Rio's** [3] - 30:23, 35:7, 35:11
**ripe** [1] - 38:5
**rising** [2] - 34:8, 70:9
**risk** [5] - 18:19, 28:4, 31:4, 36:10, 36:15
**Rivkees** [7] - 1:6, 2:4, 3:14, 14:12, 35:23, 47:3, 93:17
**Rivkees'** [1] - 38:19
**roads** [1] - 61:4
**robust** [1] - 53:5
**roll** [1] - 56:20
**Royal** [2] - 48:23, 62:18
**RPR** [2] - 1:19, 94:10
**rug** [1] - 66:18
**rule** [3] - 39:2, 41:16, 82:5
**rules** [1] - 42:12
**run** [3] - 10:11, 31:11,

47:9
**Ruth** [1] - 67:17

**S**

**sad** [1] - 48:2
**safe** [9] - 13:17, 34:22, 35:4, 36:18, 66:8, 85:2, 88:16, 88:17, 93:20
**safeguard** [1] - 70:2
**safely** [5] - 43:5, 43:18, 50:24, 85:2, 85:13
**safety** [11] - 18:18, 32:25, 36:15, 39:7, 41:4, 42:7, 44:14, 49:23, 69:22, 82:4, 88:14
**sail** [12] - 21:21, 31:4, 32:7, 33:5, 43:4, 43:5, 63:21, 63:24, 66:22, 66:23, 85:2, 85:12
**sailing** [11] - 21:21, 33:23, 35:5, 43:2, 54:11, 61:19, 61:24, 62:13, 64:23, 66:14, 86:8
**sails** [1] - 51:16
**sake** [1] - 78:20
**salient** [3] - 3:20, 4:10, 25:19
**sanction** [1] - 5:25
**sanctions** [2] - 3:10, 5:24
**SANDERS** [3] - 1:19, 94:8, 94:10
**Sanders** [4] - 5:21, 5:25, 6:2, 26:7
**sars-cov-2** [1] - 65:9
**satisfying** [1] - 24:1
**sauna** [1] - 50:4
**saved** [2] - 52:25, 53:1
**saw** [2] - 85:6, 91:9
**scale** [1] - 29:3
**scales** [2] - 31:24, 34:19
**scarlet** [2] - 17:3, 19:10
**scary** [2] - 34:8, 85:16
**scheme** [2] - 41:11, 92:12
**scholars** [1] - 29:12
**school** [5] - 8:17, 16:16, 23:5, 74:7
**schools** [5] - 8:15, 16:14, 16:20, 22:22, 56:18
**scope** [3] - 6:14, 16:8

**score** [2] - 57:5, 80:14
**Scott** [2] - 1:6, 2:4
**screen** [1] - 5:5
**screening** [5] - 80:23, 80:24, 81:4, 82:9, 82:15
**scrutiny** [22] - 11:6, 12:10, 23:19, 23:20, 23:25, 24:2, 24:5, 24:6, 24:21, 26:9, 27:6, 58:23, 59:7, 59:11, 67:25, 69:1, 69:7, 69:8, 75:21, 75:22, 76:1, 88:20
**seat** [2] - 41:5, 41:6
**second** [3] - 9:9, 82:17, 88:1
**secure** [1] - 77:8
**see** [9] - 7:21, 12:7, 19:15, 31:1, 35:1, 38:12, 44:11, 56:6, 64:9
**seeing** [1] - 19:14
**seek** [1] - 16:9
**seeking** [1] - 37:21
**seem** [1] - 54:8
**segregated** [2] - 17:11, 17:24
**self** [5] - 33:9, 41:5, 62:24, 84:16, 85:25
**selling** [1] - 69:5
**semester** [1] - 51:21
**sense** [5] - 11:7, 12:7, 12:11, 58:4, 66:18
**sensibly** [1] - 84:24
**sentence** [2] - 82:17, 82:18
**sentencing** [2] - 39:10, 92:3
**sequence** [1] - 43:1
**serendipitous** [1] - 63:5
**serious** [1] - 32:13
**serve** [2] - 36:3, 79:16
**service** [12] - 2:20, 37:21, 45:3, 49:15, 52:8, 53:21, 61:7, 65:4, 77:25, 83:8, 83:10, 93:6
**services** [2] - 49:24, 74:12
**set** [6] - 3:10, 9:7, 60:22, 63:21, 66:22, 66:23
**sets** [1] - 91:22
**setting** [1] - 66:7
**Seven** [1] - 47:5
**Seventh** [1] - 41:17
**several** [3] - 38:9, 43:9, 59:15

**Shaffer** [14] - 1:12, 2:10, 2:13, 4:5, 4:20, 37:10, 37:14, 50:1, 62:25, 67:11, 70:25, 77:7, 78:17, 92:16
**SHAFFER** [50] - 2:10, 2:14, 4:4, 4:14, 5:1, 5:4, 5:7, 5:10, 5:14, 5:18, 6:1, 6:8, 6:25, 7:2, 7:5, 8:14, 8:20, 9:18, 10:17, 11:24, 13:22, 14:15, 14:17, 15:6, 16:7, 16:12, 17:16, 18:13, 20:6, 21:10, 22:6, 22:21, 23:12, 23:21, 24:15, 25:7, 26:8, 27:8, 27:11, 29:21, 29:23, 30:22, 32:4, 33:10, 35:8, 35:16, 78:19, 81:10, 84:1, 87:4
**shaffer** [3] - 13:19, 29:10, 29:20
**shaffer's** [1] - 93:4
**shake** [1] - 62:8
**shall** [2] - 65:1, 65:7
**share** [5] - 21:7, 21:9, 21:10, 51:25, 55:8
**shell** [1] - 21:7
**shielding** [1] - 26:24
**ship** [24] - 7:13, 8:22, 16:16, 17:11, 19:13, 22:16, 31:2, 37:3, 47:16, 48:9, 48:14, 49:10, 49:23, 50:9, 51:11, 51:15, 60:18, 61:2, 66:22, 71:25, 74:13, 76:17, 88:13
**ships** [28] - 7:11, 14:4, 28:8, 28:10, 28:14, 34:22, 35:5, 35:21, 43:4, 43:8, 43:13, 43:14, 44:20, 46:25, 47:21, 48:24, 50:2, 50:12, 52:2, 61:14, 62:22, 74:21, 76:16, 86:16, 90:15, 90:19, 91:11, 92:5
**ships'** [1] - 48:5
**shoes** [1] - 59:10
**shopping** [1] - 54:18
**shores** [1] - 28:20
**short** [4] - 78:18, 78:19, 87:3, 91:18
**shorter** [1] - 13:17
**shot** [1] - 73:9
**show** [4] - 10:24, 23:1, 49:10, 60:17
**showed** [1] - 62:19
**showing** [1] - 60:17

**shown** [3] - 61:17, 72:18, 73:21
**shows** [4] - 22:21, 62:10, 71:23, 86:22
**shut** [2] - 32:6, 63:25
**side** [12] - 3:19, 4:15, 26:1, 29:3, 31:24, 36:1, 36:16, 36:23, 37:8, 60:7, 80:6, 80:15
**sign** [1] - 80:12
**signs** [8] - 12:11, 63:7, 68:5, 68:6, 68:7, 68:9
**Silver** [1] - 69:13
**similar** [1] - 69:2
**simply** [2] - 44:6, 52:9
**simulated** [2] - 91:18, 91:20
**sincerely** [1] - 17:17, 79:18
**single** [1] - 93:5
**sit** [2] - 50:3, 86:18
**sits** [1] - 34:24
**situation** [3] - 23:10, 42:11, 44:5
**sixteen** [1] - 7:22
**sixth** [1] - 48:24
**skip** [1] - 24:12
**slide** [2] - 4:7, 5:8
**slides** [5] - 4:11, 4:13, 4:15, 4:20, 4:21
**Slow** [1] - 22:20
**slow** [6] - 5:13, 5:20, 26:6, 32:3, 78:19, 87:3
**slowly** [2] - 2:22, 6:6
**small** [1] - 70:12
**smaller** [1] - 64:5
**smart** [2] - 23:6, 23:13
**Smith** [1] - 19:15
**socio** [1] - 15:16
**socio-economic** [1] - 15:16
**Solicitor** [1] - 43:22
**solve** [1] - 16:23
**someone** [11] - 7:6, 10:6, 10:7, 21:11, 25:15, 49:15, 52:21, 52:22, 76:21, 83:1, 83:10
**sometime** [1] - 63:17
**sometimes** [2] - 3:1, 3:24
**somewhat** [1] - 39:10
**somewhere** [2] - 74:7, 82:14
**soon** [1] - 93:19
**Sorrell** [7] - 11:16, 22:1, 52:11, 52:24,

53:4, 53:5
**sorry** [4] - 19:18, 26:8, 51:8, 77:15
**sort** [5] - 14:7, 77:14, 77:19, 84:16, 85:5
**sorts** [2] - 14:8, 74:22
**Sotomayor** [1] - 44:5
**SOUND** [1] - 23:11
**sounds** [1] - 31:6
**South** [1] - 1:15
**sOUTHERN** [1] - 1:1
**sovereign** [1] - 32:16
**spa** [1] - 17:12
**speakers** [2] - 2:24, 5:16
**speaking** [4] - 21:1, 25:13, 78:20, 90:12
**speaks** [1] - 53:15
**special** [1] - 28:9
**specific** [2] - 20:23, 49:13
**specifically** [9] - 28:19, 54:17, 66:21, 84:3, 87:19, 88:2, 91:8, 91:10, 91:11
**specifies** [1] - 65:8
**speech** [21] - 24:22, 25:18, 25:20, 26:19, 26:23, 27:3, 44:25, 45:20, 60:8, 68:1, 68:2, 68:3, 68:4, 68:10, 68:24, 75:17, 75:20, 75:25, 77:25, 83:6, 83:7
**spending** [1] - 28:1
**Spice** [2] - 69:13, 72:3
**spot** [1] - 26:16
**staff** [1] - 21:10
**stage** [1] - 5:10
**stakeholders** [1] - 42:14
**stand** [3] - 12:19, 36:8, 88:11
**standard** [4] - 2:20, 11:12, 68:12, 68:16
**standing** [5] - 63:24, 64:4, 85:24, 91:9
**stands** [3] - 32:25, 33:3, 33:16
**staring** [1] - 84:13
**stark** [1] - 51:3
**started** [1] - 83:6
**starting** [2] - 2:6, 6:21
**State** [28] - 1:6, 7:3, 9:5, 9:6, 17:9, 17:20, 18:5, 18:15, 27:9, 28:22, 29:3, 32:15, 40:6, 40:9, 40:11, 41:20, 42:1, 42:3, 43:17, 44:21, 52:5,

54:4, 55:22, 58:16, 66:5, 69:20, 80:7, 85:10
**state** [10] - 29:17, 31:9, 43:6, 65:5, 69:17, 70:1, 70:5, 72:11, 72:14
**State's** [2] - 54:9, 81:21
**statement** [1] - 43:10
**States** [8] - 1:19, 30:2, 30:7, 30:14, 37:25, 67:10, 88:25, 92:14
**STATES** [2] - 1:1, 1:9
**statistics** [1] - 57:12
**status** [21] - 7:19, 7:20, 8:17, 12:24, 13:4, 15:16, 19:1, 19:7, 20:15, 20:17, 20:25, 26:25, 36:25, 38:17, 39:24, 77:10, 81:14, 86:8, 89:15, 89:25, 92:1
**Statute** [2] - 3:15, 35:13
**statute** [38] - 8:11, 11:11, 11:21, 12:1, 16:4, 17:14, 26:10, 28:17, 39:15, 47:9, 49:4, 49:11, 49:15, 50:6, 52:5, 52:25, 53:2, 54:7, 56:3, 56:8, 56:12, 56:14, 56:23, 57:6, 57:7, 57:8, 57:18, 58:14, 59:25, 73:10, 73:14, 80:23, 82:9, 82:14, 82:18, 83:20, 83:21, 83:22
**statutory** [1] - 38:24
**stay** [1] - 93:20
**step** [2] - 15:11, 43:3
**stepping** [1] - 81:24
**steroids** [1] - 31:14
**still** [12] - 13:11, 29:14, 32:25, 39:11, 44:11, 75:21, 75:22, 92:2, 92:7, 92:9, 92:10, 92:11
**stop** [9] - 7:22, 8:1, 14:5, 19:6, 25:17, 48:3, 56:2, 56:24, 59:4
**store** [1] - 55:2
**stores** [1] - 72:4
**straightforward** [1] - 90:21
**strange** [1] - 9:5
**streaming** [1] - 3:7
**streams** [1] - 28:1

**Street** [1] - 1:12
**strict** [6] - 23:19, 24:5, 24:6, 58:23, 75:21, 88:20
**strictly** [1] - 3:8
**strictures** [1] - 75:21
**striking** [3] - 25:20, 26:3, 45:18
**struck** [3] - 30:3, 46:16, 52:2
**struggle** [1] - 37:6
**student's** [1] - 77:8
**students** [1] - 74:1
**subject** [10] - 3:9, 27:24, 28:9, 29:11, 59:17, 75:21, 90:24, 92:9, 92:10, 94:5
**submission** [5] - 40:7, 44:21, 69:18, 78:8, 91:17
**submissions** [3] - 3:16, 91:6, 91:25
**submit** [4] - 27:16, 31:25, 38:15, 65:21
**submitted** [9] - 50:20, 61:2, 62:15, 64:22, 65:16, 90:24, 91:7, 91:17, 92:20
**subsection** [1] - 82:20
**substantial** [5] - 26:10, 70:1, 70:4, 71:4, 77:19
**substantiate** [1] - 10:24
**substantive** [6] - 74:20, 75:2, 75:6, 86:3, 86:11, 87:11
**substantively** [2] - 85:12, 90:9
**succeed** [10] - 12:3, 23:23, 27:15, 27:16, 27:17, 29:5, 29:6, 31:15, 38:2, 65:21
**success** [3] - 12:4, 30:6, 30:9
**succumbing** [1] - 36:14
**sued** [1] - 41:9
**suffice** [1] - 24:10
**suffices** [1] - 27:18
**sufficient** [1] - 38:14
**suggest** [1] - 69:8
**suggested** [3] - 13:23, 14:18, 46:20
**suggesting** [3] - 20:21, 62:7, 65:11
**suggestion** [3] - 12:17, 40:10, 90:4
**suggests** [1] - 36:7
**sui** [2] - 25:23, 92:13

**Suite** [1] - 1:20
**summation** [1] - 3:20
**suppliers** [1] - 13:12
**support** [2] - 11:9, 18:10
**supports** [1] - 52:9
**suppose** [2] - 40:18, 55:18
**supposed** [1] - 12:20
**supposedly** [1] - 18:21
**suppression** [1] - 26:18
**Supremacy** [1] - 40:8
**Supreme** [16] - 24:7, 26:17, 29:24, 30:2, 30:7, 30:14, 40:5, 53:2, 53:5, 58:20, 67:4, 67:10, 67:12, 67:24, 69:20, 88:25
**surcharge** [2] - 89:9, 89:13
**Surgeon** [3] - 1:6, 3:14, 39:14
**survey** [1] - 62:18
**surveyed** [1] - 57:13
**surveys** [1] - 9:14
**survive** [1] - 75:22
**suspect** [5] - 9:4, 11:10, 22:7, 22:22, 31:23
**sustain** [1] - 38:14
**swear** [1] - 59:21
**system** [1] - 58:15

**T**

**table..** [1] - 40:21
**tail** [1] - 28:6
**tailored** [2] - 58:14, 89:3
**tailoring** [1] - 84:11, 84:12
**tale** [6] - 9:1, 12:11, 27:1, 31:21, 80:12, 91:20
**talks** [1] - 55:20
**targeting** [1] - 75:16
**targets** [1] - 54:20
**TB** [1] - 8:10
**technological** [1] - 94:5
**tell-tale** [6] - 9:1, 12:11, 27:1, 31:21, 80:12, 91:20
**temperature** [1] - 81:2
**temporary** [1] - 20:11
**ten** [1] - 61:12
**tenant** [1] - 42:10
**tension** [1] - 68:2

**terminal** [3] - 47:6, 47:14, 49:2
**terminology** [1] - 18:14
**terms** [28] - 2:23, 4:8, 6:14, 6:15, 12:12, 12:21, 13:8, 15:20, 15:23, 17:20, 17:22, 20:24, 22:19, 28:10, 31:6, 32:23, 34:4, 39:17, 42:1, 50:18, 58:18, 66:17, 81:12, 81:21, 83:19, 84:14, 86:15, 87:7
**test** [3] - 29:19, 30:15, 67:7
**testing** [3] - 28:2, 59:18, 81:20
**tests** [1] - 11:20
**Texas** [1] - 47:20
**text** [4] - 6:22, 49:11, 49:14, 56:2
**THE** [132] - 1:9, 1:12, 1:14, 1:17, 2:1, 2:12, 2:15, 2:18, 4:12, 4:18, 4:22, 5:3, 5:6, 5:9, 5:13, 5:15, 5:20, 6:7, 6:21, 7:1, 7:4, 8:8, 8:19, 9:12, 10:6, 11:12, 13:19, 14:11, 14:16, 15:1, 16:2, 16:11, 17:10, 18:12, 19:23, 21:2, 22:1, 22:20, 23:18, 24:14, 25:4, 26:6, 27:5, 27:10, 29:8, 29:22, 30:10, 32:3, 33:8, 35:6, 35:9, 37:10, 38:16, 39:6, 40:18, 41:7, 41:14, 42:6, 42:16, 44:8, 45:4, 46:23, 47:12, 48:1, 48:3, 48:13, 48:17, 49:7, 49:18, 50:11, 50:17, 51:13, 52:24, 54:1, 55:1, 55:16, 55:20, 56:1, 56:20, 56:24, 57:1, 57:24, 58:5, 59:4, 59:19, 60:4, 60:7, 60:21, 60:24, 61:3, 62:1, 62:3, 63:4, 63:8, 63:22, 65:10, 65:23, 67:2, 67:17, 67:22, 68:4, 69:9, 69:25, 70:7, 71:6, 71:19, 71:22, 72:21, 73:3, 73:16, 73:19, 73:24, 74:17, 75:1, 75:16,

76:6, 77:2, 77:17, 78:13, 78:17, 80:17, 82:8, 83:13, 83:22, 87:2, 91:4, 91:14, 92:16, 93:11
**theater** [1] - 50:3
**themselves** [1] - 64:16
**theoretical** [1] - 79:3
**theory** [1] - 37:24
**thereafter** [1] - 22:14
**therefore** [3] - 39:12, 67:12, 94:5
**thereof** [1] - 16:1
**thinking** [1] - 34:3
**third** [1] - 76:3
**Third** [1] - 68:23
**thoughtful** [1] - 93:13
**thousand** [1] - 7:10
**thousands** [1] - 7:12
**three** [6] - 30:11, 40:20, 46:16, 53:11, 67:3, 81:6
**threshold** [1] - 91:19
**throw** [2] - 5:18, 6:5
**thrown** [2] - 67:16, 90:18
**ticket** [1] - 15:13
**tickets** [1] - 69:5
**tier** [2] - 70:8, 71:9
**TO** [2] - 91:4, 91:14
**today** [16] - 2:19, 4:7, 5:16, 6:13, 11:8, 14:23, 16:18, 20:12, 37:7, 63:12, 78:15, 80:1, 89:18, 92:1, 93:10, 93:15
**together** [3] - 64:4, 80:16, 88:25
**tone** [1] - 3:4
**took** [3] - 42:3, 64:3, 70:18
**topic** [1] - 59:5
**total** [1] - 90:14
**totally** [5] - 11:23, 21:1, 26:12, 57:14, 78:23
**touchstone** [1] - 42:21
**town** [2] - 70:12, 72:4
**Trade** [1] - 48:7
**traditionally** [1] - 31:8
**transaction** [2] - 68:17, 69:3
**transmitted** [1] - 20:22
**Transport** [1] - 72:6
**Transportation** [1] - 30:3
**travel** [3] - 18:2, 42:8, 47:20
**treat** [1] - 40:22
**treated** [3] - 15:24,

17:23, 86:7
**treating** [3] - 31:19, 50:13, 87:22
**treatment** [6] - 17:7, 17:24, 18:4, 24:25, 87:8, 89:24
**trial** [1] - 42:24
**tries** [1] - 9:6
**trigger** [1] - 88:20
**trip** [2] - 7:8, 22:10
**truckers** [1] - 70:17
**trucks** [1] - 70:15
**true** [2] - 85:8, 90:20
**truthful** [5] - 26:18, 26:23, 27:2, 37:5, 87:20
**try** [3] - 3:3, 6:6, 24:21
**trying** [13] - 23:9, 25:15, 25:16, 26:22, 27:1, 33:22, 51:24, 58:2, 71:12, 72:1, 82:3, 84:23, 85:18
**turn** [3] - 4:3, 37:11, 78:17
**tweak** [1] - 89:19
**two** [14] - 9:8, 9:24, 21:1, 40:21, 41:4, 41:8, 44:6, 47:19, 48:23, 48:24, 76:10, 82:12, 88:23, 92:19
**type** [4] - 13:23, 14:7, 17:13, 56:4

**U**

**U.S** [6] - 28:19, 48:21, 49:6, 58:20, 62:15, 92:6
**ultimate** [2] - 69:14, 80:24
**ultimately** [1] - 32:10
**UNABLE** [2] - 91:4, 91:14
**unannounced** [1] - 63:10
**unclear** [1] - 2:23
**unconstitutional** [1] - 38:20
**uncovers** [1] - 81:20
**under** [22] - 8:8, 11:12, 23:18, 23:24, 25:20, 26:8, 28:23, 31:12, 32:16, 37:24, 40:8, 43:18, 45:18, 46:21, 58:23, 59:25, 64:3, 66:10, 69:1, 73:9, 76:23, 93:18
**underlying** [4] - 7:6, 19:4, 24:24, 89:23
**undermine** [1] - 51:24

undermined [1] - 92:22
undermining [1] - 57:6
UNDERSTAND [2] - 91:4, 91:14
understood [5] - 14:25, 15:6, 15:18, 42:9, 85:10
undisputed [2] - 34:16, 86:15
undisputedly [1] - 86:7
unduly [2] - 11:21, 70:18
unexplained [1] - 43:10
Unfair [1] - 48:7
uniquely [1] - 28:14
UNITED [1] - 1:1
United [8] - 1:19, 30:1, 30:7, 30:14, 37:25, 67:10, 88:25, 92:14
uNITED [1] - 1:9
University [2] - 51:20, 59:21
university [1] - 77:9
unless [4] - 11:22, 52:19, 79:9, 91:19
unlike [4] - 26:21, 47:23, 51:19, 87:13
unlikely [1] - 38:2
unprecedented [1] - 23:9
unreasoned [1] - 43:10
unsafe [1] - 32:7
unsatisfied [1] - 64:10
untenable [1] - 32:4
unvaccinated [15] - 12:23, 16:5, 17:2, 17:11, 17:23, 18:1, 18:17, 19:10, 19:15, 50:6, 51:6, 57:16, 74:2, 86:6, 89:24
up [15] - 4:1, 7:9, 29:13, 30:11, 34:11, 44:19, 48:5, 51:8, 51:10, 58:9, 78:11, 85:17, 85:24, 91:22
upheld [2] - 26:21, 69:1
upholding [1] - 26:18
urge [1] - 16:13
utmost [2] - 33:10, 86:13

**V**

vaccinate [1] - 54:6

vaccinated [54] - 7:7, 7:23, 8:3, 8:23, 8:24, 9:3, 13:2, 18:7, 19:5, 22:16, 24:16, 25:1, 31:2, 35:21, 35:25, 37:2, 42:14, 47:5, 47:12, 48:9, 48:15, 49:19, 50:22, 51:2, 55:2, 55:5, 55:6, 55:13, 57:14, 60:8, 60:23, 61:11, 61:12, 61:15, 61:20, 61:23, 62:13, 62:16, 62:20, 62:23, 73:5, 78:5, 79:5, 79:7, 79:9, 80:2, 80:3, 80:16, 88:14, 91:12, 91:13, 92:22, 92:24, 92:25
vaccination [44] - 6:19, 7:19, 7:20, 8:5, 8:16, 8:17, 12:24, 13:4, 13:11, 16:14, 19:1, 19:7, 19:18, 19:25, 20:14, 21:4, 22:13, 25:24, 26:24, 42:6, 44:13, 45:5, 47:6, 47:11, 47:14, 48:21, 49:2, 49:21, 57:11, 65:3, 66:3, 72:22, 72:23, 73:15, 77:9, 80:24, 86:8, 88:9, 88:12, 89:15, 89:24, 91:10, 91:11, 91:19
vaccinations [1] - 66:21
vaccine [42] - 18:24, 19:2, 20:9, 20:25, 22:23, 23:4, 23:8, 36:24, 43:11, 43:13, 43:14, 46:18, 47:23, 49:10, 53:19, 54:19, 56:17, 58:7, 58:10, 58:14, 58:15, 59:2, 59:8, 59:14, 60:4, 61:20, 63:3, 63:7, 63:14, 64:14, 65:17, 66:15, 71:17, 71:24, 73:2, 73:3, 79:1, 79:14, 80:10, 81:14, 91:2
vaccine. [1] - 59:22
vaccines [4] - 19:3, 35:24, 45:2, 60:16
vacuum [1] - 90:14
valid [5] - 18:2, 38:23, 40:14, 40:17, 41:15
validated [1] - 35:21
value [2] - 15:5, 33:3
valued [1] - 34:25

variant [2] - 85:3, 90:25
variants [1] - 34:17
various [1] - 10:13
vast [2] - 61:22, 62:12
vehicle [1] - 14:9
verbal [9] - 14:23, 55:17, 55:22, 55:23, 58:11, 73:2, 73:4, 80:8, 80:9
verbally [1] - 89:16
verification [4] - 56:11, 56:14, 56:16, 57:2
verify [2] - 20:25, 91:19
versus [6] - 2:4, 20:18, 40:24, 51:20, 58:19, 79:3
vessel [1] - 65:4
viable [3] - 29:14, 53:3, 73:9
vice [1] - 54:24
video [1] - 3:1
VIDEO [2] - 23:3, 23:11
viewpoint [3] - 26:4, 75:23, 88:19
vigorously [1] - 78:14
village [1] - 72:3
violate [1] - 69:21
violates [2] - 3:9, 64:15
violation [4] - 31:7, 65:12, 67:8, 75:18
violative [2] - 49:4, 49:11
Virgin [4] - 48:21, 48:25, 49:6, 92:6
virtually [2] - 3:3, 54:18
virtue [2] - 54:23, 89:3
vis [2] - 38:18
vis-a-vis [1] - 38:18
visiting [1] - 28:11
vociferously [1] - 33:15
volition [1] - 33:15
voyage [2] - 91:18, 91:20
voyages [1] - 80:2
vs [1] - 1:5
vulnerable [1] - 34:15

**W**

wage [2] - 68:22, 68:22
wagging [1] - 28:6
wait [2] - 63:18, 63:20
waited [2] - 64:2,

64:17
waiter [1] - 21:15
waiting [1] - 64:8
walk [1] - 4:11
Walmart [1] - 54:5
wants [11] - 15:21, 30:13, 32:7, 33:14, 33:15, 45:1, 56:19, 60:9, 78:1, 78:2, 78:22
warn [1] - 3:22
warned [1] - 75:24
wash [1] - 62:8
Washington [2] - 1:13, 1:18
waters [5] - 49:16, 50:9, 50:12, 86:12, 86:19
Wayfair [2] - 11:16, 29:14
ways [3] - 18:17, 18:18, 32:7
wear [4] - 17:3, 50:2, 61:8, 79:9
wearing [2] - 19:12, 59:10
week [1] - 19:14
weeks [4] - 21:18, 30:21, 64:11
weigh [2] - 29:2, 34:19
weighing [1] - 36:6
welcome [2] - 19:9, 37:17
Wentworth [1] - 58:19
whatsoever [1] - 79:13
whatsoever? [1] - 38:21
whole [1] - 90:17
Whole [1] - 79:8
wide [1] - 35:11
WILLIAMS [1] - 1:9
Williamson [3] - 43:16, 44:1, 44:6
willing [3] - 15:17, 20:23, 85:23
win [3] - 23:24, 81:11
window [1] - 64:5
wink [2] - 49:18, 49:19
wire [2] - 7:8, 22:10
wish [5] - 8:4, 16:6, 44:13, 76:17, 93:8
wished [1] - 92:17
wishes [2] - 4:8, 4:16
withstand [1] - 7:14
Wollschaeger [17] - 45:11, 45:14, 45:22, 46:2, 46:7, 46:21, 60:11, 71:3, 76:2, 76:23, 87:5, 87:8,

87:10, 87:22, 88:1, 88:22
woman [2] - 21:18
wonderful [1] - 33:1
word [2] - 40:15, 90:23
words [1] - 14:18
world [4] - 8:4, 23:9, 34:1, 92:15
worried [2] - 59:1, 59:23
worries [1] - 62:8
worry [2] - 23:22, 54:8
worse [6] - 5:25, 17:7, 17:24, 18:4, 34:17, 86:7
worst [2] - 28:4, 31:7
would-be [3] - 10:20, 13:1, 19:17
wrath [3] - 5:25, 6:2
wrist [2] - 19:10, 19:12
writing [1] - 87:15
written [4] - 30:12, 72:22, 89:22, 93:12

**Y**

Yamaha [1] - 72:13
years [2] - 13:21, 26:19
yields [1] - 62:5

**Z**

zero [1] - 72:19
Zoom [1] - 6:4
ZOOM [1] - 1:8