# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 20, 2023

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

FILED BY _____ AP _____ D.C.

**Jan 20, 2023**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Appeal Number:  21-12729-GG
Case Style: Norwegian Cruise Line Holdings Ltd, et al v. State Surgeon General
District Court Docket No: 1:21-cv-22492-KMW

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

Clerk's Office Phone Numbers
| | |
|---|---|
| General Information | 404-335-6100 |
| New / Before Briefing Cases | 404-335-6135 |
| Cases in Briefing / After Opinion | 404-335-6130 |
| Cases Set for Oral Argument | 404-335-6141 |
| Capital Cases | 404-335-6200 |
| Attorney Admissions | 404-335-6122 |
| CM/ECF Help Desk | 404-335-6125 |

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-12729

_____

NORWEGIAN CRUISE LINE HOLDINGS LTD,
a Bermuda Company,
NCL (BAHAMAS), LTD.,
a Bermuda Company agent of Norwegian Cruise Line,
SEVEN SEAS CRUISES S. DE R.L. LLC,
d.b.a. Regent Seven Seas Cruises,
OCEANIA CRUISES S. DE R.L.,
d.b.a. Oceania Cruises,

Plaintiffs-Appellees,

*versus*

STATE SURGEON GENERAL,
Florida Department of Health, in his official capacity,

Defendant-Appellant.

2                                                        21-12729

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cv-22492-KMW

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion is-
sued on this date in this appeal is entered as the judgment of this
Court.

Entered: October 6, 2022

For the Court: DAVID J. SMITH, Clerk of Court

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 21-12729

————————————

NORWEGIAN CRUISE LINE HOLDINGS LTD,

a Bermuda Company,

NCL (BAHAMAS), LTD.,

a Bermuda Company agent of Norwegian Cruise Line,

SEVEN SEAS CRUISES S. DE R.L. LLC,

d.b.a. Regent Seven Seas Cruises,

OCEANIA CRUISES S. DE R.L.,

d.b.a. Oceania Cruises,

                                        Plaintiffs-Appellees,

*versus*

STATE SURGEON GENERAL,

Florida Department of Health, in his official capacity,

2                    Opinion of the Court                21-12729

                                          Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cv-22492-KMW

_____

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM, and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal concerns whether a Florida statute that prohibits all businesses operating in the state from requiring customers to provide documentary proof that they are vaccinated against COVID-19 violates the Free Speech and Commerce Clauses of the Constitution. Norwegian Cruise Line Holdings Ltd., a corporation headquartered in Florida, operates cruise ships that travel around the world. Norwegian requires everyone on board its ships to be vaccinated against COVID-19. To enforce that policy, Norwegian requires its customers to provide proof of vaccination. Florida sought to protect its residents from that kind of discrimination by enacting a statute that prohibits businesses from "requir[ing] patrons or customers to provide any documentation certifying COVID-19 vaccination or postinfection recovery to gain access to, entry upon, or service from the business operations in [Florida]."

FLA. STAT. ANN. § 381.00316(1). Norwegian sued Florida's Surgeon General and moved for a preliminary injunction. The district court entered a preliminary injunction on the grounds that the statute likely violates Norwegian's right to speak freely, *see* U.S. CONST. amends. I, XIV, and likely unduly burdens interstate commerce, *see* U.S. CONST. art. I, § 8, cl. 3.

We vacate the preliminary injunction. Florida's statute is a regulation of economic conduct that only incidentally burdens speech, which does not implicate the First Amendment. And its burdens on interstate commerce do not exceed the benefits of furthering Florida's substantial interests in protecting its residents from discrimination and invasions of privacy.

## I. BACKGROUND

After March 2020, the COVID-19 pandemic took a substantial toll on the cruise industry. Although some cruise lines voluntarily suspended operations, not all did. *See* 85 FED. REG. 16628, 16631 (Mar. 24, 2020). As a result, the federal government published a No Sail Order and generally prohibited cruise-ship operations. *Id.* For more than a year, Norwegian's "entire 28-vessel fleet was docked and inactive" because of the pandemic. And the halt of operations in that time allegedly cost Norwegian more than $6 billion.

Later that year, the Centers for Disease Control and Prevention published another order that "establishe[d] a framework for a phased approach to resuming cruise ship passenger operations in

U.S. waters." 85 Fᴇᴅ. Rᴇɢ. 70153, 70153 (Nov. 4, 2020). The conditional sailing order included the "[e]stablishment of laboratory testing of crew onboard cruise ships in U.S. waters"; "simulated voyages designed to test a cruise ship operators' ability to mitigate COVID-19 onboard cruise ships"; "a certification process"; and "a return to passenger voyages in a manner that mitigates the risk of COVID-19 introduction, transmission, or spread among passengers and crew onboard ships and ashore to communities." *Id.* And the order "contain[ed] requirements for . . . [s]horeside COVID-19 laboratory screening testing of all crew"; "onboard diagnostic testing capabilities for symptomatic travelers"; "shoreside COVID-19 laboratory screening testing of all newly embarking crew"; and "continued compliance with complete, accurate, and acknowledged, No Sail Order Response Plans." *Id.*

In April 2021, the Centers sent a letter to "Cruise Industry Colleagues." The letter included updates for fully vaccinated passengers and crew. "In lieu of conducting a simulated voyage" as announced in the phased approach, cruise ship operators could "submit to [the Centers] a clear and specific vaccination plan and timeline to limit cruise ship sailings to 95 percent of passengers who have been verified by the cruise ship operator as fully vaccinated prior to sailing."

The State of Florida sued the Centers and moved for a preliminary injunction on the ground that the conditional sailing order and the later instructions were unlawful. *See Florida v. Becerra*, 544 F. Supp. 3d 1241, 1246–47 (M.D. Fla. 2021). The district court

preliminarily enjoined the Centers "from enforcing against a cruise ship arriving in, within, or departing from a port in Florida the conditional sailing order and the later measures." *Id.* at 1305. The Centers appealed to this Court and requested a stay of the injunction. After we first granted that request, we *sua sponte* vacated our initial order and denied the Centers' request for a stay. *See Florida v. Sec'y, Dep't of Health & Hum. Servs.*, No. 21-12243 (11th Cir. July 23, 2021). This year, the Centers moved to voluntarily dismiss the appeal and we granted that motion. So, the conditional sailing order and later instructions are now non-binding guidelines, but all cruise lines operating in Florida have voluntarily complied.

Norwegian planned to resume sailing from Florida for the first time "aboard the *Norwegian Gem.*" On July 9, 2021, the Centers approved Norwegian's application for a conditional sailing certificate. Norwegian "attested to [the Centers] . . . that at least 95% of passengers and 95% of its crew on its upcoming cruise will be confirmed as fully vaccinated prior to sailing." (Internal quotation marks omitted.) When Norwegian submitted its attestation, it "planned—and continues to plan—to 'confirm[]' passengers' and the crews' COVID-19 vaccination status through documentation, which [it] understand[s] to be the only reliable way of confirming vaccination status in this context."

Florida acted to discourage and prohibit businesses from requiring vaccination documents as a condition of service. Governor Ron DeSantis issued an executive order declaring that "[b]usinesses in Florida are prohibited from requiring patrons or customers to

provide any documentation certifying COVID-19 vaccination or post-transmission recovery to gain access to, entry upon, or service from the business." Fla. Exec. Order No. 21-81 § 2 (Apr. 2, 2021). The order required that businesses comply "to be eligible for grants or contracts funded through state revenue." *Id.* § 4. The Governor explained that "many Floridians have not yet had the opportunity to obtain a COVID-19 vaccination, some have infection-acquired immunity, and others may be unable to obtain a COVID-19 vaccination due to health, religious, or other reasons." *Id.* at 1. The order also stated that "individual COVID-19 vaccination records are private health information which should not be shared by mandate" and that "COVID-19 vaccine passports reduce individual freedom and will harm patient privacy." *Id.*

The next month, the Florida Legislature enacted a statute that is substantively identical to section 2 of the executive order. The statute prohibits vaccine-documentation requirements as follows:

> [A]ny business operating in this state . . . may not require patrons or customers to provide any documentation certifying COVID-19 vaccination or postinfection recovery to gain access to, entry upon, or service from the business operations in this state. This subsection does not otherwise restrict businesses from instituting screening protocols consistent with authoritative or controlling government-issued guidance to protect public health.

21-12729                Opinion of the Court                7

FLA. STAT. ANN. § 381.00316(1). The statute further declares that
the State "may impose a fine not to exceed $5,000 per violation."
*Id.* § 381.00316(4). The statute became effective on July 1, 2021.

The proponents of the legislation based their support on rea-
sons like those of the Governor. In the House, Representative Tom
Leek—the sponsor of the bill and the chairman of the Pandemics
Committee—reasoned that the statute would protect a substantial
minority population from discrimination:

> We must recognize that vaccine hesitancy is real and
> understandable. Don't get me wrong: . . . get vac-
> cinated. Please! Get vaccinated; let's return to nor-
> mal. But recognize that it is fair for certain segments
> of our community to be hesitant about getting the
> vaccine, and that it is absolutely true that the largest
> segment of our community that is vaccination-hesi-
> tant is our minority population. It was not anti-free-
> dom nor wrong when the State stepped in and said
> that employers could not discriminate on the basis of
> race. It was not anti-freedom nor wrong when the
> State told landlords that they could not discriminate
> against people with disabilities. And it is right today
> for the State to tell businesses that they may not—
> may not—enact policies that unfairly and disparately
> discriminate against our minority populations.

*House Session*, FLA. HOUSE OF REPRESENTATIVES, at 2:28:28–
2:29:37 (Apr. 28, 2021), https://www.flsenate.gov/media/Video-
Player?EventID=1_2usodgs8-202104281030&Redirect=true. Rep-
resentative Leek also explained that the "bill protects the rights of

a material portion of our minority population who remains vaccine hesitant." *Id.* at 2:30:45–2:30:56. Representative Mike Beltran explained that news reports confirmed the existence of discrimination against people based on vaccination status and concluded that "we have people discriminating against you if you're not vaccinated. Why are we doing this?" *Id.* at 2:24:25–2:24:59.

In the Senate, Senator Danny Burgess reasoned along similar lines. He explained that the Legislature was "making sure there's not a chilling effect for those who . . . have religious reasons for not getting [the vaccine] or health reasons for not wanting to get it." *Senate Session*, FLA. SENATE, at 6:24:00–6:24:10, (Apr. 29, 2021), https://www.flsenate.gov/media/VideoPlayer?EventID=1_3wpkrnbb-202104291000&Redirect=true. He added that the "vaccine is not mandated and we have exemptions already when it comes to religious beliefs, so I think that we're just in line with . . . those policies." *Id.* at 6:24:08–6:24:19. And when asked "about . . . cruise ship[s]" specifically, Senator Burgess explained that "we're making a public policy call here in Florida that . . . if you operate a business here in Florida you cannot require one to have a vaccine . . . to gain entry." *Id.* at 6:30:36–6:30:57.

The cruise industry did not uniformly adopt a vaccination requirement for all passengers. Carnival Cruise Line, Royal Caribbean International, Celebrity Cruises, and MSC Cruises each "allowed at least some unvaccinated passengers to sail, although the policy regarding the number of unvaccinated passengers permitted to sail on each ship varie[d] by company." Some of these cruise

lines "required vessels to sail with at least 95 percent of their passengers fully vaccinated" and required "[v]accinated passengers" to provide proof of their vaccination status at the terminal. "Other companies, such as MSC, have not required ships to sail with a set percentage of vaccinated guests." Norwegian took a more restrictive approach that would exclude all unvaccinated persons from their cruises. Indeed, Norwegian "promised its passengers 100% vaccinated cruises *before* [the statute] was enacted on May 3, 2021, and before it took effect on July 1, 2021." (Emphasis added.)

Norwegian and several of its wholly owned subsidiaries sued the Surgeon General of Florida in his official capacity and moved for "[p]reliminary and permanent injunctive relief preventing [the Surgeon General] from enforcing Florida Statute § 381.00316 against [Norwegian], including any subsidiaries, operators or agents" and a "declaration that [the statute] is unlawful as applied to" Norwegian. Norwegian complained that "[w]hile [it] [intended to] require documentation confirming that its passengers have been vaccinated," the State "enacted a law . . . that expressly *prohibits* [Norwegian] from requiring such documentation." Norwegian asserted that the statute "blocks communications between a business and its customers . . . in violation of the First Amendment" and "profoundly disrupts the proper flow of interstate and international commerce without advancing any substantial state interest . . . in violation of the Dormant Commerce Clause."

To support its claims, Norwegian alleged that its ships "sail to interstate and foreign ports" and that "[m]any such ports require

proof of vaccination to enter, proof of vaccination to enter without a mandatory quarantine, or proof of vaccination to enter without testing." Norwegian "scheduled several upcoming voyages to foreign ports that require proof of vaccination to enter *without testing*, including Belize, Bahamas, British Virgin Islands, and Honduras." (Emphasis added.) "As such, [Norwegian] . . . planned cruises requiring proof that 100% of passengers and crew have been vaccinated against COVID-19." Norwegian alleged that it "cannot verify its passengers' COVID-19 vaccination status unless it can require passengers to show documentation certifying that they are fully vaccinated" because "[t]here is no adequate substitute for documentary proof when it comes to confirming vaccination status." Because "the only way for [Norwegian] to require vaccine documentation . . . would be by eschewing operations in Florida," Norwegian alleged that its "operations will be impaired and it will lose substantial revenue." It alleged that "Florida's [statute] threatens to disrupt and even shut down the interstate and foreign cruise operations of [Norwegian]." And the statute allegedly burdens Norwegian's speech because it "restricts the transmission of information based on its content, as it expressly prohibits transmission only of documentation 'certifying COVID-19 vaccination or postinfection recovery.'" (Quoting Fla. Stat. Ann. § 381.00316(1).)

In an affidavit Norwegian filed in the district court, Dr. Stephen Ostroff explained that "[r]equiring that all passengers and crew be fully vaccinated is the single best way to guard against COVID-19 transmission on cruise ships." He added that "cruise

lines [cannot] effectively implement passenger and crew vaccination requirements" without "an adequate way to verify vaccination status" because "it is not uncommon for individuals to attempt to evade public health screening protocols."

Norwegian's Chief Executive Officer, Frank J. Del Rio, explained in an affidavit that "80% of cruise passengers would prefer fully vaccinated voyages" and that "[t]he maintenance of consumer confidence and goodwill is essential for sustainable business success in the cruise industry." He also explained that "requiring full vaccination for 100% of passengers and crew is consistent with the vaccination protocols required by many foreign ports where [Norwegian] ships are scheduled to visit." He reported that "[n]o other jurisdiction that [Norwegian] operates in around the world prohibits documenting passengers' vaccination status as Florida now does." And he attested that "[t]he loss of revenue caused by the [statute] in calendar year 2021 could exceed $100 million and could also result in a loss or diminishment of employment for [Norwegian] employees in South Florida."

Norwegian moved for a preliminary injunction, which the district court granted. The district court enjoined the Surgeon General "from enforcing [s]ection 381.00316 against [Norwegian] pending resolution of the merits of this case." It "f[ound] that [Norwegian] [was] entitled to a preliminary injunction because [it] ha[d] shown: (1) a substantial likelihood of success on the merits of [its] First Amendment and [D]ormant Commerce Clause claims; (2) that [it] would suffer irreparable injury absent an injunction; and

(3) that the equities and public interest weigh in favor of an injunction." On the First Amendment claim, the district court ruled that section 381.00316 is a content-based restriction; it rejected the argument that section 381.00316 is an economic regulation of conduct that only incidentally burdens speech; and it held that the statute fails to survive heightened scrutiny. On the Dormant Commerce Clause claim, it ruled that section 381.00316 "does not directly regulate, or affirmatively discriminate against, interstate commerce" and that the "[s]tatute is applicable to both out-of-state and in-state business entities that operate in the State of Florida." The district court concluded—and the parties agreed—that the statute "does not implicate concerns about local economic protectionism raised by courts that" enjoin statutes that do. It applied the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). It ruled that the Surgeon General "failed to articulate how the goals of medical privacy and antidiscrimination are fulfilled by the express terms of the [s]tatute." And it ruled that the burdens on interstate commerce are likely to be clearly excessive in relation to the putative local benefits of the statute.

After the Surgeon General filed this appeal, Norwegian identified two destinations that had since required all passengers aged 12 and older to be fully vaccinated for ships to enter port—the Bahamas and the United States Virgin Islands. But before oral argument, the Surgeon General notified this Court that the governments of those destinations now allow unvaccinated persons to enter with negative COVID-19 tests. *See* Emergency Powers (Covid-

19 Pandemic) (Management and Recovery) (No.2) (Amendment) (No. 8) Order, 2021, at 2–3, PRIME MINISTER OF THE BAHAMAS (Aug. 19, 2021) (specifying that the order is "[e]ffective the 3rd day of September, 2021 until the 1st day of November, 2021"); *Travel Protocols*, THE BAHAMAS (Apr. 2, 2022), https://travel.gov.bs/file/travelProtocols; Thirty-Fifth Supplemental Executive Order and Proclamation by the Governor of the United States Virgin Islands § 4, at 7–8, OFFICE OF THE GOVERNOR (Feb. 28, 2022).

## II. STANDARD OF REVIEW

"We review a district court's grant of a preliminary injunction for abuse of discretion." *Fed. Trade Comm'n v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1077 (11th Cir. 2021). "We review the preliminary injunction's underlying legal conclusions *de novo* and its findings of fact for clear error." *Id.* at 1078.

## III. DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right," *id.* at 1077 (internal quotation marks omitted), and the party seeking that remedy must satisfy a four-part test, *Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020). First, it must prove that "it has a substantial likelihood of success on the merits." *Id.* (internal quotation marks omitted). Second, it must prove that it will suffer irreparable injury unless the injunction issues. *Id.* Third, it must prove that the injury that threatens it "outweighs whatever damage the proposed injunction may cause the opposing party." *Id.* (internal quotation marks omitted). Finally, it

must prove that "the injunction would not be adverse to the public interest" if issued. *Id.* (internal quotation marks omitted).

We divide our discussion in two parts. First, we explain that Norwegian is unlikely to succeed on the merits of its First Amendment claim. Second, we explain that Norwegian is unlikely to succeed on the merits of its Dormant Commerce Clause claim.

### A. Norwegian Is Unlikely to Succeed on the Merits of Its First Amendment Claim.

"The First Amendment, applicable to the States through the Fourteenth Amendment," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), provides that governments "shall make no law . . . abridging the freedom of speech," U.S. CONST. amend. I. That command generally removes from governments the "power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed*, 576 U.S. at 163 (internal quotation marks omitted). Statutes "that target speech based on its communicative content" are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* And "regulation[s] of speech [are] content based if [they] appl[y] to particular speech because of the topic discussed or the idea or message expressed." *Id.*

The parties disagree about whether section 381.00316(1) is a content-based restriction of speech subject to heightened scrutiny. The Surgeon General argues that the statute is not subject to the First Amendment because it is a regulation of economic *conduct*

that only incidentally burdens speech. Norwegian argues that the statute is a content-based restriction of *speech* that cannot survive strict or intermediate scrutiny.

We agree with the Surgeon General. "In cases at the margin, it may sometimes be difficult to figure out what constitutes speech protected by the First Amendment. But this is not a hard case in that respect." *See Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc).

Statutes that regulate non-expressive conduct do "not implicate the First Amendment at all" even if they incidentally burden speech. *See Otto*, 981 F.3d at 861, 865. "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* The Supreme Court has long acknowledged that making "a course of conduct illegal" is not "an abridgment of freedom of speech . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). It has affirmed that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of the activity." *Id.* And it has rejected the contention "that the constitutional freedom for speech . . . extends its immunity to speech

or writing used as an integral part of conduct in violation of a valid criminal statute." *Giboney*, 336 U.S. at 498. That "expansive interpretation" of the First Amendment "would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society." *Id.* at 502. So, if section 381.00316 regulates non-expressive economic conduct that only incidentally burdens speech, then it does "not implicate the First Amendment at all." *See Otto*, 981 F.3d at 861, 865.

Anti-discrimination statutes ordinarily regulate non-expressive conduct. The "focal point" for their prohibitions is "on the *act* of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 572 (1995) (emphasis added). Enacting anti-discrimination statutes is "well within the State's usual power . . . when a legislature has reason to believe that a given group is the target of discrimination, and . . . do[es] not, as a general matter, violate the First or Fourteenth Amendments." *Id.* For that reason, "philosophical objections" do not generally "allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018). "Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely

because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992). And the Supreme Court has repeatedly applied these principles in rejecting First Amendment challenges to anti-discrimination statutes. *See, e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (rejecting the argument "that application of Title VII . . . would infringe constitutional rights of expression" because "invidious private discrimination . . . has never been accorded affirmative constitutional protections" (alteration adopted) (internal quotation marks omitted)); *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (explaining that although "parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable, . . . it does not follow that the *practice* of excluding racial minorities from such institutions is also protected").

Section 381.00316 is an anti-discrimination statute that regulates non-expressive economic conduct. The statute prohibits "any business operating in" Florida from "requir[ing] patrons or customers to provide any documentation certifying COVID-19 vaccination or postinfection recovery to gain access to, entry upon, or service from the business operations in [Florida]." FLA. STAT. ANN. § 381.00316(1). A "requirement" is "[t]he *act* of establishing something as a need or necessity." *See Requirement*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). The plain meaning of the statute prohibits the same action as any run-of-the-mill anti-discrimination statute: closing the business's doors to a class of

persons based "on . . . proscribed grounds." *See Hurley*, 515 U.S. at 572. A business violates section 381.00316 when it commits the "act," *see id.*, of "deny[ing]" patrons or customers "access to goods and services," *Masterpiece*, 138 S. Ct. at 1727, based on their failure to prove that they are not members of the protected class. *See* FLA. STAT. ANN. § 381.00316(1). It prohibits businesses from discriminating by "treat[ing] differently" vaccinated and unvaccinated persons based on a condition that members of only one class can satisfy. *See Wollschlaeger*, 848 F.3d at 1317. And it protects conduct for those who either cannot or desire not to comply with the proscribed condition. *See* FLA. STAT. ANN. § 381.00316(1). So, section 381.00316(1) targets "the *practice* of excluding [persons] from" businesses and prohibits their exclusion. *See Runyon*, 427 U.S. at 176.

Section 381.00316(1) does "not implicate the First Amendment at all." *See Otto*, 981 F.3d at 861. Section 381.00316(1) "appl[ies] to non-expressive conduct such as failing to," *see Wollschlaeger*, 848 F.3d at 1317, grant persons who are unwilling or unable to verify their vaccination status "access to, entry upon, or service from the business operations," FLA. STAT. ANN. § 381.00316(1). And when the statute regulates non-expressive conduct in that way, "there is no First Amendment problem." *Wollschlaeger*, 848 F.3d at 1317.

Norwegian argues that the statute regulates communications between businesses and customers. It argues that "Florida's [b]an restricts the free flow of vital, potentially life-saving

information by targeting only one type of *written* information exchange." It adopts the view of the district court that section 381.00316 "regulates speech because it restricts the free flow of information by rendering the *exchange* permissible in some circumstances but impermissible in others." And it maintains that "[t]he [b]an is triggered by a specific mode (documentary) of conveying specific information (vaccination against COVID-19) between a specific speaker and audience (customer to business)" because "[o]nly if a business first engages in this communicative exchange can its ensuing conduct (restricting access) violate the [b]an." We disagree.

Section 381.00316(1) limits no communications between customers and businesses. Norwegian concedes that the statute does not prohibit businesses from *asking* customers about their vaccination status. *See Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 135–36 (3d Cir. 2020) (holding that a provision "clearly regulate[d] speech because it prevent[ed] employers from asking potential applicants specific questions" about wage history but holding that a provision that prohibits "the act of *relying* on wage history to set a salary" regulated conduct). And the statute does not prohibit customers from *responding*—orally or in writing—with that information and proof. *Cf. Wollschlaeger*, 848 F.3d at 1307 (holding that provisions "trigger[ed] First Amendment scrutiny" because they "expressly limit[ed] the ability of certain speakers—doctors and medical professionals—to write and speak about

a certain topic—the ownership of firearms—and thereby re-strict[ed] their ability to communicate and/or convey a message").

What businesses may *not* do is close their doors to custom-ers who decline to present private medical documentation. *See* FLA. STAT. ANN. 381.00316(1). The act of closing the doors to those persons is prohibited, not any communicative exchange between them and the businesses that would like to discriminate against them "on the proscribed grounds." *See Hurley*, 515 U.S. at 572. Section 381.00316(1) is distinguishable from "speaker-focused and content-based restrictions on speech" that "limit a category of peo-ple—[such as businesses]—from communicating a particular mes-sage." *Cf. Otto*, 981 F.3d at 863 (internal quotation marks omitted) (holding that regulations of therapists were speaker-focused and content-based restrictions because they expressly restricted thera-pists "from communicating a particular message").

To be sure, Norwegian correctly asserts that the statute does not prohibit requiring oral verification of vaccination status, *see* FLA. STAT. ANN. § 381.00316(1), but that fact means only that the statute does not prohibit all conceivable discriminatory conduct against unvaccinated and privacy-concerned persons. Likewise, a statute that prohibits "any business" from "requir[ing] patrons or customers to provide any documentation certifying" that they are American born "to gain access to, entry upon, or service from the business," *see id.*, would not prohibit all discriminatory conduct against foreigners, but it would proscribe a subset of that kind of non-expressive conduct. *Cf., e.g.*, 42 U.S.C. § 2000e-2(a), (a)(1) ("It

shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual . . . because of such individual's . . . national origin."); 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of . . . national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). Different statutes can target different instances of the same kind of evil. And governments need not eliminate all discrimination whenever they wish to eliminate any. *See Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) ("[I]n deciding the constitutional propriety of the limitations in . . . a[n antidiscrimination] measure we are guided by the familiar principles that a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." (citations and internal quotation marks omitted)).

The only speech that section 381.00316(1) burdens is incidental to its direct prohibition of the discriminatory conduct of excluding persons the statute protects. "We recognize . . . the longstanding principle that valid regulations of conduct might sweep up some speech at their margins." *Otto*, 981 F.3d at 865. Although businesses may request documentary proof of vaccination status, they cannot use words to exclude people who decline that request—"in that case, sir, you may not enter." But burdens to that

kind of speech are precisely those that do not implicate the First Amendment when the statute is "directed at commerce or conduct." *Sorrell*, 564 U.S. at 567. "That is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs." *Id.* (internal quotation marks omitted). Norwegian likewise cannot put up a sign that says, "No Vaccine Passport, No Entry." That sign—analogous in this context to "a supervisor's statement 'sleep with me or you're fired'[—]may be proscribed not on the ground of any expressive idea that the statement communicates, but rather because it facilitates the threat of discriminatory conduct." *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 208 (3d Cir. 2001) (Alito, J.). "Despite the purely verbal [or written] quality of such a threat, it surely is no more 'speech' for First Amendment purposes than the robber's demand 'your money or your life.'" *See id.*

To be sure, anti-discrimination statutes can sometimes offend the First Amendment. *See Wollschlaeger*, 848 F.3d at 1317. Anti-discrimination statutes offend the First Amendment when they "declar[e] [another's] speech . . . to be the public accommodation" to which protected persons must be given access for their own expression. *Hurley*, 515 U.S. at 573 (holding that "state courts' application of [an anti-discrimination] statute had the effect of declaring" a parade that had an "expressive character . . . to be [a] public accommodation"). And they can also give offense if the regulated conduct is, as Norwegian argues here, expressive.

Section 381.00316(1) does not burden speech or expressive conduct in those forbidden ways. The statute does not "requir[e] [Norwegian] to alter the expressive content of" its speech in the way that adding an unwanted message to a parade would do. *See id.* at 572–73. And the Supreme Court has "extended First Amendment protection only to conduct that is *inherently* expressive." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.* (*FAIR*), 547 U.S. 47, 66 (2006) (emphasis added). "An observer who sees" a patron board cruise A instead of B "has no way of knowing whether" B "is expressing its disapproval of the" unvaccinated passengers, "all [B's] rooms are full, or the [patron] decided for reasons of their own that they would rather" go on A. *See id.* "The expressive component" of Norwegian's "actions is not created by the conduct itself but by the speech that accompanies it," and "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue here"—denying service to people—"is not so inherently expressive that it warrants protection." *See id.*; *see also id.* ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it."). The "objections" Norwegian has and can publicly announce consistent with section 381.00316(1) "do not allow [it] . . . to deny protected persons equal access to goods and services." *Masterpiece*, 138 S. Ct. at 1727. And its cruise-line "services lack the expressive quality of a parade, a newsletter, or the editorial page of a newspaper," *see FAIR*, 547 U.S. at 64, even if Norwegian "intends" by those services "to express an idea," *see United States v. O'Brien*, 391 U.S. 367, 376 (1968).

Supreme Court precedent confirms our conclusion that section 381.00316(1) regulates economic conduct. In *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, the Supreme Court considered a statute that "prevents an institution from receiving certain federal funding if it prohibits military recruiters from gaining access to campuses, or access to students on campuses, for purposes of military recruiting in a manner that is at least equal in quality and scope" to other employers. 547 U.S. at 54 (alteration adopted) (internal quotation marks omitted). Law schools that sought to exclude for political reasons military recruiters from their campuses argued that the statute violates the First Amendment. *Id.* at 52–53. The Supreme Court rejected that contention. Like section 381.00316(1) in relation to businesses, the Supreme Court explained that the statute in *FAIR* "neither limits what law schools may say nor requires them to say anything." *See id.* at 60. The Court held that the statute in *FAIR* "regulates conduct, not speech" because "[i]t affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* And it likened the statute to permissible anti-discrimination statutes that regulate conduct. *Id.* at 62. The same reasoning establishes that section 381.00316(1) does not implicate the First Amendment: it affects what Norwegian "must *do*—afford equal access to" those who cannot or do not disclose their own private medical documentation—"not what [Norwegian] may or may not *say*." *See id.* at 60.

Our en banc decision in *Wollschlaeger v. Governor* also establishes that section 381.00316(1) regulates non-expressive conduct. In that decision, we considered a Florida statute that "prohibits discrimination 'against a patient based solely' on his or her ownership and possession of a firearm." 848 F.3d at 1317 (quoting FLA. STAT. ANN. § 790.338(5)). We upheld the statute because it "appl[ies] to non-expressive conduct such as failing to return messages, charging more for the same services, declining reasonable appointment times, not providing test results on a timely basis, or delaying treatment because a patient (or a parent of a patient) owns firearms." *Id.* And we can similarly uphold section 381.00316(1) because it regulates non-expressive conduct such as "failing to" admit someone who lacks vaccination documentation on board a cruise ship. *See id.*

Norwegian's reliance on *Sorrell v. IMS Health Inc.*, 564 U.S. 552, and *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144 (2017), is unavailing. Both decisions involved statutes that prohibited speakers from conveying information in particular ways. And neither is on point because section 381.00316(1) includes no similar prohibition.

In *Sorrell*, the Supreme Court invalidated a state statute that prohibited "pharmacies, health insurers, and similar entities from selling prescriber-identifying information . . . to pharmaceutical marketers"; that prohibited those businesses "from disclosing" the information "for marketing"; and that "bar[red] pharmaceutical manufacturers and detailers from using the information for

marketing." 564 U.S. at 563. The Court reasoned that the statute "prohibits pharmaceutical manufacturers from using the information for . . . marketing, that is, speech with a particular content." *Id.* at 564. It explained that the statute prohibits the sale of that information to recipients who will use it for marketing, but not to "those who wish to engage in certain educational communications." *Id.* (internal quotation marks omitted). And the Supreme Court confronted "a case in which the government [had] prohibit[ed] a speaker from conveying information that the speaker *already possesse[d]*," a prohibition that "implicated" "[a]n individual's right to speak." *Id.* at 568 (emphasis added) (internal quotation marks omitted).

Section 381.00316(1), by contrast, does not prohibit the conveyance of any information in either direction, and it in no way subjects to any restraints the communication of any information already in Norwegian's or its customers' possession. *Sorrell* is inapposite.

Norwegian's reliance on *Expressions Hair Design* is similarly unavailing. In that decision, the Supreme Court held that a statute that prohibited merchants from imposing a surcharge on credit card users but did not prohibit them from offering discounts for the use of cash regulated speech, not merely conduct. *See* 137 S. Ct. at 1146–47. The Court explained that "typical price regulation[s]" regulate the "seller's conduct" and only "indirectly dictate the content of [his] speech." *Id.* at 1150–51. If, for example, the price regulation declares that a sandwich shop must charge $10 for

sandwiches, the regulation would regulate "the amount that a store could collect," and would incidentally involve communicating to customers that the price for a sandwich is $10. *Id.* But the ban on surcharges told "merchants nothing about the amount they [were] allowed to collect from a cash or credit card payer." *Id.* at 1151. Instead, the ban "regulate[d] . . . how sellers [could] communicate their prices." *Id.* A seller could communicate that the price is $10.30, with a $0.30 cash discount, but could not communicate that the price is $10.00, plus $0.30 for credit card users. *Id.* "In regulating the communication of prices rather than prices themselves, [the statute] regulate[d] speech." *Id.* Section 381.00316(1), by contrast, does not tell businesses how they may describe permissible conduct to customers. *Cf. Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1245 (11th Cir. 2015) ("Calling [a Florida statute] a 'no-surcharge law,' then, is something of a misnomer. The statute targets expression alone. More accurately, it should be a 'surcharges-are-fine-just-don't-call-them-that law.'").

We conclude that section 381.00316(1) does "not implicate the First Amendment at all," *see Otto*, 981 F.3d at 861, because it regulates non-expressive economic conduct. And "run-of-the-mill economic regulations [are] assessed under rational-basis review." *Dana's R.R. Supply*, 807 F.3d at 1251. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955). Section 381.00316(1) bears a rational relationship to the State's

substantial interests in protecting its residents from discrimination
and burdens to privacy because it prohibits businesses from exclud-
ing people who cannot or wish not to produce private medical doc-
umentation.

### B. Norwegian Is Unlikely to Succeed on the Merits of Its Dormant Commerce Clause Claim.

The Commerce Clause provides that "Congress shall have
Power . . . [t]o regulate Commerce with foreign Nations, and
among the several States." U.S. CONST. art. I, § 8, cl. 3. Although
this clause expressly concerns Congress's power, the Supreme
Court has discerned a dormant or negative aspect that limits the
power of the "several States," *id.*, to burden foreign or interstate
commerce. "The Dormant Commerce Clause prohibits regulatory
measures designed to benefit in-state economic interests by bur-
dening out-of-state competitors." *Island Silver & Spice, Inc. v. Is-
lamorada*, 542 F.3d 844, 846 (11th Cir. 2008) (internal quotation
marks omitted). And there are only two ways a statute can violate
the Dormant Commerce Clause: "by discriminating against inter-
state commerce or . . . by unduly burdening interstate commerce."
*Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1244
(11th Cir. 2012).

A regulation violates the Dormant Commerce Clause only
if it fails either one of two tests. *See Islamorada*, 542 F.3d at 846.
First, protectionist regulations that directly discriminate against in-
terstate commerce, or that have "the effect of favoring in-state eco-
nomic interests," are invalid unless they "advance a legitimate local

purpose that cannot be adequately served by reasonable nondis-criminatory alternatives." *Id.* (alteration adopted) (internal quota-tion marks omitted). These regulations are unconstitutional if the State cannot satisfy that narrow exception. *Fla. Transp. Servs., Inc.*, 703 F.3d at 1244. Second, "if the law or regulation advances a legit-imate local interest and has only indirect effects on interstate com-merce, we apply the balancing test from *Pike*." *Id.* at 1244 (internal quotation marks omitted).

The district court correctly ruled that section 381.00316(1) neither directly nor indirectly discriminates against interstate com-merce. *Accord* Dissenting Op. at 13 n.20. Indeed, the statute ex-pressly regulates all and only "business[es] operating in [Florida]"— both local and out-of-state—for their "business operations in [Flor-ida]." *See* FLA. STAT. ANN. § 381.00316(1). And the parties agree that the statute survives this test.

The sole question then is whether section 381.00316(1) sat-isfies *Pike*'s balancing test: "Where the statute regulates even-hand-edly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in rela-tion to the putative local benefits." *Pike*, 397 U.S. at 142. Under this test, we must first determine whether "a legitimate local purpose" for section 381.00316 exists. *See id.* If the State has a legitimate local purpose in enacting section 381.00316(1), we weigh the local bene-fits of enforcing the statute against the burdens imposed on inter-state commerce. *Id.* Only if the burdens on interstate commerce

clearly exceed the local benefits of section 381.00316 will we invalidate that statute. *See Fla. Transp. Servs.*, 703 F.3d at 1244. "And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted *as well* with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142 (emphasis added).

The Surgeon General asserts two state interests. First, the Surgeon General asserts that Florida has an interest in ensuring that businesses operating within the state do not discriminate against its citizens for failure to provide documentation of vaccination status. Second, the Surgeon General asserts that Florida has an interest in protecting the medical privacy of its residents.

Protecting residents from economic discrimination is a substantial interest. That interest derives from the State's traditional "police powers to protect" the well-being of its residents. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). "The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons"—latitude that includes regulating economic relationships. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (internal quotation marks omitted); *see also id.* (explaining that "States possess broad authority under their police powers to regulate the employment relationship" (internal quotation marks omitted)). "[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985). The

Supreme Court has "long recognized that a State's interests in the health and well-being of its residents extend beyond mere physical interests to economic and commercial interests." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982); *see also id.* at 608 (acknowledging "the State's interest in the removal of barriers to the participation by its residents in the free flow of interstate commerce"). And the Supreme Court has also "recognize[d] a similar state interest in securing residents from the harmful effects of discrimination," "a substantial interest" that consists in "assuring its residents that it will act to protect them from" that discrimination. *See id.* at 609; *Wollschlaeger*, 848 F.3d at 1314 (explaining that the State "has a substantial interest in making sure that its residents are able to obtain health care without discrimination"). So protecting residents from being excluded from access to goods and services by businesses that operate within the State is a substantial interest weightier than a "legitimate local" one. *See Pike*, 397 U.S. at 142.

It is true, as the dissent states, that deference is not warranted whenever a state asserts that it is promoting its economy or protecting a domestic industry. Dissenting Op. at 24. But this statute directly protects a class of individuals from being ostracized. Like any antidiscrimination statute, it protects these individuals by preventing businesses from excluding them from the market. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 609; *Wollschlaeger*, 848 F.3d at 1314. The statute prevents real harm, not some abstract economic impact. Without this statute, unvaccinated Floridians

risk being turned away from the businesses that make their lives possible—grocery stores, restaurants, fitness gyms, clothing stores, barber shops and hair salons, and even pharmacies. After all, the statute covers "any business operating in [Florida]," not just luxury ocean liners. FLA. STAT. ANN. § 381.00316(1). The dissent's attempt to artificially limit the State's interest to the protection of cruise ship passengers is, therefore, not persuasive. Dissenting Op. at 1 n.1. Florida's interest in protecting the unvaccinated from discrimination—not generally promoting its economy—is legitimate.

In similar fashion, the dissent relies on a footnote in the Supreme Court's decision in *Head v. New Mexico Board of Examiners in Optometry*, 374 U.S. 424, 428 n.4 (1963), to argue that the State's interest is insubstantial because economic well-being has an attenuated connection to public health. Dissenting Op. at 25. But *Head* supports our position. For one, *Head* upheld the statute at issue: a New Mexico law that prevented the publication of price advertising of eyeglasses by a local newspaper and radio station. 374 U.S. at 429. For another, in doing so, *Head* recognized the "legitimacy of state legislation" to protect public health. *Id.* at 428. In reaching this conclusion, *Head* acknowledged that "[t]he case is not one . . . in which the State seeks to justify a statute as a health measure on the attenuated theory that the economic well-being of a profession or industry will assure better performance in the public interest." *Id.* at 428 n.4. So too here. The Florida statute was not designed to protect a discrete profession or industry. Instead, the statute serves the State's legitimate interest in prohibiting businesses

from excluding its citizens from the interstate market. The Supreme Court has already recognized this interest is a substantial one, *Barez*, 458 U.S. at 609, and *Head* says nothing to the contrary.

The state interest in protecting the privacy of residents is also substantial. "We recognize that protection of individual privacy is a substantial government interest." *Wollschlaeger*, 848 F.3d at 1314. Supreme Court "precedents . . . leave no room for doubt that 'the protection of potential clients' privacy is a substantial [and traditional] state interest.'" *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995) (quoting *Edenfield v. Fane*, 507 U.S. 761, 769 (1993)); *cf. also Cal. Democratic Party v. Jones*, 530 U.S. 567, 585 (2000) (explaining that "the State's interest in assuring the privacy of" party affiliation is not "a 'compelling' one" because that "specific privacy interest . . . is not [like] the confidentiality of medical records or personal finances").

Taken together, the two state interests are plainly weighty. That is, Florida has a substantial interest in protecting its residents from economic ostracism based on their hesitancy to divulge to businesses private medical information. And that weighty state interest is dispositive here.

Because Florida's substantial interests are in matters traditionally of state concern, the burdens section 381.00316(1) imposes on interstate commerce do not clearly exceed its putative local benefits. The Supreme Court has explained "that a State's power to regulate commerce is never greater than in matters traditionally of local concern." *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662,

670 (1981) (plurality opinion). One "example" is "regulations that touch upon safety," regulations that "the Court has been most reluctant to invalidate." *Id.* (internal quotation marks omitted). And "if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce." *Id.* (internal quotation marks omitted). The rationale for that strong deference to legislative judgments applies to other "example[s]" of "a State's power to regulate commerce . . . in matters traditionally of local concern," *id.*, such as regulations that touch upon the health and economic well-being of residents, *Barez*, 458 U.S. at 609; *Hillsborough*, 471 U.S. at 719. To be sure, "the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack[s]" if "[r]egulations designed for that salutary purpose nevertheless . . . further the purpose . . . marginally," while "interfer[ing] with commerce . . . substantially." *Kassel*, 450 U.S. at 670. But if "[w]e cannot say that the Florida legislature's [traditional] justification[s] w[ere] merely illusory" in that way, we also cannot "second guess the legislature's judgment as to the relative importance of [those] justifications versus any burdens imposed on interstate commerce." *Locke v. Shore*, 634 F.3d 1185, 1194–95 (11th Cir. 2011).

The dissent attempts to evade the fact that section 381.00316(1) is a traditional well-being regulation by implicitly relying on the false premise that such a regulation would have to promote residents' physical health and safety. The dissent asserts that

the statute "cannot seriously be described as a" safety regulation, Dissenting Op. at 33, but the Supreme Court has made clear that the traditional police power of the state includes promoting residents' *economic* health and safety, *Barez*, 458 U.S. at 609. Florida is entitled to promote that interest over possible benefits to residents' *physical* health and safety. And the dissent ignores the secondary health effects of economic harm of which the Legislature can take account. *Cf.* FLA. STAT. § 252.311(4) (explaining that it is "the intent of the Legislature to minimize the negative effects of an extended emergency" such as "the COVID-19 pandemic").

The decision of the Supreme Court in *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981), illustrates the substantial deference owed to state legislative judgments. In that case, "the Minnesota Legislature enacted a statute banning the retail sale of milk in plastic nonreturnable, nonrefillable containers, but permitting such sale in other nonreturnable, nonrefillable containers, such as paperboard milk cartons." *Id.* at 458. "Proponents of the legislation argued that it would promote resource conservation, ease solid waste disposal problems, and conserve energy." *Id.* at 459. After a dairy sued seeking an injunction for violating the Equal Protection, Due Process, and Dormant Commerce Clauses, the trial court invalidated the Act on all three theories because it found as a fact that "the Act w[ould] not succeed in effecting the Legislature's published policy goals." *Id.* at 460. The Supreme Court of Minnesota affirmed "on the federal equal protection and due process grounds" based on that finding. *Id.* at 460–61 (internal

quotation marks omitted). And the Supreme Court reversed. *Id.* at 461. It held that any burden to interstate commerce was "not clearly excessive in light of the substantial state interest in promoting conservation of energy and other natural resources and easing solid waste disposal problems, which [it] ha[d] already reviewed in the context of [its] equal protection analysis." *Id.* at 473 (citing *id.* at 465–70) (internal quotation marks omitted); *see also id.* at 470–71 n.14; *contra* Dissenting Op. at 19 (faulting this opinion for citing the equal-protection analysis that the Supreme Court itself cited in its Commerce Clause analysis).

The Supreme Court made clear the great deference owed to legislatures when their asserted interests are substantial. "Whether *in fact* the Act will promote more environmentally desirable milk packaging is not the question"; the question is whether the "Legislature *could rationally have decided* that its ban on plastic nonreturnable milk jugs might foster greater use of environmentally desirable alternatives." *Id.* at 466. The Court explained that the state courts' finding "that the Act is not a sensible means of conserving energy" was of no moment because "it is up to legislatures, not courts, to decide on the wisdom and utility of legislation," and because "the question clearly is at least debatable, the Minnesota Supreme Court erred in substituting its judgment for that of the legislature." *Id.* at 469 (citation omitted) (internal quotation marks omitted). And importantly, "it is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature." *Id.* at 470.

Both *Kassel v. Consolidated Freightways Corp.* and *Clover Leaf Creamery* make clear that we owe strong deference to the Florida Legislature when it exercises its traditional police powers to promote traditional local interests based on justifications that are not illusory. And the State's justifications are not illusory if applying section 381.00316(1) "as written" would "rationally contribute to [the State's] purported local benefits." *See Fla. Transp. Servs.*, 703 F.3d at 1260. Section 381.00316(1) clears that low bar.

Our dissenting colleague argues that *Clover Leaf* does not govern because there "the Court didn't need to engage in further analysis of the local-benefits side of *Pike*'s balance" because further analysis would not have made a difference to the balancing outcome since the law there imposed only a "minor" burden on commerce. Dissenting Op. at 57. But the problem with our dissenting colleague's argument is that the Court *did* engage in that analysis. *Clover Leaf Creamery Co.*, 449 U.S. at 470. In doing so, the Court offered a deferential approach toward state legislation that cannot be reconciled with the dissent's analysis. The Court's reasoning was echoed in *Kassel*, which the dissent does not suggest involved a "minor" burden on commerce. Indeed, *Kassel* addressed regulations that "impair[ed] significantly the federal interest." 450 U.S. at 671. And this Court has already read *Kassel* to command substantial deference to states without any caveat for a "minor" burden on commerce. *Locke*, 634 F.3d at 1194–95 (citing *Kassel*, 450 U.S. at 670)).

Applying section 381.00316(1) as written would rationally contribute to the State's purported local benefits. Those benefits include protecting its unvaccinated and privacy-minded residents from discrimination and required disclosures of private medical information—benefits that implicate traditional and substantial state interests. The statute rationally contributes to those interests by outlawing conduct by businesses that would directly discriminate against the unvaccinated, indirectly discriminate against minority communities that are disproportionately vaccine-hesitant, and require all residents—vaccinated or not—to disclose to businesses their private medical records.

These "point[s] w[ere] stressed by [section 381.00316(1)'s] proponents in the legislature," evidencing that they were among "the legislature's major concerns." *Clover Leaf Creamery Co.*, 449 U.S. at 468–69. "As Representative [Leek], chief sponsor of the bill in the House of Representatives, explained," *see id.* at 467, "the largest segment of our community that is vaccination-hesitant is our minority population," which is why "the State [should] tell businesses that they may not . . . enact policies that unfairly and disparately discriminate against our minority populations." *House Session*, *supra*, at 2:28:00–2:31:11. "Representative [Beltran] asked rhetorically, 'Why [are we doing this]?'," *see Clover Leaf Creamery Co.*, 449 U.S. at 469–70, after he reported that "we have people discriminating against you if you're not vaccinated." *House Session*, *supra*, at 2:24:20–2:25:00. And the Legislature passed the bill over

objections about the cruise industry. *See Senate Session*, *supra*, at 6:30:30–6:31:03.

The dissent dismisses this evidence of the Legislature's concerns, but its reasoning is unavailing. We, of course, share the dissent's concerns about the difficulties of discerning collective legislative intent—at least when trying to interpret a statute. Dissenting Op. at 39–40. But as the dissent concedes, we must look to legislative history because the Supreme Court has done so in this context. *Id.* at 39. Here, we are not using legislative history to determine what the statute means but to ensure that it serves a constitutional purpose. Legislative history is often used this way, *see, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993); *Wallace v. Jaffree*, 472 U.S. 38, 58 (1985); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977), and its limited application in this context avoids the pitfalls that Justice Scalia identified. The decision cited by the dissent, *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982), illustrates this exact distinction. In *New England Power*, the Court did not rely upon legislative history because it had to discern the meaning of a law passed by Congress to decide whether *Congress* had altered the limits of state power. *Id.* at 341. *New England Power* did not involve the deferential task of assessing whether a *state* law served a constitutional purpose. *Id.* So it is inapposite.

The dissent complains that we rely "exclusively" on Representative Leek's concern about Florida's vaccine-hesitant minority

populations, Dissenting Op. at 38, while ignoring the fact that he was the "chief sponsor of the bill in the House of Representatives," *see Clover Leaf Creamery Co.*, 449 U.S. at 467, and the Chairman of the Pandemics Committee. Instead of crediting his statements, the dissent uncharitably contorts another of Representative Leek's statements to imagine contradiction where none exists. When asked if any other state statute "created a new protected class that has not been addressed through constitutional law," Representative Leek responded that state law has indeed created protected classes but that "[t]hat is not addressed in this bill." Dissenting Op. at 37. That statement—that the creation of a new protected class is not addressed in the bill—does not mean, as the dissent asserts, that the bill has nothing whatever to do with protecting minority populations. *Id.* at 38. We decline the dissent's invitation to assume legislative mendacity with no evidence of it.

The dissent also latches on to our conclusion that the State's justifications were "rational" and erroneously argues that we have applied rational basis review to the State's arguments. *Id.* at 58. Both *Kassel* and *Clover Leaf Creamery* make clear that we must assess whether the State's justifications are illusory. *See Locke*, 634 F.3d at 1194–95. Only after determining whether deference is owed do we defer to the State's rational view. *Id.* Under rational basis review, by contrast, we do not assess whether the State's justifications are illusory. Instead, we defer to any "reasonably conceivable" facts or purposes that could support a classification, even if they are not the actual rationales behind the legislation. *F.C.C. v.*

*Beach Comm., Inc.*, 508 U.S. 307, 313 (1993). These are two differ-
ent standards, and we have correctly applied the former by deter-
mining that the State's justifications are not illusory.

The district court also second-guessed Florida's legitimate
justifications. Like the trial court in *Clover Leaf Creamery Co.*, 449
U.S. at 460, the district court found that "the record" establishes
that section 381.00316(1) "is materially [in]effective at" advancing
the State's interests. It reasoned that "nothing in the statute appears
to prohibit businesses from imposing a vaccination requirement"
in another form, such as by demanding *oral* verification. *See also*
Dissenting Op. at 47 (explaining that the statute does not prohibit
requiring oral verification of vaccination status). It also reasoned
that "Florida's failure to regulate employers, COVID-19 test re-
sults, and other medical documentation—including documentary
proof-of-vaccination requirements for schoolchildren—conflicts
with its purported desire to protect medical privacy." And it con-
cluded that "[t]he statute also does not actually protect against" dis-
crimination against unvaccinated persons because businesses may
still differentiate between the vaccinated and unvaccinated in im-
plementing other practices.

The district court erred for two reasons. First, the Supreme
Court "has made clear that a legislature need not strike at all evils
at the same time or in the same way." *Cloverleaf Creamery Co.*,
449 U.S. at 466 (internal quotation marks omitted). Indeed, "a leg-
islature may implement its program step by step, adopting regula-
tions that only partially ameliorate a perceived evil and deferring

complete elimination of the evil to future regulations." *Id.* (alterations adopted) (internal quotation marks omitted). The district court erred by subjecting the statute to a kind of means-end scrutiny that would require that it eliminate all conceivable discrimination and burdens of medical privacy if it wishes to eliminate any.

Second, the district court failed to give the Legislature the deference it was due. It is "at least debatable," *id.* at 469 (internal quotation marks omitted), whether the *direct* regulation of one kind of discrimination would *indirectly* discourage the other kinds that the district court identified. For example, Norwegian itself concedes that "[t]here is no adequate substitute for documentary proof when it comes to confirming vaccination status" and that businesses like Norwegian "cannot verify [their] [customers'] COVID-19 vaccination status unless [they] can require passengers to show documentation certifying that they are fully vaccinated." If so, it is rational to suppose that section 381.00316(1) would discourage businesses from engaging in what Norwegian concedes are exercises in futility. The Legislature "*could rationally have decided,*" *id.* at 466, to prohibit what in its view is the worst species of the kinds of evils it targeted *and* that its prohibition would discourage or eliminate other species in addition. And as for the conduct the statute directly prohibits, it is incontrovertible that it will succeed at reducing or eliminating that conduct. Without section 381.00316(1), some businesses would indeed discriminate as Norwegian itself did.

Florida is on firmer ground than Minnesota was in *Clover Leaf Creamery Co.* Although Minnesota's putative benefits depended on the truth of empirical claims, such as whether a particular ban would conserve energy, *id.* at 459–60, Norwegian concedes that section 381.00316(1) would stop businesses like Norwegian from requiring vaccine documentation as a condition of service. And no amount of empirical evidence is needed to understand that preventing compelled disclosures of medical documentation held by only one class of persons prevents instances of both discrimination and required disclosures of private medical documentation that would otherwise occur. *Contra* Dissenting Op. at 17 (relying on a decision in which the State's asserted physical-safety interests were subject to empirical disconfirmation).

The dissent insinuates that section 381.00316(1) is not a true antidiscrimination statute because discrimination based on vaccination status "contrasts sharply" with the "'invidious discrimination' that 'frequently occurs along ethnic lines.'" *Id.* at 48; *see also id.* at 33 (quoting *Barez*, 458 U.S. at 609). The dissent contests that comparison because it concludes that Norwegian does not "seek to invidiously discriminate against unvaccinated people; it seeks to distinguish between vaccinated and unvaccinated people to ensure the health and safety of its passengers." *Id.* at 45.

We disagree. Florida clearly sought to prevent discrimination *against* unvaccinated people by prohibiting businesses from distinguishing *between* vaccinated and unvaccinated people. The dissent resists this conclusion by arguing that "[i]n practice, the

statute protects only unvaccinated people against discrimination."
*Id.* at 40. But the State need not protect vaccinated and unvac-
cinated people from discrimination equally. After all, Section
381.00316(1) does not involve a constitutionally protected class or
anything like selective protection of one such class over others. *Cf.*
*City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("[T]he ju-
diciary may not sit as a superlegislature to judge the wisdom or
desirability of legislative policy determinations made in areas that
neither affect fundamental rights nor proceed along suspect
lines."). More analogous examples abound. Consider a statute that
prohibits employers from relying on the wage history of prospec-
tive employees to set wages. *See Greater Phila. Chamber of Com.*,
949 F.3d at 134–36. Or consider another statute that prohibits em-
ployers from requiring prospective employees to provide wage-re-
lated information. Those statutes target wage discrimination even
if they leave untouched other forms of discrimination against the
poor. And they are anti-discrimination statutes even if they "pro-
tect[] only [poor] people against discrimination" who have suffered
from wage discrimination. *See* Dissenting Op. at 47.

The Supreme Court has rejected the dissent's view that stat-
utes must strike at all forms of discrimination if they strike at any
to count as anti-discrimination statutes. *See Katzenbach*, 384 U.S.
at 656–57 (rejecting an argument that a statute "itself works an in-
vidious discrimination . . . by prohibiting the enforcement of [an]
English literacy requirement only for those educated in American-
flag schools . . . in which the language of instruction was other than

English" because anti-discrimination statutes "need not strike at all evils at the same time" and "reform may take one step at a time" (internal quotation marks omitted)). A legislature can conclude that one kind of discrimination involving a non-suspect class is more pressing than discrimination against another non-suspect class. And the Florida Legislature could have sensibly supposed that discrimination against the unvaccinated was a serious problem requiring legislative interposition but that discrimination against the vaccinated was not. *Cf. id.* at 657 (explaining that anti-discrimination "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind" (internal quotation marks omitted)). Indeed, the evidence the dissent marshals suggests that the Legislature was unmoved by arguments that discrimination against vaccinated people was a problem that needed the same remedy. Dissenting Op. at 47–48 (discussing floor statements citing an apparent example of discrimination against vaccinated people). So Florida has the discretion to determine that the differences between vaccinated and unvaccinated people do not reasonably justify the economic ostracism to which the Legislature found the latter would otherwise be subjected.

The dissent's distinction between invidious and non-invidious discrimination is also mistaken. *Id.* at 42–43. For one, the dissent assumes that the statute has nothing to do with protecting minority populations, but the statute, as Representative Leek stated, indirectly protects minority communities who are vaccine hesitant.

*Supra* at 7. In any event, the dissent fails to acknowledge that the State may recognize new protected classes beyond federal law. As the "double security" of a "compound republic," states can do more than federal law to ensure "security for civil rights." The Federalist No. 51 at 320 (James Madison) (Clinton Rossiter ed., 1961). For example, states may protect the indigent, the disabled, and the elderly from discrimination even though these classes are not constitutionally protected. The dissent ignores this basic point. Instead, it substitutes its own intuitions to conclude that Florida's interests are illusory because the statute only protects against (what it labels) "non-pejorative" or "neutral" discrimination (whatever those labels mean). Dissenting Op. at 34, 45–46.

The dissent has it backwards. The State—not an Article III court—has the constitutional authority to determine what is and is not a "reasonable distinction" between its citizens and what qualifies as discrimination worth remedying. *Id.* at 42. In doing so, the State may find, as a matter of fact, that it needs to protect the unvaccinated from being excluded from the market. The dissent's approach would flip the script and allow Article III judges to decide which of Florida's citizens deserve protection. And that approach would threaten the State's authority to protect its citizens from various forms of discrimination. We decline the dissent's invitation to put these policy decisions in the hands of unelected federal judges. The states are in a better position to make "reasonable distinctions" between their citizens and to secure their civil rights. For that

reason, the Constitution affords state legislatures great deference in this area. *Clover Leaf Creamery Co.*, 449 U.S. at 466.

The dissent's dismissal of Florida's substantial interest in protecting privacy is similarly unpersuasive. The dissent concludes that section 381.00316(1) "does not meaningfully promote privacy." *Id.* at 53. The dissent reasons that "the state itself requires Floridians to present proof of vaccination against diseases other than COVID-19 to attend schools at the very same time that Section 381.00316(1) prohibits cruise lines from requiring documentation of COVID-19 vaccination." *Id.* at 56. But the dissent's argument again rests on an unstated and false premise that legislatures must treat all diseases as though they are equal. The Legislature could have sensibly determined that the effects of polio on children justify burdening privacy but that the effects of COVID-19 on children do not. The Legislature expressly considered that *other* diseases warrant vaccination requirements in schools despite burdens to privacy. That kind of line-drawing is quintessentially one for legislatures, not this Court. And that a legislature might weigh health benefits against privacy interests differently for different diseases does not mean that it advances privacy interests "trivially" when it prohibits compelled disclosures whenever it decides that the privacy side of the scale is weightier.

We conclude that applying section 381.00316(1) "as written" would "rationally contribute to [the State's] purported local benefits." *See Fla. Transp. Servs.*, 703 F.3d at 1260. And because "[w]e cannot say that the Florida legislature's [traditional] justification[s]

w[ere] merely illusory," we also cannot "second guess the legislature's judgment as to the relative importance of [those] justifications versus any burdens imposed on interstate commerce." *Locke*, 634 F.3d at 1194–95. So, at the very least, Norwegian "must overcome a strong presumption of validity" that favors section 381.00316(1). *See Kassel*, 450 U.S. at 670 (internal quotation marks omitted).

Despite the evidence that it will suffer economically if it complies with section 381.00316(1), Norwegian cannot overcome that strong presumption of validity. Norwegian can travel with unvaccinated passengers to ports. Although the Bahamas and the United States Virgin Islands once required all passengers aged 12 and older to be vaccinated, the governments of those destinations have since revised their protocols to allow unvaccinated persons to enter with negative COVID-19 tests. Norwegian concedes that other foreign ports similarly allow unvaccinated passengers to enter with negative testing. And Norwegian's Chief Executive Officer testified that Norwegian "plann[ed] to require that passengers . . . test negative for COVID-19 before boarding [its] cruises" in any event. Even so, Norwegian relies on evidence that compliance with section 381.00316(1) would burden its operations. The district court concluded that "documentary proof of vaccination w[ould] expedite passengers' entry into virtually every single country and port where [Norwegian] intend[s] to sail." And it concluded that without such proof, other protocols would be "impractical" and "financially, legally, and logistically onerous" for Norwegian. But

these burdens to Norwegian are not "clearly excessive in relation to" the benefits of furthering the State's substantial anti-discrimination and privacy interests. *See Pike*, 397 U.S. at 142.

The Commerce Clause does not necessarily protect Norwegian against prohibitive burdens imposed by local law. "[T]he Commerce Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Clover Leaf Creamery Co.*, 449 U.S. at 474 (internal quotation marks omitted). So, "nondiscriminatory regulation[s] serving substantial state purposes [are] not invalid simply because [they] cause[] some business to shift from a predominantly out-of-state industry to a predominantly in-state industry." *Id.* The effect of prohibitive or burdensome regulations on individual firms ordinarily "relates to the wisdom of the statute, not to its burden on commerce." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128 (1978). To be sure, burdens to individual firms can sometimes be unduly burdensome if, against the facts here, the putative local benefits are illusory or insubstantial. In *Pike*, for example, "the State's tenuous interest in having the company's [products] identified as originating in [the State] c[ould not] constitutionally justify the requirement that the company build and operate an unneeded $200,000 . . . plant in the State." 397 U.S. at 145. But the *Pike* Court did not "deal[] . . . with state legislation in [a] field . . . where the propriety of local regulation has long been recognized," *id.* at 143 (internal quotation marks omitted), and it instead dealt with a regulation "requiring business operations to be performed in the home State

that could more efficiently be performed elsewhere," a kind of "burden on commerce [that] has been declared to be virtually *per se* illegal," *id.* at 145. Because the State's interests here are substantial and long recognized, the statute can subject some businesses to prohibitive or burdensome regulations.

Section 381.00316(1) also does not unduly burden out-of-state firms any more than domestic ones. The statute does not prohibit foreign cruise lines from imposing their preferred vaccination requirements when conducting business elsewhere, and those cruise lines that do impose their preferences abroad "may continue to move freely across the [Florida] border" on other trips. *Clover Leaf Creamery Co.*, 449 U.S. at 472. Compliance with the statute may very well impose additional costs on certain cruise lines, "but there is no reason to suspect that the gainers will be [Florida] firms, or the losers out-of-state firms." *See id.* at 472–73; *see also id.* at 473 n.17 ("The existence of major in-state interests adversely affected by [a statute] is a powerful safeguard against legislative abuse."). Indeed, Norwegian is headquartered in Florida. And the strong deference ordinarily due to the Legislature remains if the statute is burdensome to domestic and foreign businesses alike. *Cf. Kassel*, 450 U.S. at 675–76 ("Less deference to the legislative judgment is due . . . where the local regulation bears disproportionately on out-of-state residents and businesses."). "[B]ecause this burden is one shared by Florida and out-of-state firms alike, the burden is not clearly excessive in relation to the requirement's local benefit." *Locke*, 634 F.3d at 1195.

Norwegian also may choose to "eschew[] operations in Florida" if it is forced to comply with section 381.00316(1), but that choice would not establish a burden that is clearly excessive in relation to the State's substantial interests. Although "[s]ome [businesses] may choose to withdraw entirely from the [Florida] market, . . . interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate [business] to another." *Exxon*, 437 U.S. at 127. The district court acknowledged that some cruise lines do not impose the kind of requirement that Norwegian would like to impose. And those other cruise lines that maintain operations in Florida may, consistent with section 381.00316(1), continue to require compliance with other restrictions for the unvaccinated, such as COVID-19 testing.

Finally, neither the district court nor Norwegian has identified a less burdensome regulation that would "promote[] as well" the State's substantial interests. *See Pike*, 397 U.S. at 142. Norwegian argues that "Florida could have adopted a narrow carveout that specifically exempts cruise line operators or interstate activities and services, such as international cruises." (Internal quotation marks omitted.) The district court used the same examples and reasoned that the State's "failure to adopt a less restrictive alternative . . . undermine[s] the survival of [s]ection 381.00316 when applying the *Pike* balancing test." But there is no reason to believe that any less burdensome alternatives would have promoted the State's interest "as well" as section 381.00316(1). *Id.* For example, an

exemption for specific industries would allow businesses within them to discriminate against and require disclosures of private medical documentation from customers and patrons. It is hard to see how that state of affairs promotes anti-discrimination and privacy interests as well as an outright ban. Indeed, the district court faulted the State for not enacting a statute that more effectively promotes those interests by extending the ban to employer-employee relationships.

Norwegian and the district court "have suggested several alternative statutory schemes, but these alternatives are either more burdensome on commerce than [section 381.00316(1)] (as, for example, banning all [vaccination requirements]) or less likely to be effective (as, for example, providing" exemptions). *See Clover Leaf Creamery Co.*, 449 U.S. at 473–74. That reasoning would turn the *Pike* test on its head. Instead of a test designed to be deferential to nondiscriminatory state laws, the test would require invalidating all such laws. Every statute that incidentally burdens interstate commerce can have gerrymandered exemptions to prevent burdensome effects in particular industries or to particular firms, but *Pike* tells us that those effects are ordinarily permissible.

One final argument merits attention. "Because foreign commerce is at stake," Norwegian argues that "weightier justification is required from the State." "In the unique context of foreign commerce, a State's power is further constrained because of the special need for federal uniformity." *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 311 (1994) (internal quotation marks omitted).

This consideration is typically implicated in the context of "state tax[es] on the instrumentalities of foreign commerce," *see Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979); *see also Wardair Can. Inc. v. Fla. Dep't of Rev.*, 477 U.S. 1, 8 (1986), but it is also implicated in the context of foreign trade and discriminatory "export restrictions," *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 99–101 (1984) (invalidating a "protectionist" and "naked restraint on export of unprocessed [timber]" to a foreign country in part because "foreign commerce [was] burdened by the restriction"). Those contexts concern "international relations" and "foreign intercourse and trade," contexts in which "the people of the United States act through a single government with unified and adequate national power." *Japan Line, Ltd.*, 441 U.S. at 448 (internal quotation marks omitted).

By contrast, any burdens imposed by section 381.00316(1) result incidentally from matters traditionally of local concern. As we have explained, section 381.00316(1) is a "regulation of health and safety," "matters [that are] primarily, and historically, . . . matter[s] of local concern," *Hillsborough*, 471 U.S. at 719, not a tax or restraint on imports and exports. And it is not the case that Congress has given "substantial attention" to the kind of regulation at issue, which does not "regulat[e] commercial relations with foreign governments." *See Wunnicke*, 467 U.S. at 99–100 (internal quotation marks omitted). So the incidental burdens imposed on foreign commerce are not "clearly excessive in relation to the putative local benefits," *Pike*, 397 U.S. at 142, that result from Florida's

traditional power to pass local well-being regulations to further substantial local interests. *Cf. S. Pac. Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 783 (1945) (explaining that "[r]egulations affecting the safety of the[] use [of highways] . . . affect[s] alike shippers in interstate and intrastate commerce" and are "akin to quarantine measures, game laws, and like local regulations of rivers, harbors, piers, and docks, with respect to which the state has exceptional scope for the exercise of its regulatory power, and which, Congress not acting, have been sustained even though they materially interfere with interstate commerce").

We conclude that Norwegian is unlikely to succeed on the merits of its Commerce Clause claim. Florida has a substantial interest in protecting its "residents from the harmful effects of discrimination," *see Barez*, 458 U.S. at 609, and in protecting the medical privacy of its residents, *Wollschlaeger*, 848 F.3d at 1314. And Florida has sought to further those interests by enacting a statute that proscribes businesses from subjecting an entire class of residents—including a substantial minority population—to economic ostracism by requiring that they produce medical documentation they either do not have or would like not to convey. *Cf. Barez*, 458 U.S. at 609. Because these justifications are not illusory, this Court cannot "second guess the legislature's judgment as to the relative importance of [those] justifications versus any burdens imposed on interstate commerce." *Locke*, 634 F.3d at 1195. It follows that "the burden on interstate commerce" does not "clearly outweigh[] the State's legitimate purposes," *Clover Leaf Creamery Co.*, 449 U.S.

at 474, especially where, as here, "the interests on both sides are incommensurate"; "more like judging whether a particular line is longer than a particular rock is heavy," *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in the judgment). Florida may, consistent with the Commerce Clause, "remov[e] . . . barriers to the participation by its residents in the free flow of interstate commerce." *Barez*, 458 U.S. at 608.

## IV. CONCLUSION

We **VACATE** the preliminary injunction against the Surgeon General.

21-12729                ROSENBAUM, J., Dissenting                1

ROSENBAUM, Circuit Judge, Dissenting:

Today the Majority Opinion validates an unconstitutional Florida law—Florida Statutes Section 381.00316(1), which prohibits businesses from requiring patrons to show proof of vaccination to receive services—as that law applies to the cruise industry.[1]  It does so by effectively applying only half of the dormant Commerce Clause analysis that Supreme Court precedent requires—and not even applying that half correctly.  For dormant Commerce Clause challenges to state laws, Supreme Court precedent requires us to balance the local benefits a state's law brings against the burdens that law imposes on interstate and foreign commerce.  When the burdens clearly exceed the benefits, the law violates the dormant Commerce Clause.  Four major mistakes plague the Majority Opinion's application of the dormant Commerce Clause test.

First, the Majority Opinion shortcuts the balancing process by mislabeling Section 381.00316(1) a health and safety regulation.

---

[1] Plaintiffs-Appellants Norwegian Entities "br[ought] this [case as an] as-applied constitutional challenge," and the district court enjoined Florida "from enforcing Section 381.00316 against Plaintiffs [Norwegian entities]" only.  *Norwegian Cruise Line Holdings, Ltd. v. Rivkees*, 553 F. Supp. 3d 1143, 1148, 1180 (S.D. Fla. 2021).  Yet the Majority Opinion refuses to recognize that this appeal raises only an as-applied challenge.  *See* Maj. Op. at 31–32 (insisting on analyzing the statute facially and discussing its application to "grocery stores, restaurants, fitness gyms, clothing stores, barber shops and hair salons, and even pharmacies").  Perhaps that's because it recognizes the weakness of its arguments as they relate to this appeal as it was in fact brought.  More on this later. *See infra* at 49–50.

2                       ROSENBAUM, J., Dissenting                  21-12729

It does so because state laws that meaningfully promote public health and safety receive "strong deference" from federal courts balancing a law's local benefits against the burdens that law imposes on interstate and foreign commerce. But a regulation qualifies for that kind of deference under dormant Commerce Clause analysis only if it actually "touch[es] upon safety," Maj. Op. at 34 (quoting *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 670 (1981) (plurality opinion)), and meaningfully advances the state's interest in promoting health and safety. Here, though, the only way Section 381.00316(1) "touch[es] upon safety" is to wallop it.

Indeed, Florida's law is the exact opposite of a law that meaningfully promotes health and safety: it will facilitate the spread of COVID-19 onboard cruise ships by depriving cruise lines of the ability to verify passengers' vaccination statuses, a resource Norwegian's[2] Chief Executive Officer has described as the company's most valuable tool for preventing the spread of COVID-19 onboard. The Majority Opinion doesn't let that pesky little fact stop it from treating Florida's law like it promotes health and safety, though, so the law can benefit from (undeserved) "strong deference."

---

[2] I use "Norwegian" to refer collectively to the plaintiffs-appellants: Norwegian Cruise Line Holdings Ltd.; NCL (Bahamas) Ltd., d/b/a Norwegian Cruise Line; Seven Seas Cruises S. De R.L., d/b/a Regent Seven Seas Cruises; and Oceania Cruises S. De R.L., d/b/a Oceania Cruises.

21-12729            R̲OSENBAUM̲, J., Dissenting                    3

Second, contrary to Supreme Court precedent, the Majority Opinion does not assess whether (and, if so, to what extent) applying Section 381.00316(1) to the cruise industry *actually* furthers Florida's claimed interests.  As the Supreme Court has explained, a state's interest is "illusory" when the law "further[s]" the state's claimed interest only "marginally," *Kassel*, 450 U.S. at 670 (plurality opinion); *see also id.* at 691 (Rehnquist, J., dissenting).  But the Majority Opinion never determines whether applying Section 381.00316(1) to the cruise industry actually furthers Florida's claimed interests.  Instead, the Majority Opinion just evaluates Florida's claimed interests in the abstract.  And that allows it to improperly equate Florida's interest in preventing cruise lines from distinguishing between vaccinated and unvaccinated customers for health reasons with a state's interest in remedying invidious discrimination along racial, ethnic, religious, or gender lines.  By engaging in this false equivalency, the Majority Opinion artificially inflates the nature of Florida's actual interest (which is relatively weak, particularly in the context of the cruise industry) to be as robust as a state's truly strong interest in preventing invidious discrimination.

Third, the Majority Opinion affords strong weight to Florida's goal of protecting the privacy of those who wish not to disclose their COVID-19 vaccination status, even though Florida itself requires proof of vaccination against many other infectious and potentially deadly and debilitating diseases to attend school and partake in other public services.  In so doing, the Majority Opinion

ignores that such a "distinction is at variance with [Florida's] as-serted legislative purpose, and tends to undermine [Florida's] justi-fication for the burden the statute imposes on interstate com-merce." *Edgar v. MITE Corp.*, 457 U.S. 624, 644 (1982).

Each of these three errors piles false weight upon false weight upon false weight on the local-benefits side of the balance so that validation of Florida's law under the Commerce Clause is a foregone (but false) conclusion. And then, for good measure, the Majority Opinion makes its fourth major error, all but ignoring the substantial burdens Section 381.00316(1) imposes on interstate and foreign commerce by facilitating the spread of COVID-19 aboard cruise ships and worldwide—burdens that damage the supply chain and significantly affect commerce otherwise.

The Majority Opinion's insistence on effectively ending its analysis with its (incorrect) assessment of the local benefits and then declaring the law valid under the Commerce Clause—rather than weighing the actual (minimal) benefits the law bestows against the true and heavy burden the law imposes on commerce—leaves the analysis half-done (and wrongly so on the done half). And it's a lot like leaving the house wearing a misbuttoned tuxedo shirt and tails, while barefoot and pantless, and declaring yourself to be formally attired. For everyone's sake, neither should occur.

Instead of the Majority's half-dressed analysis, we must cor-rectly evaluate the local benefits—that is, we must discern the pre-cise interests that Section 381.00316(1) furthers when applied to the cruise industry. And then, as the term "balancing test" conveys,

we must balance those local benefits against the burdens the law inflicts on both interstate and foreign commerce. When we do that, it's clear that the heavy burdens the law imposes on commerce far outweigh any minimal benefits in the context of the cruise industry. So Section 381.00316(1) violates the Commerce Clause as applied to Plaintiff-Appellant Norwegian. And the district court did not abuse its discretion in preliminarily enjoining the law.

I begin my analysis in Section I where the Majority Opinion left off: by noting the heavy burdens Section 381.00316(1) imposes on interstate and foreign commerce because of its significant role in the particular context of the cruise industry in facilitating and spreading COVID-19 around the globe. With that in mind, I then examine the governing standards for reviewing a preliminary injunction and for reviewing a challenge under the dormant Commerce Clause in Sections II and III, respectively. In Section IV, I explain why Florida's statute imparts few local benefits. Section V weighs any local benefits of the law against the substantial burden it inflicts on interstate and foreign commerce and shows that Norwegian is likely to succeed on the merits.[3] And Section VI shows why Norwegian meets the remaining requirements for a preliminary injunction.

---

[3] Because Section 381.00316(1) is unconstitutional under the dormant Commerce Clause, I do not consider whether it is also unconstitutional under the First Amendment.

6                          ROSENBAUM, J., Dissenting                    21-12729

I.      **COVID-19 has exacted and continues to exact a heavy toll on commerce, which Section 381.00316(1) significantly exacerbates by facilitating the spread of COVID-19 on cruise ships and around the world.**

The damage COVID-19 has wrought did not end with the tragic deaths of more than 6-and-a-half million people worldwide, including those of the million-plus in the United States.[4]  Among other legacies of COVID-19 the world lives with, we must now deal with "long COVID," a grave and widespread condition.  More than one-fifth of the roughly 609 million people who survived COVID-19—about 121 million globally and almost 19 million in the United States alone—suffer from some form of long COVID.[5]  According to the CDC, long COVID can cause "brain fog," debilitating fatigue, heart palpitations, shortness of breath, sleep problems, diarrhea, depression, chest pain, and joint and muscle pain.[6]

---

[4] World Health Organization, *WHO Coronavirus (COVID-19) Dashboard*, https://covid19.who.int/ (last visited Oct. 5, 2022).

[5] *See* Lara Bull-Otterson et al., *Post–COVID Conditions Among Adult COVID-19 Survivors Aged 18–64 and ≥65 Years — United States, March 2020–November 2021*, Centers for Disease Control and Prevention — Morbidity and Mortality Weekly Report (May 27, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/mm7121e1.htm; *see also* World Health Organization, *WHO Coronavirus (COVID-19) Dashboard*, *supra*.

[6] *See Long COVID or Post-COVID Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects/index.html (last visited Oct. 5, 2022).

21-12729                ROSENBAUM, J., Dissenting                7

Worse still, these symptoms result from biological and chemical changes in the body.[7]

Take "brain fog," for instance.  Stanford researchers studying mouse brains found that, after a COVID-19 infection, an abnormal increase in activity of certain brain cells had contributed to higher inflammation in the brain.[8]  In fact, "[t]he genes expressed . . . after COVID-19 overlapped closely with those expressed . . . in neurological conditions such as Alzheimer's disease."[9]

That's right—Alzheimer's.  And with long COVID, it's not just mouse brains that show signs of Alzheimer's; it's human brains, too.[10]  Not only that, but "the acquired dementia that these patients get tends to be lasting and very problematic."[11]  And kids who've suffered COVID-19 have been found twice as likely to

---

[7] *See id.*

[8] *See* Erin Digitale, *Brain Fog After COVID-19 has Similarities to 'Chemo Brain,' Stanford-Led Study Finds*, Stanford Medicine — News Center (June 13, 2022),   https://med.stanford.edu/news/all-news/2022/06/brain-fog-covid-chemo-brain.html.

[9] *Id.*

[10] *Id.*

[11] Elizabeth Cooney, *Risk of 'brain fog' and other conditions persists up to two years after Covid infection*, Stat   https://www.stat-news.com/2022/08/17/risk-of-brain-fog-and-other-conditions-persists-up-to-two-years-after-covid-infection/ (quoting Dr. Wes Ely) (last visited Oct. 5, 2022).

experience seizures and three times as likely to have psychotic disorders as kids who haven't had COVID-19.[12]

Nor do long COVID's profound effects stop there. Some long-haulers have problems with multiple organ systems or even experience autoimmune conditions that increase their risks of developing diabetes, heart conditions, or neurological conditions.[13]

But vaccines can prevent many of these problems. First off, vaccinated people are "markedly" less likely to contract COVID-19 than unvaccinated people.[14] And among those who get COVID-19, vaccinated people are *twelve times less likely* to endure severe disease and require hospitalization than those who are unvaccinated.[15] Vaccinated people are also only *half as likely* to develop long COVID if they do fall ill.[16]

---

[12] *Id.*

[13] *See supra*, note 5.

[14] *See* David N. Fisman et al., *Impact of Population Mixing Between Vaccinated and Unvaccinated Subpopulations on Infectious Disease Dynamics: Implications for SARS-CoV-2 Transmission*, Canadian Medical Association Journal (Apr. 25, 2022), https://www.cmaj.ca/content/194/16/E573.

[15] *See COVID-19 Vaccines Continue to Protect Against Hospitalization and Death Among Adults*, Centers for Disease Control and Prevention (Mar. 18, 2022), https://www.cdc.gov/media/releases/2022/s0318-COVID-19-vaccines-protect.html.

[16] *See UKHSA Review Shows Vaccinated Less Likely to Have Long COVID than Unvaccinated*, GOV.UK (Feb. 15, 2022), https://www.gov.uk/government/news/ukhsa-review-shows-vaccinated-less-likely-to-have-long-covid-than-unvaccinated.

Plus, vaccines protect more than just those who receive them.  Studies show that unvaccinated people contribute dispro-portionately to the spread of COVID-19 to others—including to vaccinated individuals.[17]  In fact, the district court here found that vaccines "reduce the risk of transmission from a fully vaccinated person by 80 to 90 percent."  *Norwegian Cruise Line Holdings, Ltd.*, 553 F. Supp. 3d at 1150.  So a vaccinated person is both less likely to develop COVID-19 herself and also less likely to spread COVID-19 to others than is an unvaccinated person.

This disparity is especially significant in the context of cruises, where hundreds—if not thousands—of people congregate in close quarters for several days or weeks at a time.  As the CDC has recognized, "COVID-19 spreads easily between people in close quarters on board ships."[18]  And when passengers disembark from the cruise, they enter other countries and eventually return home to different states and countries around the world, carrying with them and further spreading any infections they contracted on the ship.

Vaccines have been an important development in combat-ting our ongoing COVID-19 problem.  Still, some may have valid

---

[17] *See* Fisman, *supra*.

[18] *See Cruise Ship Travel During COVID-19*, Centers for Disease Control and Prevention (last updated July 18, 2022), https://www.cdc.gov/corona-virus/2019-ncov/travelers/cruise-travel-during-covid19.html.

10                    ROSENBAUM, J., Dissenting                21-12729

reasons for not getting vaccinated, and judging those reasons is not what this case is about.

Instead, this case is about the destruction that COVID-19 has exacted and continues to exact on national and foreign commerce: the obvious and hefty costs to economic output. Just consider the harm the pandemic has caused to the supply chain.[19] When we view COVID-19 through this lens, it is undeniable that more cases of COVID-19 mean even more damage to commerce.

Yet Section 381.00316(1) prohibits almost all businesses, including cruise lines like Norwegian, from, before serving patrons, requiring them to show proof that they are vaccinated. In this way, the statute compounds the burdens COVID-19 inflicts on interstate and foreign commerce because unvaccinated people are significantly more likely to develop (and therefore transmit) COVID-19 than vaccinated people, especially in a cruise setting. The district court found that obtaining proof of vaccination from passengers is the most important safeguard to prevent the spread of COVID-19 through cruises.

But because of Section 381.00316(1), cruise lines can't do that. So they have no way to mitigate the spread of COVID-19 on

---

[19] *See, e.g.*, Sean Harapko, *How COVID-19 Impacted Supply Chains and What Comes Next*, EY (Feb. 18, 2021), https://www.ey.com/en_us/supply-chain/how-covid-19-impacted-supply-chains-and-what-comes-next ("The COVID-19 pandemic has posed significant challenges for supply chains globally.").

that important basis.  And because the extended time in close quarters on cruises fuels the transmission of COVID-19 by unvaccinated people, more passengers will develop COVID-19.  That increased transmission creates problems not only for Norwegian's onboard medical services—which can become overrun with COVID-19 patients, obstructing medical care for other illnesses and conditions—but also for the passengers onboard, the inhabitants of the cities and ports the ships visit, and those people whom passengers encounter on their journeys home and in their communities, all of whom are now more likely to contract COVID-19 and possibly develop long COVID.  In turn, that imposes far-reaching costs on interstate and foreign commerce for Norwegian, which suffers injuries to its goodwill and its business.  And it inflicts even greater burdens on interstate and foreign commerce generally by removing workers from the workforce, which decreases consumers' spending power and causes interstate and foreign commerce to contract.

## II.   Standard of Review

With those burdens in mind, I turn to the standards that govern our review of the district court's decision to impose a preliminary injunction.  We review a district court's order on a motion for preliminary injunction for abuse of discretion.  *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1129 (11th Cir. 2005).  When conducting our evaluation, we review a district court's conclusions of law de novo and "findings of fact underlying the grant of an

injunction for clear error," *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014).

And when, as here, constitutional rights are at stake, our deference to the district court is great:  even if "the underlying constitutional question is close," "we should uphold the injunction and remand for trial on the merits." *Ashcroft v. ACLU*, 542 U.S. 656, 664–65 (2004).  So "if the district court's analysis of the preliminary injunction factors reflects a reasonable conclusion about a close question of constitutional law," "novel and difficult constitutional questions [should be] settled at a later stage, with the benefit of further factual and legal development" *Gordon v. Holder*, 721 F.3d 638, 644–45 (D.C. Cir. 2013), *overruled on other grounds by South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2099 (2018); *see also Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 817 (9th Cir. 2013).

We consider four factors when determining the propriety of preliminary injunction relief:  (1) whether the party seeking the injunction has shown a substantial likelihood of success on the merits, (2) whether the party seeking the injunction will suffer irreparable harm without the injunction, (3) whether the balance of the equities favors an injunction, and (4) whether an injunction serves the public interest.  *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020).  "The third and fourth factors 'merge' when, as here, the government is the opposing party." *Id.* at 1271 (11th Cir. 2020) (cleaned up).  Likelihood of success on the merits "is 'generally the most important' of the four factors." *Id.* at 1271

n.12 (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005)).

## III.   The Dormant Commerce Clause

This deferential standard of review governs our consideration of the district court's conclusion that Section 381.00316(1), as applied to the cruise industry, violates the Commerce Clause. The Commerce Clause empowers Congress "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

Besides conferring that power on Congress, the Clause also invalidates state laws that "impos[e] substantial burdens" on interstate and foreign commerce. *Dennis v. Higgins*, 498 U.S. 439, 448 (1991) (citation and quotation marks omitted).[20] We sometimes refer to this "implicit restraint" of the Commerce Clause as the "dormant" Commerce Clause. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338, 343

---

[20] This "dormant" aspect of the Commerce Clause also prohibits state action that discriminates against interstate commerce. *See, e.g.*, *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1243 (11th Cir. 2012). So we generally use a "two-tiered analysis" to evaluate state action challenged under the dormant Commerce Clause. *Id.* Here, though, I agree with the Majority that Section 381.00316(1) survives scrutiny under the first tier of that analysis—the statute does not discriminate against out-of-state commerce. *See* Maj. Op. at 29. For that reason, I limit my discussion to the second tier, which focuses on whether Section 381.00316(1) unduly burdens interstate commerce. *See Fla. Transp. Servs.*, 703 F.3d at 1244.

(2007).  The so-called dormant Commerce Clause invalidates state legislation that "unduly burdens" interstate and foreign commerce. *Fla Transp. Servs., Inc.*, 703 F.3d at 1245.

Whether a law unduly burdens commerce turns on the balancing test that *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), sets forth.  Under that test, a state law violates the dormant Commerce Clause when "the burden imposed on" foreign and interstate "commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142.

To state the obvious, the *Pike* balancing test is a balancing test.  So it's worth emphasizing that, in evaluating whether Section 381.00316(1) survives that test, we must *balance* the burden that the law imposes on interstate and foreign commerce against the local benefits the law yields to further the State's asserted interests. Even if the state had a rational basis for believing its legislation would accomplish a stated purpose, that is not enough, contrary to the Majority Opinion's suggestion, *see* Maj. Op. at 36, to uphold the law under the Commerce Clause.[21]  Rather, even if the state had a rational basis, we still must weigh the law's local benefits against the burden it imposes on commerce.  Again, *Pike* imposes a *balancing* test.

---

[21] As I explain later, *see infra* at 53–58, the Majority Opinion's suggestion that the second tier of the *Pike* test requires only rational-basis review on the local-benefits side of the test is incorrect.  *See* Maj. Op. at 37–38 (suggesting as much).

I begin with what we must balance on the state-interest side (local benefits) of the scale.  On this side of the balance, *Pike* and its progeny require two inquiries.  First, we must identify the true legislative purpose of the law, and second, we must determine whether and how much the law actually furthers the true purpose.

Starting with the first inquiry, we can often just accept a state's asserted purpose at face value.  But we can't do that when the legislative scheme and history show that the state's asserted purpose "could not have been a goal of the legislation." *Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648, n.16 (1975)); *see also Locke v. Shore*, 634 F.3d 1185, 1194 (11th Cir. 2011) (accepting a state's asserted safety interest when "the legislative history confirm[ed] that the legislature highlighted safety concerns").

*Pike* shows how this inquiry works.  There, Arizona enforced one of its laws in a way that prohibited a farming company from transporting uncrated cantaloupes from its Arizona ranch to its packing and processing facility in California.  *Pike*, 397 U.S. at 138.  That law's "core" provision required that fruits shipped from Arizona "be packed" so that the visible fruits did "not 'materially misrepresent' the quality of the lot as a whole." *Id.* at 142–43.  The "impetus" for that requirement was Arizona's "fear that some growers were shipping inferior or deceptively packaged produce," which caused "the reputation of Arizona growers" to suffer. *Id.* at 143.  Arizona "stipulated that [the law's] primary purpose [was] to promote and preserve the reputation of Arizona growers"—which,

in the abstract, the Supreme Court observed, were "surely legiti-mate state interest[s]." *Id.*

But as instructive here, the Court did not just accept Ari-zona's *asserted* interest and balance it against the burdens the law imposed on commerce. Rather, the Court observed that "applica-tion of the Act" to the farming-company plaintiff had "a far differ-ent impact, and quite a different purpose." *Id.* at 144. That farm-ing company grew cantaloupes "of exceptionally high quality." *Id.* So applying the law to this company—and thus preventing the company from packing its fruit outside Arizona—did not serve "the purpose of keeping the reputation of [Arizona] growers unsullied," *id.* Instead, this application "served to enhance" the "reputation" of Arizona growers by informing consumers that the company's "high quality" cantaloupes were "grown in Arizona." *Id.* And the Court held that, though the law's claimed purpose encompassed "legitimate state interests[,]" *id.* at 143, "the State's interest [as ap-plied in that particular case was] minimal at best," *id.* at 145–46. In fact, that "tenuous interest" failed to justify even the "incidental consequence" the law imposed on the farming-company plaintiff. *Id.*

Among other things, *Pike* teaches us we don't just blindly accept the state's asserted interest. Rather, we must discern the state's interest by actually looking at the law as applied to the liti-gant challenging the state's law. Only then can we see what inter-ests the state's law serves in the particular context where it is being challenged.

Once we discern the state's interest as applied to the litigant challenging the state's law, we move to the second step of the "local benefits" analysis.  At this point, "the question becomes one of degree."  *Id.* at 142.  So we focus on how well the state's law furthers its purpose.  In many cases, state laws "designed for" a "salutary purpose" still fail under the *Pike* test because those laws "further the purpose so marginally."  *Kassel*, 450 U.S. at 670 (plurality opinion); *see also id.* at 691 (Rehnquist, J., dissenting) (explaining that a State's "asserted safety justification, although rational," will often fail under *Pike* when the law yields "safety benefits" that "are demonstrably trivial").

And the Supreme Court has repeatedly invalidated state laws under the dormant Commerce Clause when those laws further their purpose only marginally.  In *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429 (1978), for example, the Court invalidated a Minnesota highway safety law because the challengers "produced a massive array of evidence to disprove the state's assertion that the regulations ma[de] some contribution to highway safety."  *Id.* at 445.

The Court again invalidated a law that furthered its purpose only marginally in *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959).  There, the Court invalidated an Illinois highway safety law because the plaintiffs "conclusively show[ed]" that the law had no safety "advantages," and "testimony" revealed that the measure "create[d] hazards previously unknown to those using the highways."  *Id.* at 525.  *See also S. Pac. Co. v. Ariz. ex rel. Sullivan*, 325

U.S. 761, 779 (1945) (invalidating Arizona safety measure that increased hazards and afforded "at most slight and dubious" safety benefits); *Fla. Transp. Servs., Inc.*, 703 F.3d at 1261 (invalidating County permitting practices that "did not further, but if anything disserved, the County's purported purposes and benefits"). As these cases illustrate, a state's interest is "illusory"—and accorded only slight weight—when the record shows that the law furthers its purpose only marginally. *See Kassel*, 450 U.S. at 671 (plurality opinion); *id.* at 692 (Rehnquist, J., dissenting).

In sum, the state-interest side of the scale demands two inquiries. First, we discern the state's true interest or purpose as the law is applied. And second, we analyze how well the law furthers those interests. We describe the product of these inquiries, taken together, as the "local benefits" that flow from the state's law.

Next, we balance those local benefits against the burdens the law imposes on interstate and foreign commerce. In so doing, we must remember that "the critical consideration is the overall effect of the statute on both local and interstate activity." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). In this sense, striking a balance under *Pike* requires "a sensitive, case-by-case analysis of purposes and effects," *South Dakota v. Wayfair, Inc.*, 139 S. Ct. 2080, 2094 (2018) (quoting *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994)).

Take *Clover Leaf Creamery*, for example—the case on which the Majority Opinion effectively rests its analysis. In that case, the Court reviewed a Minnesota law, which prohibited

retailers from selling milk bottled in single-use plastic bottles, under both the Equal Protection and Commerce Clauses. 449 U.S. at 458. The parties agreed that the State's asserted interests of conserving resources and easing waste-disposal problems "[we]re legitimate state purposes." *Id.* at 462. In its equal-protection analysis, the Court applied rational-basis review and sustained the law because the State's ban on single-use plastic milk containers bore "a rational relation to the State's objectives." *Id.* at 470.

Then the Court turned to the dormant Commerce Clause analysis. That analysis, unlike the Equal Protection Clause analysis, required a balancing of the local benefits against the burdens the law imposed on interstate commerce. The Court determined that the "burden imposed on interstate commerce by the statute [was] relatively minor." *Id.* at 472. Emphasizing just how minimal that burden was, the Court noted that the law required only that milk producers package their products in something other than single-use plastics—say, cardboard, or glass, or recyclables. And "most dairies package[d] their products in more than one type of container," anyway. *Id.* So that burden, the Court explained, was "not 'clearly excessive' in light of the substantial state interest in promoting conservation of energy and other natural resources and easing solid waste disposal problems." *Id.* at 473.

Under those circumstances, it made no difference that the law bore only a rational relation to the state's legitimate interest. And that, of course, makes sense: when a law imposes only a minor burden on commerce, that law "cannot" inflict "a burden on

interstate commerce that is 'clearly excessive in relation to the pu-tative local benefits' under *Pike*." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1155 (9th Cir. 2012). And "we need not examine the actual putative benefits of the challenged statute[]." *Id.* By logical extension, then, a law that imposes only a minor burden on commerce will necessarily survive review un-der the Commerce Clause if it also survives rational-basis review under the Equal Protection Clause (as was the case in *Clover Leaf Creamery*).

But that calculus changes when the law inflicts real burdens on commerce. *See Pike*, 397 U.S. at 140 (invalidating Arizona's law because it imposed an excessive burden on interstate commerce by requiring a farmer to "build packing facilities" at a "cost" of "ap-proximately $200,000"). In that case, we must carefully consider the local benefits that the state law returns and weigh them against its burdens. *See Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 52 (2d Cir. 2007) (explaining the need to "remand[] for fur-ther discovery or trial where a party has offered a credible expert affidavit alleging a burden on interstate commerce and challenging the proposed benefits of the law."). Greater burdens on commerce require greater local benefits. *Pike*, 397 U.S. at 142.

And when the state's law also burdens foreign commerce, even a relatively minor burden can invalidate the law. Under those circumstances, we must apply the "well-accepted rule that state re-strictions burdening foreign commerce are subjected to a more rig-orous and searching scrutiny." *S.-Cent. Timber Dev., Inc. v.*

*Wunnicke*, 467 U.S. 82, 101 (1984).  Here, as I've explained, *see supra* Section I, there's no question that Section 381.00316(1) burdens foreign commerce and relations.

Even the Majority Opinion concedes that this rule of scrutiny applies to "restraint[s] on imports and exports."  Maj. Op. at 53.  And of course, the cruise industry exports tourism when it annually takes millions of passengers from the United States to ports and cities around the world.[22]  Section 381.00316(1) restrains that export by requiring cruise ships to carry unvaccinated passengers.  As I've mentioned, that restraint is incredibly burdensome:  cruises must, for example, allocate additional resources to their onboard medical facilities because those facilities are more likely to become inundated with COVID-19 outbreaks.

Plus, local populations in foreign countries—many of whom "lack access to healthcare and other resources" needed to combat COVID-19, Del Rio Aff. ¶ 19—must endure heightened COVID-19 transmission rates because cruise ship from Florida must carry

---

[22] *See* Statista, *Cruise industry in the United States—statistics & facts* (July 18, 2022), https://www.statista.com/statistics/1251080/number-of-cruise-passengers-from-north-america/ (noting that more than 15 million cruise passengers left from ports in North America in 2019).  Indeed, PortMiami is the Cruise Capital of the world.  *See PortMiami*, Florida Ports Council, https://flaports.org/ports/portmiami/.  "Port Canaveral is perhaps best known as the second busiest cruise port in the world," *see Port Canaveral*, Florida Ports Council, https://flaports.org/ports/port-canaveral/.  And Port Everglades is the third busiest cruise port in the world.  *Port Everglades*, Florida Ports Council, https://flaports.org/ports/port-everglades/.

unvaccinated passengers to those locations.  Then, after their cruises, when passengers from around the world return home, those who've contracted COVID-19 spread it to others on their journeys home and in their communities.  And as I've explained, COVID-19 and long COVID inflict a huge toll not just on the cruise lines in these ways but also on commerce around the world—by removing workers from the supply chain and consumers from the market.  For these reasons, we must subject Florida's law "to a more rigorous and searching scrutiny." *Wunnicke*, 467 U.S. at 101.

When we do that, as I explain in Sections IV and V, we must conclude that Section 381.00316(1) cannot survive dormant Commerce Clause scrutiny under the *Pike* balancing test.

## IV.   The local benefits Section 381.00316(1) delivers are minimal at best in the context of the cruise industry.

In defense of its law, Florida asserts as the law's purposes (1) "preventing discrimination" against and (2) "promoting privacy" for those who wish not to disclose their COVID-19 vaccine documents.  Fla.'s Initial Br. at 29.  On that basis, both Florida and the Majority Opinion describe Section 381.00316(1) as a regulation of "health and safety."  Fla.'s Initial Br. at 40; Maj. Op. at 53.  From there, the Majority Opinion concludes that we owe "strong deference to the Florida Legislature" because Florida "*could rationally have decided*" that its law yields the putative benefits that the state proffers.  *See* Maj. Op. at 36 (quoting *Clover Leaf Creamery*, 449 U.S. at 461–70); *see also id.* at 42.

That approach is backwards.  As I explain in Subsection A, we grant state laws "strong deference" only when they actually promote health and safety.  Section 381.00316(1) does no such thing.  So the "strong deference" we reserve for health-and-safety regulations does not attach to Section 381.03316(1).  And while Florida's asserted interests in preventing discrimination and protecting privacy are legitimate state interests in theory, they are both illusory on this record as applied to the cruise industry, which I explain in Subsections B and C, respectively.

A.  *Although Florida describes Section 381.00316(1) as an exercise of police power to safeguard the public health and safety, it is not a law that furthers genuine health and safety interests, as the law yields no safety benefits, but meaningfully increases hazards as it applies to the cruise industry.*

The Majority Opinion first goes awry by extolling Florida's law as a regulation of health and safety, a status it then uses to cloak the law with the "strong deference" that we ordinarily reserve for laws that actually promote public health and safety.  Yet even the Majority Opinion knows it can't reasonably characterize Section 381.00316(1)—which facilitates the spread of COVID-19—as a regulation that furthers health and safety.  *See* Maj. Op. at 34–35 (implicitly conceding that Section 381.00316(1) does not further "physical health and safety").  So after granting Section 381.00316(1) "strong deference" as if that law furthers a genuine interest in promoting health and safety, the Majority Opinion then promptly disowns any safety-and-health purpose attributable to Florida's law.

Instead, it explains, Florida's law need not actually "promote residents' physical health and safety" to be an exercise of the police power to safeguard public health and safety. *Id.* at 34. The illogic of this "logic" speaks for itself.

Apparently sensing this, the Majority Opinion makes another move: it argues that Florida's law promotes "residents' *economic* health and safety," so it is entitled to the "strong deference" generally reserved for regulations that genuinely protect health and safety. *Id.* at 35. But that's just wrong. And it enables the Majority Opinion to impermissibly hide the ball.

Florida certainly has a legitimate interest in promoting its residents' economic well-being. But that interest, by itself, does not necessarily warrant "strong deference" for the purpose of the dormant Commerce Clause analysis like a state's interest in promoting its residents' health and safety does. Rather, the Majority Opinion's sleight-of-hand improperly cloaks Florida's interest in furthering Floridians' economic well-being with the deference meant for a state's interest in promoting its residents' physical health and safety. And that illegitimate move proves outcome-determinative for the Majority Opinion's analysis.

To be sure, the Majority Opinion later acknowledges "the evidence" that Norwegian "will suffer economically if it complies with section 381.00316(1)." Maj. Op. at 48. But it upholds Florida's law by relying on the "strong presumption of validity" that the dormant Commerce Clause reserves for laws that actually promote public health and safety. *Id.* Yet that "strong presumption of

validity" disappears once we establish that Florida's law does not further health and safety.

i.  Although regulations that meaningfully further health and safety warrant strong deference for the purpose of the dormant Commerce Clause analysis, economic-well-being regulations do not necessarily justify that same strong deference.

A law that promotes Floridians' economic well-being does not necessarily warrant the same deference that a law that meaningfully promotes Floridians' health and safety does.  As the Supreme Court has explained, a statute "directly addressed to the protection of public health," which "falls within the most traditional concept" of a state's police power, differs from a statute that a state labels "a health measure on the attenuated theory that" it promotes the "economic well-being" of its residents.  *Head v. New Mexico Bd. of Exam'rs in Optometry*, 374 U.S. 424, 428 & n.4 (1963); *see also Raymond Motor Transp.*, 434 U.S. at 448–449 (Blackman, J., concurring) (explaining that a state's economic interests receive less deference than a state's safety interest under *Pike*).[23]

In fact, this basic distinction explains the outcome in *Pike*—the fruit-shipping case.  Arizona's asserted interest in *Pike* did "not" implicate "state legislation in the field of safety where the propriety of local regulation has long been recognized."  397 U.S. at 143.

---

[23] Chief Justice Burger and Justices Brennan and Rehnquist joined Justice Blackman's concurrence.  Justice Stevens did not participate in the case.

Rather, Arizona asserted an economic well-being justification to "preserve the reputation of Arizona growers by prohibiting deceptive packaging" because some growers were hiding rotten fruit in packaging where it was not visible. *Id.* at 142–43. But the farming-company plaintiff packed high-quality produce. *Id.* So applying the law's requirement that the fruit be packaged in Arizona to that company enhanced (rather than preserved) Arizona's reputation for produce. And the Court held that this particular "interest [was] minimal at best—certainly less substantial than a State's interest in securing employment for its people." *Id.* at 146.

To summarize, then, the *Pike* Court distinguished not only between laws promoting safety and those promoting economic well-being, but also between different laws promoting economic well-being and even between the different economic well-being interests that a single law protected. In this respect, the *Pike* Court found some economic interests are more important—and therefore more worthy of deference—than others. The upshot of this is that, contrary to the Majority Opinion's suggestion, no one-size-fits-all approach exists for affording weight to a state's economic-well-being justifications.

Nor can the Majority Opinion's misleading citation clauses alter this principle. The Majority Opinion Frankensteins citations together to justify its conclusion that "strong deference" applies with equal force to laws that meaningfully further health and safety and those that further economic well-being—meaningfully or not. *See* Maj. Op. at 34. In so doing, the Majority Opinion creates its

own monster of a rule that robotically accords "strong deference" to any state interest that is conceivably related to the state's residents' well-being in any way. But that bloated view of a state's police powers is wrong.

We agree, the Majority and I, that a state has a quasi-sovereign interest—rather than a proprietary or sovereign interest—in the "well-being" of its citizens. *Id.* at 31 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982)). And a state's "quasi-sovereign" interest encompasses its citizens' economic and physical well-being. *Barez*, 458 U.S. at 609. But a state's "quasi-sovereign" interest merely invests it with "standing under the *parens patriae* doctrine." *Id.* That fact is totally separate from and unrelated to the deference we afford to different interests in a dormant Commerce Clause analysis.

In the dormant Commerce Clause context, the Supreme Court has told us to give greater deference to regulations that meaningfully further health and safety than to economic-well-being regulations—to treat, in other words, these two interests differently. As the Court has noted, there is "no field" where "deference to state regulation has been greater than that of highway safety regulation." *Raymond Motor Transp.*, 434 U.S. at 443. And in *Pike*, as I just discussed, the Court distinguished "state legislation in the field of safety" from state legislation designed to enhance the economic well-being of its residents. 397 U.S. at 143. It further distinguished among the strengths of different economic-well-being interests.

In sum, *Pike* requires "a sensitive, case-by-case analysis of purposes and effects," *Wayfair*, 139 S. Ct. at 2094 (quoting *Healy*, 512 U.S. at 201). And the Majority Opinion's one-size-fits-all approach, which accords strong deference upon a state's "incantation of a purpose to promote" its residents' well-being in any conceivable way, *Kassel*, 450 U.S. at 670, contradicts the Supreme Court's distinction between a state's interests in meaningfully promoting health and safety and in promoting different types of economic well-being. So even assuming that Section 381.00316(1) furthers Floridians' economic well-being, it does not follow that "strong deference" attaches to that law unless it meaningfully advances health and safety.

And regardless of whether we view the distinction between meaningful health-and-safety regulations, on the one hand, and economic regulations, on the other, as a feature or flaw, it is an essential element of our constitutional system. Of course, "[e]conomic welfare is always related to health, for there can be no health if men are starving." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935) (Cardozo, J.). But even so, the "chief occasion" for the Commerce Clause was to invest the *federal* government—not the several states—with power to regulate the national economy. *Id.* at 522. "This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control the economy," has a corollary: "the states are not separable economic units." *H.P Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 537–38 (1949) (Jackson, J.). And if we recede from that principle and necessarily accord

"strong deference" to states' economic-welfare justifications, *see* Maj. Op. at 34, we will "invite a speedy end of our national solidarity." *Baldwin*, 294 U.S. at 523.

To preserve that national solidarity, we must distinguish between regulations that meaningfully further health and safety, which warrant "strong deference," and economic well-being regulations, which are more likely to unduly burden interstate and foreign commerce. Florida's law is not one that meaningfully furthers health and safety (just the opposite). So it does not necessarily demand the "strong deference" that the Majority Opinion surrenders to the state.

ii. <u>Florida's law does not warrant strong deference because it does not meaningfully advance health or safety and in fact harms them.</u>

That said, both Florida and the Majority Opinion describe Section 381.00316(1) as an exercise of the state's "traditional police power" to safeguard both the "public health and safety *and* the economic well-being of its citizens," meaning that we must analyze both interests under *Pike*. Fla.'s Initial Br. at 1, 40; *see also* Maj. Op. at 35. They make this move, it seems, because the Supreme Court "has been most reluctant to invalidate" "regulations that touch upon safety," *id.* at 34 (quoting *Kassel*, 450 U.S. at 670); *see also* Fla.'s Initial Br. at 40. But Section 381.00316(1) is no safety regulation.

As I've noted, *Pike* requires that we scrutinize the legislature's actual interest—not simply accept its stated interest at face

value. *Clover Leaf Creamery Co.*, 449 U.S. at 463 n.7. And no one can seriously contend that Section 381.00316(1) furthers the public's health or safety. On the contrary, the law, which makes it impossible for cruise lines to ensure their passengers are vaccinated, endangers the health and safety of Norwegian's passengers and the community at large. After all, the district court found that vaccines "reduce the risk of transmission from a fully vaccinated person by 80 to 90 percent." *Norwegian*, 553 F. Supp. 3d at 1150. As Del Rio tells it, vaccination is the "most effective way to protect passengers, crews, and locals from the spread of COVID-19." Del Rio Aff. ¶ 27. So, he said, "verifying the vaccination status of cruise passengers" is the best safeguard against COVID-19 transmission aboard the company's cruises.[24] Del Rio Aff. ¶ 26. By removing this tool from the cruise industry, Section 381.00316(1) ensures more transmission of COVID-19 and decreases public safety.

We, of course, owe deference to the district court's factual findings. But it's not just the district court and Del Rio who think vaccination plays a critical role in stemming COVID-19 transmission. Scientific evidence verifies the important role that vaccination plays in stemming the transmission of COVID-19—especially in close quarters like cruise ships. *See supra* at pp. 8–9.

---

[24] To be sure, the district court found that "testing is an important adjunct measure." *Norwegian*, 553 F. Supp. 3d at 1174. But it concluded that testing "cannot serve as a substitute for vaccination because tests are susceptible to false positive and false negative results, even when repeated testing is done." *Id.*

21-12729           ROSENBAUM, J., Dissenting                31

Plus, here, the legislative history confirms that Florida nei-
ther consulted with medical experts nor reviewed scientific evi-
dence when it enacted Section 381.00316(1).  For example, during
floor debates, Florida Senator Danny Burgess, who introduced the
amendment that ultimately became Section 381.00316(1), *see* S.B.
2006, Amendment 330036, 2021 Leg. Sess. (Fla. 2021), resisted ref-
erence to any health- or safety-related evidence, reminding his col-
leagues at least twice that he had "no medical background."  *See*,
*e.g.*, *Senate Session*, FLA. SENATE, at 6:20:51–6:20:56 (Apr. 29, 2021),
https://www.flsenate.gov/media/VideoPlayer?Even-
tID=1_q42x9ekw-202104291000&Redirect=true.   When Senator
Doug Broxson asked,

> "I think most of us feel fairly confident that the vac-
> cine is working, so technically . . . if you go on a cruise
> ship and 95% of the people have taken the vaccine,
> the 5% that did not would be exposing the other 5%.
> Is that a fair analogy, that what we're doing is letting
> people that choose not to have a vaccine to be ex-
> posed by the other people who are choosing not to
> have a vaccine?"

*Id.* at 6:34:30–6:35:03.  Senator Burgess responded, "Again, not hav-
ing a medical background but **understanding kind of the . . . maybe
unscientific approach**, I would agree.  I think that's fair."  *Id.* at
6:35:09–6:35:19 (emphasis added).

But unfortunately, Senator Broxson got the science wrong:
unvaccinated people transmit COVID-19 to both unvaccinated *and*

*vaccinated* people.  *See* Fisman, *supra*.  And unvaccinated people infect more people, on a *pro rata* basis, than vaccinated people.  *See id.*  So Senator Broxson was mistaken:  the bill doesn't just facilitate transmission of COVID-19 from unvaccinated people to other unvaccinated people—it also facilitates transmission of COVID-19 from unvaccinated people to vaccinated people.

In this respect, this case is just like *Raymond Motor Transportation*, where the Court invalidated Wisconsin's so-called highway-safety regulation because "a massive array of evidence" disproved "the State's assertion that the regulations ma[d]e some contribution to highway safety."  434 U.S. at 444.  In an even more extreme way, the evidence here shows that Section 381.00316(1) does not safeguard the public health and safety but rather jeopardizes it.

But Section 381.00316(1)'s violation of the dormant Commerce Clause is even more obvious than that of the law at issue in *Raymond Motor Transportation*.  There, Wisconsin's asserted interest was "promot[ing] highway safety."  *Id.* at 442.  And as the Supreme Court explained, there is "no field" where "deference to state regulation has been greater than that of highway safety regulation."  *Id.* at 443.  Section 381.00316(1), though, is not a health-and-safety regulation—let alone a highway-safety regulation.  So it is entitled to less deference than the "safety regulation" in *Raymond Motor Transportation*.

Even if we assumed that same deference attached to Section 381.00316(1), though, a "massive array of evidence" still

"disprove[s] the State's assertion that the regulations make some contribution" to health and safety.  Instead, Section 381.00316(1) undermines public health and safety.  *Id.* at 444.  So Section 381.00316(1) cannot seriously be described as a "bona fide safety regulation[.]" *Kassel*, 450 U.S. at 670 (plurality opinion).  And Florida's asserted interest in "safeguarding public health and safety," Fla.'s Initial Br. at 1, is therefore "illusory," *Kassel*, 450 U.S. at 671 (plurality opinion); *see also id.* at 691 (Rehnquist, J., dissenting).

B.  *Section 381.00316(1) does not prevent discrimination.*

I next turn to Florida's first of two asserted interests in promoting the economic well-being of its citizens.  Florida first asserts an interest in "preventing discrimination for failure to provide documentation evidencing COVID-19 vaccination."  Fla.'s Initial Br. at 2–3.  But as I've noted, the first task in evaluating a state's interest under *Pike* is to discern the state's true interest.  That is key here because "discrimination" can connote several meanings.  *See, e.g.*, *Discrimination*, *Black's Law Dictionary* (11th ed. 2019); Bryan A. Garner, *Garner's Modern English Usage* 287–88 (4th ed. 2016).  And identifying the accurate use of the term here transforms the rest of the analysis.

Skipping that step, the Majority Opinion equates discrimination based on vaccination status with "invidious discrimination" that "frequently occurs along ethnic lines."  *See* Maj. Op. at 30–31 (quoting *Barez*, 458 U.S. at 609); *Barez*, 458 U.S. at 609.  From there, the Majority Opinion assumes parity between Florida's interest in remedying noninvidious discrimination based on vaccination

status and a state's interest in remedying invidious discrimination based on ethnicity. No matter the evil, the Majority announces, a state's interest in remedying "discrimination" is always "substantial" and always "weightier" than a mere "legitimate" interest. Maj. Op. at 31.

But the problem for the Majority Opinion is that, as *Black's Law Dictionary* unambiguously explains, invidious discrimination and noninvidious discrimination are two entirely different things. *See Discrimination*, *Black's Law Dictionary*, *supra*; Garner, *supra*, at 287–88. And the weight of a state's interest in remedying discrimination varies "depend[ing] on the nature" of the discrimination in need of remedying. *Pike*, 397 U.S. at 142. After all, the "question" of how much weight to accord a state's legitimate interest is necessarily "one of degree." *Id.* That makes it crucial to discern the type of discrimination that Florida's law tries to remedy before assigning weight to Florida's interest in remedying discrimination.

I start by defining "discrimination." In the dictionary sense, discrimination connotes the "intellectual faculty of noting differences and similarities." *Discrimination*, *Black's Law Dictionary*, *supra* (definition 1). That use of "'discrimination' is neutral" and not in any way considered pejorative. *Id.* But "the current political use of the term is frequently non-neutral, pejorative." *Id.*

On that score, *Black's Law Dictionary* defines "discrimination" in the pejorative sense in two ways: (1) "The effect of a law or established practice that confers privileges on a certain class or

that denies privileges to a certain class because of race, age, sex, nationality, religion, or disability"; and (2) "Differential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *Id.* (definitions 2 and 3).

 i. Florida's law does not remedy discrimination based on race, age, sex, nationality, religion, or disability.

 At times, both Florida and the Majority Opinion seemingly invoke the first of those pejorative uses of the term, suggesting that Florida's interest lies in remedying discrimination against its "minority populations" because those communities are more likely to face vaccine hesitancy. *See* Maj. Op. at 38; *see also id.* at 7, 45; Fla.'s Initial Br. at 29, 45 ("Through the statute, Florida is protecting its vulnerable minority populations . . . ."). But even though some "minority populations" have faced discrimination from certain parts of the medical community for decades, thus understandably prompting vaccine hesitancy of some in those populations, it's hard to take this description of *Florida's interest* at face value given the evidence (or more accurately, lack of it) supporting that assertion.

 That evidence, on which Florida and the Majority Opinion rely exclusively, is a single comment Representative Tom Leek made on the legislature's floor on April 28, 2021. Aside from that remark, the legislative history lacks any evidence that the state intended Section 381.00316(1) as antidiscrimination legislation to protect Florida's "minority populations." No other representative or senator made comments to that effect. Nor do any one of the

six analyses of SB 2006 (the bill that became Section 381.00316) from the Florida Senate's Committees on Rules, Appropriations, and Military and Veterans Affairs, Space, and Domestic Security say the first thing about protecting Florida's "minority populations," even though many of those analyses discuss the bill's purported intent.

And Representative Leek disavowed any such legislative intent the day before he made the statement on which Florida and the Majority Opinion rely as proof that Florida enacted Section 381.00316(1) to protect its minority populations.   During the House session on April 27, 2021, the following exchange occurred when Representative Michael Grieco asked Representative Leek about the provision that eventually became Section 381.00316(1):

Grieco:    Chair Leek, are you familiar with what is a protected class for purposes of private businesses being unable to discriminate against them?

Leek:    . . . *That's outside the scope of this bill*, but the answer is yes, I'm familiar.

Grieco:    With that familiarity, specifically as it applies to people that can't be discriminated [against] based on age, disability, gender, race, religion, are you familiar with anywhere else in state statute where we have created a new protected class that has not been addressed through constitutional law?

Leek:        *We're pretty far afield from what's in this bill.*
             But there are protected classes created by fed-
             eral law, state law, etc.  So I hope that ad-
             dresses your question.  Just understand: *that is
             not addressed in this bill.*

*House Session*, FLA. HOUSE OF REPRESENTATIVES, at 3:00:16–
3:01:17    (Apr.    27,    2021)    (emphasis    added),
https://www.flsenate.gov/media/VideoPlayer?Even-
tID=1_ggkot7ka-202104271030&Redirect=true.   In other words,
Representative Leek appeared to deny that the bill's purpose is to
protect Florida's "minority populations" from discrimination.  In
fact, Representative Leek said, "That's outside the scope of this
bill," "We're pretty far afield from what's in this bill," and "That is
not addressed in this bill."   Three times Representative Leek de-
clined to link what became Section 381.00316(1) with protecting
"minority populations."   *But see* Maj. Op. at 39–40 (selectively
quoting Representative Leek to avoid grappling with this fact).[25]

---

[25] No one disputes that Florida "may recognize new protected classes beyond
federal law."  Maj. Op. at 46.  But Representative Leek, whom the Majority
Opinion relies on exclusively to discern Florida's legislative intent, explicitly
denied doing so.  On the contrary, he explained that recognizing a new pro-
tected class beyond federal law was "not addressed in this bill," and the Major-
ity Opinion twice concedes as much.  *Id.* at 40 ("[T]he creation of a new pro-
tected class is not addressed in the bill[.]"); *id.* at 44 ("Section 381.00316(1) does
not involve a constitutionally protected class[.]").  By ignoring what Repre-
sentative Leek actually said and attributing that purpose to Florida's law, any-
way, the Majority Opinion "substitutes its own intuitions" for those of the
Florida legislature.   *Id.* at 46.   Even so, even assuming (contrary to

To reiterate, then, the contention that Florida enacted Section 381.00316(1) as civil-rights legislation to protect "minority populations" relies exclusively on Representative Leek's statement, which he made the day after disavowing any link between Florida's law and discrimination based on age, disability, gender, race, or religion.  To be sure, I do not attribute "legislative mendacity" to Representative Leek for his contradictory statement the next day.  Maj. Op. at 40.  On the contrary, I assume that Representative Leek reflected on Representative Grieco's question the prior day and then concluded and asserted in good faith the next day that the bill protects "minority populations."  There's certainly nothing wrong with that.

But Representative Leek's individual revelation doesn't make protecting "minority populations" the intent of the Florida legislature in enacting Section 381.00316(1).  Nothing else from the legislative record—neither from the multiple floor debates, Committee reports, nor any other part of the legislative history—echoes Representative Leek's statement on April 28 that the intent of the statute was to protect "minority populations."   And "[w]hat

---

Representative Leek's repeated denials) that Florida had recognized a new protected class beyond those recognized by federal law, the law creating that class would still have to comply with the Constitution and federal law.  *See, e.g.*, U.S. Const.  art. VI.  So even if Florida passed a law recognizing a new protected class for unvaccinated persons, that law would be unconstitutional if it imposed burdens on commerce that clearly exceeded its benefits.  *Pike*, 397 U.S. at 142.  The Majority Opinion "ignores" these "basic point[s]."  Maj. Op. at 46.

motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022) (citation and quotation marks omitted).  After all, one legislator's reconsidered view alone is not the *legislature's* view.

Rather than engage with this truth, the Majority Opinion faults me for "ignoring the fact that [Representative Leek] was the 'chief sponsor of the bill in the House of Representatives," Maj. Op. at 40 (quoting *Clover Leaf Creamery*, 449 U.S. at 467).  Yet even the case on which the Majority Opinion relies for that claim shows that a single legislator—even a bill's chief sponsor—does not speak for the legislature.  *See Clover Leaf Creamery*, 449 U.S. at 467 (citing statements from three senators on top of a statement from the bill's chief sponsor in the House to divine legislative purpose).  Indeed, as the Supreme Court has explained, relying "on a single statement made on the floor of the House of Representatives" to "divine" legislative purpose, even in the Commerce Clause context, "is an exercise fraught with hazards," *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341–42 (1982).  And that is especially so when, as here, the bill's sponsor so clearly comes to his revelation about the bill's purpose for the first time after the bill has left the committee.

So while a dormant Commerce Clause analysis necessarily relies in part on legislative history, this particular use of legislative history is the very evil that Justice Scalia warned against when he explained that "Judge Harold Leventhal used to describe the use of

legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends," *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring)—or more accurately in this case, for "one's [sole and fair-weather] friend[]." Justice Scalia would be disappointed.

The Majority Opinion responds to that criticism with a *non sequitur*. It's permissible, we are told, to rely on a *single legislator's* statement—which contradicted that legislator's statement from the day before—as evidence of the *legislature's* purpose (even though the legislature is composed of 160 legislators) because the Majority Opinion uses that evidence not "to determine what the statute means but to ensure that it serves a constitutional purpose." Maj. Op. at 39. That makes no sense.[26] The whole point here is to identify the intent of the *legislature*—no matter how the Majority Opinion describes our exercise.[27] And Justice Scalia's concern was

---

[26] It's also misleadingly imprecise. To be sure, in performing the *Pike* dormant Commerce Clause balancing test, we look to see whether the law has a constitutional purpose in that if the law passes the balancing test, it comports with constitutional requirements under the dormant Commerce Clause. But our inquiry under the local-benefits side of the *Pike* balancing test is not whether the state's purpose was constitutional in a generic sense. Even assuming it was, the state's purpose can still fail the *Pike* balancing test. That is so because, as I've explained, once we identify the state's actual interest as applied to the complaining plaintiff, we must weigh the benefits that flow from the nature of that interest against the burdens the law imposes on commerce.

[27] The Majority Opinion insists that *New England Power* proves that there's something meaningfully different about relying on a single legislator's remarks to ascertain the legislative purpose when evaluating the local benefits

that a single legislator's statement (even when he doesn't say the opposite the preceding day) does not reveal the entire legislature's intent.  And it's hard to imagine a more graphic illustration of the problem Justice Scalia pointed out than the Majority Opinion's efforts to identify the Florida legislature's intent based solely on one of two contradictory statements a single representative made on the floor.

At bottom, there is no evidence that the *legislature*'s intent in enacting Section 381.00316(1) was to prevent discrimination against Florida's minority populations.

ii.  <u>Nor does Florida's law remedy any other type of invidious discrimination.</u>

Nor does the second pejorative use of the term "discrimination" capture the interest that Florida asserts.  To reiterate, that definition describes the "failure to treat all persons equally ***when no reasonable distinction can be found between those favored and those not favored***."  *Discrimination*, *Black's Law Dictionary*, *supra* (definition 3) (emphasis added); *see also CSX Transp., Inc.  v.*

---

to the state under the *Pike* balancing test versus when determining what a statute means.  *See* Maj. Op. at 39.  It misses the point.  Of course, we often do not rely at all on legislative history in ascertaining statutory intent, while the *Pike* balancing test requires us to consider legislative history in identifying the local benefits to the state.  But that difference does not change the fact that—no matter the context in which it is wielded—a single legislator's uncorroborated (and self-contradictory) statement simply cannot speak for the intent of the legislature as a whole.  Not surprisingly, the Majority Opinion cites absolutely nothing for its novel premise to the contrary.

*Alabama Dep't of Revenue*, 562 U.S. 277, 287 (2011) (describing this definition as the "ordinary meaning" of discrimination). Applying this definition of "discrimination," the Supreme Court hypothesized that taxing "one group of taxpayers a 2% rate and another group a 4% rate, *if the groups are the same in all respects*, is to discriminate against the latter." *Id.* (emphasis added). And of course, remedying this type of *invidious* discrimination is a substantial state interest.

But that's not a problem here. In fact, the record lacks any evidence of businesses' use of vaccination status as a proxy for a person's disability, religion, or race. Rather, the evidence established that Norwegian sought proof of passengers' vaccination statuses only because that is the "most effective way to protect passengers, crews, and locals from the spread of COVID-19." Del Rio Aff. ¶ 27. Put simply, differential treatment because of vaccination status rests on a "reasonable distinction" between vaccinated and unvaccinated people. *Discrimination*, *Black's Law Dictionary*, *supra* (definition 3). The distinction is reasonable because unvaccinated people are substantially more likely to transmit COVID-19 than vaccinated people, especially in the context of a cruise ship. *See Norwegian*, 553 F. Supp. 3d at 1150.

Ignoring the reason behind Norwegian's distinction between vaccinated and unvaccinated passengers, the Majority Opinion appears to incorrectly suggest that Florida enacted Section 381.00316(1) to protect against invidious discrimination against unvaccinated people. Maj. Op. at 46; *see also id.* at 31. But this

betrays a misunderstanding of invidious discrimination—that is, discrimination when no reasonable distinction can be found between those favored and those not favored. *See Loving v. Virginia*, 388 U.S. 1, 10 (1967) (equating "invidious discrimination" with "arbitrary . . . discrimination"). Nor does the Majority Opinion marshal any evidence in the record to prove otherwise. The record is bereft, for example, of any evidence that Norwegian desires to act with "class-based, invidiously discriminatory animus" towards unvaccinated passengers. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272–73 (1993) (citation omitted). That's so because Norwegian's distinction between vaccinated and unvaccinated passengers is "reasonable rather than arbitrary and invidious." *McLaughlin v. Florida*, 379 U.S. 184, 191 (1964). Norwegian's distinction rests on the science of infectious-disease transmission.

Consider again why Norwegian would draw such a distinction: when hundreds of passengers, including unvaccinated passengers, congregate onboard a cruise to eat, socialize, and vacation in close quarters for several days, that translates to more COVID-19 cases than would be the case without vaccinated passengers. *See Norwegian*, 553 F. Supp. 3d at 1150–51, 1179. And that, in turn, means cruise operators must spend more to treat those who develop COVID-19 onboard. They also must cope with COVID-19 outbreaks that inundate their limited health services onboard, leaving little bandwidth to deal with other health emergencies. More cases of COVID-19 also mean that fewer passengers can enjoy their vacations, making them less likely to be return customers. And

some passengers who become ill may die or develop long COVID after disembarking, causing them to suffer from debilitating, long-term effects for years to come. Not only that, but cruise passengers who spread COVID-19 in foreign ports create additional problems for cruise lines (not to mention for those who frequent those foreign ports).

The Majority Opinion responds that I "ha[ve] it backwards" and that "[t]he State—not an Article III court—has the constitutional authority to determine what is and is not a 'reasonable distinction' between its citizens and what qualifies as discrimination worth remedying." Maj. Op. at 46. It continues, "declin[ing] [my alleged] invitation to put . . . policy decisions in the hands of unelected federal judges." *Id.* That sure sounds like a good invitation to decline. But it's not one I make. Once again, the Majority Opinion contorts my analysis, fails to apply the proper test under the dormant Commerce Clause, and then faults me for applying that test, which Supreme Court jurisprudence requires.

Of course, the state can determine "what qualifies as discrimination worth remedying." *Id.* But as *Pike* and its progeny show, that doesn't absolve us of evaluating the nature of that interest. So for example, in *Pike*, the Court disregarded Arizona's asserted interest because "application of the act" to the farming-company plaintiff there had "a far different impact, and quite a different purpose." 397 U.S. at 144. *See also Clover Leaf Creamery*, 449 U.S. at 463 n.7 (explaining the need to disregard a state's asserted interest when it "could not have been a goal of the legislation." (quoting

*Weinberger*, 420 U.S. at 648 n.16)).  Indeed, as I've explained, the *Pike* Court's evaluation of the nature of the state's interest revealed that the state's *asserted* interest—"protect[ing] and enhanc[ing] the reputation of growers within the State" by preventing fruit packers from packaging fruit in a way that misrepresented the fruit's quality—was significantly more substantial than the nature of the state's *actual* interest in applying its law to the farming-company plaintiff.  *See* 397 U.S. at 143–46.  And perhaps unlike its asserted interest, its actual interest was not enough to justify the burdens on commerce.  *Id.* at 146.

As *Pike* itself shows, evaluating the nature of the state's actual interest is critical to proper application of the *Pike* balancing test because it allows us to ensure proper weight on the local-benefits side of the balance.  And it's simply reality that Norwegian's use of vaccination status to make scientifically supported, health-based decisions is just not the same thing at all as invidious ethnic or racial discrimination.  So the use of Section 381.00316(1) to prevent Norwegian from requiring proof of vaccination to board a multi-day cruise to foreign ports is not entitled to the same weight on the local-benefits side of the analysis as a state law that prohibits invidious discrimination.

The bottom line is that Norwegian does not seek to invidiously discriminate against unvaccinated people; it seeks to distinguish between vaccinated and unvaccinated people to ensure the health and safety of its passengers.  And that non-pejorative "discrimination" is noninvidious.  It is therefore a far cry from the

discrimination that occurs when a doctor refuses or delays "treatment [merely] because a patient (or a parent of a patient) owns firearms." *Wollschlaeger v. Florida*, 848 F.3d 1293, 1314, 1317 (11th Cir. 2017) (en banc)—a false equivalence the Majority Opinion suggests. *See* Maj. Op. at 31–32.  Nor does distinguishing between vaccinated and unvaccinated people for health and safety purposes even vaguely resemble the "evils" of the "invidious discrimination" that "frequently occurs along ethnic lines." *Barez*, 458 U.S. at 609. And we must reject the Majority Opinion's unfortunate efforts to equate them. *See* Maj. Op. at 32 (treating a state's interest in remedying both these forms of discrimination as equal); *id.* at 43 (defending this false equivalence).

iii.  <u>Even assuming that Florida's law remedies non-pejorative discrimination, that interest is trivial at best.</u>

That brings us back to the first, non-pejorative definition of discrimination:  at best, Section 381.00316(1) remedies the "intellectual faculty of noting differences and similarities," *Discrimination*, Black's Law Dictionary, *supra* (definition 1), by preventing businesses from denying services to unvaccinated people, *see* Maj. Op. at 38 (reciting Representative Mike Beltran's statement that "we have people discriminating against you if you're not vaccinated," (quoting *House Session*, FLA. HOUSE OF REPRESENTATIVES, at 2:24:20–2:25:00 (Apr. 28, 2021), https://www.flsenate.gov/media/VideoPlayer?EventID=1_rch640e3-202104281030&Redirect=true).

And because we must evaluate the nature of the interest the state claims, it's important to identify that interest precisely. *See Pike*, 397 U.S. at 145–146 (evaluating the state's interest as the law applied to the company that sued in that case). Although Section 381.00316(1) seems on its face like it protects *both* vaccinated and unvaccinated people from discrimination for failure to produce documentation of vaccination, that's not so. In practice, the statute protects only unvaccinated people against discrimination. Only unvaccinated people cannot produce documentation that they are vaccinated. And in any case, the statute punishes businesses only for requiring customers to provide "documentation certifying COVID-19 vaccination or postinfection recovery"—not for requiring proof that customers are unvaccinated. Fla. Stat. § 381.00316(1).

In fact, the Florida Legislature even voted against an amendment that would have protected vaccinated people from discrimination. During the debate on the bill that became Section 381.00316(1), Senator Jason Pizzo voiced concerns about this kind of discrimination. He pointed to a Miami school, for example, that warned students and teachers not to get vaccinated because "they could be contracting something . . . called shedding, which is disrupting and interrupting women's menstrual cycles, their reproductive systems." *Senate Session*, FLA. SENATE, at 6:04:22–6:06:30 (Apr. 29, 2021). "That's a teacher telling a student to stay away from their parents if they've been vaccinated[,]" he said. *Id.* "Did you honestly think that there was gonna be a—I didn't—a business

that would say, 'You cannot work here anymore, Teachers'; telling your teachers that if you choose to get vaccinated, you are not allowed to work here anymore?" *Id.*

Nor was Senator Pizzo alone in voicing these concerns. Representative Grieco also remarked that the same Miami school, which received public funds, had adopted a policy preventing its teachers from being vaccinated and prohibiting vaccinated people from interacting with students. *House Session*, FLA. HOUSE OF REPRESENTATIVES, at 3:02:50–3:03:19 (Apr. 27, 2021). Yet the state chose not to realize an interest in preventing this type of discrimination. And when Senator Pizzo proposed an amendment to address this issue,[28] the Senate voted it down.

In any case, I assume that Florida's interest in protecting only unvaccinated people from "the intellectual faculty of noting differences and similarities" is a legitimate state interest. *Discrimination*, *Black's Law Dictionary*, *supra* (definition 1). But of course, the nature of that evil contrasts sharply with the "evils" of the "invidious discrimination" that "frequently occurs along ethnic lines." *Barez*, 458 U.S. at 609. Yet the Majority Opinion treats a state's interest in remedying both evils as one and the same. *See* Maj. Op. at 30–31. That's obviously a false equivalence. And discarding it

---

[28] The proposed amendment provided, "A business, a governmental entity, or an educational institution may not reject, restrict, obstruct, interfere, prevent, or deny a person access to, entry upon, or services from a business, a governmental entity, or an educational institution because the person is vaccinated against COVID-19."

reveals that Florida's interest is not "a substantial interest [that is] weightier than a 'legitimate local' one." *Id.* at 31.

That's especially so when we consider that Norwegian challenges Section 381.00316(1) only as it applies to cruise ships. Apparently aware of this problem for its analysis, the Majority Opinion relies on "grocery stores, restaurants, fitness gyms, clothing stores, barber shops and hair salons, and even pharmacies," Maj. Op. at 32, to argue Florida's interest here is substantial. But those establishments are irrelevant to this case because Norwegian challenges the law only as applied to cruise ships. Unlike cruise ships, those businesses do not transit international waters with their patrons in close quarters for days or weeks at a time. And they do not drop off their patrons in foreign countries or regularly have their patrons leave for other states or countries upon completing their business.

In short, they do not present the same infectious-disease-transmission problems that cruises do. Yet even Florida has recognized that infectious-disease-transmission issues as they relate to COVID-19 are not the same in all business contexts. *See* Section 381.00316(5) (excepting "health care provider[s]" from complying with Section 381.00316(1)). For the reasons the district court found and I've explained, the cruise context is one industry where infectious-disease-transmission problems are especially significant and different than the infectious-disease-transmission problems in contexts like the Majority Opinion relies on.

The Majority Opinion's refusal to address the challenge that is actually before the Court betrays its lack of confidence that Section 381.00316(1) survives dormant Commerce Clause analysis as applied to the cruise industry.

iv. <u>Because Florida's law furthers its interest in preventing discrimination only marginally, that interest is illusory.</u>

As I have mentioned, the extent to which an interest can justify burdening interstate and foreign commerce "will of course depend on the nature of the local interest involved," *Pike*, 397 U.S. at 142. And in considering the nature of that interest, we must also remember that this is an as-applied challenge that seeks to enjoin Section 381.00316(1) only as it applies to the cruise industry.

To that end, there's no question that Florida's law furthers its interest in preventing discrimination (if at all) only marginally. And that's the death knell for Florida's law, for a state's interest is "illusory" when the law, though "designed for" a "salutary purpose," "further[s] that purpose" only "marginally," *Kassel*, 450 U.S. at 671 (1981) (plurality opinion); *see also id.* at 691 (Rehnquist, J., dissenting). That's the case here for two interrelated reasons.

To begin with, this law applies to millions of cruise passengers, and only a small subset of those passengers are Floridians. While the cruise industry serves some Floridians, it also attracts many passengers from the other forty-nine states and around the world. As I've noted, Florida boasts the three biggest cruise ports in the world, and PortMiami is among "the cruise industry's largest

and most essential international ports."[29]  Cruise passengers travel to Florida from across the globe.  Many of those passengers remain in Florida for only the time necessary to get to and board the cruise ship, before leaving Florida, often sailing to international destinations, and then, right after their cruises, returning to their homes outside the state.  So any local benefits from Section 381.00316(1)'s application to the cruise-ship industry are minimal and short-lived.

Second, those benefits, minimal as they are to begin with, vanish soon after the cruise leaves port.  Suppose a cruise ship departing from Florida does not require proof of vaccination to board the cruise.  Instead, after leaving port, the cruise ship requires proof of vaccination to enter and use the common facilities.  And those who refuse to present vaccine documents must use separately designated and inferior facilities. *See Norwegian*, 553 F. Supp. 3d at 1155 (explaining that some cruise lines have already implemented similar practices).[30]

---

[29] *See supra* at note 22.

[30] Even if a cruise line took this approach, it could not avoid close contact between vaccinated and unvaccinated people at the beginning and end of the cruise—while the cruise line was subject to Florida's law.  And the crew, who would have to serve both unvaccinated and vaccinated people onboard the same ship, would also be exposed to both unvaccinated and vaccinated people. That problem only compounds after crew members interact with unvaccinated passengers because "the crew typically live and eat in small congregate places." *Norwegian*, 553 F. Supp. 3d at 1151.  So such an approach would not protect against transmission of COVID-19 from unvaccinated people to vaccinated people in the same way that verifying vaccination status would.  For the same reasons, it would not protect people in foreign cities from COVID-

Even the Majority Opinion concedes that Florida's laws could do nothing about this. *See* Maj. Op. at 50 (accepting that cruise lines that "impose their [vaccine requirement] preferences abroad 'may continue to move freely across the Florida border'"). And the Majority Opinion is right to make that concession because a state's law is "invalid" under the Commerce Clause when "the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

As applied to the cruise industry, then, Section 381.00316(1) protects unvaccinated Floridians from the "intellectual faculty of noting differences and similarities" only at the time of boarding and disembarking. *Discrimination*, *Black's Law Dictionary*, *supra* (definition 1). After that, cruise lines are free to differentiate between vaccinated and unvaccinated persons at their leisure. So the conclusion that Florida's law furthers its purpose only "marginally" is inescapable. *Kassel*, 450 U.S. at 670–71 (plurality opinion); *see also id.* at 691 (Rehnquist, J., dissenting). And Florida's interest in preventing discrimination is thus "illusory," *id.* at 671 (plurality opinion).

---

19 transmitted by those who leave cruise ships to visit those cities. And of course, it would not prevent COVID-19 cases from overrunning the medical services onboard and obstructing medical care for other illnesses and conditions. So such a practice would not avoid the great burdens on interstate and foreign commerce that Section 381.00316(1) imposes.

To all that, the Majority Opinion's only retort is to accuse me of "artificially limit[ing] the State's interest" by focusing only on Section 381.00316(1)'s application to "luxury ocean liners." Maj. Op. at 32. But focusing on Section 381.00316(1)'s application to "luxury ocean liners" is precisely what *Pike* requires. *See Pike*, 397 U.S. at 144 (disregarding Arizona's asserted interest because "application of the act" to the farming-company plaintiff had "a far different impact, and quite a different purpose."); *see also Norwegian*, 553 F. Supp. 3d at 1180 (enjoining Florida "from enforcing Section 381.00316 against [Norwegian]" only). And adhering to *Pike* reveals that Florida's interest in preventing discrimination is, to quote the Majority, "artificial[]" because it is illusory. Maj. Op. at 32.

## C. *Section 381.00316(1) does not meaningfully promote privacy.*

Florida's final asserted justification for the statute is one in "promoting privacy" for those who wish not to disclose their COVID-19 vaccine documents. There is no doubt that protecting privacy is a legitimate state interest.

But Florida has indicated that that privacy interest is significantly less substantial in the context of requiring proof of vaccination against deadly diseases. As Senator Tina Polsky pointed out during the bill's floor debates, Section 381.00316 prohibits businesses and schools from requiring proof of vaccination for COVID-19—even though businesses and schools can require, for instance, proof of vaccination for measles, mumps, and rubella. *See Senate*

54                    ROSENBAUM, J., Dissenting                    21-12729

*Session*, FLA. SENATE., at 6:18:00–6:18:18; 6:19:53–6:20:19; 6:20:43–
6:20:49 (Apr. 29, 2021).[31]

Time and again the Supreme Court has made clear that,
when a state contradicts its asserted interest in other contexts, that
fact "tends to undermine" the state's "justification for the burdens"
its law "imposes on interstate commerce." *MITE Corp.*, 457 U.S.
at 644. In *Raymond Motor Transportation*, for example, the Court
invalidated a Wisconsin statute that generally prohibited trucks ex-
ceeding fifty-five feet in length from operating on the state's high-
ways. 434 U.S. at 432. In so doing, the Court concluded that Wis-
consin's "assertion that the challenged regulations contribute to
highway safety" was "undercut by the maze of exemptions from
the general truck-length limit that the State itself allow[ed]." *Id.* at
443, 445.

The same issue arose in *Edgar v. MITE Corp.* There, Illinois
enacted a law requiring that certain tender offers be registered with

---

[31] As with those vaccinations, COVID-19 vaccines have obtained full authori-
zation from the FDA. *See* U.S. Food and Drug Administration, *FDA Approves
First COVID-19 Vaccine* (Aug. 23, 2021), https://www.fda.gov/news-
events/press-announcements/fda-approves-first-covid-19-vaccine (announc-
ing FDA full approval for Pfizer-BioNTech COVID-19 vaccine for those 16 and
older); U.S. Food and Drug Administration, *Coronavirus (COVID-19) Update:
FDA Takes Key Action by Approving Second COVID-19 Vaccine* (Jan. 31,
2022), https://www.fda.gov/news-events/press-announcements/corona-
virus-covid-19-update-fda-takes-key-action-approving-second-covid-19-vac-
cine (announcing FDA full approval for Moderna COVID-19 vaccine for those
18 and older). So vaccines for COVID-19 stand on the same footing as FDA-
approved vaccines for other diseases.

the Secretary of State.  457 U.S. at 626–27.  Illinois's asserted purpose for this law was to provide greater protections for resident security holders than federal securities laws afforded.  *Id.* at 644.  But the law also "completely exempt[ed] from coverage a corporation's acquisition of its own shares."  *Id.*  As a result, a company could make a tender offer for its own stock without complying with the law, leaving that company's shareholders to depend on only federal securities laws.  *Id.*  Yet Illinois clearly viewed those provisions as inadequate to protect investors in other contexts.  *Id.*  "This distinction [wa]s at variance with Illinois' asserted legislative purpose," the Court said, "and it tend[ed] to undermine [the State's] justification for the burdens the statute impose[d] on interstate commerce."  *Id.*

This case is no different.  In all three circumstances, the state contradicted its asserted interest in other contexts, thus undermining the weight of the state's interest.  And that makes sense:  when the legislature treats the same alleged problem differently—here, Florida's inconsistent treatment of the alleged lack of privacy that attends a requirement to show documentation of vaccination for an infectious, highly contagious, potentially deadly and debilitating disease at business and public institutions where people must interact and share contact with one another—it suggests that the state's claimed interest in remedying that problem is not as important as if the state addressed that interest uniformly.

So here, as in *MITE Corp.* and *Raymond Motor Transportation*, Florida has undermined its asserted interest in protecting

Floridians' privacy by contradicting that interest.  Florida contra-
dicted its privacy interest because the state itself requires Floridians
to present proof of vaccination against diseases other than COVID-
19 to attend schools at the very same time that Section 381.00316(1)
prohibits cruise lines from requiring documentation of COVID-19
vaccination.  "This distinction is at variance with [Florida's] as-
serted legislative purpose, and tends to undermine [Florida's] justi-
fication for the burdens the statute imposes on interstate [and for-
eign] commerce." *MITE Corp.*, 457 U.S. at 644.

The Majority Opinion simply ignores *MITE Corp.* and *Ray-
mond Motor Transportation*.  It doesn't even mention them at all.
Instead, the Majority Opinion says it is irrelevant that Florida re-
quires disclosure of vaccination documentation for other infec-
tious, potentially deadly, or debilitating diseases to attend school
and other venues, while it espouses an interest in protecting the
privacy of COVID-19 vaccination documentation. *See* Maj. Op. at
47.  Yet while that distinction might be irrelevant when we subject
state laws to rational-basis review (under equal-protection or due-
process analysis, for example), that distinction is very relevant
when we review state laws challenged under the dormant Com-
merce Clause.

To support its contrary claim, the Majority Opinion relies
exclusively on the *Clover Leaf Creamery* Court's *equal-protection*
analysis. *See* Maj. Op. at 41 (asserting "that a legislature need not
strike at all evils at the same time or in the same way" (quoting
*Clover Leaf Creamery*, 449 U.S. at 466)).  The Majority Opinion

justifies this move, it seems, because the *Clover Leaf Creamery* Court relied on its analysis of Minnesota's asserted interests, which it had "already reviewed" during its equal-protection analysis, for the purpose of its dormant Commerce Clause analysis. 449 U.S. at 473.

But the Majority Opinion's reliance on *Clover Leaf Creamery*'s equal-protection analysis is wrong for three reasons. *First*, because the Minnesota law in *Clover Leaf Creamery* imposed only a "minor" burden on commerce, *id.* at 472, the Court didn't need to engage in further analysis of the local-benefits side of *Pike*'s balance. Indeed, when a law imposes only a minor burden on commerce, "it follows that there cannot be a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits' under *Pike.*" *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1155. But when a law imposes more than a minor burden on commerce—and especially when a law imposes a burden on foreign commerce, *see Wunnicke*, 467 U.S. at 101—we must carefully consider the local benefits that the state law produces, before weighing those benefits against the law's burdens. *See Town of Southold*, 477 F.3d at 52 (explaining the need to "remand[] for further discovery or trial where a party has offered a credible expert affidavit alleging a burden on interstate commerce and challenging the proposed benefits of the law.").

*Second*, as far as I can tell, there's not a single other Supreme Court or Eleventh Circuit case that both applies *Pike* and employs

rational-basis scrutiny on the local-benefits side of the equation.[32]
Perhaps that explains the Majority Opinion's choice to retcon
dormant Commerce Clause cases to support its mistaken applica-
tion of rational-basis review when analyzing Section 381.00316(1)'s
local benefits.  But as I am about to explain, the Majority Opinion
fails to cite a single case that actually supports its incorrect conten-
tion that courts engage in rational-basis review when analyzing the
local-benefits side of the scale under *Pike*.

The Majority Opinion first revises *Florida Transportation
Services* to support the proposition that Florida's "justifications are
not illusory if applying section 381.00316(1) 'as written' would 'ra-
tionally contribute to [Florida's] purported local benefits.'"  Maj.
Op. at 37 (quoting *Fla. Transp. Servs.*, 703 F.3d at 1260); *see also id.*
at 47.  In essence, the Majority Opinion says that a state's justifica-
tions are not illusory if the state had a rational basis for believing
that its law would "contribute to the State's purported local bene-
fits."  *Id.* at 38 (alterations adopted).  But *Florida Transportation*

---

[32] When we analyze laws the United States Congress has enacted, we ask
whether Congress could have had a rational basis for concluding that a regu-
lated activity sufficiently affected interstate commerce to assess the constitu-
tionality of the statute under the Commerce Clause.  *United States v. Lopez*,
514 U.S. 549, 556–57 (1995).  And when the Supreme Court used to evaluate
state taxes that discriminated against those out of state (the first tier of the *Pike*
analysis), it used to consider whether the state's justification had a rational ba-
sis.  *Fulton Corp. v. Faulkner*, 516 U.S. 325, 345–46 (1996).  But it no longer
does that.  *Id.*  Of course, this case involves neither of these situations, in any
case.

*Services* never said that a state's asserted justifications are not illusory if the state had a rational basis for believing that its law would contribute to the state's purported benefits.

In fact, we never mentioned the term "rational basis" in that entire opinion. Nor did we cite *Clover Leaf Creamery*. Instead, we cited *Raymond Motor Transportation*, among other cases. And we explained that Miami-Dade's "permitting practices did not further, but if anything rather disserved, the County's purported purposes and benefits." *Fla. Transp. Servs.*, 703 F.3d at 1261. So, we reasoned, "while the local benefits identified by the County [we]re legitimate, the Port Director's permitting practices d[id] not rationally contribute to these purported local benefits." *Id.* at 1260. In other words, we used "rationally" in the sense that the state's challenged practices did not *actually* further its justifications for those practices—not as code that we were engaging in rational-basis review.

In the same way, the Majority Opinion distorts *Kassel v. Consolidated Freightways* to justify applying rational-basis review to the local-benefits side of the *Pike* scale. Maj. Op. at 37 (quoting *Kassel*, 450 U.S. at 671). But *Kassel* did not, as the Majority Opinion claims, "echo[]" *Clover Leaf Creamery*. *Id.* On the contrary, *Kassel* dealt with an Iowa highway-safety law that "tend[ed] to *increase* the number of accidents," prompting the Court to find that Iowa's asserted "safety interest" was "illusory," 450 U.S. at 671, 675 (plurality opinion). That fact, coupled with Iowa's "statutory exemptions," suggested that "the deference traditionally accorded a

State's safety judgment [was] not warranted." *Id.* at 678 (citing *Raymond Motor Transp.*, 434 U.S. at 444 & n.18, 446–47). And because Iowa's law also imposed a substantial burden on interstate commerce, the Court held that it "violate[d] the Commerce Clause." *Id.* at 678–79. In short, *Kassel* dealt with a law that imposed substantial burdens on commerce. For that reason, the Court had no choice but to determine whether Iowa's law produced any benefits. And because the law did not produce any benefits, the Court held that Iowa's asserted safety justification was illusory.

Nor have we ever read, as the Majority Opinion suggests, "*Kassel* to command substantial deference" when a state's safety benefits were illusory. Maj. Op. at 37. On the contrary, *Florida Transportation Services* applied *Kassel* to hold that Miami-Dade's permitting practices failed the dormant Commerce Clause because they were, in effect, illusory, as they "did not further, but if anything rather disserved, the County's purported purposes and benefits." *Fla. Transp. Servs.*, 703 F.3d at 1261 (citing *Kassel*, 460 U.S. at 670).

And *third*, *Raymond Motor Transportation* preceded, and *MITE* followed, *Clover Leaf Creamery*. And they both teach that a state undercuts the weight of its asserted interest by contradicting that interest in other contexts. Plus, as I've mentioned, as far as I can tell, in the forty-one years since the Supreme Court issued *Clover Leaf Creamery*, no Supreme Court case has employed rational-basis review to analyze a law's local benefits under *Pike*. Nor does

any Supreme Court case abrogate or limit *Raymond Motor Transportation*'s and *MITE*'s analyses in this respect.

The clear import of these facts is that *Clover Leaf Creamery* relied on its equal-protection analysis of the state's interests for the purpose of its dormant Commerce Clause analysis of those interests because the law imposed only a "minor" burden on commerce. 449 U.S. at 473. So the Court did not need to further explore the local-benefits side of the analysis because it could make no difference to the outcome. After all, the minor burden couldn't outweigh the local benefits, in any case.

Put simply, *Clover Leaf Creamery* did not somehow silently add or substitute rational-basis review for the *Pike* balancing test or for any part of that test under dormant Commerce Clause jurisprudence. And the Majority Opinion's efforts to rewrite the *Pike* balancing test to the contrary are inconsistent with dormant Commerce Clause jurisprudence.

Because this case demands application of the *Pike* balancing test rather than rational-basis review, the question is whether Florida's law imposes a burden on commerce that clearly exceeds its local benefits. And both *MITE Corp.* and *Raymond Motor Transportation* demand the conclusion that, by requiring Floridians to present proof of vaccination against other infectious, potentially deadly or debilitating diseases to attend school, Florida has undermined any substantiality its asserted interest in protecting Floridians' privacy in this context may have otherwise had. For that

reason, Florida's asserted privacy interest warrants less weight on the local-benefits side of the *Pike* balancing scale.

## V.  The substantial burden Section 381.00316(1) imposes on domestic and foreign commerce clearly exceeds any local benefits the law bestows.

As Section IV of this dissent shows, Florida's justifications for Section 381.00316(1) are illusory.  But even if we assume Section 381.00316(1) could "rationally" further the interests Florida claims, again, a "determination that a state law is a rational safety measure does not end the Commerce Clause inquiry." *Kassell*, 450 U.S. at 691 (Rehnquist, J., dissenting); *see also id.* at 670 (plurality opinion); *Raymond Motor Transp.*, 434 U.S. at 443.  Rather, even a safety measure may be "rational" and still fail under *Pike* if it yields demonstrably trivial safety benefits while imposing a meaningful burden on commerce.  And Section 381.00316(1) goes a step beyond that—it imposes substantial burdens on commerce.

As is clear by now, the law makes the spread of COVID-19 significantly more likely—especially in the cruise setting, where, as the district court found, "a large volume of individuals in close quarters" spend an extended period together, presenting "many opportunities for person-to-person contact in crowded or indoor settings, such as group and buffet dining, entertainment events, and excursions." *Norwegian*, 553 F. Supp. 3d at 1151.  Del Rio also explained that infected passengers (whose infection may not show up on a COVID-19 test) can expose the local populations to

COVID-19 when other countries allow cruise passengers to disembark. Del Rio Aff. ¶ 19. "[M]any of these populations lack the access to healthcare and other resources," so they "may be badly damaged and they may understandably blame [Norwegian] for it." *Id.*

But Section 381.00316(1) doesn't just increase COVID-19 cases onboard and in foreign ports. It also increases COVID-19 cases around the United States and the world. "[O]nce a cruise concludes, passengers may engage in air transportation or other types of common transports to return home." *Norwegian*, 553 F. Supp. 3d at 1151. As a result, infected passengers can cause "widespread transmission and possibly 'super spreader' events" after they disembark from the cruise and reach their homes. *Id.* So Florida's law doesn't impact *just* Floridians—it has a nationwide and even worldwide impact.

And the more people who are infected with COVID-19, the greater the burden on commerce. That's because people who are confined to beds and hospitals or who are otherwise unable to work because of the lingering effects of COVID-19 and long COVID—not to mention those who die from the virus—cannot participate in commerce as they would if they were not infected. They cannot go to their jobs and schools, consume goods and services, or participate in many other commercial activities. And at the risk of stating the obvious, dead people can't participate in commerce at all. Nor can people who are on ventilators or in the intensive care unit. Plus, when there are COVID-19 surges

(especially because of ever-more-transmissible and dangerous variants), even healthy people are more reluctant to go to work, to school, or on vacation.

We need only look to the well-known effects of COVID-19 on the supply chain to understand the size of the impact large numbers of COVID-19 cases have on both interstate and foreign commerce. *See, e.g.*, Sean Harapko, *How COVID-19 Impacted Supply Chains and What Comes Next*, EY (Feb. 18, 2021), https://www.ey.com/en_us/supply-chain/how-covid-19-impacted-supply-chains-and-what-comes-next ("The COVID-19 pandemic has posed significant challenges for supply chains globally."). COVID-19, in short, dramatically impacted interstate commerce by killing and temporarily (and permanently, in many cases) disabling millions of people, keeping them out of work, school, and leisure activity and gravely affecting the economy.

By exacerbating the COVID-19 problem, Section 381.00316(1) appreciably increases these harms nationwide (and worldwide) while bestowing negligible (if any) local benefits. So the provision doesn't survive review under the dormant Commerce Clause when we balance the law's trifling benefits against the enormous costs it inflicts on interstate and foreign commerce. "[W]here, as here, the State's safety interest has been found to be illusory, and its regulations impair significantly the federal interest in efficient and safe interstate [and foreign] transportation, the state law cannot be harmonized with the Commerce Clause." *Kassel*,

450 U.S. at 671 (plurality opinion); *see also id.*. at 691 (Rehnquist, J., dissenting).

For these reasons, the district court did not abuse its discretion in finding that Norwegian established a substantial likelihood of success on its dormant Commerce Clause claim.

## VI.   The remaining preliminary injunction factors also favor the district court's entry of its preliminary injunction.

Finally, I consider the remaining preliminary-injunction factors. As with the first and most important criterion, the district court did not abuse its discretion in concluding that Norwegian established that irreparable harm and the equities and public interest favored injunction.

First, without a preliminary injunction, Norwegian will endure irreparable harm, "the sine qua non of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). As the district court noted, the undisputed record shows that, without being able to credibly verify vaccination status, Norwegian will suffer injury to its "reputation, trust, and goodwill." *Norwegian*, 553 F. Supp. 3d at 1178. Florida has presented no evidence to refute Norwegian's assertions in these regards.

On appeal, Florida suggests that Norwegian chose to stake its reputation on requiring vaccine documentation. But that suggestion conflicts with the uncontradicted proof that Norwegian's

vaccination protocols are integral to its longstanding brand, reputation, and customer base.  As Norwegian explained, it and its passengers prize safety, hygiene, and comfort.  That's why passengers choose to cruise with Norwegian.  And less than 100% vaccination virtually ensures more COVID-19 cases and all the ill effects on safety, hygiene, and comfort that come with that.  Florida also disregards that Norwegian sold at least some of its tickets for 100%-vaccinated cruises before the legislature enacted Section 381.00316(1).

Beyond these harms, Norwegian would suffer monetary losses that it couldn't recover from the state because of its sovereign immunity, thus rendering the harm suffered irreparable.  *See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) ("[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." (quoting *Kentucky v. Graham*, 473 U.S. 159, 169 (1985))).  Florida has not rebutted Norwegian's assertion that, without an injunction, it is likely to suffer significant financial losses.

Finally, putting the general public—including Norwegian's passengers and employees, the populations who greet them, and those around them when they travel home—at risk of exposure to COVID-19 poses the worst form of irreparable harm.  Florida denies neither that vaccines best protect against COVID-19, nor that vaccine documentation best confirms vaccination status.  Nor can Florida seriously deny that COVID-19 and long COVID can be

serious—and even fatal.  *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021) ("[T]he public has a strong interest in combating the spread of the COVID-19 Delta variant.").  In sum, there is no shortage of irreparable injury here.

The equities and public interest favor an injunction, too.  Because Norwegian has established likely success on its constitutional challenge under the dormant Commerce Clause, the balance of harm and the public interest weigh in its favor because "[t]he public has no interest in the enforcement of what is very likely an unconstitutional statute."  *Odebrecht*, 715 F.3d at 1290; *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).  Plus, the more people incapacitated with COVID-19 and long COVID, the worse the effect on interstate and foreign commerce.  And that is certainly not in the public interest.

As to the equities, as I have mentioned, Norwegian has shown that it is likely to suffer significant financial and reputational harms without an injunction, and it has also shown that public health will be jeopardized.

By contrast, Florida has identified no public benefit from the continued enforcement of the statute against Norwegian, other than those that I've previously explained are not sufficient even to get the statute past dormant Commerce Clause review.  To be sure, Florida asserts that it suffers an "ongoing irreparable injury" whenever it is "'enjoined by a court from effectuating [a] statute[] enacted by representatives of its people,'" invoking its "sovereign

68             ROSENBAUM, J., Dissenting             21-12729

capacity" and "traditional police powers." Fla.'s Initial Br. at 44–45 (first quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); then citing *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018)). But those interests can be used to defend virtually any state statute, no matter how patently unconstitutional or noxious. And Florida does not deny that "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).

In sum, the district court did not abuse its discretion in preliminarily enjoining the operation of Section 381.00316(1) as applied to Norwegian.

## VII.   Conclusion

For all these reasons, I would affirm the district court's order granting a preliminary injunction of Section 381.00316(1) as applied to Norwegian. Because, in my view, the Majority Opinion incorrectly reaches the opposite conclusion, I respectfully dissent.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 06, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  21-12729-BB
Case Style:  Norwegian Cruise Line Holdings Ltd, et al v. State Surgeon General
District Court Docket No:  1:21-cv-22492-KMW

Electronic Filing

All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website. Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, Costs Against Appellee(s).

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Tonya L. Richardson, BB at (404) 335-6174.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jenifer L. Tubbs
Phone #: 404-335-6131

OPIN-1A Issuance of Opinion With Costs